UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as Personal Representative
of the Estate of WADE JONES, deceased,

     Plaintiff,
v.

KENT COUNTY, KENT COUNTY
SHERIFF LAWRENCE STELMA,
CHIEF DEPUTY DAVID KOK, CAPT.
KLINT THORNE, DEPUTY JULIE
COOPER, DEPUTY DONALD PLUGGE,
DEPUTY WILLIAM JOURDEN, DEPUTY
WILLIAM GRIMMETT, SGT. McGINNIS,
SGT. BRYAN KNOTT, DEPUTY TONY
HOUSTON, DEPUTY C. BOGNER,
DEPUTY BRYAN CLARK, DEPUTIES
JOHN DOES 1 – 5, CORIZON HEALTH,
INC., a Delaware Corporation, CORIZON
HEALTH, d/b/a CORIZON OF MICHIGAN,
TERI BYRNE, R.N., "NURSE JANICE",
JOANNE SHERWOOD, N.P., MELISSA
FURNACE, R.N., DEBORAH CARD, R.N.,
CHAD RICHARD GOETTERMAN, R.N.,
JAMES AUGUST MOLLO, L.P.N.,
ANGELA NAVARRO, R.N. and LYNNE
FIELSTRA, L.P.N., jointly and severally.

     Defendants.

Case No.:
Hon.:

**COMPLAINT AND DEMAND**
**FOR JURY TRIAL**

_____/

    NOW COMES Plaintiff, CHARLES JONES, as Personal Representative of the Estate of

WADE JONES, deceased, by and through his attorneys, Mike Morse Law Firm, PLLC, and for

his Complaint against Defendants, states as follows:

1

## JURISDICTION AND VENUE

1.      That this Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331 and 1343, and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims pursuant to 28 U.S.C. § 1367.

2.      Venue lies in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b). The unlawful actions alleged in this Complaint took place within the City of Grand Rapids in Kent County, located within the Western District of Michigan.

3.      That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of, and under the authority of, each individual Defendants' employment with the State of Michigan.

4.      That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## GENERAL ALLEGATIONS

5.      Plaintiff, Charles Jones ("Plaintiff"), is the lawfully appointed Personal Representative for the Estate of Wade Jones, deceased ("Jones" hereinafter).

6.      At all times relevant, Jones, was a resident of the City of Jenison, County of Ottawa, State of Michigan, but at the time of his death, he was incarcerated and a resident of the Kent County Correctional Facility ("KCCF"), located in Grand Rapids, Kent County, Michigan, and was entitled to all the rights, privileges, and immunities accorded to all U.S. citizens and residents of Kent County and the State of Michigan.

7.  At all times relevant, Plaintiff, Charles Jones, was and is a resident of the City of Newaygo, County of Newaygo, State of Michigan.

8.  At all times relevant, Defendant, Kent County, was and is a political subdivision duly incorporated under the laws of the State of Michigan, and it is the body responsible for the control and oversight of its departments, agencies and facilities, including the operation and staffing of the Kent County Sheriff Department and the KCCF, with said operation and staffing including the organization, training, operation, and discipline of staff correctional officers and medical and mental health personnel at that facility, including the individual Defendants.

9.  At all times relevant, Defendant, Lawrence Stelma ("Stelma"), at all times relevant herein, upon information and belief, resided in the County of Kent, State of Michigan, was the duly elected Sheriff of Kent County. Stelma was a policy maker for the KCCF and represented the ultimate repository of law enforcement power in the KCCF. Stelma was responsible for the supervision and oversight of Kent County Deputy Sheriffs. As Kent County Sheriff, Stelma exercised administrative, command, fiscal and policy making authority over the Kent County Sheriff Department, and at all times herein, was acting under the color of state law.

10. As the Kent County Sheriff, Defendant, Stelma, was employed by statute to protect the lives and property of Kent County citizens by enforcing State laws and local ordinances, investigating crimes, and detaining prisoners remanded to the KCCF in a manner which maintains the highest degree of professional excellence, integrity, and courtesy. His duties also included performing law enforcement, jail and support missions in a humane manner which reflects sensitivity to the dignity and equal rights of all citizens and reinforces the values of our community. These duties further included addressing misconduct and discipline of the corrections officers and medical staff working within the KCCF.

11.     At all times relevant, Defendant, Chief Deputy, David Kok ("Kok"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as the Chief Deputy of Corrections.  Kok is a supervisor and a policy maker for the KCCF.   Kok was acting within the scope of his employment and under the color of State law and is being sued in his official capacity as a policy maker and Chief Deputy of Corrections.

12.     At all times relevant, Defendant, Captain Klint Thorne ("Thorne"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as the Deputy Overseeing Facility Operations at KCCF, and was responsible for supervising the Deputy Sheriffs and the jail medical staff, including the individual Defendants.  Thorne was acting within the scope of his employment and under the color of State law and is being sued in his official capacity as a policy maker and Deputy Overseeing Facility Operations at KCCF.

13.     At all times relevant, Defendant, Deputy Julie Cooper ("Cooper"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of her employment at the KCCF, and is being sued in her individual capacity.

14.     At all times relevant, Defendant, Deputy Donald Plugge ("Plugge"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

15.    At all times relevant, Defendant, Deputy William Jourden ("Jourden"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

16.    At all times relevant, Defendant, Deputy William Grimmett ("Grimmett"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

17.    At all times relevant, Defendant, Deputy Donald Plugge ("Plugge"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

18.    At all times relevant, Defendant, Sergeant McGinnis ("McGinnis"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Sergeant, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

19.    At all times relevant, Defendant, Sergeant Bryan Knott ("Knott"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent

County Sheriff Department as a Sergeant, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

20.     At all times relevant, Defendant, Deputy Tony Houston ("Houston"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

21.     At all times relevant, Defendant, Deputy C. Bogner ("Bogner"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

22.     At all times relevant, Defendant, Deputy Bryan Clark ("Clark"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is employed by the Kent County Sheriff Department as a Deputy Sheriff, and was acting under the color of State law and in the course and scope of his employment at the KCCF, and is being sued in his individual capacity.

23.     At all times relevant, Defendant, Deputies John Does 1-5 ("Does"), whose identities are currently unknown, upon information and belief, resided in the County of Kent, State of Michigan, and were and are employed by the Kent County Sheriff Department as Deputy Sheriffs, and were acting under the color of State law and in the course and scope of their employment at the KCCF, and are being sued in their individual capacities.

24. At all times relevant, Defendant, Corizon Health, Inc., upon information and belief, was and is a Delaware corporation with its headquarters located in Brentwood, Tennessee, doing business in Kent County, and contracted with Kent County to provide medical services to inmates at KCCF, and is the entity responsible for the control and oversight of the operation and staffing of medical personal and facilities at KCCF, including the organization, hiring, training, operation, supervision, retention and discipline of staff medical personnel at KCCF, and the medical training of Kent County correctional employees.

25. At all times relevant, Defendant, Corizon Health, d/b/a Corizon of Michigan (Corizon Health, Inc. and Corizon Health, d/b/a Corizon of Michigan, "Corizon" collectively hereinafter), upon information and belief, was and is an assumed name for Corizon Health, Inc., registered in Kent County, Michigan, contracted with Kent County to provide medical services to inmates at KCCF, and is the entity responsible for the control and oversight of the operation and staffing of medical personal and facilities at KCCF, including the organization, hiring, training, operation, supervision, retention and discipline of staff medical personnel at KCCF, and the medical training of Kent County correctional employees.

26. At all times relevant, Defendant, Teri Byrne, R.N. ("Byrne"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

27. At all times relevant, Defendant, "Nurse Janice", upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

7

28.     At all times relevant, Defendant, Joanne Sherwood, N.P. ("Sherwood"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed nurse practitioner, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

29.     At all times relevant, Defendant, Melissa Furnace, R.N. ("Furnace"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

30.     At all times relevant, Defendant, Deborah Card, R.N. ("Card"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

31.     At all times relevant, Defendant, Chad Richard Goetterman, R.N. ("Goetterman"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of his employment with Corizon at the KCCF, and is being sued in his individual capacity.

32.     At all times relevant, Defendant, James August Mollo, L.P.N., ("Mollo"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed practical nurse, employed by Corizon, and was acting under the color of State law and in the course

and scope of his employment with Corizon at the KCCF, and is being sued in his individual capacity.

33.     At all times relevant, Defendant, Angela Navarro, R.N. ("Navarro"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed registered nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

34.     At all times relevant, Defendant, Lynne Fielstra, L.P.N. ("Fielstra"), upon information and belief, resided in the County of Kent, State of Michigan, and was and is a licensed practical nurse, employed by Corizon, and was acting under the color of State law and in the course and scope of her employment with Corizon at the KCCF, and is being sued in her individual capacity.

35.     At all times relevant, each individual Defendant identified herein was an employee/agent of Kent County and/or the KCCF, engaging in the exercise of a governmental function and conduct within the course, scope and authority of his/her/their employment/agency with Kent County and/or the KCCF.

36.     The acts set forth in this Complaint arise under Section 1 of the Civil Rights Act of 1871, 17 stat. 13, 42 U.S.C. Sec. 1983 in the Eighth and Fourteenth Amendments to the United States Constitution, unless the cause of action indicates that it arises under the laws of the State of Michigan, in which case the court has supplemental or pendent jurisdiction.

