UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as Personal
Representative of the Estate of WADE
JONES, deceased,

       Plaintiff,                               Hon. Paul L. Maloney

v.

                                             Case No. 1:20-cv-36

KENT COUNTY, et al.,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) of Defendants Corizon Health, Inc., Teri Byrne, R.N., Janice Steimel, L.P.N., Joanne Sherwood, N.P., Melisa Furnace, R.N., Dan Card, L.P.N., Chad Richard Goetterman, R.N., James August Mollo, L.P.N., Angela Navarro, R.N., and Lynne Fielstra, L.P.N. (collectively Corizon). (ECF No. 29.) The motion is fully briefed and ready for decision.[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Corizon's motion be **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Plaintiff, as Personal Representative of the Estate of Wade Jones, deceased, filed a complaint against Defendants Kent County, Corizon Health, Inc., and numerous officials and employees of those entities, alleging claims arising out of Jones's death on May 2, 2018, and events

---

[1] The Court denies Plaintiff's request for oral argument (ECF No. 47) as the motion is sufficiently briefed to allow the Court to render an informed decision.

over several days leading up to his death. Jones died from complications caused by alcohol withdrawal syndrome with delirium tremens. Plaintiff alleges claims against the individual Defendants pursuant to 42 U.S.C. § 1983 for deliberate indifference to Jones's serious medical needs, in violation of the Eighth Amendment, and claims against Kent County and Corizon pursuant to *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978). Plaintiff also alleges a state-law medical malpractice claim against the individual Corizon Defendants and a separate negligence/gross negligence claim against Corizon.

The following facts are taken from Plaintiff's complaint.

On April 13, 2018, Jones, who was 40 years old at the time, was detained at the Walker, Michigan, Meijer for shoplifting several items, including four 1.75-liter bottles, or "fifths," of alcohol. Jones admitted to stealing the merchandise. He was issued a misdemeanor citation for retail fraud–third degree and given an arraignment hearing date of April 24, 2018 in the 59th District Court. (ECF No. 1 at PageID.12–13.)

On April 24, 2018, Jones appeared for his arraignment before Judge Peter P. Versluis, which began at 1:42 p.m. Jones pled guilty to the charge. Judge Versluis accepted the plea and ordered Jones to meet with the court's probation staff for a sentencing that was to occur one hour later. At 2:46 p.m., back in court, probation officer Deven Bonham told Judge Versluis that Jones had consumed alcohol before the hearing and had a pattern of drinking. Bonham said that, because Jones was emitting a strong odor of alcohol, she asked him to take a PBT (portable breath test), which resulted in a reading of .159. Bonham administered the test a second time ten minutes later, which produced a reading of .145. Jones stated that the results surprised him because he

only had "a couple drinks" before the hearing.[2] (*Id.* at PageID.13.)  Judge Versluis asked Jones if he felt intoxicated, and Jones answered, "No."  Judge Versluis told Jones that he did not appear intoxicated, which indicated that Jones had developed a tolerance to alcohol.  Judge Versluis chastised Jones for showing up to court intoxicated and told him that he could "smell it."  Judge Versluis sentenced Jones to an immediate sentence of five days at the KCCC.  The proceeding concluded at 3:01 p.m.  (*Id.* at PageID.14.)

Jones was transported to the KCCC and taken to the Central Intake Area at 4:37 p.m.  At approximately 5:20 p.m., Defendant Teri Byrne, R.N., completed the medical and mental health intake screening examinations and surveys for Jones.  Byrne wrote "no" for current or past medical illness or health condition and "no" for HTN (hypertension) or hospitalizations within the past month.  She further noted that Jones was not under the care of a physician and reported normal physical and mental findings.  A dental screening indicated that Jones's teeth and gums were in fair condition, and no odor of alcohol was reported.  Byrne reported that there were no mental health concerns or alerts and no chart was made.  According to the mental health screening survey, Jones said that he was not currently drunk or high and used vodka occasionally.  Jones also reported that he had no concern about alcohol withdrawal.  Defendant Byrne did not further assess Jones for substance abuse and acute alcohol withdrawal, nor did she refer him to nursing, a physician and/or mental health counseling.  (*Id.* at PageID.15.)

