UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as the personal
representative of the Estate of Wade Jones,

      Plaintiff,                            Case No. 1:20-cv-36

v.                                         Hon. Hala Y. Jarbou

COUNTY OF KENT, et al.,

      Defendants.
_____/

## OPINION

      Wade Jones died from complications of alcohol withdrawal after serving part of a five-day sentence in the Kent County Correctional Facility ("KCCF"). His estate brought this action against Kent County officials working at KCCF, as well as medical staff at KCCF who work for the County's medical provider, Corizon Health. The Kent County defendants remaining in this action are Sergeant Bryan Knott and Deputies Julie Cooper, Donald Plugge, William Jourden, and William Grimmett. The other remaining defendants are Corizon and its nurses, Teri Byrne, Janice Steimel, Joanne Sherwood, Melissa Furnace, Dan Card, Chad Richard Goetterman, James August Mollo, and Lynne Fielstra (collectively, the "Corizon Defendants"). Deputies Cooper, Plugge, Jourden, and Grimmett (collectively, the "Kent County Defendants") have filed a motion for summary judgment (ECF No. 126), as have the Corizon Defendants (ECF No. 125). For the reasons herein, the Court will grant the motion by the Kent County Defendants. The Court will partially grant and partially deny the motion by the Corizon Defendants.

## I. PLAINTIFF'S CLAIMS

      Plaintiff asserts several claims against Defendants under federal and state law. In Count I of his complaint, Plaintiff contends that the Kent County Defendants were deliberately indifferent

to Jones's serious medical needs, in violation of the Eighth Amendment. The Court dismissed Count II, which asserts that Kent County is liable under 42 U.S.C. § 1983. (*See* 9/23/2021 Order, ECF No. 124.) In Count III, Plaintiff contends that the individual Corizon Defendants were deliberately indifferent to Jones's serious medical needs, in violation of the Eighth Amendment. In Count IV, Plaintiff contends that Corizon is liable under 42 U.S.C. § 1983 for failing to properly train and supervise its medical staff. In Count V, Plaintiff claims that the individual Corizon Defendants are liable for medical malpractice. In Count VI, he contends that Corizon is liable for negligence for failing to maintain working oxygen tanks and an AED.[1]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. SUMMARY OF THE EVIDENCE

### A. Alcohol Withdrawal & Delirium Tremens

Understanding Jones's condition requires an understanding of alcohol withdrawal. In a person who drinks alcohol frequently, their blood alcohol level reaches a "baseline or steady-

---

[1] Plaintiff also claimed that Corizon is liable for "gross negligence," but the Court dismissed that part of the claim. (11/5/2020 Order adopting Report & Recommendation, ECF No. 93.)

state." (Furman[2] Dep. 80, ECF No. 125-2.)  If their blood alcohol level drops below that baseline, they can experience ill effects.  (*Id.* at 81.)  Alcohol impairs the sensory nervous system.  (*Id.* at 121.)  When the blood alcohol level of a chronic drinker falls below the baseline, the nervous system can overact, "stimulat[ing] cardiac activity[,] caus[ing] peripheral vasoconstriction[,] rais[ing] heart rate[,] and . . . decreas[ing] cerebral blood flow[.]"  (Fintel[3] Dep. 63-64, ECF No. 125-3.)  Symptoms of that overaction can include hyperventilation, agitation, tremors, mental confusion, and hallucinations.  (*Id.*)  Other symptoms of withdrawal can include insomnia, anxiety, increased temperature, and increased blood pressure.  Mark A. Schuckit, *Recognition & Management of Withdrawal Delirium (Delirium Tremens)*, 371 New Eng. J. Med. 2109 (2014).

Delirium tremens is an "uncommon, serious complication" of alcohol withdrawal.  *See id.* at 2112.  "The criteria for [delirium tremens] . . . are delirium (a rapid-onset fluctuating disturbance of attention and cognition, sometimes with hallucinations) plus alcohol withdrawal."  *Id.* at 2110.  "About 50% of persons with alcohol-use disorders have symptoms of alcohol withdrawal when they reduce or discontinue their alcohol consumption; *in 3 to 5% of these persons*, grand mal convulsions, severe confusion (a delirium), or both develop."  *Id.* at 2109 (emphasis added).  The symptoms of delirium tremens typically begin two to three days after the last drink.  (Fintel Dep. 50.)

### 1. Treatment of Alcohol Withdrawal

Without appropriate medical care, delirium tremens can be fatal.  (Furman Dep. 123.)  One of Plaintiff's experts, Dr. Fintel, estimates that 20 to 40 percent of patients with delirium tremens die when the condition is left untreated.  (Fintel Dep. 97.)  Even in the hospital setting, roughly "1

---

[2] Registered Nurse Stephen Furman appears to be one of Plaintiff's standard-of-care experts.

[3] Dr. Dan James Fintel, one of Plaintiff's experts, is a cardiologist who has worked with patients undergoing alcohol withdrawal.  (Fintel Dep. 7, 10.)

to 4% of hospitalized patients with [delirium tremens] die," but "this rate could be reduced if an appropriate and timely diagnosis were made and symptoms were adequately treated."  Schuckit, 371 New Eng. J. Med. at 2110.  "Death usually results from hyperthermia, cardiac arrhythmias, complications of withdrawal seizures, or concomitant medical disorders."  *Id.*

"The major treatment goals for [delirium tremens] are to control agitation, decrease the risk of seizures, and decrease the risk of injury and death[.]"  *Id.* at 2111.  "[M]anagement of [delirium tremens] includes a careful physical examination and appropriate blood tests to identify and treat medical problems that may have contributed to the severe withdrawal state."  *Id.*  Treatment generally involves "helping to reorient the patient in a well-lit room, providing reassurance, performing frequent monitoring of vital signs, and ensuring adequate hydration."  *Id.*  Maintaining hydration is important because individuals undergoing withdrawal often do not take in adequate "fluid and food."  (Fintel Dep. 64; Yacob[4] Dep. 86, ECF No. 136-11.)  Dehydration impairs heart function and the body as a whole.  (Yacob Dep. 86.)  In addition, benzodiazepines are given to "control agitation, promote sleep, and raise the seizure threshold."  Schuckit, 371 New Eng. J. Med. at 2112.

### 2. Evaluating the Severity of Alcohol Withdrawal

To assess the severity of withdrawal symptoms, medical staff at KCCF use a "Clinical Institute Withdrawal Assessment" form for alcohol withdrawal ("CIWA-Ar").  That form contains ten categories, all but one of which are scored on a scale of zero to seven:  "Nausea and vomiting"; "Tremor"; "Paroxysmal sweats"; "Anxiety"; "Headache, fullness in head"; "Agitation"; "Tactile disturbances"; "Auditory disturbances"; "Visual disturbances"; and "Orientation and clouding of sensorium."  (*See, e.g.*, 4/26/2018 CIWA-Ar, 125-6, PageID.1507.)  The last category, orientation,

---

[4] Dr. Nasim Yacob was a medical provider for KCCF in 2018.  (Yacob Dep. 12-13, 20.)

is scored on a scale of zero to four.  On the form, seven of those ten categories provide questions for the person conducting the assessment to ask the patient.  For nausea:  "Do you feel sick to your stomach? Have you vomited?"  (*Id.*)  For anxiety:  "Do you feel nervous?"  (*Id.*)  For headache: "Does your head feel different; as if there is a band around your head?"  (*Id.*)  For tactile disturbances:  "ask about:  Feelings of itching, pins and needles, burning, numbness or bugs crawling on or under your skin?"  (*Id.*)  For auditory disturbances: "Do the sounds around you seem harsh or frightening or disturbing? Are you hearing things that you know are not there?" (*Id.*) For visual disturbances:  "Does light appear to be different, too bright or hurt your eyes?  Are you seeing anything that isn't there?"  (*Id.*)  For orientation:  "What day is this? Where are you? Who am I?"  (*Id.*)  The answers to these questions, and the nurse's observations of the patient, guide the scoring.  The most serious symptoms that receive the highest scores in their respective categories are:  "constant nausea, frequent dry heaves and vomiting"; "severe [tremors], even with arms not extended"; "drenching sweats"; anxiety "equivalent to acute panic states"; severe headache; pacing or thrashing about during most of the interview; continuous hallucinations; and "disorient[ation] for place and/or person."  (*Id.*)

The maximum possible score on the CIWA-Ar is 67.  (*Id.*)  According to Corizon's form, a score of 20-67 is considered "severe," 10-19 is "moderate," and 0-9 is "mild."  *(Id.)*  Under Corizon's policy, a score of 20 or higher is considered an "emergent" situation.  (Card Dep. 55, ECF No. 125-14; Goetterman Dep. 177, ECF No. 125-15.)  Nurse Card testified that Corizon's general practice in these situations is for the nurse conducting the assessment to contact the charge nurse, who contacts the medical provider on call (i.e., a nurse practitioner or physician) to discuss the circumstances.  (*Id.* at 55, 73, 88-89.)  Corizon's training materials indicate that "[i]ndividuals

in severe alcohol . . . withdrawal should be recommended for transfer to the emergency room." (Corizon New Employee Orientation in Clinical Presentation, ECF No. 136-18, PageID.3026.)

The CIWA-Ar form also contains spaces for recording the patient's vital signs, including body temperature, pulse rate, respiration rate, and blood pressure.  (*See* Pearson Dep. 79-80, ECF No. 136-14.)  These vital signs do not factor into the scoring, but they are "important" for assessing a person going through withdrawal.  (Jouney[5] Dep. 78, ECF No. 125-16.)  They can be an indicator of how severe the withdrawal is.  (Yacob Dep. 84.)  When alcohol withdrawal leads to a high pulse rate or high blood pressure, that symptom needs to be addressed.  (*Id.*)  Generally, diastolic blood pressure higher than 100, temperature higher than 100 degrees, or pulse higher than 100 are concerning.  (*Id.* at 102.)

The CIWA-Ar is a "universal" method for assessing alcohol withdrawal.  (Furman Dep. 52.)  However, scoring a CIWA-Ar is somewhat subjective.  (*Id.* at 89.)  Depending on who is conducting the assessment, the total score in a given case could range from 16 to 25.  (*Id.* at 90.) Also, the symptoms of withdrawal can wax and wane, resulting in different scores at different times.  (*Id.* at 91.)  And if the patient is not truthful or cooperative, the assessment is more difficult. (*Id.* at 108.)

Corizon also uses another form for assessing alcohol withdrawal, called the Substance Abuse Withdrawal Nursing Encounter Tool ("SAW NET"), but that form is generally used only during the intake process or the "first face-to-face encounter" with an inmate undergoing alcohol withdrawal.  (*See* Card Dep. 46, 52, 58, 65, 83; Goetterman Dep. 82-83; Johnson[6] Dep. 95-96, ECF No. 125-24; *see also* Corizon's NET training slides, ECF No. 136-17, PageID.3007

---

[5] Dr. Edward Jouney is Corizon's expert in "addictions, medicine and detoxification."  (Jouney Dep. 15.)

[6] Penny Johnson was Corizon's Health Services Administrator in 2018.  (Johnson Dep. 12.)

(identifying Corizon's NET for withdrawal as the "*Initial* Withdrawal Screening" (emphasis added)).)  Unlike the CIWA-Ar, the SAW NET contains a Glasgow Coma Scale.  (Goetterman Dep. 86.)  Also, the SAW NET has checkboxes to select a type of intervention, including "emergent, urgent, contact practitioner, and nursing intervention."  (*Id.* at 87.)  "Emergent intervention" means "EMS activation."  (Corizon New Employee Orientation slides, ECF No. 136-17, PageID.3016.)  But those instructions are "guidelines"; they "do not take the place of sound nursing judgment[.]"  (NET Orientation Checklist, ECF No. 136-17, PageID.3018; Yacob Dep. 73, 133-36.)

