**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

CHARLES JONES, as Personal Representative
of the Estate of Wade Jones, Deceased,

                                                                                      Case No: 1:20-cv-00036
                                                                                    Hon. Judge Hala Y. Jarbou
       Plaintiff,                                                           Magistrate Judge Sally J. Berens

v.

COUNTY OF KENT et al.

       Defendants.

| BUCKFIRE LAW FIRM | CHAPMAN LAW GROUP |
|---|---|
| Jennifer G. Damico (P51403) | Ronald W. Chapman Sr., M.P.A., |
| *Attorney for Plaintiff* | LL.M. (P37603) |
| 29000 Inkster Rd., Ste. 150 | Devlin Scarber (P64532) |
| Southfield, MI 48034 | Jeffrey L. Bomber (P85407) |
| (248) 569-4646 | *Attorneys for Corizon Health, Inc.; Teri Byrne, R.N.;* |
| jennifer@buckfirelaw.com | *Dan Card, L.P.N.; Lynne Fielstra, L.P.N.; Melissa* |
| | *Furnace, R.N.; Chad Richard Goetterman, R.N.;* |
| VARNUM LAW | *James August Mollo, L.P.N.; Joanne Sherwood, N.P.;* |
| Timothy Eagle (P38183) | *and Janice Steimel, L.P.N.* |
| Peter Smit (P27886) | 1441 West Long Lake Rd., Suite 310 |
| Kyle Konwinski (P76257) | Troy, MI 48098 |
| *Attorney for the Kent County Defendants* | (248) 644-6326 |
| P.O. Box 352 | rchapman@chapmanlawgroup.com |
| Grand Rapids, MI 49501 | dscarber@chapmanlawgroup.com |
| (616) 336-6000 | jbomber@chapmanlawgroup.com |
| teeagle@varnumlaw.com | |

**CORIZON DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE PLAINTIFF'S
NURSING EXPERT, STEPHEN FURMAN, CCRN, FROM OFFERING TESTIMONY
REGARDING THE APPLICABLE STANDARD OF CARE FOR THE CORIZON
NURSING DEFENDANTS**

Exhibit A      Stephen Furman CCRN- Expert Report

# Stephen Furman RN CCRN NRP



February 2, 2021

Jennifer Damico, Esquire

29000 Inkster Road Suite 150

Southfield, MI 48034

<b><u>Jones v. Kent County</u></b>

Dear Ms. Damico,

Thank you for requesting that I review the medical records of Mr. Wade Jones and provide you with a letter to communicate my professional medical opinions as to the relevant standard of nursing practice that was applicable to the medical staff at Kent County jail infirmary, who cared for Mr. Jones and the breaches of the standard of care.

In completing my analysis of the above-mentioned case of Mr. Jones, I have reviewed the following information:

- Kent County/Corizon medical records
- Wade Jones's medical records from Spectrum Butterworth Hospital, the Kent County Medical Examiner and Life EMS
- Plaintiff's Complaint
- Notice of Intent
- Affidavit(s) of Meritorious Defenses of Defendants
- Kent County video surveillance footage
- Deposition transcript of Chad Goetterman
- Deposition transcript of Alice Clevenger
- Deposition transcript of Joanne Sherwood
- Deposition transcript of Penny Johnson, HSA
- Deposition of Penny Johnson, as Corizon's representative
- Deposition transcript of William Grimmett
- Deposition transcript of William Jourden

1 | Page

- Deposition transcript of Emily Kalman
- Deposition transcript of Donald Plugge
- Deposition transcript of J.L. Cooper
- Deposition transcript of Teri Byrne
- Deposition transcript of Lynne Fielstra
- Deposition transcript of Janice Steimel
- Deposition transcript of Melissa Furnace
- Deposition transcript of Daniel Card
- Deposition transcript of James Mollo
- Deposition transcript of Nasim Yacob
- Deposition transcript of Christopher Pearson
- Deposition Exhibits: 1 through 144
- Corizon's Supplemental Answers to Plaintiff's Second Request for Documents
- Corizon's Supplemental Answers to Plaintiff's First Interrogatories and Request for Documents
- Corizon's Answers to Plaintiff's Second Request for Documents
- Corizon's Answers to Plaintiff's First Interrogatories and Request for Documents
- NCCHC Accreditation reports
- Employee orientation and training manuals; including Attachments "A" through "aa" produced by Corizon:
   a. Employee Hours
   b. Table of Contents – Policies and Procedures (revised 8/2018)
   c. Policies and Procedures (revised 8/2018)
   d. Table of Contents – Education Manual
   e. New Employee Orientation – Practitioner
   f. New Employee Orientation – Practitioner II
   g. Smart Start
   h. SAW Training to Officers – Briefing
   i. Clinical Smart Card – SAW Pathways
   j. Pharmacy Audit
   k. Infirmary – Scope of Services
   l. "Site Specific" Policies and Procedures (revised 7/2018)
   m. Policy Manual Signature Pages
   n. Intake Core Process Program
   o. Nursing Rounding Tool
   p. Infirmary Core Process Program
   q. Emergency & Urgent Care Core Process Program
   r. Health Assessment Core Process Program
   s. Medication Management Core Process Program
   t. NEO -Practitioner I
   u. NEO – Practitioner II
   v. NET Manual
   w. Dr. Yacob Time Sheets

