## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

CHARLES JONES, as Personal Representative
of the Estate of Wade Jones, Deceased,

Case No: 1:20-cv-00036
Hon. Judge Hala Y. Jarbou
Magistrate Judge Sally J. Berens

      Plaintiff,

v.

COUNTY OF KENT et al.

      Defendants.

---

| | |
|---|---|
| BUCKFIRE LAW FIRM<br>Jennifer G. Damico (P51403)<br>*Attorney for Plaintiff*<br>29000 Inkster Rd., Ste. 150<br>Southfield, MI 48034<br>(248) 569-4646<br>jennifer@buckfirelaw.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A.,<br>LL.M. (P37603)<br>Devlin Scarber (P64532)<br>Jeffrey L. Bomber (P85407)<br>*Attorneys for Corizon Health, Inc.; Teri Byrne, R.N.;<br>Dan Card, L.P.N.; Lynne Fielstra, L.P.N.; Melissa<br>Furnace, R.N.; Chad Richard Goetterman, R.N.;<br>James August Mollo, L.P.N.; Joanne Sherwood, N.P.;<br>and Janice Steimel, L.P.N.* |
| VARNUM LAW<br>Timothy Eagle (P38183)<br>Peter Smit (P27886)<br>Kyle Konwinski (P76257)<br>*Attorney for the Kent County Defendants*<br>P.O. Box 352<br>Grand Rapids, MI 49501<br>(616) 336-6000<br>teeagle@varnumlaw.com | 1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>dscarber@chapmanlawgroup.com<br>jbomber@chapmanlawgroup.com |

---

**CORIZON DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE PLAINTIFF'S
NURSING EXPERT, STEPHEN FURMAN, CCRN, FROM OFFERING TESTIMONY
REGARDING THE APPLICABLE STANDARD OF CARE FOR THE CORIZON
NURSING DEFENDANTS**

Exhibit B        Stephen Furman Deposition Transcript

STEPHEN FURMAN, R.N.
July 07, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

------------------------------

CHARLES JONES, as Personal Representative
of the Estate of Wade Jones, Deceased,

       Plaintiff,

      v.               Case No. 1:20-cv-36

COUNTY OF KENT, et al,

      Defendants.

------------------------------


         Complete transcript of the
deposition of STEPHEN FURMAN, R.N., taken at the
instance of the Defendant, before Mary E. Donivan,
a Court Reporter and Notary Public for the State of
Virginia at Large, on July 7, 2021, beginning at
10:00 a.via Zoom Video; said deposition taken
pursuant to Fed. R. Civ P. 30, Rules of Michigan.

STEPHEN FURMAN, R.N.
July 07, 2021

```
                                              Page 2
 1    APPEARANCES:
 2         Ms. Jennifer G. Damico, Esq.
           Buckfire Law Firm
 3         29000 Inkster Road, Suite 150
           Southfield, MI   48034
 4
              on behalf of Plaintiff;
 5
 6         Mr. Ronald W. Chapman, Sr. M.P.A, LL.M
 7         Chapman Law Group
           1441 West Long Lake Road, Suite 310
 8         Troy, MI  48098
 9            on behalf of Defendants Corizon
              Health, Inc., et al.
10
11         Mr. Peter Smit, Esq.
           Varnum Law
12         P.O. Box 352
           Grand Rapids, MI   49501
13
              on behalf of Defendant, Kent County.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3
 1                I N D E X
 2    ─────────────────────────────
 3            T E S T I M O N Y
 4    Direct Examination
      by Mr. Chapman                         pg    5
 5
 6    Cross Examination
      by Mr. Smit                            pg  149
 7
 8    Cross Examination
      by Ms. Damico                          pg  169
 9
10
11            E X H I B I T S **
12
13    Number 158   Expert Furman Report      pg   58
14    Number 159   Email Chain               pg   59
15    Number 160   Billing Records           pg   61
16    Number 161   Damico Letter,            pg   64
                    In Re: Video Hard Drive
17    Number 162   Lippincott Chapter        pg   66
                    Alcohol Withdrawal
18
19    Number 163   Dft Expert Disclosure     pg   69
20    Number 164   Article- Predictors of    pg   70
                    Severe Alcohol Withdrawal
21    Number 165   Abstract                  pg   71
                    British Journal of Addiction
22
23    Number 166   Article - Diagnosis and   pg   73
                    Management of Acute
                    Alcohol Withdrawal
24
25    Number 167   Article - Clinical        pg   75
                    Institute Withdrawal
                    Assessment, Revised
```

```
                                              Page 4
 1
 2
 3    Number 168   Article - Recognition     pg   79
                    and Management of
 4                  Withdrawal Delirium
 5    Number 169   Article - Alcohol         pg   82
                    Withdrawal Syndrome:
 6                  Benzodiazepine & Beyond
 7    Number 170   Census Information        pg   85
 8    Number 171   CIWA Scale, Revised       pg   86
 9    Number 172   CIWA-Ar Corizon Record    pg   88
10    Number 173   Furman's Handwritten
                    Notes                    pg   92
11
12    Number 174   Furman's Final Opinion    pg  132
13    Number 175   Flash Drive               pg  149
14
      ** EXHIBITS RETAINED BY COUNSEL
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 5
 1         Under the current National Emergency,
 2    pursuant to Section 319 of the Public Health Service
 3    Act, counsel stipulate the witness may be sworn
 4    remotely.
 5              STEPHEN FURMAN, R.N., called as a
 6    witness by the Defendants, was duly sworn and
 7    testified as follows:
 8
 9         MS. DAMICO:  Jennifer Damico, for the
10    plaintiff, the Estate of Wade Jones.
11         MR. CHAPMAN:  This is Ronald W. Chapman on
12    behalf of the medical defendants.
13         MR. SMIT:  This is Peter Smit from the
14    Varnum Firm on behalf of the County defendants.
15
16             DIRECT EXAMINATION
17    BY MR. CHAPMAN:
18    Q    Mr. Furman, as I just indicated, I'm the
19    one that's going to be taking the initial part of
20    the deposition.  And there may be questions from
21    Ms. Damico or Mr. Smit after I am done, and then
22    potentially I will have some more questions after
23    that.  I assume you've given a deposition before?
24    A    Correct.
25    Q    Looks to me like, I don't know, maybe 50
```

STEPHEN FURMAN, R.N.
July 07, 2021

**Page 6**

1  or 100 times?
2      A    About 55 times.
3      Q    About 55 times.  So I'll give you some
4  rules and I'm sure they're completely different than
5  the 55 you've heard before.  You have to answer
6  audibly; correct?
7      A    Correct.
8      Q    You can't shake your head or move your
9  head.  You can do all that but the court reporter
10  can't take that down; okay?
11      A    Right.
12      Q    If you can't understand a question I ask
13  for any reason, I screw up a date, screw up a
14  medical term, screw up somebody's name, transpose
15  the moon or sun or whatever it is, don't answer the
16  question and tell me you don't understand.  Fair
17  enough?
18      A    Fair enough.
19      Q    If you tell me you don't understand I may
20  ask you what don't you understand.  And you can
21  point out the foolish statement I made and I'll
22  correct it.  Fair enough?
23      A    Fair enough.
24      Q    If you need to take a break, that's fine.
25  We can take a break at any time you want for as long

**Page 7**

1  as you need.  But the question that's posed, at
2  minimum, you have to answer; correct?
3      A    Correct.
4      Q    If you do think you're going to need a
5  break I would like some lead time at least to finish
6  maybe the line of question before we get to the time
7  of the break; okay?
8      A    Sure.
9      Q    Since you're not a client of Ms. Damico's
10  anything you say outside the break I'll ask what you
11  talked about, and you'll have to tell me what it is
12  that you talked about.
13          Do you have any reasons why you can't
14  give a deposition today?  Do you have some pressing
15  appointments over the next hour, or are you on some
16  drugs or you can't remember or anything like that?
17      A    No.
18      Q    Okay.  Would you please state your full
19  and complete name for the record.
20      A    Sure.  My name is Stephen Allen Furman.
21  And I am a Jr.
22      Q    I read a number of your prior depositions.
23  And one of the depositions I read was in the middle
24  of 2018.  You said that you have been retained 100
25  times.  So how many times have you been retained now

**Page 8**

1  to provide expert testimony?
2      A    That would be a good question.  I would
3  figure it to be approaching 200.
4      Q    So in 2 1/2 years you've received about
5  100 more cases?
6      A    I would guess somewhere around there.
7      Q    Okay.
8      A    I mean, not -- I can't give you an exact
9  number but somewhere in that ballpark.
10      Q    I understand in one of your prior
11  depositions you said you received four or five cases
12  a month?
13      A    Sometimes I don't take all the cases I
14  receive.  Some of those I decline because they lack
15  merit.
16      Q    Well, if you decline a case because it
17  lacks merit do you just give an opinion and say the
18  case lacks merit?  Or you don't take the case
19  because you can't support the attorney?
20      A    Exactly.  I don't take the case because I
21  find standard of care deviations within the nursing
22  staff that I was evaluating.
23      Q    Let me see if I understand this.  So when
24  you're hired as an expert, if you don't agree with
25  the attorney's position you tell them, and they

**Page 9**

1  decline to retain you?
2      A    They ask me to review the case.  I review
3  the case and then I can either support it or I can't
4  support it.
5      Q    I got that.  But when they ask you to
6  review the case at that point in time you're
7  retained to look at the case.  You're paid for the
8  time; right?
9      A    Sure.
10      Q    Okay.  So let's also count the ones that
11  you say there's no breach of the standard of care.
12  We're now back up to 4 or five a month; right?
13      A    About that, yes.
14      Q    Okay.  So that's about 48 to 60 cases a
15  year that you look at?
16      A    Okay.  I'll agree with the math.
17  Sometimes it's, you know, 2 cases a month but an
18  aggregate of 4 to 5 a month.
19      Q    But for the middle of 2018 to the middle
20  of 2021 you increased by 100 cases you'd have to be
21  doing at least three to 5 a month?
22      A    Okay.
23      Q    Just do the math.
24      A    Sure.
25      Q    3 times 12 is 36 times 3 would be 108?

STEPHEN FURMAN, R.N.
July 07, 2021

Page 10

1     A     Okay.  I agree.
2     Q     108 plus 100 is about 200; right?
3     A     That is.
4     Q     And of those 200 cases that you reviewed,
5  how many are defendants and how many were
6  plaintiffs?
7     A     Could be, ballpark speculation, but I'll
8  say 70 percent is plaintiff and 30 percent is
9  defense.  And there was a couple of outliers that
10 were I would say not standard of care opinion cases.
11    Q     Okay.  How many cases has Ms. Damico
12 retained you to look at?
13    A     This is the only one.
14    Q     How many cases has Mike Morse Law Firm
15 retained you to look at?
16    A     This is the only one.
17    Q     Okay.  How many cases -- well, what
18 attorneys in Michigan have you looked at cases for?
19    A     I have reviewed several cases for I would
20 say the law firm that Emily Peacock is a partner in.
21 Mark Lipton of Lipton Law and Ms. Audrey Sherman.  I
22 believe that's all of Michigan.
23              (Proceedings paused for audio
24              adjustments after which time the
25              following resumed on the

Page 11

1              record:)
2  BY MR. CHAPMAN:
3     Q     Do all of your cases that you look at, do
4  they deal with nursing care?
5     A     Like I said just a few minutes ago, there
6  are a couple of outliers that were not standard of
7  care opinions.
8     Q     So 95 percent would deal with nursing
9  care?
10    A     It would be a little north of 95 percent.
11 I've done 4 cases or 5 cases that weren't standard
12 of care opinions.
13    Q     In all the reviews that you have done,
14 Mr. Furman, have you ever reviewed a case that dealt
15 with someone going through detox in a jail?
16    A     No.
17    Q     Have you ever written a paper or published
18 an article or taught a class relating to someone who
19 is going through detox in a jail?
20    A     No.
21    Q     Do you have a copy of your CV there?
22    A     I believe it's on this disk (indicates)
23 here.
24    Q     Do you want to pull it up, or do you know
25 it by heart?

Page 12

1     A     I know it pretty well.
2     Q     Okay.  The CV that I have was updated as
3  of January 2020 so about a year and a half ago.  Has
4  anything changed since then?
5     A     It has.
6     Q     What's changed?
7     A     I have my bachelor's degree now.  I'm in a
8  master's in nursing education program.
9     Q     Are you in a master's to obtain your nurse
10 practitioner license or something else?
11    A     Nursing education.
12    Q     When did you obtain your bachelor of
13 science degree?
14    A     In April 2021.
15    Q     Anything else change?
16    A     Now my certifications, you can take away
17 TPATC.
18    Q     You can take away which one?  Oh, TPATC?
19    A     Correct.
20    MR. SMIT:  Ron?
21    MR. CHAPMAN:  Yes?
22    MR. SMIT:  During our last break somebody
23 did something so I don't see the witness
24 anymore.
25    MR. CHAPMAN:  Well, you can't see him and

Page 13

1  hear me at the same time.
2              (Proceedings paused to adjust
3              visual clarity and the following
4              resumed:)
5  BY MR. CHAPMAN:
6     Q     Is that all the changes, or do you have
7  other changes?  The ones you talked about are you
8  finished your BS.  You're in a master's program, and
9  you no longer have the TPATC certification.
10    A     Correct.  And then for professional
11 organizations, other than the American Association
12 of Critical Care Nurses I'm also a member of the
13 American Nurses Association, Virginia Nurses
14 Association.  And I was accepted into Sigma Beta
15 Tau.
16    Q     Anything else?
17    A     No.
18    Q     Okay.
19    A     And those were updated 4/10/21.
20    Q     Okay.  I guess we can start with your
21 education.  We have an association's degree in
22 nursing.  And then you said you just completed your
23 bachelor's degree; correct?
24    A     Correct.
25    Q     Was your bachelor's degree online, or was

STEPHEN FURMAN, R.N.
July 07, 2021

Page 14

1  it done in person?
2      A   It was done online.
3      Q   Okay.  What university did you go to?
4      A   Chamberlain University.
5      Q   Is Chamberlain an accredited university?
6      A   It is.
7      Q   Why did you chose to go online and not go
8  in person?
9      A   Because working in the hospital I work
10  varied shifts.  Our scheduling requirements doesn't
11  allow me the same days off every week.  Therefore, I
12  had to chose a program in which I can work around my
13  schedule versus the scheduled days of going to
14  school.
15      Q   How were you able to complete the hands-on
16  training, clinical training online?
17      A   Well, when you're going from RN to BSN
18  there are no clinical requirements.
19      Q   What about the hands-on training?  There
20  aren't any?
21      A   No.
22      Q   So it's all text book?
23      A   Correct.
24      Q   Or all lectures?
25      A   Yes.

Page 15

1      Q   So if you look at the beginning of your CV
2  it says VCU Medical Center in Richmond, and you were
3  there from 2004.  Are you still working there?
4      A   I am, yes.
5      Q   And it's a Level 1 trauma center?
6      A   It is.
7      Q   Supplemental staffing pool.  Do you still
8  rotate every 4 hours?
9      A   Sometimes every 4 hours.  Sometimes every
10  8 hours.  And sometimes I get to stay on that same
11  unit for 12 hours.
12      Q   Do you rotate pretty much every day?
13      A   I'm on a different unit every day.  It's
14  very seldom that I'm on the same unit 2 days in a
15  row.
16      Q   Why is that?  Why not be in the same unit
17  so you could develop the expertise for that unit?
18      A   Because I like variety.  And with
19  supplemental staffing I do get variety.  Some days
20  I'm in cardiac.  Some days I'm in trauma.  Some days
21  I'm in the emergency room.  Some days I'm in
22  surgery.  So I like it.
23      Q   So with supplemental staffing with a
24  particular division, a section is understaffed
25  somebody doesn't come in, vacations, whatever, then

Page 16

1  they would call on the supplemental staffing pool to
2  fill that need?
3      A   Correct.
4      Q   Okay.  It says here that you worked in the
5  pediatric intensive care unit?
6      A   I have, yes.
7      Q   Are there many pediatric patients going
8  through detox?
9      A   You don't see it very often.
10      Q   Probably never see that?
11      A   I've never seen that.
12      Q   Says you work in ICU for adults?
13      A   Correct.
14      Q   Okay.  Many of those folks in the ICU
15  going through detox?
16      A   Sometimes.  I had one Saturday.
17      Q   But they're in the ICU; correct?
18      A   They are, yes.
19      Q   So they're in a hospital in an ICU; right?
20      A   Correct.
21      Q   And that's when you see them.  When
22  they've already been to the hospital, and they're
23  already in the intensive care unit; right?  Under
24  this condition?
25      A   If you're isolating it to ICU, yes.

Page 17

1      Q   Just isolating this.  We'll go through
2  some of the others.  So in this case you see some
3  detox patients that are already in VCU Medical
4  Center in the intensive care unit?
5      A   Correct.
6      Q   All right.  You work in the telemetry
7  unit?
8      A   Yes.
9      Q   Many of those patients go through detox?
10      A   Occasionally.
11      Q   Occasionally.  How often is occasionally?
12  Once a year?  Twice a year?
13      A   So with it being varying degrees of detox,
14  if they have an alcoholic history or DTOH history,
15  we put them on CIWA scoring.  So CIWA scoring you
16  would see 15, sometimes 20 patients a months that
17  you're doing CIWA scoring every 4 hours.
18      Q   Any of those folks you see in the
19  telemetry unit experiencing DTs, tremors?
20      A   True DTs not so much in telemetry.
21  They're usually monitored in the ICU at that point
22  if they're true DTs --
23      Q   I'm talking about telemetry.
24      A   I'm answering.  So if we have a patient
25  that's been through DTs, normally they're

STEPHEN FURMAN, R.N.
July 07, 2021

Page 18

1  transferred to the intensive care unit to be
2  appropriately managed.  So you will have patients on
3  telemetry who are scoring 4, 5, 6 on their CIWA
4  scores.  But the true DTs, you're not going to see
5  that in telemetry.
6      Q    Okay.  The med-surg floor, many of those
7  folks going through detox?
8      A    It would be the same as the telemetry
9  floor.  We combine.  All of our med-surg floors are
10 combined with telemetry.
11     Q    So how many patients in telemetry in the
12 last 2 years have you treated that were going
13 through detox?  Alcohol detox, not drugs.
14     A    So -- and we're talking about true DTs.
15 Not scoring 4 or 5 on a CIWA score?
16     Q    Yes.  Not scoring 4, 5, 6, 7.
17     A    Okay.
18     Q    I mean, that's not really even going
19 through withdrawal.  I'm talking about somebody
20 that's --
21     A    15 to 20.
22     Q    15 to 40.  I think the CIWA score goes up
23 to 60; right?  So 15 to 60 let's say.
24     A    I would say you would see probably one
25 every other month.

Page 19

1      Q    How many have you seen?
2      A    Oh, I mean me.  I would see one, about one
3  every other -- now, me taking care of them
4  personally.  I'm the assignment nurse taking care of
5  that patient one every other month.  Me assisting my
6  fellow nurses is going to be one or 2 a month.
7          MR. SMIT:  Ron?
8          MR. CHAPMAN:  Yes.
9          MR. SMIT:  Just as clarification, are we
10         talking about his treating them primarily for
11         DTs?
12         MR. CHAPMAN:  What I would like, Peter, is
13         let me ask my questions.  If you want to object
14         to form or foundation you can do that.  And
15         then when it's your turn you can ask questions.
16         But I'd appreciate you not stopping me and ask
17         to clarify a question I'm asking.
18         MR. SMIT:  All right.  Fair enough.
19         MR. CHAPMAN:  Okay.
20 BY MR. CHAPMAN:
21     Q    In rehab do you treat, you personally,
22 treat people going through detox?
23     A    It would be far past detox by the time
24 they got to inpatient rehab.
25     Q    Critical care transport -- first what was

Page 20

1  your role in critical care transport?
2      A    I was a -- served as transport ICU
3  critical care nurse, and I also filled as a critical
4  care paramedic.
5      Q    And were these transporting patients from
6  the hospital potentially to another hospital or from
7  the field like where an EMT gets somebody from a car
8  accident to the hospital?
9      A    It would normally be transports, bringing
10 patients into our hospital.  I think I transported 2
11 patients out of our hospital to another hospital
12 because our pediatric ICU was full.
13     Q    So as part of a transport team, you would
14 go to another facility, pick up a patient and bring
15 that patient to your facility?
16     A    Right.
17     Q    Okay.  Any of those patients going through
18 alcohol detox?
19     A    They are not.
20     Q    Okay.  And you said you worked in the
21 emergency department?
22     A    Correct.
23     Q    How many shifts a year, and let's take --
24 let's just take this year from January 1st to now.
25 So half a year.  How many shifts did you work in the

Page 21

1  emergency department?
2      A    This is going to be kind of ballpark, but
3  I would say 15 shifts.
4      Q    Okay.  And that would be 4-hour shifts or
5  8-hour shifts?
6      A    I'm going on 12-hour shifts.
7      Q    12-hour shifts, okay.  So when it says
8  floating every 4 hours why would you stay in the
9  emergency department for 12 hours?
10     A    Sometimes I get scheduled in one place for
11 12 hours.  But I will say since January there were
12 several times I did work in the emergency room, and
13 I was pulled out at 3 to go to another floor to
14 work.
15     Q    But most of your floating is 4 hours?
16 Because that's what it says on your resume.
17     A    Correct.
18     Q    Okay.
19     A    Potentially every 4 hours.  I've been
20 moved within 2 hours.  But potentially, I move every
21 4.  Sometimes I stay in one place for 8.  Sometimes
22 I stay in one place for 12.
23     Q    So my question to you, in the emergency
24 department how many times did you perform a 12-hour
25 shift in the last 6 months?  Continuous 12 hours,

STEPHEN FURMAN, R.N.
July 07, 2021

Page 22

1  6 a to 6 p kind of thing?
2       A    I would say probably 10 or 12.
3       Q    Okay.  So why in the emergency department
4  would you do 12-hour shifts?  Why aren't you doing 4
5  or 6 or 8?  Why are you doing 12?
6       A    I could potentially work in one place for
7  4 hours, 8 hours or 12 hours.  My staffing
8  coordinator tells me to move and I move.  I don't
9  get the choice and stay.  If I had the choice I
10  would obviously stay there the entire 12 hours.
11  Because it's a little difficult uprooting and moving
12  to a new unit to accept a brand new set of patients.
13  But I don't get that choice.  It's the entire
14  staffing coordinator's decision on whether I move or
15  not.
16       Q    And I understand that.  It's just that
17  your resume says every 4 hours.  That's why I'm
18  questioning it.
19       A    My resume says potentially every 4 hours,
20  not absolutely every 4 hours.
21       Q    In the emergency department do you see
22  patients there going through alcohol detox as
23  opposed to drug?
24       A    Sometimes you do.  Usually, what you see
25  there is somebody comes in with seizures, and it's

Page 23

1  found they haven't had alcohol in a couple of days,
2  and they've had an alcohol induced seizure.  So you
3  do see those occasionally.  More often than not you
4  see the intoxicated patient that comes into the
5  emergency room, and they get admitted to the
6  hospital.
7       Q    Okay.  So other than the emergency room
8  they're not necessarily going through withdrawals?
9       A    Correct.
10       Q    Okay.  Because you don't go through
11  withdrawals until your blood alcohol level drops
12  below your normal blood alcohol level then you
13  potentially start withdrawals; correct?
14       A    That's usually the way.  I mean, you can
15  occasionally.  If someone comes in with seizures and
16  we find they have alcohol history, obviously, we're
17  going to ask them when their last drink was.  And
18  sometimes we can pin it down to this is the onset of
19  alcohol withdrawals.  And sometimes patients are
20  postictal for a while, and then once they come out
21  of the postictal state we can inquire when their
22  last drink was to try to pin down if it's
23  withdrawals or if it was seizure due to some
24  metabolic derangement.
25       Q    In that situation that you just described

Page 24

1  it's important that the patient, if they're able --
2  I mean, coming out of a postictal state it might be
3  difficult.  They might still be confused.  But if
4  they're able it's important that they tell you the
5  truth; right?
6       A    Sure.
7       Q    So if I'm coming into your facility and
8  I'm intoxicated, but I'm coming in there because of
9  a car accident or I cut my arm or something like
10  that, and you ask me and I say I never drink.  I had
11  my first drink like three hours ago.  You wouldn't
12  then be thinking that this person might go through
13  withdrawals or have a difficult time withdrawing;
14  right?  He only had his first drink in his life and
15  that was three hours ago.
16       A    Sure.  And the nice part of our charting
17  system at our hospital is if they are a previous
18  patient there, obviously, when we hit their icon it
19  will bring up all of their past medical history if
20  they've been a patient there before.  So we will be
21  able to see their past medical history.
22       Q    And then you worked at Henrico Doctors'
23  Hospital.  You haven't worked there since 2013;
24  correct?
25       A    Correct.

Page 25

1       Q    And while working there you worked at
2  Adult -- you were receiving adult and pediatric
3  patients from the operating room.  That's one of the
4  things.  Probably not many people going through
5  detox there; right?
6       A    No.  There's not many going through detox
7  in the recovery room.
8       Q    And then it says you were assuring their
9  safe emergence from various types of anesthesia.
10  Probably didn't encounter people detoxing from
11  alcohol there?
12       A    Correct.
13       Q    And then it says, Further various duties
14  included medical administration.  Unless we're
15  talking about a doctor or a nurse, not many people
16  going through detox there; right?
17       A    That's correct.
18       Q    And then it says, critical drip titration.
19  Probably not many going through detox?
20       A    Correct.
21       Q    Lab draws.  Could be going through detox
22  but typically not; right?
23       A    Correct.  We're just waking them up from
24  anesthesia.
25       Q    Okay.  Blood glucose monitoring,

STEPHEN FURMAN, R.N.
July 07, 2021

Page 26

1  discontinuing the base of lines, critical thinking
2  skills.  Again, not many of those folks going
3  through detox; right?
4      A    Correct.
5      Q    Okay.  And then it says you worked at St.
6  Francis Medical Center, Virginia from 06 to 09.
7  Looks like you did pretty much the same thing as you
8  did at Henrico.  So not many of those folks were
9  going through detox; correct?
10     A    The difference between Henrico Doctors'
11 Hospital and St. Francis, at Henrico Doctors' I woke
12 people up from anesthesia and then we follow those
13 unit.  At St. Francis Medical Center in Chesterfield
14 I worked in the Adult ICU and was also on the
15 in-house code team.  So it's a little bit different.
16 So occasionally, in the ICU there would get
17 patients withdrawing from alcohol and/or other
18 substances.
19     Q    When you say "occasional" what does that
20 mean to you?
21     A    One every 2 to three months.  It wasn't
22 very often at that hospital.
23     Q    So maybe you're talking 2 or three a year?
24     A    I would say that, yes.
25     Q    Okay.  Then it says you worked for Travel

Page 27

1  Nursing.  Why did you choose Travel Nursing?  Seems
2  kind of odd in your career history here.
3      A    Once again, prior to Progressive Nursing
4  Stoppers I worked at Maryview Medical Center.  And
5  at Maryview Medical Center I just wanted to get out
6  and do something more.  I liked the variety.  And
7  with Progressive I got to bounce around to several
8  hospitals, see how other hospitals ran.  And I got a
9  bit of diverse education, experience from different
10 hospitals.
11     Q    Did you leave Maryview voluntarily?
12     A    I did.
13     Q    Did you leave them under any type of
14 investigation?
15     A    No.  They were very angry with me when I
16 left.
17     Q    Then you worked for Chesapeake Fire
18 Department as a paramedic; right?
19     A    I did, yes.
20     Q    So I assume as a paramedic from 91 to 97
21 you see all types of things?
22     A    You can say that.  You do see quite a bit
23 of things.
24     Q    But as a paramedic, it's stabilize and
25 transport; right?

Page 28

1      A    It is, yes.
2      Q    Okay.  So you don't treat other than field
3  treatment if you're giving somebody Narcan or
4  starting an IV or doing something at the direction
5  of a physician or under protocols you might have
6  from, you know, the system you're working in.  And
7  then you're transporting to the hospital?
8      A    Exactly.  We had algorithms on most every
9  type of patient, and then we follow those algorithms
10 that were set forth by our operational medical
11 director.
12     Q    In that case, and other than doing that,
13 you're not treating.  You're stabilizing and
14 transporting, getting them to the hospital as fast
15 as you can in the best shape you can?
16     A    Exactly.  I mean, some things you treat.
17 Hypoglycemia you would treat with dextrose.
18 Somebody in anaphylactic shock.  I've had a couple
19 of those.  And we treat with epinephrine and IV
20 Benadryl.
21     Q    So you still treat but then transport.  But
22 you treat in order to get them transported.
23     A    Correct.
24     Q    But you're treating in order to stabilize
25 to transport?

Page 29

1      A    Correct.
2      Q    I see the various classes you took at
3  Tidewater Community College.  I don't see any
4  specific classes on treating patients going through
5  detox; correct?  I'm looking at your resume here.
6      A    No specific classes.  It's what you learn
7  in your nursing education as well as paramedic
8  education.
9      Q    Have you ever treated a patient when
10 they're going through detox or anything else in a
11 jail?
12         MS. DAMICO:  Asked and answered.
13         THE WITNESS:  In a jail, no.
14 BY MR. CHAPMAN:
15     Q    In a prison?
16         MS. DAMICO:  While they're in the prison?
17         THE WITNESS:  The only reason I'm
18 hesitating is we have a prison floor in our
19 hospital I do occasionally work in.  And I do
20 not recall DT patients there because they've
21 usually been in prison for a while.  It's
22 Virginia Department of Corrections.  So they've
23 normally been there so one would assume they've
24 not been able to get alcohol while in prison.
25

STEPHEN FURMAN, R.N.
July 07, 2021

Page 30

1  BY MR. CHAPMAN:
2      Q    While working in any one of your medical
3  positions you sometimes have to rely on family
4  members to give you information?
5      A    Sure.
6      Q    Do they 100 percent of the time always
7  tell you the truth?
8      A    No.
9      Q    Do patients 100 percent of the time always
10  tell you the truth?
11      A    Some patients do tell you the truth.  Some
12  patients don't tell you the truth.
13      Q    And sometimes you rely on information
14  provided by another medical provider; correct?
15      A    Correct.
16      Q    Information that's relayed to you by
17  another medical provider isn't always 100 percent of
18  the time exactly what took place; correct?
19      A    That is true.
20      Q    In fact, in college you've probably seen
21  this where you've gone through studies where one
22  person learns a fact, tells another, tells another,
23  tells another.  By the time it gets to the end of
24  the line it's nothing as it started out to be;
25  right?

Page 31

1      A    Right.  I did that in my communications
2  file.  That's exactly right.
3      Q    And sometimes that happens with nurses?
4      A    Correct.
5      Q    Sometimes it could happen with any number
6  of people like correction's officers?
7      A    I would think so.  I've never been a
8  correction's officer but.
9      Q    It could happen between lawyers?
10      A    Sure.
11      Q    It's just part of the human problem of
12  communicating; right?
13      A    Correct.
14      Q    Okay.  You're not here to give any
15  testimony relating to Nurse Sherwood; correct?
16      A    I'm not.
17      Q    You're not here to testify as to proximate
18  cause; correct?
19      A    I don't believe so.
20      Q    You're not here to testify as to damages;
21  correct?
22      A    I don't believe so.
23      Q    You're here to testify, by reading your
24  report, as to what you believe to be standard of
25  care violations for the nursing staff?

Page 32

1      A    That's correct.
2      Q    Did you ever carry out -- strike that.
3           As a nurse, have you ever been
4  required to carry out orders from a provider -- and
5  when I say "provider" throughout this whole dep I'm
6  talking MDs, nurse practitioners, all those folks.
7  I'm not referring necessarily to nurses; okay?
8      A    Okay.
9      Q    Do you ever carry out providers' orders?
10      A    Yes.
11      Q    In fact, that's a significant part of a
12  nursing function, is to ensure that the providers'
13  orders are carried out?
14      A    Yes.
15      Q    Are nurses required under your Nurse
16  Practice Act to accurately carry out providers'
17  orders?
18      A    We're required to ask questions if the
19  order does not make sense; clarify the order, if you
20  will, from a provider.  But once that clarification
21  is suffice, then yes, you carry the order out
22  exactly as written.
23      Q    Nurses are not in the power to change the
24  orders of a provider; are they?
25      A    Correct.  You cannot change the order

Page 33

1  unless you're given another order to counter that
2  order.
3      Q    Unless a physician or unless a provider is
4  giving another order to counter that order?
5      A    Exactly.  The last order is the one that's
6  followed.
7      Q    Even if the nurse disagrees with the order
8  -- I understand that they can talk to the provider,
9  but even if they disagree with it they still have to
10  carry it out; correct?
11      A    Unless they feel that order is going
12  to cause harm to the patient then at that point you
13  do not carry it out.  You talk to the providers,
14  and/or that's when you would kind of advocate the
15  chain of command and have a conversation about the
16  order.  So if you're telling me to give a non
17  diabetic patient 50 units of insulin I'm going to
18  have a problem with that because their blood sugar
19  is normal, and they're not diabetic.  But if the
20  physician stands there and demands you to give it,
21  I'm not doing it.  That's dangerous.  So if that
22  answers your question.
23      Q    So I understand the concept if the order
24  is clearly dangerous to someone.  In this case the
25  person's not a diabetic, and the physician isn't

STEPHEN FURMAN, R.N.
July 07, 2021

Page 34

1    ordering to give the patient insulin.  But that's an
2    extreme.  If the physician is saying give this drug
3    to a patient, give this milligrams to a patient, I
4    want to give them three times a day, twice a day,
5    whatever.  Those orders, while you might talk to the
6    provider, those orders have to be carried out.  Even
7    if you think a different drug should be given?
8         A    Oh, sure.  I mean, if they're choosing one
9    drug over another I have no problems with that.
10   What I'm saying is if I feel the order is dangerous
11   to the patient if that order is carried out, then I
12   have a duty to question the physician about the
13   order.
14        Q    How many times in the last year have you
15   gone, let's say, over the head of the physician to
16   the chairman of the department and said this
17   physician is potentially trying to harm this patient
18   by giving this drug or this patient?
19        A    I have never had to get to that level yet.
20   But I will tell you our CEO has provided his pager
21   number to us, and if we have problems with our
22   attending we are to go to him.
23        Q    That's not my question.  My question is,
24   how many times have you gone to the chief of the
25   department complaining about a physician prescribing

Page 35

1    some type of medication or treatment that you
2    thought was dangerous to the patient?
3         A    And I said none.
4         Q    Okay.  You felt that you would go to the
5    physician, and say, hey, I've had experience with
6    this before.  I think could you consider this.
7    Could we possibly give this.  I've been with this
8    patient for the last three days and kind of know
9    him.  You would share your beliefs, your knowledge,
10   and your training with the physician?
11        A    Sure.  We call it a questioning attitude.
12   If the order that you just want clarification,
13   that's what you ask them.  You do not have to be
14   vindictive and sarcastic in asking the question just
15   for clarification.
16        Q    Is it a violation of the Nurse Practice
17   Act for a nurse to change the provider's order
18   without permission from the provider?
19        A    That would be, yes.
20        Q    When providers are ordering medication
21   it's up to the provider for what the dose is, how
22   many times a day it's given; correct?
23        A    It is.
24        Q    It's not up to the nurse?
25        A    No.

Page 36

1         Q    In your hospital if a doctor wants
2    something done right now, like wants somebody given
3    medication right now, they do write "stat"; correct?
4         A    If they want -- they'll write stat or
5    first dose now.
6         Q    Okay.  Something to indicate to the
7    provider that it's got to go out right now?
8              MS. DAMICO:  To the nurse.
9    BY MR. CHAPMAN:
10        Q    To the nurse?
11        A    Correct.  I mean, if they're ordering
12   blood pressure medicine for that day if the patient
13   didn't get his blood pressure medicine.  I did that
14   the other day.  They ordered it but it didn't go out
15   until the following day.  So I asked them did they
16   want to give a dose today or just let it ride until
17   tomorrow?  And that's the questioning attitude that
18   you have.  And they said, oh, no.  I meant to order
19   it today.  And they went back in and ordered a dose
20   for first dose now.
21        Q    But the physician could have said, no,
22   tomorrow's fine?
23        A    Oh, sure.  They could have said it.
24        Q    And then you would have given it tomorrow?
25        A    Absolutely.

