**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

CHARLES JONES, as Personal Representative
of the Estate of Wade Jones, Deceased,

                                           Case No: 1:20-cv-00036
                                    Hon. Judge Hala Y. Jarbou

      Plaintiff,                    Magistrate Judge Sally J. Berens

v.

COUNTY OF KENT et al.

      Defendants.

| | |
|---|---|
| BUCKFIRE LAW FIRM | CHAPMAN LAW GROUP |
| Jennifer G. Damico (P51403) | Ronald W. Chapman Sr., M.P.A., |
| *Attorney for Plaintiff* | LL.M. (P37603) |
| 29000 Inkster Rd., Ste. 150 | Devlin Scarber (P64532) |
| Southfield, MI 48034 | Jeffrey L. Bomber (P85407) |
| (248) 569-4646 | *Attorneys for Corizon Health, Inc.; Teri Byrne, R.N.;* |
| jennifer@buckfirelaw.com | *Dan Card, L.P.N.; Lynne Fielstra, L.P.N.; Melissa* |
| | *Furnace, R.N.; Chad Richard Goetterman, R.N.;* |
| | *James August Mollo, L.P.N.; Joanne Sherwood, N.P.;* |
| | *and Janice Steimel, L.P.N.* |
| | 1441 West Long Lake Rd., Suite 310 |
| | Troy, MI 48098 |
| | (248) 644-6326 |
| | rchapman@chapmanlawgroup.com |
| | dscarber@chapmanlawgroup.com |
| | jbomber@chapmanlawgroup.com |

**DEFENDANTS' TRIAL BRIEF**

**Trial Date: August 15, 2022**

NOW COME Defendants CORIZON HEALTH, INC.; TERI BYRNE, R.N., JANICE STEIMEL, L.P.N; JOANNE SHERWOOD, N.P., MELISSA FURNACE, R.N., DAN CARD, L.P.N; CHAD GOETTERMAN, R.N.; JAMES MOLLO, L.P.N.; and LYNNE FIELSTRA, L.P.N., by and through their counsel, CHAPMAN LAW GROUP, and for their Trial Brief in this matter, state as follows:

Plaintiff brings both deliberate indifference claims, and medical malpractice claims against Defendants.  Both claims will be tried before this Court.  In submitting this Trial Brief, Defendants also rely upon the arguments in their motions in limine, which are pending before this Court.

## I.   STATEMENT OF FACTS

On April 13, 2018, Plaintiff's decedent, Mr. Wade Jones, was arrested for stealing liquor from a Meijer store in Walker, Michigan. (**ECF No. 125-1**, Arraignment Hrg. Transcript, pg. 2). While at his arraignment hearing, during a recess, the court's probationer officer asked Jones to undergo two (2) portable breathalyzer tests (PBT).   Jones' first PBT was .159 and his second PBT was .145 (*Id.* at 8). **Both tests are nearly twice the legal limit for alcohol intoxication in Michigan.**  These tests occurred shortly before 3:00 p.m. (*Id*)  At the hearing, the presiding judge, Judge Peter Versluis, became frustrated upon learning of Jones' conduct, stating: "You got an alcohol problem, you stole vodka, didn't you?"  (*Id.* at 11).  Judge Versluis also noted of Jones, "you don't present intoxicated, which concerns that you have a tolerance built up.  **You didn't drive here, did you?"** (*Id.* at 10).  "…[Y]our options are simple:  Stop drinking. (*Id.* at 11).  Jones was sentenced to five (5) days in jail, starting April 24, 2018.  (*Id.* at 12).  As the hearing concluded Judge Versluis (apparently frustrated) stated to Jones: "**You show up intoxicated, okay?**...Officer, if you would help Mr. Jones please."  (*Id.*).  The court hearing concluded at 3:01 p.m. From the courthouse, Jones was transported to the Kent County Jail to serve his sentence, where he arrived

at the jail at approximately 4:19 p.m.   After being processed and booked (i.e., searched, fingerprinted, mugshot, etc.), Jones presented to the medical department at approximately 5:20 p.m. for a general and mental health screening.  When Jones arrived at the jail on April 24, 2018, no one was advised about the circumstances that occurred earlier that day at Jones' arraignment hearing.  Obviously, there was no court transcript and Jones was only booked for third degree retail fraud.

Plaintiff's expert agreed that just ninety-six (96) minutes before Jones arrived at the jail, his PBT was .159, nearly two (2) times the legal limit for intoxication in Michigan.  (**ECF No. 125-2**, Furman, 110,112).  Nurse Furman testified that Jones had "functional tolerance with respect to his blood alcohol level" and agreed that Jones was intoxicated when he presented to the jail (**ECF No. 125-2**, 111):

Plaintiff's only medical physician expert, cardiologist Dr. James Fintel, M.D., testified that Jones was a functional alcoholic with a "pretty significant alcohol tolerance."  (**ECF No. 125-3**, Fintel, 32-33).  Plaintiff's fiancé, Jennifer Razzoog, a professional bartender, testified that Jones was a daily drinker, usually consuming six (6) to seven (7) drinks per day, and that he typically drank "vodka/water" or "rum and diet." (**ECF No. 125-4**, Razzoog. 110-112). She "never thought he was drunk." (*Id.* at 112).  Discovery also revealed Jones had a prior alcohol offense in 2002.