37.     The amount in controversy exceeds $75,000 exclusive of interest, costs, and fees.

38.     That on December 8, 2016, Defendants, Corizon and Kent County, renewed their health services agreement, whereby Defendant, Corizon, would continue providing medical

services to inmates at the Kent County Correction Facility, including Wade Jones.[1]

39.     That in exchange for approximately $5,500,000.00 annually, Defendant, Corizon, agreed to provide health care services in accordance with applicable NCCHC [National Commission on Correctional Health Care] standards and agreed that it would be formally accredited through NCCHC, which included providing licensed health care professionals to properly perform all health care services to inmates at the KCCF. *See,* Contract, generally. (Exhibit 2)

40.     That in further exchange for approximately $5,500,000.00 annually, Defendant, Corizon, upon information and belief, at all times relevant, was the Responsible Health AUTHORITY ("RHA"), pursuant to NCCHC Standard J-A-02, and "tasked with the delivery of all healthcare in the [KCCF]" and "final clinical judgments rest with a single, designated, licensed, *responsible physician,*"  and  assumed all responsibility at KCCF to assure that quality health care was accessible to all inmates, to implement all policies and procedures necessary for the operation of the KCCF health care program, to tailor specific policies and procedures for the KCCF as required by NCCHC standards, to provide a medical detoxification program for drug and/or alcohol addicted inmates, to provide intermittent monitoring of detoxing inmates to determine their health status, including, at a minimum, documentation of vital signs and determination of levels of consciousness, to recruit, interview, hire, train and supervise all health care staff, to implement a Quality Assurance Program, and to maintain staffing levels as set forth by the Contract and consistent with the standards set by the NCCHC.

41.     That pursuant to the Contract and NCCHC Standards, Defendant, Corizon, agreed to provide training and education to its staff and Defendant, Kent County's employees, including

---

[1] Ex. 1, Correctional Health Services Agreement, 2/27/14 and Ex. 2, Third Amendment to the Correctional Health Services Renewal Agreement for Kent, County, Michigan, 12/8/16 ("Contract" hereinafter).

KCCF deputies, in accordance with NCCHC Standards, including, cardiopulmonary resuscitation, first aid, acute manifestations of chronic illness, and recognition and assessment of intoxication and withdrawal. Exhibit 2, Sec. B.2.r.i. and ii.

42. The NCCHC publishes "Standards for Health Services in Jails" and Standard J-E-02 states that it is "essential" that a "receiving screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met" and that "persons who are … severely intoxicated, exhibiting signs of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and *medical clearance* into the facility."[2]

43. Further, the NCCHC Standard J-E-02 compliance indicator explains that "[m]edical clearance is a clinical assessment of physical and mental status before an individual is admitted into the facility. The medical clearance may come from the on-site health staff or may require sending the individual to the hospital emergency room. The medical clearance is documented in writing."

44. NCCHC Standard J-F-04 states that it is "essential" that "[i]nmates who are intoxicated or undergoing withdrawal are appropriately managed and treated."

45. NCCHC Standard J-F-04 also states that it is "essential" that "[i]ndividuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved."

46. NCCHC Standard J-F-04 states that it is "essential" that "[i]nmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility."

---

[2] STANDARDS FOR HEALTH SERVICES IN JAILS, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (2018 ED).

47.     That upon information and belief, the Contract that was in effect on the dates of Jones' incarceration, revealed that Defendant, Corizon, understaffed the KCCF, namely, that a staff physician was only on site at the jail one day a week, on Wednesdays, for 6 hours a day, from January 1, 2017 through December 21, 2018, as compared to the prior contract term, where a staff physician was on site two days a week, for a total of 10 hours per week.  *See,* Exhibits 1 and 2.

48.     That upon information and belief, during Jones' incarceration, the only qualified health care professional licensed to prescribe medication, a "prescriber" pursuant to NCCHC Standards, was a nurse practitioner, who upon information further information and belief, was Defendant, Sherwood, who was only on site during the "day shift" Monday through Friday.

49.     That upon information and belief, Defendant, Sherwood, who was never on site, or saw Jones during his incarceration, gave two (2) orders for his medical care or treatment by way of telephonic communications to Defendant, Furnace.

50.     That upon information and belief, there was no medical director or physician "on site" at the KCCF on April 25, 26 or 27, 2018, and upon further information and belief, either one or both of the positions were unstaffed by Defendant, Corizon.

51.     On April 13, 2018, Jones, age 40, was detained at the Meijer store located in Walker, Michigan, by its loss prevention personnel for suspicion of stealing merchandise totaling $94.50.  The items included golf balls, a whole chicken, bread, macaroni and cheese, and four (4) 1.75-liter bottles of alcohol, commonly called "fifths."

52.     Walker Police Officer Jessica Wisinski arrived at Meijer. where Jones admitted to stealing the merchandise.

53.     Jones was issued a misdemeanor citation for retail fraud – 3rd degree (MCL 750.356d(4)) with an arraignment hearing for April 24, 2018 in the 59th District Court.[3]

54.     On April 24, 2018, Jones appeared for his arraignment before the Honorable Peter P. Versluis, in the 59th District Court, State of Michigan, and the proceeding began at 1:42 p.m.

55.     Jones pled guilty to the misdemeanor charge.

56.     Judge Versluis accepted Jones' guilty plea and ordered him to meet with the court's probation staff prior to sentencing to occur approximately one hour later.

57.     At 2:46 p.m., Deven Bonham, the court's probation officer, told Judge Versluis that Jones had a pattern of drinking, that he admitted to drinking before the hearing, at that she smelled a "strong order of intoxicants coming from his person."[4]

58.     Ms. Bonham administered two (2) portable breath tests (PBT) which resulted in the following results: .159 and .145; almost two times the legal limit in Michigan for operating a vehicle while impaired.

59.     Bonham stated that Jones was "surprised" at the results because he told her that he only had "a couple of drinks." *Id.*

60.     At all times relevant, Jones was 5'9" and 185 lbs., and upon information and belief, based upon his height and weight, likely consumed approximately 6 to 7 alcoholic drinks, prior to the hearing.[5]

61.     Judge Versluis asked Jones if he felt intoxicated, to which he replied: "No." *Id.*

62.     Judge Versluis stated: "You don't present as intoxicated, which concerns that you have a tolerance built up." *Id.*

---

[3]MCL 750.356d(4) is punishable by imprisonment for not more than 93 days in jail or a fine of not more than$500.00, or 3 times the value of the stolen property, whichever is greater, or imprisonment and fine.
[4] Exhibit 3 – Transcript from April 24, 2018 Arraignment-Plea-Sentencing, p. 7.
[5] Exhibit 4 – National Highway Traffic Safety Administration Blood Alcohol Chart.

63.     The Judge chastised Jones for stealing alcohol, showing up at court intoxicated and told him that he could "smell it", and that Jones had a "drinking problem." *Id.* at pp. 9-10.

64.     Other than a misdemeanor conviction approximately 20 years prior for operating while impaired, Jones, a graduate of Grand Valley State University, and local business owner, had no criminal record.

65.     Judge Versluis sentenced Jones to an immediate five (5) day sentence at the Kent County Correctional Facility, for third-degree retail fraud with a release date of April 28, 2018.

66.     The proceeding concluded at 3:01 p.m.

67.     Jones was transported by Walker Police Officer, Scott Malkewitz, to KCCF, and taken directly to the Central Intake Area at 4:37 p.m.

68.     That upon information and belief, on April 24, 2018, Jones notified Defendants that he was experiencing alcohol withdrawal symptoms, as discussed in more further detail herein.

69.     That upon information and belief, Jones was exhibiting signs of alcohol intoxication, and exuding the odor of alcohol.

70.     At approximately 5:20 p.m., Defendant, Byrne, the nurse assigned to Intake at KCCF, purportedly performed and completed the Medical and Mental Health Screening Examinations and Surveys for Jones, however, the documents are unsigned by Defendant, Byrne, and dated two (2) days later, on April 26, 2018.

71.     For his medical health history, the screening form noted: "no" for current or past medical illness or health condition, and "no" for HTN [hypertension] or hospitalizations within the past month.

72.     The form further noted that Wade was not under a physician's care and that Jones had normal gait, normal breathing, no tremors, no sweating, no aggressive or angry behavior, not confused and/or disoriented, no crying, and no other important observations.

73.     Defendant, Byrne, then allegedly completed a dental screening of Jones and noted teeth and gums in fair condition.  She did not indicate on the form any odor of alcohol.

74.     Jones' vital signs were taken, and his vital signs were noted as blood pressure 130/82, temperature 98.6, respirations 16, pulse ox 95%.

75.     The record further noted in the comment section: "no mental health concerns, no alerts, no chart made."

76.     The Mental Health Screening Survey, allegedly completed at the same time by Defendant, Byrne, noted the following: "Are you currently drunk or high: 'No' and 'Do you currently use alcohol: Yes -vodka occasionally.'"

77.     According to the record, Defendant, Byrne, asked no further follow-up questions regarding Jones' history of alcohol, including amount, duration of use, history of withdrawal for alcohol which standardized screening substance abuse questions are.

78.     Despite presenting to KCCF acutely intoxicated, Defendant, Byrne, did not further assess Jones for substance abuse and acute alcohol withdrawal using standard diagnostic criteria, such as the Clinical Institute Withdrawal Assessment – Alcohol Revised (CIWA-Ar).[6]

79.     No referral was made to nursing, a physician and/or to a mental health professional.

80.     Jones was not placed in an observation cell nor did Defendant, Byrne, recommend that he be placed on a medically-supervised withdrawal protocol, formerly called a detoxification protocol.

---

[6] Clinical Institute Withdrawal Assessment for Alcohol, commonly abbreviated as CIWA or CIWA-Ar (revised version), is a ten-item scale used in the assessment and management of alcohol withdrawal.

81.     Upon information and belief, Defendant, Byrne, had subjective knowledge of Jones' serious medical need, namely, Alcohol Withdrawal Syndrome (AWS), an objectively-identifiable medical condition that can quickly progress to delirium tremens and death if not promptly identified and treated.

82.     After his Medical and Mental Health Screenings, at approximately 9:00 p.m., Jones was moved onto housing unit L1 in the main jail where was placed in a single person cell, Cell #011; not an observation or medical isolation cell.

83.     On April 24, 2018, at approximately 10:18 p.m., approximately 5 ½ hours after being booked in the KCCF, Defendant, Sheriff Deputy Julie Cooper, entered the following "Medical Alert" into the record: "WD – WITHDRAWLS OR DTS." At the bottom of the record, in the Notes, "ETOH," the abbreviation for Ethanol, or drinking alcohol, was entered.