At approximately 9:00 p.m., Jones was placed in a single-person cell in housing unit L1.  At approximately 10:18 p.m., Defendant Deputy Cooper entered a "Medical Alert" into Jones's record, indicating "WD – WITHDRAWLS OR DTS," with a notation "ETOH" at the bottom—

---

[2] Plaintiff alleges that based on Jones's height and weight and according to the National Highway Traffic Safety Administration Blood Alcohol Chart, Jones likely consumed between 6 to 7 alcoholic drinks prior to the hearing.  (*Id.*; ECF No. 1-5.)

the abbreviation for ethanol, or drinking alcohol.  The reason for the alert was "INM [Inmate] REPORTS MEDICAL CONDITION."  One minute later, Deputy Cooper entered an additional alert:  "LOWER BUNK ONLY" and noted "DURING WD ALC," meaning during withdrawal from alcohol.

On April 25, 2018, at approximately 1:17 p.m., Defendant Deputy Plugge prepared Jones's Primary Classification Screening Survey, in which he noted:  "GOING THROUGH ALC WD'S [alcohol withdrawals] HASN'T REC MEDS YET.  HAVING ISSUES WITH SLEEPING AND THROWING UP.  SOME ANXIETY USED TO TAKE MEDS.  NO S/I [suicide ideation].  DAILY LIQUOR USE."  Plugge wrote:  "LEAVE IN CURRENT LOCATION UNTIL WD'S IMPROVE."  (*Id.* at PageID.18–19.)  From April 25 to April 26, 2018, video surveillance showed Jones in his cell pacing, attempting to escape, appearing to "pick his skin," falling down, experiencing hallucinations, and taking off his clothes and putting them back on.  (*Id.* at PageID.19–20.)

At approximately 1:00 a.m. on April 26, 2018, Defendant Deputy Jourden noted:  "Inmate has started to display symptoms of alcohol WD.  Hallucinations, confusion, picking and banging on door to escape.  Will continue to monitor."  At approximately 4:00 a.m. on April 26, 2018, Defendant "Nurse Janice" noted that Jones was exhibiting symptoms of alcohol withdrawal and/or delirium tremens.  She took his vital signs, noted he was not taking fluids, and recorded a moderate Clinical Institute Withdrawal Assessment – Alcohol Revised (CIWA) score of 19.  (*Id.* at PageID.21.)  At approximately 4:30 a.m. on April 26, Defendant Nurse Furnace entered Jones's CIWA score and noted that Jones was hallucinating.  About an hour later, Defendant Furnace completed a "Practitioner's Order for Alcohol, Benzodiazepine or Barbiturate Medical Withdrawal" form and received verbal orders from Defendant Sherwood to administer Diazepam

(Valium). At approximately 1:00 p.m., Defendant Fielstra saw Jones and recorded a moderate CIWA score of 13. (*Id.* at PageID.22.)

Jones continued to exhibit symptoms of alcohol withdrawal until approximately 6:00 a.m. on April 27, 2018, when he was transferred to KCCF's Medical Isolation Unit for observation. (*Id.* at PageID.26.) At approximately 7:30 a.m., a Corizon employee observed Jones on the toilet slumped over. (*Id.* at PageID.29.) At approximately 7:43 a.m., Defendant Goetterman entered the cell and found Jones unresponsive. After finding the oxygen tank either empty or defective, Defendant Goetterman began chest and manual ventilation. Defendant Goetterman attempted to revive Jones with the automated external defibrillator (AED) but was unsuccessful because it powered off due to a low battery. (*Id.* at PageID.31–32.)

First responders transported Jones to Spectrum Health Butterworth Campus, where Jones presented following a cardiac arrest, with no spontaneous movement and a Glasgow coma score of 3. Jones underwent hypothermia protocol and was placed on a continuous EEG, which showed deterioration. A CT scan of his head revealed loss of gray-white matter and progressive cerebral edema. He was monitored over the next several days and continued to be unresponsive. On May 2, 2018, formal brain testing was performed, and Jones was pronounced dead. The Kent County Medical Examiner's final diagnosis was medical complications resulting from chronic ethanol abuse. (*Id.* at PageID.33.)