### B. Timeline of Events

#### 1. April 24, 2018

##### (a) Jones pleads guilty to retail fraud (1:30 pm).

On April 24, 2018, at approximately 1:30 pm, Jones appeared for an arraignment hearing at the 59th District Court in Walker, Michigan.  (*See* Hr'g Tr., ECF No. 125-1.)  Jones had been charged with retail fraud for stealing alcohol and golf balls on April 13, 2018.  (*Id.* at 5.)  The judge read him his rights and Jones stated that he intended to plead guilty.  After questioning Jones, the court determined that Jones understood his rights and that his guilty plea was a knowing and voluntary one.

Before proceeding to sentencing, the court adjourned for about an hour so that Jones could meet with a probation officer.  In their meeting, the probation officer smelled a "strong odor" of alcohol on Jones.  (*Id.* at 7.)  Jones admitted that he had consumed alcohol earlier in the day.  Jones told the officer that he began drinking when he was 17 years old and that his alcohol use had increased to two or three drinks of vodka per week.  (*Id.*)  Jones agreed to submit to two portable breath tests, ten minutes apart.  The first test showed a breath alcohol content of 0.159 and the

second showed an alcohol content of 0.145.  (*Id.*)  Those scores are well above Michigan's legal limit of 0.08.  (Furman Dep. 112.)

After the probation officer reported this information to the court, the court asked Jones if he felt intoxicated and Jones said, "No."  (Hr'g Tr. 9.)  The court observed that Jones did not "present as intoxicated," so the court speculated that Jones had "a tolerance built up."  (*Id.*)  That observation was consistent with the experience of Jones's girlfriend, Jennifer Razzoog.  She says that Jones consumed *six to seven drinks per day*, but she never thought of him as intoxicated. (Razzoog Dep. 112-13, ECF No. 125-4; Furman Dep. 111 (agreeing the Jones had "functional tolerance"); Fintel Dep. 33 (same).)  The court chastised Jones for "com[ing] to court after having consumed alcohol" and told Jones that he had "an alcohol problem[.]"  (Hr'g Tr. 10.)  The court sentenced him to five days of incarceration at KCCF.  (*Id.*)  The hearing ended at 3:01 pm.

### (b) Jones undergoes intake screening at KCCF (5:00 pm).

At 4:40 pm, an officer transported Jones to KCCF.  When Jones arrived at the facility, the booking officer completed an intake form, checking "No" to the question of whether the officer knew or believed that Jones had a medical condition.  (Central Intake Admission Form, ECF No. 136-1, PageID.2839.)

As part of the booking process, Deputy Natascha Hirdes asked Jones a set of questions on a triage screening form.  (*See* Hirdes Dep. 34-35, ECF No. 136-2.)  Based on information she received from the booking officer, from Jones's responses to her questions, and from her own observations, she entered "No" to the following questions:

> Ask the arresting officer, "Do you have any reason to think that this person has a medical condition?"
>
> . . .
>
> Is the inmate uncooperative, very angry or acting in an aggressive manner?

Does this inmate appear to be confused or disoriented?

Is the inmate expressing suicidal thoughts . . . ?

Was there a BAC test?

(Booking Form, ECF No. 136-4, PageID.2865.)  If Jones had appeared disoriented, confused, or under the influence of alcohol, Hirdes would have reported it to medical staff.  (Hirdes Dep. 57.) There was plexiglass between Hirdes and Jones, with a speaker between them to communicate, so she would not have been able to smell any alcohol on Jones.  (*Id.* at 55.)

Nurse Byrne conducted a medical screening of Jones at 5:27 pm.  On the screening form, she noted that his gait and breathing were normal, and he did not present as sweating, anxious, disheveled, lethargic, confused, or disoriented.  (Medical Health Screening Form, ECF No. 42-4, PageID.446.)  She entered "No" and "DENIES" to the questions  "Are you currently drunk or high?" and "Do you have any alcohol withdrawal concerns?"  (*Id.*, PageID.448.)  Jones did not tell Byrne the truth about his alcohol consumption.  According to the form, Jones told her that he drinks "vodka occas[]ionally."  (*Id.*)  Byrne did not note any medical concerns and concluded that there were no mental health concerns.  (*Id.*, PageID.449.)  Consequently, she did not create a medical chart or obtain his consent to receive medical treatment.  (*See* Goetterman Dep. 137 (testifying that, typically, staff create a medical chart and complete consent-to-treat forms during intake).)

### (c) Deputy Cooper reports Jones is undergoing withdrawal (9:00 pm).

After Jones completed the intake screening, officers moved him to the orientation unit. Deputy Cooper was working on that unit.  Near the end of her shift, around 9:00 pm, deputies who had escorted Jones to his cell told Cooper that Jones might be experiencing alcohol withdrawal.

(Cooper Dep. 42-43, 46, ECF No. 127-5[7].)  At that point, Jones had been assigned to a cell on the upper level.  Cooper had him moved to a cell on the lower level where he would not have to walk up and down stairs and where he could be seen more easily by the deputies at their station.  (*Id.* at 41.)

The cell to which Cooper assigned Jones is located in the "L1" unit on the main level of the facility.  It was a "side cell," part of a group of four cells that open into a small, secured "sub-dayroom" adjacent to the deputy station.  (*Id.* at 38, 40-41; Jourden Dep. 23, ECF No. 135-8[8].)  Prisoners in these cells typically eat their meals at tables in the sub-dayroom instead of in the larger dayroom with the general population.  (Grimmett Dep. 28-29, ECF No. 135-6[9].)  Each cell has a door with a vertical window, visible from the deputy station through a wall of windows separating the deputy station from the sub-dayroom.  (*See* Cooper Dep. 41.)  Prisoners with disciplinary issues, medical conditions, withdrawal alerts, and lower bunk restrictions are generally placed in these cells.  (*Id.* at 36-38; Jourden Dep. 24.)  At the deputy station, officers have the ability to activate cameras that can monitor what's happening inside the cells.  (Grimmett Dep. 19-20; Jourden Dep. 26.)

Shortly after 10:00 pm, Cooper entered two medical alerts into the electronic Jail Management System ("JMS") for Jones:  a withdrawal alert and a lower-bunk alert.  (*See* 4/24/2018 Alerts, ECF No. 127-6, PageID.2224-2225.)  These alerts are visible at the top of the computer screen whenever jail staff conduct inmate inquiries on the JMS.  (Nelson Report, ECF No. 127-7, PageID.2229.)  Medical staff have access to these alerts.  (Furnace Dep. 61, ECF No. 125-10; Johnson Dep. 39.)  However, the purpose of these alerts is to inform deputies of medical

---

[7] Excerpts of Cooper's deposition are also located at ECF No. 135-3.

[8] Excerpts of Jourden's deposition are also located at ECF No. 127-16.

[9] Excerpts of Grimmett's deposition are also located at ECF No. 127-4.

concerns regarding specific inmates because deputies cannot access the inmates' medical information.  (Johnson Dep. 40, 127.)  Medical staff do not automatically receive notice of the alerts when deputies enter them into the JMS.  (*Id.* at 40, 138.)

When *an inmate* requests medical assistance, KCCF policy required deputies to inform medical staff of this request through a "notification" in the JMS.  (Kalman Dep. 117-18, ECF No. 127-8[10].)  A notification is an entry directed to a specific person or division, like an email.  (Grimmett Dep. 42.)  Cooper did not send this notification.  Instead, Cooper says she called the medical office to inform them of the withdrawal alert for Jones; there is evidence that this call occurred, but Cooper does not recall who she spoke with.  (Cooper Dep. 44, 60.)

Nurse Furnace was the charge nurse on duty for that evening, and for the next two evenings, working from around 10:00 pm to 6:30 am.  (Furnace Dep. 69; Payroll Record, ECF No. 136-6, PageID.2870.)  In that role, she supervised the medical assistants and other nurses.  (*Id.* at 24.)  She does not recall Jones.  (*Id.* at 59.)  Anyone working in the medical office that evening could have received Cooper's call.  (*Id.* at 70-71, 134; Johnson Dep. 32, 36.)

Medical staff generally perform withdrawal checks and dispense medication each day at 4:00 am, 1:00 pm, and 7:00 pm.  (Furnace Dep. 52-53; Card Dep. 46-47.)  However, Jones did not receive a withdrawal check until April 26, either because Cooper did not properly notify medical staff about Jones's alcohol withdrawal, or because whoever answered her call did not properly record Jones's need for one.

---

[10] Excerpts of Kalman's deposition are also located at ECF No. 135-10.

### 2. April 25, 2018

### (a) Jones begins vomiting (12:09 am – 7:38 am).

Lieutenant Emily Kalman reviewed the video of Jones's cell during his entire time in custody at KCCF.  (Kalman Dep. 78.)  According to her investigation report, the video shows Jones bending over his toilet, possibly vomiting, at 10:31 pm on April 24 and at 12:09 am, 1:10 am, 2:10 am, 3:17 am, 5:04 am, and 7:38 am on April 25.  (Kalman Report, ECF No. 135-11, PageID.2651-2652.)

Jones was not evaluated at the 4:00 am withdrawal check.  Nurse Card performed the routine withdrawal checks at 3:41 am on April 25, but he did not assess Jones.

### (b) Deputy Grimmett starts his shift (7:00 am).

Deputy Grimmett was the unit deputy for the L1 unit during the day shift on April 25.  His shift started at 7:00 am and ended at 7:00 pm.  His usual routine at the start of his shift was to log into the computer, assess his equipment, and wait for the first head count.  (Grimmett Dep. 48.)  There is a "floor card book" at the deputy station that "usually" contains the alerts on file for the inmates in the unit.  (*Id.* at 48, 53.)  Grimmett could also access the inmates' information in the JMS.

During the day shift, deputies in the L1 unit typically conduct "block checks" every 40 minutes.  (*Id.* at 20.)  The purpose of these checks is to check on the "wellbeing of the inmates." (*Id.* at 21.) In addition, Grimmett would conduct "head counts" where he would take a roster around to each cell to make sure the inmates assigned to that cell were in the cell and that they were alive and well.  (*Id.* at 22.)  Grimmett was aware that alcohol withdrawal could be fatal.  (*Id.* at 39.)  From his training, he knew that the signs and symptoms of severe withdrawal were hallucinations and shaking.  (*Id.* at 39-40.)

To perform a proper block check, KCCF policy requires the officer to enter the sub-dayroom and walk past each cell.  (Jourden Dep. 51-52.)  According to Grimmett's activity log, he conducted 10 block checks and 2 head counts during his shift on April 24.  (*See* Activity Log, ECF 127-15; Pl.'s Summary of Activity Log, ECF No. 135, PageID.2464.)  However, Grimmett did not enter the sub-dayroom for most of his cell checks, and he looked in or at Jones's cell for only three of them.  (Pl.'s Summary of Grimmett's Cell Checks, ECF No. 135-13, PageID.2675.)

### (c) Deputy Plugge conducts a classification interview (12:50 pm).

At 12:48 pm, Deputy Plugge interviewed Jones in the classification office near the deputy station.  Plugge saw that Jones had alerts in his file for alcohol withdrawal and a lower bunk.  (*See* Classification Note, ECF No. 127-12, PageID.2324.)  However, Jones told Plugge that he had not received his withdrawal medication yet.  (*Id.*)  Jones also told Plugge about his "daily liquor use" and said that he was "having issues sleeping and throwing up."  (*Id.*)  Plugge observed some "anxiety" in Jones, but overall, as Plugge later told Grimmett, Jones "presented pretty well"; he was "joking around" and "laughing."  (Plugge Dep. 48, ECF No. 127-13.)  Plugge told Jones that he should talk to medical staff about receiving medication when they come around for their withdrawal checks.  (*Id.* at 51.)  Plugge decided not to move Jones to another cell, but he told Grimmett to "keep an eye on the withdrawals."  (*Id.* at 48.)

Plugge then entered the following note into the JMS:

> FIRST TIME IN JAIL. NO KSEPS OR DRU. WD, LB, R1 ALERTS.  GOING THRU ALC WD'S. STATES HASN'T REC MEDS YET. HAVING ISSUES SLEEPING AND THROWING UP. SOME ANXIETY. USED TO TAKE MEDS. NO S/I. DAILY LIQUOR USE. NO PAST TX. . . . PREA COMPLETED. LEAVE IN CURRENT LOCATION UNTIL WD'S IMPROVE.