- x.   NCCHC Audits
- y.   Employee Orientation Manual
- z.   Core Skills Chart
- aa.  Infirmary Scope of Services
- Employee core competencies and skills
- Infirmary scope of services
- Kent County Jail Records, including Case Notes, Intake File, Medical and Mental Health Screening Forms, Classification records, Kent County Jail Record Entries, Activity Logs from Booking, L1 and the Infirmary and Incident and Investigation Reports
- Alcohol Withdrawal Management Article – ASAM
- Various Kent County Policies & Procedures, including "Medical" and "Critical Incidents"
- Corizon's answer to Plaintiff's Fourth Request for Documents
- Site Staff Orientation Manual (January 2016)
- Prison Health Services, Inc., Intoxication and Withdrawal Policy and Procedure, J-G-06
- MA Medication Training – manual
- Corizon Health Nurse – education manual
- Infirmary manual (2015)
- Reference materials: The Lippincott Manual of Nursing Practices

## Background and Qualifications

I have been working as a staff registered nurse in an acute care hospital my entire career, which started in July 1996 lasting until present. My initial nursing job after graduating from nursing school was a staff RN position in the cardiac intensive care unit and I am presently working in a level 1 trauma center in Richmond Virginia. Prior to nursing I was working as a Paramedic responding to 911 calls in Chesapeake, Virginia. A more extensive background is depicted in my CV which will be attached to this letter which I am incorporating here as reference. My training and experience, as specifically detailed above and within my CV, has caused me to become closely familiar with all standards of care set forth in this report. In the course of working continuously as a registered nurse for the past 25 years, I care for patients who are at risk for or presently going through alcohol withdrawals. I can comfortably state, there are hundreds of patients whom I have cared for in various stages of alcohol withdrawal as well as potentially going into withdrawals. The withdrawal scale typically used by both nurses and physicians to assess the degree of which a patient is suffering the effects of their body being void of alcohol is the Clinical Institute Withdrawal Assessment of Alcohol Scale (CIWA-Ar scale). In this scale patients are observed and asked a series of questions therefore assigning point values to each of the categories and in the end totaling the points which will shed light to what degree of alcohol withdrawal the patient is in at that present time. Alcohol withdrawal syndrome (AWS) varies person to person which is why there is importance in assessing each patient utilizing the CIWA score which will allow acknowledgement the presence of either waxing or waning in the patient's symptoms. AWS can produce minimal/mild symptoms but on the obverse side there can also be

life threatening symptoms including death if not treated appropriately meaning with the appropriate medications in an appropriate amount of time. AWS symptoms can be seen in as little as several hours after the last consumption of alcohol to several days which is the rationale for an initial alcohol screening as well as the staff being alerted to the potential for withdrawal necessitating the need for ongoing CIWA-Ar scoring to be completed.

## Summary of facts

Mr. Wade Jones was a 40-year-old at the time of the incarceration which was subsequent to being convicted of retail fraud, which included theft several bottles of alcohol. He was sentenced to 5 days in jail (4/24/2018-4/29/2018). Mr. Jones on his arrival to Kent County Jail was provided a health screening by Teri Byrne RN at 5:15pm on April 24, 2018 and after the screening was complete, he was transferred to the orientation unit (L1). Deputy Cooper testified in her deposition that she was notified of Mr. Jones going into withdrawals at about 8:49pm on April 24, 2018 but that alert was not entered for another 1 ½ hours. Deputy Cooper called down to the medical office at 10:13pm and advised a female of Mr. Jones reports that he is going through withdrawals. A SAW NET was not initiated with the new onset of withdrawal complaints by Mr. Jones. On April 25, 2018 at 3:41am, Dan Card does withdrawal checks but because Mr. Jones was not on the withdrawal protocol, he was not assessed. Mr. Jones was noted to have vomited 5 times at the point of Mr. Card's withdrawal checks which is a sign of alcohol withdrawal. But because Mr. Jones was either not on the list, or because no medical chart had been made, he was not assessed.

During the day of April 25, 2018, Mr. Jones had no contacts with any medical personnel to assess the degree of severity his alcohol withdrawal was at the time despite that he should have been added to the list after Deputy Cooper's call on the evening of April 24, 2018. During his Classification Screening by Deputy Plugge, at approximately 12:45pm, Jones told the Deputy that he was a daily drinker, was vomiting and had not yet received any medications.

There was a case note entered by Deputy Jourden at 1:02am on April 26, 2018 referencing Mr. Jones's condition as hallucinating, confusion, picking and vomited 6 times. Deputy Jourdan spoke with LPN Steimal at 3:30am on April 26, 2018 when she was on the floor for her routine withdrawal check. The first CIWA assessment was documented by LPN Steimal at 4:30am on April 26, 2018 which was 19 which is 1 point below severe. Furnace RN, the charge nurse, placed a progress note in the chart that the patient was hallucinating and CIWA was 19. She contacted Sherwood NP and an order for Diazepam was entered into the medical record at 5:30am but the first dose was not administered until 12:55pm by Mollo LPN on April 26, 2018. According to Furnace RN and Nasim Yacob, MD's testimony, nothing prevented a now dose to be administered.