Page 37

1         Q    You've had several cases where the issue
2    was why something wasn't carried out stat; correct?
3         A    As a medical legal review?
4         Q    Yes.
5         A    Correct.
6         Q    I have read quite a few of them.  And your
7    position has always been if the physician writes
8    stat, it must be carried out stat?
9         A    That is true.
10        Q    If the physician doesn't write stat then
11   it doesn't have to be carried out stat?
12        A    That is true.
13        Q    And in fact, you testified once before
14   that stat is carried out based on policies, customs,
15   practices of that health care unit?
16        A    I'm not sure I understand what you're
17   asking.
18        Q    Sure.  If medication typically is given at
19   10:00 and then somebody writes an order at 2:00 in
20   the morning and it doesn't say stat you'll give it
21   at 10:00?
22        A    Correct.
23        Q    Do patient's have rights with respect to
24   their medical treatment?
25        A    They do.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 38

1    Q    Is it permissible for a nurse to force a
2  patient to accept medical care?
3    A    Not without a judge's order.
4    Q    Even if I as the patient know, because you
5  told me, that my refusal could be detrimental, might
6  lead to death, impairment, whatever, I still have
7  the right to say no?
8    A    You have the right to say no.
9    Q    And if I'm found to be incompetent; maybe
10 a judge might say, no, you have to get that care and
11 treatment; right?
12   A    Exactly.  So if patients are refusing, if
13 they do not have capacity, we will get our
14 psychiatrist to come in, evaluate them.  If they
15 have capacity and find they've refused, once they're
16 educated on why we're doing this treatment or
17 medication then they're allowed to refuse.  But if
18 they're determined incapacitated then obviously
19 they're not able to refuse and a judge can get
20 involved, family can get involved, and it can become
21 a mess at that point.
22   Q    But as long as somebody is not impaired to
23 the point that they're not incapacitated they have
24 the right to say no; correct?
25   A    As long as they're oriented, yes.

Page 39

1    Q    Well, that would be as long as they're not
2  impaired such that they don't have the capacity to
3  make a decision they can say no; correct?
4    A    That would be correct.
5    Q    In fact, patients can walk out of a
6  hospital.  If they don't want the treatment, they
7  don't like what's going on, if they can get up and
8  walk, they can get up and walk right out; right?
9    A    They sure can.
10   Q    And you as a nurse or provider might think
11 this is terrible.  That person is going to die in 8
12 hours, whatever.  But there's nothing you can do
13 about it.  If they want to leave they can leave.
14 Short of getting a court order.
15   A    That's what I was going to say.  If you
16 know they're going to have a detrimental outcome by
17 their actions then you can put them under medical
18 TPO, and you can have a judge come.  And our crisis
19 people will come in and evaluate them and a judge
20 would have say so.  And at that point we can keep
21 them against their wishes.
22   Q    You could.  But until that happens you
23 can't imprison somebody in your facility, lock the
24 door and say they have to stay here; can you?
25   A    No, we can't.  It's called an emergency

Page 40

1  custody order.
2    Q    You can do that after a physician or after
3  a psychiatrist has looked or a physician has looked
4  and said something?
5    A    No, no.
6    Q    Okay.
7    A    Not in the State of Virginia.  I don't
8  know if that's Michigan.  But in Virginia we can do
9  a 2-hour ECO.
10   Q    Okay.
11   A    And that's when we start the TPO process
12 and normally have it completed in that 2 hours.
13   Q    Let me ask you this.  In Michigan do you
14 believe you have an understanding of the involuntary
15 commitment rules in Michigan?
16   A    If you're arguing with me over what I just
17 said then I would say no.
18   Q    I am.  I just wanted to make sure that
19 you're not saying you know Michigan rule.
20        When you're questioning a patient
21 about whatever history, a patient has the right to
22 either give you a truthful answer or not a truthful
23 answer; right?
24   A    Sure.  I mean, a patient can give whatever
25 answer they want to.

Page 41

1    Q    The patient can even refuse to answer the
2  question if they want?
3    A    They could.
4    Q    Sometimes patients don't want a medical
5  provider to know some of their medical history for
6  whatever reason; right?
7    A    Correct.
8    Q    When a patient fails to answer questions
9  or a question honestly, sometimes that can result in
10 negative consequences for the patient.
11   A    It could lead to negative consequences,
12 yes.
13   Q    Often times the history that one receives
14 from the patient has a big impact on the treatment
15 plan created?
16   A    The information received from the patient?
17   Q    From the patient, has a big impact on the
18 treatment plan created?
19   A    Yes.  It has an impact on the patient.
20   Q    When someone comes into your facility, say
21 a hospital where you work, the hospital sometimes
22 will run objective tests like x-rays, MRIs, draw
23 blood, that type thing; right?
24   A    Correct.
25   Q    Other than that -- and a physical exam.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 42

1  Other than that, the hospital has to gain
2  information from talking to the patient or their
3  family members or maybe looking at outside medical
4  records, that type of thing?
5      A   We will, yes.
6      Q   And often times, let's say the emergency
7  room when someone comes in, the only people
8  available are the individual or maybe a family
9  member or a friend that might be accompanying them?
10     A   Sometimes, yes.
11     Q   And if none of them tell you the truth
12  you're left with the information they gave you and
13  whatever objective testing or exams that you could
14  do or the provider could do?
15     A   Sure.  I mean, also we can look at getting
16  medical records from other facilities.  If they've
17  been in our facility before, obviously, we catalog
18  admittances to the hospital so we can look back at
19  past medical records.
20     Q   In obtaining outside medical records, that
21  takes some time?
22     A   Sometimes yes.
23     Q   And again, a delayed treatment plan can
24  sometimes have negative consequences to the patient;
25  correct?

Page 43

1      A   It could.
2      Q   Is a patient responsible for their failure
3  to give honest information that then results in
4  delayed treatment plan?
5          MS. DAMICO:  I'm going to object to form
6      and foundation.  It calls for a legal
7      conclusion.
8          THE WITNESS:  It depends on their
9      orientation status.  If they're disoriented,
10     obviously, they can't be held responsible for
11     what they say.  If they are oriented and they
12     understand that misinformation can result in a
13     bad outcome, sure.
14  BY MR. CHAPMAN:
15     Q   You drafted a report; correct?
16     A   I did.
17     Q   In the report in the first line -- well,
18  do you have your report?
19     A   Yes, sir.
20     Q   The second line of your report that says
21  your giving, My professional medical opinions as
22  they relate to the standard of care that relate to
23  nursing practice.
24          That's the intent of this report and
25  that's what your opinions are related to; correct?

Page 44

1      A   Correct.
2      Q   Do you agree that hospital procedures are
3  not the standard of care, they're guidelines
4  provided by the hospital?
5      A   The policies and procedures?
6      Q   The hospital's policies and procedures do
7  not define the standard of care, they're the
8  hospital's policies and procedures?
9          MS. DAMICO:  His hospital's?
10  BY MR. CHAPMAN:
11     Q   Any hospital?
12     A   Hospital policies and procedures, sure,
13  aren't the standard of care.  But they are kind of a
14  requirement of your practice within the hospital
15  pertaining to those policies.
16     Q   Well, I understand that, that employees
17  should follow policies and procedures.  But that's
18  not my question.  My question is, the hospital or an
19  emergency room or anybody that employs health
20  practitioners, no matter what their policies and
21  procedures are, those do not form the standard of
22  care for the health care provider; correct?
23     A   Correct.
24     Q   Now, policies and procedures may
25  accurately reflect the standard of care but they're

Page 45

1  not required to?
2      A   That would be true.  Policies and
3  procedures are more based on evidence based practice
4  and that -- more often than not it does follow the
5  standard of care.  But I guess it's not required to.
6  And, you know, they're there to protect the patient
7  and the staff members as well.
8      Q   Well, we won't debate why they're there.
9  They could be there to protect the hospital; right?
10     A   Sure.
11     Q   They could be there to protect the
12  providers; correct?
13     A   Sure.  The patients and providers, yes.
14     Q   I misunderstood.  Did you say patients are
15  providers or patients or providers?
16     A   And providers.
17     Q   And providers.  Okay.  It says here that
18  you reviewed medical records, records from Spectrum,
19  there's a whole list of items here.  Depositions.
20  Did you review every single word of everything that
21  you listed here?
22     A   I do not think that I reviewed every
23  single word of everything that's listed there.  This
24  is a lot of information.
25     Q   And that's what I'm getting to.  There's a

STEPHEN FURMAN, R.N.
July 07, 2021

Page 46

1  whole bunch of depositions listed here. Did you
2  read every single deposition?
3      A    I did read depositions.
4      Q    Did you read every single deposition
5  listed here?
6      A    Yes.
7      Q    Did you read it word for word from page
8  one to page whatever it ends?
9      A    Yes.
10     Q    Okay. Did you read -- how much time did
11 you spend in total?
12     A    I'm not sure how many hours.
13     Q    How much time did you bill for?
14          MS. DAMICO:  (Document proffered to
15 Witness.)
16          MR. SMIT:  While they're doing that we're
17 on the February 2 document; right?
18          MS. DAMICO:  Yes.  That's the only report.
19          MR. SMIT:  Okay.
20          THE WITNESS:  This bill is for 40 hours.
21 BY MR. CHAPMAN:
22     Q    40 hours total up until today or up until
23 yesterday?  I saw you reading that so we'll exclude
24 that.  40 hours up until the time you came here
25 yesterday?

Page 47

1      A    40 hours total is what I invoiced for, and
2  then I have 10 or so hours of preparation to speak
3  to her (indicates) yesterday.
4      Q    Okay.  So are you saying you either billed
5  or are billing 50 hours total?
6      A    Correct.
7      Q    How many pages do you read a minute?
8      A    I read through it as fast as I can.
9      Q    How fast was that?
10     A    I mean, I can get through 2 pages a
11 minute.  About that.  Sometimes you read slower.
12 Sometimes you read faster because --
13     Q    That's all the question.  Just how fast
14 you read.  So you read all the issues.  You read the
15 medical records from Spectrum, the medical records
16 from the jail, Plaintiff's Complaint, Notice of
17 Intent, all of the affidavits, the meritorious
18 defense, all of these depositions.  There's Kent
19 County surveillance footage.  Did you watch that
20 footage?
21     A    I believe I did.  I don't know how many
22 hours of footage there is.  I feel like I watched
23 the entire footage.
24     Q    And you did all this in 50 hours?  That's
25 your testimony?

Page 48

1      A    Yes.
2      Q    Okay.  And you read all the Supplemental
3  Answers and the Answers for Corizon and Supplemental
4  Answers; correct?
5      A    I read through them.  And as I said, I
6  don't believe I read every single word.  If it
7  didn't kind of relate to this case I would say I
8  glossed over that part.
9      Q    The Corizon Supplemental Answers and
10 Answers?  What are you referring to when you say you
11 didn't read every word?
12     A    The Deposition Exhibits 1 through 144.
13 The depositions I did read and the medical records
14 from the jail.
15     Q    But you didn't look through all the
16 exhibits?
17     A    Well, they're covered within the
18 depositions so I did look at them.  But as you're
19 stating word for word, not necessarily, no.
20     Q    So you did look at all 144 depositions as
21 they -- sorry -- exhibits as they were referred to
22 in the depositions?
23     A    I can't, I cannot tell you honestly that I
24 looked at every single one, but I feel like I looked
25 at every single one.

Page 49

1      Q    I mean, I don't want to be argumentative.
2  But earlier you said you did read every single word.
3  Now you're not sure that you did?
4          MS. DAMICO:  Objection.  He never said he
5      read every single word.
6          MR. CHAPMAN:  You can object to form and
7      foundation.
8  BY MR. CHAPMAN:
9      Q    You can answer the question.
10     A    No, I didn't.  I said I glossed over.
11     Q    Okay.
12     A    I said I read a lot of information from
13 this record.  And I can't guarantee you that I did
14 read every single word because I don't feel like I
15 did.
16     Q    Okay.  Under, Employee Orientation
17 Training Manuals A through 8A, did you read every
18 single word of all those listed?
19     A    Every single word, no.
20     Q    Would it be fair to say that you read some
21 and glossed over others?
22     A    Correct.
23     Q    And then there's Kent County Policies and
24 Procedures.  Did you read every one of them?  Or did
25 you read some, gloss over others?

STEPHEN FURMAN, R.N.
July 07, 2021

Page 50

1    A   I did not read every one of those.

2    Q   Okay. Have you ever done any surveying

3  work for NCCHC, National Commission of Correctional

4  Health Care?

5    A   I have not.

6    Q   Have you ever, outside of this case ever

7  reviewed their guidelines?

8    A   I have not.

9    Q   Including this case have you ever spoken

10  to anyone from NCCHC?

11    A   I have not.

12    Q   Have you read any of the NCCHC Guidelines?

13  Not Corizon guidelines or Kent County guidelines but

14  guidelines from NCCHC?

15    A   I have.

16    Q   You have. And the guidelines you read,

17  tell me how you read those. Did you read all of the

18  notes and implementation and commentary? Or did you

19  just read the policy or the guideline?

20    A   The guideline.

21    Q   Did you look any further as to how NCCHC

22  interprets that as to where ancillary documents that

23  talk about how these things are interpreted?

24    A   I did not.

25    Q   Okay. Did you talk to any surveyors about

Page 51

1  how they would review a particular policy?

2    A   No.

3    Q   Or guideline?

4    A   No.

5    Q   The Infirmary Manual 2015, did you read

6  that completely?

7    A   I did not.

8    Q   And you say your reference material was

9  Lippincott Manual of Nursing Practices, about 1,120

10  pages. You didn't read every single word of that

11  manual; did you?

12    A   I did not.

13    Q   Did you rely on a particular section or

14  sections with respect to this case?

15    A   Yes.

16    Q   Which were they?

17    A   That would be alcohol withdrawal and CIWA.

18    Q   Now, the CIWA protocol stands for what?

19    A   Clinical Institute Withdrawal Assessment.

20    Q   Did you use that before?

21    A   More times than you can imagine.

22    Q   Well, I like to imagine. I would be

23  interested.

24    A   In my lifetime I would say 500.

25    Q   Okay. You use it when somebody is going

Page 52

1  through detox; right?

2    A   Or potentially, yes.

3    Q   What do you mean by "or potentially?"

4    A   If somebody has an alcohol history then

5  sometimes the provider will start them on CIWA

6  scoring, and we do it every 4 hours. So even though

7  they're showing zero signs by CIWA score zero, still

8  nonetheless, I get an icon every 4 hours to chart a

9  zero score.

10    Q   CIWA scoring is pretty much universal?

11    A   From what I understand, yes.

12    Q   And it deals with people going through

13  alcohol withdrawal and benzodiazepine withdrawal?

14    A   Sure. And there's opiate withdrawals.

15  But the CIWA is just only for alcohol.

16    Q   I'm confused. The CIWA is for

17  benzodiazepine and alcohol. But COWS is for opioid;

18  correct?

19    A   Yes. CIWA is for -- I've not done a

20  benzodiazepine withdrawal. I've only done alcohol.

21    Q   And in all those you've used the CIWA

22  score?

23    A   Correct.

24    MS. DAMICO: Can we just clarify for the

25  record CIWA-Ar is for alcohol.

Page 53

1  BY MR. CHAPMAN:

2    Q   In your report you reviewed the items we

3  talked about. And then you gave some opinions

4  relative to several nurses that did provide care to

5  Mr. Jones; correct?

6    A   Correct.

7    Q   Okay. You're not providing comments

8  relating to anything that corrections does; correct?

9    A   Correct.

10    Q   You're not providing comments relating to

11  corrections' policies or procedures or how those are

12  implemented on the correction's side; correct?

13    A   Correct.

14    Q   You're limiting your testimony to the

15  medical providers. The nurses, not the nurse

16  practitioners; correct?

17    A   Not the medical providers. The nurses.

18    Q   Correct. Thank you. So you're limiting

19  your testimony to the nurses; correct?

20    A   Yes, sir.

21    Q   In your -- tell you what. This is a good

22  point. Can you show me, you have some notes and

23  things there. Can I see those?

24    A   This is my report.

25    Q   Your CV, your report. Do you have any

STEPHEN FURMAN, R.N.
July 07, 2021

Page 54

1  comments, any writing, any highlighting on your
2  report?
3      A    (Reviews documents.)  I've got a couple of
4  dots and my signature.
5      Q    Do those dots mean anything to you?
6      A    It's just where I wrote that there was a
7  standard of care deviation.  So therefore, if you
8  ask me a blanket statement of what are your opinions
9  in this case I would be able to follow that report
10 and give them to you.  (Document proffered.)
11         MS. DAMICO:  So Ron, why don't we take a
12         second.  You flip through his records.  Take a
13         break.  Because I want to talk to him about
14         what stuff he left at home.
15         MR. CHAPMAN:  Why don't we do that.
16              (After the break the following
17               testimony resumed on the
18               record:)
19 BY MR. CHAPMAN:
20     Q    I want to show you some documents here,
21 and I just want you to identify what they are.  Some
22 I'll mark as exhibits.  (Document proffered.)  This
23 is a copy of your Affidavit of Meritorious Claim; is
24 that correct?
25     A    (Reviews document.)  Yes, sir.

Page 55

1      Q    Did you make more than one draft?
2      A    No.
3      Q    So that's the one and only one, and you
4  wrote it and you edited it for misspelled words,
5  that kind of stuff and that was it?
6      A    I'm sorry.  You said I wrote it?
7      Q    You wrote the Affidavit of Meritorious
8  Claim; correct?  Or did somebody write it for you?
9      A    No.  Somebody wrote it for me, and then I
10 went through, proof red it and agreed.  It was a
11 long, drawn-out case.
12     Q    So the Affidavit of Meritorious Claim was
13 sent to you by Ms. Damico or somebody in her firm?
14     A    I think it was Ms. Sabatini.
15     Q    Is that someone from her firm?
16     A    Correct.
17     Q    Was the document drafted by Ms. Damico and
18 then sent to you?
19     A    It was.  It was a case conference, and
20 then I spelled out all of my criticisms.  And then
21 it was drafted and sent to me.
22     Q    So you spoke to her about your criticisms,
23 and then she drafted the affidavit of merit and then
24 sent it to you and you signed it?
25     A    Notarized, yes.

Page 56

1      Q    And you signed it under a notary and it
2  was notarized; right?
3      A    Correct.
4      Q    Why didn't you draft it?  It was your
5  opinion.
6      A    I find the majority of -- I've only ever
7  drafted one, and that was about 3 or 4 weeks ago.
8  Most of the attorneys that I've worked with in the
9  past, whether it be defense or plaintiff, always
10 write it and I either agree, disagree, I'll make
11 changes.  It's usually sent in word document.
12     Q    So the words --
13         MR. SMIT:  Let him finish.
14 BY MR. CHAPMAN:
15     Q    Go ahead.
16     A    It's sent to me in a word document, and
17 then I'll make changes if changes need to be made,
18 and then I take to it the notary to be signed.
19     Q    So the words aren't actually your words.
20 They're somebody else's words that were put on paper
21 to reflect what you were thinking?
22     A    And what we spoke about.
23     Q    So the exact way that the words are put
24 together are not your words?
25     A    No.  They're my words.  It's what I told

Page 57

1  the attorney when I first talked to them.
2      Q    So when you got it back with like a
3  standard of care violation that might be there, it's
4  your testimony that those are the exact words that
5  you told Ms. Damico over the phone?  Exact words?
6      A    I'm not going to say it's verbatim.
7      Q    Okay.  So she listened to you and put the
8  words in the language she wanted and sent it back to
9  you and then you reviewed it?
10     A    Yes.  And I made changes if changes need
11 to be made.
12     Q    Well, what were those changes?  That's
13 what I asked you.  This the one and only draft and
14 you said yes.  If there's changes I need them.
15     A    No.  It was sent to me in word.  I don't
16 think there were changes.  I agreed with everything
17 that was in writing.
18     Q    Okay.  So Ms. Damico listened to you,
19 wrote it in her words, sent it to you, you signed
20 it, and that was the end of it.  And then it was
21 produced in this case?
22     A    Correct.
23         MR. CHAPMAN:  Can we mark -- let's mark
24 this as Exhibit -- what number?
25         MS. DAMICO:  What number are we on?  I can

STEPHEN FURMAN, R.N.
July 07, 2021

Page 58

1  tell you.  We are on Exhibit No. 158.
2        MR. CHAPMAN:  Exhibit 158.  And then put
3  your initials.
4              (The aforementioned document
5              marked Deposition Exhibit No.
6              158.)
7        MS. DAMICO:  I still have to send you guys
8  the exhibits from Fintel.  There's only 2 but
9  I'll get them to you.
10        MR. CHAPMAN:  And can you count the
11  exhibits and just put however many pages are
12  there.
13        MS. DAMICO:  What's today's date?  6th?
14        MR. CHAPMAN:  7th.
15        MS. DAMICO:  7th.
16  BY MR. CHAPMAN:
17    Q    There appear to be emails to and from you,
18  Ms. Damico and maybe her legal assistant or
19  paralegal? (Documents proffered.)
20    A    (Reviews documents.)  Looks like it.
21    Q    Is that what they are?
22    A    Yes.
23    Q    To the best of your knowledge is that all
24  of your email communication between you and
25  Ms. Damico?

Page 59

1    A    To the best of my knowledge, yes.
2        MR. CHAPMAN:  What is the number?
3        MS. DAMICO:  159?
4        MR. CHAPMAN:  Could you mark that Exhibit
5  159 and put your initials and then count the
6  pages.  And I'm only doing it this way because
7  we don't have the court reporter here.
8        THE WITNESS:  (Complies.)
9              (The aforementioned documents
10              marked Deposition Exhibit No.
11              159.)
12  BY MR. CHAPMAN:
13    Q    How many pages?
14    A    25.
15    Q    Okay.  All right.  Set it over here.
16        I'm (proffered) showing you 2
17  documents.  They look to be identical; right?
18  They're just cover letters.  Are they identical?
19    A    (Views documents.)  Yes, they are
20  identical.
21    Q    So let me show you a March 22, 2019 email
22  and an invoice.  Was the invoice attached to the
23  email or are they two completely separate?  We're
24  dealing with money.  Are they completely separate
25  documents?

Page 60

1    A    They are.
2    Q    Okay.  So the March 22nd, that looks like
3  an initial retainer that was paid to you?
4    A    Correct.
5    Q    And it was for $1,000?
6    A    Correct.
7    Q    And then the second document there looks
8  to be an invoice that you submitted?
9    A    Correct.
10    Q    For $5,500 something?
11    A    Correct.
12    Q    Has that invoice been paid?
13    A    It has been.
14    Q    Okay.  And was that invoice inclusive of
15  the $1,000?  Or should the $1,000 be deducted?  In
16  other words was it 6,000 something that you billed
17  or was it 5,000 something?
18    A    It was $6,520.
19        MR. CHAPMAN:  Okay.  Can you -- what's the
20  next exhibit?
21        MS. DAMICO:  160.
22        MR. CHAPMAN:  Can you mark those 2
23  documents Number 160.
24              (The aforementioned documents
25              marked Deposition Exhibit No.

Page 61

1              160.)
2        MR. SMIT:  I'm sorry.  Was 159 the emails?
3        MS. DAMICO:  Yes.  And 160 is billing
4  records.
5        MR. CHAPMAN:  And that's a good way to
6  identify that, billing records.
7  BY MR. CHAPMAN:
8    Q    From our previous conversation you have
9  maybe another 10 hours to bill?
10    A    I would anticipate that.
11    Q    Okay.  And that would take you, not
12  totally, but according to my paperwork up to the
13  debt; right?
14    A    Yes.
15    Q    And then this is just an email sending you
16  a flash drive; correct?
17    A    Correct.
18    Q    Not an email.  Letter?
19    A    Correct.
20    Q    And the flash drive, do you have that with
21  you?
22    A    I do not.  But I have all of my records on
23  it.  I don't have -- I couldn't tell you if this was
24  the actual one or not with the records, but I do
25  have all of my records on (indicates) this flash

STEPHEN FURMAN, R.N.
July 07, 2021

1  drive for this case.

2      Q   Okay.  And the records that you have on
3  the flash drive in front of you, are they annotated
4  or are those just the bare records?

5      A   No.  That's the totality of the file.

6      Q   I understand that.  But are they records
7  in the totality of the file that are annotated by
8  you?

9      A   No.

10      Q   Okay.  So in other words -- let me explain
11  myself further.  Like a PDF document you can draw
12  circles, make arrows, put in text boxes, call-outs.
13  All that kind of thing.  Those records do not carry
14  any of that?

15      A   That is above my pay grade.  I couldn't do
16  that if my life depended on it.  So no.  The only
17  thing that would be on here would be a draft report
18  I believe is the only thing in word.  Everything
19  else is in PDF.  And I don't know how to change
20  anything in PDF.  And there are no lines or circles.

21      Q   The draft report that Ms. Damico sent you?

22      A   No.  That's the one I created.

23      Q   So this is your draft report, not the
24  affidavit?

25      A   Correct.

1      Q   Now, when you created that draft report
2  what did you do with it?

3      A   Probably sent it to her.

4      Q   Okay.  Locate this right here.  I'm going
5  to pull that up in a moment so that I can -- just
6  give me a few moments so that I can make a copy of
7  that and make it an exhibit.

8          MS. DAMICO:  Sure.  Do you want to make
9      that an exhibit, that flash drive?

10          MR. CHAPMAN:  No.

11          MR. SMIT:  We didn't mark his February 2
12      report; did we?

13          MS. DAMICO:  No.  We have not done that
14      yet.

15          MR. SMIT:  Okay.

16          MS. DAMICO:  Thank you, Peter.

17          MR. SMIT:  I just wanted to make sure I
18      didn't miss it.

19  BY MR. CHAPMAN:

20      Q   Let me show you a letter dated April 21st.
21  It talks about sending you video footage regarding
22  Jones?

23      A   Correct.

24      Q   Now, I see down at the bottom of the first
25  page and on the second page there are particular

1  sections that are highlighted for you.  Do you know
2  why that is?

3      A   She's just pointing out I believe what I
4  was looking at and the camera angle.

5      Q   Or what she wanted you to look at;
6  correct?

7      A   Correct.

8      Q   You didn't look at everything.  You looked
9  at what Ms. Damico wanted you to look at?

10      A   Correct.

11          MR. CHAPMAN:  Can we have that marked as
12      the next exhibit.

13          MS. DAMICO:  161.  What's the date of that
14      letter?

15          THE WITNESS:  August 21, 2020.

16              (The aforementioned document
17              marked Deposition Exhibit No.
18              161.)

19          MS. DAMICO:  Letter from Damico, In Re:
20      Video hard drive.  Can we call it that?

21          MR. CHAPMAN:  Video hard drive, yes.  We
22      can call it that.

23  BY MR. CHAPMAN:

24      Q   I want to show you what looks like a
25  section that you copied from Lippincott.  Can you

1  identify that?  (Document proffered.)

2      A   ((Reviews document.)  It's the Alcohol
3  Withdrawal Management.

4      Q   Did you make any notations, earmarks,
5  dots, any other figure?

6      A   I highlighted one line and that's all.

7      Q   Could you read the line you highlighted
8  and tell me the page.

9      A   Page 6 of 11.  And it states, "Patients
10  with moderate or severe withdrawal symptoms should
11  be monitored closely and treated and in an intensive
12  care unit."

13      Q   The Lippincott Manual is a published work
14  that's suggestive of what nurses should be doing;
15  correct?

16      A   Correct.

17      Q   This particular document doesn't form the
18  standard of care.  This is somebody's
19  interpretation, the interpretation of Wolters Kluwer
20  Health, Inc. which copy wrote this in 2019.  It's
21  their interpretation of what should or shouldn't be
22  done; correct?

23      A   It's practice guidelines, yes.

24      Q   Drafted by this one particular company?

25      A   Correct.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 66

1  Q   Okay.  There are multiple different
2  companies, organizations, that put together
3  guidelines suggestions.  There's the Merck Manual.
4  There's all kinds of different publications that
5  suggest how to treat things; correct?
6      A   Correct.
7      Q   This is just one of them?
8      A   It is.
9      Q   Why is it the one you chose?  Is it the
10  one you're familiar with?
11      A   It is, yes.
12         MR. CHAPMAN:  Okay.  What number are we
13  on?
14         MS. DAMICO:  We're on 162.
15         MR. CHAPMAN:  Would you mark this as 162.
16  And I don't believe we need to count the pages.
17  Up at the top I think it says 1 of number of
18  pages.
19         MS. DAMICO:  Manual section on alcohol.
20  And alcohol section next to that?
21         MR. CHAPMAN:  There's actually a section
22  number I think.  Is there a section number?
23  Maybe not.
24             (The aforementioned document
25             marked Deposition Exhibit No.

Page 67

1             162.)
2         MR. SMIT:  I'm sorry.  162 is also a
3  portion of Lippincott?
4         MR. CHAPMAN:  It's the chapter section on
5  alcohol withdrawal.
6         MR. SMIT:  And 161 was what?
7         MS. DAMICO:  A letter from me to Furman
8  containing the external hard drive with your
9  surveillance.
10         MR. SMIT:  Okay.
11  BY MR. CHAPMAN:
12      Q   Now let me show you a page that appears to
13  have some statements from the NCCHC.  Is that
14  (proffered) a copy of a page from the NCCHC
15  Guidelines?
16      A   (Reviews document.)  It is not.
17      Q   What is it?
18      A   It's page 12 of 18 from your expert's
19  disclosure.
20      Q   Okay.  But do you know where they come
21  from?
22      A   I'm sorry, what?
23      Q   Do you have any idea what the document
24  that you're looking at, other than it came from one
25  of defendant's experts, do you have any idea what it

Page 68

1  is?
2      A   Sure.  It's a care guideline.
3      Q   Okay.  And you have a section that's
4  highlighted talking about access to care; correct?
5      A   Correct.
6      Q   Is it your opinion that Mr. Jones was
7  denied access to care?
8      A   He wasn't provided access to care.
9      Q   Well, didn't he have nurses, nurse
10  practitioners attend to him?
11      A   Later in his stay in the jail, yes.
12      Q   So you're talking about the first of 38
13  hours or so in the jail before health care assessed
14  and put him on a CIWA protocol?  You're talking
15  about that period of time he wasn't given access to
16  care?
17      A   Correct.
18      Q   Do you know how much time that was in
19  hours?  Have you ever calculated that?
20      A   I believe I calculated 34 hours.
21         MR. SMIT:  Okay.  Whatever the next number
22  is, could we mark that?
23         MS. DAMICO:  163.  And that's an excerpt
24  from, what did you call that?
25         THE WITNESS:  It's page 12 of 18 from

Page 69

1  defense expert disclosure.  And that was
2  Section J-A-01, Access to Care.
3             (The aforementioned document
4             marked Deposition Exhibit No.
5             163.)
6  BY MR. CHAPMAN:
7      Q   Now I have a document that you handed to
8  me that's called Predictors of Severe Alcohol
9  Withdrawal Syndrome Systematic Review and
10  Meta-Analysis.  Is that (proffered) something that
11  you read?
12      A   (Reviews document.)  It is.
13      Q   Did you read that prior to this case?
14      A   No.
15      Q   Is that specific research that you've done
16  for this case?
17      A   Correct.
18      Q   Okay.  Do you have anything -- so you have
19  the first page or something highlighted.  Other than
20  that do you have anything highlighted or marked or
21  annotated?
22      A   No.
23      Q   Why did you choose -- well, strike that.
24  Were you provided that article by Ms. Damico?
25      A   We spoke about it some time ago.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 70

1    Q    That's not the issue.  Did she provide
2  that article to you or give you the citation for you
3  to read that article?
4    A    For the citation, yes.
5    Q    Okay.  And then you pulled the article to
6  read it?
7    A    Correct.
8    Q    Independent of Ms. Damico giving you that
9  article to read why didn't you pull it on your own?
10   A    I did pull some articles on my own.
11   Q    That's not my question.  I'm talking
12  specifically about this document.
13       MR. CHAPMAN:  Why don't we number it right
14  now if we could.
15       MS. DAMICO:  This is 164.
16       MR. CHAPMAN:  Could you mark that 164.
17       MR. SMIT:  What is it again, Ron?
18       MR. CHAPMAN:  It's an article regarding
19  predictors of withdrawal.  That's not the full
20  title but.
21       MR. SMIT:  That's fine.
22            (The aforementioned document
23            marked Deposition Exhibit No.
24            164.)
25

Page 71

1  BY MR. CHAPMAN:
2    Q    Now, referring to 164, that specific
3  article, you did not pull that article on your own
4  independent of Ms. Damico directing you to; correct?
5    A    Can you say that one more time.
6    Q    You did not pull that article, review that
7  article, independent of Ms. Damico sending it to you
8  and suggesting you look at it?
9    A    She told me that DOI so I looked it up.
10  So I would say, yes, to your question.
11   Q    Yes.  I show you the next document is a
12  British Journal of Addiction but it's only the
13  abstract.  (Document proffered.)
14       MR. CHAPMAN:  I believe that would be 165?
15       MS. DAMICO:  Yes.
16       MR. CHAPMAN:  Could you mark that at the
17  bottom and then your initials.
18       THE WITNESS:  Yes.
19            (The aforementioned document
20            marked Deposition Exhibit No.
21            165.)
22  BY MR. CHAPMAN:
23   Q    Was that abstract provided to you by
24  Ms. Damico?
25       MS. DAMICO:  What's the title?

Page 72

1        THE WITNESS:  Increased Severity of
2    Alcohol Withdrawal in In-patient Alcoholics
3    with Co-existing Anxiety Diagnosis.
4  BY MR. CHAPMAN:
5    Q    So the question is, did Ms. Damico provide
6  you either the citation to that exhibit, which is
7  Number 165, or the actual document in your hand?
8    A    The citation.
9    Q    And then you looked it up; correct?
10   A    Correct.
11   Q    And is that note yours there that says --
12  let me read it exactly.  It says, "Do you have full
13  article co-morbidity?"
14   A    No.  This is Ms. Damico's handwriting from
15  our meeting last night.
16   Q    Was she asking you if you pulled the full
17  article referred to by the abstract?
18   A    That's what -- yes.
19   Q    Did you?
20   A    I couldn't find it.
21       MR. SMIT:  I'm sorry.  I missed the
22       answer.
23       MR. CHAPMAN:  He said he could not find
24       it.
25       MR. SMIT:  Okay.

Page 73

1  BY MR. CHAPMAN:
2    Q    Now, independent of Ms. Damico asking you
3  to look at Exhibit 165 you did not find it
4  independently on your own to review; correct?
5    A    Correct.
6    Q    I'm going to show you another article here
7  that says, "Diagnosis and Management of Acute
8  Alcohol Withdrawal."  (Document proffered.)
9        MR. CHAPMAN:  I believe this would be
10       Exhibit 166.
11       MS. DAMICO:  Yes.
12       MR. CHAPMAN:  Would you mark Exhibit 166.
13       THE WITNESS:  (Complies.)
14            (The aforementioned document
15            marked Deposition Exhibit No.
16            166.)
17  BY MR. CHAPMAN:
18   Q    Now, Exhibit 166, was that a document or
19  citation that was provided to you by Ms. Damico?
20   A    Yes.  The citation would be.
21   Q    And from her giving you the citation you
22  looked up the article?
23   A    Correct.
24   Q    And then on the side there, there's a
25  sticky note that says something.  What does it say?

STEPHEN FURMAN, R.N.
July 07, 2021

Page 74

1    A   Another peer reviewed study.
2    Q   And that was in Ms. Damico's handwriting?
3    A   Yes.
4    Q   And she gave that to you last night?
5    A   No.  We spoke -- we talked last night and
6    she wrote that sticky note on it.
7    Q   Why would she write another sticky note
8    that says "another peer reviewed" article that she'd
9    already given to you before last night?  Can you
10   explain the circumstances?
11   A   No.  I printed it off before last night.
12   Q   Okay.  Based on her giving you the
13   citation?
14   A   Right.  And she was reviewing it.
15   Q   But why would she write "another peer
16   reviewed" article?  Do you know?
17   A   I'm not sure.  She was writing sticky
18   notes.  I'm not sure of everything she wrote.
19   Q   Okay.
20       MS. DAMICO:  I'm organized.
21       MR. CHAPMAN:  I believe this is going to
22   be Exhibit 167.
23       MS. DAMICO:  Yes.
24       MR. CHAPMAN:  It's called Clinical
25   Institute Withdrawal Assessment for Alcohol,

Page 75

1    Revised.  Might be an unreliable tool in the
2    management of alcohol withdrawal.  (Document
3    proffered.)
4    Could you mark that as Exhibit 167.
5       THE WITNESS:  (Complies.)
6           (The aforementioned document
7           marked Deposition Exhibit No.
8           167.)
9    BY MR. CHAPMAN:
10   Q   Exhibit 167 was the document or citation
11   to the document that was provided to you by
12   Ms. Damico?
13   A   On this one, no.
14   Q   Okay.  How did you arrive at that one?
15   A   A public search.
16   Q   Okay.  So Exhibit 167 is part of your own
17   research?
18   A   Correct.
19   Q   Okay.  Do you have any highlighting on
20   that document?
21   A   There are some highlighting.
22   Q   Look on the first page.  The highlighting
23   seems to be what?  Just a citation down there?
24   A   The journal it came from.
25   Q   Okay.  And then turn to the next page.