Dr. Fintel testified that with functional tolerance, the person appears to not be intoxicated even though he is intoxicated, and that by legal definition Jones was intoxicated. (*Id.* at 55).

**<u>Timeline of Medical Treatment Provided by the Corizon Defendants</u>**

**(a) <u>April 24, 2018 – Intake Interview</u>**

On April 24, 2018, at 5:20 p.m., Jones underwent an intake screening by Nurse Teri Byrne, R.N.  Nurse Byrne conducted a medical screening (**ECF No. 125-5**, Intake Medical Screening, 12-

14, took Jones' vitals, and asked Jones a series of approximately thirty-two (32) questions covering multiple topics, including regarding his alcohol use history. Despite Jones' nearly 20-year history of alcohol abuse (as documented by his records and his family), including what had occurred in court hours earlier wherein he tested nearly two (2) times the legal limit for intoxication, Jones **was dishonest** with Nurse Byrne, answering:

  2.  Are you currently drunk or high?  (If yes, state details):  **No.**
  4a. Do you currently use alcohol? (If yes, state details):  **Yes. VODKA; OCCASIONALLY**
  4b.  Do you have any alcohol withdrawal concerns? **No.**
  5.  Have you ever had alcohol or drug withdrawal? **No.**
  7.  Is there anything else we need to know about your substance abuse history?  **No.**  (**ECF No. 125-6**, Mental Health Screening, 18)

Nurse Byrne testified that even when "looking at someone, seeing someone, smelling them," she cannot "always tell if they are intoxicated and/or under the influence of alcohol." (Byrne, 63).  Nor can she tell just by seeing them what their "blood alcohol level is." (*Id*. at 64). Nurse Byrne testified that she "cannot tell if someone would be going into withdrawal later just based on looking at them, talking to them, interviewing them, during their interview, they denied that they had withdrawal problems. (**ECF No. 125-7**, Byrne, 64).  Here, not only did Jones deny any withdrawal concerns, but he also denied alcohol problems altogether, including being drunk or high and any substance abuse history **at all**.  Therefore, no medical action or plan for treatment was initiated by medical on April 24, 2018.  Plaintiff's expert, Nurse Stephen Furman, R.N., testified that there is a burden on a patient to answer questions correctly and that "providing an accurate history has a direct effect on the treatment plan and orders that might be provided by the health care provider."  (**ECF No. 125-2**, 109).

**(b) April 26, 2018**

Plaintiff alleges that Jones began to self-report and exhibit alcohol withdrawal symptoms at some point **after** his intake interview on April 24, 2018 with Nurse Byrne.  According to

Plaintiff's expert, Jones "could not reach out and call the medical people himself.  It was merely by observation by Deputy Jordan that actually got the medical people involved in the first place" *in the early morning hours of April 26, 2018* (**ECF No. 125-2**, 164).

On **April 26, 2018**, at approximately **4:00 a.m.**, Jones was seen and assessed by Nurse Janice Steimel, L.P.N., as experiencing alcohol withdrawal. (**ECF No. 125-6**, pg. 11).  Nurse Steimel conducted a Clinical Institute Withdrawal Assessment (CIWA) as part of her assessment, which she testified is based upon Jones' presentation at the time she sees a patient and what the patient is telling her. (**ECF No. 125-8**, Steimel, 73).

A CIWA is a test that can be used when a patient "is going through detox" and "assessing people that are going through alcohol withdrawal (**ECF No. 125-2**, Furman, 51-52)."  There are different variations of the CIWA form used throughout the country, and "some people have modified" the original CIWA form (**ECF No. 125-9**, Plt nurse practitioner expert, Michael McMunn, 86).  Corizon's forms list the following CIWA scales: "**Maximum possible score=67**; 0-9=mild; 10-19=moderate; 20-**67**=severe." (**ECF No. 125-6**, 12).  For the most part, much of the CIWA assessment is very subjective, it is based upon the scorer's perception of what they are observing at the time they see a patient, and waxes and wanes to the extent that a patient's condition often changes throughout the course of detox (e.g., patient may not be vomiting all the time, anxiety level goes up and down, etc.) (**ECF No. 125-2**, 90):

> Q.  So when you get down to say somebody's a 21 in scoring.  <u>It could be a 16</u>.  It could be a 25 depending on who is doing the scoring?
> A.  **Yes.**  (Furman, 90).

At **4:00 a.m.,** Nurse Steimel assessed Jones with a CIWA score of 19 (**ECF No. 125-6**, 11,14).  Nurse Steimel testified that the CIWA questions and score are based upon the scorer's "subjective analysis." (**ECF No. 125-8**, 77).  She also obtained Jones' temperature, pulse ox, and

respirations (**ECF No. 125-6**, pg. 62-63; **ECF No. 125-6**, pg. 11). She obtained all of Jones' vitals with the exception of his blood pressure, and notified her charge nurse Melissa Furnace, R.N., of her assessment, including the CIWA and all of his vitals she was able to obtain (**ECF No. 125-6**, pg. 5; **ECF No. 125-8**, 92). At approximately 4:30 a.m., Nurse Furnace documented that Jones "scored 19 CIWA, hallucinating" (**ECF No. 125-6**, pg. 5). On April 26, 2018, at approximately 5:30 a.m., Nurse Furnace spoke with the medical provider who was on call that morning, NP Joanne Sherwood (**ECF No. 125-6**, pg. 17), and advised her of Jones' CIWA score (Furnace, 85, 86) and obtained orders for Jones' medical care. NP Sherwood ordered medications for withdrawal: Diazepam (Valium) 10 mg by mouth every eight (8) hours for two (2) days, along with a multivitamin, thiamine, Promethazine (Phenergan). (**ECF No. 125-6**, pg. 5). Sherwood testified that, at Corizon, they use Valium for individuals going through withdrawal because "it has a long life, persists in the body longer, it's not excreted quickly, so its effect would be continued." (**ECF No. 125-11**, Sherwood, 101). The reason she would prescribe Phenergan is for nausea and vomiting. (Sherwood, 102), and the multivitamin and thiamine would assist with nutrition/meals (*Id.* at 57).