84.     The reason stated for the Medical Alert was: "INM [Inmate] REPORTS MEDICAL CONDITION."

85.     One minute later, at 10:19 p.m., Defendant, Cooper, entered an additional Medical Alert: "LOWER BUNK ONLY."  At the bottom of the record, in the Notes, "DURING WD ALC," meaning, upon information and belief, "during withdrawal from alcohol", was entered.

86.     After 10:19 p.m., on April 24, 2018, upon information and belief, these two Medical Alerts appeared prominently in Jones' KCCF and Corizon's electronic medical records system, eOMIS Electronic Medical Record Solution ("EMR" hereinafter) and, upon further information and belief, were accessible to all Defendants.

87.     Defendant, Cooper, upon information and belief, had subjective knowledge of Jones' serious medical need, based upon his self-reporting that he was withdrawing from alcohol.

88.     Defendant, Cooper, upon information and belief, did not refer Jones to the medical staff, did not call 911, and did not arrange for Jones to be transferred to an acute care facility and/or hospital.

89.     Upon information and belief, Defendants, Bogner, Clark, Grimmett, and John Does 1 – 5, were assigned to housing unit L1, and in particular, Cell #011 where Jones was incarcerated, on April 24, 2018 and April 25, 2018.

90.     While incarcerated in Cell #011, Jones, pursuant to KCCF policies and procedures, was to be regularly and frequently checked and monitored by Defendants, including Bogner, Clark, Grimmett, and John Does 1- 5, assigned to housing unit L1 during the evening of April 24, 2018, throughout the night, and into the early morning and day of April 25, 2018.

91.     Between April 24, 2018 and April 25, 2018, upon information and belief, on several occasions, Jones, while suffering from acute alcohol withdrawal syndrome (AWS), and/or delirium tremens, notified the Defendants, including Byrne, Cooper, Bogner, Clark, Grimmett, and John Does 1-5, of same, and/or was observed by Defendants suffering from the serious and objectively-identifiable medical condition by Defendants.

92.     Upon information and belief, Defendants Byrne, Cooper, Bogner, Clark, Grimmett and John Does 1 -5, had subjective knowledge of Jones' serious medical condition, i.e. alcohol withdrawals, and/or delirium tremens, based upon their observations of him, the Medical Alerts, and his communications of same, and objective knowledge of Jones' serious medical condition, i.e. alcohol withdrawals, detox and/or delirium tremens, based upon their alleged knowledge, training and experience.

93.     Upon information and belief, no referrals to nursing and/or the medical staff were made by Defendants Byrne, Cooper, Bogner, Clark, Grimmett, and John Does 1 – 5.

94.     Despite Defendants, Byrne, Cooper, Bogner, Clark, Grimmett, and John Does 1 – 5's subjective and objective knowledge of Jones' serious medical needs, Defendants made the conscious decision to deliberately ignore Jones' signs and symptoms of AWS and/or delirium tremens, which amounts to cruel and unusual punishment and a violation of his Constitutional Rights.

95.     On April 25, 2018 at approximately 1:17 p.m., approximately 21 hours after Jones had been booked at the KCCF, Defendant, Plugge, conducted Jones' Primary Classification Screening Survey ("classification survey").

96.     Upon information and belief, Defendant, Plugge, in addition to interviewing Jones, and documenting his "self-reports" of experiencing AWS and/or delirium tremens, reviewed Jones' record and noted the prominent Medical Alerts as he referenced them in his classification survey.

97.     Defendant, Plugge's, classification survey read: "GOING THRU ALC WD'S [alcohol withdrawals] HASN'T REC MEDS YET.  HAVING ISSUES WITH SLEEPING AND THROWING UP.  SOME ANXIETY USED TO TAKE MEDS.  NO S/I [suicidal ideation].  DAILY LIQUOR USE."

98.     Upon information and belief, Defendant, Plugge, did not provide Jones any medical attention.  He did not refer Jones to nursing and/or any medical personnel in an attempt to obtain medication for Jones, despite his subjective and objective knowledge of Jones' serious medical needs, i.e., AWS and/or delirium tremens as noted by Defendant, Plugge's, entry into the record.

99.     Upon information and belief, because Jones was only serving a 5-day sentence, Defendant, Plugge, deliberated, weighing the cost of calling a nurse or medical staff, sending Jones to the medical isolation unit,  and/or an off-site acute care facility or hospital, compared to the less

expensive alternative of having him "ride it out" in the main jail, and wrote: "LEAVE IN CURRENT LOCATION UNTIL WD'S IMPROVE."

100.    Defendant, Plugge, was deliberately indifferent to Jones' above-stated objective and plainly-visible, serious medical needs where he subjectively knew that Jones was an admitted daily alcohol user, actively in withdrawals, vomiting, experiencing anxiety, had not had any alcohol for at least 20 hours, and had not been administered any medications to prevent the onset of delirium tremens – a fatal condition if not promptly treated.

101.    Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1 – 5 were assigned to housing unit L1, and in particular, Cell #011 where Jones was incarcerated, on April 25, 2018 and April 26, 2018.

102.    While incarcerated in Cell #011, pursuant to KCCF policies and procedures, Jones was to be regularly and frequently checked and monitored by Defendants, including Defendants Grimmett, Jourden and John Does 1- 5, assigned to housing unit L1 on April 25, 2018, throughout the night, and into the early morning and day of April 26, 2018.

103.    Upon information and belief, on several occasions, Jones, while suffering from AWS, and/or delirium tremens, notified the Defendants of same, and/or was observed by Defendants as suffering from the serious and objectively-identifiable medical condition by Defendants.

104.    Upon information and belief, during this time period, video surveillance of housing unit L1 and Cell #011 showed Jones pacing, attempting to escape his cell, appearing to "pick his skin," falling down, pounding the walls and door of his cells with his fists, experiencing auditory

and visual hallucinations, taking off his clothes, then putting them back on, squatting, and crouching down, among other concerning behaviors.[7]

105.    Defendants, Grimmett, Jourden, and John Does 1- 5, conducted numerous bed/cell checks during April 25, 2018, throughout the night, and into the early morning and day of April 26, 2018, where Defendants looked into Jones's cell, observed Jones and, on occasion, talked to Jones.

106.    Upon and information and belief, Defendants, Grimmett, Jourden, and John Does 1-5, also had video monitors at the guard station in Unit L1, from which they could observe Jones' erratic behavior in between bed/cell checks.

107.    Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1-5, had subjective knowledge, that Jones was not eating or drinking, as it was noted in the KCCF records.

108.    Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1 -5, had subjective knowledge of Jones' serious medical condition, i.e. AWS, and/or delirium tremens, based upon the Medical Alerts in his jail record, their observations of him, and his communications of same, and objective knowledge of Jones' serious medical condition, i.e. alcohol withdrawals, and/or delirium tremens, based upon their actual knowledge, training and experience.

109.    Upon information and belief, no referrals to the nursing and/or medical personnel were made by Defendants, Grimmett, Jourden, and John Does 1 – 5.

110.    Despite Defendants, Grimmett, Jourden, and John Does 1 – 5's subjective and objective knowledge of Jones' serious medical needs, and despite having time to consider the consequences of their actions, as hours passed while Jones continued to deteriorate and needlessly

---

[7] On October 18th and 19th of 2018, Plaintiff's counsel, Jennifer G. Damico, viewed the video surveillance of Jones' incarceration, in the administrative offices of the KCCF.

suffer, Defendants deliberately ignored, and were indifferent to, Jones' signs and symptoms of AWS and/or delirium tremens.

111.    At approximately 1:00 a.m. on April 26, 2018, Defendant, Jourden, entered a note into the KCCF record: "Inmate has started to display symptoms of alcohol WD.  Hallucinations, confusion, picking and banging on door to escape.  Will continue to monitor."

112.    Upon information and belief, Defendant, Jourden, and Defendants, Grimmett and John Does 1 -5, had subjective knowledge of Jones WDS and/or delirium tremens prior to the Defendant, Jourden's, 1:00 a.m. entry note on April 26, 2018, based upon the video surveillance.

113.    Despite the Medical Alert entered 27 hours earlier, that Jones had self-reported being in alcohol withdrawal, on April 24, 2018 at 10:18 p.m., which, upon information and belief, was plainly visible to all who accessed Jones' record, including Defendants, Jourden, Grimmett, and John Does 1 -5, Defendants made the intentional and measured decision to "monitor" rather than seek medical attention for Jones, including calling for emergency transport to an acute care facility and/or hospital, while he continued to needlessly suffer and deteriorate.

114.    Upon information and belief, at approximately 4:00 a.m., on April 26, 2018, Jones was seen by Defendant, "Nurse Janice," and he was exhibiting the aforementioned obvious and serious signs and symptoms of alcohol withdrawal and/or delirium tremens.

115.    While according to the records, Jones' vital signs were noted as: temperature 97.7, pulse 124, respiration 16, blood pressure "unable to get," oxygen saturation 92, taking fluid "no," CIWA 19, Defendant, "Nurse Janice" never entered his cell and conducted her medical examination through the food slot in Jones' cell door.

116.    According to the records, at approximately 4:30 a.m., on April 26, 2018, Defendant, Nurse Furnace, entered the CIWA score of 19 (score of 10-19 is "moderate"; score above 20 is "severe."), and wrote that Jones was hallucinating in the Progress Note.

117.    Upon information and belief, at approximately 5:30 a.m., on April 26, 2018, Defendant, Furnace, completed a "Practitioner's Orders for Alcohol, Benzodiazepine or Barbiturate Medical Withdrawal" form and received "verbal orders" from Defendant, Nurse Practitioner, Sherwood, for the administration of "Diazepam (Valium) 10 mg PO q 8 hours x 2 days then."

118.    Upon information and belief, this order for Diazepam was the first, and only order, in the records for Jones, and was given approximately 32 hours after Jones self-reported to Defendants that he was going through alcohol withdrawal and/or delirium tremens, and the Medical Alerts were entered into his record.

119.    Upon information and belief, Jones was not administered Diazepam, consistent with the above order.

120.    Upon information and belief, neither Defendant, Furnace, nor any Defendant, ever contacted the "on-call physician," or any allopathic or osteopathic physician employed by Corizon, regarding the care and treatment of Jones while he was incarcerated at KCCF, because, upon information and belief, the position was not staffed, in violation of the Contract between Defendants, Corizon and Kent County.