## II. Motion Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating the assertions therein in a light most favorable to Plaintiff to determine whether they state a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any attached exhibits, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided they are referenced in the complaint and central to the claims therein. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008).

### III. Discussion

#### A.    Bar pursuant to Mich. Comp. Laws § 600.2955a

Corizon argues that Counts V and VI, which allege state-law medical malpractice and ordinary negligence/gross negligence claims, must be dismissed because they are barred by Mich. Comp. Laws § 600.2955a, which provides as follows:

> (1) It is an absolute defense in an action for the death of an individual or for injury to a person or property that the individual upon whose death or injury the action is based

6

> had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury. If the individual described in this subsection was less than 50% the cause of the accident or event, an award of damages shall be reduced by that percentage.

Mich. Comp. Laws § 600.2955a(1).   The statute defines "impaired ability to function" as follows:

> (b) "Impaired ability to function due to the influence of intoxicating liquor or a controlled substance" means that, as a result of an individual drinking, ingesting, smoking, or otherwise consuming intoxicating liquor or a controlled substance, the individual's senses are impaired to the point that the ability to react is diminished from what it would be had the individual not consumed liquor or a controlled substance. An individual is presumed under this section to have an impaired ability to function due to the influence of intoxicating liquor or a controlled substance if, under a standard prescribed by section 625a of the Michigan vehicle code, Act No. 300 of the Public Acts of 1949, being section 257.625a of the Michigan Compiled Laws, a presumption would arise that the individual's ability to operate a vehicle was impaired.

Mich. Comp. Laws § 600.2955a(2)(b).   Thus, a presumption of "impaired ability" arises when an individual's blood alcohol content exceeds the legal limit.[3]   The purpose of the statute is "to place more responsibility on intoxicated plaintiffs who are equally or more to blame for their injuries, therefore marking a shift toward personal responsibility envisioned by overall tort reform." *Wysocki v. Kivi*, 248 Mich. App. 346, 358–59 (2001).   To avail itself of this defense, a defendant must show that:   "(1) the decedent had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and (2) that as a result of that impaired ability, the decedent was fifty percent or more the cause of the accident or event that resulted in his death." *Harbour v. Corr. Med. Servs., Inc.*, 266 Mich. App. 452, 456 (2005).

The facts in *Harbour* were analogous to those in the instant case (but decided after a trial). The decedent was arrested for driving under the influence of alcohol.   At the jail, the decedent took a breathalyzer test and registered 0.32 grams per 210 liters of breath—over three times the

---

[3] At the time of Jones' death, the legal limit was 0.08 grams per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine.   Mich. Comp. Laws § 257.625(1)(b).

7

then-existing legal limit. A nurse assessed the decedent and placed him on "sick call" in a holding cell to be seen by a doctor the following morning. Two hours after the assessment, the decedent collapsed in his cell and died from irregular heart rhythms caused by acute alcohol withdrawal. *Id.* at 454. The trial court granted the defendant's motion for a directed verdict based on the statute. The Michigan Court of Appeals rejected the plaintiff's argument that the statute was inapplicable because an "accident or event" resulting in the decedent's death had not occurred. The court noted that the expert witnesses unanimously agreed "that withdrawal, although caused by drinking alcohol, is a process or syndrome distinct from alcohol consumption; withdrawal has a detectable onset, is manifested by specific symptoms, and eventually passes." *Id.* at 459. Thus, the court held, alcohol withdrawal constitutes an "event." *Id.* The court also looked to *Robinson v. Detroit*, 462 Mich. 439 (2000), which construed the phrase, "the proximate cause," in Michigan's governmental tort liability act as "the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.'" *Id.* at 462 (quoting *Robinson*, 462 Mich. at 446). The *Harbour* court observed that, like the governmental immunity statute in *Robinson*, the intoxication statute refers to "the cause" and not "a cause." *Id.* The court held that, because it was undisputed that the decedent had a blood alcohol level of 0.32 grams and thus had an impaired ability to function, reasonable minds could not differ that

> the decedent was fifty percent or more the cause of the 'event'—acute alcohol withdrawal—that resulted in his death. Plaintiff's own evidence was unequivocal that the decedent's chronic alcohol abuse and, on the night in question, his alcohol-related impairment caused the acute withdrawal that was the "most immediate, efficient, and direct cause" of his death.