(Classification Note, PageID.2324-2325.)

Plugge says he did not follow up on the fact that Jones had not received medication because he "had no reason . . . to believe [Jones] wouldn't get medications if he needed them."  (Plugge

Dep. 48.) Also, as Plaintiff's expert agrees, Plugge understood that not everyone on a "withdrawal protocol" receives medication. (*Id.*; *see* McMunn[11] Dep. 99-100, ECF No. 125-9 (for a person on a withdrawal protocol, a nurse could decide "no medication, some medication, [or] a transport to the emergency room"); Jouney[12] Dep. 141, ECF No. 125-16 (not all withdrawal patients require "drug intervention"); Fintel Dep. 109-110 (observation is sufficient when the patient scores around 10 on a CIWA).)

### (d) Jones approaches Grimmett at the deputy station (1:00 pm).

After leaving the classification interview, Jones approached the officers at the deputy station. (*See* 4-25-18 Deputy Station 23 Video, Ex. 7.d to Pl.'s Resp. Br., ECF No. 135.) Plaintiff describes the video of this interaction as showing that Jones waited to talk to Grimmett, and Grimmett did not acknowledge or respond to him, so Jones left. (*See* Pl.'s Br. 14-15, ECF No. 135.) Instead, the video shows that Jones approached the desk and waited for a few moments. He then appears to say a few words to one of the two officers (who Plaintiff identifies as Grimmett). Grimmett then turned his chair around, away from Jones, shuffled through some papers and shrugged with his hand before turning back around. Jones then walked away from the desk.

### (e) Jones does not receive a withdrawal check (1:30 pm).

No one assessed Jones at the 1:00 pm withdrawal check. Video footage shows Grimmett receiving paperwork from a nurse at 1:30 pm, but Grimmett did not have Jones come out of his cell for a check or let the nurse into the sub-dayroom to check on Jones.

---

[11] Nurse Practitioner Michael McMunn is Plaintiff's standard-of-care expert for a licensed nurse practitioner. (McMunn Dep. 57.)

[12] Dr. Edward Jouney is Corizon's expert on "addictions, medicine and detoxification." (Jouney Dep. 15.)

### (f) Deputy Jourden starts his shift (7:00 pm).

Deputy Jourden started his shift at 7:00 pm.  According to Jourden, he does not know which inmates need a withdrawal check until the nurse comes to the unit and presents him with a list. (Jourden Dep. 33-34.)  The nurse cannot conduct the check without an officer present, so Jourden decides which inmates can come out of their cell for the check.  (*Id.* at 35.)  The other inmates are checked from inside their cell or at the doorway to their cell.  (*Id.*)

### (g) Jones does not receive a withdrawal check (7:00 pm).

No one assessed Jones for withdrawal symptoms at the 7:00 pm withdrawal check.

### (h) Deputy Jimenez meets with Jones (7:30 pm).

At around 7:30 pm, Deputy Jimenez stopped by Jones's cell to visit him.  Jimenez was not on duty, but he was friends with Razzoog, who had asked Jimenez to check on Jones.  (Jimenez Dep. 24-25, ECF No. 127-14.)  Jimenez met with Jones for about two minutes.  (*Id.* at 42.)  Jimenez asked Jones how he was doing and whether he needed anything.  (*Id.* at 40.)  Jimenez was familiar with the signs and symptoms of alcohol withdrawal through his years of experience as a correctional officer.  (*Id.* at 14-15.)  According to Jimenez, Jones did not appear to be exhibiting those symptoms.  (*Id.* at 40.)  Jones did not tell Jimenez about vomiting or not eating food, and he did not say that he was experiencing withdrawal.  (*Id.*)  Jimenez did not notice anything "unusual" about Jones.  (*Id.* at 42.)

A video shows that Jimenez entered Jones's cell, remained there for a couple minutes, and then headed back to the deputy station.  (4-25-18 Deputy Station 39 Video, Ex. 7.e to Pl.'s Br., ECF No. 135.)  Standing near the station was a nurse next to a cart.  As Jimenez approached the station, he spoke to Jourden, who was seated behind his desk.  Plaintiff says that Jimenez shook his hands, "imitating a person with hand tremors," and then "[a]ll three men look[ed] . . . in the direction of Jones'[s] cell."  (Pl.'s Br. 16, ECF No. 135.)  However, the video shows something

different. After Jimenez reached the desk, the nurse turned his head and looked toward Jones's cell momentarily as Jimenez looked in the same direction. Then, Jimenez lifted his hands and shook them back and forth. He continued talking with Jourden for a few seconds. Jourden did not look toward Jones's cell.

### 3. April 26, 2018

#### (a) Jourden notes withdrawal symptoms (1:00 am).

Just before 1:00 am on April 26, Jones tried to open his cell door. (Kalman Report, PageID. 2320.) At 1:02 am, Jourden entered the following "case note" in the JMS regarding Jones: "Inmate has started to display symptoms of alcohol WD. Hallucinations, confusion, picking, and banging on door to escape. Will continue to monitor." (ECF No. 127-18, PageID.2384.) Case notes are accessible to deputies and medical staff. (Jourden Dep. 43.) Medical staff received this information around 1:38 am. (Johnson Dep. 129.) Jourden checked on Jones at least two more times before medical staff arrived at 3:30 am. (*See* Kalman Report, PageID.2320.)

#### (b) Nurse Steimel conducts Jones's first withdrawal check (3:30 am).

At 3:30 am, Nurse Steimel arrived at the L1 unit to conduct withdrawal checks. She gave Jourden a list of inmates who needed to be checked. Jones's name was not on the list, so Jourden looked up Jones's information in the JMS and found his withdrawal alert. (Jourden Dep. 90.) He told Steimel that Jones needed an evaluation, and she did one by interacting with Jones through the food slot in his door. (4-26-18 Deputy Station 27 Video, Ex. 7.f.) She then completed a CIWA-Ar. That assessment scored Jones at 19, which is at the high end of the "moderate" range. (4/26/2018 CIWA-Ar, ECF No. 125-6, PageID.1507.) In her assessment, Steimel noted no nausea or vomiting, moderate fidgeting, moderate sensitivity to light and sound, and "disorient[ation] for date by more than 2 calendar days[.]" (*Id.*) She also noted that he was not taking fluids and that he had a pulse of 124, which is considered "abnormal" according to Corizon's withdrawal flow

sheet (which is what she used to record the results of her assessment).  (Substance Abuse Withdrawal Flow Sheet, ECF No. 125-6, PageID.1504.)  A high pulse rate can indicate anxiety or that the heart is "working harder."  (Steimel Dep. 67, ECF No. 125-8.)  And it can lead to a heart attack in some situations.  (Fielstra Dep. 43, ECF No. 125-13.)  Steimel reported Jones's condition to Furnace.  (Steimel Dep. 77-78, 92-93.)  She did not obtain Jones's blood pressure.

After this check, Jourden entered the following note about Jones into the JMS:  "Seen by Nurse [Steimel] approx.  0400 hrs.  Still showing signs of WD's, medical advised he will be seen again soon."  (ECF No. 127-20, PageID.2392.)

### (c) Nurse Furnace orders medication and monitoring (5:30 am).

At 5:30 am, after consulting with Nurse Practitioner Sherwood, Nurse Furnace completed an order for Jones to receive medication for alcohol withdrawal.  (*See* Practitioner's Orders, ECF No. 125-6, PageID.1510.)  The order noted "high" acuity withdrawal with hallucinations as a symptom.  (*Id.*)  It ordered that Jones have his vitals taken once per shift and receive 10 mg of Diazepam (Valium) every 8 hours for two days.  (*Id.*)  It also ordered a daily multivitamin, a daily dose of 100 mg of thiamine, and 25 mg of Promethazine (anti-nausea medication) as needed.  (*Id.*)  Furnace expected that Jones would receive his medication at the next scheduled withdrawal check, at 1:00 pm.  (Furnace Dep. 94.)

### (d) Jourden completes his shift; Grimmett replaces him  (7:00 am).

Jourden checked on Jones several more times before the end of his shift.  (Kalman Report, PageID.2320.)  At 6:13 am, Jourden noted in the JMS that Jones did not eat the breakfast offered to him.  (ECF No. 127-21, PageID.2394.)

Jourden's shift ended at 7:00 am.  Jourden's usual practice at the end of his shift was to brief the oncoming deputy about the status of inmates who have medical conditions so that the deputy can keep an eye on those inmates.  (Jourden Dep. 58.)  On the morning of April 26,

17

Grimmett was that deputy.   Video of their shift change shows Jourden talking to Grimmett. Jourden pointed toward Jones's cell and then Grimmett looked in that direction.  (4-26-18 Deputy Station 40 Video, Ex. 7.g.)  Jourden then continued talking to Grimmett.

### (e) Jimenez visits Jones again (7:22 am).

Jimenez stopped by to see Jones again at around 7:22 am.  Jimenez says that Jones gave him a "blank stare" and did not seem to recognize him.  (Jimenez Dep. 49-50.)  Otherwise, Jimenez did not notice anything unusual.  (*Id.* at 50.)

### (f) Grimmett checks on Jones throughout his shift.

The activity log indicates that Grimmett performed a total of fourteen block checks and two head counts during his 12-hour shift.  (Activity Log, PageID.2352-2357.)   Video evidence indicates that he looked inside Jones's cell seven out of those fourteen times.  (*See* Pl.'s Summary of Grimmett's Cell Checks, PageID.2675-2676.)

### (g) Jones receives his first dose of medication (1:00 pm).

Nurse Mollo gave Jones his withdrawal medication at around 1:00 pm.  Steimel was also present.  (*See* Steimel Dep. 81-82.)  Steimel and Mollo were "help[ing] each other out" during the withdrawal check.  (*Id.* at 81.)  There is an unsigned CIWA-Ar assessment from that date and time which scored Jones at 13.  (4/26/2018 CIWA-Ar, ECF No. 125-6, PageID.1505.)  Mollo does not recall his encounter with Jones (Mollo Dep. 29-30, 90, ECF No. 125-12), but a video shows him bringing medicine to Jones's cell and talking to Jones for about 40 seconds through the food slot in Jones's cell door.  (4-26-18 Deputy Station 29 Video, Ex. 7.h.)  Mollo testified that it normally takes him 20 to 25 seconds to perform such an assessment.  (Mollo Dep. 49.)  Mollo did not attempt to take Jones's vital signs.

### (h) Nurse Fielstra attempts to give Jones his medicine and conducts a withdrawal check (6:30 pm).

At around 6:30 pm, Nurse Fielstra arrived at Jones's cell to give him medication and conduct a withdrawal check.  On the video, Jones appears fidgety and confused, making odd gestures with his hands.  (4-26-18 Deputy Station 27 Video, Ex. 7.j.)  Fielstra had to get his attention to come to the door by slapping the food slot.  She held his medicine (dissolved in liquid) in a cup in the food slot and he took it from her, but he appears to have been confused about what to do with it.  He held the cup and looked around his cell as she repeatedly motioned for him to drink.  Instead of following her directions, he put it down and then walked back to the cell door. He apparently went back and picked it up again, but it is not clear from the video whether he actually took the medicine because his body is partially obscured by the doorway.  However, Fielstra shook her head, suggesting that he did not comply.  According to Fielstra, Jones took the medicine because she noted it on the "Medication Administration Record."  (Fielstra Dep. 88; Medication Admin. R., ECF No. 125-6, PageID.1508.)

In her written CIWA-Ar assessment, Fielstra scored Jones at 21, putting him on the low end of the "severe" category.  (See 4/26/2018 CIWA-Ar, ECF No. 125-6, PageID.1505.)  She testified that they would have transferred him to an acute care facility if he was hallucinating and not responding to medicine, but she does not recall him hallucinating (Fielstra Dep. 61), and her CIWA-Ar assessment does not note it.  Instead, it notes moderate sensitivity to sound and light and a high level of agitation.  She did not take his vital signs or attempt to do so.