Jones was not transferred to the Infirmary, despite the Order listing his acuity level as "high" which according to Corizon, requires the highest level of care and observation that can be provided in the infirmary. Deputy Jourden entered a case note at 4:00am on 4/26/18 that said:

"Seen by Nurse Janice approx. 0400 hrs. Still showing signs of WD's, medical advised he will be seen again soon."

Jones next assessment was at the regularly scheduled withdrawal check at 1:00pm on 4/26/18; 9 hours later. The new CIWA score assessed at the time of being given his first dose of Diazepam was noted as 13, but a review of the video shows that no one actually performed a CIWA assessment and the form is unsigned.

After his first dose of Diazepam, his CIWA increased to 21 which moved him into the severe withdrawal category despite him being scored a zero for nausea and vomiting, so in reality he should have been scored at least a 28. Mollo LPN testified that he has no recollection of completing the CIWA assessment at 4/26/18 at 1:00pm. Mollo LPN was at the cell door for about only 60 seconds. On the consent to treatment form, a note was written and initialed by Mollo and Steimal that read: "4-26-18-attempted signature going through WDS."

On April 26, 2018 at 6:25pm Nurse Fielstra LPN, comes to the cell door of Mr. Jones and attempted to give him meds. She charted a CIWA of 21 which is still in the severe range for withdrawal but in that interaction, it appears that Mr. Jones did not take the medication provided and Nurse Fielstra walked away without attempting vital signs.

On April 26, 2018 at 10:52pm, Mr. Jones was on the top bunk in his cell when he fell off of it just after midnight. At approximately 12:55am on 4/27/18, Deputy Jourdan contacted medical to advise them that Jones was deteriorating writing: "medical contacted about inmate Jones condition, Inmate Jones now has a small laceration on his right elbow from his rapid movements inside his cell. Medical advised he will be seen." The charge nurse was Furnace RN. She did not come to his cell to provide treatment or conduct a face-to-face encounter. She did not send LPN Card. They were the only two nurses on duty during this night shift. Instead, medical assistant Pearson responded to the Jones' cell but only carrying papers on a clipboard and not any medical supplies. MA Pearson did not enter the cell to assess the patient and only had Mr. Jones sign some papers. No documentation by MA Pearson of this encounter exists. MA Pearson testified that he had Jones sign papers but does not recall what papers other than a consent to treatment form. The forms, including the consent form, appear to have Jones' illegible scribble as his signature. He cannot recall anything else about the encounter with Jones, but the video is clear that he did not provide any treatment.

At 4:00am, the regularly-scheduled withdrawal check time, LPN Card came to the cell and assessed Jones' CIWA, which was 20, as well as attempted to give Mr. Jones his medication but according to Card, he refused. He did not take vital signs with that interaction. At 5:33am on April 27, 2018, Deputy Jourden calls the medical office with his radio to advise them that Mr. Jones was face down in his cell.

Multiple medical personnel arrived at the patient's cell at about 5:35am and along with someone carrying a medical bag. This was Furnace RN's first and only face-to-face interaction with Jones. At that time, his blood pressure was assessed at 150/92. Jones was confused and was having

both auditory and visual hallucinations. The medical staff remained in the patient's cell for about 10 minutes with all of the staff leaving at 5:45am. Nurse Furnace called and spoke with NP Sherwood and she received orders to admit to the infirmary for close observation.

At 6:06am Mr. Jones was received in the cell in the infirmary located in front of the charge nurses' desk. According to the records and the video, Furnace's shift ended at around 6:30am and Goetterman RN's, the oncoming charge nurse's shift began at 6:00am. Mr. Jones was placed in the cell on a mattress which had been placed on the floor. Mr. Jones appears to be speaking to himself and picking items off of the door. Mr. Jones was ambulating around in his cell with a very ataxic gait, pretending to smoke but nothing is in his hands, trying at times to open the cell door, at one-point falls striking his head on the corner of the bath stall wall and stumbles another time.

These events were going unnoticed by the medical staff due to them not there observing the patient and them looking at a ring with a magnifying glass. At 7:38am, Mr. Jones was sitting on the toilet appearing to vomit then at 7:39am he became motionless slumped over on the toilet. At 7:42am, Deputy Houston and RN Goetterman enter the cell and as Deputy Huston pulls the patient off of the toilet, RN Goetterman summons help but then stood there for about 45 seconds putting on his gloves. Time is critical and CPR needs to be started as soon as possible.

Chest Compressions were initiated at 7:44am. There was continued chest compressions but there was no assisted breathing until 7:52am. The Paramedics arrived at 7:53, dropped a King airway, attached the patient to their monitor/defibrillator and started an IV. The patient was given Epinephrine 1mg IV and then subsequently developed return of spontaneous circulation (ROSC). He was unresponsive after ROSC. At about 8:04, Mr. Jones was loaded onto their stretcher and transported to the Emergency Department. Mr. Jones was declared brain dead on May 2, 2018 and died May 4, 2018. Spectrum diagnosed with cardiac arrest with severe anoxic brain injury resulting in brain death. His heart was transplanted on the date of his death.

## Opinions

Based upon my review of all the materials stated above, my education, training, skills and experience as a licensed registered nurse, the medical staff at Kent County jail violated the applicable standard of professional practice as it pertains to the care that was provided to Mr. Wade Jones on April 24-27, 2018.