Page 76

1    There are 2 sections.  Is it 2 sections highlighted?
2    A   Three.
3    Q   Three.  Could you read the first one?
4    A   Sure.  "An important limitation of the
5    CIWA-Ar is it's heavily subjective nature.  Only 3
6    out of 10 components:  Tremor, paroxysmal sweats,
7    agitation can be rated observational alone.  The
8    other 7 components require at least some discussion
9    with the patient."
10   Q   Now, could you put a number 1 next to that
11   so when we read the transcript we will know exactly
12   what we mean by 1.  Circle it and put your initials.
13   A   (Witness complies.)
14   Q   Now, was there another highlighted area on
15   that document?
16   A   There is.
17   Q   Can you put a 2, circle it and put your
18   initials and then read it for the record.
19   A   "The second limitation of CIWA-Ar was
20   subtler.  The patient was confused, disoriented so
21   even in the absence of a communication barrier his
22   responses might have been unreliable."
23   Q   Does that say that -- paraphrase, the
24   patient might be confused, therefore his statements,
25   comments might be unreliable?

Page 77

1    A   Correct.
2    Q   Okay.  Is there another section
3    highlighted?
4    A   There is.
5    Q   Could you put a 3 and circle it with your
6    initials and then read it into the record.
7    A   "Objective Alcohol Withdrawal Scale."
8    Q   And is that -- below that I see there's
9    some gray area.  Is that the scale that you're
10   referring to?
11   A   Correct.
12   Q   Okay.  Why did you highlight that?
13   A   It's objective versus subjective.  So it's
14   measurable data.
15   Q   So Section 3, the comments included in the
16   gray area or the highlighted area below Comment No.
17   3, are those subjective or objective?
18   A   They're objective.
19   Q   Okay.  What are they?  Could you identify
20   them?
21   A   Sure.  Vital signs as well as tremors and
22   diaphoresis as well as agitation.
23   Q   So agitation, sweating, blood pressure and
24   what was the fourth one?
25   A   Heart -- vital signs.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 78

1    Q    Vital signs.
2    A    Heart rate and tremors.
3    Q    Those are all objective; correct?
4    A    Correct.
5    Q    Okay.  Any other comments on there marked?
6    A    Not on this page.
7    Q    Look through the whole document.  Is there
8  any on subsequent pages?
9    A    The OAWS in the box.  Do you want me to
10 mark that?
11   Q    No.
12   A    All right.  That's it in the document.
13   Q    Okay.  And what's the number of that
14 exhibit?
15   A    167.
16   Q    And 167 is an exhibit that reflects
17 independent research that you did apart from
18 Ms. Damico sending you a citation?
19   A    Correct.
20   Q    Okay.  You can set that aside.  I believe
21 now we're on Exhibit 168 which says, Recognition and
22 Management of Withdrawal Delirium.  And then in
23 brackets it says, Delirium Tremens.
24        MR. CHAPMAN:  I believe that's 168.  Could
25     you mark that Exhibit 168 with your initials.

Page 79

1        (Document proffered.)
2        THE WITNESS:  (Complies.)
3                (The aforementioned document
4                marked Deposition Exhibit No.
5                168.)
6  BY MR. CHAPMAN:
7    Q    Now, is 168 a document that you found
8  doing your own research?  Or is it a document that
9  Ms. Damico either provided or gave you the citation
10 to?
11   A    It was my research.
12   Q    Okay.  The subject of 168 is DTs?
13   A    The Recognition and management of
14 withdrawal of delirium tremens.
15   Q    When you say withdrawal of delirium
16 tremens do you mean delirium tremens that result
17 from someone going through alcohol withdrawal?
18   A    Yes.
19   Q    Okay.  Are there other types of delirium
20 tremens not related to alcohol withdrawal?  Or is
21 that a symptom specifically related to alcohol
22 withdrawal?
23   A    From the education that I've received in
24 the past it's only alcohol.
25   Q    Okay.  And there's a number of sections

Page 80

1  highlighted on there; correct?
2    A    There is.
3    Q    Those sections that are highlighted,
4  without reading them, can you tell me why they were
5  highlighted?
6    A    It was areas in which I felt that
7  corroborated my standard of care opinions in this
8  case.
9    Q    Can I see the document, please?
10   A    Sure.  (Document proffered.)
11   Q    (Reviews document.)  Now, I only have one
12 document to share so I'm going to state some
13 questions.  If you actually want to see the
14 document, that's fine.
15        On the first page of this, which
16 would be page 209 of the document, one of the areas
17 you have highlighted says, "Withdrawal symptoms
18 usually begin within 8 hours after blood alcohol
19 level decreases."
20        Is that one of the things you found
21 in your research?
22   A    Yes.
23   Q    Now, do you agree that someone who is a
24 long-term chronic alcoholic that their blood alcohol
25 level reaches what's called a steady-state?

Page 81

1  Meaning, an alcohol level at which if it falls below
2  that they might start into alcohol withdrawal?
3    A    Absolutely.
4    Q    And for some alcoholics, they have to
5  continually drink to keep their blood alcohol level
6  above that baseline or steady-state for them to
7  appear not drunk or intoxicated?
8    A    That's true.  They have to drink to stop
9  the tremors.
10   Q    Yes.  So somebody that is a long-time
11 alcoholic if they go without alcohol for a period of
12 time they might start shaking and appear like
13 they're intoxicated?
14   A    They might not appear they're intoxicated?
15   Q    No.  They might start shaking and appear
16 that they are intoxicated?
17   A    Most intoxicated persons do not shake.
18 But once -- to clarify your question.  If a person
19 is used to, a chronic alcoholic is used to a blood
20 alcoholic content of 50 percent, .15 and then they
21 drop down below the .1 threshold, at that point they
22 might start with tremors.  They might start getting
23 diaphoretic.  And once they get a drink to get their
24 BAC up above that .15 their symptoms subside.
25   Q    Okay.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 82

1    A    If that answers your question.  That seems
2  to be what you're asking.
3    Q    Thank you.  That's pretty close to what
4  I'm asking.
5         MR. SMIT:  Ron, without getting into
6    detail, I have a little technical issue here.
7         MR. CHAPMAN:  Okay.
8         MR. SMIT:  At your leisure, if we can take
9    5, that would be helpful.
10        MR. CHAPMAN:  We can do it right now.
11        MS. DAMICO:  Good time.  We'll take a
12   break.
13        MR. SMIT:  Thanks, guys.
14                 (After the break the following
15                 testimony resumed on the
16                 record:)
17 BY MR. CHAPMAN:
18   Q    All right.  Let me show you one last
19 article that I have called Alcohol Withdrawal
20 Syndrome:  Benzodiazepines and Beyond.
21        MR. CHAPMAN:  We're at 169?
22        MS. DAMICO:  Yes.
23        MR. CHAPMAN:  Could you mark that as
24   Exhibit 169. (Document proffered.)
25

Page 83

1                 (The aforementioned document
2                 marked Deposition Exhibit No.
3                 169.)
4         THE WITNESS:  (Complies.)
5  BY MR. CHAPMAN:
6    Q    And that particular article, is that one
7  you located using your own independent research, or
8  is that an article that Ms. Damico provided to you,
9  either the citation or the actual article?
10   A    It was me.
11   Q    And in that particular document there's no
12 highlighting; correct?
13   A    There's not.  Just where it came from, the
14 journal.
15   Q    Now, in that article it appears to be
16 mostly benzodiazepines; correct?
17   A    Correct.  It's more psychiatry.
18   Q    And Mr. Jones was not detoxing from
19 benzodiazepines; was he?
20   A    He was not.
21   Q    Is there some relationship between
22 detoxing from benzodiazepines and alcohol?  Or do
23 they effect the method and manner of detoxing
24 differently?  Or do you know?
25   A    They're different.

Page 84

1    Q    More empirical?
2    A    Yes.
3    Q    And that's fine.  Now I have some
4  documents here that I have no idea why I have them.
5  They're quick facts about Richmond City, Virginia.
6  Do those have anything to do with this case?
7    A    I was making a comparison between Grand
8  Rapids, Michigan and Richmond, Virginia.
9    Q    Why would that matter?
10   A    Because we're in a local standard of care
11 in the State of Michigan.
12   Q    But why would a census have anything to do
13 with the standard of care in a particular locality?
14   A    I was -- just the comparison to the size
15 of Richmond where I work to the size of Grand
16 Rapids, Michigan where this case is.
17   Q    My question to you is, why does the census
18 have anything to do with the standard of care with
19 the local community?
20   A    It's what I normally review when I'm
21 getting ready to testify in those areas.
22   Q    No, I understand that.  That's fine.  But
23 what I'm asking is, why does the number of people in
24 a community, the population of a community, the
25 number of stores in a community, the primary source

Page 85

1  of employment, why does that have anything to do
2  with the standard of care?
3    A    It probably doesn't.  But I'm just looking
4  at comparison comparing that area to the area in
5  which I live.
6    Q    Okay.  So your testimony is, doesn't have
7  anything to do with the standard of care, but you
8  just do that as part of your preparation?
9    A    Right.
10        MR. CHAPMAN:  Okay.  Do you want to mark
11   that, Peter, so you can see the difference
12   between Grand Rapids and Richmond, Virginia?
13        MR. SMIT:  I could put that in my travel
14   file I guess.
15        MR. CHAPMAN:  Let's mark it as whatever
16   the next exhibit is.
17        MS. DAMICO:  It would be 170.
18                 (The aforementioned document
19                 marked Deposition Exhibit No.
20                 170.)
21 BY MR. CHAPMAN:
22   Q    Now, another document I'm handing
23 (proffered) you is titled, Clinical Institute
24 Withdrawal Assessment of Alcohol Scale, Revised,
25 CIWA-Ar.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 86

1    MR. CHAPMAN:  First, could you mark that
2    Exhibit 171 and identify that as 2 pages.
3         (The aforementioned document
4         marked Deposition Exhibit No.
5         171.)
6    THE WITNESS:  (Complies.)
7    BY MR. CHAPMAN:
8    Q    Now, that is not a document from the
9    medical chart of Corizon and Kent County; correct?
10   A    Correct.
11   Q    That is a document that reflects the CIWA
12   scoring, though; correct?
13   A    Correct.
14   Q    This is a document that you pulled from
15   where?
16   A    A Google search.
17   Q    Okay.  Just on the internet Google search?
18   A    Correct.
19   Q    Okay.  The items listed in each of the
20   various categories, are those items the same as the
21   items listed in the Corizon CIWA?
22   A    (No response.)
23   Q    I guess to help you, you also had this
24   attached (document proffered.).  Not to that but it
25   was separate.

Page 87

1    MR. CHAPMAN:  What I handed him was an
2    actual CIWA document from the record.
3    THE WITNESS:  I'm not ...
4    BY MR. CHAPMAN:
5    Q    Isn't it true that CIWA and the categories
6    under which they are scored, they're basically all
7    similar, but the different CIWA charts have some
8    variations in them?
9    A    Correct.
10   MR. CHAPMAN:  Okay.  Let's mark the one to
11   your left as -- we already marked that.  Okay.
12   Mark the one to your right --
13   MS. DAMICO:  It's already been marked.
14   MR. CHAPMAN:  But I'll mark it part of
15   that because it was part of his record.
16   BY MR. CHAPMAN:
17   Q    I assume that document went hand in hand
18   with this exhibit?
19   A    Not really, no.  I was going through --
20   the way I did it is when I first started reading
21   this, that it was alcohol withdrawal, I printed off
22   the CIWA score and tried to go through a little bit
23   of the records.  And then once I got the video tape
24   I could look at the video tape and try to come up
25   with a CIWA score.

Page 88

1    MR. CHAPMAN:  Okay.  Mark the actual sheet
2    there the next exhibit.
3    MS. DAMICO:  So 172 I've called it CIWA-Ar
4    Corizon record, page 12.  Because that's what
5    it says.
6    MR. CHAPMAN:  Sounds good.
7         (The aforementioned document
8         marked Deposition Exhibit No.
9         172.)
10   BY MR. CHAPMAN:
11   Q    Okay.  Let's go back to Exhibit 171.  So
12   if I heard you correctly, that is a document you
13   pulled up from Google search that reflects someone's
14   version of a CIWA; correct?
15   A    Yes, sir.
16   Q    And all CIWA-Ars are pretty similar but
17   carry some differences?
18   A    They do.
19   Q    Now, one of the articles that you
20   spoke about and in your report you spoke about is
21   the CIWA scoring isn't subjective?
22   A    It is.
23   Q    There are limited objective determinations
24   like vital signs, diaphoresis, agitation and
25   tremors.  Those things can be observed.  Everything

Page 89

1    else is objective?
2    A    Correct.
3    Q    And if you look at -- for example, look at
4    the category under Tremors on the 171 Document.  To
5    distinguish between 1, 2, 3, 4, 5, 6 and 7, there's
6    variations there.  Like the difference between a 2
7    and a 3.  It doesn't even tell you.  That's
8    subjective to the person scoring; correct?
9    A    It is.
10   Q    The difference between a 5 and a 6 is also
11   subjective to the person scoring; correct?
12   A    It is.
13   Q    Even a 7.  Severe, even with arms not
14   extended; and moderate, with patient's arm extended,
15   there's no real delineation between them other than
16   the subjective evaluation of the score; correct?
17   A    Correct.
18   Q    When we get down to anxiety zero is no
19   anxiety, at ease.  But that's extremely subjective;
20   correct?
21   A    Correct.
22   Q    Somebody could be very anxious, tell you
23   they don't have anxiety and not appear to be
24   anxious?
25   A    Yes.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 90

1    Q    And you might score it a zero when, in
2  fact, it might be something higher than zero;
3  correct?
4    A    Correct.
5    Q    And the difference between 1 which is
6  barely perceptible sweating, palms moist and beads
7  of sweat obvious on the forehead, there's a
8  subjectiveness between those as well or -- wait a
9  minute -- strike that last question.
10           When we're talking about anxiety; 1,
11 mildly anxious or moderately anxious or guarded,
12 those are very subjective; aren't they?
13   A    They are subjective, yes.
14   Q    And that goes on and on with all of this.
15 It's subjective.  One might score it a 3.  One might
16 score it a 5?
17   A    Correct.
18   Q    All right.  So when you get down to say
19 somebody's a 21 in scoring.  It could be a 16.  It
20 could be a 25 depending on who's doing the scoring?
21   A    Yes.
22   Q    Okay.  And if you have 5 people working in
23 a situation like a jail, and they're evaluating at
24 different times, their scores could be dramatically
25 different; couldn't they?

Page 91

1    A    They could be, yes.
2    Q    And an individual going through
3  withdrawals, they wax and wane; don't they?
4    A    They can depending upon medications
5  they're receiving, yes.  That's the answer to your
6  question.
7    Q    Even depending on the medication they're
8  receiving they can still wax and wane to the extent
9  that one time I can have an anxiety level of 1 and
10 the next time an anxiety level of 5 and the next
11 time an anxiety level of 1; correct?
12   A    Sure.  You could.
13   Q    I could be vomiting one time and then not
14 vomiting for 2 times and then vomiting again;
15 correct?
16   A    Correct.
17   Q    And those would be scored differently;
18 correct?
19   A    They would.
20     MR. CHAPMAN:  Okay.  Now, I think my last
21 thing before I hand you off would be 173?
22     MS. DAMICO:  Yes.
23     MR. CHAPMAN:  Look at your handwritten
24 notes to the left of you.  Could you mark those
25 as Exhibit 173 on the bottom right-hand corner.

Page 92

1          And could you count how many pages so I know
2   how many pages there are?
3      THE WITNESS:  (Complies.)
4      MS. DAMICO:  I count 7 pages for his
5  notes.
6                (The aforementioned document
7                marked Deposition Exhibit No.
8                173.)
9  BY MR. CHAPMAN:
10   Q    In your report you make some comments
11 regarding Deputy Cooper's alleged call at 8:49 to
12 medical; correct?
13   A    Yes.
14   Q    Now, I just want to ask you a couple
15 questions about that.  Other than the testimony from
16 Deputy Cooper and the fact that there is a record
17 that a phone call was made to medical at that point
18 in time there's no other evidence that that phone
19 call was actually made; correct?
20   A    The phone call, no.
21   Q    Okay.  There's no -- do you know whether
22 she spoke to her husband who's also a deputy that
23 was down in medical at that time?
24   A    No.  I was going on her deposition
25 testimony.

Page 93

1    Q    Do you know if she spoke to any other of
2  the 8 or 9 deputies that were in and about medical
3  at that time?
4    A    She said that she spoke to a female in
5  medical so I'm not sure.
6    Q    I understand that.  But I'm asking you do
7  you know if you spoke to any of those 8 or 9
8  deputies that were there?
9    A    I have no idea.
10   Q    Do you know if she did she make a record
11 of any person she spoke to?
12   A    She did not.
13   Q    Did she make a record of exactly what she
14 told this person and what this person might have
15 said?
16   A    No record.
17   Q    Did she send written notification to
18 medical that someone was, Mr. Jones in particular,
19 was going through withdrawal, following up on the
20 phone call that allegedly was made on 4/24 at 8:49
21 p.m.
22   A    Correct.  And just after 10 there was
23 another that was placed by --
24   Q    I'm talking about by Ms. Cooper, Deputy
25 Cooper?

STEPHEN FURMAN, R.N.
July 07, 2021

1      A     Correct.  At 10:13.
2      Q     She didn't make it.  Did she make the
3   alert?
4      A     Yes.
5      Q     Okay.  Now, an alert, do you have any idea
6   of how an alert -- well, first let me ask you this.
7   Are you aware of the system used by Kent County, the
8   alert, the medical record system?
9      A     I know a little bit of it, yes.
10     Q     Okay.  Alerts that are entered, do they in
11  fact alert medical to anything?  Do they show up on
12  the screen?
13     A     They do.
14     Q     They do?  How do you know that?
15     A     My inquiry about the medical record
16  system.
17     Q     Can you point to anybody's deposition that
18  said that that's what happened?
19     A     No.
20     Q     Were you ever given the opportunity to
21  read the deposition of Lieutenant Kelman?
22     A     Yes.  And her report.
23     Q     Did Ms. Kelman testify that there is no
24  notification screen that shows up in medical?
25            MR. SMIT:  Object as to form.

1            MS. DAMICO:  And I join.
2            THE WITNESS:  I don't remember that.  I
3        remember it being in the banner that would have
4        been available to the nursing staff.
5   BY MR. CHAPMAN:
6      Q     Well, page 121, line 22, Lieutenant Kelman
7   says, There is no notification screen.  The screen
8   doesn't start flashing.  And there's not an email to
9   alert medical.
10            Did you read that?
11     A     I'm sure I did.
12     Q     So with that information why are you of
13  the belief that putting an alert automatically
14  alerts medical when Lieutenant Kelman says it
15  doesn't?
16            MS. DAMICO:  I'm going to object to form
17        and foundation.
18            MR. CHAPMAN:  You can object to form and
19        foundation.  That's it.
20            MR. SMIT:  Object to form.
21  BY MR. CHAPMAN:
22     Q     Go ahead.
23     A     Well, it's my understanding that it
24  doesn't flash or beep or whistle or anything like
25  that.  It just comes up that he was going through

1   withdrawals.  Or that Mr. Jones was going through
2   withdrawals.
3      Q     Comes up where and when?
4      A     On their front screen on their computer.
5      Q     Well, Lieutenant Kelman says there's not a
6   notification screen.
7            MR. SMIT:  Form.
8            MS. DAMICO:  Form.
9   BY MR. CHAPMAN:
10     Q     So why do you believe there's a
11  notification screen where it comes up and says,
12  Alert.  Somebody going through withdrawals?
13            MS. DAMICO:  Let me object.  He did not --
14        that is not what he said.
15            MR. CHAPMAN:  Just form or foundation.
16  BY MR. CHAPMAN:
17     Q     You can testify.
18     A     It was my understanding of the -- I'm not
19  sure where I read it -- that said the alert would be
20  on the screen and it would be seen or the ability to
21  be seen by the nursing staff.
22     Q     Can you explain that more?
23            MS. DAMICO:  He called it a banner.  He
24        already testified as to what it was.
25            MR. CHAPMAN:  Just form and foundation.  I

1   have to --
2            MS. DAMICO:  He gave you the answer.  He
3        gave you the answer.  If you want to follow up
4        on that, that's fine.
5            MR. CHAPMAN:  You know what you can do and
6        what you can't do.
7            MS. DAMICO:  You can't badger my witness
8        when he's given you the answer.
9            MR. CHAPMAN:  I'm not badgering the
10       witness.
11  BY MR. CHAPMAN:
12     Q     Is it your testimony that Lieutenant
13  Kelman supports your understanding that this banner
14  shows up so that everybody in medical can see it?
15     A     I'm sorry.  Can you ask one more time.
16     Q     Is it your belief that Lieutenant Kelman
17  supports your position that this banner shows up so
18  that everybody in medical can see it?
19     A     I'm not sure.  Lieutenant Kelman supports
20  my opinion.
21     Q     This banner that shows up, does it only
22  show up if you're looking at Mr. Jones' record?  Or
23  does it just appear no matter what record you're
24  looking at?
25     A     It looked like when they get the

STEPHEN FURMAN, R.N.
July 07, 2021

1  withdrawal alerts. And that's where they printed
2  their withdrawal checks from. So whether they did
3  it at the beginning or the end or the middle of
4  their shift, of the nursing shift, that I wasn't
5  sure. But it was my understanding once that went
6  into the computer it would be available for the RN
7  to see that. And therefore, the RN would be able to
8  print off a withdrawal checklist from those alerts
9  that are placed in the computer.
10  Q    Where did you get that idea from?
11  A    I don't remember where I got that idea
12  from.
13  Q    Did you read Nurse Heather Tunnell's
14  T-U-N-N-E-L-L, testimony?
15  A    I'm sure I did. I'll say yes.
16  Q    Well, then you read her testimony at page
17  36 where she said, "There is no list of control
18  checks generated for alerts." Did you read that?
19  A    No, I did not.
20  Q    Well, let me just ask you this. You can
21  look it up if you want. Assuming she said that,
22  would that go against what your opinion is?
23  A    My opinion about there being a banner or
24  my opinion about Deputy Cooper calling them and
25  telling them that Mr. Jones is starting to go

1  through withdrawals?
2  Q    Neither of those. You said when alerts
3  are entered that that generates a CIWA checklist or
4  something that would start somebody on withdrawals.
5  And Nurse Tunnell says that's not true. That's not
6  how withdrawal is generated, and that's not what
7  starts a withdrawal check. If she said that, do you
8  agree that's different from what your opinion is?
9  A    That's different, yes.
10  Q    Do you want to look it up, or do you want
11  to move on? It's up to you.
12  A    You can move on.
13  Q    Okay. Let's talk a little bit about CIWA.
14        Do you want to read? Or can I have
15  your attention?
16  A    You can go ahead.
17  Q    Okay. You can close your computer unless
18  you need to look at it for some reason.
19        In your report, page 3, you said,
20  "Conducting CIWA evaluations consists of 2 parts:
21  Ask and observe." Do you agree with that?
22  A    Yes.
23  Q    And if the patient is not cooperating or
24  not answering questions the nurse's CIWA assessment
25  would rely exclusively on his or her observations;

1  correct?
2  A    I'll say correct. If they're
3  uncooperative with the exam it would be subjective.
4  Q    And you would agree looking at some video
5  which doesn't accurately show Mr. Jones when he was
6  up on the floor is not conducive to scoring a CIWA?
7        MS. DAMICO:  Object to form and
8        foundation.
9  BY MR. CHAPMAN:
10  Q    Do you agree with that?
11  A    Can you ask that one more time?
12  Q    Sure. Your Exhibit 171 is a CIWA score
13  sheet that you found through Google; correct?
14  A    Correct.
15  Q    And you attempted to score some sections
16  on there based on your observations of the video;
17  correct?
18  A    Correct.
19  Q    In observing these things from video
20  you're unable to ask questions; correct?
21  A    Correct.
22  Q    And watching something on a video is not
23  the same as being there in real time observing
24  somebody. Do you agree?
25  A    Correct.

1  Q    Okay. Particularly, when you're trying to
2  make distinctions between some of the scoring
3  between a 5 and a 6 or a 3 and a 4; correct?
4  A    Correct.
5  Q    I'm sweating. From a video you can't
6  really see if someone has some paroxysmal sweating
7  or if they've got beads of sweat on their forehead
8  or if their hands are clammy and sweaty. You can't
9  see that over video; can you?
10  A    It's very difficult.
11  Q    Okay. In fact, if we look at Exhibit 172
12  on the left-hand side there's a number of questions
13  that you asked for different categories. And
14  there's a lot of empty scoring where it's up to the
15  nurse to determine what level based on their close
16  observation; correct?
17  A    Correct.
18  Q    It's hard to see those variances or those
19  nuances over video; correct?
20  A    It is.
21  Q    Okay. And you agree that the video you
22  watched doesn't have any sound; correct?
23  A    That's correct.
24  Q    Okay. Do you agree in conducting a CIWA,
25  if the patient is not answering questions the CIWA

STEPHEN FURMAN, R.N.
July 07, 2021

1  assessment would take less time?
2       A    It might take a couple of seconds less, I
3  mean, if they're not going to answer orientation
4  questions.  Ours, we do simple math with our CIWA
5  scoring so it will take a couple seconds less.
6       Q    Well, if you're talking to a patient and
7  you're asking them how they feel and if they're
8  anxious they don't answer in one word -- well, they
9  could say nothing, or they could answer in one or 2
10  words.  Or they could talk to you for a minute and
11  say well, this is going on, that's going on, et
12  cetera; right?
13       A    Yes.
14       Q    If they talk to you that could take a
15  little more than a couple seconds; right?
16       A    Yes.
17       Q    Okay.  If they don't talk to you and they
18  either respond by nodding their head or with a
19  one-word answer, that would take less time?
20       A    If they did exactly that, sure.
21       Q    Right.  And you've done CIWA assessments
22  before; right?
23       A    Correct.
24       Q    When you're doing those -- I'm looking at
25  Exhibit 172.  When you're assessing tremor,

1  paroxysmal sweats, anxiety, you can do all of those
2  at one time by looking at the patient; right?
3       A    Sure.  But you're following a sheet or on
4  a computer screen so you're going down to make sure
5  that you do assess all parts and all aspects of the
6  CIWA.
7       Q    I understand.  But you have to go through
8  these looks like 10 different categories that you
9  make an assessment on; correct?
10       A    Correct.
11       Q    Is that how many are on this sheet?
12       A    There are.
13       Q    Okay.  So, I mean, the first one:  Nausea
14  and vomiting, you would ask the patient or the
15  inmate if they're nauseous or vomiting; right?
16       A    Correct.
17       Q    If they don't tell you they vomited 10
18  minutes ago or 4 hours ago then you would write no;
19  correct?  Unless you see it?
20       A    Exactly.  Or unless somebody tells you
21  that they've been throwing up.  So you can utilize
22  that as well.  So usually you have to sit there and
23  talk to the patient first a few minutes.  Some
24  people are very distrustful so that takes a
25  few minutes sometimes to get through.

1       Q    Well, I'm kind of interested about that.
2  Because you said if the person doesn't respond to
3  you that would cut off a few seconds.  Now you say
4  it would take a few minutes to talk to the inmate
5  about vomiting.  Which is it?
6       A    No.  But you said if they won't answer at
7  all then obviously that would take some time.
8       Q    But you said a few seconds.  Now you say
9  just vomiting alone it could take a few minutes in
10  talking to the patient.
11       A    Well, it's nausea, vomiting.  It might
12  take some time.  It varies from person to person.
13       Q    Well, I understand.  But if someone isn't
14  cooperative and doesn't talk to you it doesn't trim
15  off a few seconds.  It could trim off significant
16  time doing a CIWA if they're not talking to you or
17  not responding; correct?
18       A    Sure.  If they're standing on the floor
19  rocking back and forth with their back to you and
20  refuse to even acknowledge you being there.  You
21  know, you try your best to be their friend and get
22  information from them to treat them the best you
23  can.  But if they're not going to respond to you
24  whatsoever then you're left to just be objective.
25       Q    Or they could just be standing there

1  looking at you, standing, and you ask them a
2  question and they just ignore you?
3       A    Sure.  So then with that then you try to
4  befriend them a little bit.
5       Q    Sure.
6       A    These people have never seen you before.
7  Sometimes they're distrustful.  And you sit there
8  and talk to them.  Hey, where do you live, and
9  things like that and try to build a rapport with the
10  patient.  You don't just come in, hey, Mr. Jones,
11  and him not, okay, next person, and then move on
12  down the line.  That's not what you're supposed to
13  do.
14       Q    Have you ever assessed a person in a jail?
15       A    In an actual jail?
16       Q    In an actual jail?
17       A    No.
18       Q    Do you believe inmates in jail are
19  trusting of guards and medical?  Just by nature
20  they're free and trusting?  Or do you believe by
21  being locked up there's distrust just built in?
22       A    I mean, it would be speculation.  But I
23  deal with inmates frequently, and they are -- those
24  are usually fairly trusting.  But if you'd ask me
25  about a general jail.  Our jail population is a

STEPHEN FURMAN, R.N.
July 07, 2021

Page 106

1  little bit different, and they seem to be more
2  distrustful.
3      Q    Well, I'm a little confused.  Because
4  about 3 hours ago you said there's a prison ward
5  from the [Vermont] prison.  There's no jail people.
6  They're prison people.
7      A    Virginia.  Yes.
8      Q    So you don't deal with jail people; do
9  you?
10     A    I do.  Richmond City Jail in the emergency
11  room.
12     Q    Okay.  So you have some people coming from
13  the jail to the emergency room?
14     A    Sure.
15     Q    Okay.
16     A    If they felt need to be transferred to the
17  hospital for some reason we evaluate them.
18     Q    But those folks aren't from the jail.
19  They're coming now to medical outside the jail
20  telling nurses or doctors, whatever it is they want
21  to tell them; correct?
22     A    Correct.
23     Q    Okay.  Do you have any evidence, not your
24  opinion or your belief, any evidence that any of the
25  nurses did not, for example nausea and vomiting, try

Page 107

1  to elicit information from him?
2      A    No.  I mean, it would be --
3      Q    The answer is yes or no, if you could.
4      A    Yes.
5      Q    You do?  What?
6      A    The video tape.
7      Q    In the video tape do you see whether
8  they're talking or not talking?
9      A    I see LPN Card come and glance in the cell
10  and keep walking.  So if he's talking, he's talking
11  as he's walking away.  So that's one bit of
12  evidence.
13     Q    Okay.  What about Mollo?  Is that the same
14  thing?  Did he do an assessment?
15         MS. DAMICO:  Object to form and
16  foundation.
17  BY MR. CHAPMAN:
18     Q    You can answer.
19     A    I didn't see him at 4:00 in the morning.
20     Q    If somebody doesn't talk to you how long
21  does it take to do an assessment, the shortest
22  period of time to do an assessment?
23     A    A CIWA assessment or a physical
24  assessment?
25     Q    No.  A CIWA assessment if an inmate

Page 108

1  doesn't talk to you, what's the shortest period of
2  time it takes to do it?  And don't speculate if you
3  don't know.
4      A    Yes, it would be speculation.
5      Q    Do you agree that when a health care
6  professional in the jail setting is trying to assist
7  the patient it's important for the patient to be
8  cooperative?
9      A    That makes their job a little bit easier,
10  yes.
11     Q    And without a cooperative patient
12  answering questions truthfully to you it's very hard
13  to do an assessment, at least a subjective
14  assessment, because they're not telling you
15  everything?
16     A    It makes it more difficult, yes.
17     Q    As part of -- do you think a patient has a
18  duty to provide an accurate history in answers to
19  questions provided or posed by health care
20  providers?
21         MS. DAMICO:  Objection.  Asked and
22  answered.
23         THE WITNESS:  If they understand the
24  questions I would hope that my patients answer
25  accurately.

Page 109

1  BY MR. CHAPMAN:
2      Q    But do you believe there's a burden on the
3  patient to answer questions accurately?  Not
4  something you would hope.
5      A    There is.  But there are also variables
6  that you need to factor in.
7      Q    You know, I think we spoke about this.
8  But providing an accurate history has a direct
9  affect on the treatment plan and orders that might
10  be provided by the health care provider?
11     A    True.
12     Q    Can there be a reasonable expectation by a
13  health care provider or a nurse that a patient will
14  follow instructions?
15     A    I will say there's, both, a reasonable
16  expectation as well as a hope.  That patients will
17  follow the instructions that you give them.
18     Q    We all know that some patients don't.  You
19  have a diabetic and you tell them to monitor their
20  blood sugar and you find out they're eating sugar
21  maybe.  But you would hope that they follow, but
22  they don't always?
23     A    Sure.
24     Q    You might tell a patient it would be good
25  if you lost 50 pounds.  That might help with your

STEPHEN FURMAN, R.N.
July 07, 2021

Page 110

1  diabetes.  And they gain 20 pounds.
2      A   Right.
3      Q   Really all a health care provider can
4  really do is advise the patient on what to do and
5  hope that they do it; right?
6      A   Sure, yes.
7      Q   And then continue to monitor them and
8  continue to help them the best they can?
9      A   Correct.
10     Q   When Mr. Jones came into the facility he
11  told the intake person that basically he only drank
12  occasionally; correct?
13     A   Correct.
14     Q   Did he tell the intake nurse that just 96
15  minutes earlier he had a PBT test of .159?
16         MS. DAMICO:  I'm going to object.  It's
17  hearsay.
18         THE WITNESS:  That's not documented.
19  BY MR. CHAPMAN:
20     Q   Were you aware that when he was in court
21  the deputy took a PBT test 96 minutes before he
22  arrived at the jail, and that was 1.59?
23     A   I am, yes.
24     Q   Are you aware at the jail, in fact, the
25  judge commented that he didn't appear to exhibit

Page 111

1  effects from alcohol?
2      A   Yes.
3      Q   Do you agree that Mr. Wade had what they
4  call functional tolerance with respect to blood
5  alcohol level?
6      A   Yes.
7      Q   Did he appear -- let me ask this.  If he
8  appeared to the judge that he didn't have outward
9  effects of alcohol at .159 would you assume that
10  somewhere close to that would have been his
11  baseline?
12     A   It would appear to be that, yes.
13     Q   Do you know per hour what percentage for
14  the blood level that alcohol would decrease if
15  you're not consuming alcohol?  Does that make sense
16  what I just said?
17     A   It does.  And I will say I'm not sure.  I
18  don't know how fast your blood alcohol content
19  diminishes over the course of one hour, 2 hours or 4
20  hours.
21     Q   Do you agree with the fact that when he
22  appeared to medical that he was intoxicated?
23     A   He should have been, yes.
24     Q   He should have been because his blood
25  alcohol would have been somewhere around [1.5] --

Page 112

1  correction, .15?
2         MS. DAMICO:  Object to foundation.
3  BY MR. CHAPMAN:
4      Q   Do you agree with that?
5      A   Yes.
6      Q   Were you aware that the statutory level of
7  blood alcohol to be intoxicated in Michigan is .08?
8      A   Correct.
9      Q   Okay.  Do you agree that .159 is about 2
10  times the limit in Michigan?
11     A   Yes.
12     Q   Okay.  Do you agree that the treatment of
13  Mr. Jones would have been different if he had told
14  the intake nurse that he was drinking 6 to 7 drinks
15  a day for at least the last 10 years?
16     A   I don't know that he didn't tell her that.
17     Q   It's not documented that he did; is it?
18     A   No.
19     Q   And we don't have his testimony whether he
20  did or he didn't; right?
21     A   Correct.
22     Q   Do you generally have to rely on medical
23  records when you give your opinion?
24     A   Correct.
25     Q   In fact, you have no objective basis to

Page 113

1  deny that the medical record from intake is, in
2  fact, what was told to her by Mr. Jones?
3      A   True.
4      Q   And you can't as an expert just change the
5  facts as you feel like it in order to arrive at a
6  different opinion; can you?
7      A   No.
8      Q   So is it true that in order to give an
9  opinion you have to rely on the intake treating
10  record?
11     A   Correct.
12     Q   Okay.
13     Q   Plus discovery depositions.
14     Q   Okay.  Is there some discovery deposition
15  that changes the document at intake?
16     A   The documented intake, no.
17     Q   Okay.
18     A   I mean, Nurse Byrne had stated that if --
19  that he wouldn't give her the information on that
20  aspect.  And if it was true then she would have
21  wrote "refused" on the paperwork.  And I didn't see
22  that documented.
23     Q   The document says "denied"; right?  What
24  does it say?
25     A   "Refused" on his last drink.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 114

1    Q    Yes.  So isn't it incumbent upon him to
2  tell her when his last drink would have been in his
3  history of drinking when she asked him?
4    A    If he was asked.
5    Q    Well, there's questions here that identify
6  that he was asked.  Or are you trying to say that
7  there's evidence that suggests he was not asked
8  those questions?
9    A    It was not asked -- I didn't see
10  documented that he was asked when his last drink
11  was.  And Nurse Byrne in her deposition stated that
12  he refused to answerer that question.  I believe
13  that's what it was.  Then she would have written
14  refused.  But there was not documented --
15    Q    Didn't he testify that his drinking
16  history was he occasionally drank?
17         MS. DAMICO:  He did not testify so
18    objection.
19         MR. CHAPMAN:  You can't say whether
20    someone testified or didn't --
21         MS. DAMICO:  You said, didn't he testify.
22         MR. CHAPMAN:  Then state form or
23    foundation.
24         MS. DAMICO:  He didn't testify.
25         MR. CHAPMAN:  The witness can say he

Page 115

1  doesn't understand the question I asked.
2         MS. DAMICO:  Okay.  Sorry.
3  BY MR. CHAPMAN:
4    Q    Doesn't the record say that he indicated
5  he only drank 2 drinks?
6    A    That's true.
7    Q    Okay.  That's different than someone who
8  has a blood alcohol level of .159 and drank before
9  he went into the courthouse; correct?
10    A    That would show that he drank right before
11  he went into the courthouse; correct.
12    Q    He didn't say that; did he?
13    A    I don't believe that question was asked is
14  what I was saying.
15    Q    The question posed to you is that he said
16  he drinks occasionally; correct?
17    A    Correct.
18    Q    Drinks occasionally is not what his
19  history is; correct?
20    A    Correct.
21    Q    He is a long-time chronic alcoholic that
22  drinks significant amounts.  6 to 7 drinks a day;
23  correct?
24    A    Yes.
25    Q    He did not say that when he said I drink

Page 116

1  occasionally; correct?
2    A    Correct.
3    Q    Mr. Jones on occasion refused to take his
4  medication; correct?
5    A    While he was in the jail?
6    Q    Yes.
7    A    Correct.
8    Q    And the record indicates that he was
9  advised of the consequences of not taking his
10  medication?
11    A    That's what was stated.  But, you know,
12  with that I question how much he understood.
13    Q    I'm not asking you that question.  I'm
14  asking you if the record says he was advised?
15    A    Correct.
16    Q    And with respect to this issue of how much
17  he understood would be pure speculation on your part
18  to say how much he understood or didn't understand;
19  correct?
20    A    Correct.
21    Q    Okay.  The questions that I'm about to ask
22  you, if you don't have actual knowledge I don't want
23  you to speculate; okay?  I don't want you to say
24  what you believe.  I want you to tell me what you
25  know from your research or training or whatever it

Page 117

1  might be; okay?
2    A    Okay.
3    Q    Is that agreed?
4    A    Yes.
5    Q    Okay.  Consuming large amounts of alcohol
6  over a period of years causes someone to develop
7  functional tolerance; correct?
8    A    That's correct.
9    Q    Consuming large amounts of alcohol over a
10  period of years causes someone to develop a high
11  base level, blood alcohol level.  Meaning if it
12  falls below the base level someone could go into
13  withdrawals?
14    A    Right.
15    Q    With respect to Mr. Jones, the only
16  evidence we have to his base level is that .159 the
17  judge said he didn't appear to be intoxicated;
18  correct?
19    A    True.
20    Q    That would suggest that his base level
21  would be either at .159 or something below that?
22    A    True.
23    Q    On autopsy the medical examiner identified
24  damage to his liver that would cause functional
25  impairment of his liver; correct?