Beginning from that point, the **plan of care** for Jones included that he would be assessed and provided with the withdrawal medications every shift at the regularly scheduled intervals of 1:00 p.m. (1300 hrs.), 7:00 p.m. (1900 hrs.), and 4:00 a.m. (0400 hrs.). (**ECF No. 125-10**, Furnace, 94; **ECF No. 125-11**, Sherwood, 60,63). It was not a "stat" medication order (**ECF No. 125-10**, Furnace, 93). In most hospital settings, and particularly the jail setting, unless a medication is ordered "stat," medications are usually distributed at regularly "scheduled med passes…up to three

times a day."[1] (McMunn, pg. 102). Therefore, Jones was to be provided his first medications on April 26, 2018 at 1:00 p.m., i.e., the next medications pass (*Id.*) (Furnace, 53).

On **April 26, 2018**, at approximately **1:00 p.m.**, Nurse Furnace sent Nurse James Mollo, L.P.N., to assist Nurse Fielstra in seeing patients. Nurse Mollo provided Jones with his withdrawal medications, communicated with Jones "quite a bit," and initialed Jones' flow sheet indicating Jones' CIWA score of 13 and signed the Medication Administration Record (MAR). (**ECF No. 125-12**, Mollo, 31,41,43-45,47) (**ECF No. 125-6**, 11,15).   Nurse Mollo has no independent memory of the April 26, 2018 encounter and acknowledged that one (1) of the CIWA assessments omits a signature.   However, Mollo recognized from video that it was him at Jones' cell at approximately 1:00 p.m., "talking with him quite a bit", "giving him medication," and that Nurse Mollo was "observing him," "visually monitoring him," and was able to "hear if [Jones] was saying things." (**ECF No. 125-12**, 41,84,87).   Nurse Mollo testified that he signed both the MAR and the withdrawal flowsheet indicating the 13 CIWA score.   Therefore, Mollo testified that he likely performed the 1:00 p.m. CIWA assessment, but just omitted a signature on one (1) out of the three (3) forms that he initialed during that encounter (**ECF No. 125-12**, 91).   Mollo further testified that if he did not obtain Jones' vital signs, it may have been because Jones refused. (**ECF No. 125-12**, 44-45).   Mollo testified that in a situation where Jones otherwise participated (e.g., answered his questions and took the medications), "I may not have filled out a refusal." (**Mollo**, 45).   Nurse Furnace testified that a CIWA can be performed without taking vital signs such as temperature, pulse, or blood pressure and that that you cannot make a patient have his vitals taken.

---

[1] In the jail setting, having regularly scheduled times and routines for seeing inmates and providing medications (a/k/a "meds pass") is "the way all routine meds are done" because nurses are pushing a medication cart through the jail and are required to go in and out of the lock-up areas from cell to cell with assistance of corrections officers, giving medications to inmates who require medications. (**ECF No. 125-9**, Pltf expert, McMunn, pg. 101)

(**ECF No. 125-10**, 72-73). Plaintiff's nursing expert, Nurse Furman testified that "all a health care provider can really do is advise the patient on what to do and hope that they do it," and "then continue to monitor them and continue to help them the best they can." (**ECF No. 125-2**, 110).

On **April 26, 2018**, at approximately **7:00 p.m.**, Nurse Lynne Fielstra, L.P.N. evaluated Jones and performed a CIWA examination (**ECF No. 125-6**, 12; **ECF No. 125-13**, Fielstra, 65). Fielstra testified that the CIWA score is based upon her assessment (*Id.* at 57) and that the CIWA score and whether someone is "severe" "can be different with every person." (*Id.* at 58). She assessed Jones with a CIWA score of 21 (**ECF No. 125-6**, 12). She asked Jones all the questions on the CIWA assessment, and Jones answered her (**ECF No. 125-13**, 88. To her memory, she did not observe Jones to be hallucinating at the time she saw him (*Id.* at 61). She also confirmed from the jail video that Jones was not hallucinating when she assessed him. (*Id.* at 87) She testified that she was unable to obtain Jones' vitals (*Id.* at 71), and that a reason for this is because "he refused or wouldn't cooperate so I could take them." (Id. at 71, 76, 87). She further testified that so long as Jones allowed her to do the rest of her assessment, she would not have filled out a refusal form, but did note in his chart "N/A", meaning "not able to get his vitals." (*Id.* at 76, 104). During her assessment, Fielstra gave Jones the withdrawal medications, and he took them. (*Id.* at 88, **ECF No. 125-6**, pg. 15). After performing the CIWA assessment, she reported her findings to her charge nurse (*Id*. at 98, **ECF No. 125-6**, pg. 22)