121.    Upon information and belief, Jones was not seen by any Defendant medical personnel until seven (7) hours later at approximately 1:00 p.m. when Defendant, Fielstra, noted his CIWA score as 13 (moderate); approximately 39 hours after Jones self-reported withdrawal symptoms and the Medical Alerts were entered into his record.

22

122.     Upon information and belief, and according to the records, a "General Consent to Medical Services" was completed for Jones but Defendant, Fielstra, was unable to obtain his signature and noted: "attempted signature going through withdrawals."

123.     Jones' purported signature on the "General Consent to Medical Services" was an illegible scribble.

124.     According to the records, from approximately 12:00 a.m. on April 26, 2018, until he was transported to the emergency department at Spectrum Hospital, Jones did not eat, drink or use the toilet, and became progressively physically weak and dehydrated.

125.     On April 26, 2018, at approximately 7:00 p.m., Defendant, Fielstra, noted Jones' CIWA score as 21 (severe) and wrote: "seen for WD [withdrawal] at 19:00. WD came back from WD discuss inmates [sic] condition with present CN [charge nurse] and oncoming CN."

126.     Despite being in severe withdrawals and/or delirium tremens, Defendants, Fielstra and "Nurse Janice", according to the video surveillance, did not start Jones on IV fluids, did not transfer him to the medical isolation unit, did not note the change in his withdrawal severity symptoms in the EMR, namely the Substance Abuse Withdrawal Flow Sheet, did not notify the responsible provider, Defendant, Sherwood, and/or the responsible physician, did not call 911, and/or did not call for Jones to be transported to an acute care facility and/or hospital.

127.     Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1 – 5, were assigned to housing unit L1, and in particular, Cell #011 where Jones was incarcerated, on April 26, 2018.

128.     While incarcerated in Cell #011, upon information and belief, Jones, pursuant to KCCF policies and procedures, was to be regularly and frequently checked and monitored by

Defendants, including Defendants, Grimmett, Jourden, and John Does 1- 5, assigned to housing unit L1 on April 26, 2018.

129.   Upon information and belief, on several occasions, Jones, while suffering from AWS, and/or delirium tremens, notified Defendants, Grimmett, Jourden, and John Does 1-5, of same, and/or was observed by Defendants, as suffering from the serious and objectively-identifiable medical condition by Defendants.

130.   Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1-5, observed Jones' failure and inability to eat, drink and use the toilet, his verbal and auditory hallucinations, pacing, banging on the cell door and walls, picking his skin, taking his clothing and shoes on and off repeatedly, speaking incoherently and rapidly deteriorating.

131.   Defendants, Grimmett, Jourden, and John Does 1- 5, conducted numerous bed/cell checks on April 26, 2018, and they were seen on video surveillance looking into Jones' cell, opening his cell door, walking in, observing Jones and, talking to Jones.

132.   Upon information and belief, Defendants, Grimmett, Jourden, and John Does 1 -5, had subjective knowledge of Jones' serious medical condition, i.e. alcohol withdrawals, and/or delirium tremens, based upon their observations of him, and his communications of same, and objective knowledge of Jones' serious medical condition, i.e. AWS and/or delirium tremens, based upon the obviousness of his condition and their actual knowledge, training and experience.

133.   Despite Defendants, Grimmett, Jourden and John Does 1 – 5's, subjective and objective knowledge of Jones' serious medical needs, Defendants deliberately ignored Jones' signs and symptoms of AWS and/or delirium tremens, and allowed him to deteriorate and suffer in his jail cell, and refused to call for an emergency transfer to an acute care facility and/or hospital capable of providing life-saving medical care.

134.   On April 27, 2018 at approximately 12:25 a.m., according to the records, Defendant, Jourden, called for medical personnel because Jones sustained a laceration to his right elbow, was bleeding, and because of his rapid movements in his cell.

135.   At approximately 12:35 a.m., Defendant, Mollo, arrived at Cell #011, and observed Jones.

136.   According the video surveillance, and upon information and belief, Defendant, Mollo, did not provide any medical care or treatment to Jones.  Instead, he entered Jones' cell with a clipboard and attempted to have Jones sign a "Refusal of Clinical Services" form from objectively and visibly incoherent and delusional Jones who was in a severe medical crisis.

137.   This form was not signed by Jones due to his plainly visible mental and physical incapacity.

138.   According the video surveillance, and upon information and belief, Jones was not seen by any medical personnel until 3 ½ hours later, at approximately 4:00 a.m. on April 27, 2018.

139.   At that time, Defendant, Card, according to the video surveillance, and upon information and belief, entered Jones' cell to perform the CIWA protocol.

140.   According to the records, Defendant, Card, completed Jones' CIWA and noted his score as 20 (severe).

141.   According to the records, Jones was unable to understand directions from staff to be fully evaluated during withdrawal check.

142.   According to the records, Defendant, Card, signed the "Refusal of Clinical Services" for on April 27, 2018 at 4:00 a.m., and listed the "reason for refusal" as "OK, at this time" despite Jones' CIWA score of 20, and her subjective observations that Jones was

incapacitated and in severe withdrawal, which was plainly and objectively obvious from the video surveillance.

143.    According to the records, at approximately 5:30 a.m., on April 27, 2018, Defendant, Furnace, completed a "Nursing Encounter Tool Altered Mental Status" which identified the reason for the medical staff being called to Jones' cell as: "severe withdrawal, shaking."  The record also noted: "blood pressure as 150/90, temperature 98.9, respirations 20, pulse 92."

144.    This record further noted that Jones was very confused, hallucinating with tremors; he knew his name, but not where he was or the time frame.

145.    Upon information and belief, Defendant, Furnace, called her supervisor, Defendant, Sherwood, who was not scheduled for duty until 8:00 a.m., for orders.

146.    Upon information and belief, at no time, was Jones seen by a medical doctor during his incarceration at KCCF.

147.    Upon information and belief, at no time, did any individual Defendant contact a medical doctor to discuss Jones' medical condition, care or treatment during his incarceration at KCCF, in violation of Defendant Corizon's contract with Defendant, Kent County, and the NCCHC Standards.

148.    In the "Urgent Intervention – Contact Practitioner" section of the "Nursing Encounter Tool Altered Mental Status" record, Defendant, Furnace, wrote: "attempt to have inmate rel. (rel. date tomm)[release date tomorrow, 4/28/18] and bring to ER – spoke to Sgt. McGinnis, after 7 a.m. can try and talk to courts and/or bring to ER.  To infirmary now."

149.    Despite having subjective and objective knowledge of Jones' serious medical needs, AWS and delirium tremens, Defendants, Sherwood, Furnace, Card, Mollo, Nurse Janice, Grimmett, Jourden, and John Does 1-5, were deliberately indifferent to his serious medical needs,

and made the conscious decision to leave Jones in the KCCF where he continued to needlessly suffer, disregarding the consequences of their actions, thereby violating Jones' Constitutional right to be free from cruel and inhumane treatment.

150.    Upon information and belief, Defendant, McGinnis, made the deliberate and intentional decision to wait until he could contact the court to accelerate Jones' release date, rather than transfer him immediately to an off-site acute care facility and/or hospital, so that Defendant, Kent County, would not incur the additional expense of transporting and guarding an inmate transferred to the hospital.

151.    That Defendant, McGinnis', calculated decision to forego emergency medical attention for Jones, namely, the immediate transfer to an acute care facility and/or emergency department, where he had subjective and objective knowledge of Jones' condition, in order to save money and manpower, amounted to cruel, unusual, and inhumane suffering, and deliberate indifference to Jones' serious medical needs.

152.    At approximately 6:00 a.m. on April 27, 2018, Jones was transferred to the infirmary or the Medical Isolation Unit (H1M) where was he confined to an observation cell.

153.    According to video surveillance, Jones could not walk or stand. He was transported by wheelchair; which objectively established the seriousness of his medical condition.

154.    Once in Cell 0139, according to the records and surveillance, Jones was "incoherent." He was observed not wearing a shirt, socks or shoes.

155.    According to the video surveillance, Jones was observed from the inside of the Medical Office and through the window in his cell door, by Defendants, pacing, mumbling, picking up imaginary objects from the ground, stumbling, pretending to smoke, and taking the sheets off of his bed.

27

156.    Upon information and belief, Defendants, Goetterman and Mollo, were the charge nurses on duty for the H1M.

157.    Neither Defendants, Goetterman, Mollo, nor any Corizon employee, including Defendants, Sherwood, Furnace, Nurse Janice, Nurse Navarro or Fielstra (the "Corizon Defendants" collectively) entered Cell 0139 to provide medical care or assistance to Jones until after they discovered him unresponsive in the bathroom approximately 1 ½ hours later.

158.    Upon information and belief, none of the Corizon Defendants, including Defendants, Goetterman and Mollo, the charge nurses, started an IV of fluids or medication, or administered medication orally, namely, Diazepam, although, from the video surveillance, the medication was given to Defendants, Goetterman and Mollo, where they placed it on the ledge of the observation window between the medical office and Jones' isolation cell.

159.    Upon information and belief, none of the Corizon Defendants ever took Jones' vital signs.

160.    According to the video surveillance, the Corizon Defendants, including Defendants, Goetterman and Mollo, the charge nurses, were observed watching Jones in Cell 0139, from the Medical Office, pacing, mumbling, picking up imaginary objects off of the ground, stumbling, pushing on the "sliding" door with his full body weight, kicking the walls, crawling on his knees, grabbing and attempting to pull down the bathing privacy curtain, taking the sheets off of his bed, and falling to the ground.

161.    According to the video surveillance, and upon information and belief, Defendant, Deputy Houston, assigned to H1M, observed Jones in Cell 0139 pacing, mumbling, picking up imaginary objects off of the ground, stumbling, pushing on the "sliding" door with his full body weight, kicking the walls, crawling on his knees, grabbing and attempting to pull down the bathing

28

privacy curtain, taking the sheets off of his bed, and falling to the ground, and noted in the records that Jones was "incoherent."