*Id.* at 463 (citing *Robinson*). The court also commented that the plaintiff's own expert had admitted that, whether the nurse could have done anything differently to save the plaintiff was "pure speculation" and "it would have been an illusion for anyone who never had a chance to

8

examine Mr. Harbour to envision exactly what would have happened if he had survived or if he had been taken to an emergency room." *Id.*

Corizon argues that Plaintiff's admissions in his complaint establish both elements of the defense as a matter of law. First, it points out that Plaintiff admits that Jones's blood alcohol content at the time of his sentencing was almost twice the legal limit for operating a motor vehicle in Michigan. (ECF No. 29 at PageID.257 (citing ECF No. 1-4 at PageID.122–26); *see also* ECF No. 1 at PageID.13 (admitting that Jones's blood alcohol content was "almost two times the legal limit in Michigan for operating a vehicle while impaired").) Second, it argues that Plaintiff's allegations make clear that Jones's "chronic ethanol abuse was the 'most immediate, efficient, and direct cause' of his death." (ECF No. 29 at PageID.257 (citing *Harbour*, 266 Mich. App. at 462–63).)

Corizon's argument fails as to both elements. As to the first element, whether Jones had an "impaired ability to function," the presumption under the statute is rebuttable, not conclusive. *See Estate of Morton by Morton v. Theta Chi Fraternity*, No. 344556, 2019 WL 6173687, at *4 (Mich. Ct. App. Nov. 19, 2019) ("[B]ecause plaintiff presented no substantively admissible evidence to rebut the presumption of impairment (and instead concedes it), it is 'established beyond dispute.'") (quoting *Harbour*). The statute requires that the individual's senses were "impaired to the point that the ability to react [wa]s diminished from what it would [have] be[en] had the individual not consumed liquor . . . ." Mich. Comp. Laws § 600.2955a(2)(b). *Harbour* is distinguishable from the instant case because it was decided following a jury trial, and the plaintiff failed to present any evidence rebutting the presumption. Here, the complaint cites evidence indicating that, due to the tolerance he had developed through chronic alcohol abuse, Jones was able to function at a fairly high level even with an elevated blood alcohol content.

9

Judge Versluis remarked during the April 24, 2018 sentencing hearing that Plaintiff did not appear to be intoxicated. (ECF No. 1 at PageID.13.) In addition, during Jones's intake examination, Defendant Byrne failed to independently detect that Jones had been drinking. (*Id.* at PageID.15.) Thus, Plaintiff's allegations do not conclusively show that Jones had an "impaired ability to function."

As for the second element, Plaintiff's allegations do not establish as a matter of law that Jones was fifty percent or more the cause of the event that resulted in his death. It is true that Plaintiff's allegations show that Jones was solely responsible for the "event" under *Harbour*— alcohol withdrawal resulting from his own chronic alcohol abuse—that precipitated his death. And, if *Robinson* controlled, *i.e.*, the event was "the one most immediate, efficient, and direct cause preceding an injury," 462 Mich. at 446, Corizon would have a strong argument because Michigan courts have indicated that concepts of foreseeability and intervening and superseding causes are irrelevant under the governmental tort liability act, which focuses exclusively on "the proximate cause." *Cooper v. Washtenaw Cty.*, 270 Mich. App. 506, 509–10. Although the *Harbour* court implied that Mich. Comp. Laws § 600.2925a should be construed in the same fashion as the governmental tort liability act, Mich. Comp. Laws § 600.2925a speaks in terms of "the cause," not "the proximate cause," and the Michigan Supreme Court has indicated that such interpretation is error.[4]