Sometime later, Fielstra's supervisor had her prepare a written statement about the "incident" involving Jones.  (Fielstra Dep. 92-93.)  She wrote the following:

4/26/18  Seen for WD @ 1900.  WD.  Came back from WD.  Discuss inmate[']s condition [with] present CN [and] oncoming CN.

19

(Fielstra Statement, ECF No. 125-6, PageID.1515.)  That statement was not part of Jones's medical record.  (Fielstra Dep. 93.)

Corizon's policy required nurses to report scores of 20 or higher to the charge nurse. (Mollo Dep. 37.)  Fielstra does not recall what she discussed with the charge nurse.  (Fielstra Dep. 94.)  If she reported the CIWA-Ar score, Corizon's policy required the charge nurse to contact a medical provider.  (Furnace Dep. 128.)  According to Furnace, however, not every score of 20 or higher is an emergency; it depends on the patient.  (*Id.* at 129.)

### (i) Jourden contacts medical staff (9:24 pm).

Jourden began the night shift at 7:00 pm.  At 9:24 pm, Jourden called medical staff about Jones.  (Jourden Dep. 68-69.)  Mental health staff arrived at Jones's cell at 9:58 pm and spoke to him for over a minute.  (Kalman Report, PageID.2321.)  During that conversation, Jones hit the cell door with the sides of his palms two or three times.  (*Id.*)

### (j) Jones falls from his bunk (10:52 pm).

At 10:52 pm, Jones jumped or fell from the top bunk, hitting the ground and rolling to the opposite wall of his cell.  (*See* 4-26-18 Deputy Station 27 Video, Ex. 7.k.)  After a few moments, he got back up and returned to pacing around his cell.  (*Id.*)  Jourden did not see Jones's fall. (Jourden Dep. 71.)

### 4. April 27, 2018

#### (a) Jourden contacts medical staff because Jones cut his elbow (12:14 am).

During a block check at 12:14 am, Jourden opened the door of Jones's cell.  He saw that Jones had a cut on his elbow and observed that he was hallucinating, so Jourden called medical staff.  (Jourden Dep. 76-77.)  Jones was sitting in the corner by the back wall with his mattress on the floor.  (*See* 4-27-18 Deputy Station 27 Video, Ex. 7.l.)

At 12:25 am, Jourden made the following entry into the JMS:

Medical contacted about inmates Jones condition.  Inmate Jones now has a small laceration on his right elbow from his rapid movements inside his cell.  Medical advised he will be seen.

(ECF No. 127-24, PageID.2401.)

Nurse Furnace was the charge nurse during that shift.  (Furnace Dep. 133-34.)  It is possible that she received Jourden's call, but she does not remember.  (*Id.* at 134.)  Anyone in the medical office could have taken Jourden's call.  (*Id.*)

According to Jourden, medical staff told him that Jones had not signed a form to consent to treatment, so Jourden asked them to send a form down.  (Jourden Dep. 103.)  Christopher Pearson, a medical assistant, arrived a few minutes later with a medical chart and a clipboard.  (4-27-18 Deputy Station 39 Video, Ex. 7.l.)  Furnace does not recall whether she is the one who sent Pearson.  (Furnace Dep. 136.)

Jourden accompanied Pearson to Jones's cell.  Jourden opened the door to the cell, went inside, and spoke to Jones for several minutes.  Jourden examined Jones and then brought the papers inside for Jones to sign.  Jones scribbled on them.  (*See* Consent Forms, ECF No. 125-6, PageID.1495-1497.)  Pearson did not enter the cell or examine Jones.  (*See* 4-27-18 Deputy Station 27 Video, Ex. 7.l.)  The video shows that Jones had a cut or abrasion on his right elbow.

### (b) Nurse Card arrives for a withdrawal check; he does not give Jones his medicine (4:10 am).

At 4:10 am, Nurse Card arrived at the deputy station for withdrawal checks.  Jourden told Card about Jones's condition.  (Jourden Dep. 80.)  Jourden took Card to Jones's cell.  Jones was sitting on the floor of his cell, making motions with his hands.  (*See* 4-27-18 Deputy Station 27 Video, Ex. 7.m.)  Jourden opened the door and Card went inside.  Card was carrying what appears to be a cup for dispensing medicine.  (*See id.*)  Card observed Jones but did not attempt to examine

him closely or give him any medication.  (*Id.*)  He did not take any of Jones's vital signs.  (*Id.*)  He did not have any equipment on his person for doing so.

Card then completed a CIWA-Ar form indicating that Jones's score was 20, which is at the bottom of the "severe" range.  (ECF No. 125-6, PageID.1505.)  However, Card did not tally the score on the form.  Card also recorded that Jones had refused his medication, writing "OK at this time[.]"  (Refusal Form, ECF No. 125-6, PageID.1506; Card Dep. 43.)  According to Card, Jones said that he was "okay at this time."  (Card Dep. 57.)

At 5:01 am, however, Jourden entered the following case note into the JMS:

Inmate Jones was unable to understand directions from staff to be evaluated by medical during WD checks.

(ECF No. 135-17, PageID.2713.)

Card acknowledges that Corizon's policy required him to notify a provider when an inmate misses or refuses medication, but he did not do this.  (Card Dep. 54-55.)  Card testified that he believed that Jones's condition was "emergent" at that time, but that Jones did not require "urgent medical attention."  (Card Dep. 66-67.)  Card believes he spoke to the charge nurse (Furnace) about Jones.  (*Id.* at 66.)

### (c) Jourden contacts medical staff (5:30 am).

At 5:30 am, Jourden radioed medical staff because Jones was lying face down in his cell.  Jourden thought that Jones might be having a seizure because he was "moving rapidly on the ground."  (Jourden Dep. 72-73.)  According to Corizon's expert, if a seizure had occurred, Jones would have been transferred to the emergency room.  (Jouney Dep. 111.)

### (d) Medical staff arrive and bandage Jones (5:40 am).

A few minutes after Jourden radioed for assistance, medical staff arrived at Jones's cell, including Nurses Mollo, Card, and Furnace.  Furnace bandaged his arm and took his vital signs.  She did not attempt to give him his medication.

### (e) Furnace documents Jones's condition (5:50 am).

On a NET form, Furnace noted that Jones had "severe W/D."  (NET Form, ECF No. 125-6, PageID.1499.)   He was "shaking," hallucinating, and was "very confused."  (*Id.*)   His temperature was 98.9, his pulse was 92, his blood pressure was 150/92, and his oxygenation was 97%.  (*Id.*)  She checked the box on the form for "urgent intervention" instead of "emergent intervention."  (*Id.*, PageID.1500.)  In her judgment, Jones did not require emergency care at that point because he did not have problems with his "airway, breathing [or] circulation."  (Furnace Dep. 156-57; *see also* Card Dep. 38 (emergent intervention is required for cardiac arrest or a stroke).)

Furnace reported Jones's condition to Sherwood.  (*Id.* at 153.)  They agreed that Jones should be transferred to the infirmary.  Sherwood intended to check on Jones when she arrived at 8:00 am.  (Sherwood Dep. 104, ECF No. 125-11.)

Furnace also notified Sergeant McGinnis that Jones needed to be transferred to the infirmary.  (*See* McGinnis Dep. 33, ECF No. 125-17.)  Furnace spoke with McGinnis about the possibility of releasing Jones early, but McGinnis said she could not release him without court authority.  (*Id.* at 34.)

On Furnace's NET form, she wrote the following:

attempt to have inmate rel. [released] (rel. date tomm) and bring to ER. – spoke to Sgt McGinnis, after 7 am can try and talk to courts and/or bring to ER. To infirmary now.

(NET Form, PageID.1500.)

23

According to Furnace, her notes discussed bringing Jones to the "ER" because he was due to be released the following day, at midnight, and he would have needed to continue detoxing in a hospital after his release.  (Furnace Dep. 164-65.)

Sherwood says that, in her experience, a score of 20 on a CIWA-Ar assessment is not unusual.  (Sherwood Dep. 109.)  She has seen inmates with worse symptoms than Jones.  (*Id.*)  But Furnace could have had Jones transferred to a hospital if she thought he needed it.  (*Id.* at 175-76.) The infirmary can start an IV of saline to aid hydration, or an IV of Phenergan for nausea and vomiting, but unlike a hospital, the infirmary does not give Valium through an IV.  (*Id.* at 84.)

### (f) Jones is transferred to the infirmary (6:00 am).

After Furnace's shift ended at 6:00 am, Nurse Goetterman took over as the charge nurse. Goetterman went to the L1 unit and assisted in transporting Jones to the infirmary.  Jones was unable to stand and walk without assistance, so officers moved him to the infirmary using a wheelchair.  The infirmary is located next to the nurse's station, separated by a wall of windows. Goetterman's desk faced the windows into Jones's cell.

Goetterman recalls that Jones "appeared to be having some signs of withdrawal" and that he "might [have been] hallucinating." (Goetterman Dep. 99.)  He also recalls speaking with Nurse Furnace, who told him that Jones

> was brought to the infirmary for withdrawals and that she had spoke to Nurse Practitioner Sherwood and the nurse practitioner was going to also see him when she first arrived in the morning and . . . that as a courtesy, because he was going to require follow-up care after his release, they were going to attempt to see if they could get him released early and start his follow-up care early.

(*Id.* at 125.)

Jones arrived at the infirmary at around 6:06 am.  (Kalman Report, PageID.2656.)  For the next hour and 40 minutes, he sat on a mattress on the floor, sat on the bed, sat on the toilet, or moved around in the cell.  (*Id.*)  Twice, he fell to the ground.  (*Id.*)

24

**(g) Jones loses consciousness (7:39 am).**

A video of the infirmary from around 6:54 am to 6:56 am shows Jones stand at the window in front of Goetterman's desk for a couple minutes.  (Video 1, Ex. 7.o.)  Jones was not in any obvious distress.  He moved his hands and looked around, apparently confused or hallucinating.  Goetterman looked in his direction a few times.

Another video from 7:32 am to 7:43 am shows Jones sitting on his bed for about a minute.  (Video 2, Ex. 7.o.)  He then walked to the bathroom and sat on the toilet with his pants on.  Goetterman looked over at Jones at about 7:35 am.  For the next four minutes, Goetterman did not pay attention to Jones.  During those four minutes, Jones turned his body and fidgeted with the shower curtain.  He then slumped over his knees with his side against the wall and stopped moving at around 7:39 am.  At that time, Goetterman was facing away from Jones's cell.

According to a statement written by a medical clerk, Hailie Falconridge, she

had observed [Jones] in the cell shaking terribly, trying to prop his arm up against the sink in the shower area.  A few minutes later, I heard one of my co-workers say that he was slumped over on the toilet, which he was very much so.  A few minutes later, after no movement from the patient, I nudged the charge nurse saying that he was keeled over sitting up on the toilet.

(Falconridge Statement, ECF No. 125-6, PageID.1518.)[13]

At 7:42 am, Deputy Houston entered the nurse's station and spoke to Goetterman.  Houston had received a call from Sergeant Knott asking whether the nurses had started an IV on Jones.  (Houston Dep. 19, ECF No. 125-19.)  Houston did not know, so he went to the nurse's station and asked Goetterman.  Goetterman told Houston that he was waiting for Nurse Sherwood to arrive and "decide if . . . they were going to put in the IV or send him to the hospital."  (*Id.* at 20.)  Goetterman expected Sherwood to arrive at 8:00 am.

---

[13] Plaintiff argues that Falconridge's statement is admissible as a recorded recollection under Rule 803(5) of the Federal Rules of Evidence.