    1.    **Nurse Goetterman**

Nurse Goetterman was responsible for the close observation of Mr. Jones during his known shifts: 4/25/18 from 6:00am to 2:30pm, and on 4/27/18 when he was moved to the infirmary. Again, despite medical being told by Deputy Cooper that Jones was going through withdrawals, his alerts being prominent in his jail file, and testimony from Lt. Kalman that the withdraw checklist is generated by medical staff from the "WD alerts," on 4/25/18 at the beginning of his shift or prior to the next scheduled withdrawal check (1:00 pm), Goetterman either did not create a new withdrawal checklist using the "WD alerts" or he disregarded Jones on the list because no medical

chart had been made. Goetterman missed the opportunity to assess Jones and get him started on withdraw medications which early intervention would have more than likely saved his life.

On 4/27/18, Jones was transported to the infirmary in a wheelchair. It does not appear that he was able to stand up or ambulate without assistance. His head was slumped over during transport. A review of the video taken of the medical office it shows that nurse Goetterman was out of the office multiple times and paying very little attention to Jones, the person he was supposed to be "closely watching". During the shift change between Furnace and Goetterman, they can be seen leaving the medical office area, walking down a hallway together, and being out of camera range for about 12 minutes. Nurse Goetterman had his back to Mr. Jones and a keen interest in looking at a ring with a magnifying glass, chatting it up with female staff, and leaning back in his chair with his arms overhead. Jones' medical chart, the location of which I followed closely through the videos, was given to Goetterman by Furnace during the shift change, but not touched by Goetterman during the approximate 1 ½ hours that Jones was in the infirmity under his supervision. His record, including the CIWA sheets, the flow sheet, the refusal form, would be contained in this paper chart because Corizon did not utilize electronic medical records.

If nurse Goetterman was performing his job as he was supposed to, he could have evaluated Mr. Jones following his fall by both a physical assessment and a vital sign assessment. There is a high degree of probability that Mr. Jones could have had interventions initiated if nurse Goetterman was paying attention to him by noting his fall and evaluating him following that fall. It shows that Mr. Jones was trying to get the attention of nurse Goetterman but that nurse did not even look up at him to see what was needed. We will never know what Mr. Jones was trying to convey to nurse Goetterman because Mr. Jones was ignored, and he is unable to tell us now because he is dead as a result of an anoxic brain injury suffered as a result of his cardiac arrest. If Mr. Jones was having chest pain or shortness of breath, then interventions could have been initiated with a high degree of probability of avoiding a cardiac arrest and death.

Video shows that Mr. Jones fell striking his head on the corner of the shower wall which went unnoticed by any of the medical staff and RN Goetterman, who was in charge. The rationale for moving Mr. Jones to the infirmary was for closer observation but it appears that he would have closer observation if he were just left in his cell. Video further shows that Mr. Jones was motionless slumped over on the toilet for almost five minutes before Goetterman came into the cell and that visit was only to take vitals and assess the patient but found that he was in cardiac arrest. Once again, Mr. Jones was supposed to be close observation and not be ignored. He laid slumped over in the restroom on the toilet for almost five minutes without any intervention by the medical staff and by the lackadaisical approach by Nurse Goetterman going to Mr. Jones's cell and taking 40 seconds to put on gloves before he checked to see if Mr. Jones was breathing or had a pulse. The medical staff was clueless that anything was wrong. In the viewing of the video there seemed to be no sense of urgency by the medical staff. Nurse Goetterman was an Emergency Department nurse once out of nursing school and should have been well versed in working cardiac arrests but the video tape shows something completely different. It shows that

once chest compressions were being performed by LPN Mollo that Nurse Goetterman did not attempt assisted respirations for almost seven minutes which will ensure that the patient develops an anoxic brain injury if ROSC was achieved. A nurse has a duty to act and assisting ventilations with a bag valve mask (BVM) is the standard of care when the patient is in cardiac arrest. Although preferable to be attached to oxygen, it is not required for the BVM to be attached to oxygen. It would result the patient being oxygenated with room air.

Nurse Goetterman seemed to be confused as to how to attach and run an automatic external defibrillator (AED) which as a charge nurse you should be very comfortable in knowing all of the equipment, making sure all of the equipment is available and being very comfortable utilizing all of the equipment. As for the oxygen tanks, Goetterman is seen fidgeting with one tank, requesting for another to be brought in to the cell, trying to hook up to the second tank, and after that one does not appear to work, he hooks back into the first tank. During that time, no one gives any rescue breaths to Jones. Goetterman testified he switched back and forth between tanks, because one may have been leaking the other one had more oxygen in it.

Lastly from the video, we can see that Mr. Jones is in severe withdrawals and would be best served in an ICU and not a jail cell. There was a no sense of urgency to have Mr. Jones evaluated by an emergency department. Nurse Geotterman stated in his deposition that he understood that people can die as a result of alcohol withdrawals and he knew that the patients can get dehydrated, but also, they can have electrolyte anomalies as well as seizures but with Mr. Jones refusing to eat, drink or take his needed medication those issues would become more of a concern and allowing him to sit in a jail cell was not what he needed. Goetterman testified that he recalled observing Mr. Jones and that Mr. Jones "might be hallucinating or things like that." His assessment of Mr. Jones was done by "looking at him" through the window. Goetterman testified that he did not need to go into the cell or perform a complete assessment unless there was a change in his condition from the prior assessment.