STEPHEN FURMAN, R.N.
July 07, 2021

Page 118

1    A    Acute hepatitis, yes.
2    Q    Listen to my question.  The medical
3  examiner identified damage to his liver that would
4  cause functional impairment of his liver?
5         MS. DAMICO:  Objection.  Foundation.
6         THE WITNESS:  It would be a functional
7    impairment, sure.
8  BY MR. CHAPMAN:
9    Q    Okay.  On autopsy the medical examiner
10 identified that he had pancreatitis causing
11 functional impairment; correct?
12        MS. DAMICO:  Object to foundation.
13        THE WITNESS:  I'm not sure of functional
14   impairment, but he did find acute pancreatitis.
15 BY MR. CHAPMAN:
16   Q    Well, acute pancreatitis would impair the
17 function of the pancreas; right?
18   A    Depends upon degree but yes it could.
19   Q    Okay.  But again, like I said before, I
20 don't want you speculating.  If these are questions
21 that should be asked the medical providers then just
22 say that's outside my pay grade, as you said before,
23 or outside my expertise.  So I don't want you
24 speculating as to what you may or may not know;
25 okay?

Page 119

1    A    Okay.
2    Q    So on that question with respect to would
3  acute pancreatitis cause dysfunction or impairment
4  of the pancreas, is that something you feel you can
5  answer, or do you want to punt on that to a health
6  care provider?
7    A    I would say I'm fine punting to a
8  physician or endocrinologist.  But with that, I've
9  also seen patients with acute pancreatitis do very
10 well with their pain and eat and be merry and happy
11 in the hospital.  And I've seen some that were food
12 restricted because of their pancreatitis.  So
13 pancreatitis can come in varying degrees.
14   Q    But regardless of the degree, acute
15 pancreatitis causes impairment of the pancreas.
16 Just the inflammation and the problems alone the
17 pancreas reacts differently than it would if it
18 didn't have acute pancreatitis; correct?
19   A    It could.  I mean, I'm fine referring to
20 an endocrinologies.
21   Q    Let me ask you this.  Did you read the
22 deposition of Dr. Fintel?  It was just taken a
23 couple weeks ago.  If Dr. Fintel was asked these
24 questions and responded, would you defer to him?
25   A    Sure.

Page 120

1    Q    Okay.  On autopsy it was found that
2  Mr. Jones had damage to his hippocampus.  Do you
3  know what that controls?
4         MS. DAMICO:  First of all, he said he's
5    not testify as to causation.
6         MR. CHAPMAN:  I'm asking the question.
7         MS. DAMICO:  He already testified.  He's
8    said he's not testifying to that.
9         MR. CHAPMAN:  Then he can say he doesn't
10   have an opinion on this, or this isn't what I'm
11   testifying to, or I'll rely on the medical
12   provider.
13        THE WITNESS:  I'll rely on the medical
14   provider.
15        MR. CHAPMAN:  Okay.
16        MS. DAMICO:  You're asking opinions that
17   are not in his report.
18 BY MR. CHAPMAN:
19   Q    Just to be clear as to the cause of death,
20 we have testimony by Dr. Fintel, plaintiff's expert.
21 You're not testifying to that, with respect to that;
22 correct?
23   A    Correct.
24   Q    Okay.  In your research did you find that
25 alcohol impairs the sensory nervous system?

Page 121

1    A    It does.
2    Q    In your research did you find that the
3  withdrawal from alcohol causes the central nervous
4  system to overreact?
5    A    It does.
6    Q    In your research did you find that as the
7  central nervous system overreacts it could cause
8  DTs, delirium tremens?
9    A    Yes.
10   Q    Did you find in your research that
11 delirium tremens could cause death?
12   A    Yes.
13   Q    Do you agree that hallucinations impair
14 one's ability to function?
15   A    Yes.
16   Q    Do you believe that mental confusion
17 impairs one's ability to function?
18   A    Yes.
19   Q    In your report on page 12 you indicate on
20 4/26/18 Mr. Jones was hallucinating and confused.
21 Would you agree with that?  You don't have to refer
22 to a specific date.  Do you agree that Mr. Jones was
23 hallucinating and confused?
24   A    Yes.
25   Q    Go ahead.  Page 12.  Do you see on 4/26/18

STEPHEN FURMAN, R.N.
July 07, 2021

Page 122

1 that he was hallucinating and confused?
2     A    (Reviews document.)  I don't see it but
3 I'm sure he was.
4     Q    I refer you to page 5 at the bottom.  This
5 is a different day.  You say Jones was confused and
6 having both auditory and visual hallucinations?
7         MS. DAMICO:  What paragraph?
8         MR. CHAPMAN:  Bottom of page 5, last
9     sentence.
10 BY MR. CHAPMAN:
11     Q    Do you see that?
12     A    Yes, sir.
13     Q    So you would agree that off and on from
14 4/26 until his death there were periods where he
15 appeared to be hallucinating and confused?
16     A    Correct.
17     Q    Do you agree that Mr. Jones' senses,
18 condition was impaired to the point that he had the
19 inability to react to what providers were telling
20 him which ultimately led to DTs that caused his
21 death?
22         MS. DAMICO:  Object to foundation and
23     form.
24         THE WITNESS:  I'm going to restate your
25     question just to make sure I understand what

Page 123

1     you're saying.  You're asking me that if
2     Mr. Jones, despite what was told to him,
3     developed DTs as a result of not listening?
4 BY MR. CHAPMAN:
5     Q    No.  I'm just asking that from the period
6 of, let's say the 26th to the end, that Mr. Jones
7 was sufficiently impaired by confusion,
8 hallucinations, et cetera, that he was unable to
9 care for himself?
10     A    Absolutely.  I mean, you can tell by the
11 video and --
12     Q    I just asked you yes or no.  You can
13 follow-up on that later.
14     A    Yes.  It appears he was.
15     Q    And that being impaired ultimately led to
16 his continual withdrawal and led to his DTs which
17 led to his death.  And let me anticipate -- or
18 proximate cause.  So let's just say led to his
19 continual withdrawal and led to his delirium
20 tremens?
21     A    Without medication, appropriate medication
22 it would continue on.  So I agree with you, yes.
23     Q    If you could, look to your record if you
24 need to.  I have it on page 12.  Or it may be on 13.
25 But I think it was your testimony that confusion and

Page 124

1 hallucinations started on 4/26/18.  Could you
2 confirm or testify to that now or confirm in your
3 record that you actually said that.  I have it here
4 you said that.
5         MR. SMIT:  Hallucinations and what, Ron?
6         MR. CHAPMAN:  Confusion.
7 BY MR. CHAPMAN:
8     Q    Began on 4/26/2018.
9         MS. DAMICO:  You haven't asked the
10     question.
11 BY MR. CHAPMAN:
12     Q    It's in the report.  My question is, is
13 that your opinion?
14     A    Is that the first documented confusion
15 that any provider or any jail member on 4/26 --
16     Q    That's not my question.  Is it your
17 opinion that his hallucinations and confusion
18 started on 4/26/18?
19     A    That's when they were first documented.
20     Q    Give me one second.  (Reviews documents.)
21         With respect specifically to Nurse
22 Furnace, an hour and a half after being told that
23 Mr. Jones was in withdrawal she contacted Nurse
24 Practitioner Sherwood.  And if you want to say a
25 couple of hours.  It says an hour and a half.  I

Page 125

1 won't quibble over exact time.
2     A    Yes.
3     Q    And Nurse Sherwood issued an order to put
4 him on medication per CIWA protocol; correct?
5     A    Correct.
6     Q    And Nurse Practitioner Sherwood did not
7 tell her to give the medication stat; correct?
8     A    That's true.
9     Q    And the practice at the jail was to give
10 medication at specific set times; correct?
11 Withdrawal medication.
12     A    That's what she said in her deposition.
13     Q    And there was testimony that I think the
14 next time to give the medication would have been at
15 1:30?
16     A    I thought it was 2:00.
17     Q    Or 2:00.  And that's when the medication
18 was given?
19     A    Yes.
20     Q    Okay.  I think it was somewhere around 1
21 or 2; right?
22     A    Correct.
23     Q    And certainly was sometime after 5:30 in
24 the morning; correct?
25     A    Correct.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 126

1    Q   Would you agree -- strike that.
2        Do you agree that nurses are required
3    to use their clinical judgment when assessing,
4    evaluating patients for health care providers?
5    A   Sure.
6    Q   Okay.  Do you agree that following the
7    order of Nurse Practitioner Sherwood and the
8    practice, that Ms. Furnace carried out the order and
9    put him on CIWA and gave him the medication at the
10   next medication pass?
11   A   Are you asking me, that's what transpired?
12   Q   Well, I'm asking you if Nurse Furnace
13   complied or followed Nurse Practitioner Sherwood's
14   order to give the medication at the next med pass
15   because it was not stated stat?  Do you agree that's
16   what happened?
17   A   That is what happened.  But as you stated
18   prior, we have to assess the patient.  And this is
19   where your nursing judgment comes into play.  And
20   you have a person who walked in and was fully
21   functional on Day 1 in the jail.  And now he's
22   stumbling, disoriented, talking to himself, picking
23   things off the floor that don't exist.  And now you
24   have a significant change in the patient.  And if I
25   was Nurse Furnace, a reasonably prudent nurse in

Page 127

1    Nurse Furnace's situation should have asked, do you
2    want me to give a now dose or a first dose now
3    knowing what I know about alcohol withdrawal and
4    what she should know about alcohol withdrawal.
5    Because it seems like they would deal with those a
6    fair amount.  But that wasn't asked.  So that's
7    where I find that was somewhat of an egregious act
8    on her part.
9    Q   Well, Nurse Furnace and Nurse Sherwood's
10   call; correct?
11   A   They did.
12   Q   And Nurse Practitioner Sherwood was aware
13   of the system and aware of the condition that was
14   identified to her about Mr. Jones at that time.
15   That's what she testified to; correct?
16   A   She did.
17   Q   And Nurse Practitioner Sherwood ordered
18   the medication; correct?
19   A   She did.
20   Q   So she was aware of what medication needed
21   to be given; correct?
22   A   That I don't remember her saying she knows
23   that it was supposed to be given 7 1/2 hours after
24   it was ordered.
25   Q   So you're not here to testify for

Page 128

1    Ms. Sherwood.  So let's assume that Nurse Sherwood
2    gave the medication without stating stat, intended
3    the medication not to be given immediately but to be
4    given at the next med pass.  If true, Nurse Furnace
5    followed the order; correct?
6    A   I mean, Nurse Furnace followed the order.
7    Q   That's all.  Are you familiar with the
8    concept of verbal shift reports that are given
9    between nurses?
10   A   I am.
11   Q   Okay.  And those do happen; correct?
12   A   Every shift.  Twice.
13   Q   You weren't present during shift report
14   between Nurse Goetterman and Nurse Furnace; were
15   you?
16   A   I wasn't present, no.
17   Q   You don't have an audio recording or some
18   kind of recording of what took place; do you?
19   A   I don't.
20   Q   You don't have any firsthand knowledge of
21   what Nurse Furnace and Nurse Goetterman spoke about;
22   do you?
23   A   I do not.
24   Q   Do you recall Nurse Goetterman testifying
25   that he did take shift report from Furnace, and they

Page 129

1    did discuss Mr. Jones?
2    A   Yes.
3    Q   And did you read in Nurse Furnace's
4    deposition that she testified that she did discuss
5    Mr. Jones along with others with Mr. Goetterman as
6    part of the shift report?
7    A   No.
8    Q   In fact, she says on page 104 of her
9    deposition:
10       ANSWER:  Any people that had problems
11   in the night we had went and saw, anything that
12   happened in the night, people in the infirmary,
13   anything we need to make sure that needs to be done
14   that day.  That kind of stuff is discussed during
15   the shift report.
16       And that's pretty typical of what
17   nurses would exchange in a shift report; correct?
18   A   Correct.
19   Q   It's not always about people brought to
20   the infirmary and those things.  It's the nuances
21   that are going on with patients so that the nurse
22   can kind of get a picture of both the critical
23   things, the non critical things that took place
24   during the night on that particular shift; right?
25   A   Right.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 130

1    Q   With respect to whether someone should go
2  to the ER or not go to the ER when they're going
3  through withdrawals, you agree that that entails
4  medical judgment?
5    A   Yes.  It would entail medical judgment.
6    Q   In fact, one of your criticisms is that
7  the proper medical judgment was not exercised?
8    A   I agree it was not.
9    Q   In fact, you say that Ms. Furnace did not
10  properly exercise medical -- sorry.  It's on page 11
11  of your report.  Paraphrasing.
12         You say that the medical judgment
13  exercised by Nurse Furnace not to call 911 or send
14  him to the emergency room was deficient.
15         Is that your opinion?
16    A   Yes.
17    Q   And you agree that Nurse Furnace used her
18  medical judgment to call NP Sherwood in the morning
19  of the 27th?
20    A   Yes.
21    Q   And NP Sherwood then made a decision and
22  gave some orders; correct?
23    A   Correct.
24    Q   And following those orders Mr. Jones was
25  brought down to the infirmary; correct?

Page 131

1    A   He was.
2    Q   You weren't privy to the conversation
3  between Ms. Furnace and Ms. Sherwood; correct?
4    A   I was not.
5    Q   Assume, as Ms. Sherwood testified, that
6  that was, in fact, her order.  And Nurse Furnace
7  didn't have the ability to disregard that order at
8  that moment and send him to the infirmary or to the
9  emergency room.  Did she?
10    A   In all actuality, she didn't have to call
11  Nurse Practitioner Sherwood.  Within their policies
12  and procedures she could have transported to the
13  emergency room.
14    Q   That's true.  But her medical judgment was
15  to call the provider and explain the situation to
16  the provider and ask the provider to make a call, so
17  to speak, of what should we do; correct?
18    A   That's what she did.
19    Q   And that's what nurses can do.  Often
20  times nurses are at a point -- tell me if you
21  agree with this.  I'm not sure if I should do this
22  or I should do this.  So they call the provider and
23  say, here's the situation.  Do you want me to do
24  this, or do you want me to do this?  That happens
25  regularly in the life of a nurse; correct?

Page 132

1    A   It does.
2    Q   There's not an algorithm for everything;
3  correct?
4    A   There is not.
5    Q   Looking for your opinion where you put the
6  little red dots.
7    A   I have it right here.
8      MR. CHAPMAN:  I'm going to mark that now.
9      MS. DAMICO:  We're on 174.
10         (The aforementioned document
11         marked Deposition Exhibit No.
12         174.)
13  BY MR. CHAPMAN:
14    Q   Does your opinion have page numbers
15  marked?
16    A   They do.
17    Q   So on the opinion, Exhibit 174, is that,
18  in fact, your final opinion?
19    A   It is.
20    Q   So earlier, a while ago you said that you
21  made little red dots by areas where your opinion is
22  that the standard of care was breached so that you
23  could recall them if asked what your opinions were?
24    A   If you had given me a broad question, give
25  me all your opinions in this case.  Instead of me

Page 133

1  going line by line in this report and taking up all
2  your time I just put a dot right beside the standard
3  of care.
4    Q   Maybe my question was poor.  That's not
5  what my question was.  The dots reflect your opinion
6  where the standard of care was breached?
7    A   Correct.
8    Q   Okay.  And when did you put those dots on
9  there?  Before today?
10    A   The last couple of days.
11    Q   Okay.  In preparation for this deposition?
12    A   Correct.
13    Q   Okay.  So look on page 9 down at the
14  bottom you have three areas that have little dots on
15  them; correct?
16    A   I do.
17    Q   Okay.  Let's go to page 11.  The second
18  paragraph above.  Do you see that?  You have four
19  little dots.
20    A   I agree.
21    Q   And then on page 12 right above your 5
22  Section you have 2 little dots; correct?
23      MR. SMIT:  Sorry.  What page?
24      MR. CHAPMAN:  Page 12 right above Section
25  5.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 134

1  BY MR. CHAPMAN:
2      Q    The last 2 sentences have little dots on
3  it; correct?
4      A    The last paragraph actually has 4.
5      Q    Could I see yours?
6      A    (Document proffered.)
7      Q    (Reviews document.) I stand corrected.
8  On page 12 right above Section 5 you have 4 red dots
9  reflecting 4 opinions relating to what you believe
10 are violations of the standard of care?
11     A    Correct.
12     Q    And then on that same page, the next
13 paragraph under Section 5, you have 2 dots where you
14 believe the standard of care was breached?
15     A    Yes.
16          MR. SMIT:  Sorry.  Those are all on page
17     12?
18          MR. CHAPMAN:  Yes.
19 BY MR. CHAPMAN:
20     Q    I looked through the remainder of the
21 pages.  I don't see any dots, pages 13 to the end.
22          MS. DAMICO:  I just want to say for the
23     record, are you saying that --
24          MR. CHAPMAN:  Just no speaking.  Don't
25     give a speaking objection.

Page 135

1          MS. DAMICO:  Okay.
2  BY MR. CHAPMAN:
3      Q    Do you have other dots?
4      A    Yes.
5      Q    I could be color blind.  I have cataracts
6  but I missed the red dots.
7          I'll give you pages 13 and 14 to the
8  end.  Looking on page 13 -- we may have already
9  covered this one.  But in the paragraph above Nurse
10 Mollo there is one that starts out:  Failure to
11 appropriately ...
12     A    That's one, yes.
13     Q    And going down to Paragraph 6, second
14 paragraph.  You had one that started out:  Nurse
15 Mollo also failed ...
16     A    There's actually one above that.
17     Q    Which starts out where?
18     A    That first paragraph.
19     Q    Nurse Mollo understood ...
20     A    Four sentences up from Nurse Mollo and it
21 starts:  She did not take his vital signs as
22 required by protocol according to Dr...
23     Q    Okay.  So then going down below that
24 second paragraph, the one starting:  Nurse Mollo
25 also failed ...

Page 136

1      A    Correct.
2      Q    And you have a red dot on the last
3  sentence there in that same paragraph says:  Nurse
4  Mollo also failed to follow; correct?
5      A    Correct.
6      Q    And then the next paragraph, second
7  sentence, you also have a dot that says:  He did not
8  take his vitals as required?
9      A    Correct.
10     Q    And then Nurse Card on the next page now
11 which I believe is page 14 you have a dot by:  LPN
12 Card's testimony is disingenuous in my opinion.
13 Correct?
14     A    Correct.
15     Q    Okay.  And further down in the next
16 paragraph you have one dot that says:  Nurse Card
17 did not attempt to take vitals.  Did not attempt any
18 sort of -- and it continues.  Correct?
19     A    Correct.
20     Q    And I believe that's it.  Look at the last
21 2 pages.  I don't see any red dots.
22     A    That's correct.
23     Q    Again, your opinion does not address the
24 proximate cause as to whether any of these breaches
25 for the standard of care violations actually

Page 137

1  proximately caused the death.  You leave that up to
2  the providers; correct?  Wait a second.  You're not
3  testifying to proximate cause.
4      A    The only thing I want to say about that,
5  and I guess it can be argued or not --
6      Q    Well, if you're not testifying to
7  proximate cause, don't.  If you are, we'll be here
8  quite a while longer.
9          MS. DAMICO:  Let him testify.
10         THE WITNESS:  In medicine we're taught 5
11 minutes without oxygen, 5 days without water,
12 and 5 weeks without food is your line in the
13 sand of not -- a patient not being viable from
14 that point.  And from the video that I reviewed
15 I saw that Mr. Jones was not provided any
16 oxygen by artificial respiration through the
17 Ambu bag for greater than 5 minutes.
18         So when I teach advanced cardiac life
19 support as well as pediatric life support we
20 stress that when they take basic CPR that the
21 algorithm is assessing the patient.  They look,
22 listen and feel for respirations.  There's no
23 respirations we start chest compressions, and
24 we Ambu the patient at a 30-compression to 2
25 breath ratio for 5 cycles and we reassess.

Page 138

1    We can see Nurse Mollo doing chest
2    compressions and occasionally stopping chest
3    compressions, but he was not getting any oxygen
4    as a result of an Ambu bag respiration in that
5    time.  So that I can say comfortably he
6    exceeded past 5 minutes of receiving any oxygen
7    through the Ambu bag from Nurse Goetterman.
8    BY MR. CHAPMAN:
9    Q    I guess my question is, you don't know if
10   that proximately caused his death.  He may have died
11   when he was on the toilet?
12   A    Oh, he did die when he was on the toilet.
13   But what we did there -- what the nurses did there
14   is he more or less ensured he was going to have
15   anoxic brain injury as a result of the cardiac
16   arrest because they were doing chest compression,
17   but they were not giving supplemental oxygen through
18   Ambu bag.
19   Q    So is it your testimony then that you are
20   giving proximate cause testimony as to what he
21   actually died of?
22   A    I didn't say he actually -- I can tell you
23   he died -- it was anoxic brain injury, and he was
24   proven brain dead as a result of that.  So I can say
25   that because it's stated within the records by the

Page 139

1    physicians.  And I can also tell you that if a
2    patient isn't provided oxygen.  Nurse Goetterman had
3    an Ambu bag sitting right beside him.  He just never
4    utilized it.  Nurse Mollo did chest compressions.
5    Nurse Goetterman did not do the Ambu bag
6    respirations that are required to be done by the
7    American Heart Association through their basic CPR
8    algorithm.
9    Q    That might be true but you can't testify
10   that but for that he would have lived; correct?
11   A    I can't say he would have lived or if he
12   would have had anoxic injury because he did lay
13   motionless on the toilet for some minutes before
14   chest compressions were started.
15   Q    So within a reasonable degree of medical
16   certainty you can't testify as to exactly when
17   anoxic brain injury occurred?
18   A    Correct.
19   Q    Okay.  It could have occurred within a
20   reasonable degree of medical certainty while he was
21   on the toilet; correct?
22   A    Him not breathing, he would develop a
23   degree of anoxic injury.  And as time progressed
24   with no respiratory effort he would have increased
25   his degree of anoxic injury.  You have some people

Page 140

1    that come out of a cardiac arrest, after their
2    cardiac arrest, after they were -- hypothermia
3    protocol as he received.  And you have somebody that
4    you talk to them and they're just a little off
5    center.  And that's a minor degree of their anoxic
6    injury during their cardiac arrest.
7    Q    But listen to my question.  You cannot say
8    within a reasonable degree of medical certainty
9    whether or not he had anoxic brain injury while he
10   was on the toilet; correct?
11   A    I think you couldn't say that.
12   Q    And you can't say that -- let's use this
13   concept.  I know it's a medical concept, but
14   irreversible anoxic brain injury, whether that
15   occurred while he was on the toilet; correct?
16         MS. DAMICO:  Objection to foundation.
17         THE WITNESS:  They started chest
18   compressions --
19   BY MR. CHAPMAN:
20   Q    Listen to my question.  You can not say
21   within a reasonable degree of medical certainty that
22   irreversible anoxic brain damage did not occur while
23   he was on the toilet; correct?
24         MS. DAMICO:  Same objection.
25         THE WITNESS:  Yes.

Page 141

1         MR. CHAPMAN:  The notes that we have here,
2    can we mark these?  I think we did.
3    BY MR. CHAPMAN:
4    Q    These notes which are Exhibit No. 173, did
5    you create these notes at one period of time or over
6    a period of time?
7    A    It would have been all at one time for
8    let's see -- it's been over a period of time.  One
9    would be the initial review of records I received.
10   And then I believe the one page here was --
11   Q    Which page?
12   A    The medical examiner's report, their
13   diagnosis.  So it's been over a period of time.  And
14   then I did this (indicates) way later.
15   Q    Okay.  So I can't follow what you're
16   saying.  So "this way later" we're going to label.
17   Why don't you label that page 1 and put 1 in the
18   circle.  And we're going to put that in the order in
19   which you believe you did that.
20   A    (Witness complies.)
21   Q    So the timeline, this was prepared much
22   later?
23   A    Yes.
24   Q    Okay.  And then identify the next page.  I
25   think we did that the wrong way.  Cross out the 1

STEPHEN FURMAN, R.N.
July 07, 2021

Page 142

1  and just initial that you crossed that out.  I think
2  that's the way we do this.  Now, put these in the
3  order in which timeframe wise you did this.  Which
4  one you created first and then second.  I know they
5  didn't happen contemporaneously, put them in the
6  order.
7      A    You said the most recent?
8      Q    Yes.  The most recent -- no.
9      A    Or do you want me to do 173 A, B, C, D, E?
10     Q    If you could do it not the most recent,
11  but the one you would have prepared first, second
12  and third and then fourth.  So this is the last --
13     A    This (indicates) is the one I did very
14  first.  It's four pages.  This (indicates) is the
15  one I did last.
16     Q    So the order you have in reverse
17  chronological order from the early on, the one you
18  prepared, the next, the next, then it ends with the
19  one you did last week or whenever you prepared it.
20     A    Correct.
21     Q    Okay.  Could you mark it 1, 2, 3, 4, 5.
22     A    (Witness complies.)
23     Q    So is 1 the most recent or is it the first
24  one you did?
25     A    The 1 is most recent.

Page 143

1      Q    Okay.
2      A    One with a box.  2 with a box.  And so on
3  and so forth.
4      Q    Yes.  That would be good.  There's some
5  red and then there's some other colors.  Does the
6  color that you used mean anything?
7      A    That means I'm somewhat anal.  When I
8  started this I had a different color per nurse with
9  my intention with the dates written in red.  And
10  that just went to crap so I gave up.
11     Q    Okay.
12         MR. CHAPMAN:  Madam Court Reporter, before
13     we started marking this I asked a question.
14     Could you read back that question.
15                  (Requested question and answer
16                  was read back and the
17                  proceedings resumed.)
18  BY MR. CHAPMAN:
19     Q    And I want to clarify what the yes means.
20  Yes means you agree with the statement, correct?
21     A    Yes.  That I can say with a reasonable
22  degree of medical certainty that I do not feel that
23  his anoxic injury resulted while he was sitting on
24  the toilet.  If you take the timing in which he went
25  unresponsive on the toilet to the time in which

Page 144

1  chest compressions were started you would have
2  gotten in below that 5-minute mark.  But Nurse
3  Goetterman, because he did not start assisting
4  respirations then you essentially crossed over that
5  line to ensure that Mr. Jones would have a
6  devastating anoxic injury.
7      Q    Anoxic brain injury can occur within 3
8  minutes, sometimes 2; right?
9      A    As I stated before, you can have varying
10  degrees of anoxic injury.  His anoxic injury
11  resulted in brain death.
12     Q    Anoxic injury could have occurred within a
13  couple of minutes; correct?
14     A    As I said before, sure.  You will have
15  patients that are just a little off center.  And you
16  will have people that --
17     Q    Listen to my question.
18         MS. DAMICO:  Let him finish his answer.
19         THE WITNESS:  Then you'll have people that
20     will drool on themselves.  Those are varying
21     degrees of anoxic injury.
22  BY MR. CHAPMAN:
23     Q    Listen to my question.  Irreversible
24  anoxic brain injury that can cause death can occur
25  in as little as 3 minutes; correct?

Page 145

1      A    What I've been taught is 5 minutes without
2  oxygen and I'll stick to that.
3      Q    You're testifying as to what you believe
4  you were taught or what you recall being taught.
5  Being a nurse you have never made a determination as
6  to whether somebody has anoxic brain injury as a
7  medical provider; correct?
8      A    That's true.
9      Q    Being a nurse you can only assess;
10  correct?
11     A    In the legal sense of the word I will say
12  yes.  But in the instance of care unit our
13  physicians do rely heavily on the nurse's opinions
14  in the care of their patient.
15     Q    The Nurse Practices Act says the nurse
16  licensure is limited to doing assessments; correct?
17     A    It does.
18     Q    Okay.  You were not present and did not do
19  an assessment of Mr. Jones after he was pulled off
20  the toilet; correct?
21     A    No.  I had a visual assessment of what I
22  could see on camera.
23     Q    But you were not there doing the
24  assessment; correct?
25     A    No.

STEPHEN FURMAN, R.N.
July 07, 2021

Page 146

1    Q    You weren't there doing an assessment
2   while the nurses were working on him; correct?
3    A    No.
4    Q    The medical provider that actually did do
5   treatment never gave an opinion as to when anoxic
6   brain injury became irreversible; correct?
7    A    Not that I read.
8    Q    But you think being a nurse you're capable
9   of making that determination even though the health
10  care providers did not make that determination?
11   A    Those health care providers also weren't
12  at the bedside and assessed him coming off the
13  toilet.  So therefore, they didn't have no idea how
14  long he sat on the toilet, how long -- they probably
15  had no idea that Nurse Goetterman never did
16  respiratory or assisted ventilations until some 7
17  minutes after they pulled him off the toilet.
18   Q    Except now you're totally speculating.
19  You don't know what they saw, what they didn't see,
20  what they heard, what they observed; correct?
21   A    Sure.  I don't.
22   Q    The medical provider -- I'm sorry.  The
23  autopsy lists the cause of death; correct?
24   A    It does.
25   Q    All right.  And the autopsy says that he

Page 147

1   died from complications from acute alcohol
2   withdrawal; correct?
3    A    Correct.
4    Q    It doesn't say that he died of anoxic
5   brain injury; correct?
6    A    He was declared brain dead.
7    Q    That's not my question.  I'm asking you
8   what the autopsy says.  That's a simple no.  Does
9   the autopsy say he died of complications of anoxic
10  brain injury?
11   A    No.
12   Q    The autopsy says:  Medical complications
13  of chronic ethanol abuse, history of ethanol abuse,
14  alcoholic hepatitis, acute hepatitis, ischemic --
15  history of shaking, hallucinations prior to being
16  found unresponsive in the jail; correct?
17   MS. DAMICO:  He'd like to see the record
18  and then ask him about it.
19  BY MR. CHAPMAN:
20   Q    His heart was harvested; correct?
21   A    It was.
22   Q    And the autopsy also indicated that he had
23  toxic ischemic encephalopathy; correct?
24   A    Correct.
25   Q    Medical examiner says that he died of

Page 148

1   acute ethanol withdrawal; correct?  That was the
2   final diagnosis; correct?
3    A    [Sequelethol.]
4    Q    What?
5    A    [Sequelethol.]
6    Q    Okay.  In your report isn't one of the
7   criticisms that you have is that Corizon policies
8   and procedures were not followed; correct?
9    A    Correct.
10   Q    Well, you would agree with me that in
11  order for these procedures not to be followed,
12  Corizon had to have policies and procedures?
13   A    Correct.
14   Q    And if those policies and procedures were
15  followed it's your testimony the outcome might have
16  been different?
17   A    Absolutely.
18   MR. CHAPMAN:  Okay.  I have no further
19  questions.  Can we take a break before you
20  start?
21   MS. DAMICO:  Okay.  And I think Peter has
22  some questions first.
23   MR. CHAPMAN:  So you have some questions,
24  Peter?
25   MR. SMIT:  I do.