**(c) <u>April 27, 2018</u>**

On April 27, 2018, at approximately **4:00 a.m.**, Nurse Daniel Card, L.P.N., evaluated Jones and performed a CIWA assessment (**ECF No. 125-6**, pg. 12). He assessed Jones's CIWA score as 20, and testified that at that point, he would try to get Jones to take his medication and inform his charge nurse (**Ex N**, Card, 32). Nurse Card did both. He provided medications to Jones and

this time Jones refused to cooperate with taking medications, which Card documented in the record (**ECF No. 125-6**, at 15). Card also testified that Jones was "not going to let me take his vitals and was probably being difficult at that time." (**Ex N**, at 52).  Nurse Card testified "<u>we try to get vitals at every withdrawal check, but they do have the right to refuse,</u>" and "<u>you can't forcibly hold an inmate down</u>" to take his vitals." (**Card**, 29, 66). Nurse Card testified that Jones told him that he was refusing because he was "OK at this time." (*Id*. at 56).  "That's what he [Jones] said at that time."  (*Id*. 56) Card testified that he explained to Jones the impact of Jones' refusal of service, including the "possible risks, complications, and effects of refusing clinical services." (*Id*. at 57). He presented a refusal form to Jones, which was signed by Nurse Card and a corrections deputy as a witness (*Id*. at 57-59; **ECF No. 125-6**, 13).  Nurse Card testified that he was performing his CIWA assessment (asking all pertinent questions and observed Jones' behavior) the entire time that he was talking to Jones in formulating his CIWA score.  (*Id*. at 59) Based upon Jones' conduct and responses, he believes Jones "definitely knows there were some risks involved here" (*Id.* at 60-61), and "had the capacity to intelligently refuse his withdrawal medications."  (*Id.* at 62). Nurse Card testified that he did not agree (a) that EMS must be called because a CIWA score is 20 or higher,[2] nor (b) that Jones' condition at the time of his assessment required urgent medical attention.  Nurse Card further testified that he made his charge nurse, Nurse Furnace, aware of what happened. (**Ex N**, 53).  Plaintiff's expert testified that inmates cannot be forced to take medications or cooperate with the recommended treatment (**ECF No. 125-9**, 65-66):

> 65
> 14   Q   An inmate refuses medication.  You can't force

---

[2] Similarly, Nurse Chad Goetterman, R.N., testified that if an inmate scores 20 or higher on a CIWA, this does not mean EMS "must" be contacted.  (**ECF No. 125-15**, Goetterman, 88).  The "nurse would use their judgment based on their assessment and call the provider.  And the provider and the nurse would discuss the case and he would get the medical judgment from the provider."  (Goetterman, 88).

15  the inmate to take that medication; correct?
16     A   **Correct.**
                                    *  *  *
                          66
18     Q   Okay.  So following up one more time on the
19  patients' rights, so patients can refuse treatment even
20  if there's a negative consequence to refusing that
21  treatments; correct?
22     A   **Yes.**

On April 27, 2018, at approximately **5:30 a.m.**, the charge nurse that morning, Melissa Furnace, R.N., came to evaluate Jones.  Nurse Dan Card and two (2) other members of the medical staff were with her.  Nurse Furnace noted in her charting that Jones had been going through severe withdrawal, had sustained a skin tear to his right elbow, was hallucinating and confused, but was able to speak and knew his name, his facial expressions were symmetrical, he was able to move his face from side to side, had strong and equal grips with his hands, his lungs were clear, his skin was warm and dry, and that his Glasgow Coma Scale was at 13[3], which was fairly normal. (**ECF No. 125-6**, 6: Furnace, 151-153).  At this time, Nurse Furnace was able to obtain Jones' vital signs: **Temperature 98.9; Pulse 92; Respirations 20; Blood Pressure 159/52; Pulse Ox 97%**, which were all **fairly normal**.  The only addiction medicine and detoxification expert in this case, Dr. Edward Jouney, M.D., testified (**ECF No. 125-16**, Jouney, 146):

 5  A.   You're referring to on 4/27?
 6  Q.    Yeah.  I'm referring to the findings -- based upon
 7        the findings on this **particular examination** --
 8  A.   Yes.
 9  Q.    -- do you believe that there was concern at this
10        point that Jones needed to be sent to an

---

[3] "The Glasgow Coma Scale (GCS) is used to objectively describe the extent of impaired consciousness in all types of acute medical and trauma patients. The scale assesses patients according to three aspects of responsiveness: eye-opening, motor, and verbal responses… The Glasgow Coma Scale and its total score have since been incorporated in numerous clinical guidelines and scoring systems for victims of trauma or critical illness." https://www.ncbi.nlm.nih.gov/books/NBK513298/.  The GCS score ranges from 3 (most severe) to 15 (most mild). Here, Jones GCS score was 13, meaning the less likely he was to have any severe impaired altered consciousness.