162.    That from the multiple views and/or cameras from the video surveillance, during the 1 ½ hours that Jones was in H1M, upon information and belief, numerous Defendant Deputies, John Does 1-5, the Corizon Defendants, and the Correction Defendants, observed Jones in Cell 0139, exhibiting the following behaviors: pacing, panting, stumbling and falling to the ground, crawling on the floor, picking at his skin, pretending to smoke, picking imaging items off the floor, taking the sheets of his bed, pounding the walls, attempting to push open the door, and experiencing auditory and visual hallucinations; plainly objective and visible signs and symptoms of a serious medical condition – alcohol withdrawals and delirium tremens.

163.    That at no time during this 1 ½ hour period, until Jones was found unresponsive, did any Defendant, including Sgt. Knott, who upon information and belief, was the shift supervisor, and according to the records, had subjective knowledge of Jones' serious medical needs, enter Jones' cell, request medical assistance, call for emergency medical assistance, i.e., "911", provide medical assistance, check his vital signs, perform a CIWA analysis, administer medications or fluids, by IV or orally, where he was in obvious distress and in serious need of life-saving medical assistance.

164.    At approximately 7:30 a.m. on April 27, 2018, upon information and belief, Corizon employee, Ariel Nulty, observed Jones sitting on the toilet in Cell 0139 and thought he had "passed out."

165.    According to the records, Ariel Nulty told Defendant, Goetterman: "hey it looks like he is passed out over himself."

166.    According to the records, Defendant, Goetterman, did not act, check on or provide medical assistance to Jones, but rather, proceeded to discuss another inmate with Defendant, Houston, and/or John Does 1 – 5.

167.    That the Corizon Defendants, including Defendants, Goetterman and Mollo, and Defendants, Houston, McGinnis, Knott, and/or Defendant, Deputies John Does 1 – 5, made the conscious and deliberate decision to willfully ignore the serious, and obvious, medical needs of Jones.

168.    From approximately 7:35 a.m. until 7:43 a.m., from the video surveillance, Jones can be seen slumped over on the toilet.

169.    That according to the records, blood was found at the base of the toilet in the bathroom stall.

170.    During this time period, from the video surveillance, Defendants, Goetterman and Mollo, the charge nurses, who had subjective and objective knowledge of Jones' serious medical needs, are seen talking to co-workers, handling breakfast foods, and looking at jewelry with a magnifying glass; and occasionally glancing through the observation window at Jones, who was in obvious life-threatening, agonizing distress.

171.    From the video surveillance, Defendant, Houston, upon information and belief, observed Jones slumped over on the toilet, from the Medical Office window in Cell 0139, and deliberately ignored Jones, who was in serious need of life-saving medical attention.

172.    That from the records, Defendant, Houston, called his supervisor, Defendant, Knott, who inquired as to whether the medical personnel had started an IV of fluids and administered medication (Diazepam) to Jones, to which Defendant, Houston, replied they had not

because they were waiting for Defendant, Sherwood, to arrive at 8:00 a.m., to decide if they were going to start the IV or send Jones to the emergency department.

173.    That upon information and belief, at no time after Jones was transferred to H1M, did any Defendant, including Defendant, Knott, call Defendant, Sherwood, or any medical doctor regarding Jones' medical care and treatment while incarcerated at KCCF on the morning of April 27, 2018.

174.    That upon information and belief, despite knowing that Jones was "passed out" on the toilet, had not moved in over 10 minutes, was in severe alcohol withdrawals (last recorded CIWA score 20), and was exhibiting the behaviors described above, instead of starting an IV of fluids, administering Diazepam, calling "911" or transporting Jones immediately to an off-site acute care facility and/or hospital, according to the records, Defendant, Goetterman, decided that he would finally take Jones' vital signs.

175.    That upon further information and belief, despite the Medical Office connecting to Jones' cell, from the multiple views from the surveillance cameras, after the door on Jones' cell automatically slid opened, it took Defendant, Goetterman, approximately (60) seconds, to stand up from his chair in the Medical Office, while continuing his conversations with co-workers, walk out of the office, and into Jones' cell next door.

176.    According the records and video surveillance, Defendant, Goetterman, entered and found Jones unresponsive in the bathroom of Cell 0139 at approximately 7:43 a.m.

177.    Once Jones was dragged onto the cell floor, Defendant, Goetterman, began chest compressions and manual ventilation after the oxygen tank, upon information and belief, was empty and/or defective, in violation on Defendant, Corizon's, Contract with Defendant, Kent County.

178.    No IV was started and Jones was not intubated by any of the Corizon Defendants.

179.    The automated external defibrillator ("AED") was retrieved and it was noted, by Corizon employees, according to the records, that Defendant, Goetterman, was not sure where to put the cord or otherwise how to operate the AED.

180.    When the AED was attempted, "no shock was advised," the machine was on "low battery" and it powered off.

181.    According to the first responder's records, a call was placed to 911 dispatch at 7:44 a.m. on April 27, 2018.

182.    According to Life EMS records, Jones was found in a supine position, unresponsive and unconscious.  His Glasgow coma score was noted as 3, with both left and right eyes dilated and fixed. His ECG rhythm revealed sinus tachycardia with widespread st depression.

183.    According to the Life EMS records, EMT Dyer intubated Jones at 7:54 a.m., and he was transported to Spectrum Health Butterworth Campus ("Spectrum") at 8:08 a.m.

184.    The Spectrum records noted that Jones presented following a cardiac arrest and initial vital signs in the emergency room were "concerning" for oxygen saturation of 70's, no spontaneous movement and Glasgow coma score of 3.  I-stat labs were also concerning for acidosis with a pH of 7.1, lactic acid was elevated at 12.3.

185.    The Spectrum records further noted that Jones experienced acute respiratory failure secondary to his cardiac arrest and his active problems were listed as: cardiac arrest, acute respiratory failure with hypoxia, acute kidney injury, hyperkalemia, alcohol abuse, shock, elevated troponin, lactic acidosis, and metabolic acidosis.

186.    While at Spectrum, Jones underwent hypothermia protocol, was placed on a continuous EEG which showed deterioration and a CT scan of his head revealed loss of gray-white matter and progressive cerebral edema.

187.    Jones continued to remain with nonreactive pupils, no cough or gag, no corneal reflex, no DTR, no reaction to painful stimuli, and Babinski without toe movement.

188.    An EKG demonstrated sinus tachycardia.

189.    Jones was diagnosed as being in a persistent vegetative state.

190.    By May 2, 2018, there was no change in his neurologic examination.  Formal brain death testing was performed, and Jones was pronounced dead with his family at his bedside.

191.    Gift of Life was notified as Jones was on the organ donor registry.  Jones underwent testing with gift of life and was found to be an appropriate heart donor.

192.    An autopsy was performed on Jones.

193.    According to the Kent County Medical Examiner's report, Jones' "down time" was estimated to be at least 20 minutes.  CT scans of the head showed developing cerebral edema with anoxic injury.  Prior to his transport, Jones was displaying signs of severe alcohol withdrawal including but not limited to shaking and hallucinations while he was left alone in his cell.    Jones had been coughing with bloody sputum.

194.    The Kent County Medical Examiner's report further noted the final diagnosis as medical complications of chronic ethanol abuse history of ethanol abuse, alcoholic hepatitis, acute pancreatitis, history of shaking and hallucinations prior to being found unresponsive in jail cell; status post postpartum harvest of heart; and hypoxic ischemic encephalopathy.

## COUNT I

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 (CORRECTIONS DEFENDANTS)

### DEFENDANTS DEPUTY JULIE COOPER, DEPUTY DONALD PLUGGE, DEPUTY WILLIAM T. JOURDEN, DEPUTY C. GRIMMETT, SGT. McGINNIS, SGT. BRYAN KNOTT, DEPUTY TONY HOUSTON, DEPUTY C. BOGNER, DEPUTY B. CLARK, DEPUTIES JOHN DOES 1 – 5

195.   Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one ninety-four (194) as if fully set forth herein.

196.   Defendants, Cooper, Plugge, Jourden, Grimmett, McGinnis, Knott, Houston, Bogner, Clark and Deputies John Does 1 – 5 (the "Corrections Defendants" hereinafter), were acting under the color of state law, and subjected Jones to a deprivation of his rights, privileges and immunities secured by the Constitution and laws of the United States and the State of Michigan.

197.   Pursuant to 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution, the Corrections Defendants owed Jones duties to act prudently and with reasonable care, and otherwise act without imposing cruel and unusual punishment.

198.   That the acts or omissions by the Corrections Defendants, as more specifically described in the General Allegations Section above, were unreasonable and performed knowingly, wantonly, deliberately, indifferently, intentionally, maliciously, willfully, and with gross negligence, callousness, consciousness, and deliberate indifference to Jones' well-being and serious medical needs.

34

199.   That Jones' medical needs, namely, severe alcohol withdrawals and delirium tremens, were objectively serious, as they were diagnosed by a medical professional and/or were so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

200.   That the Defendants had subjective knowledge of the serious risk of harm to Jones and disregarded the risk by the acts and/or omissions as outlined in the General Allegations Section above.