---

[4] In *Beebe v. Hartman*, 290 Mich. App. 512 (2010), the court concluded that Mich. Comp. Laws § 600.2955a did not preclude the plaintiff's claim because there were two distinct injures resulting from two separate events or accidents. In reaching its decision, the majority cited *Robinson* and stated that for the defense to apply, the "plaintiff's impairment from alcohol must . . . have been the one proximate cause of plaintiff's injuries suffered as a result of compartment syndrome." *Id.* at 523. The concurrence found this reasoning erroneous because Mich. Comp. Laws § 600.2955a "does not refer to 'the proximate cause,'" and, therefore, "it is sufficient if a plaintiff's impairment, considered alongside any other proximate causes, constituted 50 percent or more of the cause of the event resulting in the injury." *Id.* at 529 (Bandstra, J., concurring). Subsequently, on the

Corizon also argues—in reply to Plaintiff's argument that the Defendants' improper treatment of Jones, or their failure to treat him, was an independent superseding or intervening proximate cause of Jones's death—that negligent medical treatment of an injury is typically considered foreseeable, meaning that Corizon's alleged negligence would not break the chain of causation resulting from Jones's self-induced alcohol withdrawal. *See Richards v. Pierce*, 162 Mich. App. 308, 317 (1987). Even so, Michigan courts recognize that "whether an intervening negligent act of a third person constitutes a superseding proximate cause is a question for the jury." *Taylor v. Wyeth Labs., Inc.*, 139 Mich. App. 389, 402 (1984) (footnote omitted); *see also Richards*, 162 Mich. App. at 317–18. Moreover, gross negligence "is considered sufficient to break the causal chain between the defendant and the victim because it is not reasonably foreseeable." *People v. Feezel*, 486 Mich. 184, 195 (2010) (internal quotation marks omitted). Here, in addition to ordinary negligence, Plaintiff alleges that Defendants were "deliberately indifferent" to Jones's serious medical needs—a standard the Sixth Circuit has held to be "'akin to criminal recklessness,' a very high standard of culpability that exceeds gross negligence [under Michigan law]." *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (2012) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 947 (6th Cir. 2010)).

B.    **Ordinary/Gross Negligence versus Medical Malpractice**

Corizon next argues that Plaintiff's claim in Count IV for ordinary/gross negligence must be dismissed because it alleges negligence during a professional physician-patient relationship and raises questions regarding medical judgment and, therefore, is properly considered a malpractice claim.

---

defendant's application for leave to appeal, the Michigan Supreme Court vacated the portion of the court of appeals' opinion incorporating *Robinson*, for the reasons stated in the concurring opinion.  *Beebe v. Hartman*, 489 Mich. 956 (2011).

11

Under Michigan law, "[t]he key to a medical malpractice claim is whether it is alleged that the negligence occurred within the course of a professional relationship. The providing of professional medical care and treatment by a hospital includes supervision of staff physicians and decisions regarding selection and retention of medical staff." *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 45 (1999) (quoting *Bronson v. Sisters of Mercy Health Corp.*, 175 Mich. App. 647, 652–53 (1989)). "The gravamen of an action is determined by reading the claim as a whole." *Lee v. Detroit Med. Ctr.*, 285 Mich. App. 51, 61 (2009). The characterization of a claim as one for malpractice or one involving only ordinary negligence turns on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or raise issues involving medical judgment, requiring expert testimony. *Wilson v. Stilwill*, 411 Mich. 587, 611 (1981). Thus, for a claim to be considered a malpractice claim, a professional relationship must have existed, and the claim must involve an issue requiring medical judgment. *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 422 (2004).

As the Court construes Plaintiff's complaint and response, Plaintiff's negligence claim is limited to the allegation that Corizon breached its duty to maintain medical equipment in proper working order. (ECF No. 1 at pageID.56.) In particular, Plaintiff alleges that: (1) after dragging Plaintiff onto the floor of the Medical Isolation Unit, Defendant Goetterman began chest and manual ventilation because the oxygen tank was either empty and/or defective; and (2) when Defendant Goetterman attempted to use the AED on Plaintiff, "'no shock was advised,' the machine was on 'low battery' and it powered off." (ECF No. 1 at PageID.31–32.) Plaintiff argues that no expert testimony is required to determine whether Corizon failed to properly maintain equipment and supplies in the infirmary because Corizon's contract with Kent County required it to adhere to National Commission on Correctional Health Care (NCCHC) standards,

and Standard J-D-03 requires that the facility has, at a minimum, oxygen and an AED. (ECF No. 42 at PageID.421.) Plaintiff argues that whether Corizon failed to meet this obligation as to the oxygen tank and the AED are matters within the common knowledge of the jury.