Goetterman then asked Houston if he could check Jones's vital signs.  (Houston Dep. 21.)  At 7:43 am, Goetterman got up to go to Jones's cell.  By that time, Jones had not moved for about four minutes.  A video from inside Jones's cell shows what happened next.  (*See* Video 3, Ex. 7.o.)  Goetterman and Houston entered the cell and pulled Jones out of the bathroom stall and onto the floor at about 7:44 am.  They checked his pulse and could not find one so Goetterman and then Mollo performed chest compressions on Jones for the next five minutes while other staff brought in an AED, a bag valve mask, and then an oxygen tank.[14]  Although CPR requires rescue breaths as well as chest compressions (Mollo Dep. 65; Goetterman Dep. 170), neither Goetterman nor Mollo performed rescue breaths or delivered oxygen to Jones.  Instead, Goetterman prepared the AED and applied it to Jones's chest.  Goetterman finally applied the bag valve mask at around 7:49 am.

The EMS team arrived at 7:53 am.  At some point, Jones's heart started beating again, so they started an IV and took him to a hospital.  He died at the hospital on May 4, 2018, about a week after he was admitted.  (*See* Autopsy Report, ECF No. 125-20, PageID.2069.)

After an autopsy, a pathologist determined that Jones died due to "complications of chronic ethanol abuse."  (*Id.*)  Among other things, the pathologist noted "diffuse acute pancreatitis," "abundant alcoholic hepatitis" in the liver, "osmotic nephrosis" in the kidneys, and "extensive necrosis" in parts of his brain.  (*Id.*, PageID.2071-2072.)  A toxicology test of Jones's blood, which was collected on April 27, detected less than 0.1 micrograms per milliliter of Diazepam and less than 20 nanograms per milliliter of Promethazine, well below the therapeutic range.  (*Id.*, PageID.2073.)

---

[14] Apparently, the first oxygen tank was empty, so staff had to bring a second tank to the cell.

### C. Expert Opinions

Plaintiff's expert, Dr. Dan James Fintel, opines that for a patient who scores

> 20 or above and is manifesting symptoms and signs of acute alcohol withdrawal, then it's time to get the patient to a general hospital for treatment, including observation, hydration, the initiation of oral benzodiazepine medications like Librium or Valium, and monitoring, if necessary, if there's any instability of heart rate or vital signs.

(Fintel Dep. 15.)  Fintel believes that, by a few minutes after midnight on April 26, Jones needed to be transported to a hospital "within . . . the next hour so" because "there were documented abnormalities in his behavior," including hallucinations.  (*Id.* at 17.)  And "with each hour of the clock, his chance of survival diminished[.]"  (*Id.* at 19.)  According to Fintel, Jones's chances of survival had diminished to less than 50 percent by 6:00 am on April 27.  (*Id.* at 20.)  Treatment at a hospital would have included "[h]ydration, monitoring, [and] the initiation of [oral] benzodiazepine therapy . . . with fairly high doses in the first four to six hours[.]"  (*Id.* at 95.)

On the whole, there is no "crystal ball that will state when somebody will have a cardiac arrest in the next five minutes."  (*Id.* at 103.)  "But as the patient gets sicker and manifests more and more . . . signs of disequilibrium and the effect of alcohol withdrawal, the risk of fatal delirium tremens increases substantially, but there is no one cutoff, no one test that will say that particularly."  (*Id.*)  A score of 20 on a CIWA is the "approximate range in which consideration for urgent transfer be performed."  (*Id.* at 111.)

Dr. Jouney testified that, in his clinical experience, patients who have been abstinent for 24 to 36 hours and who come to his clinic and score a 19 on a CIWA will be prescribed medicine, but they do not receive it immediately.  Outpatients will go get it at the pharmacy while inpatients will receive it at a set time when the hospital unit dispenses medication.  (Jouney Dep. 86.)  In Jouney's opinion, an "emergent" situation is one where there is a "cardiovascular issue," such as shortness of breath, chest pain, or difficulty breathing.  (*Id.* at 88.)  "Very rarely" is alcohol

27

withdrawal an emergent issue.  (*Id.*)  Medication is necessary when the patient is hallucinating. (*Id.* at 142.)  However, Jouney does not believe that on the morning of April 27 Jones required transfer to an emergency room or was at risk of dying.  (*Id.* at 146.)

Similarly, Margaret Migaud, Corizon's nurse practitioner expert, states that Jones's condition at 5:30 am on April 27, when Furnace assessed him and had him transferred to the infirmary, was "fairly typical of someone who is going through alcohol withdrawal."  (Migaud Report 3, ECF No. 125-18.)  Jones's blood pressure and slightly elevated pulse were "close to normal," and his "overall presentation," including his hallucinations, were not "cause for a nurse practitioner to order that [he] be immediately sent to the hospital."  (*Id.*)

As for Defendants' resuscitation efforts, Corizon's standard-of-care expert, Kimberly Pearson, testified that medical staff are trained to not do mouth-to-mouth resuscitation during CPR due to the risk of contracting infectious diseases; other methods are recommended, including a barrier or a bag valve mask.  (Pearson Dep. 145-56.)  Also, chest compressions are the "priority." (*Id.* at 155.)

## IV.  EIGHTH AMENDMENT STANDARD

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The Eighth Amendment obligates authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  The Eighth Amendment is violated when an official is deliberately indifferent to the serious medical needs of a prisoner in their care.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component,

the plaintiff must establish that the medical need at issue is sufficiently serious.  *Id.*  A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  Where, as here, the claim is based in part on an unreasonable delay in treatment, Plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment[.]"  *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires Plaintiff to show that the officials had "a sufficiently culpable state of mind" in denying or delaying medical care.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer,* 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  To prove a defendant's knowledge, "[a] plaintiff may rely on circumstantial evidence . . . :  A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 105.

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

29

*Id.* at 105-06 (quotation marks omitted).  Thus, differences in judgment between an inmate and medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014).  "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

A non-medically trained official is not deliberately indifferent when he defers to a "medical recommendation that he reasonably believes to be appropriate, even if in retrospect that recommendation was inappropriate." *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017); *see also Winkler v. Madison Cnty.*, 893 F.3d 877, 895 (6th Cir. 2018) (favorably citing *McGaw*).  "[A]n officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical opinion for a reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms." *Stojcevski v. Macomb Cnty.*, 827 F. App'x 515, 522 (6th Cir. 2020) (quoting *Barberick v. Hilmer*, 727 F. App'x 160, 163-64

(6th Cir. 2018)). Also, "officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844.

## V. QUALIFIED IMMUNITY

Kent County Defendants raise the defense of qualified immunity, should the Court find that there is a question of fact about whether they violated Jones's constitutional rights. Qualified immunity requires Plaintiff to show "(1) 'that government officials violated a constitutional right,' and (2) 'that the unconstitutionality of their conduct was clearly established when they acted.'" *Murray v. Ohio Dep't of Corrs.*, 29 F.4th 779, 786 (6th Cir. 2022) (quoting *Beck v. Hamblen Cnty.*, 969 F.3d 592, 598 (6th Cir. 2020)). The Court need not resolve this issue because the Court concludes these defendants are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claims against them. Plaintiff's evidence does not suffice to demonstrate that they were deliberately indifferent to Jones's serious medical needs.

## VI. COUNTS I & III - EIGHTH AMENDMENT

Defendants do not argue that Jones was not suffering from an objectively serious medical need. Indeed, there is no question that delirium tremens is an objectively serious medical need. *See Kindl v. City of Berkley*, 798 F.3d 391, 402 (6th Cir. 2015) (recognizing that "delirium tremens is . . . unquestionably a serious medical condition"); *accord Greene v. Crawford Cnty.*, 22 F.4th 593, 599 (6th Cir. 2022). Also, "[a] medical condition is sufficiently serious to confer constitutional protections where delay in treatment may cause 'a serious medical injury.'" *Kindl*, 798 F.3d at 401. Here, Plaintiff's expert asserts that delaying treatment for Jones's alcohol withdrawal put him at greater risk for serious complications. (Fintel Dep. 107-08.)

Instead, Defendants argue that they did not have a sufficiently culpable state of mind and did not unreasonably delay or deny care for Jones. The Court must evaluate each Defendant separately.

### A. Nurse Byrne

Byrne completed the medical screening for Jones, during which Jones denied having any concerns about alcohol withdrawal and lied about the extent of his alcohol use.  He gave Byrne the same information about his alcohol use that he had given the court just a few hours earlier, telling her that he drank vodka only two or three times per week.  Based on this information, she had no reason to believe that he was at risk of alcohol withdrawal.  Even if she could smell alcohol on his person, she would not have had reason to believe that he was a chronic drinker and therefore faced a risk of undergoing withdrawal.  Many individuals who drink alcohol can abstain for a few days without any ill effects.  Accordingly, Plaintiff's claim against Byrne fails the subjective prong of the Eighth Amendment standard.

### B. Deputy Cooper

Cooper learned from other deputies that Jones might be experiencing alcohol withdrawal. In response, she had him moved to the lower level to a cell where he could be more easily observed by jail staff.  She also entered a withdrawal alert and a lower-bunk alert into the JMS.

According to KCCF's policy, she should have called the medical office or sent them a notification explaining Jones's need for withdrawal care.  That policy states:

**12.9.1 Immediate Response Procedures**

. . .

**B. MEDICAL NEEDS FURTHER DEFINED**

1. Signal White: imminent death or birth, loss of consciousness.
    a. Central control will confirm over the Portable Transmitter (PT) that the nurse is responding.  If there is no confirmation, central control will call medical at 6470.
    b. Expected response:  The nurse will report to the inmate location with all emergency equipment.

1. Urgent medical:  Time is a factor; but the above does not apply.
    a. *Call the Charge Nurse Station at 6470.

  b. Provide medical with inmate name, location, nature of issue.
  c. Expected response:  Nurse will pull the inmate file to determine the
   appropriate action.
  d. *If there is not answer at 6470 or the inmate's condition deteriorates, call
   a Signal White.

**12.11.4** . . .

**A. NON-EMERGENCY MEDICAL REQUESTS INITIATED BY THE
DEPUTY**
1. If an inmate requests to see medical, the following procedures will be followed:
a. Staff will call medical at extension 6470.
b. Medical will be given the inmate's name, location and nature of the issue.
c. A medical notification must be comp[l]eted in the JMS.
. . .

(KCCF Policy, ECF No. 127-10, PageID.2304-2305.)  In other words, one section requires the

deputy to call the medical office, while the other section requires the deputy to call the medical

office *and* send a medical notification.  Similarly, Deputy Plugge testified that there are "three

things" a deputy can do in this sort of situation:  (1) "go talk to the intake nurse and tell her";

(2) "put in a withdrawal alert and generate a notification"; or (3) "put a withdrawal alert in or pick

up the phone [to call the medical office]."  (Plugge Dep. 24-25.)  The important thing is that

"somebody's been notified."  (*Id.* at 25.)

   As discussed above, Cooper contends that she called the medical office; there is evidence

that such a call occurred, but Cooper does not recall who she spoke with.  And there is no evidence

that medical staff took any action in response to this call.  Construing the evidence in the light

most favorable to Plaintiff, a jury could reasonably infer that Cooper called the medical office but

did not inform them of Jones's need for care.

   The parties disagree about whether Cooper's withdrawal alert would have notified medical

staff of the need for Jones to receive care.  Although such an alert would show up on the screen if

medical staff had looked up Jones's information in the JMS, there is no genuine dispute that these

alerts do not themselves automatically provide notice to medical staff.  (*See* Balzeski[15] Dep. 47, ECF No. 139-1 (testifying that a "medical alert [does not] automatically become something that will be seen by the medical department").)  Lieutenant Kalman testified that medical staff use the withdrawal alerts to generate the list of inmates who need to be seen for withdrawal checks. (Kalman Dep. 26, 40, 47-48.)  However, Kalman acknowledged that her belief was based only on her "experience" and her "conversations" with Corizon's Health Services Administrator, Penny Johnson.  (*Id.* at 26.)  Kalman was not a member of KCCF's medical staff, so she would not have been involved in generating those lists.  (*See id.* at 137, 139-40.)  And Johnson testified that the alerts are "not used for medical staff."  (Johnson Dep. 127.)  None of the nurses or other medical staff members deposed by Plaintiff testified that they used the withdrawal alerts to create the withdrawal check lists.  In fact, one nurse expressly testified that those alerts were *not* used to create the withdrawal check lists.  (Tunnel[16] Dep. 35-36, ECF No. 139-2.)  Instead, medical staff enter "withdrawal check times" into the JMS and use those entries to create the lists.  (*Id.* at 36.) And that explains why Jones was not on the withdrawal check list even though Cooper had entered a withdrawal alert.