Nurse Goetterman agreed that alcohol withdrawal syndrome can be fatal for the patient but yet made a conscious decision to not appropriately assess a patient with significantly elevated CIWA scores in obvious severe alcohol withdrawal which significantly increased his risk for harm and ultimately resulted in his death. A withdrawal checklist should have been created on the morning of 4/25/18 when nurse Goetterman was the charge nurse but it was overlooked negligently therefore delayed the withdrawal checks to be conducted on Mr. Jones. This fact that withdrawal check should have start on 4/25/18 would be a standard of care deviation by nurse Goetterman. As Mr. Jones was in front of Nurse Goetterman at the glass there was no concern despite knowing his present medical condition and totally ignored him if Mr. Jones were making a plea for help it fell on deaf ears. Delay in assessing the patient with alarming CIWA scores as well as ignoring the patient knocking on the glass is a standard of care deviation. Ignoring the patient who is supposed to be a close observation is also a standard of care deviation. The fact that a patient was found in his close observation cell who appears by video to be unconscious for about 5-minutes before chest compression are started is a standard of care violation. Once patient was found to be

pulseless Nurse Geotterman dawdled for just under a minute getting his gloves on which further delayed life-saving chest compressions and rescue breathing. This is also a standard of care violation. The fact that, 7-minutes went by before rescue breathing was initiated was a standard of care violation. There was just no sense of urgency by nurse Goetterman to save Mr. Jones.

Nurse Goetterman's care of Mr. Jones was blatantly inadequate. He failed to inquire into necessary facts, i.e., he did not even open or look at his medical records, to make a professional judgment. Had Goetterman asked questions to Furnace or looked at the chart, he would have discovered that Mr. Jones refused his medications at the 4:00am withdraw check, had been hallucinating for over 24 hours, was unable to understand directions, and only had taken one dose of his prescribed medications. The information was there to be found had he taken the time or effort to read the chart. Goetterman, at the very least, should have tried to administer the 4:00am dose of Diazepam. It is questionable whether Goetterman received verbal orders to start Mr. Jones on IV fluids. It is mentioned in the records, but no one has any recollection of this. Goetterman did not check on Mr. Jones, administer his missed dose of medication or start him on an IV. In my opinion, Nurse Goetterman's care was so egregious that it does not amount to medical attention and required no medical judgment.

2. **Nurse Furnace**

Nurse Furnace once coming on shift at 10:00pm on April 24, 2018, may or may not have seen the alert sent out by Deputy Cooper at 10:18 that same day, but there was a call to the medical unit and she spoke to a female to advise them that Mr. Jones was complaining of withdrawal symptoms. That phone call was not acted upon and Mr. Jones went more than 24-hours until he was evaluated by LPN Steimal but only as a request by Deputy Jourden. Nurse Furnace was the CN on 4/24/18 and 4/25/18 (night shift 10:00pm -6:30am). She should have been the first CN to print up the WD checklist on 4/25/18 for the 4:00am WD check (alert entered on 4/24/18 at 10:18 -she was on then and likely was the one who took the call from Deputy Cooper – who called the extension at the charge nurse desk.)

Due to him not being on that withdrawal checks list, despite the medical department being made aware of it by Deputy Cooper at about 10:13pm on April 24, 2018, Mr. Jones was not started on withdrawal checks until April 26, 2018 at 4:30am when Deputy Jourden requested LPN Steimal to check on Mr. Jones therefore significantly delaying treatment for his withdrawal symptoms.

Nurse Furnace missed opportunities to start Jones on the withdrawal protocol prior to getting his first (and likely only) dose of Diazepam on 4/26/18 at 1:00pm. Nurse Furnace started her shift on 4/25/18 at 10:00pm.

Nonetheless, once LPN Steimel made her findings known to nurse Furnace, she should have initiated a SAW NET. The SAW NET would have guided her in the treatment of Mr. Jones. Not completing the SAW NET was a violation of the policy and procedures in which she is to follow. It is also a violation of the standard of care. Nurse Furnace once evaluating the initial CIWA of 19 should have had a face-to-face encounter with Mr. Jones and then she could have properly

conveyed all necessary assessment information to NP Sherwood. Nurse Furnace failed to do that and the totality of what was done was to put him on withdrawal protocol. Despite of having a CIWA of 19, and knowing that he was hallucinating, Mr. Jones was not provided necessary medication Diazepam for almost eight hours later. Dr Yacob stated in his deposition that the nurse has the discretion to give the medication early but sadly we see that was not done. Nurse Furnace simply testified that she only passes out medications during withdrawal check and that's just "the way it is". Nurse Furnace, in my opinion, did not use any medical judgment in failing in to give Jones his first dose of Diazepam almost 8 hours after it was ordered and by failing to do a face-to-face encounter when she wrote that he was hallucinating in her progress note. The delay in treatment, in my opinion, was due to Nurse Furnace's apathy and not properly doing her job.

On 4/26/18 at 6:35pm, Fielstra LPN performed the withdrawal check and scored him at 21, which is severe. Nurse Fielstra charted and testified that discussed this assessment with Nurse Furnace. The increase score of 21 (from 19) was after he was given his dose of Diazepam. Nurse Furnace should have performed a face-to-face assessment of Mr. Jones and completed a SAW NET due to the change in his condition and because the medication did not appear to be working. If Nurse Furnace had followed Corizon's protocol, and did not deviate from the standard of care, she would have been prompted by the SAW NET to contact EMS, or at the very least, the provider. Furnace did nothing.