Page 149

1    MR. CHAPMAN:  Let's take a break and then
2   come back if you don't mind.
3    MR. SMIT:  10 minutes?
4    MR. CHAPMAN:  That's fine.
5    Can you mark the flash drive Exhibit --
6   what are we up to?
7    MS. DAMICO:  175.
8    MR. CHAPMAN:  Mark the flash drive Exhibit
9   175.
10            (The aforementioned flash drive
11            marked Deposition Exhibit No.
12            175.)
13
14            (After the break the following
15            testimony resumed on the
16            record:)
17            CROSS EXAMINATION
18  BY MR. SMIT:
19   Q    Mr. Furman, my name is Peter Smit, and I
20  represent the County defendants in this case.
21  Correctional officers and the like.  I'm going to
22  ask you a few questions.  If you don't understand,
23  let me know.  I'll try to rephrase it; all right?
24   A    Okay.
25   Q    As I understand it, you have never worked

STEPHEN FURMAN, R.N.
July 07, 2021

Page 150

1  at a correctional facility in any capacity?
2      A    Other than what's in our hospital where we
3  have a department of corrections unit.
4      Q    And by that I take it what you're talking
5  about is an area in the hospital that is used to
6  treat prisoners who have been transferred from such
7  a facility?
8      A    Transferred in from a state correctional
9  facility; yes, sir.
10     Q    But you've not worked in a prison or jail,
11 per se?
12     A    That is correct.
13     Q    And looking at your background it appears
14 that prior to your career in nursing you were a
15 paramedic; correct?
16     A    I was.
17     Q    Then you, I gather, went to school and
18 received training to be an RN?
19     A    That is accurate.
20     Q    Is there a particular reason you went into
21 nursing as opposed to going to medical school and
22 being an M.D.?
23     A    I have been asked that a multitude of
24 times.  And what I said to my patient just last
25 Saturday or Friday is I like, I like talking to my

Page 151

1  patients.  I like interacting.  I like teaching
2  them.  And I note that physicians will come in,
3  they'll listen to them breath, and then they're
4  backtracking right back out through the door in
5  which they arrived about 3 to 4 minutes prior to
6  that.  I don't like to function like that.  I like
7  talking to the patients.  And you find physicians
8  are usually, only the facts, ma'am.  As Joe Friday
9  said.  So that's what I didn't like so, therefore,
10 I'm happy I chose the route of nursing over the
11 route of a physician.
12     Q    But you've branched out from pure nursing
13 and interacting relationship-wise with your patients
14 into the legal world; correct?
15     A    I am still a full-time employee of the
16 hospital.  So I still work 36 to 60 hours per week
17 in the hospital.  I just added another dimension in
18 my work.
19     Q    When and why did you decide to start
20 charging and testifying for lawyers?
21     A    So some years ago one of the nurses that I
22 worked with, Linda Dunn, who also reviewed medical
23 malpractice lawsuits, and she told me that, hey, you
24 work everywhere in this hospital.  You are sometimes
25 opinionated.  And I think you would do -- and you're

Page 152

1  really smart.  And I think you would do well at
2  this.  I think you should consider it.  So I did.
3  And I made my CV look decent, and I made a fee
4  schedule.  And at that point I started applying for
5  jobs on LNCExchange which was a Yahoo blog site.
6      Q    And that has now evolved into you've done
7  maybe 200 depositions like this?
8      A    Not 200 depositions.  Just about 200 case
9  reviews.  Depositions have been, I'm not sure.
10 Maybe 55 or 57.  Somewhere in that ballpark.
11     Q    What -- is Richmond your home?
12     A    I live about an hour and 20 minutes
13 outside.  Just an hour and 20 minutes or 72 miles
14 west of Richmond.  And I live about 60 miles south
15 of Charlottesville in the middle of the woods.
16     Q    A bit reclusive?
17     A    A touch.
18     Q    Did you grow up in Virginia?
19     A    I grew up down towards Virginia Beach in a
20 city called Chesapeake which is one city over from
21 the ocean.  And I moved out of Chesapeake I believe
22 it was 2001.  The jobs up in Richmond were better
23 than what they were down in the area in which I grew
24 up.  It's a large military population so we had
25 military wives that would come in and sometimes

Page 153

1  would work for less money.  And the jobs up here
2  were better.  So we moved up in this direction.  As
3  well as land was a lot cheaper.
4      Q    As I understand it you have done a fair
5  amount of researching and reviewing articles in this
6  case pertaining to alcohol withdrawal; is that fair?
7      A    Yes, sir.
8      Q    And you've looked at a section of the
9  Lippincott manual regarding alcohol withdrawal;
10 correct?
11     A    Correct.
12     Q    Ms. Damico has provided you with the site
13 for a number of articles which you have I guess at
14 her request looked up and reviewed on alcohol
15 withdrawal; correct?
16     A    Correct.
17     Q    You have Googled on the internet CIWA and
18 information pertaining to the CIWA scale; correct?
19     A    I went to Google search.  I was wanting to
20 download a CIWA form.
21     Q    Have you particularly specialized in your
22 career on treating alcohol withdrawal?
23     A    I wouldn't say I specialized in it.  It's
24 a patient that I can potentially care for on any day
25 of the week in which I work at the bedside.  So it's

STEPHEN FURMAN, R.N.
July 07, 2021

1   just as chest pain rule out MI stroke or diabetic
2   ketoacidosis.  Those are all potential patients I
3   can care for.  So therefore, I have to understand
4   how to care for each of those.
5        Q    Have you treated -- or how many patients
6   have you treated where the only item that you
7   treated them for was alcohol withdrawal and/or DTs?
8        A    The total number of patients since I've
9   been a nurse?
10       Q    Yes.  Just alcohol withdrawals and DTs?
11  Not something where someone came in with a
12  particular medical problem, and they also had some
13  withdrawal issues.  People that you have treated
14  purely for alcohol withdrawal and delirium tremens?
15       A    I would say we're somewhere between 50 and
16  100.
17       Q    What do you mean "we?"
18       A    We I mean me.
19       Q    I mean, you're not Sybil.  So in your
20  career you've done maybe 50 to 100 alcohol
21  withdrawal patients?
22       A    Yes.  Whether they came in as a seizure
23  patient that was found to be in alcohol withdrawal
24  or, you know, they came in wanting -- we
25  occasionally have patients come into the emergency

1   department wanting detox and ask us how to detox.
2   And sometimes they are also admitted and allow our
3   substance abuse nurses to work with them.
4        Q    Are you what could generally be described
5   as a critical care nurse?
6        A    I would agree with that.
7        Q    Would you describe yourself as an ER
8   nurse?
9        A    I work in the critical care area more
10  often than the emergency room.  And my certification
11  is in critical care nursing.
12       Q    So generally, you're an emergency room
13  critical care type nurse?
14       A    Yes.
15       Q    How many ER critical care nurses would you
16  estimate are located between here and where they're
17  located by Richmond, Virginia?  Thousands?
18       A    I think our hospital employs about 20,000
19  nurses and we have several hospitals in and around
20  Richmond.  So yes, you're talking about thousands of
21  nurses.
22       Q    So out of all of these thousands of nurses
23  between where we are in Michigan and where you are
24  down in Virginia, the obvious question is why you?
25  What do you bring to this party, if you will,

1   different from all the rest of them when it comes to
2   alcohol withdrawal?
3        A    The rest of the nurses that are in and
4   around me between me and Richmond?
5        Q    No.  All the ER critical care nurses
6   between Grand Rapids and Richmond?  What do you have
7   in your background or what do you possess knowledge
8   wise and expertise wise that would mean it would
9   make sense to go all the way to Virginia to have you
10  testify instead of people in Michigan?
11            I guess the simple question is, what
12  makes you special here regarding alcohol withdrawal?
13            MS. DAMICO:  I'm going to object to form
14       and foundation.
15            THE WITNESS:  I'm not sure what makes me
16       special.  I understand alcohol withdrawal.  I
17       routinely do CIWA scoring on my patients, and I
18       understand the sequella from being without
19       benzodiazepines when you're going through
20       alcohol withdrawal.  So, you know, that's a
21       reasonably prudent nurse.  And if we're looking
22       at the standard of care what a reasonably
23       prudent nurse would be, that's what I bring
24       myself to be.

1   BY MR. SMIT:
2        Q    Critical care ER nurses in Michigan don't
3   know that?
4        A    That I'm not sure.  Because, you know, I
5   don't know.  I held my Michigan license some years
6   ago.  I just never worked in Michigan, but I had a
7   license there.
8        Q    Have you visited our fine state?
9        A    It's too cold up there for me.
10       Q    So you've never been in Michigan?
11       A    I have not.
12       Q    Does the standard of care for nursing and
13  nurses vary from region to region, state to state?
14       A    It could, yes.  I mean, you have national
15  standards of care and you have local standards of
16  care.
17       Q    Are you saying that the nurses in this
18  case breached the standard of care in Virginia or in
19  Michigan?
20       A    They breached the standard of care in
21  Michigan.
22       Q    How do you know what the standard of care
23  is in Michigan?  Or do you?
24       A    What I take from it is when I read through
25  deposition testimony of the nursing staff and what

STEPHEN FURMAN, R.N.
July 07, 2021

Page 158

1  is required of the nursing staff in those situations
2  as well as I look at the data of the areas, you
3  know, the census data that I looked at.  As well as
4  if I'm testifying against a hospital case it would
5  be, you know, the size of the hospital.
6      Q    You testified for, at least I think you
7  had, looks like at least 3 law firms in Michigan;
8  right?  Peacock, Lipton and Sheremet?
9      A    Correct.
10     Q    And those Michigan law firms all had the
11 plaintiff, the people suing?
12     A    Correct.
13     Q    Did you testify as to the standard of care
14 for the medical people in those cases?
15     A    I did.
16     Q    And how did you determine what the
17 standard of care was in Michigan?
18     A    It was -- I looked and evaluated the
19 hospital, the size of hospital between my hospital,
20 my area, the number of people in my area.  Also we
21 utilize or I utilize the discovery depositions taken
22 of the medical staff, what physicians expected, what
23 nurses expected.  And from that you can conclude of
24 what is the standard of care.  Also if you look at
25 national examinations, the ones that are given by

Page 159

1  American Association of Critical Care Nurses.  Those
2  examinations are given to us here in Virginia, you
3  in Michigan and the people out in Anchorage, Alaska.
4  We're given the exact same examinations on how to
5  care for these types of patients.
6      Q    You indicated that Mr. Jones was denied
7  access to care for 34 hours; is that correct?
8      A    That's correct.
9      Q    When did that 34 hours specifically begin?
10     A    It would begin when Deputy Cooper made a
11 phone call to -- or when she was told by Mr. Jones
12 that he felt he was going through withdrawal and
13 then the phone call in which she made to the medical
14 infirmary that he needed, you know, withdrawal
15 medication or that he was going through withdrawal.
16 And she entered into the computer system, and from
17 what I understand was an alert which should have
18 gone to the nurse, the charge nurse, and what they
19 made their withdrawal checklist from.
20     Q    And that's roughly about 10:13 in the
21 evening on April 24, 2018?
22     A    Correct.
23     Q    And then is it that early morning of the
24 26th that that 36 hours ends?
25     A    It's when Deputy Jordan stopped or asked

Page 160

1  LPN Steimel to evaluate Mr. Jones.
2      Q    That's when he started showing DTs,
3  hallucinating, confusion and the like?
4      A    It was prior to that because Deputy Jordan
5  entered a communication in their computer system
6  that he was hallucinating.  So those are signs of
7  the withdrawal and also Deputy -- I'm going to botch
8  his name so I'll apologize to him before I do that
9  P-L-U-G-G-E -- in his classification (inaudible) was
10 having signs of withdrawals.  And Deputy P-L-U-G-G-E
11 told him to tell the staff -- Plugge -- told Deputy
12 Plugge to tell the staff that he needs to be seen by
13 medical.  And that was on the 25th.  That morning
14 time was his classification (inaudible.)
15     Q    Just because someone has some sign of
16 withdrawal does that mean they need some specific
17 medication or other treatment?
18     A    Sure.  I mean, you will find that in
19 alcohol withdrawal, early recognition and early
20 intervention you'll have better outcomes.  But
21 because we waited so long to initiate intervention
22 Mr. Jones had a bad outcome.
23     Q    Does everyone that has any of the signs on
24 a CIWA score:  Little shaky hands, perspiring, a
25 little nervous, they all need to be medicated and

Page 161

1  treated?  Is that your testimony?
2      A    I didn't say they have to be medicated.
3  This is dependent on -- this is when a good history
4  and a physical would come into play.  So that's why
5  they have policies and procedures to be evaluated by
6  the registered nurse.  So once these alerts went
7  into place the registered nurse would do their Saw
8  Net, do their face-to-face encounter with the
9  patient, get a more in-depth history.  Because
10 you'll never be able to predict how severe the
11 withdrawals are going to be.  But once they cross
12 that threshold, as well as some of the peer reviewed
13 articles we have, it shows if a patient is 8 to 12
14 then they need to get this amount of medicine, and
15 they need to be re-evaluated in an hour or 2.  If
16 they're worsening then they get another dose of
17 medicine.  So those are kind of PRNs based on the
18 CIWA scoring.
19     Q    Given you are not giving an opinion
20 regarding proximate cause, I gather that you can't
21 tell us with a reasonable degree of medical
22 certainty when the last point was in this timeline
23 that Mr. Jones could have been treated and his life
24 saved; is that correct?
25     A    Like I said, it's 5 minutes without

STEPHEN FURMAN, R.N.
July 07, 2021

Page 162

1  oxygen.  So there would be a chance that he could
2  have been saved.  But once you're past that 5-minute
3  timeline that's your line in the sand not being able
4  to be saved.
5      Q   Do you have an opinion --
6          MR. CHAPMAN:  Wait a minute.  I want to
7      object to the answer as being outside his scope
8      of practice.
9  BY MR. SMIT:
10     Q   Do you have an opinion if Mr. Jones was
11 transferred to a hospital on April 26th at 6 a.m.
12 the outcome would have been different than if he had
13 been transferred to the infirmary?  Were you asked
14 to give an opinion on that?
15         MR. CHAPMAN:  Objection.  Outside the
16     scope of his practice.
17         THE WITNESS:  I didn't hear the last part
18     of your question, sir.
19 BY MR. SMIT:
20     Q   I'm asking if you were asked to give an
21 opinion in this case as to whether Mr. Jones would
22 be alive today if he had been transferred to a
23 hospital instead of the infirmary?
24         MR. CHAPMAN:  Same objection.
25         THE WITNESS:  Nobody would be able to tell

Page 163

1      you that.
2  BY MR. SMIT:
3      Q   Okay.  Do you have any expertise or
4  training in the policy, standards or procedures of
5  correctional institutions?
6      A   For correctional institutions only?
7      Q   Yes.
8      A   No.
9      Q   And you're not offering an opinion in this
10 case nor have you been asked to offer an opinion as
11 to what the officers being sued should have known
12 medically?
13     A   No.  You wouldn't expect officers to know
14 medical.  But sometimes -- obviously, Deputy Jordon
15 understood something was definitely wrong.  Because
16 one, he entered this -- after 1:00 on the 26th he
17 entered in a notification in their computer system
18 and then he flagged down an LPN doing withdrawal
19 checks at or about 4 a.m.  So obviously, he
20 recognized something was grossly wrong with
21 Mr. Jones and asked for somebody to be seen.
22     Q   My question was --
23     A   I'm answering your question.
24     Q   No, no, no, you're not.  I asked if you've
25 been asked to give an opinion on that by Ms. Damico?

Page 164

1      A   No.
2      Q   In your review of the documents and the
3  testimony in this case would you say that Mr. Jones
4  was candid about his alcohol use at intake?
5      A   On intake it doesn't appear by what's
6  documented.
7      Q   And did you review information where
8  Officer Plugge advised Mr. Jones to contact the
9  medical people when they came around?
10     A   Exactly.  I saw that.  And that's what I
11 just told you.  But he had no access.  He stood in
12 front of Deputy Grimmett I believe to try to get
13 medical, but he appeared to be ignored.
14     Q   So from that point until his transfer to
15 the infirmary is it your testimony he was denied
16 access or proximity to any of the medical people?
17     A   He was denied access.  There's no call
18 bell in his cell.  He couldn't reach out and call
19 the medical people himself.  It was merely by
20 observation by Deputy Jordan that actually got the
21 medical people involved in the first place.  If
22 Deputy Jordan would have never contacted the medical
23 people or asked LPN Steimel to evaluate Mr. Jones he
24 would never have been evaluated.
25     Q   If you're a nurse and you're in Mr. Jones'

Page 165

1  cell to give him his medication and he refuses, what
2  are your options?
3      A   Your options are at that point if anybody
4  refuses medication the first thing you do is you try
5  to educate them on why they are taking that
6  medication.  And you also are evaluating their
7  capacity to understand or making an attempt to
8  evaluate their capacity to see if they understand
9  the ramification of their actions.
10     Q   What's your next option once you've done
11 those two?
12         MS. DAMICO:  Let him finish.
13         MR. SMIT:  Sorry.
14         THE WITNESS:  So once you evaluate and
15     then you have to advance past that as almost a
16     medical TPO and get a forced medical order from
17     a judge.  And then after that, obviously, it
18     would be transport a patient to the emergency
19     department so we can establish IV access and
20     give it to him through IV.
21 BY MR. SMIT:
22     Q   What if the inmate refuses to go to the
23 hospital?
24     A   It depends.  If he's disoriented to any of
25 the person, place, time or events then he's

STEPHEN FURMAN, R.N.
July 07, 2021

Page 166

1  disoriented and can't make his own decisions at that
2  point.
3      Q    Based on everything you reviewed in this
4  case, all the testimony, all the documents, did you
5  see anything where Mr. Jones specifically requested
6  to see medical?
7      A    I did.
8      Q    Where is it?  This is where he said:  I
9  want to see medical?
10     A    So it was -- well, one would be with
11 Deputy Cooper's deposition.  Are you asking about
12 deposition transcripts or just medical records?
13     Q    I'm asking anything where someone
14 testified that he specifically said I need or I want
15 to see medical?
16     A    So he was asking for help.  Deputy Cooper
17 and I believe it was Lieutenant [Culmins'] report.
18     Q    Kelman?
19     A    Kelman.  I apologize for botching their
20 names.
21     Q    That's fine.  These Michigan names.  So do
22 you have a site where he said:  I want to see
23 medical?  You're saying he told Julie Cooper he
24 wanted to see medical?
25     A    He stated he was going through

Page 167

1  withdrawals.  So that's an implication he wanted to
2  see medical.
3      Q    I'm not asking for implications.  I want
4  to know if there's anything you can site me to where
5  he specifically asked to see medical the whole time
6  he was there?
7      A    Nobody took any direct quotes from him so
8  no.
9      Q    On page 3 of your report, Exhibit 174, you
10 say:  I can comfortably state -- middle of that big
11 paragraph under Background and Qualifications:  I
12 can comfortably state there are hundreds of patients
13 whom I have cared for in various stages of alcohol
14 withdrawal as well as potentially going into
15 withdrawals.  Correct?
16     A    Correct.
17     Q    Wouldn't that be true of virtually any ER
18 nurse that's practiced 5 or 10 years?
19     MS. DAMICO:  Object to form, foundation.
20 BY MR. SMIT:
21     Q    That's not an unusually high number for an
22 ER nurse; is it?
23     MS. DAMICO:  There's no number in that
24 question.
25

Page 168

1  BY MR. SMIT:
2      Q    Can you answer?
3      A    Some -- I mean, you take care of some and
4  not everybody is in alcohol withdrawal.  You might
5  get one a shift.  You might get one every other
6  shift.
7      Q    What I'm saying is that you aren't
8  abnormally more than a comparable ER nurse; fair?
9      A    Sure.
10     Q    When were the withdrawal checks scheduled
11 at the facility based on your review?  What hours?
12     A    Looks like they were done at about 4:00 in
13 the morning, right around 1:00 in the afternoon, and
14 I believe it was 7:00 at night.
15     Q    And the first one that took place was
16 4 a.m. on the 26th; correct?
17     A    That's correct.
18     Q    And then there was another one roughly at
19 1:00, give or take?
20     A    Correct.
21     Q    Another one at 7:00 that evening?
22     A    Correct.
23     Q    And the next one was 4:00 the morning of
24 the 27th; correct?
25     A    It's documented, yes.

Page 169

1      Q    And then there was Officer Jordan radioed
2  medical, and he was transferred to the infirmary at
3  about 6 a.m.?
4      A    True.  He radioed about 5 a.m. and was
5  transferred at 6 a.m.
6      MR. SMIT:  That's all I have.  Thank you,
7  sir.
8      THE WITNESS:  Thank you.
9      MS. DAMICO:  I have a few questions.
10              CROSS EXAMINATION
11 BY MS. DAMICO:
12     Q    Mr. Furman, you wrote a 16-page report in
13 this case; correct?
14     A    I did.
15     Q    And you came here prepared today to
16 testify about all your opinions in this case;
17 correct?
18     A    Yes, ma'am.
19     Q    In your report you wrote very detailed
20 opinions regarding the seven nurses, RNs and LPNs
21 that are defendants in this case; correct?
22     A    Yes, ma'am.
23     Q    And with respect to each of those LPNs,
24 and RNs in your written opinion you categorized them
25 in your report in Paragraphs 1 through 7; correct?

STEPHEN FURMAN, R.N.
July 07, 2021

Page 170

1    Each nurse has their own category?
2        MR. CHAPMAN:  Object to the form and
3    foundation.
4    BY MS. DAMICO:
5        Q    Is that true?
6        A    True.
7        Q    And with respect to each nurse, your
8    opinions are based on detailed facts and evidence
9    that you reviewed in this case; correct?
10       MR. CHAPMAN:  Object to the form and
11       foundation, leading.
12       MS. DAMICO:  I'm allowed to lead.
13       MR. CHAPMAN:  No, you're not.  Go ahead.
14       THE WITNESS:  Yes.
15   BY MS. DAMICO:
16       Q    Okay.  And during -- you were prepared to
17   testify with respect to your opinions today with
18   respect to each particular nurse; correct?
19       A    Yes, ma'am.
20       Q    Okay.  And, in fact, during examination by
21   Mr. Chapman you were asked very little with respect
22   to the specifics of your opinion with respect to
23   each nurse; correct?
24       MR. CHAPMAN:  Object to form and
25       foundation.

Page 171

1        THE WITNESS:  Yes, ma'am.
2    BY MS. DAMICO:
3        Q    For example, were you asked your opinion
4    about what Nurse Mollo, whether Nurse Mollo breached
5    the standard of care?
6        A    No.
7        Q    Were you asked whether Nurse Mollo did
8    anything else with respect to outside the standard
9    of care, whether he did anything you felt amounted
10   to not using medical judgment?  Were you asked any
11   questions about that by Mr. Chapman?
12       A    No.
13       Q    Were you asked whether any of his conduct
14   was egregious or if any of his conduct was reckless?
15       A    No, ma'am.
16       MR. CHAPMAN:  Objection to form and
17       foundation.
18   BY MS. DAMICO:
19       Q    Was that included in your report?
20       MR. CHAPMAN:  Objection to form and
21       foundation.
22       THE WITNESS:  It was.
23   BY MS. DAMICO:
24       Q    Okay.  In fact, you spent quite a bit of
25   time detailing all the things that Mr. Mollo did in

Page 172

1    his care and treatment of Mr. Jones that you found
2    either breached the standard of care or you found
3    was outside of the nursing norms based upon your
4    skill, experience and training?
5        A    Correct.
6        Q    Okay.  And that's true with all the
7    nurses; correct?
8        A    Yes, ma'am.
9        Q    Okay.  And what's contained in your report
10   are all the things you plan on testifying to at
11   trial; correct?
12       A    Yes, ma'am.
13       Q    And you'll sign an affidavit to that
14   effect because you weren't asked to testify today
15   regarding everything contained in your report; is
16   that true?
17       MR. CHAPMAN:  Object to form and
18       foundation.
19   BY MS. DAMICO:
20       Q    Is that true?
21       A    Yes, ma'am.
22       Q    The dots that you were asked to point out
23   in your report, those dots aren't all your opinions
24   in this case, the dots that you marked in your
25   report?

Page 173

1        MR. CHAPMAN:  Object to form and
2        foundation, leading.
3        THE WITNESS:  No.  It's just for easy
4        reference.
5    BY MS. DAMICO:
6        Q    Okay.  You were asked a number of
7    questions regarding CIWA and CIWA scores; correct?
8        A    Correct.
9        MR. CHAPMAN:  Object to form, foundation.
10   BY MS. DAMICO:
11       Q    If a person cannot get answers from a
12   patient if they're not being cooperative or they
13   can't answer questions, is there any other way to
14   get an accurate or objective CIWA scoring?
15       A    For the objective signs?
16       Q    Uh-huh.
17       A    Sure.
18       Q    What would that be?
19       A    Touch the patient.
20       Q    Okay.  Is there anything else you could do
21   to get objective signs?
22       A    They could do vital signs, touch the
23   patient for diaphoresis unless they see diaphoresis.
24   Tremors.  You can see tremors.
25       Q    What nurse did you find in your review

STEPHEN FURMAN, R.N.
July 07, 2021

Page 174

1  that did or did not take vital signs when they did
2  their CIWA analysis?
3      A    A complete set of vital signs, no nurse
4  did it except for 5:30 in the morning on 5/27, the
5  day he died or the day he cardiac arrested.
6      Q    And which nurse did that?
7      A    Nurse Furnace.
8      Q    And that was her -- was that her first,
9  second or third encounter with Mr. Jones,
10  face-to-face encounter?
11      A    It was her first.
12      Q    First and only; is that true?
13      A    Yes.
14      Q    And it's your testimony that none of the
15  other nurses, LPN ever completed a full set of vital
16  signs on Mr. Jones?
17          MR. CHAPMAN:  Objection.  Leading.
18          THE WITNESS:  They did not.
19  BY MS. DAMICO:
20      Q    Of all the exhibits that are in this file
21  and the articles, which ones did you rely on in
22  formulating your opinions today?
23      A    I relied on all of them.
24      Q    Okay.  And can you explain to me, you
25  testified something about locality standards in

Page 175

1  Michigan is the locality standard.  What do you mean
2  by that?
3      A    It's just a standard of care, a local
4  standard of care versus a national standard of care.
5  So some states practice a national standard of care
6  so it's what the body in the country would do.  And
7  then sometimes it's the local standard of care.
8  They isolate to this one particular area, and it
9  would be what those people would do in the same or
10  similar circumstances as well as, you know, you're
11  looking at the same size facility, population is
12  what I understand it to be.
13      Q    Okay.  And you've testified in Michigan
14  cases before and you've been qualified to testify in
15  the locality in which the hospital and doctors in
16  which you were asked to testify?
17          MR. CHAPMAN:  Object to form and
18      foundation.
19          THE WITNESS:  Yes.
20  BY MS. DAMICO:
21      Q    And that's why you looked at that census
22  information?
23      A    Correct.
24      Q    Okay.  And you believe that the locality
25  in which you practice is the same or similar to the

Page 176

1  locality of Grand Rapids or Kent County?
2      A    Yes.
3      Q    And the nursing practices are the same or
4  similar here to what they are in Kent County?
5      A    Correct.
6      Q    Do you have any reason to believe that the
7  standard of care would be any different here in
8  Richmond than it is in Kent County or the Grand
9  Rapids area?
10      A    It doesn't appear to be, no.
11      Q    Okay.  And you base that upon what?
12      A    My review of the records and my review of
13  both the discovery depositions and locality census.
14      Q    Did you review any infirmary records?
15      A    Yes.
16      Q    You did.  Specifically from the infirmary?
17      A    Those records from the -- the infirmary
18  was the video tape and that was it.  There was no
19  infirmary records for when he was admitted on the
20  27th at 6 a.m.
21      Q    Okay.  And you're talking about infirmary
22  medical records?
23      A    Correct.
24          MS. DAMICO:  Okay.  I have nothing
25      further.

Page 177

1          MR. CHAPMAN:  We're done.  Unless Peter?
2          MR. SMIT:  I'm done.
3
4
5          (Exhibits retained by Counsel.)
6          (Proceedings concluded at 2:48 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STEPHEN FURMAN, R.N.
July 07, 2021

Page 178

```
 1              C E R T I F I C A T E

 2

 3    Commonwealth of Virginia,

 4    Chesterfield County, to-wit:

 5              I, Mary E. Donivan, a Notary

 6    Public for the Commonwealth of Virginia at Large, do

 7    hereby certify that the witness, STEPHEN FURMAN,

 8    was duly sworn to tell the truth in the cause

 9    aforesaid at the time and place specified in the

10    foregoing caption.

11              Further, that this transcript

12    is, to the best of my ability, a true and accurate

13    record of the testimony given.

14              I do hereby further certify that I

15    am not a relative, counsel or attorney of either

16    party or otherwise interested in the outcome of this

17    action.

18                   Given under my hand this 20th day

19    of July, 2021.

20

21         --------------------------------

               Mary Elizabeth Donivan

22

23

24    Virginia Notary Registration No. 270874

25    My commission expires

      May 31, 2024.
```

STEPHEN FURMAN, R.N.
July 07, 2021

**$**

**$1,000**
60:5,15

**$5,500**
60:10

**$6,520**
60:18

**0**

**06**
26:6

**08**
112:7

**09**
26:6

**1**

**1**
15:5 48:12
66:17 76:10,12
81:21 89:5
90:5,10 91:9,
11 125:20
126:21 141:17,
25 142:21,23,
25 169:25

**1,120**
51:9

**1.5**
111:25

**1.59**
110:22

**1/2**
8:4 127:23

**10**
22:2 47:2 61:9
76:6 93:22

103:8,17
112:15 149:3
167:18

**100**
6:1 7:24 8:5
9:20 10:2
30:6,9,17
154:16,20

**104**
129:8

**108**
9:25 10:2

**10:00**
37:19,21

**10:13**
94:1 159:20

**11**
65:9 130:10
133:17

**12**
9:25 15:11
21:9,11,22,25
22:2,5,7,10
67:18 68:25
88:4 121:19,25
123:24 133:21,
24 134:8,17
161:13

**12-hour**
21:6,7,24 22:4

**121**
95:6

**13**
123:24 134:21
135:7,8

**132**
4:12

**14**
135:7 136:11

**144**
48:12,20

**149**
3:6 4:13

**15**
17:16 18:21,
22,23 21:3
81:20,24 112:1

**158**
3:12 58:1,2,6

**159**
3:13 59:3,5,11
61:2 110:15
111:9 112:9
115:8 117:16,
21

**16**
90:19

**16-page**
169:12

**160**
3:14 60:21,23
61:1,3

**161**
3:15 64:13,18
67:6

**162**
3:17 66:14,15
67:1,2

**163**
3:18 68:23
69:5

**164**
3:19 70:15,16,
24 71:2

**165**
3:21 71:14,21
72:7 73:3

**166**
3:22 73:10,12,

16,18

**167**
3:24 74:22
75:4,8,10,16
78:15,16

**168**
4:3 78:21,24,
25 79:5,7,12

**169**
3:8 4:5 82:21,
24 83:3

**170**
4:7 85:17,20

**171**
4:8 86:2,5
88:11 89:4
100:12

**172**
4:9 88:3,9
101:11 102:25

**173**
4:10 91:21,25
92:8 141:4
142:9

**174**
4:12 132:9,12,
17 167:9

**175**
4:13 149:7,9,
12

**18**
67:18 68:25

**1:00**
163:16 168:13,
19

**1:30**
125:15

**1st**
20:24

STEPHEN FURMAN, R.N.
July 07, 2021

**2**

**2**
8:4 9:17 15:14
18:12 19:6
20:10 21:20
26:21,23 40:12
46:17 47:10
58:8 59:16
60:22 63:11
76:1,17 86:2
89:5,6 91:14
99:20 102:9
111:19 112:9
115:5 125:21
133:22 134:2,
13 136:21
137:24 142:21
143:2 144:8
161:15

**2-hour**
40:9

**20**
17:16 18:21
110:1 152:12,
13

**20,000**
155:18

**200**
8:3 10:2,4
152:7,8

**2001**
152:22

**2004**
15:3

**2013**
24:23

**2015**
51:5

**2018**
7:24 9:19

159:21

**2019**
59:21 65:20

**2020**
12:3 64:15

**2021**
9:20 12:14

**209**
80:16

**21**
64:15 90:19

**21st**
63:20

**22**
59:21 95:6

**22nd**
60:2

**24**
159:21

**25**
59:14 90:20

**25th**
160:13

**26th**
123:6 159:24
162:11 163:16
168:16

**27th**
130:19 168:24

**2:00**
37:19 125:16,
17

**3**

**3**
9:25 21:13
56:7 76:5
77:5,15,17

89:5,7 90:15
99:19 101:3
106:4 142:21
144:7,25 151:5
158:7 167:9

**30**
10:8

**30-compression**
137:24

**319**
5:2

**34**
68:20 159:7,9

**36**
9:25 98:17
151:16 159:24

**38**
68:12

**4**

**4**
9:12,18 11:11
15:8,9 17:17
18:3,15,16
21:8,15,19,21
22:4,7,17,19,
20 52:6,8 56:7
89:5 101:3
103:18 111:19
134:4,8,9
142:21 151:5
163:19 168:16

**4-hour**
21:4

**4/10/21**
13:19

**4/24**
93:20

**4/26**
122:14 124:15

**4/26/18**
121:20,25
124:1,18

**4/26/2018**
124:8

**40**
18:22 46:20,
22,24 47:1

**48**
9:14

**4:00**
107:19 168:12,
23

**5**

**5**
3:4 9:18,21
11:11 18:3,15,
16 82:9 89:5,
10 90:16,22
91:10 101:3
122:4,8
133:21,25
134:8,13
137:10,11,12,
17,25 138:6
142:21 145:1
161:25 167:18
169:4

**5,000**
60:17

**5-minute**
144:2 162:2

**5/27**
174:4

**50**
5:25 33:17
47:5,24 81:20
109:25 154:15,
20

STEPHEN FURMAN, R.N.
July 07, 2021

**500**
  51:24

**55**
  6:2,3,5  152:10

**57**
  152:10

**58**
  3:12

**59**
  3:13

**5:30**
  125:23  174:4

---

**6**

**6**
  18:3,16  21:25
  22:1,5  65:9
  89:5,10  101:3
  112:14  115:22
  135:13  162:11
  169:3,5

**6,000**
  60:16

**60**
  9:14  18:23
  151:16  152:14

**61**
  3:14

**64**
  3:15

**66**
  3:17

**69**
  3:18

**6th**
  58:13

---

**7**

**7**
  18:16  76:8
  89:5,13  92:4
  112:14  115:22
  127:23  146:16
  169:25

**70**
  3:19  10:8

**71**
  3:21

**72**
  152:13

**73**
  3:22

**75**
  3:24

**79**
  4:3

**7:00**
  168:14,21

**7th**
  58:14,15

---

**8**

**8**
  15:10  21:21
  22:5,7  39:11
  80:18  93:2,7
  161:13

**8-hour**
  21:5

**82**
  4:5

**85**
  4:7

**86**

**4:8**

**88**
  4:9

**8:49**
  92:11  93:20

**8A**
  49:17

---

**9**

**9**
  93:2,7  133:13

**91**
  27:20

**911**
  130:13

**92**
  4:10

**95**
  11:8,10

**96**
  110:14,21

**97**
  27:20

---

**A**

**a.m.**
  162:11  163:19
  168:16  169:3,
  4,5

**ability**
  96:20  121:14,
  17  131:7

**able**
  14:15  24:1,4,
  21  29:24  38:19
  54:9  98:7
  161:10  162:3,
  25

**abnormally**
  168:8

**above**
  62:15  81:6,24
  133:18,21,24
  134:8  135:9,16

**absence**
  76:21

**absolutely**
  22:20  36:25
  81:3  123:10
  148:17

**abstract**
  3:21  71:13,23
  72:17

**abuse**
  147:13  155:3

**accept**
  22:12  38:2

**accepted**
  13:14

**access**
  68:4,7,8,15
  69:2  159:7
  164:11,16,17
  165:19

**accident**
  20:8  24:9

**accompanying**
  42:9

**accredited**
  14:5

**accurate**
  108:18  109:8
  150:19  173:14

**accurately**
  32:16  44:25
  100:5  108:25
  109:3

STEPHEN FURMAN, R.N.
July 07, 2021

acknowledge
 104:20

act
 5:3 32:16
 35:17 127:7
 145:15

actions
 39:17 165:9

actual
 61:24 72:7
 83:9 87:2 88:1
 105:15,16
 116:22

actuality
 131:10

acute
 3:23 73:7
 118:1,14,16
 119:3,9,14,18
 147:1,14 148:1

added
 151:17

Addiction
 3:21 71:12

address
 136:23

adjust
 13:2

adjustments
 10:24

administration
 25:14

admittances
 42:18

admitted
 23:5 155:2

adult
 25:2 26:14

adults

advance
 165:15

advanced
 137:18

advise
 110:4

advised
 116:9,14 164:8

advocate
 33:14

affect
 109:9

affidavit
 54:23 55:7,12,
 23 62:24
 172:13

affidavits
 47:17

aforementioned
 58:4 59:9
 60:24 64:16
 66:24 69:3
 70:22 71:19
 73:14 75:6
 79:3 83:1
 85:18 86:3
 88:7 92:6
 132:10 149:10

afternoon
 168:13

aggregate
 9:18

agitation
 76:7 77:22,23
 88:24

ago
 11:5 12:3
 24:11,15 56:7
 69:25 103:18

16:12

106:4 119:23
132:20 151:21
157:6

agree
 8:24 9:16 10:1
 44:2 56:10
 80:23 99:8,21
 100:4,10,24
 101:21,24
 108:5 111:3,21
 112:4,9,12
 121:13,21,22
 122:13,17
 123:22 126:1,
 2,6,15 130:3,
 8,17 131:21
 133:20 143:20
 148:10 155:6

agreed
 55:10 57:16
 117:3

ahead
 56:15 95:22
 99:16 121:25
 170:13

Alaska
 159:3

alcohol
 3:17,20,23 4:5
 18:13 20:18
 22:22 23:1,2,
 11,12,16,19
 25:11 26:17
 51:17 52:4,13,
 15,17,20,25
 65:2 66:19,20
 67:5 69:8 72:2
 73:8 74:25
 75:2 77:7
 79:17,20,21,24
 80:18,24 81:1,
 2,5,11 82:19
 83:22 85:24

87:21 111:1,5,
 9,14,15,18,25
 112:7 115:8
 117:5,9,11
 120:25 121:3
 127:3,4 147:1
 153:6,9,14,22
 154:7,10,14,
 20,23 156:2,
 12,16,20
 160:19 164:4
 167:13 168:4

alcoholic
 17:14 80:24
 81:11,19,20
 115:21 147:14

alcoholics
 72:2 81:4

alert
 94:3,5,6,8,11
 95:9,13 96:12,
 19 159:17

alerts
 94:10 95:14
 98:1,8,18 99:2
 161:6

algorithm
 132:2 137:21
 139:8

algorithms
 28:8,9

alive
 162:22

alleged
 92:11

allegedly
 93:20

Allen
 7:20

allow
 14:11 155:2

STEPHEN FURMAN, R.N.
July 07, 2021

allowed
  38:17 170:12
Ambu
  137:17,24
  138:4,7,18
  139:3,5
American
  13:11,13 139:7
  159:1
amount
  127:6 153:5
  161:14
amounted
  171:9
amounts
  115:22 117:5,9
anal
  143:7
analysis
  174:2
anaphylactic
  28:18
Anchorage
  159:3
ancillary
  50:22
and/or
  26:17 33:14
  154:7
anesthesia
  25:9,24 26:12
angle
  64:4
angry
  27:15
annotated
  62:3,7 69:21
anoxic
  138:15,23