11    emergency room or was in some kind of way in
12    jeopardy of losing his life?
13    A.   **No.**

Nurse Furnace testified that typically she would not call EMS if a patient is "talking and walking around." (**ECF No. 125-10**, 156).  Plaintiff's expert, <u>Dr. Fintel, testified that from seeing Jones "walking around," "breathing, and talking," on April 27, 2018 around 7:00 a.m. "I did not know he would be dead in one minute from that…**No doctor could**</u>." (**ECF No. 125-3**, 102). Nurse Furnace testified that "you would not honestly call EMS for every score 20-67. It depends on the patient. You call the provider," (**ECF No. 125-10**, 129), which is what Nurse Furnace did in this case.  Furnace also testified that, in her medical judgment, she did not think Jones needed "emergent" intervention. He was having no problems with airway breathing circulation, i.e., what she referred to as the "ABC's" making a condition emergent for an emergency room.  (*Id.* at 157). Nurse Furnace testified that at the time of her evaluation, in her "medical judgment," Jones was withdrawing but was stable enough where it was not emergent. (*Id.* at 156).  <u>This is very consistent with Dr. Jouney, who testified that **"usually, emergent, in most cases, is a cardiovascular issue." "Very rarely in cases of alcohol withdrawal is it an emergent basis."**</u> (**ECF No. 125-16**, Jouney, 88).

Nurse Furnace testified that she reported all of these findings to provider, NP Sherwood. (**ECF No. 125-10**, 153). Furnace also testified that she called the provider and gave her the "whole picture" regarding Jones' condition. (*Id.* at 151).  Furnace testified that, when she was assessing Jones, the medical forms that she used were the most appropriate for his condition (*Id.* at 149). Nurse Furnace testified that when she makes decisions, she uses her "clinical judgment", including when deciding whether to send someone to an emergency room. (*Id.* at 179-180).

Just after Nurse Furnace's 5:30 a.m. assessment, she and NP Sherwood discussed Jones' condition and that it did not warrant emergent intervention or calling an ambulance at that time. Instead, NP Sherwood ordered that Jones be placed in the jail Infirmary for observation and safety. (**ECF No. 125-6**, 7).  A documented **plan and continuity of care** was issued, which included nurse follow up, referral to practitioner for his present complaint, and notifying custody of special needs. (**ECF No. 125-6**, 7).  Nurse Furnace and NP Sherwood also discussed that  Jones' release date was within twenty-four (24) hours (i.e. 12:00 a.m. midnight on April 28, 2018) and that sometime after 12:00 a.m. "he was going to have to go to the ED anyway because... he was not going to be done detoxing by then."[4]   As part of the documented medical plan and continuity of care, per NP Sherwood's orders, the staff planned to contact the court on April 27, 2018, after the court opened to see if  Jones could obtain an early release and continue his detox treatment at the hospital where he would have ended up being taken the next day. Nurse Furnace testified that she spoke with a jail sergeant, Sgt. McGinnis about Jones' situation. (**ECF No. 125-10**, 165).  Sgt. McGinnis testified that Nurse Furnace discussed with her the possibility of Jones being released, and she told Nurse Furnace that it was 5:30 a.m., she as the sergeant could not release him, and only a judge could do that (**ECF No. 125-17**, McGinnis, pg. 33).  Sgt. McGinnis testified that given that it was 5:30 a.m., it would have to be someone else that would call the court later that day on Jones' behalf.  (**ECF No. 125-17**, 33-35).   Therefore, it was determined that since the courts were closed such attempts would be made when the courts opened later that morning (**ECF No. 125-6**, 7). Defendants' expert nurse practitioner, Margaret Migaud, D.N.P., opines that this

---

[4] In the jail setting, when an inmate is still detoxing at the time that he is released he is going to be taken to an emergency room after he is released to continue detox, meaning in Jones' case he would be admitted to a hospital sometime after 12:00 a.m., in the early morning hours of April 28, 2018, (**ECF No. 125-10**, Furnace, 165).

was a proper plan and order and compliant with the standard of care (**ECF No. 125-18**, Migaud, Expert Rpt., pg. 5).

NP Sherwood further testified that her plan was to assess Jones again when she arrived at the jail on April 27, 2018, at approximately 8:00 a.m.  (**ECF No. 125-11**, 86, 90).

NP Sherwood testified that, during her conversations with the nurses, CIWA scores and "data is typically given to me.  I don't have to ask for it.  If they're abnormal, they're given to me." (**ECF No. 125-11**, 96).  She believes that when Nurse Furnace called her, Furnace "gives you all the information she has." (Sherwood, 107).  However, when it comes to whether to admit a patient to an infirmary or different care setting, NP Sherwood testified that she is **less concerned with CIWA scores but instead "I need to know the patient's clinical state.  I need to know what condition he's in."** (**ECF No. 125-11**, 45).  She testified that the general practice at the jail is that nurses would call her or another provider if they felt an inmate needed to be sent out. (**ECF No. 125-11**, 106).  NP Sherwood testified that a CIWA score of 20 is not unusual as she has seen inmates that exhibited far worse symptoms. (**ECF No. 125-11**, 109).  She testified that the only thing that really stands out about Jones from the other inmates that she has seen in similar or worse conditions is that he "suddenly slumped over and passed away."  (**ECF No. 125-11**, 109).