201.   That the conduct of the Correction Defendants, individually, deprived Jones of his clearly established rights, privileges, and immunities guaranteed under the United States Constitution, specifically those set forth under the Eighth and Fourteenth Amendments to same, as evidenced by the following particulars offered by way of illustration and not limitation:

    a.    Deliberately ignoring Jones' self-reports that he was going through alcohol withdrawals;

    b.    Deliberately ignoring KCCF electronic jail records where his two Medical Alerts appeared prominently and were accessible to all Defendants; as early as April 24, 2018 at 10:19 p.m.;

    c.    Failing to ensure Jones was hydrated;

    d.    Failing to ensure Jones was eating his meals;

    e.    Failing to observe and check on Jones as requested and ordered;

    f.    Failing to observe and check on Jones as required by KCCF policies;

    g.    Failing to observe and check on Jones via continuous camera monitoring;

    h.    Failure to timely make referrals to medical or nursing personnel where Jones was clearly displaying obvious and serious signs of alcohol withdrawal and/or delirium tremens from April 24, 2018 when Defendant, Cooper, first entered the Medical Alert and April 25, 2018 after Defendant, Plugge's, Primary Classification Screening, until 4:00 a.m. on April 26, 2018; the first time Jones was seen by any medical personnel;

35

i.      Failing to contact medical or nursing personnel when Defendants knew that Jones was under a Medication Order because of serious alcohol withdrawal and he was not getting his medication as ordered;

j.      Failing to transfer Jones to the Medical Isolation Unit timely;

k.      Failing to request immediate medical attention when it was known that Jones' condition was deteriorating;

l.      Failing to request emergency medical attention by calling "911" and sending Jones to an acute care facility and/or hospital;

m.      Failing to report to medical staff that Jones was not taking meals or fluids;

n.      Failing to monitor Jones who was known to be serious withdrawals while in the main jail and/or H1M;

o.      Failing to request and arrange for timely medical attention when it was known Jones was unresponsive while in the main jail and/or H1M;

p.      Failure to timely perform CPR on Jones when it was known he was not breathing and without a pulse;

q.      Failing to have a working defibrillator available that was properly maintained and was fully charged;

r.      Failing to have working oxygen tanks available that were properly maintained, filled and usable;

s.      Failing to intervene and to prevent the ongoing constitutional violations against Jones by Co-Defendants, where Defendants had numerous and reasonable opportunities to intervene,

t.      Failing to properly document Jones' self-reports of AWS and/or delirium tremens in the KCCF record, and;

u.      Any other wrongful acts and/or omissions that become known through the course of discovery.

202.    As a direct and proximate result of the wrongful conduct of each of the individual Defendants, Plaintiff has been substantially and irreparably injured.  These injuries to Jones and his Estate include, but are not limited to:

a.      Acute respiratory failure;

36

    b.      Anoxic brain injury secondary to cardiac arrest;

    c.      Jones' severe and inhumane physical pain and suffering from alcohol withdrawals and delirium tremens;

    d.      Jones' severe and inhumane emotional and mental pain and suffering;

    e.      Shock, fright, and humiliation;

    f.      Prolonged hospital stay due to complications from injury;

    g.      Left in a persistent vegetative state due to lack of oxygen to brain;

    h.      Conscious pain and suffering;

    i.      Loss of society and companionship of the heirs of the Estate;

    j.      Great pain, emotional and psychological distress of the heirs of the Estate;

    k.      Loss of support and earning capacity;

    l.      Medical expenses;

    m.      Funeral and burial expenses; and

    n.      Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award of compensatory and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

<u>**COUNT II**</u>

<u>**FAILURE TO TRAIN, FAILURE TO SUPERVISE, AND INADEQUATE POLICIES, PROCEDURES, CUSTOMS AND PRACTICES - DELIBERATE INDIFFERENCE**</u>

<u>**VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (MONELL CLAIM – KENT COUNTY)**</u>

<u>**DEFENDANTS KENT COUNTY, KENT COUNTY SHERIFF LAWRENCE STELMA, CHIEF DEPUTY DAVE KOK, AND CAPTAIN KLINT THORNE ("KENT COUNTY DEFENDANTS")**</u>

203.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through two hundred two (202) as if fully set forth herein.

204.    42 U.S.C. § 1983 states:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress ...

205.    Defendants, Kent County, Stelma, Kok and Thorne ("Kent County Defendants" hereinafter), had an obligation to supervise, monitor and train their agents and employees, including the individual Corrections Defendants named herein, to ensure that the Constitutional rights of Jones and similarly situated citizens were not violated.

206.    The Kent County Defendants, as the final policy-makers for the county, failed to adequately train, staff, report, supervise, monitor, investigate and/or discipline their correction officers and/or medical services personnel, with respect to AWS and/or delirium tremens, signs, symptoms, monitoring, and/or indications for medical intervention, leading the failures as set forth by way of illustration in Paragraph 202 above.

207.    That the Kent County Defendants further adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train and/or supervise their employees/agents, and were the final policy-maker within the Sheriff Department and/or the KCCF.

208.    That the motivating and moving force for the individual Defendants' conduct as described herein, such that same also amounted to the deprivation of Jones' Eighth and Fourteenth Amendment Rights, were the following unconstitutional official policies, procedures, customs and/or practices of the Kent County Defendants such that same amounted to the deprivation of Jones' Eighth and Fourteenth Amendment Rights:

    a.    A policy, custom or practice of failing to provide sufficient correctional and medical health staff coverage for inmates at the KCCF;

    b.    A policy, custom or practice of failing to follow the staffing guidelines as set forth in the standards published by the NCCHC;

    c.    A policy, custom or practice of providing financial incentives to employees who prevented emergency room visits by inmates of the KCCF;

    d.    A policy, custom or practice of not referring inmates suffering from severe withdrawal symptoms from alcohol to licensed acute care facilities and/or hospital settings;

    e.    A policy, custom or practice of not using intravenous therapy to treat inmates while they withdraw from alcohol;

    f.    A policy, custom or practice of not using intravenous therapy to treat inmates suffering from dehydration;

    g.    A policy, custom or practice of failing to follow monitoring guidelines relating to the medical detoxification program set forth in the Contract between Defendants, Kent County and Corizon;

    h.    A policy, custom or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening withdrawal from alcohol;

i.    A policy, custom or practice of denying inmates at the KCCF access to appropriate, competent and necessary care for serious medical needs;

j.    A policy, custom or practice of failing to provide adequate supervision to assist medical personnel by an on-site physician;

k.    A policy, custom or practice of denying KCCF inmates necessary medical care if said inmate is thought to be serving a short sentence or to be released shortly;

l.    A policy, custom or practice of discouraging transferring inmates to a licensed acute care facility and/or hospital for medical care;

m.    A policy, custom or practice of failing to follow and enforce the contract terms that required audits, specifically a Medical Audit Committee to review all jail health care services for quality of care through established and regularly performed health care audits, and recommend and implement all policies and procedures for jail health care;

n.    A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant Corizon to tailor and adopt policies and procedures for health care at the KCCF, and to provide those policies and procedures to Defendant, Kent County, employees and officials; said policies and procedures were to be consistent with the standards set forth by the NCCHC;

o.    A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to maintain minimum staffing levels, at the KCCF, and the failure to enforce led to Corizon to under-staff the medical care at KCCF and/or substitute less qualified and lesser paid medical staff than required by the Contract;

p.    A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to notify Defendant, Kent County, of all claims made against it; thereby revealing a pattern of proving deficient medical services by Defendant, Corizon;

q.    A policy, custom or practice of failing to enforce and follow the Contract terms requiring that Defendant, Kent County, employ correctional staff, including deputy sheriffs, who are trained in recognizing the signs and symptoms of AWS and/or delirium tremens;

r.    A policy, custom or practice of failing to adequality monitor Defendant, Corizon's, performance to ensure it met staffing commitments and provided quality health care;

40

   s. A policy, custom or practice of failing to enforce the Contract terms requiring that Defendant, Kent County, employ staff in the KCCF, who are regularly trained in recognizing the signs and symptoms of AWS and/or delirium tremens;

   t. A policy, custom or practice of failing to enforce the Contract terms requiring that all medical personnel working at the KCCF are properly licensed in the State of Michigan;

   u. A policy, custom or practice of failing to train its corrections staff to properly classify inmates during the Primary Classification Process and/or Survey, including failure to train to ask proper follow up screening questions regarding alcohol withdrawal and identification of signs and symptoms of withdrawal; and

   v. Any other policies, customs or practices that become known through the course of discovery.

209. As a direct and proximate result of the wrongful conduct of each of the individual Defendants due to the Kent County Defendants' failure to train, failure to supervise, and their inadequate policies, procedures, customs and/or practices, Plaintiff has been substantially and irreparably injured.  These injuries to Jones and his Estate include, but are not limited to:

   a. Acute respiratory failure;

   b. Anoxic brain injury secondary to cardiac arrest;

   c. Jones' severe and inhumane physical pain and suffering from alcohol withdrawals and delirium tremenss;

   d. Jones's severe and inhumane emotional and mental pain and suffering;

   e. Shock, fright, and humiliation;

   f. Prolonged hospital stay due to complications from injury;

   g. Left in a persistent vegetative state due to lack of oxygen to brain;

   h. Conscious pain and suffering;

   i. Loss of society and companionship to the Estate;

   j. Great pain, emotional and psychological distress of the heirs of the Estate;

k.      Loss of support and earning capacity;

l.      Medical expenses;

m.     Funeral and burial expenses; and

n.      Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award of compensatory and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

## COUNT III

## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (CORIZON DEFENDANTS)

### DEFENDANTS
**TERI BYRNE, R.N., "NURSE JANICE", JOANNE SHERWOOD, N.P., MELISSA FURNACE, R.N., DEBORAH CARD, R.N., CHAD RICHARD GOETTERMAN, R.N., JAMES AUGUST MOLLO, L.P.N., AND LYNNE FIELSTRA, L.P.N.**

210.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through two hundred nine (209) as if fully set forth herein.

211.    That upon information and belief, at all times relevant, Defendants, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, and Fielstra ("Corizon Defendants" hereinafter), were employees of Defendant, Corizon.

212.    That upon information and belief, the medical supervisor in charge of the Corizon Defendants, including personnel in the Medical Isolation Unit, was Defendant, Sherwood, a licensed nurse practitioner.

213.    That upon information and belief, Defendant, Sherwood, was the highest-ranking medical personnel on staff for Defendant, Corizon, and Defendant, Kent County, on April 26 and April 27, 2018.

214.    That upon information and belief, Defendant, Sherwood, was only contacted by telephone on two occasions regarding the treatment of Jones; namely, to give the verbal order for Diazepam, and to order his transfer to H1M.

215.    That the Corizon Defendants, as more specifically described above, were unreasonable and performed knowingly, wantonly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Jones' serious medical needs.