Corizon argues that Plaintiff's claim sounds in medical malpractice because the gravamen of his complaint is that Jones had a professional relationship with Corizon and its employees and that Corizon failed to properly instruct, train, and supervise its medical staff regarding his treatment. Corizon also argues that Plaintiff concedes that expert testimony is required because his nurse practitioner and registered nurse experts both state in their affidavits that the medical professionals were responsible for timely maintaining, testing, and properly ensuring that medical equipment was functioning and in proper working order. (ECF No. 1-6 at PageID.133, 136.)

It is undisputed that the first question—whether a professional relationship existed— should be answered in the affirmative. Jones had a professional relationship with the medical providers mentioned in his complaint and, therefore, with Corizon. Regarding the second question, in *Johnson v. William Beaumont Hospital*, No. 299215, 2011 WL 5008613 (Mich. Ct. App. Oct. 20, 2011) (per curiam), the plaintiff alleged that her ear was burned by a headlight the doctor wore on her head during the surgery. The plaintiff alleged that the hospital breached its duty to properly maintain its equipment and that both the hospital and the doctor breached their duties to inspect and test the headlight to ensure that it was safe for use. The court concluded that the claim was for malpractice:

> The "headlight" used by Nowak during Johnson's operation is a piece of surgical equipment. In analyzing the reasonableness of the actions of the Hospital in inspecting and testing its surgical equipment, it is necessary to know how often a hospital is required to inspect and test its equipment. This is outside of the scope of the knowledge of a lay juror, as it requires knowledge of the standard of care applicable to the Hospital. Since expert testimony is required for that determination, the claim against the Hospital sounds in medical malpractice.

13

*Id.* at *3.

As noted, Plaintiff's claims are that Corizon employees failed to maintain the oxygen tank because it was either empty or defective and failed to maintain the AED because the battery was low. Applying *Johnson*'s reasoning here, it is not clear that an oxygen tank is analogous to a piece of surgical equipment, particularly because their use is not limited to operating rooms or hospitals. Moreover, an understanding of the defects Plaintiff alleges—an empty or nonfunctioning tank—are not matters clearly beyond the scope of a lay juror's knowledge. At this point, Plaintiff should be allowed to proceed with discovery on this issue, and Corizon may revisit it in the future if the need for expert testimony becomes clear. The alleged AED defect does not require expert testimony. Today, AEDs are widely employed in public buildings, such as schools, government buildings and courthouses, churches, gyms and other non-medical settings, and lay individuals who have no formal medical background or training are often trained to use them. Therefore, an understanding of their proper use and maintenance—including ensuring that they are properly charged—would not necessarily be outside the realm of a lay juror's knowledge.

Accordingly, the Court concludes that Plaintiff's negligence claim based on improper maintenance of the oxygen tank and the AED should be allowed to proceed. However, the Court concludes that the gross negligence portion of Count VI must be dismissed because Michigan law does not recognize an independent cause of action for gross negligence. *See Johnson v. Williams*, No. 15-13856, 2017 WL 4236548, at *16 (E.D. Mich. Sept. 25, 2017) ("However, Defendant correctly asserts that gross negligence claims no longer are independent causes of action under Michigan law, since the Courts have repudiated contributory negligence principles and adopted comparative negligence.") (citing, among others, *Jennings v. Southwood*, 446 Mich. 125, 149 (1994)).

## C. Deliberate Indifference—Defendant Byrne

Corizon argues that Plaintiff's deliberate indifference claim is subject to dismissal because it is based solely on conclusory allegations that Defendant Byrne had subjective knowledge of Jones's condition.

Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. Corizon's motion involves the second step or component of an Eighth Amendment claim, which is the subjective inquiry. The Supreme Court has summarized the subjective inquiry as follows:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it." *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005).