Nevertheless, even if Cooper did not notify medical staff, through an alert or otherwise, she is entitled to summary judgment because she was not deliberately indifferent to Jones's needs. She placed him in a cell where he could be observed and entered alerts notifying deputies of the need for that observation.  There is no evidence that she was aware of Jones's history of alcohol use or of any specific symptoms of his withdrawal.  Indeed, only a few hours earlier, Jones had exhibited no signs of intoxication, let alone withdrawal.  And even the next day, when Jones met

---

[15] Robin Balzeski is a nurse who worked at KCCF.

[16] Heather Tunnell is a another nurse who worked at KCCF.

with Plugge, when he approached Grimmett at the deputy station, and when he met with Jimenez, he did not exhibit significant symptoms of withdrawal.  Thus, there is no reason to believe that Cooper learned of any serious symptoms from the deputies who spoke to her about Jones's withdrawal.

In a similar case, a deputy learned that an inmate was going through alcohol withdrawal, but the deputy had no contact with the inmate, and had no "reason to appreciate the seriousness of [the inmate's] condition."  *See Speers v. Cnty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006).  The Court of Appeals held that mere knowledge that an inmate is "going through alcohol withdrawal, an occasional reality of life in a prison setting, does not establish a triable issue of fact over deliberate indifference."  *Id.* at 396-97.  The same is true here.

Plaintiff relies upon *Stefan v. Olson*, 497 F. App'x 568 (6th Cir. 2012), in which the Court of Appeals upheld the denial of qualified immunity to a nurse who admitted an individual to a jail rather than send him to the hospital when she knew the following:  the detainee "had a blood alcohol content of 0.349"; "he had a racing pulse"; he was "dehydrated"; "he would not be drinking any alcohol for the next 10 to 12 hours"; "he would go through withdrawal"; "he had a history of withdrawal seizures"; "there would be no protocol medications at the jail and no one who could dispense them in any event"; and "the jail had neither the medication nor the oversight personnel to follow the jail's own protocol to treat [him]."  *Id.* at 574, 578.  The detainee had a seizure the following morning, struck his head on a concrete bunk, and died five days later due to "a cerebral herniation, multiple hematomas, hemorrhaging, and contusions."  *Id.* at 574.

That case is distinguishable.  There, the prison official (a nurse) had knowledge of facts about the detainee that Cooper did not have about Jones, namely:  a high blood alcohol content, a likelihood of withdrawal, a history of withdrawal seizures, and a lack of medication to treat the

withdrawal.  Importantly, unlike Cooper, the prison official in *Stefan* perceived a risk that the detainee would experience seizures—a particularly serious complication from withdrawal—and did not take steps to address that risk.  *See id.* at 579.   In contrast, Cooper merely perceived a risk of alcohol withdrawal, a condition which Plaintiff's experts acknowledge falls on a spectrum of severity.  It does not always require medical intervention.  Cooper then took steps to address that risk by ensuring that Jones would be housed in a cell where he would be observed by jail staff.

Plaintiff quotes the Court of Appeals' statement that the Eighth amendment protects against "future harm" and "sufficiently imminent dangers," *Stefan*, 497 F. App'x at 577 (emphasis omitted), arguing that Cooper was deliberately indifferent for failing to notify medical staff of Jones's reported alcohol withdrawal.  However, Cooper took steps to address the risk that she was aware of.  There is no evidence from which a jury could conclude that she perceived a more serious risk of harm, such as delirium tremens, and then disregarded it.

Even if Cooper failed to follow prison policy, that failure does not mean that Cooper violated Jones's constitutional rights.  *See Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018) ("Nor does the failure to follow internal policies, without more, constitute deliberate indifference."); *Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) (noting that an awareness of a policy and the failure to comply with it "is not a per se constitutional violation").  Accordingly, Cooper is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### C. Deputy Plugge

Plugge interviewed Jones the day after his arrival at KCCF.  According to Plugge, Jones reported that he was undergoing alcohol withdrawal after "daily liquor use."  He had vomited and was having trouble sleeping.  Also, he had not yet received any medication.  At the time, however, Jones was laughing and joking.  These observations are consistent with those of Jimenez, who did

not notice anything unusual about Jones several hours later.  And video of Jones immediately after the interview with Plugge does not indicate any obvious signs of withdrawal.

Plugge did not follow up on the issue of Plaintiff's medication because not everyone on withdrawal receives medication, and Plugge had no reason to believe that Jones could not get medicine if he needed it.  In fact, Plugge told Jones to ask about it during withdrawal checks. (Plugge Dep. 51.)  Plugge assumed that Jones would receive withdrawal checks because there was already a withdrawal alert in his file.  (*Id.* at 54.)

In short, like Cooper, Plugge did not observe significant symptoms of withdrawal when he met with Jones.  It was not "obvious to a layman" (or to someone in Plugge's position) that Jones needed prompt medical attention.  Plugge reasonably assumed that Jones was being monitored for withdrawal symptoms due to the withdrawal alert, and he had no reason to believe that Jones would not receive medicine if he asked for it and needed it.  As classification officer, he decided to keep Jones in an observation cell.

Plaintiff argues that Plugge could have determined that Jones was not on the withdrawal check list by looking at Jones's information in the JMS.  (*See* Pl.'s Br. 11, ECF No. 135.)  However, Plaintiff provides no support for this assertion.  There is no evidence that custody staff had electronic access to the withdrawal check lists created by medical staff.

Plaintiff implies that Jones was not able to obtain help from medical staff or anyone else while detained in an observation cell as opposed to a cell in the general population unit.  There is no support for this assertion either, other than the fact that a locked door blocked Jones's passage from his cell to the deputy station.  To the contrary, immediately after Jones's interview with Plugge, he walked up to the deputies at the deputy station.  Also, deputies regularly conducted cell

checks.  Jones could have flagged the deputy and requested medication at the deputy station or during one of the cell checks.

Plaintiff again relies upon *Stefan* to support his claim against Plugge, arguing that Plugge perceived a substantial risk of harm.  But the only significant facts distinguishing the claim against Cooper from the claim against Plugge are that Jones told Plugge he had vomited and that he was having some anxiety and trouble sleeping.  Also, Jones indicated that he had not received medication.  However, Plugge reasonably assumed that Jones would receive further observation and would receive medication if he needed it.  The other facts about Jones's condition are not sufficient to establish that Plugge perceived a substantial risk of serious harm.  Plugge was not a medical official capable of assessing Jones's needs or the severity of his condition.  (*See* Plugge Dep. 55 (stating that he does not know how to perform an alcohol withdrawal assessment).)  Instead, he was aware that there is a difference between "severe alcohol withdrawal" requiring immediate medical attention (i.e., withdrawal involving "sweating[,] shaking[,] or looking disoriented") and other, less serious forms of withdrawal.  (*Id.* at 67.)  Accordingly, at most, the facts indicate that Plugge was aware that Jones was experiencing some symptoms of alcohol withdrawal and would receive further observation.  In contrast to *Stefan*, the facts do not indicate that Plugge was aware that the inmate in his care faced a substantial risk of severe withdrawal and would not receive treatment for it.  Thus, Plaintiff's Eighth Amendment claim against Plugge fails as a matter of law.

### D. Deputy Grimmett

Deputy Grimmett worked the day shift on April 25, when Jones approached the deputy station after his interview with Plugge.  Plaintiff contends that the video shows that Grimmett ignored Jones, but that is speculation.  What the video shows is that after Jones approached the deputy station, Grimmett turned away from Jones for a few moments and then turned back.  Jones

38

then left.  Even if Grimmett did ignore Jones momentarily, that does not establish deliberate indifference.  Also, it did not prevent Jones from requesting assistance if he needed it.

A jury could infer that Grimmett was aware that Jones was experiencing alcohol withdrawal.  Plugge says that he told Grimmett to keep an eye on Jones's withdrawal.  Also, a jury could infer that Grimmett was aware of the withdrawal alert for Jones because Grimmett says that his usual routine at the start of his shift was to check the alerts on file.  Nevertheless, Grimmett did not have the nurse check Jones when the nurse arrived for withdrawal checks at 1:30 pm on April 25.

At that point in time, however, Jones was not displaying serious signs of withdrawal.  Like Plugge, Grimmett was aware that alcohol withdrawal can be fatal, and that the signs of severe withdrawal requiring medical attention are shaking and hallucinations.  (Grimmett Dep. 39-41.) However, there is no evidence that Jones was shaking or hallucinating on the afternoon of April 25.  Consequently, Grimmett's failure to ensure that Jones received a withdrawal check on that one occasion is, at most, negligence.  It is not evidence that he was aware of, and deliberately disregarded, a substantial risk of serious harm to Jones.  For the same reason, Grimmett's failure to perform "proper" block checks that day by entering the sub-dayroom does not establish deliberate indifference.

In a similar case, where a jail official did not conduct proper cell checks on a detainee suffering from a drug overdose, the Court of Appeals held that the official's conduct did not amount to deliberate indifference.

> There is a certain irony that Ouderkirk's admitted violation of the jail's cell check policy excuses her from liability because she never witnessed Phillips in medical distress.  Her failure to confirm that Phillips was alive and well—despite registering that she had done so—left Phillips lying unconscious in a pool of vomit for an additional 42 minutes.  She certainly should have investigated further when she realized during the third cell check that Phillips had not moved in the roughly 85

minutes since she had last seen him.  When asked how she would have known whether Phillips was all right because of her deficient cell check, Ouderkirk replied, "I guess I wouldn't." . . .

Such cavalier treatment of detainees she had an obligation to protect was certainly negligent, maybe grossly so. But the plaintiff must show that "the official acted with a culpable enough state of mind, rising above gross negligence." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).  And failing to follow internal policies, without more, does not constitute deliberate indifference. . . .

*Burwell v. City of Lansing*, 7 F.4th 456, 471 (6th Cir. 2021).  The same logic applies here.

Jones's condition changed for the worse before the start of Grimmett's next shift.  By 7:00 am on April 26, Deputy Jourden had entered several notes into the JMS, one at 1:30 am indicating that Jones was hallucinating, and another at 4:00 am indicating that medical staff would see Jones soon.  A jury could infer that Grimmett was aware of Jones's serious symptoms through his conversation with Jourden at the end of Jourden's shift.

By that time, however, Nurse Furnace had ordered that Jones receive medication and withdrawal checks, and Nurse Steimel had conducted a withdrawal check.  Also, Grimmett checked on Jones at least seven times during his shift, and he allowed nurses Mollo and Fielstra to give him medicine and check on him.  Thus, Grimmett was aware that medical staff were treating and regularly checking on Jones.  Although Jones was exhibiting signs of severe withdrawal, Grimmett could defer to the judgment of medical staff regarding the extent of Jones's care.  "[I]n a situation where a non-trained officer defers to a medical professional's judgment, 'absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.'"  *McGaw*, 715 F. App'x at 498 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  Here, Grimmett had no reason to know or believe that medical staff were mistreating or not treating Jones's condition.  For instance,

there is no evidence that Jones's condition changed significantly during Grimmett's second shift. Accordingly, Grimmett is entitled to summary judgment.

### E. Nurse Steimel

Steimel conducted the first withdrawal check on Jones at 3:30 am on April 26, after Jourden reported that Jones was hallucinating.  She scored him at 19, which is in the "moderate" range on the CIWA-Ar.  She also noted an elevated pulse and that he was not taking fluids.  She reported her findings to Nurse Furnace.  In response to this assessment, Furnace ordered medication for Jones.  These actions do not demonstrate deliberate indifference by Steimel.  She confirmed that Jones needed treatment and she reported those findings to her superior, who ordered treatment. Plaintiff faults Steimel for not taking Jones's blood pressure as well,[17] but her failure to do so is no more than mere negligence.