Next, Nurse Furnace utilized no medical judgment when she sent MA Pearson to Jones' cell at 1:00am, on 4/27/18 in response to Deputy Jourden's call. Even though Deputy Jourden's note stated that Jones was bleeding from a laceration to his elbow, Furnace, sent MA Pearson with forms to complete. This was after Jones has scored 21 on his last CIWA on 4/26/18 at 7:00pm. His acuity level was already "high" according to the Order, and there was an obvious change in his symptoms, including a new injury. This was also after Jones had fallen from the top bunk. There was no such mention of the fall in the medical notes by any of the nursing staff which is disingenuous in nature and a failure to keep accurate and up to date medical records.

In my opinion, Furnace was disinterested and made the measured decision to disregard the Deputy's call for medical attention, and was more interested in getting the medical forms signed and in his chart.

At the next withdrawal check, at 4:00am on 4/27/18, Furnace sent LPN Card to assess Jones. He testified that Jones refused to take his medications. Card scored Mr. Jones a 20 during his evaluation. He partially completed a refusal form, discussed below, and would have reported his findings to Furnace. Furnace, at that time, was required to contact NP Sherwood, per Corizon's policies, because Jones refused a dose of withdrawal medication. She did not contact NP Sherwood. Furnace should have done a face-to-face with Jones after this refusal to take his medications. She should have tried to get him to take his medication. She did not do this despite knowing that Mr. Jones alcohol withdrawals were severe and that severe alcohol withdrawal can be fatal.

It was only after the radio call from Deputy Jourden, at 5:30am did Furnace make the decision to see Jones. A review of the video from inside the medical office shows Furnace and other medical staff, jump up and go to his cell when they heard the radio call from Jourden.

Lastly Nurse Furnace, once evaluating Mr. Jones in his cell when they were called with him being found face down, *could have and should have* called 911 at that point to have the patient transported to the Emergency Department. Instead, Furnace decides to move a confused patient who was refusing all oral necessary medication to the infirmary for "close observation". The medical judgment exercised by Nurse Furnace, in my opinion, was so deficient that no competent RN would have responded in the manner in which she did.

Nurse Furnace agreed that alcohol withdrawal syndrome can be fatal for the patient but made a conscious decision to not appropriately assess a patient face to face which increased his risk for harm and ultimately resulted in his death. Nurse Furnace violated the applicable standards of care by not starting withdrawal checks after getting a call from Deputy Cooper about Mr. Jones stating his is starting withdrawals as well as no SAW NET initiation or face to face with the patient following a CIWA score of 19 on 4/26/18 at 4:30am. Nurse Furnace also deviated from the applicable standard of care when she abandoned her judgement and give Mr. Jones his first dose with Diazepam eight (8) hours after it was prescribed when she knew he was hallucinating and had not received any medication. She also violated the standard of care when she sent a medical assistant to assess a patient will severely elevated CIWA scores to assess a patient with injuries after falling off of the top bunk in his cell. No assessment done but the MA did get Mr. Jones to sign some papers for nurse Furnace. Nurse Furnace also violated the standard of care when she failed to call the nurse practitioner and do a face to face when Mr. Jones refused medication on 4/27/18 at 4:00am. Lastly nurse Furnace violated the standard of care when she failed to call 911 when the medical team was dispatched to Mr. Jones's cell after he was found face down on 4/27/18 at about 5:30am.

In sum, Nurse Furnace's medical decisions, and her decisions that required no medical judgment, were not only erroneous, but completely unreasonable under the circumstances described above. Many of her actions and/or inactions as described above are not, and cannot, be supported by legitimate medical judgement. In my opinion, Nurse Furnace failed to follow the course of treatment prescribed, which caused Mr. Jones to suffer needlessly, and ultimately die.

3. **Nurse Byrne**

Nurse Teri Byrne in her screening of Mr. Jones provided no documentation of date and time of last alcohol consumption or a refusal by Mr. Jones to provide information pertaining to his alcohol consumption which if documented, would have allowed nursing staff to be aware of his potential for having withdrawal symptoms. This lack of documentation set off a cascade of events allowing withdrawal checks of Mr. Jones to fall through the cracks which resulted in a lack of appropriate treatment, meaning assessments and medications to minimize the effects of alcohol withdrawal.

Any nurse no matter if a RN, LPN has a duty to care for a patient despite how the patient is acting towards you.

Nurse Byrne had the ability to have appropriate actions taken to minimize the effects of Mr. Jones's withdrawal symptoms, but she did not document that he consumed alcohol or even if he refused, she did not document that either. Nurse Byrne agreed that alcohol withdrawal syndrome can be fatal for the patient but made a conscious choice to not appropriately document therefore providing subsequent nursing staff that the patient will be at an increased his risk for harm and which ultimately resulted in his death. Failure to not properly document are violations in the applicable standard of care.