139:12,17,23,
  25 140:5,9,14,
  22 143:23
  144:6,7,10,12,
  21,24 145:6
  146:5 147:4,9
answer
  6:5,15 7:2
  40:22,23,25
  41:1,8 49:9
  72:22 91:5
  97:2,3,8
  102:3,8,9,19
  104:6 107:3,18
  108:24 109:3
  119:5 129:10
  143:15 144:18
  162:7 168:2
  173:13
answered
  29:12 108:22
answerer
  114:12
answering
  17:24 99:24
  101:25 108:12
  163:23
answers
  33:22 48:3,4,
  9,10 82:1
  108:18 173:11
anticipate
  61:10 123:17
anxiety
  72:3 89:18,19,
  23 90:10 91:9,
  10,11 103:1
anxious
  89:22,24 90:11
  102:8
anybody
  44:19 165:3

anybody's
  94:17
anymore
  12:24
anyone
  50:10
apart
  78:17
apologize
  160:8 166:19
appeared
  111:8,22
  122:15 164:13
appears
  67:12 83:15
  123:14 150:13
applying
  152:4
appointments
  7:15
appreciate
  19:16
approaching
  8:3
appropriate
  123:21
appropriately
  18:2 135:11
April
  12:14 63:20
  159:21 162:11
area
  76:14 77:9,16
  85:4 150:5
  152:23 155:9
  158:20
areas
  80:6,16 84:21
  132:21 133:14

anybody's
158:2
argued
  137:5
arguing
  40:16
argumentative
  49:1
arm
  24:9 89:14
arms
  89:13
around
  8:6 14:12 27:7
  111:25 125:20
  155:19 156:4
  164:9 168:13
arrest
  138:16 140:1,
  2,6
arrested
  174:5
arrive
  75:14 113:5
arrived
  110:22 151:5
arrows
  62:12
article
  3:22,24 4:3,5
  11:18 69:24
  70:2,3,5,9,18
  71:3,6,7
  72:13,17 73:6,
  22 74:8,16
  82:19 83:6,8,
  9,15
Article-
  3:19
articles
  70:10 88:19

STEPHEN FURMAN, R.N.
July 07, 2021

153:5,13
161:13 174:21

**artificial**
137:16

**asked**
29:12 36:15
57:13 101:13
108:21 114:3,
4,6,7,9,10
115:1,13
118:21 119:23
123:12 124:9
127:1,6 132:23
143:13 150:23
159:25 162:13,
20 163:10,21,
24,25 164:23
167:5 170:21
171:3,7,10,13
172:14,22
173:6

**asking**
19:17 35:14
37:17 72:16
73:2 82:2,4
84:23 93:6
102:7 116:13,
14 120:6,16
123:1,5
126:11,12
147:7 162:20
166:11,13,16
167:3

**aspect**
113:20

**aspects**
103:5

**assess**
103:5 126:18
145:9

**assessed**
68:13 105:14

146:12

**assessing**
102:25 126:3
137:21

**assessment**
3:25 51:19
74:25 85:24
99:24 102:1
103:9 107:14,
21,22,23,24,25
108:13,14
145:19,21,24
146:1

**assessments**
102:21 145:16

**assignment**
19:4

**assist**
108:6

**assistant**
58:18

**assisted**
146:16

**assisting**
19:5 144:3

**Association**
13:11,13,14
139:7 159:1

**association's**
13:21

**assume**
5:23 27:20
29:23 87:17
111:9 128:1
131:5

**Assuming**
98:21

**assuring**
25:8

**attached**
59:22 86:24

**attempt**
136:17 165:7

**attempted**
100:15

**attend**
68:10

**attending**
34:22

**attention**
99:15

**attitude**
35:11 36:17

**attorney**
8:19 57:1

**attorney's**
8:25

**attorneys**
10:18 56:8

**audibly**
6:6

**audio**
10:23 128:17

**auditory**
122:6

**Audrey**
10:21

**August**
64:15

**automatically**
95:13

**autopsy**
117:23 118:9
120:1 146:23,
25 147:8,9,12,
22

**available**

42:8 95:4 98:6

**aware**
94:7 110:20,24
112:6 127:12,
13,20

---

**B**

**BAC**
81:24

**bachelor**
12:12

**bachelor's**
12:7 13:23,25

**back**
9:12 36:19
42:18 57:2,8
88:11 104:19
143:14,16
149:2 151:4

**background**
150:13 156:7
167:11

**backtracking**
151:4

**bad**
43:13 160:22

**badger**
97:7

**badgering**
97:9

**bag**
137:17 138:4,
7,18 139:3,5

**ballpark**
8:9 10:7 21:2
152:10

**banner**
95:3 96:23
97:13,17,21

STEPHEN FURMAN, R.N.
July 07, 2021

98:23

**bare**
62:4

**barely**
90:6

**barrier**
76:21

**base**
26:1 117:11,
12,16,20

**based**
37:14 45:3
74:12 100:16
101:15 161:17
166:3 168:11
170:8 172:3

**baseline**
81:6 111:11

**basic**
137:20 139:7

**basically**
87:6 110:11

**basis**
112:25

**Beach**
152:19

**beads**
90:6 101:7

**bedside**
146:12 153:25

**beep**
95:24

**befriend**
105:4

**Began**
124:8

**begin**
80:18 159:9,10

**beginning**
15:1 98:3

**behalf**
5:12,14

**belief**
95:13 97:16
106:24

**beliefs**
35:9

**believe**
10:22 11:22
31:19,22,24
40:14 47:21
48:6 62:18
64:3 66:16
68:20 71:14
73:9 74:21
78:20,24 96:10
105:18,20
109:2 114:12
115:13 116:24
121:16 134:9,
14 136:11,20
141:10,19
145:3 152:21
164:12 166:17
168:14

**bell**
164:18

**below**
23:12 77:8,16
81:1,21
117:12,21
135:23 144:2

**Benadryl**
28:20

**benzodiazepine**
4:6 52:13,17,
20

**benzodiazepines**
82:20 83:16,
19,22 156:19

**beside**
133:2 139:3

**best**
28:15 58:23
59:1 104:21,22
110:8

**Beta**
13:14

**better**
152:22 153:2
160:20

**big**
41:14,17
167:10

**bill**
46:13,20 61:9

**billed**
47:4 60:16

**billing**
3:14 47:5
61:3,6

**bit**
26:15 27:9,22
87:22 94:9
99:13 105:4
106:1 107:11
108:9 152:16
171:24

**blanket**
54:8

**blind**
135:5

**blog**
152:5

**blood**
23:11,12 25:25
33:18 36:12,13
41:23 77:23
80:18,24 81:5,
19 109:20

**beside**
111:4,14,18,24
112:7 115:8
117:11

**book**
14:22

**botch**
160:7

**botching**
166:19

**bottom**
63:24 71:17
91:25 122:4,8
133:14

**bounce**
27:7

**box**
78:9 143:2

**boxes**
62:12

**brackets**
78:23

**brain**
138:15,23,24
139:17 140:9,
14,22 144:7,
11,24 145:6
146:6 147:5,6,
10

**branched**
151:12

**brand**
22:12

**breach**
9:11

**breached**
132:22 133:6
134:14 157:18,
20 171:4 172:2

**breaches**
136:24

STEPHEN FURMAN, R.N.
July 07, 2021

**break**
  6:24,25 7:5,7,
  10 12:22
  54:13,16
  82:12,14
  148:19 149:1,
  14

**breath**
  137:25 151:3

**breathing**
  139:22

**bring**
  20:14 24:19
  155:25 156:23

**bringing**
  20:9

**British**
  3:21 71:12

**broad**
  132:24

**brought**
  129:19 130:25

**BS**
  13:8

**BSN**
  14:17

**build**
  105:9

**built**
  105:21

**bunch**
  46:1

**burden**
  109:2

**Byrne**
  113:18 114:11

---

**C**

**calculated**
  68:19,20

**call**
  16:1 35:11
  64:20,22 68:24
  92:11,17,19,20
  93:20 111:4
  127:10 130:13,
  18 131:10,15,
  16,22 159:11,
  13 164:17,18

**call-outs**
  62:12

**called**
  5:5 39:25 69:8
  74:24 80:25
  82:19 88:3
  96:23 152:20

**calling**
  98:24

**calls**
  43:6

**camera**
  64:4 145:22

**candid**
  164:4

**capable**
  146:8

**capacity**
  38:13,15 39:2
  150:1 165:7,8

**car**
  20:7 24:9

**Card**
  107:9 136:10,
  16

**Card's**

---

  136:12

**cardiac**
  15:20 137:18
  138:15 140:1,
  2,6 174:5

**care**
  8:21 9:11
  10:10 11:4,7,
  9,12 13:12
  16:5,23 17:4
  18:1 19:3,4,25
  20:1,3,4 26:12
  31:25 37:15
  38:2,10 43:22
  44:3,7,13,22,
  25 45:5 50:4
  53:4 54:7 57:3
  65:12,18 68:2,
  4,7,8,13,16
  69:2 80:7
  84:10,13,18
  85:2,7 108:5,
  19 109:10,13
  110:3 119:6
  123:9 126:4
  132:22 133:3,6
  134:10,14
  136:25 145:12,
  14 146:10,11
  153:24 154:3,4
  155:5,9,11,13,
  15 156:5,22
  157:2,12,15,
  16,18,20,22
  158:13,17,24
  159:1,5,7
  168:3 171:5,9
  172:1,2

**cared**
  167:13

**career**
  27:2 150:14
  153:22 154:20

---

**carried**
  32:13 34:6,11
  37:2,8,11,14
  126:8

**carry**
  32:2,4,9,16,21
  33:10,13 62:13
  88:17

**case**
  8:16,18,20
  9:2,3,6,7
  11:14 17:2
  28:12 33:24
  48:7 50:6,9
  51:14 54:9
  55:11,19 57:21
  62:1 69:13,16
  80:8 84:6,16
  132:25 149:20
  152:8 153:6
  157:18 158:4
  162:21 163:10
  164:3 166:4
  169:13,16,21
  170:9 172:24

**cases**
  8:5,11,13
  9:14,17,20
  10:4,10,11,14,
  17,18,19 11:3,
  11 37:1 158:14

**catalog**
  42:17

**cataracts**
  135:5

**categories**
  86:20 87:5
  101:13 103:8

**categorized**
  169:24

**category**
  89:4 170:1

STEPHEN FURMAN, R.N.
July 07, 2021

causation
  120:5

caused
  122:20 137:1
  138:10

causing
  118:10

cell
  107:9 164:18
  165:1

census
  4:7 84:12,17
  158:3

center
  15:2,5 17:4
  26:6,13 27:4,5
  140:5 144:15

central
  121:3,7

CEO
  34:20

certainly
  125:23

certainty
  139:16,20
  140:8,21
  143:22 161:22

certification
  13:9 155:10

certifications
  12:16

cetera
  102:12 123:8

chain
  3:13 33:15

chairman
  34:16

Chamberlain
  14:4,5

chance
  162:1

change
  12:15 32:23,25
  35:17 62:19
  113:4 126:24

changed
  12:4,6

changes
  13:6,7 56:11,
  17 57:10,12,
  14,16 113:15

Chapman
  3:4 5:11,17
  11:2 12:21,25
  13:5 19:8,12,
  19,20 29:14
  30:1 36:9
  43:14 44:10
  46:21 49:6,8
  53:1 54:15,19
  56:14 57:23
  58:2,10,14,16
  59:2,4,12
  60:19,22 61:5,
  7 63:10,19
  64:11,21,23
  66:12,15,21
  67:4,11 69:6
  70:13,16,18
  71:1,14,16,22
  72:4,23 73:1,
  9,12,17 74:21,
  24 75:9 78:24
  79:6 82:7,10,
  17,21,23 83:5
  85:10,15,21
  86:1,7 87:1,4,
  10,14,16 88:1,
  6,10 91:20,23
  92:9 95:5,18,
  21 96:9,15,16,
  25 97:5,9,11
  100:9 107:17

109:1 110:19
  112:3 114:19,
  22,25 115:3
  118:8,15
  120:6,9,15,18
  122:8,10 123:4
  124:6,7,11
  132:8,13
  133:24 134:1,
  18,19,24 135:2
  138:8 140:19
  141:1,3
  143:12,18
  144:22 147:19
  148:18,23
  149:1,4,8
  162:6,15,24
  170:2,10,13,
  21,24 171:11,
  16,20 172:17
  173:1,9 174:17

chapter
  3:17 67:4

charge
  159:18

charging
  151:20

Charlottesville
  152:15

chart
  52:8 86:9

charting
  24:16

charts
  87:7

cheaper
  153:3

check
  99:7

checklist
  98:8 99:3

159:19

checks
  98:2,18 163:19
  168:10

Chesapeake
  27:17 152:20,
  21

chest
  137:23 138:1,
  2,16 139:4,14
  140:17 144:1
  154:1

Chesterfield
  26:13

chief
  34:24

choice
  22:9,13

choose
  27:1 69:23

choosing
  34:8

chose
  14:7,12 66:9
  151:10

chronic
  80:24 81:19
  115:21 147:13

chronological
  142:17

circle
  76:12,17 77:5
  141:18

circles
  62:12,20

circumstances
  74:10

citation
  70:2,4 72:6,8

STEPHEN FURMAN, R.N.
July 07, 2021

73:19,20,21
74:13 75:10,23
78:18 79:9
83:9

**city**
84:5 106:10
152:20

**CIWA**
4:8 17:15,17
18:3,15,22
51:17,18 52:5,
7,10,15,16,19,
21 68:14
86:11,21 87:2,
5,7,22,25
88:14,21 99:3,
13,20,24
100:6,12
101:24,25
102:4,21 103:6
104:16 107:23,
25 125:4 126:9
153:17,18,20
156:17 160:24
161:18 173:7,
14 174:2

**CIWA-AR**
4:9 52:25
76:5,19 85:25
88:3

**CIWA-ARS**
88:16

**Claim**
54:23 55:8,12

**clammy**
101:8

**clarification**
19:9 32:20
35:12,15

**clarify**
19:17 32:19
52:24 81:18

143:19

**clarity**
13:3

**class**
11:18

**classes**
29:2,4,6

**classification**
160:9,14

**clear**
120:19

**clearly**
33:24

**client**
7:9

**clinical**
3:24 14:16,18
51:19 74:24
85:23 126:3

**close**
82:3 99:17
101:15 111:10

**closely**
65:11

**Co-existing**
72:3

**co-morbidity**
72:13

**code**
26:15

**cold**
157:9

**college**
29:3 30:20

**color**
135:5 143:6,8

**colors**
143:5

**combine**
18:9

**combined**
18:10

**come**
15:25 23:20
38:14 39:18,19
67:20 87:24
105:10 107:9
119:13 140:1
149:2 151:2
152:25 154:25
161:4

**comes**
22:25 23:4,15
41:20 42:7
95:25 96:3,11
126:19 156:1

**comfortably**
138:5 167:10,
12

**command**
33:15

**Comment**
77:16

**commentary**
50:18

**commented**
110:25

**comments**
53:7,10 54:1
76:25 77:15
78:5 92:10

**Commission**
50:3

**commitment**
40:15

**communicating**
31:12

**communication**
58:24 76:21
160:5

**communications**
31:1

**community**
29:3 84:19,24,
25

**companies**
66:2

**company**
65:24

**comparable**
168:8

**comparing**
85:4

**comparison**
84:7,14 85:4

**complaining**
34:25

**Complaint**
47:16

**complete**
7:19 14:15
174:3

**completed**
13:22 40:12
174:15

**completely**
6:4 51:6
59:23,24

**complications**
147:1,9,12

**complied**
126:13

**complies**
59:8 73:13
75:5 76:13
79:2 83:4 86:6

STEPHEN FURMAN, R.N.
July 07, 2021

92:3 141:20
142:22

**components**
76:6,8

**compression**
138:16

**compressions**
137:23 138:2,3
139:4,14
140:18 144:1

**computer**
96:4 98:6,9
99:17 103:4
159:16 160:5
163:17

**concept**
33:23 128:8
140:13

**conclude**
158:23

**conclusion**
43:7

**condition**
16:24 122:18
127:13

**conducive**
100:6

**conduct**
171:13,14

**conducting**
99:20 101:24

**conference**
55:19

**confirm**
124:2

**confused**
24:3 52:16
76:20,24 106:3
121:20,23
122:1,5,15

**confusion**
121:16 123:7,
25 124:6,14,17
160:3

**consequences**
41:10,11 42:24
116:9

**consider**
35:6 152:2

**consists**
99:20

**consuming**
111:15 117:5,9

**contact**
164:8

**contacted**
124:23 164:22

**contained**
172:9,15

**contemporaneously**
142:5

**content**
81:20 111:18

**continual**
123:16,19

**continually**
81:5

**continue**
110:7,8 123:22

**continues**
136:18

**Continuous**
21:25

**control**
98:17

**controls**
120:3

**conversation**
33:15 61:8
131:2

**Cooper**
92:16 93:24,25
98:24 159:10
166:16,23

**Cooper's**
92:11 166:11

**cooperating**
99:23

**cooperative**
104:14 108:8,
11 173:12

**coordinator**
22:8

**coordinator's**
22:14

**copied**
64:25

**copy**
11:21 54:23
63:6 65:20
67:14

**Corizon**
4:9 48:3,9
50:13 86:9,21
88:4 148:7,12

**corner**
91:25

**correct**
5:24 6:6,7,22
7:2,3 12:19
13:10,23,24
14:23 16:3,13,
17,20 17:5
20:22 21:17
23:9,13 24:24,
25 25:12,17,
20,23 26:4,9
28:23 29:1,5

30:14,15,18
31:4,13,15,18,
21 32:1,25
33:10 35:22
36:3,11 37:2,
5,22 38:24
39:3,4 41:7,24
42:25 43:15,25
44:1,22,23
45:12 47:6
48:4 49:22
52:18,23 53:5,
6,8,9,12,13,
16,18,19 54:24
55:8,16 56:3
57:22 60:4,6,
9,11 61:16,17,
19 62:25 63:23
64:6,7,10
65:15,16,22,25
66:5,6 68:4,5,
17 69:17 70:7
71:4 72:9,10
73:4,5,23
75:18 77:1,11
78:3,4,19 80:1
83:12,16,17
86:9,10,12,13,
18 87:9 88:14
89:2,8,11,16,
17,20,21 90:3,
4,17 91:11,15,
16,18 92:12,19
93:22 94:1
100:1,2,13,14,
17,18,20,21,25
101:3,4,16,17,
19,22,23
102:23 103:9,
10,16,19
104:17 106:21,
22 110:9,12,13
112:8,21,24
113:11 115:9,
11,16,17,19,

STEPHEN FURMAN, R.N.
July 07, 2021

20,23 116:1,2,
4,7,15,19,20
117:7,8,18,25
118:11 119:18
120:22,23
122:16 125:4,
5,7,10,22,24,
25 127:10,15,
18,21 128:5,11
129:17,18
130:22,23,25
131:3,17,25
132:3 133:7,
12,15,22
134:3,11
136:1,4,5,9,
13,14,18,19,22
137:2 139:10,
18,21 140:10,
15,23 142:20
143:20 144:13,
25 145:7,10,
16,20,24
146:2,6,20,23
147:2,3,5,16,
20,23,24
148:1,2,8,9,13
150:12,15
151:14 153:10,
11,15,16,18
158:9,12
159:7,8,22
161:24 167:15,
16 168:16,17,
20,22,24
169:13,17,21,
25 170:9,18,23
172:5,7,11
173:7,8

**corrected**
134:7

**correction**
112:1

**correction's**

31:6,8 53:12

**correctional**
50:3 149:21
150:1,8 163:5,
6

**corrections**
29:22 53:8
150:3

**corrections'**
53:11

**correctly**
88:12

**corroborated**
80:7

**counsel**
4:14 5:3

**count**
9:10 58:10
59:5 66:16
92:1,4

**counter**
33:1,4

**County**
5:14 47:19
49:23 50:13
86:9 94:7
149:20

**couple**
10:9 11:6 23:1
28:18 54:3
92:14 102:2,5,
15 119:23
124:25 133:10
144:13

**course**
111:19

**court**
6:9 39:14 59:7
110:20 143:12

**courthouse**
115:9,11

**cover**
59:18

**covered**
48:17 135:9

**COWS**
52:17

**CPR**
137:20 139:7

**crap**
143:10

**create**
141:5

**created**
41:15,18 62:22
63:1 142:4

**crisis**
39:18

**critical**
13:12 19:25
20:1,3 25:18
26:1 129:22,23
155:5,9,11,13,
15 156:5 157:2
159:1

**criticisms**
55:20,22 130:6
148:7

**cross**
3:6,8 141:25
149:17 161:11
169:10

**crossed**
142:1 144:4

**Culmins'**
166:17

**current**
5:1

**custody**
40:1

**customs**
37:14

**cut**
24:9 104:3

**CV**
11:21 12:2
15:1 53:25
152:3

**cycles**
137:25

**D**

**damage**
117:24 118:3
120:2 140:22

**damages**
31:20

**Damico**
3:8,15 5:9,21
10:11 29:12,16
36:8 43:5 44:9
46:14,18 49:4
52:24 54:11
55:13,17 57:5,
18,25 58:7,13,
15,18,25 59:3
60:21 61:3
62:21 63:8,13,
16 64:9,13,19
66:14,19 67:7
68:23 69:24
70:8,15 71:4,
7,15,24,25
72:5 73:2,11,
19 74:20,23
75:12 78:18
79:9 82:11,22
83:8 85:17
87:13 88:3

STEPHEN FURMAN, R.N.
July 07, 2021

91:22 92:4
95:1,16 96:8,
13,23 97:2,7
100:7 107:15
108:21 110:16
112:2 114:17,
21,24 115:2
118:5,12
120:4,7,16
122:7,22 124:9
132:9 134:22
135:1 137:9
140:16,24
144:18 147:17
148:21 149:7
153:12 156:13
163:25 165:12
167:19,23
169:9,11
170:4,12,15
171:2,18,23
172:19 173:5,
10 174:19

**Damico's**
7:9 72:14 74:2

**dangerous**
33:21,24 34:10
35:2

**data**
77:14 158:2,3

**date**
6:13 58:13
64:13 121:22

**dated**
63:20

**dates**
143:9

**day**
15:12,13 34:4
35:22 36:12,
14,15 112:15
115:22 122:5

126:21 129:14
153:24 174:5

**days**
14:11,13
15:14,19,20,21
23:1 35:8
133:10 137:11

**dead**
138:24 147:6

**deal**
11:4,8 105:23
106:8 127:5

**dealing**
59:24

**deals**
52:12

**dealt**
11:14

**death**
38:6 120:19
121:11 122:14,
21 123:17
137:1 138:10
144:11,24
146:23

**debate**
45:8

**debt**
61:13

**decent**
152:3

**decide**
151:19

**decision**
22:14 39:3
130:21

**decisions**
166:1

**declared**
147:6

**decline**
8:14,16 9:1

**decrease**
111:14

**decreases**
80:19

**deducted**
60:15

**defendant's**
67:25

**defendants**
5:6,12,14 10:5
149:20 169:21

**defense**
10:9 47:18
56:9 69:1

**defer**
119:24

**deficient**
130:14

**define**
44:7

**definitely**
163:15

**degree**
12:7,13 13:21,
23,25 118:18
119:14 139:15,
20,23,25
140:5,8,21
143:22 161:21

**degrees**
17:13 119:13
144:10,21

**delayed**
42:23 43:4

**delineation**
89:15

**delirium**

4:4 78:22,23
79:14,15,16,19
121:8,11
123:19 154:14

**demands**
33:20

**denied**
68:7 113:23
159:6 164:15,
17

**deny**
113:1

**dep**
32:5

**department**
20:21 21:1,9,
24 22:3,21
27:18 29:22
34:16,25 150:3
155:1 165:19

**depended**
62:16

**dependent**
161:3

**depending**
90:20 91:4,7

**depends**
43:8 118:18
165:24

**deposition**
5:20,23 7:14
46:2,4 48:12
58:5 59:10
60:25 64:17
66:25 69:4
70:23 71:20
73:15 75:7
79:4 83:2
85:19 86:4
88:8 92:7,24
94:17,21

STEPHEN FURMAN, R.N.
July 07, 2021

113:14 114:11
119:22 125:12
129:4,9 132:11
133:11 149:11
157:25 166:11,
12

**depositions**
7:22,23 8:11
45:19 46:1,3
47:18 48:13,
18,20,22
113:13 152:7,
8,9 158:21

**deputies**
93:2,8

**deputy**
92:11,16,22
93:24 98:24
110:21 159:10,
25 160:4,7,10,
11 163:14
164:12,20,22
166:11,16

**derangement**
23:24

**describe**
155:7

**described**
23:25 155:4

**detail**
82:6

**detailed**
169:19 170:8

**detailing**
171:25

**determination**
145:5 146:9,10

**determinations**
88:23

**determine**

101:15 158:16

**determined**
38:18

**detox**
11:15,19 16:8,
15 17:3,9,13
18:7,13 19:22,
23 20:18 22:22
25:5,6,16,19,
21 26:3,9
29:5,10 52:1
155:1

**detoxing**
25:10 83:18,
22,23

**detrimental**
38:5 39:16

**devastating**
144:6

**develop**
15:17 117:6,10
139:22

**developed**
123:3

**deviation**
54:7

**deviations**
8:21

**dextrose**
28:17

**Dft**
3:18

**diabetes**
110:1

**diabetic**
33:17,19,25
109:19 154:1

**diagnosis**
3:22 72:3 73:7
141:13 148:2

**diaphoresis**
77:22 88:24
173:23

**diaphoretic**
81:23

**die**
39:11 138:12

**died**
138:10,21,23
147:1,4,9,25
174:5

**difference**
26:10 85:11
89:6,10 90:5

**differences**
88:17

**different**
6:4 15:13
26:15 27:9
34:7 66:1,4
83:25 87:7
90:24,25 99:8,
9 101:13 103:8
106:1 112:13
113:6 115:7
122:5 143:8
148:16 156:1
162:12

**differently**
83:24 91:17
119:17

**difficult**
22:11 24:3,13
101:10 108:16

**dimension**
151:17

**diminishes**
111:19

**direct**
3:4 5:16 109:8
167:7

**directing**
71:4

**direction**
28:4 153:2

**director**
28:11

**disagree**
33:9 56:10

**disagrees**
33:7

**disclosure**
3:18 67:19
69:1

**discontinuing**
26:1

**discovery**
113:13,14
158:21

**discuss**
129:1,4

**discussed**
129:14

**discussion**
76:8

**disingenuous**
136:12

**disk**
11:22

**disoriented**
43:9 76:20
126:22 165:24
166:1

**disregard**
131:7

**distinctions**
101:2

**distinguish**
89:5

STEPHEN FURMAN, R.N.
July 07, 2021

distrust
  105:21

distrustful
  103:24 105:7
  106:2

diverse
  27:9

division
  15:24

doctor
  25:15 36:1

doctors
  106:20

Doctors'
  24:22 26:10,11

document
  46:14,17
  54:10,22,25
  55:17 56:11,16
  58:4 60:7
  62:11 64:16
  65:1,2,17
  66:24 67:16,23
  69:3,7,12
  70:12,22
  71:11,13,19
  72:7 73:8,14,
  18 75:2,6,10,
  11,20 76:15
  78:7,12 79:1,
  3,7,8 80:9,10,
  11,12,14,16
  82:24 83:1,11
  85:18,22 86:3,
  8,11,14,24
  87:2,17 88:7,
  12 89:4 92:6
  113:15,23
  122:2 132:10
  134:6,7

documented
  110:18 112:17

113:16,22
114:10,14
124:14,19
164:6 168:25

documents
  50:22 54:3,20
  58:19,20 59:9,
  17,19,25
  60:23,24 84:4
  124:20 164:2
  166:4

DOI
  71:9

doing
  9:21 17:17
  22:4,5 28:4,12
  33:21 38:16
  46:16 59:6
  65:14 79:8
  90:20 102:24
  104:16 138:1,
  16 145:16,23
  146:1 163:18

door
  39:24 151:4

dose
  35:21 36:5,16,
  19,20 127:2
  161:16

dot
  133:2 136:2,7,
  11,16

dots
  54:4,5 65:5
  132:6,21
  133:5,8,14,19,
  22 134:2,8,13,
  21 135:3,6
  136:21 172:22,
  23,24

download
  153:20

draft
  55:1 56:4
  57:13 62:17,
  21,23 63:1

drafted
  43:15 55:17,
  21,23 56:7
  65:24

dramatically
  90:24

drank
  110:11 114:16
  115:5,8,10

draw
  41:22 62:11

drawn-out
  55:11

draws
  25:21

drink
  23:17,22
  24:10,11,14
  81:5,8,23
  113:25 114:2,
  10 115:25

drinking
  112:14 114:3,
  15

drinks
  112:14 115:5,
  16,18,22

drip
  25:18

drive
  3:16 4:13
  61:16,20 62:1,
  3 63:9 64:20,
  21 67:8 149:5,
  8,10

drool

144:20

drop
  81:21

drops
  23:11

drug
  22:23 34:2,7,
  9,18

drugs
  7:16 18:13

drunk
  81:7

DT
  29:20

DTOH
  17:14

DTS
  17:19,20,22,25
  18:4,14 19:11
  79:12 121:8
  122:20 123:3,
  16 154:7,10
  160:2

due
  23:23

duly
  5:6

Dunn
  151:22

duties
  25:13

duty
  34:12 108:18

dysfunction
  119:3

———————————————
**E**
———————————————

earlier

STEPHEN FURMAN, R.N.
July 07, 2021

early
142:17 159:23
160:19

earmarks
65:4

ease
89:19

easier
108:9

easy
173:3

eat
119:10

eating
109:20

ECO
40:9

edited
55:4

educate
165:5

educated
38:16

education
12:8,11 13:21
27:9 29:7,8
79:23

effect
83:23 172:14

effects
111:1,9

effort
139:24

egregious
127:7 171:14

either

49:2 110:15
132:20

9:3 40:22 47:4
56:10 72:6
79:9 83:9
102:18 117:21
172:2

elicit
107:1

else's
56:20

email
3:13 58:24
59:21,23
61:15,18 95:8

emails
58:17 61:2

emergence
25:9

emergency
5:1 15:21
20:21 21:1,9,
12,23 22:3,21
23:5,7 39:25
42:6 44:19
106:10,13
130:14 131:9,
13 154:25
155:10,12
165:18

Emily
10:20

empirical
84:1

employee
49:16 151:15

employees
44:16

employment
85:1

employs
44:19 155:18

empty
101:14

EMT
20:7

encephalopathy
147:23

encounter
25:10 161:8
174:9,10

end
30:23 57:20
98:3 123:6
134:21 135:8

endocrinologies
119:20

endocrinologist
119:8

ends
46:8 142:18
159:24

ensure
32:12 144:5

ensured
138:14

entail
130:5

entails
130:3

entered
94:10 99:3
159:16 160:5
163:16,17

entire
22:10,13 47:23

epinephrine
28:19

ER
130:2 155:7,15
156:5 157:2

167:17,22
168:8

essentially
144:4

establish
165:19

Estate
5:10

estimate
155:16

et
102:11 123:8

ethanol
147:13 148:1

evaluate
38:14 39:19
106:17 160:1
164:23 165:8,
14

evaluated
158:18 161:5
164:24

evaluating
8:22 90:23
126:4 165:6

evaluation
89:16

evaluations
99:20

evening
159:21 168:21

events
165:25

everybody
97:14,18 168:4

everyone
160:23

evidence
45:3 92:18

STEPHEN FURMAN, R.N.
July 07, 2021

106:23,24
107:12 114:7
117:16 170:8

**evolved**
152:6

**exact**
8:8 56:23
57:4,5 125:1
159:4

**exactly**
8:20 28:8,16
30:18 31:2
32:22 33:5
38:12 72:12
76:11 93:13
102:20 103:20
139:16 164:10

**exam**
41:25 100:3

**examination**
3:4,6,8 5:16
149:17 169:10
170:20

**examinations**
158:25 159:2,4

**examiner**
117:23 118:3,9
147:25

**examiner's**
141:12

**exams**
42:13

**exceeded**
138:6

**excerpt**
68:23

**exchange**
129:17

**exclude**
46:23

**exclusively**
99:25

**exercise**
130:10

**exercised**
130:7,13

**exhibit**
57:24 58:1,2,5
59:4,10 60:20,
25 63:7,9
64:12,17 66:25
69:4 70:23
71:20 72:6
73:3,10,12,15,
18 74:22 75:4,
7,10,16 78:14,
16,21,25 79:4
82:24 83:2
85:16,19 86:2,
4 87:18 88:2,
8,11 91:25
92:7 100:12
101:11 102:25
110:25 132:11,
17 141:4
149:5,8,11
167:9

**exhibits**
4:14 48:12,16,
21 54:22 58:8,
11 174:20

**exist**
126:23

**expect**
163:13

**expectation**
109:12,16

**expected**
158:22,23

**experience**
27:9 35:5
172:4

**experiencing**
17:19

**expert**
3:12,18 8:1,24
69:1 113:4
120:20

**expert's**
67:18

**expertise**
15:17 118:23
156:8 163:3

**experts**
67:25

**explain**
62:10 74:10
96:22 131:15
174:24

**extended**
89:14

**extent**
91:8

**external**
67:8

**extreme**
34:2

**extremely**
89:19

---
**F**
---

**face-to-face**
161:8 174:10

**facilities**
42:16

**facility**
20:14,15 24:7
39:23 41:20
42:17 110:10
150:1,7,9
168:11

**fact**
30:20,22 32:11
37:13 39:5
90:2 92:16
94:11 101:11
110:24 111:21
112:25 113:2
129:8 130:6,9
131:6 132:18
170:20 171:24

**factor**
109:6

**facts**
84:5 113:5
151:8 170:8

**failed**
135:15,25
136:4

**fails**
41:8

**failure**
43:2 135:10

**fair**
6:16,18,22,23
19:18 49:20
127:6 153:4,6
168:8

**fairly**
105:24

**falls**
81:1 117:12

**familiar**
66:10 128:7

**family**
30:3 38:20
42:3,8

**far**
19:23

**fast**
28:14 47:8,9,

STEPHEN FURMAN, R.N.
July 07, 2021

13 111:18

**faster**
47:12

**February**
46:17 63:11

**fee**
152:3

**feel**
33:11 34:10
47:22 48:24
49:14 102:7
113:5 119:4
137:22 143:22

**fellow**
19:6

**felt**
35:4 80:6
106:16 159:12
171:9

**female**
93:4

**field**
20:7 28:2

**figure**
8:3 65:5

**file**
31:2 62:5,7
85:14 174:20

**fill**
16:2

**filled**
20:3

**final**
4:12 132:18
148:2

**find**
8:21 23:16
38:15 56:6
72:20,23 73:3
109:20 118:14

120:24 121:2,
6,10 127:7
151:7 160:18
173:25

**fine**
6:24 36:22
70:21 80:14
84:3,22 97:4
119:7,19 149:4
157:8 166:21

**finish**
7:5 56:13
144:18 165:12

**finished**
13:8

**Fintel**
58:8 119:22,23
120:20

**Fire**
27:17

**firm**
5:14 10:14,20
55:13,15

**firms**
158:7,10

**first**
19:25 24:11,14
36:5,20 43:17
57:1 63:24
68:12 69:19
75:22 76:3
80:15 86:1
87:20 94:6
103:13,23
120:4 124:14,
19 127:2
135:18 142:4,
11,14,23
148:22 164:21
165:4 168:15
174:8,11,12

**firsthand**
128:20

**five**
8:11 9:12

**flagged**
163:18

**flash**
4:13 61:16,20,
25 62:3 63:9
95:24 149:5,8,
10

**flashing**
95:8

**flip**
54:12

**floating**
21:8,15

**floor**
18:6,9 21:13
29:18 100:6
104:18 126:23

**floors**
18:9

**folks**
16:14 17:18
18:7 26:2,8
32:6 106:18

**follow**
28:9 44:17
45:4 54:9 97:3
109:14,17,21
136:4 141:15

**follow-up**
123:13

**followed**
33:6 126:13
128:5,6 148:8,
11,15

**following**
10:25 13:3

36:15 54:16
82:14 93:19
103:3 126:6
130:24 149:14

**follows**
5:7

**food**
119:11 137:12

**foolish**
6:21

**footage**
47:19,20,22,23
63:21

**force**
38:1

**forced**
165:16

**forehead**
90:7 101:7

**form**
19:14 43:5
44:21 49:6
65:17 94:25
95:16,18,20
96:7,8,15,25
100:7 107:15
114:22 122:23
153:20 156:13
167:19 170:2,
10,24 171:16,
20 172:17
173:1,9