On **April 27, 2018**, at approximately **5:55 a.m.,** Nurse Furnace assisted in preparing a cell in the infirmary for Jones.  At approximately **6:06 a.m**., Jones was brought to the jail infirmary. Furnace was ending her shift, and Nurse Chad Goetterman, R.N., was coming on as the new charge nurse.  Nurse Goetterman testified that Jones "was moved up [to the infirmary] just prior to me coming on shift and punching in." (**ECF No. 125-15**, 142).  Nurse Furnace testified that when her shift ended, she definitely would have told the on-coming charge nurse about a patient coming to the infirmary and " what's going on" with the patient, anything that happened throughout the night,

the people in the infirmary, and anything that needs to be done that day (**ECF No. 125-10**, 165,168). Nurse Goetterman testified that when he starts his shift, he obtains a shift report from the outgoing charge nurse, which would include discussing "any inmates that have been sick throughout the night that need follow-up." (**ECF No. 125-15**, 106).  Nurse Goetterman remembers Nurse Furnace advising him that Jones "was brought to the infirmary for withdrawals and that she had spoken to Nurse Practitioner Sherwood and the nurse practitioner was going to also see Jones when she first arrived in the morning."  (*Id.* at 125).  Nurse Goetterman further testified that Furnace advised him that "as a courtesy, because he was going to require follow-up care after his release, they were going to attempt to see if they could get him released early and start his follow-up care early. That's what I remember." (**ECF No. 125-15**, 125).

The infirmary observation cell in which Jones was placed was a windowed cell by the medical office (**ECF No. 125-15**, 149).  There are also two (2) other windows on the cell facing the hallway that deputies are required to look through to observe the inmate.  Nurse Goetterman testified that one of the purposes for Jones being placed in the infirmary was "so that he's under sight or sound, which would include not just myself, but if somebody else was there, which allots for things like me doing treatments with other patients[5]." (**ECF No. 125-15** 182).   Nurse Goetterman testified that because Jones' vital signs had just been completed right before he came up, it was not required that he immediately take Jones' vitals and that he would have waited a while to do that. (**ECF No. 125-15**, 165).  Nurse Goetterman testified that his plan was "either to go in there [Jones' infirmary cell] with the nurse practitioner when she arrived or at a time earlier than that if the patient -- if either there was an acute change and a need to go in or if he was able

---

[5] During that time period, Nurse Goetterman still had duties to treat other patients, and was in another inmate's cell getting the inmate ready for court. (**ECF No. 125-6**, Medical Record, 30) Plaintiff has sued no other medical staff members who were in the observation room.

to be approached to go in." (**ECF No. 125-15**, 148).  Nurse Goetterman testified that prior to him going into the cell at 7:42 a.m., "there were no acute changes in his presentation." (*Id.* at 172) When he was watching Jones, he observed Jones pushing on the door, having hallucinations, "standing in front of me, playing with curtains that weren't there, but then walking around his cell." (*Id.* at 173). Nurse Goetterman testified that the symptoms he observed were "consistent to the previous assessment, which was consistent to somebody going through withdrawals" and "somebody that had scored a 20" on the CIWA. (*Id.* at 172).  Nurse Goetterman testified that **Jones' CIWA score of 20 was "on the very bottom end of the [severe] scale," and was only one (1) number away from being considered moderate**." (**ECF No. 125-15**, 177).  "There was not an acute change to go in and assess again.  An assessment had just been done.  The vital signs were not concerning." (*Id.*  177).

On April 27, 2018, at approximately 7:42 a.m., Nurse Goetterman could see that Jones was sitting down in the bathroom on the toilet. (*Id.* at 167).  Nurse Goetterman asked a deputy assigned to the medical department, Deputy Tony Houston, if they could go in and do an assessment and get vitals.  The deputy stated, "Jones was sleeping now." (**ECF No. 125-15**, 167).  Deputy Houston testified that Nurse Goetterman asked if he could go in to check Jones' "vitals while I was there…and I told him we could and **I looked into the cell and said sure, now that he's asleep**." (**ECF No. 125-19**, Houston, 21).  As a matter of jail protocol for safety and security, a nurse or provider cannot enter an inmate's cell, even in the infirmary, without a deputy being present, securing the cell, and escorting the nurse.

When Deputy Houston, followed by Nurse Goetterman, entered the cell, they noticed that Jones may not be sleeping and was instead unresponsive. (**ECF No. 125-6**, 30).  Nurse Goetterman summoned additional medical staff, EMS was called, and life saving measures were performed by

Nurse Goetterman and Nurse Mollo (**ECF No. 125-6**, 5), who were assisted by other medical staff. Nurse Goetterman summoned nurses for help, verified no pulse, performed CPR, performed chest compressions, and provided Jones oxygen through oxygen tanks attempting to revive the patient. (**ECF No. 125-15**, 120-121,170-171; **ECF No. 125-6**, 30). When EMS arrived, a king tube was inserted and an IV started. A return of spontaneous circulation was noted, and Jones was loaded onto a stretcher and transported to Spectrum Hospital. Jones died at the hospital on May 4, 2018. **"Cause of Death: Medical complications of chronic alcohol abuse."** (**ECF No. 125-20**, Autopsy Report, pgs. 1-2). The Final diagnosis includes: "1. Medical complications of chronic ethanol abuse: A. History of ethanol abuse; B. Alcoholic hepatitis; and C. Acute pancreatitis." (**ECF No. 125-20**, pg. 1).

## II.    GOVERNING LAW

### A.    Deliberate Indifference

The U.S. Supreme Court holds that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, an action under the Eighth Amendment does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id*. at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id*. To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895 (6th Cir. 2004). To satisfy the

objective component, an inmate's "sufficiently serious" medical need must be a condition "diagnosed by a physician as mandating treatment," or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004). To satisfy the subjective component, a plaintiff must prove that the Defendants "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

A healthcare professional exercising medical judgment to determine what treatment is needed for a patient is not unconstitutional or illegal. A deliberate indifference claim is a more "stringent standard" than a traditional medical malpractice claim and the "misdiagnosis of an ailment" is insufficient to establish deliberate indifference. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976). The law holds that, so long as a Defendant provided medical treatment, "albeit carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs." *Comstock, supra*. The reasoning for the "subjectively perceived" standard and requirement is:

> *Why is it necessary that a medical professional subjectively perceive facts from which to infer a substantial risk of harm, and then also draw that inference*? Because a medical professional who assesses patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care.