216.    That Jones' medical needs, namely, severe alcohol withdrawals and/or delirium tremens, were objectively serious, as they were diagnosed by a medical professional and/or were so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

217.    That the Corizon Defendants had subjective knowledge of the serious risk of harm to Jones and disregarded the risk by the acts and/or omissions as outlined in the General Allegations Section above.

218.    That the conduct of the Corizon Defendants, individually, deprived Jones of his clearly established rights, privileges, and immunities guaranteed under the United States Constitution, specifically those set forth under the Eighth and Fourteenth Amendments to same, as evidenced by the following particulars offered by way of illustration and not limitation:

43

a. Deliberately ignoring Jones' self-reports that he was going through alcohol withdrawal;

b. Deliberately ignoring electronic records where his two Medical Alerts appeared prominently and were accessible to all Defendants; as early as April 24, 2018 at 10:19 p.m.;

c. Failing to ensure Jones was hydrated;

d. Failing to ensure Jones was eating his meals;

e. Failing to observe and check on Jones as requested and ordered;

f. Failing to observe and check on Jones as required by KCCF and Corizon policies;

g. Failing to observe and check on Jones via continuous camera and personal monitoring;

h. Failing to timely transfer Jones to the Medical Isolation Unit timely;

i. Failing to order alcohol withdrawal medications timely;

j. Failing to administer alcohol withdrawal medications and/or in timely manner or in proper dosages;

k. Failing to administer the CIWA protocol and/or properly perform the CIWA protocol;

l. Failing to properly and timely enter notations in medical charting, including the EMR;

m. Failing to request immediate medical attention when it was known that Jones' condition was deteriorating;

n. Failing to request emergency medical attention by calling "911" and sending Jones to the emergency department at a licensed acute care facility and/or hospital;

o. Failing to report to medical staff that Jones was not taking meals or fluids;

p. Failing to monitor Jones who was known to be serious withdrawals while in the Medical Isolation Unit;

q. Failing to request and arrange for timely medical attention when it was known Jones was unresponsive while in his cell;

44

r.     Failure to timely perform CPR on Jones when it was known he was not breathing and without a pulse;

s.     Failing to have a working defibrillator available that was properly maintained and was fully charged;

t.     Deliberately falsifying the medical record;

u.     Failing to have working oxygen tanks available that were properly maintained, filled and usable;

v.     Failing to follow protocols for the management and treatment of inmates under the influence of intoxicant and/or undergoing alcohol withdrawals;

w.     Failing to properly monitor Jones while he was in obvious withdrawal from alcohol in violation of NCCHC Standards;

x.     Failing to intervene and to prevent the ongoing constitutional violations against Jones by Co-Defendants, where Defendants had numerous and reasonable opportunities to intervene, and

y.     Any other wrongful acts and/or omissions that become known through the course of discovery.

219.   As a direct and proximate result of the wrongful conduct of each of the individual Corizon Defendants, Plaintiff has been substantially and irreparably injured.  These injuries to Jones and his Estate include, but are not limited to:

a.     Acute respiratory failure;

b.     Anoxic brain injury secondary to cardiac arrest;

c.     Jones' severe and inhumane physical pain and suffering from alcohol withdrawals and delirium tremors;

d.     Jones' severe and inhumane emotional and mental pain and suffering;

e.     Shock, fright, and humiliation;

f.     Prolonged hospital stay due to complications from injury;

g.     Left in a persistent vegetative state due to lack of oxygen to brain;

      h.     Conscious pain and suffering;

      i.     Loss of society and companionship to the heirs of his Estate;

      j.     Great pain, emotional and psychological distress of the heirs of the Estate;

      k.     Loss of support and earning capacity;

      l.     Medical expenses;

      m.     Funeral and burial expenses; and

      n.     Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award of compensatory and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

## COUNT IV

### FAILURE TO SCREEN, FAILURE TO TRAIN, FAILURE TO SUPERVISE, AND INADEQUATE POLICIES, PROCEDURES, CUSTOMS AND PRACTICES - DELIBERATE INDIFFERENCE

### VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (MONELL CLAIM – CORIZON)

### DEFENDANTS CORIZON HEALTH, INC., CORIZON HEALTH d/b/a CORIZON OF MICHIGAN ("CORIZON")

220.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through two hundred nineteen (219) as if fully set forth herein.

221.    That prior to and during the period of Jones' incarceration at KCCF, Defendant, Corizon, was responsible for providing medical and health care services to inmates, including Jones, pursuant to its Contract with Defendant, Kent County.

222.    That Defendant, Corizon, is and was, a private corporation, and pursuant to its Contract with Defendant, KCCF, performed a traditional state function of providing medical services to prison inmates, including Jones, and therefore, acted under the color of state law.

223.    That pursuant to the Contract, Defendant, Corizon, provided the following pertinent services in the KCCF, which are not inclusive of all services provided under the Contract:

a.    Intake screening/assessment of all inmates;

b.    Comprehensive health evaluations;

c.    Regularly scheduled NCCHC-complaint sick calls;

d.    Regularly scheduled nursing coverage at all facilities;

e.    Regularly scheduled physician hours at KCCF, and perpetual on-call physician staffing for KCCF.

f.    Medication administration;

g.    Emergency medical care;

h.    Ambulance transportation for medical emergencies;

i.    Medical records management; and

j.    Pharmaceutical services;

224.    That Defendant, Corizon, adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to deliberate indifference to Jones' serious medical needs.

225.    That Defendant, Corizon's, policies and procedures implemented to deliver and coordinate said medical services to inmates, including Jones, were deliberately indifferent to Jones' serious medical needs in that said policies did not ensure that his alcohol withdrawal and/or

delirium tremens were timely and adequately treated, and did not ensure that medical care would be carried out as requested and/ordered by qualified medical personnel.

226.    That in addition to the actions and inactions as described in Count III and the General Allegations Sections above, during Jones' period of incarceration at KCCF, Defendant, Corizon, was improperly staffed with medical personnel and/or staffed with inadequately or improperly licensed medical personnel in violation of the Contract.

227.    That according the records and upon information and belief, during the period of Jones' incarceration, Defendant, Corizon, did not have a medical director employed at KCCF and/or an "on-call" physician working during the overnight and early morning hours of April 26th or 27th of 2018, in violation of Contract.

228.    That these facts, along with the General Allegations, and the acts and omissions against the individual Corizon Defendants, plausibly allege both that Jones' constitutional rights were violated and that Defendant, Corizon's, policy and/or custom of failing to staff, screen, train and/or supervise its employees were a "moving force" behind the deprivation of Jones' Eighth and Fourteenth Amendment Rights to be free from inhumane treatment while incarcerated.

229.    Further, that the motivating and moving force for the individual Defendants' conduct as described herein, such that same also amounted to the deprivation of Jones' Eighth Amendment Rights, were the following unconstitutional official policies, procedures, customs and/or practices of Defendant, Corizon:

      a.    A policy, custom or practice of failing to provide sufficient medical health staff coverage for inmates at the KCCF;

      b.    A policy, custom or practice of failing to follow the staffing guidelines as set forth in the standards published by the NCCHC; namely, the failure to have a Responsible Health Authority (RHA) overseeing the medical staff at KCCF;

c.      A policy, custom or practice of providing financial incentives to employees who limited emergency room visits by inmates of the KCCF;

d.      A policy, custom or practice of not referring inmates suffering from severe withdrawal symptoms from alcohol to licensed acute care facilities and/or hospital settings;

e.      A policy, custom or practice of not using intravenous therapy to treat inmates while they withdraw from alcohol;

f.      A policy, custom or practice of not using intravenous therapy to treat inmates suffering from dehydration;

g.      A policy, custom or practice of failing to follow monitoring guidelines relating to the medical detoxification program set forth in the Contract between Defendants, Kent County and Corizon;

h.      A policy, custom or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening withdrawal from alcohol;

i.      A policy, custom or practice of failing to train Defendant, Kent County, employees, in the recognition of severe, progressive and life-threatening withdrawal from alcohol, in violation of the Contract and the NCCHC Standards;

j.      A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

k.      A policy, custom or practice of denying inmates at the KCCF access to appropriate, competent and necessary care for serious medical needs;

l.      A policy, custom or practice of failing to provide adequate supervision to assistant medical personnel by an on-site physician;

m.     A policy, custom or practice of denying KCCF inmates necessary medical care if said inmate is thought to be serving a short sentence or to be released shortly to save money and resources;

n.      A policy, custom or practice of discouraging transferring inmates to a licensed acute facility and/or hospital for medical care to save money and resources;

o.      A policy, custom or practice of failing to follow and enforce the Contract terms that required audits, specifically form a Medical Audit Committee, to

review all jail health care services for quality of care through established and regularly performed health care audits, and recommend and implement all policies and procedures for jail health care;

p.      A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to tailor and adopt policies and procedures for health care at the KCCF, and to provide those policies and procedures to Defendant, Kent County, employees and officials; said policies and procedures were to be consistent with the standards set forth by the NCCHC;

q.      A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to maintain minimum staffing levels, at the KCCF, and the failure to enforce led to Corizon to under-staff the medical care at KCCF and/or substitute less qualified and lesser paid medical staff than required by the Contract;

r.      A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to notify Defendant, Kent County, of all claims made against it; thereby revealing a pattern of claims alleging deficient medical services provided by Defendant, Corizon;

s.      A policy, custom or practice of failing to adequality monitor Defendant, Corizon's, performance to ensure it met staffing commitments and provided quality health care;

t.      A policy, custom or practice of "back-dating" medical records or "late entries" in medical records and charting;

u.      A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, Corizon, to staff the KCCF with medical professional licensed in the State of Michigan; and

v.      Any other policies, customs or practices that become known through the course of discovery.