According to Plaintiff's complaint, Defendant Byrne conducted Jones's medical and mental health intake screenings on April 24, 2018 at 5:20 p.m., when Jones first arrived at KCCC. Jones responded to Byrne's questions by indicating that he had no current or past medical or health condition of which medical staff at KCCC should be aware. Defendant Byrne noted that Jones was not under the care of a physician and reported normal findings—normal gait and breathing, no tremors or sweating, no aggressive or angry behavior, no confusion or disorientation, no crying,

and no other significant observations. Defendant Byrne conducted a dental screening but did not detect the odor of alcohol. She noted in the comment section of the Medical Screening Form, "No mental health concerns. No alerts. No chart made." As for questions on the Mental Health Screening Form, Jones answered that he was not currently drunk or high, drank vodka occasionally, and had no concerns about alcohol withdrawal. (ECF No. 1 at Page14–15.) These are Plaintiff's allegations, and they not only fail to show that Defendant Byrne was subjectively aware that Jones was intoxicated and at risk for alcohol withdrawal, but also undermine any reasonable inference that she was subjectively aware of Jones's condition. Based upon these allegations, Defendant Byrne's failure to make further inquiry might amount to negligence, but it does not meet the high deliberate indifference threshold. While Plaintiff alleges, upon information and belief, that Jones exhibited the signs of intoxication and smelled of alcohol and that Defendant Byrne had subjective knowledge of Jones's alcohol withdrawal symptom, these are conclusory allegations, unsupported by facts, and contradicted by Plaintiff's allegations that Jones confirmed that he was not drunk, used alcohol only occasionally, and had no concerns about alcohol withdrawal.

Plaintiff makes much of the fact that Corizon's Exhibit A to its brief, which is the Medical and Mental Health Screening form that Defendant Byrne completed, is redacted, while Plaintiff's Exhibit B—the same form—is not redacted. The Court has no idea why Corizon submitted a redacted form and Plaintiff did not. Regardless, nothing about the existence of a redacted form suggests that Defendant Byrne might have been subjectively aware of Jones's condition. There is no indication that Corizon's redacted exhibit and Plaintiff's exhibit are not the same record.

16

Moreover, Plaintiff's speculative questions about the forms and what other evidence might exist do not save his claim from dismissal.[5]

Accordingly, Plaintiff fails to state a deliberate indifference claim against Defendant Byrne.

### D.     *Monell* Liability—Corizon

Finally, Corizon argues that Plaintiff's claim for *Monell* liability must be dismissed because Plaintiff fails to plead any fact establishing that Corizon had an unconstitutional policy, practice, or procedure that caused a deprivation of Jones's constitutional rights.  Corizon argues that Plaintiff fails to allege specific facts establishing a policy or custom and instead provides "a shot gun list of twenty-two 'policies' in conclusory fashion without specifically expressing where the policy was derived, []or how each policy is 'closely related to the ultimate injury.'"  (ECF No. 29 at PageID.260.)

A private provider of health care services to prisoners, such as Corizon, cannot be held liable under Section 1983 on a theory of respondeat superior or vicarious liability.  *Perry v. Corizon Health, Inc.*, No. 17-2489, 2018 WL 3006334, at *1 (6th Cir. June 8, 2018) (citing *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014)); *see also Monell v. New York Dep't of Soc.*

---

[5] The cases Plaintiff cites, *Tate v. Coffee Cty.*, 48 F. App'x 176 (6th Cir. 2002), *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), and *Cook v. Martin*, 148 F. App'x 327 (6th Cir. 2005), are all distinguishable, as the defendants in those cases were aware of facts indicating that the prisoners were suffering, or had suffered, serious medical conditions.  In *Tate*, the defendant suspected that the plaintiff had suffered a stroke, but she failed to examine him.  48 F. App'x at 180.  In *Comstock*, the psychologist knew that the prisoner had been on suicide watch but failed to adequately follow up on the prisoner's problems with other prisoners before releasing him from suicide observation.  273 F.3d at 704–05.  Finally, in *Cook*, the nurse failed to complete a health history form, perform screenings, and take vital signs, all of which likely would have revealed that the plaintiff had become ill at the previous facility.  The court also concluded that a reasonable jury could find the nurse deliberately indifferent where she was aware of the prisoner's elevated heart rate and lethargic or unconscious state but failed to take appropriate action.  148 F. App'x at 338.