Steimel was also present at 1:00 pm on April 26 when Mollo gave Jones his medication and briefly spoke with Jones at the door to Jones's cell.  Mollo apparently completed a CIWA-Ar scoring Jones at 13, without taking Jones's vital signs.  However, Steimel is not responsible for Mollo's actions.  And in any case, Steimel and Mollo were treating Jones with medicine and recording observations of his condition.  They were not deliberately indifferent to his medical needs.  A dispute about the adequacy of a withdrawal check is equivalent to a medical malpractice claim.  It does not rise to the level of indifference necessary for an Eighth Amendment claim.

Plaintiff argues that this case is similar to *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), in which the Court of Appeals noted that "[i]t is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs; rather, 'the doctor must provide

---

[17] Steimel wrote "unable to get" in the space for recording blood pressure (Flow Sheet, ECF No. 125-6, PageID.1504), but she does not recall why she could not obtain Jones's blood pressure.  (Steimel Dep. 63.)  She speculates that her electronic wrist cuff could not get a reading, but she acknowledges that she also carried a manual cuff.  (*Id.* at 63-64.)

medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.'" *Id.* at 940 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).  The Court of Appeals stated that "[f]ailure by a jail medical staff to adhere to a prescribed course of treatment may satisfy the subjective component of an Eighth Amendment violation."  *Id.* at 939.  Plaintiff argues that, by not taking Jones's vital signs, Steimel and Mollo were not following Furnace's order.  On its face, however, that order only required medical staff to take Jones's vital signs once per shift.  (*See* Practitioner's Orders, PageID.1510.)  It did not require vital signs at every withdrawal check.

Moreover, the difference between *Richmond* and this case is that Steimel and Mollo were providing the prescribed treatment.  They gave Jones medication.  The issue Plaintiff raises is whether they properly evaluated his condition.  True, their assessment was not as thorough as it could have been, but that shortcoming is negligence, at most; it is not sufficient to infer that they consciously exposed Jones to an excessive risk of serious harm.

Finally, Plaintiff argues that Steimel is liable because she initialed the consent-to-treat forms completed by Pearson.  However, there is no evidence that Steimel was aware of Plaintiff's condition and the treatment he was receiving when those forms were signed.  (*See* Pl.'s Br. 38, ECF No. 136 ("Neither Steimel nor Nurse Mollo are seen on the video footage with any [consent] forms in the vicinity of Jones' cell.  Neither has any recollection of trying to obtain his signature on the form.").)  If anything, Steimel's initials indicate that she was attempting to aid Jones's access to medical care.  Accordingly, Steimel is entitled to summary judgment for the Eighth Amendment claim against her.

### F. Nurse Mollo

As discussed above, Nurse Mollo gave Jones his medication on April 26.  Plaintiff argues that Mollo did not conduct an adequate withdrawal check because he did not take Jones's vital signs; however, that conduct does not amount to deliberate indifference.

In addition, Mollo was one of the individuals who responded to Jourden's call that Jones was lying face down in his cell because Jones had apparently had a seizure.  Instead of calling for emergency medical assistance, Mollo allowed Jones to be taken to the infirmary for observation.  Also, Mollo assisted Goetterman with performing CPR on Jones but did not provide oxygen in any form, despite the fact that a bag valve mask was available.  Even if chest compressions are a "priority" during CPR, oxygen is clearly a necessary and vital component.  In either of the foregoing situations, a jury could conclude that Mollo was deliberately indifferent to Jones's medical needs.

### G. Deputy Jourden

Deputy Jourden worked the night shifts when Jones was detained at KCCF.  He was apparently on duty when medical staff conducted withdrawal checks around 7:00 pm on April 25, but he did not have the nurse assess Jones.  A jury could infer that he was aware of the withdrawal alert at that point; however, his failure to speak to the nurse was no more than negligence.  There is no evidence that Jourden was aware of severe symptoms of withdrawal that would have required prompt treatment.  In fact, Jimenez visited Jones only half an hour after this check and did not notice anything unusual about Jones.

Relying on the video in which Jimenez shakes his hands while speaking with Jourden, Plaintiff argues that Jimenez communicated to Jourden that Jones was experiencing tremors.  That argument is a tenuous one because Jimenez's hand motions may have had nothing to do with Jones.  But even accepting Plaintiff's argument about the video, Jourden was not deliberately indifferent

to Jones's needs because he continued to monitor Jones throughout his shift.  Approximately five hours later, he entered a case note notifying medical staff that Jones was displaying symptoms of withdrawal, including hallucinations and confusion.  He also asked Nurse Steimel to assess Jones at the 3:30 am withdrawal check, even though Jones was not on the withdrawal check list.  And according to his notes, medical staff advised him that they would check on Jones again soon.

Jourden continued monitoring Jones during his next shift on the evening of April 26 and morning of April 27.  By that time, medical staff were regularly assessing and treating Jones.  Like Grimmett, Jourden could reasonably rely on their expertise for Jones's care.  And when Jones's condition worsened, Jourden alerted medical staff.  He did so at 9:30 pm on April 26 and again at 12:15 am on April 27, after he noticed that Jones had cut his elbow.  When Pearson arrived in response to the call at 12:15 am, Jourden went into Jones's cell.  Pearson did not treat Jones's elbow, but that condition was not an objectively serious one.

Jourden was present when Nurse Card checked on Jones during the morning withdrawal check at around 4:00 am on April 27.  Card did not enter Jones's cell, did not give Jones his medication, and did not take Jones's vital signs; however, Jourden had seen other medical staff conduct withdrawal checks through the food slot; Jourden did not know what was necessary to complete a full evaluation.  (*See* Jourden Dep. 54-55.)  He relies on medical staff to conduct those evaluations.  (*Id.* at 95.)

Jourden was no doubt aware that Jones's mental state had declined since April 25, but it was Card's and the charge nurse's obligation to decide how to treat Jones in those circumstances, not Jourden's.  It would not have been obvious to Jourden that, by not giving Jones his medication on one occasion or by not taking Jones's vital signs, Card was mistreating Jones.  *See Spears v.*

*Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by medical staff).

Finally, Jourden radioed medical staff after he saw Jones lying face down in his cell.  In other words, when it was obvious that Jones needed additional medical attention, Jourden obtained it.  Medical staff arrived and then took Jones to the infirmary.  A reasonable jury could not conclude that Jourden was deliberately indifferent to Jones's medical needs.

### H. Nurse Fielstra

Fielstra attempted to give Jones his second dose of medication at 6:30 pm on April 26. Construing the evidence in a light most favorable to Plaintiff, a jury could infer that Plaintiff did not take the medication.  The video indicates that he was confused about what to do with the medicine cup.  And Fielstra can be seen shaking her head after motioning to Jones to drink the medicine, which suggests that he did not follow her directions.  Also, a toxicology report from a blood sample taken less than a day later revealed that Jones's Diazepam and Promethazine levels were barely detectable.  According to Plaintiff's expert, those levels suggest that Jones received only "one dose of 10 milligrams in the middle of the day on the 26th."  (Fintel Dep. 123-24.)  In other words, he likely did not receive the dose that Fielstra attempted to give him.

A single missed dose of medication might not rise to the level of deliberate indifference in some circumstances, but here, Fielstra's CIWA assessment indicates that she knew Jones was in the "severe" category for withdrawal, despite having received a dose of medicine just a few hours earlier.  She also knew that he would have to wait at least another eight hours before he received another dose and another withdrawal check.  Thus, it was important for him to receive his prescribed dose.  *See Richmond*, 885 F.3d at 947-48 ("[T]his Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation.").

45

Fielstra herself acknowledged that Jones would have been sent to an acute care facility if he had been hallucinating and he was not responding to medication.  A jury could infer that those are the very circumstances she faced.  She contends that she does not recall him hallucinating, but a jury could infer from his conduct in the video that he was, in fact, hallucinating.

Although Fielstra contends that she reported his condition to the charge nurse, there is no evidence of what she reported other than what she recorded on her CIWA assessment and the medication administration record.  There is also no evidence that medical staff took additional measures to treat Jones's serious symptoms.  Accordingly, a jury could conclude that Fielstra was deliberately indifferent to Jones's needs.

### I. Nurse Card

Nurse Card did nothing to treat Jones at the 4:00 am withdrawal check on April 27.  Card merely observed Jones, who was sitting on the floor.  Jourden observed that Jones was hallucinating and unable to understand directions.  Nevertheless, Card did not give Jones his medication or attempt to provide more urgent treatment.  Card contends that Jones *refused* his medication; however, a jury could infer that Jones did not in fact refuse treatment because he lacked the mental comprehension to do so.  If Jones could not follow simple directions, it is difficult to believe that he could knowingly refuse critical medical care.  Thus, a jury could conclude that Nurse Card effectively stopped treating Jones, contrary to the orders given by Nurse Furnace, and with knowledge that Jones's condition had progressed to a serious state.  As with Fielstra, the evidence is sufficient for a jury to conclude that Card was deliberately indifferent to Jones's serious medical needs.

### J. Nurse Furnace

Furnace implemented Sherwood's directions to put Jones on the withdrawal protocol at around 5:30 am on April 26, after Furnace learned that he was undergoing "high acuity"

46

withdrawal with symptoms that included hallucinations, and after reviewing Steimel's CIWA-Ar assessment that scored him at 19 with an abnormally high pulse rate.  Furnace created Jones's medical chart, so she would have looked up his information on the JMS and discovered the withdrawal alert, telling her that Jones had been undergoing some form of withdrawal for over 30 hours without any treatment.  (*See* Furnace Dep. 55-57, 61.)  Furnace could have ordered that Jones receive his medicine as soon as possible; instead, she allowed him to receive it at the next distribution time, about seven and a half hours later.  (*See id.* at 93-95, 99.)  Her justification for this delay was one of convenience rather than medical judgment.  She stated, "That's the schedule." (*Id.* at 94-95.)

Plaintiff's expert opines that timing was important; if Jones had received treatment "much earlier" in his incarceration, that treatment could have prevented the "horrific consequences" he suffered later.  (Fintel Dep. 107-08.)  Thus, a jury could conclude that the unnecessary delay in treatment permitted by Furnace exhibited deliberate indifference to his needs.  *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (concluding that a medical provider was deliberately indifferent where she learned about the prisoner's serious symptoms at about 3:30 pm, but "would not see him until her regularly scheduled medication run at around 7:00 pm"); *Murray*, 29 F.4th at 791 (accepting an expert opinion as "verifying medical evidence" establishing the detrimental effect of a delay in treatment, as required by *Napier*).

In addition, Plaintiff notes that Furnace was the charge nurse when the final three withdrawal checks were performed, including the check conducted by Nurse Fielstra on April 26 that scored Jones at 21 on the CIWA-Ar, and the check conducted by Nurse Card at 4:00 am on April 27, when Jones purportedly refused to take his medication.  Fielstra does not recall whether she discussed her CIWA score with Furnace (Fielstra Dep. 94), and Card does not recall whether

he discussed Jones's refusal to take his medicine with Furnace (Card Dep. 66).  However, it was the general practice of nurses conducting withdrawal checks to report their findings to the charge nurse.  (*See* Card Dep. 53; Mollo Dep. 36-37, 92; Steimel Dep. 40, 43-44, 91-93; Fielstra Dep. 38-39, 98-99.)  Thus, a jury could infer that Fielstra and Card discussed their withdrawal checks, as well as Jones's purported refusal to take his medicine, with Furnace.  In that case, Furnace would have known that Jones was undergoing severe withdrawal with hallucinations and was not receiving the treatment ordered by Sherwood.  There is no evidence that she did anything in response to the cessation of his treatment.  A jury could conclude that her inaction was deliberate indifference.