4.  **Nurse Fielstra**

When Nurse Fielstra went to his cell, on 4/26/18 at 6:30pm, she did not crush his controlled substance but allowed him to refuse it. She did not take vitals as she should have done and according to Dr. Yacob, vital signs are required in order to do a proper CIWA scoring. She assessed his CIWA at 21, but there was no communication with the provider as to how to properly treat this gentleman who was getting worse. In the record, there is a progress note from LPN Fielstra stating she reported Jones' condition to the current charge nurse and the oncoming charge nurse, who was RN Furnace. Despite Jones' condition getting worse, even where he had one dose of medication, and his score was increasing instead of decreasing, LPN Fielstra did not even attempt to take his vital signs. We will never know what they were at this time. She did not complete a refusal and admitted that because Jones was hallucinating at time, she saw him, he probably did not understand what he was refusing and probably did not have the capacity to understand what was going on. Whether LPN Fielstra properly reported all of this to Nurse Furnace is unknown because it is not documented.

Nurse Fielstra agreed that alcohol withdrawal syndrome can be fatal for the patient but yet made a conscious decision to not appropriately assess a patient which increased his risk for harm and ultimately resulted in his death. Her care of Mr. Jones was so deficient that she knowingly exposed him to an increased risk of severe harm. Nurse Fielstra violated the standard of care by allowing a confused patient to refuse medication which will help and prevent him from dying. There was not a properly assessed CIWA score of Mr. Jones when she went to his call on 4/26/18 at 6:30pm. No vitals were taken but she still assessed the patient with a CIWA score of 21 which emergent actions should have been taken but were not. Even advance concerns to the charge nurse or nurse practitioner which she did not do. Nurse Fielstra had a duty to act and she did not which constitutes a violation in the standard of care.

5.  **Nurse Steimel**

Nurse Steimel also once evaluating Mr. Jones was not able to get a blood pressure but did get a heart rate of 124 which is significantly elevated. Per Dr. Yacob there should have been a manual cuff used if she was not able to get the blood pressure. She also should have reported back to

the charge nurse, Furance, of the significant elevation in the CIWA score of 19 and her "inability" to take his vital signs.

Nurse Steimel agreed that alcohol withdrawal syndrome can be fatal for the patient but made a conscious decision to not appropriately assess a patient which increased his risk for harm and ultimately resulted in his death. The failure to appropriately assess the CIWA score of Mr. Jones and the inability to obtain vital signs as well as report back to the charge nurse the significant CIWA score elevation is a violation in the standard of care. When she returned to L1 on 4/26/18 at 1:00pm, with Nurse Mollo, Steimel noted that Mr. Jones would not sign the consent to treatment form because he was going through withdrawals. She did not perform a CIWA assessment during her withdrawal check, as prescribed by the Order. She did not take his vital signs as required by protocol according to Dr. Yacob. By interfering with Mr. Jones' course of treatment, and being aware that she was not implementing the Orders, she increased the risk of severe harm to Mr. Jones.

6.   **Nurse Mollo**

Nurse Mollo provided Mr. Jones his first dose, and likely only dose, of Diazepam at the 1:00pm withdrawal check on 4/26/18. While the CIWA form shows a score of 13, Nurse Mollo has no recollection of doing a CIWA assessment. Not vital signs are noted. He is only at Jones' cell for less than 60 seconds, coxing Jones to drink his dissolved medication. Nurse Mollo completely failed to properly assess Jones. If a complete CIWA had been performed and his vital signs taken, based upon Jones' presentation in the video, he would have scored in the high 20's which would have required immediate transfer to an emergency department. He also did no rescue breathing in the infirmary during CPR.

Nurse Mollo understood per his deposition transcript the alcohol withdrawal syndrome can be fatal but yet made a conscious decision to not appropriately assess a patient which increased his risk for harm and ultimately resulted in his death. Nurse Mollo also failed to perform a proper CIWA assessment due to the lack of vital signs and amount of time that he was interacting with Mr. Jones is a standard of care violation. When providing his one and only dose of Diazepam, he had the ability to perform a proper assessment would have been completed then more likely than not, Mr. Jones would have scored in the upper 20's which would have required immediate transport to the Emergency Department. Nurse Mollo also failed to follow established American Heart Association algorithms in performing basic CPR by performing rescue breaths which is also a standard of care violation.

Like Nurse Steimel, Nurse Mollo did not perform a CIWA assessment during his withdrawal check, as prescribed by the Order. He did not take his vital signs as required by protocol according to Dr. Yacob. By interfering with Mr. Jones' course of treatment, and being aware that he was not implementing the Orders, Nurse Mollo increased the risk of severe harm to Mr. Jones.

7.   **Nurse Card**

As stated above, at 4:00am on 4/27/18, Furnace sent LPN Card to assess Jones. He did not take Jones vital signs. He testified that Jones refused to take his withdrawal medication and that "he was probably being difficult at the time." The video shows LPN Card walk up to Jones' cell, peer in and walk away. He does not even try to take vitals or give Jones medication. He did not assess or tend to Jones' elbow laceration and bleeding, from the fall off of the top bunk. The refusal form completed by Nurse Card is incomplete. Nowhere does it state that he refused medications. It is extremely troubling that LPN Card scored Jones a 20 which is severe and required emergent intervention, without even doing the bare minimum at the withdrawal check. During his deposition, he testified that Jones was "ok at that time" according to his incomplete refusal. LPN Card testified that he had no memory of Jones, but he testified that he explained to Jones that a refusal of withdrawal medication could lead to his death. LPN Card's testimony is disingenuous, in my opinion, as Deputy Jourden wrote at 4/27/18 at 4:00am, that Jones was unable to understand directions during withdrawal check. LPN Card testified that he relayed his findings, including his score of 20, to Nurse Furnace. It is unknown if he told her that Jones refused his medications although the refusal form is part of the record. After watching the video of his purported withdrawal check, **LPN Card admitted at the end of his deposition that when he saw Jones it was an emergent situation**. He did not call EMS, nor did he call NP Sherwood. He only, went back to the cell was after Deputy Jourden had radioed in that Jones needed immediate attention, 1 ½ hours later.