**formulating**
174:22

**forth**
28:10 104:19
143:3

**found**
23:1 38:9 79:7
80:20 100:13
120:1 147:16

STEPHEN FURMAN, R.N.
July 07, 2021

154:23 172:1,2

**foundation**
19:14 43:6
49:7 95:17,19
96:15,25 100:8
107:16 112:2
114:23 118:5,
12 122:22
140:16 156:14
167:19 170:3,
11,25 171:17,
21 172:18
173:2,9

**four**
8:11 133:18
135:20 142:14

**fourth**
77:24 142:12

**Francis**
26:6,11,13

**free**
105:20

**frequently**
105:23

**Friday**
150:25 151:8

**friend**
42:9 104:21

**front**
62:3 96:4
164:12

**full**
7:18 20:12
70:19 72:12,16
174:15

**full-time**
151:15

**fully**
126:20

**function**
32:12 118:17
121:14,17
151:6

**functional**
111:4 117:7,24
118:4,6,11,13
126:21

**Furman**
3:12 5:5,18
7:20 11:14
67:7 149:19
169:12

**Furman's**
4:10,12

**Furnace**
124:22 126:8,
12,25 127:9
128:4,6,14,21,
25 130:9,13,17
131:3,6 174:7

**Furnace's**
127:1 129:3

---

**G**

---

**gain**
42:1 110:1

**gather**
150:17 161:20

**gave**
42:12 53:3
74:4 79:9
97:2,3 126:9
128:2 130:22
143:10 146:5

**general**
105:25

**generally**
112:22 155:4,
12

**generated**
98:18 99:6

**generates**
99:3

**get alcohol**
29:24

**getting**
28:14 39:14
42:15 45:25
81:22 82:5
84:21 138:3

**give**
6:3 7:14 8:8,
17 30:4 31:14
33:16,20 34:1,
2,3,4 35:7
36:16 37:20
40:22,24 43:3
54:10 63:6
70:2 109:17
112:23 113:8,
19 124:20
125:7,9,14
126:14 127:2
132:24 134:25
135:7 162:14,
20 163:25
165:1,20
168:19

**given**
5:23 33:1 34:7
35:22 36:2,24
37:18 68:15
74:9 94:20
97:8 125:18
127:21,23
128:3,4,8
132:24 158:25
159:2,4 161:19

**giving**
28:3 33:4
34:18 43:21
70:8 73:21

**generated**
74:12 138:17,
20 161:19

**glance**
107:9

**gloss**
49:25

**glossed**
48:8 49:10,21

**glucose**
25:25

**goes**
18:22 90:14

**Goetterman**
128:14,21,24
129:5 138:7
139:2,5 144:3
146:15

**going**
5:19 7:4
11:15,19
14:13,17 16:7,
15 18:4,7,12,
18 19:6,22
20:17 21:2,6
22:22 23:8,17
25:4,6,16,19,
21 26:2,9
29:4,10 33:11,
17 39:7,11,15,
16 43:5 51:25
52:12 57:6
63:4 73:6
74:21 79:17
80:12 87:19
91:2 92:24
93:19 95:16,25
96:1,12 102:3,
11 103:4
104:23 110:16
122:24 129:21
130:2 132:8
133:1 135:13,

STEPHEN FURMAN, R.N.
July 07, 2021

23 138:14
141:16,18
149:21 150:21
156:13,19
159:12,15
160:7 161:11
166:25 167:14

good
8:2 53:21 61:5
82:11 88:6
109:24 143:4
161:3

Google
86:16,17 88:13
100:13 153:19

Googled
153:17

grade
62:15 118:22

Grand
84:7,15 85:12
156:6

gray
77:9,16

greater
137:17

grew
152:19,23

Grimmett
164:12

grossly
163:20

grow
152:18

guarantee
49:13

guarded
90:11

guards
105:19

guess
8:6 13:20 45:5
85:14 86:23
137:5 138:9
153:13 156:11

guideline
50:19,20 51:3
68:2

guidelines
44:3 50:7,12,
13,14,16 65:23
66:3 67:15

guys
58:7 82:13

---

**H**

half
12:3 20:25
124:22,25

hallucinating
121:20,23
122:1,15
160:3,6

hallucinations
121:13 122:6
123:8 124:1,5,
17 147:15

hand
72:7 87:17
91:21

handed
69:7 87:1

handing
85:22

hands
101:8 160:24

hands-on
14:15,19

handwriting

72:14 74:2

handwritten
4:10 91:23

happen
31:5,9 128:11
142:5

happened
94:18 126:16,
17 129:12

happy
119:10 151:10

hard
3:16 64:20,21
67:8 101:18
108:12

harm
33:12 34:17

harvested
147:20

head
6:8,9 34:15
102:18

health
5:2 37:15
44:19,22 50:4
65:20 68:13
108:5,19
109:10,13
110:3 119:5
126:4 146:9,11

hear
13:1 162:17

heard
6:5 88:12
146:20

hearsay
110:17

heart
11:25 77:25
78:2 139:7

147:20

Heather
98:13

heavily
76:5 145:13

held
43:10 157:5

help
86:23 109:25
110:8 166:16

helpful
82:9

Henrico
24:22 26:8,10,
11

hepatitis
118:1 147:14

hesitating
29:18

hey
35:5 105:8,10
151:23

high
117:10 167:21

higher
90:2

highlight
77:12

highlighted
64:1 65:6,7
68:4 69:19,20
76:1,14 77:3,
16 80:1,3,5,17

highlighting
54:1 75:19,21,
22 83:12

hippocampus
120:2

STEPHEN FURMAN, R.N.
July 07, 2021

hired
  8:24
history
  17:14 23:16
  24:19,21 27:2
  40:21 41:5,13
  52:4 108:18
  109:8 114:3,16
  115:19 147:13,
  15 161:3,9
hit
  24:18
home
  54:14 152:11
honest
  43:3
honestly
  41:9 48:23
hope
  108:24 109:4,
  16,21 110:5
hospital
  14:9 16:19,22
  20:6,8,10,11
  23:6 24:17,23
  26:11,22 28:7,
  14 29:19 36:1
  39:6 41:21
  42:1,18 44:2,
  4,11,12,14,18
  45:9 106:17
  119:11 150:2,5
  151:16,17,24
  155:18 158:4,
  5,19 162:11,23
  165:23
hospital's
  44:6,8,9
hospitals
  27:8,10 155:19
hour

7:15 111:13,19
124:22,25
152:12,13
161:15
hours
  15:8,9,10,11
  17:17 21:8,9,
  11,15,19,20,25
  22:7,10,17,19,
  20 24:11,15
  39:12 40:12
  46:12,20,22,24
  47:1,2,5,22,24
  52:6,8 61:9
  68:13,19,20
  80:18 103:18
  106:4 111:19,
  20 124:25
  127:23 151:16
  159:7,9,24
  168:11
human
  31:11
hundreds
  167:12
husband
  92:22
Hypoglycemia
  28:17
hypothermia
  140:2

                I

icon
  24:18 52:8
ICU
  16:12,14,17,
  19,25 17:21
  20:2,12 26:14,
  16

idea
  67:23,25 84:4
  93:9 94:5
  98:10,11
  146:13,15
identical
  59:17,18,20
identified
  117:23 118:3,
  10 127:14
identify
  54:21 61:6
  65:1 77:19
  86:2 114:5
  141:24
ignore
  105:2
ignored
  164:13
imagine
  51:21,22
immediately
  128:3
impact
  41:14,17,19
impair
  118:16 121:13
impaired
  38:22 39:2
  122:18 123:7,
  15
impairment
  38:6 117:25
  118:4,7,11,14
  119:3,15
impairs
  120:25 121:17
implementation
  50:18

implemented
  53:12
implication
  167:1
implications
  167:3
important
  24:1,4 76:4
  108:7
imprison
  39:23
in-depth
  161:9
in-house
  26:15
In-patient
  72:2
inability
  122:19
inaudible
  160:9,14
incapacitated
  38:18,23
included
  25:14 77:15
  171:19
Including
  50:9
inclusive
  60:14
incompetent
  38:9
increased
  9:20 72:1
  139:24
incumbent
  114:1
independent

STEPHEN FURMAN, R.N.
July 07, 2021

70:8 71:4,7
73:2 78:17
83:7

**independently**
73:4

**indicate**
36:6 121:19

**indicated**
5:18 115:4
147:22 159:6

**indicates**
11:22 47:3
61:25 116:8
141:14 142:13,
14

**individual**
42:8 91:2

**induced**
23:2

**infirmary**
51:5 129:12,20
130:25 131:8
159:14 162:13,
23 164:15
169:2

**inflammation**
119:16

**information**
4:7 30:4,13,16
41:16 42:2,12
43:3 45:24
49:12 95:12
104:22 107:1
113:19 153:18
164:7

**initial**
5:19 60:3
141:9 142:1

**initials**
58:3 59:5
71:17 76:12,18

77:6 78:25

**initiate**
160:21

**injury**
138:15,23
139:12,17,23,
25 140:6,9,14
143:23 144:6,
7,10,12,21,24
145:6 146:6
147:5,10

**inmate**
103:15 104:4
107:25 165:22

**inmates**
105:18,23

**inpatient**
19:24

**inquire**
23:21

**inquiry**
94:15

**instance**
145:12

**Institute**
3:25 51:19
74:25 85:23

**institutions**
163:5,6

**instructions**
109:14,17

**insulin**
33:17 34:1

**intake**
110:11,14
112:14 113:1,
9,15,16 164:4,
5

**intended**
128:2

**intensive**
16:5,23 17:4
18:1 65:11

**intent**
43:24 47:17

**intention**
143:9

**interacting**
151:1,13

**interested**
51:23 104:1

**internet**
86:17 153:17

**interpretation**
65:19,21

**interpreted**
50:23

**interprets**
50:22

**intervention**
160:20,21

**intoxicated**
23:4 24:8
81:7,13,14,16,
17 111:22
112:7 117:17

**investigation**
27:14

**invoice**
59:22 60:8,12,
14

**invoiced**
47:1

**involuntary**
40:14

**involved**
38:20 164:21

**irreversible**
140:14,22

144:23 146:6

**ischemic**
147:14,23

**isolating**
16:25 17:1

**issue**
37:1 70:1 82:6
116:16

**issued**
125:3

**issues**
47:14 154:13

**item**
154:6

**items**
45:19 53:2
86:19,20,21

**IV**
28:4,19
165:19,20

---

**J**

**J-A-01**
69:2

**jail**
11:15,19
29:11,13 47:16
48:14 68:11,13
90:23 105:14,
15,16,18,25
106:5,8,10,13,
18,19 108:6
110:22,24
116:5 124:15
125:9 126:21
147:16 150:10

**January**
12:3 20:24
21:11

STEPHEN FURMAN, R.N.
July 07, 2021

Jennifer
  5:9
job
  108:9
jobs
  152:5,22 153:1
Joe
  151:8
join
  95:1
Jones
  5:10 53:5
  63:22 68:6
  83:18 93:18
  96:1 98:25
  100:5 105:10
  110:10 112:13
  113:2 116:3
  117:15 120:2
  121:20,22
  122:5 123:2,6
  124:23 127:14
  129:1,5 130:24
  137:15 144:5
  145:19 159:6,
  11 160:1,22
  161:23 162:10,
  21 163:21
  164:3,8,23
  166:5 172:1
  174:9,16
Jones'
  97:22 122:17
  164:25
Jordan
  159:25 160:4
  164:20,22
  169:1
Jordon
  163:14
journal
  3:21 71:12

75:24 83:14
Jr
  7:21
judge
  38:10,19
  39:18,19
  110:25 111:8
  117:17 165:17
judge's
  38:3
judgment
  126:3,19
  130:4,5,7,12,
  18 131:14
  171:10
Julie
  166:23

———————

        K

keep
  39:20 81:5
  107:10
Kelman
  94:21,23 95:6,
  14 96:5 97:13,
  16,19 166:18,
  19
Kent
  47:18 49:23
  50:13 86:9
  94:7
ketoacidosis
  154:2
kind
  21:2 22:1 27:2
  33:14 35:8
  44:13 48:7
  55:5 62:13
  104:1 128:18
  129:14,22

161:17
kinds
  66:4
Kluwer
  65:19
know
  5:25 9:17
  11:24 12:1
  28:6 35:8 38:4
  39:16 40:8,19
  41:5 45:6
  47:21 62:19
  64:1 67:20
  68:18 74:16
  76:11 83:24
  92:1,21 93:1,
  7,10 94:9,14
  97:5 104:21
  108:3 109:7,18
  111:13,18
  112:16 116:11,
  25 118:24
  120:3 127:3,4
  138:9 140:13
  142:4 146:19
  149:23 154:24
  156:20 157:3,
  4,5,22 158:3,5
  159:14 163:13
  167:4
knowing
  127:3
knowledge
  35:9 58:23
  59:1 116:22
  128:20 156:7
known
  163:11

———————

        L

Lab

25:21
label
  141:16,17
lack
  8:14
lacks
  8:17,18
land
  153:3
language
  57:8
large
  117:5,9 152:24
law
  10:14,20,21
  158:7,10
lawsuits
  151:23
lawyers
  31:9 151:20
lay
  139:12
lead
  7:5 38:6 41:11
  170:12
leading
  170:11 173:2
  174:17
learn
  29:6
learns
  30:22
leave
  27:11,13 39:13
  137:1
lectures
  14:24
led

STEPHEN FURMAN, R.N.
July 07, 2021

122:20 123:15,
16,17,18,19

**left**
27:16 42:12
54:14 87:11
91:24 104:24

**left-hand**
101:12

**legal**
37:3 43:6
58:18 145:11
151:14

**leisure**
82:8

**letter**
3:15 61:18
63:20 64:14,19
67:7

**letters**
59:18

**level**
15:5 23:11,12
34:19 80:19,25
81:1,5 91:9,
10,11 101:15
111:5,14 112:6
115:8 117:11,
12,16,20

**license**
12:10 157:5,7

**licensure**
145:16

**Lieutenant**
94:21 95:6,14
96:5 97:12,16,
19 166:17

**life**
24:14 62:16
131:25 137:18,
19 161:23

**lifetime**
51:24

**limit**
112:10

**limitation**
76:4,19

**limited**
88:23 145:16

**limiting**
53:14,18

**Linda**
151:22

**line**
7:6 30:24
43:17,20 65:6,
7 95:6 105:12
133:1 137:12
144:5 162:3

**lines**
26:1 62:20

**Lippincott**
3:17 51:9
64:25 65:13
67:3 153:9

**Lipton**
10:21 158:8

**list**
45:19 98:17

**listed**
45:21,23 46:1,
5 49:18 86:19,
21

**listen**
118:2 137:22
140:7,20
144:17,23
151:3

**listened**
57:7,18

**listening**
123:3

**lists**
146:23

**little**
11:10 22:11
26:15 82:6
87:22 94:9
99:13 102:15
105:4 106:1,3
108:9 132:6,21
133:14,19,22
134:2 140:4
144:15,25
160:24,25
170:21

**live**
85:5 105:8
152:12,14

**lived**
139:10,11

**liver**
117:24,25
118:3,4

**LNCEXCHANGE**
152:5

**local**
84:10,19
157:15

**locality**
84:13 174:25

**Locate**
63:4

**located**
83:7 155:16,17

**lock**
39:23

**locked**
105:21

**long**
6:25 38:22,25
39:1 55:11
107:20 146:14
160:21

**long-term**
80:24

**long-time**
81:10 115:21

**longer**
13:9 137:8

**look**
9:7,15 10:12,
15 11:3 15:1
42:15,18
48:15,18,20
50:21 59:17
64:5,8,9 71:8
73:3 75:22
78:7 87:24
89:3 91:23
98:21 99:10,18
101:11 123:23
133:13 136:20
137:21 152:3
158:2,24

**looked**
10:18 40:3
48:24 64:8
71:9 72:9
73:22 97:25
134:20 153:8,
14 158:3,18

**looking**
29:5 42:3 64:4
67:24 85:3
97:22,24 100:4
102:24 103:2
105:1 132:5
135:8 150:13
156:21

**looks**

STEPHEN FURMAN, R.N.
July 07, 2021

5:25 26:7
58:20 60:2,7
64:24 103:8
158:7 168:12

**lost**
109:25

**lot**
45:24 49:12
101:14 153:3

**LPN**
107:9 136:11
160:1 163:18
164:23 174:15

**LPNS**
169:20,23

---

**M**

---

**M.D.**
150:22

**Madam**
143:12

**made**
6:21 56:17
57:10,11
92:17,19 93:20
130:21 132:21
145:5 152:3
159:10,13,19

**majority**
56:6

**make**
32:19 39:3
40:18 55:1
56:10,17 62:12
63:6,7,8,17
65:4 92:10
93:10,13 94:2
101:2 103:4,9
111:15 122:25
129:13 131:16
146:10 156:9

166:1

**makes**
108:9,16
156:12,15

**making**
84:7 146:9
165:7

**malpractice**
151:23

**managed**
18:2

**management**
3:23 4:3 65:3
73:7 75:2
78:22 79:13

**manner**
83:23

**manual**
51:5,9,11
65:13 66:3,19
153:9

**Manuals**
49:17

**March**
59:21 60:2

**mark**
10:21 54:22
57:23 59:4
60:22 63:11
66:15 68:22
70:16 71:16
73:12 75:4
78:10,25 82:23
85:10,15 86:1
87:10,12,14
88:1 91:24
132:8 141:2
142:21 144:2
149:5,8

**marked**
58:5 59:10

60:25 64:11,17
66:25 69:4,20
70:23 71:20
73:15 75:7
78:5 79:4 83:2
85:19 86:4
87:11,13 88:8
92:7 132:11,15
149:11 172:24

**marking**
143:13

**Maryview**
27:4,5,11

**master's**
12:8,9 13:8

**material**
51:8

**math**
9:16,23 102:4

**matter**
44:20 84:9
97:23

**MDS**
32:6

**mean**
8:8 18:18 19:2
23:14 24:2
26:20 28:16
34:8 36:11
40:24 42:15
47:10 49:1
52:3 54:5
76:12 79:16
102:3 103:13
105:22 107:2
113:18 119:19
123:10 128:6
143:6 154:17,
18,19 156:8
157:14 160:16,
18 168:3

**Meaning**
81:1 117:11

**means**
143:7,19,20

**meant**
36:18

**measurable**
77:14

**med**
126:14 128:4

**med-surg**
18:6,9

**medical**
5:12 6:14 15:2
17:3 24:19,21
25:14 26:6,13
27:4,5 28:10
30:2,14,17
37:3,24 38:2
39:17 41:4,5
42:3,16,19,20
43:21 45:18
47:15 48:13
53:15,17 86:9
92:12,17,23
93:2,5,18
94:8,11,15,24
95:9,14 97:14,
18 105:19
106:19 111:22
112:22 113:1
117:23 118:2,
9,21 120:11,13
130:4,5,7,10,
12,18 131:14
139:15,20
140:8,13,21
141:12 143:22
145:7 146:4,22
147:12,25
150:21 151:22
154:12 158:14,
22 159:13

STEPHEN FURMAN, R.N.
July 07, 2021

160:13 161:21
163:14 164:9,
13,16,19,21,22
165:16 166:6,
9,12,15,23,24
167:2,5 169:2
171:10

**medically**
163:12

**medicated**
160:25 161:2

**medication**
35:1,20 36:3
37:18 38:17
91:7 116:4,10
123:21 125:4,
7,10,11,14,17
126:9,10,14
127:18,20
128:2,3 159:15
160:17 165:1,
4,6

**medications**
91:4

**medicine**
36:12,13
137:10 161:14,
17

**meeting**
72:15

**member**
13:12 42:9
124:15

**members**
30:4 42:3 45:7

**mental**
121:16

**Merck**
66:3

**merit**
8:15,17,18

55:23

**meritorious**
47:17 54:23
55:7,12

**merry**
119:10

**mess**
38:21

**Meta-analysis**
69:10

**metabolic**
23:24

**method**
83:23

**MI**
154:1

**Michigan**
10:18,22 40:8,
13,15,19 84:8,
11,16 112:7,10
155:23 156:10
157:2,5,6,10,
19,21,23
158:7,10,17
159:3 166:21

**middle**
7:23 9:19 98:3
152:15 167:10

**Mike**
10:14

**mildly**
90:11

**miles**
152:13,14

**military**
152:24,25

**milligrams**
34:3

**mind**

149:2

**minimum**
7:2

**minor**
140:5

**minute**
47:7,11 90:9
102:10 162:6

**minutes**
11:5 103:18,
23,25 104:4,9
110:15,21
137:11,17
138:6 139:13
144:8,13,25
145:1 146:17
149:3 151:5
152:12,13
161:25

**misinformation**
43:12

**missed**
72:21 135:6

**misspelled**
55:4

**misunderstood**
45:14

**moderate**
65:10 89:14

**moderately**
90:11

**moist**
90:6

**Mollo**
107:13 135:10,
15,19,20,24
136:4 138:1
139:4 171:4,7,
25

**moment**
63:5 131:8

**moments**
63:6

**money**
59:24 153:1

**monitor**
109:19 110:7

**monitored**
17:21 65:11

**monitoring**
25:25

**month**
8:12 9:12,17,
18,21 18:25
19:5,6

**months**
17:16 21:25
26:21

**moon**
6:15

**morning**
37:20 107:19
125:24 130:18
159:23 160:13
168:13,23
174:4

**Morse**
10:14

**motionless**
139:13

**move**
6:8 21:20
22:8,14 99:11,
12 105:11

**moved**
21:20 152:21
153:2

**moving**
22:11

MRIS
  41:22

multiple
  66:1

multitude
  150:23

_____

**N**

name
  6:14 7:19,20
  149:19 160:8

names
  166:20,21

Narcan
  28:3

national
  5:1 50:3
  157:14 158:25

nature
  76:5 105:19

nausea
  103:13 104:11
  106:25

nauseous
  103:15

NCCHC
  50:3,10,12,14,
  21 67:13,14

necessarily
  23:8 32:7
  48:19

need
  6:24 7:1,4
  16:2 56:17
  57:10,14 66:16
  99:18 106:16
  109:6 123:24
  129:13 160:16,
  25 161:14,15

166:14

needed
  127:20 159:14

needs
  129:13 160:12

negative
  41:10,11 42:24

nervous
  120:25 121:3,7
  160:25

Net
  161:8

never
  16:10,11 24:10
  31:7 34:19
  49:4 105:6
  139:3 145:5
  146:5,15
  149:25 157:6,
  10 161:10
  164:22,24

nice
  24:16

night
  72:15 74:4,5,
  9,11 129:11,
  12,24 168:14

nodding
  102:18

nonetheless
  52:8

normal
  23:12 33:19

norms
  172:3

north
  11:10

notarized
  55:25 56:2

notary
  56:1,18

notations
  65:4

note
  72:11 73:25
  74:6,7 151:2

notes
  4:10 50:18
  53:22 74:18
  91:24 92:5
  141:1,4,5

Notice
  47:16

notification
  93:17 94:24
  95:7 96:6,11
  163:17

NP
  130:18,21

nuances
  101:19 129:20

number
  3:12,13,14,15,
  17,18,19,21,
  22,24 4:3,5,7,
  8,9,10,12,13
  7:22 8:9 31:5
  34:21 57:24,25
  59:2 60:23
  66:12,17,22
  68:21 70:13
  72:7 76:10
  78:13 79:25
  84:23,25
  101:12 153:13
  154:8 158:20
  167:21,23
  173:6

numbers
  132:14

nurse
  12:9 19:4 20:3
  25:15 31:15
  32:3,6,15 33:7
  35:16,17,24
  36:8,10 38:1
  39:10 53:15
  68:9 98:13
  99:5 101:15
  109:13 110:14
  112:14 113:18
  114:11 124:21,
  23 125:3,6
  126:7,12,13,25
  127:1,9,12,17
  128:1,4,6,14,
  21,24 129:3,21
  130:13,17
  131:6,11,25
  135:9,14,19,
  20,24 136:3,
  10,16 138:1,7
  139:2,4,5
  143:8 144:2
  145:5,9,15
  146:8,15 154:9
  155:5,8,13
  156:21,23
  159:18 161:6,7
  164:25 167:18,
  22 168:8
  170:1,7,18,23
  171:4,7 173:25
  174:3,6,7

nurse's
  99:24 145:13

nurses
  13:12,13 19:6
  31:3 32:7,15,
  23 53:4,15,17,
  19 65:14 68:9
  106:20,25
  126:2 128:9
  129:17 131:19,

STEPHEN FURMAN, R.N.
July 07, 2021

20 138:13
146:2 151:21
155:3,15,19,
21,22 156:3,5
157:2,13,17
158:23 159:1
169:20 172:7
174:15

**nursing**
8:21 11:4,8
12:8,11 13:22
27:1,3 29:7
31:25 32:12
43:23 51:9
95:4 96:21
98:4 126:19
150:14,21
151:10,12
155:11 157:12,
25 158:1 172:3

───────────

O

───────────

**OAWS**
78:9

**object**
19:13 43:5
49:6 94:25
95:16,18,20
96:13 100:7
107:15 110:16
112:2 118:12
122:22 156:13
162:7 167:19
170:2,10,24
172:17 173:1,9

**objection**
49:4 108:21
114:18 118:5
134:25 140:16,
24 162:15,24
171:16,20
174:17

**objective**
41:22 42:13
77:7,13,17,18
78:3 88:23
89:1 104:24
112:25 173:14,
15,21

**observation**
101:16 164:20

**observational**
76:7

**observations**
99:25 100:16

**observe**
99:21

**observed**
88:25 146:20

**observing**
100:19,23

**obtain**
12:9,12

**obtaining**
42:20

**obvious**
90:7 155:24

**obviously**
22:10 23:16
24:18 38:18
42:17 43:10
104:7 163:14,
19 165:17

**occasion**
116:3

**occasional**
26:19

**occasionally**
17:10,11 23:3,
15 26:16 29:19
110:12 114:16
115:16,18

116:1 138:2
154:25

**occur**
140:22 144:7,
24

**occurred**
139:17,19
140:15 144:12

**ocean**
152:21

**odd**
27:2

**offer**
163:10

**offering**
163:9

**officer**
31:8 164:8
169:1

**officers**
31:6 149:21
163:11,13

**okay**
6:10 7:7,18
8:7 9:10,14,
16,22 10:1,11,
17 12:2 13:18,
20 14:3 16:4,
14 18:6,17
19:19 20:17,20
21:4,7,18 22:3
23:7,10 25:25
26:5,25 28:2
31:14 32:7,8
35:4 36:6
40:6,10 45:17
46:10,19 47:4
48:2 49:11,16
50:2,25 51:25
53:7 57:7,18
59:15 60:2,14,
19 61:11 62:2,

10 63:4,15
66:1,12 67:10,
20 68:3,21
69:18 70:5
72:25 74:12,19
75:14,16,19,25
77:2,12,19
78:5,13,20
79:12,19,25
81:25 82:7
85:6,10 86:17,
19 87:10,11
88:1,11,19
90:22 91:20
92:21 94:5,10
99:13,17
101:1,11,21,24
102:17 103:13
105:11 106:12,
15,23 107:13
112:9,12
113:12,14,17
115:2,7
116:21,23
117:1,2,5
118:9,19,25
119:1 120:1,
15,24 125:20
126:6 128:11
133:8,11,13,17
135:1,23
136:15 139:19
141:15,24
142:21 143:1,
11 145:18
148:6,18,21
149:24 163:3
170:16,20
171:24 172:6,9
173:6,20
174:24

**once**
17:12 23:20
27:3 32:20
37:13 38:15

81:18,23 87:23
98:5 161:6,11
162:2 165:10,
14

**one**
5:19 7:23 8:10
10:13,16 12:18
16:16 18:24
19:2,5,6
21:10,21,22
22:6 25:3
26:21 29:23
30:2,21 33:5
34:8 41:13
46:8 48:24,25
49:24 50:1
55:1,3 56:7
57:13 61:24
62:22 65:6,24
66:7,9,10
67:24 71:5
75:13,14 76:3
77:24 80:11,
16,20 82:18
83:6 87:10,12
88:19 90:15
91:9,13 97:15
100:11 102:8,9
103:2,13
107:11 111:19
124:20 130:6
135:9,10,12,
14,16,24
136:16 141:5,
7,8,10 142:4,
11,13,15,17,
19,24 143:2
148:6 151:21
152:20 163:16
166:10 168:5,
15,18,21,23

**one's**
121:14,17

**one-word**

102:19

**ones**
9:10 13:7
158:25 174:21

**online**
13:25 14:2,7,
16

**onset**
23:18

**operating**
25:3

**operational**
28:10

**opiate**
52:14

**opinion**
4:12 8:17
10:10 56:5
68:6 97:20
98:22,23,24
99:8 106:24
112:23 113:6,9
120:10 124:13,
17 130:15
132:5,14,17,
18,21 133:5
136:12,23
146:5 161:19
162:5,10,14,21
163:9,10,25
169:24 170:22
171:3

**opinionated**
151:25

**opinions**
11:7,12 43:21,
25 53:3 54:8
80:7 120:16
132:23,25
134:9 145:13
169:16,20
170:8,17

172:23 174:22

**opioid**
52:17

**opportunity**
94:20

**opposed**
22:23 150:21

**option**
165:10

**options**
165:2,3

**order**
28:22,24
32:19,21,25
33:1,2,4,5,7,
11,16,23
34:10,11,13
35:12,17 36:18
37:19 38:3
39:14 40:1
113:5,8 125:3
126:7,8,14
128:5,6 131:6,
7 141:18
142:3,6,16,17
148:11 165:16

**ordered**
36:14,19
127:17,24

**ordering**
34:1 35:20
36:11

**orders**
32:4,9,13,17,
24 34:5,6
109:9 130:22,
24

**organizations**
13:11 66:2

**organized**
74:20

**orientation**
43:9 49:16
102:3

**oriented**
38:25 43:11

**outcome**
39:16 43:13
148:15 160:22
162:12

**outcomes**
160:20

**outliers**
10:9 11:6

**outside**
7:10 42:3,20
50:6 106:19
118:22,23
152:13 162:7,
15 171:8 172:3

**outward**
111:8

**overreact**
121:4

**overreacts**
121:7

**oxygen**
137:11,16
138:3,6,17
139:2 145:2
162:1

---

**P**

**P-L-U-G-G-E**
160:9,10

**p.m.**
93:21

**page**
46:7,8 63:25
65:8,9 67:12,

STEPHEN FURMAN, R.N.
July 07, 2021

14,18 68:25
69:19 75:22,25
78:6 80:15,16
88:4 95:6
98:16 99:19
121:19,25
122:4,8 123:24
129:8 130:10
132:14 133:13,
17,21,23,24
134:8,12,16
135:8 136:10,
11 141:10,11,
17,24 167:9

**pager**
  34:20

**pages**
  47:7,10 51:10
  58:11 59:6,13
  66:16,18 78:8
  86:2 92:1,2,4
  134:21 135:7
  136:21 142:14

**paid**
  9:7 60:3,12

**pain**
  119:10 154:1

**palms**
  90:6

**pancreas**
  118:17 119:4,
  15,17

**pancreatitis**
  118:10,14,16
  119:3,9,12,13,
  15,18

**paper**
  11:17 56:20

**paperwork**
  61:12 113:21

**paragraph**

122:7 133:18
134:4,13
135:9,13,14,
18,24 136:3,6,
16 167:11

**Paragraphs**
  169:25

**paralegal**
  58:19

**paramedic**
  20:4 27:18,20,
  24 29:7 150:15

**paraphrase**
  76:23

**Paraphrasing**
  130:11

**paroxysmal**
  76:6 101:6
  103:1

**part**
  5:19 20:13
  24:16 31:11
  32:11 48:8
  75:16 85:8
  87:14,15
  108:17 116:17
  127:8 129:6
  162:17

**particular**
  15:24 51:1,13
  63:25 65:17,24
  83:6,11 84:13
  93:18 129:24
  150:20 154:12
  170:18

**partner**
  10:20

**parts**
  99:20 103:5

**party**
  155:25

**pass**
  126:10,14
  128:4

**past**
  19:23 24:19,21
  42:19 56:9
  79:24 138:6
  162:2 165:15

**patient**
  17:24 19:5
  20:14,15 23:4
  24:1,18,20
  28:9 29:9
  33:12,17 34:1,
  3,11,17,18
  35:2,8 36:12
  38:2,4 40:20,
  21,24 41:1,8,
  10,14,16,17,19
  42:2,24 43:2
  45:6 76:9,20,
  24 99:23
  101:25 102:6
  103:2,14,23
  104:10 105:10
  108:7,11,17
  109:3,13,24
  110:4 126:18,
  24 137:13,21,
  24 139:2
  145:14 150:24
  153:24 154:23
  161:9,13
  165:18 173:12,
  19,23

**patient's**
  37:23 89:14

**patients**
  16:7 17:3,9,16
  18:2,11 20:5,
  10,11,17
  22:12,22 23:19
  25:3 26:17
  29:4,20 30:9,

11,12 38:12
39:5 41:4
45:13,14,15
65:9 108:24
109:16,18
119:9 126:4
129:21 144:15
151:1,7,13
154:2,5,8,21,
25 156:17
159:5 167:12

**paused**
  10:23 13:2

**pay**
  62:15 118:22

**PBT**
  110:15,21

**PDF**
  62:11,19,20

**Peacock**
  10:20 158:8

**pediatric**
  16:5,7 20:12
  25:2 137:19

**peer**
  74:1,8,15
  161:12

**people**
  19:22 25:4,10,
  15 26:12 31:6
  39:19 42:7
  52:12 84:23
  90:22 103:24
  105:6 106:5,6,
  8,12 129:10,
  12,19 139:25
  144:16,19
  154:13 156:10
  158:11,14,20
  159:3 164:9,
  16,19,21,23

STEPHEN FURMAN, R.N.
July 07, 2021

percent
 10:8  11:8,10
 30:6,9,17
 81:20

percentage
 111:13

perceptible
 90:6

perform
 21:24

period
 68:15  81:11
 107:22  108:1
 117:6,10  123:5
 141:5,6,8,13

periods
 122:14

permissible
 38:1

permission
 35:18

person
 14:1,8  24:12
 30:22  39:11
 81:18  89:8,11
 93:11,14
 104:2,12
 105:11,14
 110:11  126:20
 165:25  173:11

person's
 33:25

personally
 19:4,21

persons
 81:17

perspiring
 160:24

pertaining
 44:15  153:6,18

Peter
 5:13  19:12
 63:16  85:11
 148:21,24
 149:19

pg
 3:4,6,8,12,13,
 14,15,17,18,
 19,21,22,24
 4:3,5,7,8,9,
 10,12,13

phone
 57:5  92:17,18,
 20  93:20
 159:11,13

physical
 41:25  107:23
 161:4

physician
 28:5  33:3,20,
 25  34:2,12,15,
 17,25  35:5,10
 36:21  37:7,10
 40:2,3  119:8
 151:11

physicians
 139:1  145:13
 151:2,7  158:22

pick
 20:14

picking
 126:22

picture
 129:22

pin
 23:18,22

place
 21:10,21,22
 22:6  30:18
 128:18  129:23
 161:7  164:21

 165:25  168:15

plaintiff
 5:10  10:8  56:9
 158:11

plaintiff's
 47:16  120:20

plaintiffs
 10:6

plan
 41:15,18  42:23
 43:4  109:9
 172:10

play
 126:19  161:4

please
 7:18  80:9

Plugge
 160:11,12
 164:8

point
 6:21  9:6  17:21
 33:12  38:21,23
 39:20  53:22
 81:21  92:17
 94:17  122:18
 131:20  137:14
 152:4  161:22
 164:14  165:3
 166:2  172:22

pointing
 64:3

policies
 37:14  44:5,6,
 8,12,15,17,20,
 24  45:2  49:23
 53:11  131:11
 148:7,12,14
 161:5

policy
 50:19  51:1
 163:4

pool
 15:7  16:1

poor
 133:4

population
 84:24  105:25
 152:24

portion
 67:3

posed
 7:1  108:19
 115:15

position
 8:25  37:7
 97:17

positions
 30:3

possess
 156:7

possibly
 35:7

postictal
 23:20,21  24:2

potential
 154:2

potentially
 5:22  20:6
 21:19,20  22:6,
 19  23:13  34:17
 52:2,3  153:24
 167:14

pounds
 109:25  110:1

power
 32:23

practice
 32:16  35:16
 43:23  44:14
 45:3  65:23
 125:9  126:8

STEPHEN FURMAN, R.N.
July 07, 2021

162:8,16

**practiced**
167:18

**practices**
37:15 51:9
145:15

**practitioner**
12:10 124:24
125:6 126:7,13
127:12,17
131:11

**practitioners**
32:6 44:20
53:16 68:10

**predict**
161:10

**predictors**
3:19 69:8
70:19

**preparation**
47:2 85:8
133:11

**prepared**
141:21 142:11,
18,19 169:15
170:16

**prescribing**
34:25

**present**
128:13,16
145:18

**pressing**
7:14

**pressure**
36:12,13 77:23

**pretty**
12:1 15:12
26:7 52:10
82:3 88:16
129:16

**previous**
24:17 61:8

**primarily**
19:10

**primary**
84:25

**print**
98:8

**printed**
74:11 87:21
98:1

**prior**
7:22 8:10 27:3
69:13 126:18
147:15 150:14
151:5 160:4

**prison**
29:15,16,18,
21,24 106:4,5,
6 150:10

**prisoners**
150:6

**privy**
131:2

**PRNS**
161:17

**probably**
16:10 18:24
22:2 25:4,10,
19 30:20 63:3
85:3 146:14

**problem**
31:11 33:18
154:12

**problems**
34:9,21 119:16
129:10

**procedures**
44:2,5,6,8,12,
17,21,24 45:3

49:24 53:11
131:12 148:8,
11,12,14 161:5
163:4

**proceedings**
10:23 13:2
143:17

**process**
40:11

**produced**
57:21

**professional**
13:10 43:21
108:6

**proffered**
46:14 54:10,22
58:19 59:16
65:1 67:14
69:10 71:13
73:8 75:3 79:1
80:10 82:24
85:23 86:24
134:6

**program**
12:8 13:8
14:12

**progressed**
139:23

**Progressive**
27:3,7

**proof**
55:10

**proper**
130:7

**properly**
130:10

**protect**
45:6,9,11

**protocol**
51:18 68:14

125:4 135:22
140:3

**protocols**
28:5

**proven**
138:24

**provide**
8:1 53:4 70:1
72:5 108:18

**provided**
30:14 34:20
44:4 68:8
69:24 71:23
73:19 75:11
79:9 83:8
108:19 109:10
137:15 139:2
153:12

**provider**
30:14,17 32:4,
5,20,24 33:3,8
34:6 35:18,21
36:7 39:10
41:5 42:14
44:22 52:5
109:10,13
110:3 119:6
120:12,14
124:15 131:15,
16,22 145:7
146:4,22