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019) (emphasis added)

1.     **There Is No Deliberate Indifference By Nurse Mollo, Nurse Fielstra, Nurse Card, Nurse Furnace, Nor NP Sherwood Since Defendants Will Demonstrate At Trial That They Provided Medical Treatment and Exercised Medical Judgment.**

From April 24, 2018 at 4:00 a.m. through April 27, 2018, until approximately 7:53 a.m. when the EMS arrives, the individual Defendants provided <u>care and treatment</u> to Jones as follows:

**Nurse Byrne:** Asked Jones numerous questions for intake examination and concerns; assessed and observed Jones; obtained a history; conducted general health and mental health screening; obtained vitals. (**ECF No. 125-7**, 63-64, **ECF No. 125-6**, 18-19; **ECF No. 125-5**; **ECF No. 125-6**, 12-14). The Court dismissed all deliberate indifference claims against Nurse Byrne. (**ECF No. 147, PageID.3228**). However, the above treatment Byrne provided was also in line with the standard of care as it pertains to Plaintiff's medical malpractice claim. This court has further ruled that Byrne "had no reason to believe [Jones] was at risk for alcohol withdrawal. Even if she could smell alcohol on his person, she would have no reason to believe that he was a chronic drinker and therefore faced a risk of undergoing alcohol withdrawal." (***Id.***).

**Nurse Steimel:** Assessed Jones with CIWA (asking, observing, and assessing Jones for various symptoms, including nausea, vomiting, tremor, sweats, anxiety, headaches, agitation, tactile disturbances, auditory disturbances, visual disturbances, and orientation); obtained temperature, pulse, respirations; notified nurse of findings; responded to deputy when she was seeing other inmates to provide care. (**ECF No. 125-8**, 62-6373, 77, 92; **ECF No. 125-6**, 5, 11, 14). The Court dismissed all deliberate indifference claims against Nurse Steimel. (**ECF No. 147, PageID.3238**). However, the above treatment Steimel provided was also in line with the standard of care as it pertains to Plaintiff's medical malpractice claim.

**Nurse Furnace:**  Obtained information from LPN's; contacted on-call medical  provider for orders for medications, infirmary, and CIWA protocol; spoke with corrections deputies and sergeants regarding and advocating for  Jones' special needs; advocated for  Jones to be released early for follow-up care; documented findings of other nurses; assessed  Jones' condition and obtained vitals (normal) and his mental status, and dressed his elbow wound; assisted in preparing Jones' infirmary cell; communicated with staff regarding  Jones' plan of care.  (**ECF No. 125-10**, 85,86,94,129,149,151-153,156,157,165,168,179-180; **ECF No. 125-6** pg. 5,6,7,17)

**NP Sherwood:**  Obtained information from nurses; provided orders, including withdrawal medications, infirmary, withdrawal protocol, and attempted to have Jones released early for follow-up care; planned to examine Jones at 8:00 a.m. when she arrived.  (**ECF No. 125-11**, 45,53,57, 60,63,86,90,96,101,102,107,109**; ECF No. 125-6**, 6,7,17)

**Nurse Mollo:**  Assessed Jones with CIWA (asking, observing, and assessing Jones for various symptoms, including nausea, vomiting, tremor, sweats, anxiety, headaches, agitation, tactile disturbances, auditory disturbances, visual disturbances, and orientation); provided Jones with medications. (**ECF No. 125-12**, 31,41,43-45-47,87; **ECF No. 125-6**, 11,15)

**Nurse Fielstra:**  Assessed Jones with CIWA (asking, observing, and assessing Jones for various symptoms, including nausea, vomiting, tremor, sweats, anxiety, headaches, agitation, tactile disturbances, auditory disturbances, visual disturbances, and orientation); provided Jones with medications.  (**ECF No. 125-13**, 57,58,65; **ECF No. 125-6** pgs. 12)

**Nurse Card:**  Assessed  Jones with CIWA (asking, observing, and assessing  Jones for various  symptoms, including nausea, vomiting, tremor, sweats, anxiety, headaches, agitation, tactile disturbances, auditory disturbances, visual disturbances, and orientation); provided  Jones with medications which  Jones refused; tried to convince  Jones to take his medications and

cooperate with medical treatment; documented  Jones' refusal; notified the charge nurse; came back to see  Jones, along with Nurse Furnace, while she was assessing him at 5:30 a.m. (**Ex N**, pgs. 29, 32, 52,53,57-59,60-62,66**; ECF No. 125-6**, pgs. 12,13,15

**Nurse Goetterman:**  Obtained report from outgoing charge nurse upon  Jones' arrival; was assessing  Jones for acute changes; observed  Jones' symptoms and conduct; used his medical judgment to determine what he believed to be acute or important symptoms; planned to obtain vitals when nurse practitioner arrived; went in to take  Jones' vitals when he believed that  Jones was resting and approachable; summoned other medical staff for assistance when  Jones was unresponsive; performed life saving measures on  Jones, including chest compressions and oxygenation, until  EMS  arrived. (**ECF No.  125-15**,  106,120-121,125,148,165,167,170-173,177,182; **ECF No. 125-6**, 30)

All of the above establishes that Jones received medical treatment. All of Plaintiff's complaints amount to disputes as to medical judgment or over the adequacy of the treatment that Jones was provided and therefore will not constitute deliberate indifference at trial. See *Comstock, supra, Westlake, supra*.  See also See *Rhinehart, supra,* at 752, holding: "Neither negligence alone, nor a disagreement over the wisdom or correctness of a medical judgment is sufficient for the purpose of a deliberate indifference claim."