229.    As a direct and proximate result of the wrongful conduct of each of individual Defendants, due to the Corizon Defendants' failure to screen, failure to train, failure to supervise and their inadequate policies, procedures, customs and/or practices, Plaintiff has been substantially and irreparably injured.  These injuries to Jones and his Estate include, but are not limited to:

a.      Acute respiratory failure;

b.      Anoxic brain injury secondary to cardiac arrest;

c.      Jones's severe and inhumane physical pain and suffering from alcohol withdrawals and delirium tremors;

d.      Jones's severe and inhumane emotional and mental pain and suffering;

e.      Shock, fright, and humiliation;

f.      Prolonged hospital stay due to complications from injury;

g.      Left in a persistent vegetative state due to lack of oxygen to brain;

h.      Conscious pain and suffering;

i.      Loss of society and companionship of the heirs of the Estate;

j.      Great pain, emotional and psychological distress of the heirs of the Estate;

k.      Loss of support and earning capacity;

l.      Medical expenses;

m.      Funeral and burial expenses; and

n.      Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award of compensatory and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

### COUNT V
### MEDICAL MALPRACTICE

### DEFENDANTS
### CORIZON HEALTH, INC., CORIZON HEALTH, d/b/a CORIZON OF MICHIGAN, TERI BYRNE, R.N., "NURSE JANICE", JOANNE SHERWOOD, N.P., MELISSA FURNACE, R.N., DEBORAH CARD, R.N., CHAD RICHARD GOETTERMAN, R.N., JAMES AUGUST MOLLO, L.P.N., ANGELA NAVARRO, R.N, and LYNNE FIELSTRA, L.P.N.

230.   Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs two hundred twenty-nine (229) as if fully set forth herein.

231.   At all times relevant to this lawsuit, as more fully set forth above, Defendant Corizon, undertook and had a duty to provide Jones with competent medical care and treatment, through and by its employees and/or agents, which would at all times be in accordance with the acceptable standards of care.

232.   At all times relevant to this lawsuit, Defendants, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, Navarro and Fielstra were employees of Defendant, Corizon, and/or actual agents and/or apparent/ostensible agents of Defendant, Corizon, and acting in the course and scope of their employment with Defendant, Corizon, and thus, Defendant, Corizon, is vicariously liable for medical personnel's acts of medical malpractice pursuant to the doctrine of Respondent Supervisor and/or Ostensible Agency.

233.   At the time of the Jones' incarceration, Defendants, Corizon, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, Navarro and Fielstra, owed a duty to Jones, to act reasonably, prudently and to comply with the pertinent standard of care by way of their care and treatment of Jones.

234.   Although required by the standard of practice, Defendant, Corizon, failed to follow the applicable statutes and/or rules regulations of the State of Michigan and/or State of Michigan's Administration Code, or federal government including, but not limited to, MCLA 333.21513, et. seq.

235.   Although required by the standard of practice, Defendant, Corizon, failed to select and retain only competent physicians, nurses, nurse practitioners, licensed practical nurses,

technicians, and/or staff and use reasonable means to periodically evaluate their competency so as only to retain competent physicians, nurses, nurse practitioners, licensed practical nurses, technicians, and/or staff.

236.    Defendant, Corizon, individually, as well as its authorized agents, servants and/or employees, including but not limited to Defendants, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, Navarro and Fielstra, breached the above duties and obligations owed to Jones, by acting contrary to the applicable standards of care, and therefore committed medical malpractice and are professionally negligent in the following particular manners, which include, but are not limited to:

a.    Failing to timely and properly select, train, and monitor its employees, servants, agents, actual or ostensible and/or staff to ensure that they were competent;

b.    Failing to provide qualified staff with the proper training and ability to meet their patients' needs, including the ability to perform and appreciate a thorough history and physical examination and render an appropriate differential diagnosis and follow-up with appropriate evaluation, examination, follow-up and/or referral;

c.    Failing to ensure that appropriate policies and/or procedures are adopted and followed, including but not limited to, pursuing patient advocacy by following the chain of command where indicated, ensuring that all equipment was working and functioning properly including any and all AED machines and oxygen tanks;

d.    Failing to obtain and appreciate a thorough and pertinent history of Wade, including but not limited to the medical history and present condition;

e.    Failing to timely and appropriately treat and examine Wade;

f.    Failing to timely obtain medical attention and treatment for Wade when obvious risk factors for medical complications were present;

g.    Failing to timely and appropriately transfer Wade to a hospital;

h.    Failing to timely obtain appropriate medical care in a timely fashion, including but not limited to transfer to a hospital;

i.      Failing to request and ensure transfer to a hospital for a complete physical workup, to include medical testing, laboratory studies, and any additional testing that may be necessary;

j.      Failing to perform and appreciate a thorough and pertinent physical examination, including but not limited to examinations detailed and based upon Wade's history, conditions, and/or complaints;

k.      Failing to be familiar with the signs, symptoms, and/or risks of alcohol withdrawal and/or detox, delirium tremens, respiratory distress, and/or cardiac arrest and the appropriate and necessary treatment;

l.      Failing to timely and appropriately monitor an inmate patient while that inmate patient is under observation;

m.     Failing to ensure that medical and nursing staff is following all appropriate protocols, including but not limited to obtaining vital signs;

n.      Failing to ensure that policies and procedures of a jail infirmary are followed;

o.      Failing to ensure that proper and timely assessment of Wade is made and recognize a medical emergency, including but not limited to severe alcohol withdrawal and/or detox, delirium tremens, respiratory distress, and/or cardiac arrest;

p.      Failing to timely and appropriately communicate the severity and significance of Wade's condition so that timely and appropriate medical treatment is received;

q.      Failing to timely and appropriately provide medications and appropriate medication dosage;

r.      Failing to recommend and obtain all necessary tests in a timely manner;

s.      Failing to properly enter medication orders in the medical record keeping system;

t.      Failing to timely maintain, test, and properly ensure that any and all medical equipment including but not limited to AED equipment was functioning and in proper working order, and that all medical staff is appropriately trained in the use of all medical equipment;

u.      Failing to ensure that any and all orders and/or instructions are followed, including but not limited to medication and/or transfer instructions;

v.      Failing to timely and appropriately perform CIWA protocols;

w.     Failing to avoid improper instructions, including medication and/or transfer instructions;

x.      Failing to timely and approximately make medical entries into the chart and/or record;

y.      Failing to ensure the medical records are accurate and not falsified;

z.      Failing to timely respond to and treat cardiac arrest; and

aa.     Any and all other breaches of the standard of care found to be violated through the course of discovery.

237.    The applicable standard of care required Defendant, Corizon, through its agents, servants, and/or employees including but not necessarily limited to Defendants, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, Navarro and Fielstra, and others to ensure Jones was provided with appropriate and timely medical care, to ensure that Wade was appropriately monitored and assessed, so that he did not suffer severe alcohol withdrawal and/or delirium tremens, cardiac arrest, respiratory failure, anoxic encephalopathy, and ultimately death from lack of proper medical care and treatment.  It is further evident from a review of all the materials including medical records and jail records that Wade was not properly monitored and/or treated.  Had he been properly monitored and/or treated, Wade would not have been forced to endure economic and noneconomic damages including conscious pain and suffering in his jail cell, alone, prior to his death.  (Exhibit 5 – Affidavits of Meritorious Claims and Affidavit of James Fintel, M.D.)

238.    As a direct and proximate result of the negligence and professional negligence of Defendants, Corizon, Byrne, Nurse Janice, Sherwood, Furnace, Card, Goetterman, Mollo, Navarro and Fielstra, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act including but not limited to the following:

a.      reasonable medical, hospital, funeral and burial expenses;

b.      reasonable compensation for the pain and suffering undergone by Jones while he was conscious during the time between his injuries and his death;

55

c.      loss of financial support;

d.      loss of service;

e.      loss of gifts or other valuable gratuities;

f.      loss of society and companionship; and

g.      Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act; MCLA §600.2922.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy- Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

### COUNT VI
### ORDINARY NEGLIGENCE AND/OR GROSS NEGLIGENCE

### DEFENDANT
### CORIZON HEALTH, INC., CORIZON HEALTH, d/b/a CORIZON OF MICHIGAN

239.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through two hundred thirty-eight (238) as if fully set forth herein.

240.    At the time and place set forth above, Defendant, Corizon, owed certain duties to the public, but in particular to Jones, to act reasonably with respect to the conduct of its employees, and agents, including but not limited to any of its medical staff working at KCCF during the relevant time period, so as to prevent unnecessary injury to patients receiving services at a facility with whom it contracted.

241.    This duty included the duty to maintain all medical equipment in proper working order, including but not limited to the AED machine and the oxygen tanks, pursuant to the Contract between Defendant, Corizon, and Defendant, Kent County, and Michigan common law.

56

242.    Despite the above duties, Defendant, Corizon, breached its duties, and was therefore negligence, grossly negligence and/or reckless in the following manners, including, but not limited to:

  a. Failing to properly hire, train, instruct, supervise or control the actions and conduct of its employees and agents, including but not limited to any of its medical staff working at KCCF;

  b. Failing to properly instruct, supervise or control the actions and conduct of its employees and agents including, but not limited to any of its medical staff working at KCCF;

  c. All other acts and/or omissions constituting negligence, gross negligence and/or reckless misconduct which may be learned through the course of discovery.

243.    Defendant, Corizon, is responsible for the negligence, gross negligence and/or reckless misconduct of its employees, agents, including, but not limited to the medical staff at KCCF, under the doctrine of respondeat superior.

244.    As a direct and proximate result of Defendant, Corizon's, negligence, gross negligence and/or reckless misconduct, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act including but not limited to the following:

  a. reasonable medical, hospital, funeral and burial expenses;

  b. reasonable compensation for the pain and suffering undergone by Jones while he was conscious during the time between his injuries and his death;

  c. loss of financial support;

  d. loss of service;

  e. loss of gifts or other valuable gratuities;

  f. loss of society and companionship; and

g.     Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act; MCLA §600.2922.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy- Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

## A JURY TRIAL IS HEREBY DEMANDED

Respectfully submitted by:


/s/ Jennifer G. Damico
JENNIFER G. DAMICO (P51403)
MIKE MORSE LAW FIRM, PLLC
Attorneys for Plaintiff
24901 Northwestern Highway, Ste. 700
Southfield, MI  48075
(248) 350-9050
(248) 281-9110 (fax)
jdamico@855mikewins.com


Dated:   January 14, 2020