*Servs.*, 436 U.S. 658, 691–92 (1978). To state a claim for relief against a private contractor, a plaintiff must allege that his injuries resulted from the contractor's unconstitutional policy or custom. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). To satisfy *Monell*'s requirements, a plaintiff must identify the policy or custom, connect it to the contractor, and show that the policy caused the injury or deprivation. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003). A plaintiff must allege "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986); *see also Bartalone v. Berrien Cty.*, 643 F. Supp. 574, 578–79 (W.D. Mich. 1986) (stating that a plaintiff in a Section 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which [he] complains").

Plaintiff responds that his *Monell* allegations fall into two categories: (1) failure to screen, train and supervise; and (2) inadequate customs, policies, practices, and procedures. Regarding Corizon's alleged inaction (failure to screen, train, and supervise), Plaintiff can establish liability only where the need to act "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [entity] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). A

plaintiff can allege a failure to train claim under two different theories. First, the plaintiff may show that the entity knew of and disregarded prior instances of unconstitutional conduct such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Alternatively, a plaintiff can demonstrate a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700–01 (6th Cir. 2006) (internal quotation marks omitted). Here, Plaintiff has adequately alleged a failure to train, at least under the second theory. That is, Plaintiff alleges that NCCHC standards regarding alcohol withdrawal advise that prisoners who are intoxicated or undergoing withdrawal should be appropriately managed and treated and that prisoners who are experiencing severe withdrawal should be transferred immediately to an acute care facility. (ECF No. 1 at PageID.11.) The NCCHC standards thus recognize that jails are likely to routinely encounter inmates who are intoxicated and/or experiencing alcohol withdrawal. The need for such training is thus foreseeable.

As for the remainder of Plaintiff's *Monell* allegations, the Court concludes that Plaintiff has sufficiently identified the alleged Corizon policies and connected them to Jones's constitutional injury, at least for purposes of surviving a Rule 12(b)(6) motion to dismiss. Unlike cases in which courts have dismissed complaints because they merely alleged the existence of undefined policies, practices and customs, Plaintiff has alleged specific policies that may be fleshed out in discovery. *See Bilder v. City of Akron*, No. 92-4310, 1993 WL 394595, at *2 (6th Cir. Oct. 6, 1993) (affirming dismissal of the municipality where the plaintiff's allegation of a policy or custom was conclusory, and the plaintiff failed to allege any facts tending to support the allegation"); *Bey v. Trumbull Cty. Health Dep't*, No. 4:18CV1166, 2019 WL 950078, at *5 (N.D.

Ohio Feb. 27, 2019) ("Plaintiff's bare conclusory allegation that Trumbull County's policies, practices, and customs were a 'moving force' behind his injuries is insufficient to state a plausible Section 1983 claim against Trumbull County or any of the county agencies or municipal offices."). As for Corizon's argument that Plaintiff's allegation that Corizon failed to comply with the NCHHS standards and policies that it contractually agreed to follow undercuts Plaintiff's *Monell* claim, it is not a basis for dismissal at this juncture. Corizon is correct that, if it adopted the NCHHS standards as policy and simply failed to follow them in this particular instance, Plaintiff could not show that a Corizon policy caused the alleged violation (assuming the NCHHS standards are in fact constitutionally sufficient). But, as the Court understands Plaintiff's allegations, Plaintiff maintains that Corizon had a deliberate policy of not enforcing or following NCHHS standards. Whether Plaintiff can prove such a policy remains to be seen, but for present purposes his claim may proceed.

## IV.  Conclusion

For the foregoing reasons, the undersigned recommends that Corizon's Motion to Dismiss (ECF No. 29) be **granted in part and denied in part**, dismissing the Eighth Amendment deliberate indifference claim against Defendant Byrne and denying the motion in all other respects.

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: August 14, 2020                               /s/ Sally J. Berens
                                                                    SALLY J. BERENS
                                                                    U.S. Magistrate Judge