Finally, Furnace evaluated Jones at 5:30 am on April 27 after it appeared that he had undergone a seizure.  She did not contact an emergency medical team.  She did not change his treatment plan.  Instead, she allowed him to be taken to the infirmary, where she knew that he would not receive IV medication to treat his agitation and reduce his seizure risk.  (*See* Furnace Dep. 130.)  She also spoke to Sergeant McGinnis about releasing Jones to an emergency room (*id.* at 164), which suggests that she thought more urgent care was necessary.  But she did not order that care.

Furnace did speak with Sherwood, and they apparently agreed to transfer Jones to the infirmary.  However, there is a question of fact about what details Furnace relayed to Sherwood.  Furnace does not recall what she said.  (*Id.* at 166.)  It is possible that she did not relay any details regarding Jones's possible seizure.  And in any case, Furnace was the one who actually examined Jones; she could have sent him to the hospital without Sherwood's approval.  (*Id.* at 175-76.)

Defendants argue that Furnace made all her decisions while exercising medical judgment, and that Plaintiff's disagreement with these decisions gives rise to no more than a malpractice

48

claim.   A jury could conclude otherwise.  For instance, a jury could conclude that keeping Jones in his cell for periodic observation after he stopped receiving his medicine, or transferring him to the infirmary for further observation after he had apparently suffered a seizure, was tantamount to providing no medical care at all.

### K. Nurse Goetterman

After Jones had apparently stopped taking his medication and had a seizure, Goetterman simply observed Jones.  He did not start an IV for hydration.  He did not contact an emergency provider.  He did not check Jones's vital signs for almost two hours.  "At a certain point, bare minimum observation [of an inmate suffering delirium tremens] ceases to be constitutionally adequate."  *Greene*, 22 F.4th at 609.  A jury could conclude that, before arriving at the infirmary, Jones had already passed the point where observation alone was no longer constitutionally adequate.

In addition, Goetterman did not give any form of oxygen to Jones for about five minutes after recognizing that Jones's heart had stopped beating, even though a bag valve mask was available.  Viewing the evidence in a light most favorable to Plaintiff, a jury could conclude that Goetterman was deliberately indifferent to Jones's needs by failing to give him some form of oxygen.

### L. Nurse Practitioner Sherwood

Like Furnace, Sherwood did not order that Jones receive his medication immediately.  And she did nothing after Jones had a possible seizure, except promise to check on him several hours later.  She did not change his treatment plan when it was obvious that his condition was deteriorating and he was not receiving or responding to treatment.  In short, the evidence is sufficient for a jury to conclude that Sherwood was deliberately indifferent to Jones's medical needs.

## VII. COUNT IV – *MONELL* LIABILITY (CORIZON)

Plaintiff asserts that Corizon is liable for failing to properly train or supervise its staff, which resulted in the deprivation of Jones's constitutional rights. Specifically, Plaintiff contends that Corizon "failed to train its employees in the proper management of inmates experiencing acute alcohol withdrawal, a known, re-occurring issue at the Jail presenting an obvious potential for constitutional violations." (Pl.'s Br. 47, ECF No. 136.)

Corizon cannot be held liable for the unconstitutional conduct of its employees under a theory of respondeat superior or vicarious liability. *Perry v. Corizon Health, Inc.*, No. 17-2489, 2018 WL 3006334, at *1 (6th Cir. June 8, 2018) (citing *Rouster*, 749 F.3d at 453); *see Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, Plaintiff must demonstrate that a policy or custom of Corizon was the "moving force" behind the deprivation of Plaintiff's constitutional rights. *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694).

For a claim based on a failure to train, Corizon is liable only if its failure to train "resulted in the constitutional deprivation" suffered by Plaintiff *and* if that failure "reflects deliberate indifference [by Corizon] to . . . constitutional rights[.]" *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

*Monell* claims typically require evidence of multiple constitutional violations. In other words, "[t]o establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [entity] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Here, Plaintiff proceeds under a "single violation" theory, meaning that "a single violation of federal rights, accompanied by a showing that [Corizon] has failed to train

its employees to handle recurring situations present[ed] an obvious potential for such a violation[.]" *Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

Although alcohol withdrawal is a recurring situation faced by staff at KCCF, Plaintiff has not shown that Corizon failed to train its staff to handle these situations, or that its training was so inadequate that it was deliberately indifferent to an obvious potential for a constitutional violation. Plaintiff focuses on an apparent absence of employee records showing that the individual Corizon Defendants completed their orientation and "annual training" on substance abuse withdrawal and NET forms prior to Jones's death. (*See* Pl.'s Br. 50, ECF No. 136.) But Corizon's Health Services Administrator testified that Corizon did not start keeping an electronic record of training until 2018. (Johnson Dep. 99-100.)

In any case, training need not occur in formal settings administered by the employer; it can also occur through pre-employment schooling and through on-the-job experience.  Here, the undisputed evidence indicates that the individual Corizon Defendants were licensed medical staff. They were aware of the seriousness of alcohol withdrawal.  They were familiar with the use of instruments for monitoring vital signs, with the CIWA-Ar for assessing the severity of withdrawal symptoms, and with the need for medication to treat those symptoms.  They were also aware that some circumstances might require transferring an inmate to a hospital instead of keeping them at the infirmary.  Indeed, all this expertise is what undergirds Plaintiff's Eighth Amendment claims against them.  Because of Defendants' knowledge and training, a jury could infer that they were aware of and disregarded the substantial risks faced by Jones when, for instance, they did not provide his initial medication in a prompt manner, they ceased providing the treatment prescribed by Sherwood, and they did not provide any form of oxygen to Jones after his heart attack.  Thus,

a jury could not reasonably conclude that Corizon was deliberately indifferent to the need for additional training regarding alcohol withdrawal.

## VIII. COUNT V - MEDICAL MALPRACTICE (CORIZON DEFENDANTS)

### A. Claims after April 27, 2018, at 6:00 am.

Plaintiff concedes that it cannot assert a claim for malpractice for events occurring after April 27, 2018, at 6:00 am, because Plaintiff's expert believes that Jones's opportunity to survive was not greater than 50% at that time.  (Pl.'s Br. 53, ECF No. 136.)  *See* Mich. Comp. Laws § 600.2912a(2) ("In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.").  Accordingly, Plaintiff consents to dismissal of Defendant Goetterman from Count V.  (Pl.'s Br. 53, ECF No. 136.)

### B. Mich. Comp. Laws § 600.2955a

Corizon Defendants assert that Mich. Comp. Laws § 600.2955a bars the other malpractice claims.  That statute provides an "absolute defense" to liability if the individual seeking damages for injury or death had an "impaired ability to function" due to the consumption of alcohol, and if, "as a result of that impaired ability, the individual was 50% or more the cause of the . . . event that resulted in the death or injury."  Mich. Comp. Laws § 600.2955a(1).  An "impaired ability to function" means that "the individual's senses are impaired to the point that the ability to react is diminished from what it would be had the individual not consumed [alcohol]."  *Id.* § 600.2955a(2)(b).  An individual is "presumed" to have an impaired ability to function if their blood alcohol level exceeds Michigan's legal limit.  But as this Court stated in a previous order, that presumption is "rebuttable."  (11/5/2020 Order, ECF No. 93.)

In short, to prevail under this statute, Defendants must establish that

> (1) the decedent had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and (2) that as a result of that impaired ability, the decedent was fifty percent or more the cause of the accident or event that resulted in his death.

*Harbour v. Corr. Med. Servs.*, 702 N.W.2d 671, 674 (Mich. Ct. App. 2005).

Only one Michigan court has interpreted this statute in the context of death or injury resulting from alcohol withdrawal.  In *Harbour*, the decedent was arrested while driving under the influence of liquor.  *Id.* at 673.  Hours after arriving at the jail, he collapsed and died "as a result of irregular heart rhythms caused by acute alcohol withdrawal[.]"  *Id.*  His estate brought an action against the jail's medical provider.  There was no dispute that the decedent had an impaired ability to function at the time of his arrest.  *Id.* at 678.  The trial court decided that his alcohol impairment was the cause of his death and entered a directed verdict in favor of the medical provider under Mich. Comp. Laws § 600.2955a.  The Michigan Court of Appeals upheld that result, holding that "acute alcohol withdrawal" can be an "event" resulting in death under the statute.  *Id.* at 678.  The court noted that there was no dispute that the decedent's "chronic alcohol abuse and, on the night in question, his alcohol-related impairment caused the acute withdrawal that was the most immediate, efficient, and direct cause of his death."  *Id.* (quotation marks omitted).  Even the plaintiff's expert admitted that "what might have happened to the decedent had [the nurse] treated him differently is pure speculation[.]"  *Id.*

This case is not like *Harbour* because Jones's senses and ability to react were not obviously impaired at the time of his arrest.  Relying on testimony by Dr. Fintel, Defendants argue that Jones's hippocampus was damaged, his central nervous system was suppressed (*see* Fintel Dep. 32-33, 61), and therefore his functioning was impaired.  But those impairments do not necessarily mean that Jones's *senses* were impaired such that his *ability to react was diminished*.  Indeed, a higher tolerance to alcohol, as Jones possessed, could rebut the presumption of impaired ability to

Case 1:20-cv-00036-HYJ  ECF No. 147, PageID.3250  Filed 04/29/22  Page 54 of 55

function due to intoxication.  *See Lawrence v. Schuuf*, No. 354872, 2022 WL 414265, at \*7 (Mich. Ct. App. Feb. 10, 2022) (considering an argument that the decedent was not impaired because he had a higher tolerance to alcohol, but rejecting that argument because it was not supported by the evidence).  Thus, there is a factual dispute about the extent of Jones's impairment, which precludes the application of Mich. Comp. Laws § 600.2555a to dismiss Plaintiff's claims.

### C. Reliance on Corizon's Policies

Defendants argue that Plaintiff has failed to demonstrate a medical malpractice claim because that claim is based solely on Corizon's policies.  In Michigan, courts "look to the standard practiced in the community rather than internal rules and regulations to determine . . . responsibility in a malpractice action."  *Gallagher v. Detroit-Macomb Hosp. Ass'n*, 431 N.W.2d 90, 94 (Mich. Ct. App. 1988).  On the other hand, a provider's rules "could be admissible as reflecting the community's standard where they were adopted by the relevant medical staff and where there is a causal relationship between the violation of the rule and the injury."  *Id.* at 93.

Neither Plaintiff nor his experts contend that the applicable standard of care is defined solely by Corizon's internal policies.  Instead, as Defendants indicate in their brief, Plaintiff's experts opine that such policies are *not* the standard of care.  (*See* Corizon Defs.' Br. 31, ECF No. 125.)  Thus, Defendants' argument is not a basis for dismissal of Plaintiff's malpractice claims.

In summary, the Court is not persuaded that the Corizon Defendants are entitled to summary judgment for all of Plaintiff's malpractice claims.  But based on Plaintiff's concession, the Court will dismiss Goetterman from Count V, along with any other claim for malpractice based on events occurring after 6:00 am on April 27, 2018.

### IX. COUNT VI – NEGLIGENCE (CORIZON)

Plaintiff consents to dismissal of Count VI.  (Pl.'s Br. 53, ECF No. 136.)

## X. CONCLUSION

For the reasons herein, the Court will grant the Kent County Defendants' motion for summary judgment and dismiss Defendants Cooper, Plugge, Jourden, and Grimmett from Count I. The Court will also grant the Corizon Defendant's motion for summary judgment in part, dismissing the following: Defendants Byrne and Steimel from Count III; Count IV; Defendant Goetterman from Count V, as well all medical malpractice claims arising from events occurring after 6:00 am on April 27, 2018; and Count VI.

After dismissal of the foregoing claims and defendants, the following claims are still pending: Count I (Eighth Amendment) against Defendant Knott; Count III (Eighth Amendment) against Defendants Sherwood, Mollo, Card, Fielstra, Furnace, and Goetterman; and Count V (medical malpractice) against Defendants Corizon, Byrne, Steimel, Sherwood, Mollo, Card, Fielstra, and Furnace.

An order will enter consistent with this Opinion.


Dated:   April 29, 2022                          /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 UNITED STATES DISTRICT JUDGE