Nurse Card agreed that alcohol withdrawal syndrome can be fatal yet made a conscious decision to not appropriately assess a patient which increased his risk for harm and ultimately resulted in his death. Nurse knew that Mr. Jones' condition was an emergency. When Nurse Card was sent to assess Mr. Jones on 4/27/18 at 4:00am but he in-fact only quickly glanced at Mr. Jones which does not constitute an assessment. Nurse Card did not attempt to take vital signs, did not attempt any sort of patient assessment, attempt to give withdrawal medications nor did he complete the refusal paperwork which are all standard of care violations. He did not act on the CIWA score of 20 which dictates emergent action be taken and agreed that Mr. Jones was an emergent situation but failed to act which is also a standard of care violation.

Nurse Card's treatment or lack of treatment, in light of the fact that he knew Mr. Jones' condition was emergent, in failing to carry out Orders, intentionally interfering with treatment as prescribed, by failing to call EMS, the practitioner, or at the very least, reporting the seriousness of Mr. Jones' condition to his supervisor, in my opinion, significantly increased the risk of severe harm to Mr. Jones, and ultimately contributed to his death.

Case 1:20-cv-00036-HYJ ECF No. 162-1, PageID.3657 Filed 06/30/22 Page 16 of 17

## In Summary

Mr. Jones was placed in jail with a five-day sentence for retail fraud under $100.00, but during his screening by nurse Teri Byrne there is no documentation or a refusal by Mr. Jones to provide information pertaining to his alcohol consumption which prevented nursing staff to be aware of his potential for having withdrawal symptoms. Later that same day Mr. Jones conveyed that he was starting to have symptoms of withdrawal for which Deputy Cooper put out an alert as well as called medical to inform them. Despite those actions, Mr. Jones fell under that radar as it relates to withdrawal checks and interventions which should have been put in place much earlier.

The nursing staff caring for Mr. Wade Jones during his incarceration starting on 4/24/2018 breached the standard of care by not appropriately assessing CIWA scores as well as appropriately treating the scores in which they did receive. CIWA scoring was started 30 hours after which they should have been initiated. There was no concern that they were allowing a confused patient refuse his medication and once refused there was no following of their own policy and procedures by contacting the providers or having the patient transported to the hospital as a result if severely elevated CIWA scores depicting severe alcohol withdrawal which as everyone named can be fatal yet they made the conscious decision not to treat the patient. Instead, the patient moves to an observation cell for which he was being far from observed to the point he lay there motionless for 5-minutes before staff comes in a find him dead and the subsequent actions of the nursing staff just ensured there would not be a successful ending.

Mr. Jones was allowed to progress in his withdrawals to where he was not eating, drinking and taking his necessary medication which would make the symptoms of withdrawal more manageable. Once Mr. Jones progressed to the level of severe withdrawal, Nurse Furnace had him moved to the infirmary for close observation. We can see from the video that he was anything but closely observed in that he was walking with an ataxic gait and falling against walls and then slumped over motionless for almost five minutes before being found to be in cardiac arrest. Mr. Jones developed an anoxic injury as a result of his brain being deprived of oxygen during his cardiac arrest for which is the reason, he ultimately declared brain dead and died. In the Emergency Department Mr. Jones toxicology results demonstrated that his levels of diazepam and promethazine were at low levels as a result of being allowed to refuse medication despite no evaluation for capacity which if confused the patient will not understand the ramifications of their actions. If these medications are not taken the probability that the patient could die is greatly increased. Nurses Fielstra and Card allowed the patient to refuse but did not convey that to any providers or charge nurse.

If the standards of care, and policies and protocols as set forth above, were followed by the find Corizon medical staff at the Kent County Jail then once Mr. Jones was assessed with an elevated CIWA score, that would have been conveyed to the provider as well as the subsequent scores demonstrating that his condition was worsening which once again should have been conveyed to the providers and/or transferred to the Emergency department by 911 ambulance for severe

15 | Page

16 | Page

alcohol withdrawal. Despite being an inmate, Mr. Jones did not deserve any lesser degree of medical care than any other patient but in reviewing the medical records supplemented by deposition testimony that is exactly what he did get and died as a result.

My opinions are held to a reasonable degree of nursing certainty, and based upon my knowledge, education, experience and skills as a registered nurse. I reserve the right to alter my opinion as more/new information is made available through discovery. In addition to the above documents, I relied upon Lippincott which are generally accepted for setting the standard of care in nursing and nursing practices and the assessment and treatment of alcohol withdrawal syndrome and/or delirium tremens.

Sincerely,

*[signature]*

Stephen Furman RN CCRN