**provider's**
35:17

**providers**
33:13 35:20
45:12,13,15,
16,17 53:15,17
108:20 118:21
122:19 126:4
137:2 146:10,
11

**providers'**

32:9,12,16

**providing**
53:7,10 109:8

**proximate**
31:17 123:18
136:24 137:3,7
138:20 161:20

**proximately**
137:1 138:10

**proximity**
164:16

**prudent**
126:25 156:21,
23

**psychiatrist**
38:14 40:3

**psychiatry**
83:17

**public**
5:2 75:15

**publications**
66:4

**published**
11:17 65:13

**pull**
11:24 63:5
70:9,10 71:3,6

**pulled**
21:13 70:5
72:16 86:14
88:13 145:19
146:17

**punt**
119:5

**punting**
119:7

**pure**
116:17 151:12

**purely**
154:14

**pursuant**
5:2

**put**
17:15 39:17
56:20,23 57:7
58:2,11 59:5
62:12 66:2
68:14 76:10,
12,17 77:5
85:13 125:3
126:9 132:5
133:2,8
141:17,18
142:2,5

**putting**
95:13

---

**Q**

**Qualifications**
167:11

**question**
6:12,16 7:1,6
8:2 19:17
21:23 33:22
34:12,23 35:14
41:2,9 44:18
47:13 49:9
70:11 71:10
72:5 81:18
82:1 84:17
90:9 91:6
105:2 114:12
115:1,13,15
116:12,13
118:2 119:2
120:6 122:25
124:10,12,16
132:24 133:4,5
138:9 140:7,20
143:13,14,15

144:17,23
147:7 155:24
156:11 162:18
163:22,23
167:24

**questioning**
22:18 35:11
36:17 40:20

**questions**
5:20,22 19:13,
15 32:18 41:8
80:13 92:15
99:24 100:20
101:12,25
102:4 108:12,
19,24 109:3
114:5,8 116:21
118:20 119:24
148:19,22,23
149:22 169:9
171:11 173:7,
13

**quibble**
125:1

**quick**
84:5

**quite**
27:22 37:6
137:8 171:24

**quotes**
167:7

---

**R**

**R.N.**
5:5

**radioed**
169:1,4

**ramification**
165:9

**ran**

27:8

**Rapids**
84:8,16 85:12
156:6

**rapport**
105:9

**rate**
78:2

**rated**
76:7

**ratio**
137:25

**re-evaluated**
161:15

**reach**
164:18

**reaches**
80:25

**react**
122:19

**reacts**
119:17

**read**
7:22,23 37:6
46:2,3,4,7,10
47:7,8,11,12,
14 48:2,5,6,
11,13 49:2,5,
12,14,17,20,
24,25 50:1,12,
16,17,19 51:5,
10 65:7 69:11,
13 70:3,6,9
72:12 76:3,11,
18 77:6 94:21
95:10 96:19
98:13,16,18
99:14 119:21
129:3 143:14,
16 146:7
157:24

STEPHEN FURMAN, R.N.
July 07, 2021

| | | | |
|---|---|---|---|
| **reading**<br>31:23 46:23<br>80:4 87:20 | **reclusive**<br>152:16 | **reference**<br>51:8 173:4 | **regularly**<br>131:25 |
| **ready**<br>84:21 | **recognition**<br>4:3 78:21<br>79:13 160:19 | **referred**<br>48:21 72:17 | **rehab**<br>19:21,24 |
| **real**<br>89:15 100:23 | **recognized**<br>163:20 | **referring**<br>32:7 48:10<br>71:2 77:10<br>119:19 | **relate**<br>43:22 48:7 |
| **reason**<br>6:13 29:17<br>41:6 99:18<br>106:17 150:20 | **record**<br>4:9 7:19 11:1<br>49:13 52:25<br>54:18 76:18<br>77:6 82:16<br>87:2,15 88:4<br>92:16 93:10,<br>13,16 94:8,15<br>97:22,23<br>113:1,10 115:4<br>116:8,14<br>123:23 124:3<br>134:23 147:17<br>149:16 | **reflect**<br>44:25 56:21<br>133:5 | **related**<br>43:25 79:20,21 |
| **reasonable**<br>109:12,15<br>139:15,20<br>140:8,21<br>143:21 161:21 | | **reflecting**<br>134:9 | **relating**<br>11:18 31:15<br>53:8,10 134:9 |
| **reasons**<br>7:13 | | **reflects**<br>78:16 86:11<br>88:13 | **relationship**<br>83:21 |
| **reassess**<br>137:25 | | **refusal**<br>38:5 | **relationship-**<br>**wise**<br>151:13 |
| **recall**<br>29:20 128:24<br>132:23 145:4 | | **refuse**<br>38:17,19 41:1<br>104:20 | **relative**<br>53:4 |
| **receive**<br>8:14 | **recording**<br>128:17,18 | **refused**<br>38:15 113:21,<br>25 114:12,14<br>116:3 | **relayed**<br>30:16 |
| **received**<br>8:4,11 41:16<br>79:23 140:3<br>141:9 150:18 | **records**<br>3:14 42:4,16,<br>19,20 45:18<br>47:15 48:13<br>54:12 61:4,6,<br>22,24,25 62:2,<br>4,6,13 87:23<br>112:23 138:25<br>141:9 166:12 | | **relied**<br>174:23 |
| **receives**<br>41:13 | | **refuses**<br>165:1,4,22 | **rely**<br>30:3,13 51:13<br>99:25 112:22<br>113:9 120:11,<br>13 145:13<br>174:21 |
| **receiving**<br>25:2 91:5,8<br>138:6 | | **refusing**<br>38:12 | |
| **recent**<br>142:7,8,10,23,<br>25 | **recovery**<br>25:7 | **regarding**<br>63:21 70:18<br>92:11 153:9<br>156:12 161:20<br>169:20 172:15<br>173:7 | **remainder**<br>134:20 |
| | **red**<br>55:10 132:6,21<br>134:8 135:6<br>136:2,21<br>143:5,9 | | **remember**<br>7:16 95:2,3<br>98:11 127:22 |
| **reckless**<br>171:14 | | **region**<br>157:13 | **remotely**<br>5:4 |
| | **refer**<br>121:21 122:4 | **registered**<br>161:6,7 | **rephrase**<br>149:23 |
| | | | **report**<br>3:12 31:24 |

STEPHEN FURMAN, R.N.
July 07, 2021

43:15,17,18,
20,24 46:18
53:2,24,25
54:2,9 62:17,
21,23 63:1,12
88:20 92:10
94:22 99:19
120:17 121:19
124:12 128:13,
25 129:6,15,17
130:11 133:1
141:12 148:6
166:17 167:9
169:12,19,25
171:19 172:9,
15,23,25

**reporter**
6:9 59:7
143:12

**reports**
128:8

**represent**
149:20

**request**
153:14

**requested**
143:15 166:5

**require**
76:8

**required**
32:4,15,18
45:1,5 126:2
135:22 136:8
139:6 158:1

**requirement**
44:14

**requirements**
14:10,18

**research**
69:15 75:17
78:17 79:8,11

80:21 83:7
116:25 120:24
121:2,6,10

**researching**
153:5

**respect**
37:23 51:14
111:4 116:16
117:15 119:2
120:21 124:21
130:1 169:23
170:7,17,18,
21,22 171:8

**respiration**
137:16 138:4

**respirations**
137:22,23
139:6 144:4

**respiratory**
139:24 146:16

**respond**
102:18 104:2,
23

**responded**
119:24

**responding**
104:17

**response**
86:22

**responses**
76:22

**responsible**
43:2,10

**rest**
156:1,3

**restate**
122:24

**restricted**
119:12

**result**
41:9 43:12
79:16 123:3
138:4,15,24

**resulted**
143:23 144:11

**results**
43:3

**resume**
21:16 22:17,19
29:5

**resumed**
10:25 13:4
54:17 82:15
143:17 149:15

**retain**
9:1

**retained**
4:14 7:24,25
9:7 10:12,15

**retainer**
60:3

**reverse**
142:16

**review**
9:2,6 37:3
45:20 51:1
69:9 71:6 73:4
84:20 141:9
164:2,7 168:11
173:25

**reviewed**
10:4,19 11:14
45:18,22 50:7
53:2 57:9
74:1,8,16
137:14 151:22
153:14 161:12
166:3 170:9

**reviewing**
74:14 153:5

**reviews**
11:13 54:3,25
58:20 65:2
67:16 69:12
80:11 122:2
124:20 134:7
152:9

**Revised**
3:25 4:8 75:1
85:24

**Richmond**
15:2 84:5,8,15
85:12 106:10
152:11,14,22
155:17,20
156:4,6

**ride**
36:16

**right**
6:11 9:8,12
10:2 16:19,23
17:6 18:23
19:18 20:16
24:5,14 25:5,
16,22 26:3
27:18,25 30:25
31:1,2,12
36:2,3,7 38:7,
8,11,24 39:8
40:21,23 41:6,
23 45:9 46:17
52:1 56:2
59:15,17 61:13
63:4 70:13
74:14 78:12
82:10,18 85:9
87:12 90:18
102:12,15,21,
22 103:2,15
110:2,5 112:20
113:23 115:10
117:14 118:17
125:21 129:24,
25 132:7

STEPHEN FURMAN, R.N.
July 07, 2021

133:2,21,24
134:8 139:3
144:8 146:25
149:23 151:4
158:8 168:13

**right-hand**
91:25

**rights**
37:23

**RN**
14:17 98:6,7
150:18

**RNS**
169:20,24

**rocking**
104:19

**role**
20:1

**Ron**
12:20 19:7
54:11 70:17
82:5 124:5

**Ronald**
5:11

**room**
15:21 21:12
23:5,7 25:3,7
42:7 44:19
106:11,13
130:14 131:9,
13 155:10,12

**rotate**
15:8,12

**roughly**
159:20 168:18

**route**
151:10,11

**routinely**
156:17

**row**
15:15

**rule**
40:19 154:1

**rules**
6:4 40:15

**run**
41:22

---

**S**

**Sabatini**
55:14

**safe**
25:9

**sand**
137:13 162:3

**sarcastic**
35:14

**sat**
146:14

**Saturday**
16:16 150:25

**saved**
161:24 162:2,4

**saying**
34:2,10 40:19
47:4 115:14
123:1 127:22
134:23 141:16
157:17 166:23
168:7

**says**
15:2 16:4,12
21:7,16 22:17,
19 25:8,13,18
26:5,25 43:20
45:17 66:17
72:11,12 73:7,
25 74:8 78:21,

23 80:17 88:5
95:7,14 96:5,
11 99:5 113:23
116:14 124:25
129:8 136:3,7,
16 145:15
146:25 147:8,
12,25

**scale**
4:8 77:7,9
85:24 153:18

**schedule**
14:13 152:4

**scheduled**
14:13 21:10
168:10

**scheduling**
14:10

**school**
14:14 150:17,
21

**science**
12:13

**scope**
162:7,16

**score**
18:15,22 52:7,
9,22 87:22,25
89:16 90:1,15,
16 100:12,15
160:24

**scored**
87:6 91:17

**scores**
18:4 90:24
173:7

**scoring**
17:15,17 18:3,
15,16 52:6,10
86:12 88:21
89:8,11 90:19,

20 100:6
101:2,14 102:5
156:17 161:18
173:14

**screen**
94:12,24 95:7
96:4,6,11,20
103:4

**screw**
6:13,14

**search**
75:15 86:16,17
88:13 153:19

**second**
43:20 54:12
60:7 63:25
76:19 124:20
133:17 135:13,
24 136:6 137:2
142:4,11 174:9

**seconds**
102:2,5,15
104:3,8,15

**section**
5:2 15:24
51:13 64:25
66:19,20,21,22
67:4 68:3 69:2
77:2,15
133:22,24
134:8,13 153:8

**sections**
51:14 64:1
76:1 79:25
80:3 100:15

**see**
8:23 12:23,25
16:9,10,21
17:2,16,18
18:4,24 19:2
22:21,24 23:3,
4 24:21 27:8,

STEPHEN FURMAN, R.N.
July 07, 2021

21,22 29:2,3
53:23 63:24
77:8 80:9,13
85:11 97:14,18
98:7 101:6,9,
18 103:19
107:7,9,19
113:21 114:9
121:25 122:2,
11 133:18
134:5,21
136:21 138:1
141:8 145:22
146:19 147:17
165:8 166:5,6,
9,15,22,24
167:2,5
173:23,24

**seizure**
23:2,23 154:22

**seizures**
22:25 23:15

**seldom**
15:14

**send**
58:7 93:17
130:13 131:8

**sending**
61:15 63:21
71:7 78:18

**sense**
32:19 111:15
145:11 156:9

**senses**
122:17

**sensory**
120:25

**sentence**
122:9 136:3,7

**sentences**
134:2 135:20

**separate**
59:23,24 86:25

**Sequelethol**
148:3,5

**sequella**
156:18

**served**
20:2

**Service**
5:2

**set**
22:12 28:10
59:15 78:20
125:10 174:3,
15

**setting**
108:6

**seven**
169:20

**several**
10:19 21:12
27:7 37:1 53:4
155:19

**severe**
3:20 65:10
69:8 89:13
161:10

**Severity**
72:1

**shake**
6:8 81:17

**shaking**
81:12,15
147:15

**shaky**
160:24

**shape**
28:15

**share**

35:9 80:12

**she'd**
74:8

**sheet**
88:1 100:13
103:3,11

**Sheremet**
158:8

**Sherman**
10:21

**Sherwood**
31:15 124:24
125:3,6 126:7
127:12,17
128:1 130:18,
21 131:3,5,11

**Sherwood's**
126:13 127:9

**shift**
21:25 98:4
128:8,12,13,25
129:6,15,17,24
168:5,6

**shifts**
14:10 20:23,25
21:3,4,5,6,7
22:4

**shock**
28:18

**Short**
39:14

**shortest**
107:21 108:1

**show**
53:22 54:20
59:21 63:20
64:24 67:12
71:11 73:6
82:18 94:11
97:22 100:5

115:10

**showing**
52:7 59:16
160:2

**shows**
94:24 97:14,
17,21 161:13

**side**
53:12 73:24
101:12

**Sigma**
13:14

**sign**
160:15 172:13

**signature**
54:4

**signed**
55:24 56:1,18
57:19

**significant**
32:11 104:15
115:22 126:24

**signs**
52:7 77:21,25
78:1 88:24
135:21 160:6,
10,23 173:15,
21,22 174:1,3,
16

**similar**
87:7 88:16

**simple**
102:4 147:8
156:11

**single**
45:20,23 46:2,
4 48:6,24,25
49:2,5,14,18,
19 51:10

STEPHEN FURMAN, R.N.
July 07, 2021

sir
   43:19 53:20
   54:25 88:15
   122:12 150:9
   153:7 162:18
   169:7

sit
   103:22 105:7

site
   152:5 153:12
   166:22 167:4

sitting
   139:3 143:23

situation
   23:25 90:23
   127:1 131:15,
   23

situations
   158:1

size
   84:14,15
   158:5,19

skill
   172:4

skills
   26:2

slower
   47:11

smart
   152:1

Smit
   3:6 5:13,21
   12:20,22 19:7,
   9,18 46:16,19
   56:13 61:2
   63:11,15,17
   67:2,6,10
   68:21 70:17,21
   72:21,25 82:5,
   8,13 85:13
   94:25 95:20

96:7 124:5
133:23 134:16
148:25 149:3,
18,19 157:1
162:9,19 163:2
165:13,21
167:20 168:1
169:6

somebody's
   6:14 65:18
   90:19

someone's
   88:13

sort
   136:18

sound
   101:22

Sounds
   88:6

source
   84:25

south
   152:14

speak
   47:2 131:17

speaking
   134:24,25

special
   156:12,16

specialized
   153:21,23

specific
   29:4,6 69:15
   71:2 121:22
   125:10 160:16

specifically
   70:12 79:21
   124:21 159:9
   166:5,14 167:5

specifics
   170:22

Spectrum
   45:18 47:15

speculate
   108:2 116:23

speculating
   118:20,24
   146:18

speculation
   10:7 105:22
   108:4 116:17

spelled
   55:20

spend
   46:11

spent
   171:24

spoke
   55:22 56:22
   69:25 74:5
   88:20 92:22
   93:1,4,7,11
   109:7 128:21

spoken
   50:9

St
   26:5,11,13

stabilize
   27:24 28:24

stabilizing
   28:13

staff
   8:22 31:25
   45:7 95:4
   96:21 157:25
   158:1,22
   160:11,12

staffing
   15:7,19,23

16:1 22:7,14

stages
   167:13

stand
   134:7

standard
   8:21 9:11
   10:10 11:6,11
   31:24 43:22
   44:3,7,13,21,
   25 45:5 54:7
   57:3 65:18
   80:7 84:10,13,
   18 85:2,7
   132:22 133:2,6
   134:10,14
   136:25 156:22
   157:12,18,20,
   22 158:13,17,
   24 171:5,8
   172:2

standards
   157:15 163:4
   174:25

standing
   104:18,25
   105:1

stands
   33:20 51:18

start
   13:20 23:13
   40:11 52:5
   81:2,12,15,22
   95:8 99:4
   137:23 144:3
   148:20 151:19

started
   30:24 87:20
   124:1,18
   135:14 139:14
   140:17 143:8,
   13 144:1 152:4

STEPHEN FURMAN, R.N.
July 07, 2021

160:2

**starting**
28:4 98:25
135:24

**starts**
99:7 135:10,
17,21

**stat**
36:3,4 37:2,8,
10,11,14,20
125:7 126:15
128:2

**state**
7:18 23:21
24:2 40:7
80:12 84:11
114:22 150:8
157:8,13
167:10,12

**stated**
113:18 114:11
116:11 126:15,
17 138:25
144:9 166:25

**statement**
6:21 54:8
143:20

**statements**
67:13 76:24

**states**
65:9

**stating**
48:19 128:2

**status**
43:9

**statutory**
112:6

**stay**
15:10 21:8,21,
22 22:9,10

39:24 68:11

**steady-state**
80:25 81:6

**Steimel**
160:1 164:23

**Stephen**
5:5 7:20

**stick**
145:2

**sticky**
73:25 74:6,7,
17

**stipulate**
5:3

**stood**
164:11

**stop**
81:8

**stopped**
159:25

**Stoppers**
27:4

**stopping**
19:16 138:2

**stores**
84:25

**stress**
137:20

**strike**
32:2 69:23
90:9 126:1

**stroke**
154:1

**studies**
30:21

**study**
74:1

**stuff**
54:14 55:5
129:14

**stumbling**
126:22

**subject**
79:12

**subjective**
76:5 77:13,17
88:21 89:8,11,
16,19 90:12,
13,15 100:3
108:13

**subjectiveness**
90:8

**submitted**
60:8

**subsequent**
78:8

**subside**
81:24

**substance**
155:3

**substances**
26:18

**subtler**
76:20

**sued**
163:11

**suffice**
32:21

**sufficiently**
123:7

**sugar**
33:18 109:20

**suggest**
66:5 117:20

**suggesting**
71:8

**suggestions**
66:3

**suggestive**
65:14

**suggests**
114:7

**suing**
158:11

**sun**
6:15

**supplemental**
15:7,19,23
16:1 48:2,3,9
138:17

**support**
8:19 9:3,4
137:19

**supports**
97:13,17,19

**supposed**
105:12 127:23

**sure**
6:4 7:8,20
9:9,24 24:6,16
30:5 31:10
34:8 35:11
36:23 37:16,18
39:9 40:18,24
42:15 43:13
44:12 45:10,13
46:12 49:3
52:14 63:8,17
68:2 74:17,18
76:4 77:21
80:10 91:12
93:5 95:11
96:19 97:19
98:5,15 100:12
102:20 103:3,4
104:18 105:3,5
106:14 109:23
110:6 111:17

STEPHEN FURMAN, R.N.
July 07, 2021

118:7,13
119:25 122:3,
25 126:5
129:13 131:21
144:14 146:21
152:9 156:15
157:4 160:18
168:9 173:17

**surgery**
15:22

**surveillance**
47:19 67:9

**surveying**
50:2

**surveyors**
50:25

**sweat**
90:7 101:7

**sweating**
77:23 90:6
101:5,6

**sweats**
76:6 103:1

**sweaty**
101:8

**sworn**
5:3,6

**Sybil**
154:19

**symptom**
79:21

**symptoms**
65:10 80:17
81:24

**Syndrome**
4:5 69:9 82:20

**system**
24:17 28:6
94:7,8,16
120:25 121:4,7

127:13 159:16
160:5 163:17

**Systematic**
69:9

---

**T**

**T-U-N-N-E-L-L**
98:14

**take**
6:10,24,25
8:13,18,20
12:16,18
20:23,24
54:11,12 56:18
61:11 82:8,11
102:1,2,5,14,
19 104:4,7,9,
12 107:21
116:3 128:25
135:21 136:8,
17 137:20
143:24 148:19
149:1 150:4
157:24 168:3,
19 174:1

**taken**
119:22 158:21

**takes**
42:21 103:24
108:2

**taking**
5:19 19:3,4
116:9 133:1
165:5

**talk**
33:8,13 34:5
50:23,25 54:13
99:13 102:10,
14,17 103:23
104:4,14 105:8
107:20 108:1

140:4

**talked**
7:11,12 13:7
53:3 57:1 74:5

**talking**
17:23 18:14,19
19:10 25:15
26:23 32:6
42:2 68:4,12,
14 70:11 90:10
93:24 102:6
104:10,16
107:8,10
126:22 150:4,
25 151:7
155:20

**talks**
63:21

**tape**
87:23,24
107:6,7

**Tau**
13:15

**taught**
11:18 137:10
145:1,4

**teach**
137:18

**teaching**
151:1

**team**
20:13 26:15

**technical**
82:6

**telemetry**
17:6,19,20,23
18:3,5,8,10,11

**tell**
6:16,19 7:11
8:25 24:4

30:7,10,11,12
34:20 42:11
48:23 50:17
53:21 58:1
61:23 65:8
80:4 89:7,22
103:17 106:21
109:19,24
110:14 112:16
114:2 116:24
123:10 125:7
131:20 138:22
139:1 160:11,
12 161:21
162:25

**telling**
33:16 98:25
106:20 108:14
122:19

**tells**
22:8 30:22,23
103:20

**term**
6:14

**terrible**
39:11

**test**
110:15,21

**testified**
5:7 37:13
96:24 114:20
120:7 127:15
129:4 131:5
158:6 166:14
174:25

**testify**
31:17,20,23
84:21 94:23
96:17 114:15,
17,21,24 120:5
124:2 127:25
137:9 139:9,16

STEPHEN FURMAN, R.N.
July 07, 2021

testifying
156:10 158:13
169:16 170:17
172:14

**testifying**
120:8,11,21
128:24 137:3,6
145:3 151:20
158:4 172:10

**testimony**
8:1 31:15
47:25 53:14,19
54:17 57:4
82:15 85:6
92:15,25 97:12
98:14,16
112:19 120:20
123:25 125:13
136:12 138:19,
20 148:15
149:15 157:25
161:1 164:3,15
166:4 174:14

**testing**
42:13

**tests**
41:22

**text**
14:22 62:12

**Thank**
53:18 63:16
82:3 169:6,8

**Thanks**
82:13

**thing**
22:1 26:7
41:23 42:4
62:13,17,18
91:21 107:14
137:4 165:4

**things**
25:4 27:21,23
28:16 50:23

53:23 66:5
80:20 88:25
100:19 105:9
126:23 129:20,
23 171:25
172:10

**think**
7:4 18:22
20:10 31:7
34:7 35:6
39:10 45:22
55:14 57:16
66:17,22 91:20
108:17 109:7
123:25 125:13,
20 140:11
141:2,25 142:1
146:8 148:21
151:25 152:1,2
155:18 158:6

**thinking**
24:12 26:1
56:21

**third**
142:12 174:9

**thought**
35:2 125:16

**thousands**
155:17,20,22

**three**
9:21 24:11,15
26:21,23 34:4
35:8 76:2,3
133:14

**threshold**
81:21 161:12

**throwing**
103:21

**Tidewater**
29:3

**time**

6:25 7:5,6
9:6,8 10:24
13:1 19:23
24:13 30:6,9,
18,23 42:21
46:10,13,24
68:15,18 69:25
71:5 81:12
82:11 91:9,10,
11,13 92:18,23
93:3 97:15
100:11,23
102:1,19 103:2
104:7,12,16
107:22 108:2
125:1,14
127:14 133:2
138:5 139:23
141:5,6,7,8,13
143:25 160:14
165:25 167:5
171:25

**timeframe**
142:3

**timeline**
141:21 161:22
162:3

**times**
6:1,2,3 7:25
9:25 21:12,24
34:4,14,24
35:22 41:13
42:6 51:21
90:24 91:14
112:10 125:10
131:20 150:24

**timing**
143:24

**title**
70:20 71:25

**titled**
85:23

**titration**
25:18

**today**
7:14 36:16,19
46:22 133:9
162:22 169:15
170:17 172:14
174:22

**today's**
58:13

**toilet**
138:11,12
139:13,21
140:10,15,23
143:24,25
145:20 146:13,
14,17

**told**
38:5 56:25
57:5 71:9
93:14 110:11
112:13 113:2
123:2 124:22
151:23 159:11
160:11 164:11
166:23

**tolerance**
111:4 117:7

**tomorrow**
36:17,24

**tomorrow's**
36:22

**tool**
75:1

**top**
66:17

**total**
46:11,22 47:1,
5 154:8

**totality**
62:5,7

STEPHEN FURMAN, R.N.
July 07, 2021

**totally**
  61:12 146:18

**touch**
  152:17 173:19,
  22

**toxic**
  147:23

**TPATC**
  12:17,18 13:9

**TPO**
  39:18 40:11
  165:16

**training**
  14:16,19 35:10
  49:17 116:25
  150:18 163:4
  172:4

**transcript**
  76:11

**transcripts**
  166:12

**transfer**
  164:14

**transferred**
  18:1 106:16
  150:6,8
  162:11,13,22
  169:2,5

**transpired**
  126:11

**transport**
  19:25 20:1,2,
  13 27:25
  28:21,25
  165:18

**transported**
  20:10 28:22
  131:12

**transporting**
  20:5 28:7,14

**transports**
  20:9

**transpose**
  6:14

**trauma**
  15:5,20

**travel**
  26:25 27:1
  85:13

**treat**
  19:21,22 28:2,
  16,17,19,21,22
  66:5 104:22
  150:6

**treated**
  18:12 29:9
  65:11 154:5,6,
  7,13 161:1,23

**treating**
  19:10 28:13,24
  29:4 113:9
  153:22

**treatment**
  28:3 35:1
  37:24 38:11,16
  39:6 41:14,18
  42:23 43:4
  109:9 112:12
  146:5 160:17
  172:1

**tremens**
  78:23 79:14,
  16,20 121:8,11
  123:20 154:14

**tremor**
  76:6 102:25

**tremors**
  17:19 77:21
  78:2 81:9,22
  88:25 89:4
  173:24

**trial**
  172:11

**trim**
  104:14,15

**true**
  17:20,22 18:4,
  14 30:19 37:9,
  12 45:2 81:8
  87:5 99:5
  109:11 113:3,
  8,20 115:6
  117:19,22
  125:8 128:4
  131:14 139:9
  145:8 167:17
  169:4 170:5,6
  172:6,16,20
  174:12

**trusting**
  105:19,20,24

**truth**
  24:5 30:7,10,
  11,12 42:11

**truthful**
  40:22

**truthfully**
  108:12

**try**
  23:22 87:24
  104:21 105:3,9
  106:25 149:23
  164:12 165:4

**trying**
  34:17 101:1
  108:6 114:6

**Tunnell**
  99:5

**Tunnell's**
  98:13

**turn**
  19:15 75:25

**twice**
  17:12 34:4
  128:12

**two**
  59:23 165:11

**type**
  27:13 28:9
  35:1 41:23
  42:4 155:13

**types**
  25:9 27:21
  79:19 159:5

**typical**
  129:16

**typically**
  25:22 37:18

—————————

**U**

**Uh-huh**
  173:16

**ultimately**
  122:20 123:15

**unable**
  100:20 123:8

**uncooperative**
  100:3

**understaffed**
  15:24

**understand**
  6:12,16,19,20
  8:10,23 22:16
  33:8,23 37:16
  43:12 44:16
  52:11 62:6
  84:22 93:6
  103:7 104:13
  108:23 115:1
  116:18 122:25
  149:22,25
  153:4 154:3

STEPHEN FURMAN, R.N.

July 07, 2021

156:16,18
159:17 165:7,8

**understanding**
40:14 95:23
96:18 97:13
98:5

**understood**
116:12,17,18
135:19 163:15

**unit**
15:11,13,14,
16,17 16:5,23
17:4,7,19 18:1
22:12 26:13
37:15 65:12
145:12 150:3

**units**
33:17

**universal**
52:10

**university**
14:3,4,5

**unreliable**
75:1 76:22,25

**unresponsive**
143:25 147:16

**unusually**
167:21

**updated**
12:2 13:19

**uprooting**
22:11

**utilize**
103:21 158:21

**utilized**
139:4

---

**V**

**vacations**
15:25

**variables**
109:5

**variances**
101:18

**variations**
87:8 89:6

**varied**
14:10

**varies**
104:12

**variety**
15:18,19 27:6

**various**
25:9,13 29:2
86:20 167:13

**Varnum**
5:14

**vary**
157:13

**varying**
17:13 119:13
144:9,20

**VCU**
15:2 17:3

**ventilations**
146:16

**verbal**
128:8

**verbatim**
57:6

**Vermont**
106:5

**version**
88:14

**versus**
14:13 77:13

**viable**
137:13

**video**
3:16 63:21
64:20,21
87:23,24
100:4,16,19,22
101:5,9,19,21
107:6,7 123:11
137:14

**views**
59:19

**vindictive**
35:14

**violation**
35:16 57:3

**violations**
31:25 134:10
136:25

**Virginia**
13:13 26:6
29:22 40:7,8
84:5,8 85:12
106:7 152:18,
19 155:17,24
156:9 157:18
159:2

**virtually**
167:17

**visited**
157:8

**visual**
13:3 122:6
145:21

**vital**
77:21,25 78:1
88:24 135:21
173:22 174:1,
3,15

**vitals**
136:8,17

**voluntarily**
27:11

**vomited**
103:17

**vomiting**
91:13,14
103:14,15
104:5,9,11
106:25

---

**W**

**Wade**
5:10 111:3

**wait**
90:8 137:2
162:6

**waited**
160:21

**waking**
25:23

**walk**
39:5,8

**walked**
126:20

**walking**
107:10,11

**wane**
91:3,8

**want**
6:25 11:24
19:13 34:4
35:12 36:4,16
39:6,13 40:25
41:2,4 49:1
54:13,20,21
63:8 64:24
78:9 80:13

STEPHEN FURMAN, R.N.
July 07, 2021

85:10 92:14
97:3 98:21
99:10,14
106:20 116:22,
23,24 118:20,
23 119:5
124:24 127:2
131:23,24
134:22 137:4
142:9 143:19
162:6 166:9,
14,22 167:3

**wanted**
27:5 40:18
57:8 63:17
64:5,9 166:24
167:1

**wanting**
153:19 154:24
155:1

**ward**
106:4

**watch**
47:19

**watched**
47:22 101:22

**watching**
100:22

**water**
137:11

**wax**
91:3,8

**way**
23:14 56:23
59:6 61:5
87:20 141:14,
16,25 142:2
156:9 173:13

**week**
14:11 142:19
151:16 153:25

**weeks**
56:7 119:23
137:12

**went**
36:19 55:10
87:17 98:5
115:9,11
129:11 143:10,
24 150:17,20
153:19 161:6

**west**
152:14

**whatsoever**
104:24

**whistle**
95:24

**wise**
142:3 156:8

**wishes**
39:21

**withdrawal**
3:17,20,23,25
4:4,5 18:19
51:17,19
52:13,20 65:3,
10 67:5 69:9
70:19 72:2
73:8 74:25
75:2 77:7
78:22 79:14,
15,17,20,22
80:17 81:2
82:19 85:24
87:21 93:19
98:1,2,8 99:6,
7 121:3
123:16,19
124:23 125:11
127:3,4 147:2
148:1 153:6,9,
15,22 154:7,
13,14,21,23

156:2,12,16,20
159:12,14,15,
19 160:7,16,19
163:18 167:14
168:4,10

**withdrawals**
23:8,11,13,19,
23 24:13 52:14
91:3 96:1,2,12
99:1,4 117:13
130:3 154:10
160:10 161:11
167:1,15

**withdrawing**
24:13 26:17

**witness**
5:3,6 12:23
29:13,17 43:8
46:15,20 59:8
64:15 68:25
71:18 72:1
73:13 75:5
76:13 79:2
83:4 86:6 87:3
92:3 95:2
97:7,10 108:23
110:18 114:25
118:6,13
120:13 122:24
137:10 140:17,
25 141:20
142:22 144:19
156:15 162:17,
25 165:14
169:8 170:14
171:1,22 173:3
174:18

**wives**
152:25

**woke**
26:11

**Wolters**
65:19

**woods**
152:15

**word**
45:20,23 46:7
48:6,11,19
49:2,5,14,18,
19 51:10
56:11,16 57:15
62:18 102:8
145:11

**words**
55:4 56:12,19,
20,23,24,25
57:4,5,8,19
60:16 62:10
102:10

**work**
14:9,12 16:12
17:6 20:25
21:12,14 22:6
29:19 41:21
50:3 65:13
84:15 151:16,
18,24 153:1,25
155:3,9

**worked**
16:4 20:20
24:22,23 25:1
26:5,14,25
27:4,17 56:8
149:25 150:10
151:22 157:6

**working**
14:9 15:3 25:1
28:6 30:2
90:22 146:2

**world**
151:14

**worsening**
161:16

**write**
36:3,4 37:10

STEPHEN FURMAN, R.N.
July 07, 2021

55:8 56:10
74:7,15 103:18

**writes**
37:7,19

**writing**
54:1 57:17
74:17

**written**
11:17 32:22
93:17 114:13
143:9 169:24

**wrong**
141:25 163:15,
20

**wrote**
54:6 55:4,6,7,
9 57:19 65:20
74:6,18 113:21
169:12,19

---

**X**

---

**x-rays**
41:22

---

**Y**

---

**Yahoo**
152:5

**year**
9:15 12:3
17:12 20:23,
24,25 26:23
34:14

**years**
8:4 18:12
112:15 117:6,
10 151:21
157:5 167:18

**yesterday**
46:23,25 47:3

---

**Z**

---

**zero**
52:7,9 89:18
90:1,2