Also, a jail healthcare provider's decision of whether to send an inmate to the emergency room constitutes the exercise of medical judgment, not deliberate indifference. See *Ruffin v. Cuyahoga Cty.*, 2017 U.S. Dist. LEXIS 102199 (N.D. Ohio, June 30, 2017) (**ECF No. 125-21**), holding, "while Plaintiff believes that Sharp should have been sent to the emergency room…, the Supreme Court has held that a medical decision not to order certain procedures does not represent

cruel and unusual punishment but is at most medical malpractice." (citing *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 293, 50 L. Ed. 2d 251 (1976)).

See also *Mattox v. Edelman*, 2013 U.S. Dist. LEXIS 106497 (E.D. Mich. June 24, 2013), holding, "plaintiff's allegations establish nothing more than that Defendant Neff made a <u>medical judgment</u>, based on the evidence available to her, that <u>Plaintiff did not need to be transported to the emergency room. Even if this judgment was wrong or negligent, it does not establish Defendant Neff's deliberate indifference</u>."

Also, an alleged failure by an individual to comply with an administrative rule or policy does not rise to a deliberate indifference constitutional violation. The administrative policy does not create a protectible liberty interest. 42 U.S.C. § 1983 is addressed to remedy violations of federal law, not internal policies. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018) (**ECF No. 125-22**).

**B.**   **Medical Malpractice**

In Michigan, "[m]edical malpractice . . . has been defined as the failure of a member of the medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession…." *Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 471 Mich. 411, 424, 684 N.W.2d 864, 872 (2004) (citing *Adkins v Annapolis Hosp.*, 116 Mich. App. 558; 323 N.W.2d 482 (1982).  An alleged violation of a policy does not constitute medical malpractice, just like it cannot establish deliberate indifference. "In Michigan, we look to the standard practice…rather than internal rules and regulations to determine that responsibility in a malpractice action." *Gallagher v. Detroit-Macomb Hosp Ass'n*, 171 Mich. App. 761, 764-765 (1988).

1.    **There Is No Medical Malpractice By Nurse Byrne, Nurse Steimel, Nurse Mollo, Nurse Fielstra, Nurse Card, Nurse Furnace, Nor NP Sherwood Since Defendants Will Demonstrate At Trial That Plaintiff's Claims Are Barred By MCL 600.2955A.**

MCL § 600.2955a is a complete bar to negligence and medical malpractice claims when the event is caused fifty percent (50%) or more by intoxication or the effects of intoxication. Defendants are afforded an absolute defense to Plaintiff's negligence claims pursuant to MCL § 600.2955a which states in pertinent part:

> (1) It is an absolute defense in an action for the death of an individual or for injury to a person or property that the individual upon whose death or injury the action is based had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury. If the individual described in this subsection was less than 50% the cause of the accident or event, an award of damages shall be reduced by that percentage.

MCL § 600.2955a.  At the time of trial, Defendants will establish that (1) the decedent had an impaired ability to function due to the influence of intoxicating liquor, and (2) that as a result of that impaired ability, the decedent was fifty percent (50%) or more the cause of the accident or event that resulted in his death. *Harbour v. Correctional Med. Serv.*, 266 Mich. App. 452, 455 (2005).

2.    **There Is No Medical Malpractice By Nurse Byrne, Nurse Steimel, Nurse Mollo, Nurse Fielstra, Nurse Card, Nurse Furnace, Nor NP Sherwood Since Defendants Will Demonstrate At Trial That They Complied With the Standard of Care.**

This Court has dismissed all medical malpractice claims against Nurse Goetterman (**ECF No. 147, PageID.3248**).  At trial, Defendants will establish that all of their actions were within the standard of care applicable to them and also that their actions were not the proximate cause of Plaintiff's damages. See the Statement of Facts section and pages 18-20 above outlining each

Defendant's actions in this matter, all of which complied with the standard of care.  Since there is

no individual liability by the individual Defendants, at the time of trial there will be no vicarious

liability for Corizon, Inc.

Respectfully submitted,

CHAPMAN LAW GROUP

Dated: July 18, 2022                    /s/Devlin K. Scarber
                                        Ronald W. Chapman Sr., M.P.A.,
                                        LL.M. (P37603)
                                        Devlin Scarber (P64532)
                                        Jeffrey L. Bomber (P85407)
                                        Attorneys for Corizon Defendants
                                        1441 West Long Lake Rd., Suite 310
                                        Troy, MI 48098, (248) 644-6326
                                        rchapman@chapmanlawgroup.com
                                        dscarber@chapmanlawgroup.com
                                        jbomber@chapmanlawgroup.com


**PROOF OF SERVICE**

I hereby certify that on July 18, 2022, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved nonparticipants.

/s/ Devlin Scarber
Devlin Scarber (P64532)
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com