1      *IN THE UNITED STATES DISTRICT COURT*
        *FOR THE WESTERN DISTRICT OF MICHIGAN*
2                 *SOUTHERN DIVISION*

3

   CHARLES JONES,
4
                Plaintiff,
5
   vs.                                    Case No. 1:20-cv-36
6
   CORIZON HEALTH, INC., et al,
7
                Defendants.
8   _____/

9                              *TRIAL*
           *(Excerpt:  Testimony of Stephen Furman, RN)*
10
     *HELD BEFORE THE HONORABLE HALA JARBOU, U.S. DISTRICT JUDGE*
11
          *Lansing, Michigan, Thursday, November 17, 2022*
12

13   APPEARANCES:
     For the Plaintiff:    JENNIFER G. DAMICO
14                         Buckfire Law
                           29000 Inkster Road
15                         Suite 15
                           Southfield , MI  48034
16

17   For the Defendant:    RONALD W. CHAPMAN, SR.
                           DEVLIN SCARBER
18                         Chapman Law Group
                           1441 West Long Lake Road
19                         Suite 310
                           Troy, MI 48098
20

21   REPORTED BY:          GENEVIEVE A HAMLIN, CSR-3218, RMR, CRR
                           Federal Official Court Reporter
22                         128 Federal Bldg
                           Lansing MI 48933
23

24

25

1    Lansing, MI.

2    November 17, 2022

3    9:56 a.m.

4                        *E X C E R P T*

5            MS. DAMICO:  Plaintiff calls to the stand Stephen

6    Furman, RN.

7            THE COURT:  Kelly.  Okay.  Thank you.  If you'll

8    come -- if you'll pull that door towards you right there.

9    Watch your step, and if you'll stay standing and raise your

10   right hand, please.

11                      *STEPHEN FURMAN,*

12      *having been sworn by the Clerk at 9:57 a.m. testified as*

13                          *follows:*

14           THE COURT:  Thank you.  Have a seat.  And if you'll

15   just adjust yourself and the microphone so we can hear you.

16   If you'll state your full name and spell it for the record,

17   please.

18           THE WITNESS:  My name is Stephen Furman, my middle

19   name is Allen, A-l-l-e-n, last name is junior -- I mean, I am

20   a junior, last name is F-u-r-m-a-n.

21           THE COURT:  All right.  Thank you.  Ms. Damico.

22                    *DIRECT EXAMINATION*

23   BY MS. DAMICO:

24   Q.   Good morning.

25   A.   Good morning.

1    Q.    Mr. Furman, can you please state your job?

2    A.    I am a registered nurse.

3    Q.    Okay.  And why are you here today?

4    A.    To testify in this medical malpractice matter.

5    Q.    Okay.  And you were retained by the plaintiff in this case

6    as an expert witness?

7    A.    I was.

8    Q.    You have some letters after your name.  RN, what does that

9    stand for?

10   A.    Stands for registered nurse.

11   Q.    And what is CCRN?

12   A.    It stands for critical care registered nurse.

13   Q.    And what's NRP?

14   A.    That's -- it's a nationally registered paramedic.

15   Q.    Okay.  So let's talk a little bit about your education

16   since you've touched on it.  Can you tell the jury where you

17   obtained your nursing education?

18   A.    I have obtained my associate degree in nursing from a

19   community college, Tidewater Community College, in Norfolk,

20   Virginia, in 1996 and I obtained my bachelor's of science in

21   nursing in 2021.

22   Q.    So the first one was a two-year degree and then to get

23   your bachelor, how much more schooling was that?

24   A.    It was two years.

25   Q.    Okay.  And then after that did you have any more training

1    in nursing or in the medical field?

2    **A.**    Correct.  I have certifications.

3    **Q.**    Okay.  Are you registered in any other medical field,

4    technician, technology, anything like that?

5    **A.**    Well, I have advanced cardiac life support, which is a

6    certification, pediatric advanced life support, which is a

7    certification, and I'm also an instructor on both of those.

8            I also have PHTLS, which stands for prehospital

9    trauma life support which goes along with the paramedic

10   certification.

11   **Q.**    Are you a paramedic?

12   **A.**    I am a paramedic, yes.

13   **Q.**    Okay.  And what's -- I'm just looking at your resume.

14   What's basic emergency medical technician training?

15   **A.**    So when you become an emergency medical technician, or

16   EMT, that rides on an ambulance you have different levels.

17   EMTB, basic is your entry level EMT.  Then you also have an

18   EMTI, which is an intermediate, that can start IVs, place

19   people on an EKG monitor, give a couple of medications, and

20   then the highest level is EMT paramedic.

21   **Q.**    So just in order, and I think I took you out of order,

22   tell me how this went.  Did you do the paramedic EMT before

23   you became a nurse?

24   **A.**    Correct.  I did my EMT basic in 1991, obtained my

25   paramedic in August of 1994, and then obtained my nursing

1    degree in May of 1996.

2    Q.    Are you currently working as a nurse?

3    A.    I am, yes.

4    Q.    Can you give the jury just a little background of where

5    you worked as a nurse?

6    A.    Sure.  I initially started off in July of 1996 at Maryview

7    Medical Center, which is also in Portsmouth, Virginia, in the

8    coronary care unit, and then I did some travel nursing with

9    emergency rooms and some ICUs, and then I also worked in the

10    recovery room at one hospital full-time, and my present

11    employer is Virginia Commonwealth University Medical Center

12    which is in downtown Richmond, Virginia, and I have been

13    employed there since June of 2004 in their float pool.

14    Q.    Explain to the jury what a float pool is.

15    A.    So I am -- I receive a phone call at 5:30 in the morning

16    and they tell me which unit in the hospital to go to, so we

17    have about 39 different nursing units in our hospital based --

18    from emergency room to recovery room to ICU and floors, so I'm

19    assigned to one of those for four hours.  Sometimes I'm there

20    for my entire 12-hour shift.  Sometimes I'm on one unit for

21    four hours, another unit for four hours and then another unit

22    for the next four hours.

23    Q.    Now, is there any reason you are a float nurse?

24    A.    What I always tell people is I believe I have degree of

25    ADD and I always need something different.  I don't like the

1    same thing day after day after day, so with the variety that I

2    get at VCU in the float pool, one day I'll be on the

3    orthopedic floor, one day I'll be on the emergency room,

4    sometimes the ICU, so I float all around and it stays

5    interesting.

6    Q.    How many hours -- do you -- is it a full-time job?

7    A.    So I was full-time.  I went part-time about three months

8    ago.

9    Q.    What's the reason you did that?

10   A.    I am slowing down in life.

11   Q.    Too young to slow down.

12   A.    No.

13   Q.    Can you tell the jury a little bit about your life?  You

14   live in Virginia; is that true?

15   A.    I do live in Virginia.

16   Q.    What do you do in Virginia besides nursing?

17   A.    So job-wise, obviously, I'm a registered nurse.  I also

18   live on a farm so me and my wife and my 14-year old, we raise

19   a wide variety of animals.  I would say we probably have about

20   500 animals at my house, so sheep farmer is probably the

21   primary income from our farm, and then I also raise exotic

22   birds.

23   Q.    Back in the year before this incident, so April 2017 until

24   April 2018, how many hours a day were you spending on the farm

25   as compared to working as a nurse?

1    A.    At that point I was working full-time so I would typically

2    schedule -- we're not allowed to work over 60 hours per week

3    so I would schedule myself four 12s and an 8-hour shift.  Most

4    nurses, you know, obviously have overlap that you hold over in

5    your job so, therefore, I wouldn't encroach on my 60-hour

6    week, so I worked 60 hours at the hospital normally and then

7    farm work would incorporate -- it would be about an hour an

8    evening feeding, watering, moving hay bales.

9    Q.    Who did the rest of the farm work?

10   A.    My wife and child.  My child was six years old and she was

11   birthing sheep.

12   Q.    Okay.  So it's fair to say that in the year preceding the

13   incident leading up to the incident, so April 2017 through

14   April 2018, a majority of your professional time was spent in

15   the active clinical practice of nursing?

16   A.    Oh, absolutely.

17   Q.    Okay.  Now, I know that you had a deposition -- Mr.

18   Chapman took your deposition in this matter back in July of

19   2021.  Do you recall that?

20   A.    I do recall that.

21   Q.    Okay.  And I think you were asked a bunch of questions

22   about nursing in a jail environment.  Do you recall those

23   questions, that line of questioning?

24   A.    I do.

25   Q.    And it's true you've never been a nurse in a jail?

**A.**    That's correct.

**Q.**    Do you -- have you treated in your career people going through alcohol withdrawal?

**A.**    I have.

**Q.**    Okay.  We'll get to that in a minute.  Have you testified as an expert witness in medical malpractice cases in Michigan before?

**A.**    I have.  In deposition, yes.

**Q.**    Okay.  That's my question.  Have you ever given trial testimony in Michigan before?

**A.**    I have not.

**Q.**    Okay.  How many times have you been retained as an expert witness for Michigan medical malpractice cases, if you can recall?

**A.**    I don't recall.  I would roughly say 15 -- 10, 15.

**Q.**    And you supplied a list to Mr. Chapman back at your deposition in July of 2021?

**A.**    I'm sorry, did you ask total cases or just testimony?

**Q.**    Trial testimony -- deposition testimony.

**A.**    I think that was only two.

**Q.**    Okay.  You've given depositions?

**A.**    Of Michigan cases, yes.

**Q.**    Okay.  So in preparing to give testimony or review a medical malpractice case in Michigan, how do you prepare for a case?

A.   Usually the first thing I'm given are the medical records, and I would review the medical records and give initial impressions.  I look for standard of care deviations by the nursing staff, so what a reasonably prudent nurse would do in same or similar circumstances, and once I give my initial impression, obviously in Michigan I'm supplied the complaint and the notice of intent so I can kind of see the direction the attorneys are coming from, and I will either corroborate or discredit what they state in their notice of intent, and then after I speak with the attorney I normally complete an affidavit of merit.

Q.   How do you know what the standard of care is in Michigan -- for nurses in Michigan?

A.   So Michigan does something a little bit different than other states where they have a local standard of care, so I look through where the hospital is, the population of the area in which I'm reviewing as well and compare to Richmond, Virginia, the number of hospitals that are in those areas, main industry that we have in that area versus Richmond, and what's available to the people who live in that area.

Q.   Okay.  And in this case did you do any research to compare the local standard of care -- what research did you do in this case to compare the standard of care of nursing in west Michigan -- so this is a Kent County case, in west Michigan to determine the standard of care of nursing?

**A.**    So I looked at the area of Grand Rapids and noted that there was just under 200,000 people in that area.  Richmond, Virginia, has 200,000 people in our area.

There were three hospitals total in Grand Rapids, two from Spectrum and one from Trinity Health, so that's the same number of hospitals that we have in Richmond, so we're kind of the same, if you will, just a couple miles apart.

**Q.**    Did you look at the Nurses Practicing Act in Michigan?

**A.**    I did.

**Q.**    Okay.  Is that the -- well, what did you do when you looked at it?

**A.**    So I compared it to the state of Virginia, and if you -- oddly enough when you look at the Michigan practice act and Virginia Nurse Practice Act, it's kind of exactly the same, it's just the order is a little different.

**Q.**    Okay.  And after doing that did you -- let me ask you this, have you been qualified to testify as an expert witness in Michigan before, if you know?

**A.**    I don't know.  I would assume so, but I'm not sure.

**Q.**    Let me ask it a different way, do you know if you've ever been disqualified as an expert witness in Michigan?

**A.**    Not to my knowledge.

**Q.**    Okay.  And in this case, tell the jury how you went about formulating any conclusions or opinions.

**A.**    So this case was a little different because there was not

1    a whole lot of medical records to go through, and I could see

2    the end result, so there were conclusions that I had at the

3    very beginning, and then we started getting deposition

4    transcripts from people that were involved with Mr. Jones at

5    the time in the jail so it would give their rendition of what

6    happened in comparison to what I was reading in the medical

7    records and, therefore, can come up with reasonable

8    conclusions.

9    Q.    Okay.  Do you recall what you reviewed in this matter

10    before coming -- forming your conclusions?  You said

11    depositions.  Was there anything else you reviewed?

12    **A.**    There were quite a few depositions, yes.  There were also

13    medical records from the jail cell -- or the jail.  There was

14    medical records from Spectrum Health.  There were

15    interrogatories that I read through.  There was obviously a

16    coroner's report.  There were a tremendous amount of

17    deposition exhibits that were created as a result of all the

18    depositions that were taken.  There was also policies and

19    procedures that were supplied to me to where I could also

20    compare with depositions, compare with medical records.

21    Q.    Did you watch anything?

22    **A.**    I watched a jail video, a very long jail video.

23    Q.    Can you estimate how many hours of jail video you watched?

24    **A.**    I'm not sure how long it was total.  It was a while.

25    Q.    Okay.

1    A.   Hours.

2    Q.   Okay.  And you did form conclusions and opinions in this

3    case; is that true?

4    A.   I did, yes.

5    Q.   Okay.  And you believe that you have the qualifications

6    based upon your education, your skill, your experience, and

7    your knowledge to testify as an expert witness in the field of

8    nursing, including registered nursing and licensed practical

9    nursing in this matter?

10   A.   That's correct.

11   Q.   Okay.

12        MS. DAMICO:  Your Honor, at this time I would like to

13   proffer Stephen Furman as an expert in the field of nursing.

14        MR. CHAPMAN:  Your Honor, we object based on the

15   arguments we made earlier.  I don't believe he's qualified to

16   give the standard of care of nursing under the Michigan

17   Malpractice Act.  I would be happy to voir dire him if the

18   Court would like.

19        THE COURT:  Go for it.  Go ahead.

20                    *VOIR DIRE EXAMINATION*

21   BY MR. CHAPMAN:

22   Q.   This is the first time you've ever visited Michigan,

23   correct?

24   A.   It is, yes.

25   Q.   At your deposition you said you didn't want to come to

1    Michigan because it was too cold.  I guess we proved you

2    right, right?

3    A.   You very much did so this morning, yes.

4    Q.   The standard of care, I believe you already testified, is

5    the standard of care applicable to Michigan, not to Virginia,

6    not to Washington, D.C., not to any other state, it's a local

7    standard of care?

8    A.   That's correct.

9    Q.   Okay.  And you said that you know the local standard of

10   care because you compared census data to the state of

11   Michigan?

12   A.   Correct.  That's part of what I do, and then through

13   deposition testimony the standard of care is also brought

14   forth and what those nurses would do.

15   Q.   Do you remember your deposition where I asked you, does

16   census data have anything to do with the standard of care, and

17   you said, no, it doesn't?  Do you remember that?

18   A.   No.  I remember regurgitating a lot of census data to you.

19        MR. CHAPMAN:  May I approach the witness, Your Honor?

20        THE COURT:  Yes.

21   BY MR. CHAPMAN:

22   Q.   I'd like you to look at page 84, and I'm going to start

23   right there, okay?  Line 22.  Do you see where that is?

24   A.   I do.

25   Q.   Could you read starting on line 22, read the question and

1    the answer?

2    A.    No, I understand that.  That's fine.  But what I'm asking

3    is why does the number of people in a community, the

4    population of a community, the number of stores in a

5    community, the primary source of employment, why does that

6    have anything to do with the standard of care?

7    Q.    Read your answer.

8    A.    It probably doesn't.

9    Q.    Thank you.

10    A.    But I'm just looking at comparisons, comparing that area

11    to the area in which I live.

12    Q.    Thank you.  Why is it that you just testified now that

13    census data somehow can formulate or help you formulate the

14    standard of care when you just testified in your deposition it

15    has nothing to do with the standard of care?

16    A.    It's what I use -- as I stated there, that's what I use to

17    compare the two areas, and our two areas are noted to be

18    almost identical.

19    Q.    Well, whether the area is identical -- we may have the

20    same number of hospitals, the same number of people as some

21    city in Russia.  Why does it make their standard of care the

22    same as our standard of care?  Just because we have the same

23    number of people, the same number of hospitals?

24    A.    I use that in comparison.  I also use the deposition

25    testimony in comparison to the way I would practice.

1   Q.   I understand that, and the thing that I have difficulty

2   with with that -- so you read their depositions which describe

3   their standard of practice and so you used their standard of

4   practice against their standard of practice for you to say

5   they violated the standard of practice?  How does that work?

6   **A.**   No.  I use the medical records in comparison to what their

7   deposition said, in comparison to what the policies and

8   procedures are from Corizon as well.

9          MR. CHAPMAN:  May I approach the witness again, Your

10  Honor?

11         THE COURT:  Yes.

12  BY MR. CHAPMAN:

13  Q.   If you could, could you start reading right here on

14  line 16, and you can end at line 24 -- or line 23.  Just end

15  with your answer.  Do you see that?  Do you see where I'm

16  pointing?

17  **A.**   You said 16, correct?

18  Q.   Let me help you out.  Yeah.  What I want you to read is --

19  **A.**   Well, I understand that the employees should follow

20  policies and procedures, but that's not my question.  My

21  question is the hospital or an emergency room or anybody that

22  employs health practitioners, no matter what their policies

23  and procedures are, those are not formed -- those do not form

24  the standard of care for health care providers, correct?

25  That's correct.

Q.   So let me see if I got your testimony so far.  You use
census data, which doesn't form the standard of care, you
agree, and then you use policies and procedures, which you
just testified don't form the standard of care, and then you
read their depositions which they say is the standard of care,
and somehow you can testify they violated the standard of
care?  My logic doesn't follow that.

MS. DAMICO:  Your Honor, I object to argumentative.

MR. CHAPMAN:  It's cross examination, Your Honor.

THE COURT:  Well, it's voir dire on qualification --
on qualifications.  I'll allow it, but let's stick to those --
the qualifications.  Go ahead.

THE WITNESS:  I'm sorry, could you repeat that,
please?

BY MR. CHAPMAN:

Q.   Sure.  I don't understand how you can use census data,
which has nothing to do with the standard of care, you've
already testified; you can use policies and procedures which
have nothing to do with the standard of care, and then you
read their depositions and somehow you can now testify they
violated the standard of care.  I don't see what you're basing
any of that on.

A.   As it relates to the standard of care, the policies don't
set the standard of care, is what I was describing there.  As
it relates to nurses who work in a hospital or a health care

facility, we are, as was described in their deposition, is

that you follow the hospital -- or the health care policies

and procedures.

Q.   But that's not a qualification to testify.  You have to be

able to testify not what a corporation tells somebody they

think they should do.  You have to know what's the standard of

care for all nurses in the state of Michigan, and you haven't

done any homework to figure that out, have you?

        MS. DAMICO:  Your Honor, objection to form,

foundation.  It's not the law.  He has to be able to testify

to the local standard, and this is outside the scope of voir

dire for qualifications.

        THE COURT:  It goes to qualifications.  The question

is -- he's asking about the standard of care and what his

basis was -- what he bases his opinion on.

        MS. DAMICO:  But he said all of Michigan.

        THE COURT:  Is that not the case?

        MS. DAMICO:  Local.

        THE COURT:  There's a standard -- a local standard of

care, right, okay?  So you're saying it's just geographic to

the west side of the state?

        MS. DAMICO:  His motion in limine was Michigan --

yes.

        THE COURT:  Is that what you're saying, Mr. Chapman,

is it the west side of the state or is it all of Michigan?

1        MR. CHAPMAN:  It's the state of Michigan standard.

2        THE COURT:  Based --

3        MR. CHAPMAN:  It's a local standard.

4        THE COURT:  Okay.

5        MR. CHAPMAN:  As opposed to it's not a Virginia

6    standard, it's not a Washington D.C. standard.

7        THE COURT:  All right.  We can argue this in a

8    minute.  Keep going.

9    BY MR. CHAPMAN:

10   Q.   Do you remember the question?

11   A.   No, sir.

12   Q.   The question was, you use policies and procedures which

13   don't formulate the standard of care, you use census data

14   which doesn't formulate the standard of care, my question to

15   you, then, is how do you know the standard of care in the

16   state of Michigan in Grand Rapids for them or anywhere in the

17   state of Michigan, how do you know the standard of care?

18   A.   Well, the standard of care definition is what a reasonably

19   prudent nurse would do in same or similar circumstances, so --

20   Q.   Based on -- go ahead.

21   A.   And I consider myself a reasonably prudent nurse, so

22   that's also what I base that on.

23   Q.   Isn't it true, though, the standard of care is a local

24   standard?  It's not -- it's what a reasonably prudent nurse

25   would do compared to the local standards?  In other words, to

1   decide what a reasonably prudent nurse would do you have to

2   know what the local standard is for a reasonably prudent

3   nurse, don't you?

4   **A.**   Yes.

5          MR. CHAPMAN:  I have no further questions.  I do not

6   believe he's qualified to testify for medical malpractice,

7   Your Honor.

8          THE COURT:  Any other questions as it relates to

9   qualifications for medical malpractice?

10         MS. DAMICO:  Yes.

11         THE COURT:  Go ahead.

12                *DIRECT EXAMINATION (Continued)*

13  BY MS. DAMICO:

14  **Q.**   Do you have your deposition in front of you?  Did he give

15  it back to you?

16  **A.**   I do not.

17  **Q.**   You do not?

18  **A.**   No.

19  **Q.**   Can you turn to page 175, please?

20         MR. CHAPMAN:  You say 175?

21         MS. DAMICO:  Yeah.  174, I apologize.

22         THE WITNESS:  Okay.

23  BY MS. DAMICO:

24  **Q.**   And you were asked the question:  Okay.  And can you

25  explain to me -- you testified about something -- about

1    some -- something about locality standards -- in Michigan is

2    the locality standard.  What do you mean by that?

3           MR. CHAPMAN:  Your Honor, object.  You're supposed to

4    ask a question of him, not just read a transcript.  You can

5    read a transcript if he answers differently than the question.

6           MS. DAMICO:  I'll rephrase.

7           THE COURT:  That's correct.  Go ahead.

8           MR. CHAPMAN:  You can't read it.

9    BY MS. DAMICO:

10   Q.   Do you recall testifying or explaining about the locality

11   standard and how you use the census data when you were asked

12   questions on cross examination during your deposition?

13   A.   I do.

14   Q.   Okay.

15          MR. CHAPMAN:  Your Honor, asked and answered.  She

16   went through that on her direct examination and he explained

17   it.

18          THE COURT:  Listen, I'm going to give both of you a

19   little leeway into this and then we're going to come to a

20   conclusion.  Go ahead.  Anything else?

21   BY MS. DAMICO:

22   Q.   And do you recall that while some of the information on

23   the census data you did not use, for example, you didn't

24   really care that much about industry and some other things on

25   the data, census data, but you did use some of the data in

1    formulating your -- familiarizing yourself with the census --

2    with the standard of care, true?

3    **A.**   That's true.

4    **Q.**   Okay.  And do you recall what data you did use?

5    **A.**   So I looked at population data.  That was similar.  The

6    number of hospitals and health care facilities within Grand

7    Rapids as well as Richmond, Virginia, and they were

8    comparable.

9    **Q.**   Okay.  And in performing CIWA analysis assessments, do you

10   have an understanding of whether CIWA assessments in alcohol

11   withdrawal is treated differently in Michigan as it is

12   compared -- compared to Virginia?

13   **A.**   No.  By the medications they gave, it was appropriate.

14   **Q.**   Do you know if a CIWA-Ar is a nationally recognized tool

15   to assess alcohol withdrawal?

16   **A.**   It is, yes.

17   **Q.**   Okay.  And in your opinion, is that something that is

18   nationally recognized as the standard of care in assessing

19   someone going through alcohol withdrawals, so commonly

20   recognized that it's a national standard that applies to that?

21   **A.**   That's correct.

22   **Q.**   Okay.

23          MS. DAMICO:  I have nothing further.

24          MR. CHAPMAN:  Your Honor, may I ask just a few

25   questions following up on that?

1              THE COURT:  Go ahead.

2                    *VOIR DIRE EXAMINATION*

3    BY MR. CHAPMAN:

4    Q.    When I talked to you before you said that your involvement

5    with detox was your work through the ER, correct?

6    A.    No.  You can have --

7    Q.    No.  Your involvement.  Your personal -- your experience

8    with evaluating people in detox or intoxication is through

9    your work at the ER?

10   A.    As well as inpatient units.

11   Q.    Yeah, as well as inpatient units.  And your ER, was that

12   at Francis Medical Center?

13   A.    No.  That was at VCU Medical Center.

14   Q.    Okay.  And didn't you testify that you would see maybe one

15   or two patients every three months for detox?

16   A.    That were actively withdrawing.  It was patients -- you'll

17   see them weekly who you're assessing for withdrawals, but

18   somebody who is actively withdrawing who scores on a CIWA

19   score to where we have to give as-needed medications based on

20   their CIWA scoring total would be about every month or --

21   every month and a half, two months.

22   Q.    Now, when I asked you a question, between 2018 and 2021

23   you only seen one patient every other month as it relates to

24   alcohol withdrawal, you said yes.  Do you recall that?

25   A.    That is withdrawing, sure.

Q.   Okay.

A.   But we assess patients who tell us they drink, so we will assess them.  Just like last Saturday I assessed a patient for a CIWA.  He didn't drink but -- I mean, he had stopped drinking some days prior, but we're still assessing him.

Q.   Well, didn't you testify, though, those people that are coming in, they're coming into the ER because they were drinking, not because they were detoxing.  Do you remember testifying to that?

A.   I'm not sure what you're asking.  I mean, there are a fair amount of patients that come into the emergency room that have been drinking.

Q.   Well, could you --

        MR. CHAPMAN:  May I approach the witness, Your Honor?

        THE COURT:  Yes.

BY MR. CHAPMAN:

Q.   Read from your deposition, page 22, can you start at line 21, read over to 23, and complete at line nine?  Did you get that?  I got it blacked off.

A.   In the emergency department you do see patients there going through alcohol detox as opposed to drug.  Sometimes you do.  Usually what you see there is somebody that comes in with seizures and it's found they haven't had alcohol in a couple of days and they've had an alcohol induced seizure, so you do see those occasionally.  More often than not you see the

1    intoxicated patient that comes into the emergency department

2    and then they get admitted to the hospital.  Okay.  So other

3    than the emergency room, they're not necessarily going through

4    withdrawals; correct.

5    Q.   Wouldn't you agree that the sole question here today that

6    the jury is going to rule on is whether or not the nurses

7    committed malpractice while evaluating people going through

8    detox?

9            MS. DAMICO:  Your Honor, this is -- objection.  This

10   is outside the scope of recross on qualifications.

11           MR. CHAPMAN:  I think it's a fair question, Your

12   Honor.

13           THE COURT:  This isn't regarding -- you'll have

14   plenty of time for cross examination.  I only want as it

15   relates to his qualifications.  How does that relate to his

16   qualifications?

17           MR. CHAPMAN:  Well, it relates to his qualifications

18   because if he -- if he has not evaluated with CIWA scores

19   because he only sees people that are intoxicated and then

20   admits them to the hospital, how do you know the standard of

21   care to evaluate these nurses that are going through and

22   evaluating CIWAs?  We spent three days so far going through

23   the various things of CIWA scoring.

24           THE COURT:  Okay.  Very limited.  Go ahead.

25   BY MR. CHAPMAN:

Q.   Could you answer the question?

A.   I'm sorry, could you ask it one more time?

Q.   I don't remember, either.

A.   Sorry.

Q.   So the question to you was if you only see people in the ER that are intoxicated and then they go into the hospital, what standard of care do you use to evaluate these nurses on not performing CIWA scores correctly?

A.   I see intoxicated patients in the emergency department, yes.  Once they have stayed their time in the emergency department that intoxication gets better to where they become lucid and sometimes those patients are admitted to the hospital.  Once admitted to the hospital, then, yes, you note that they have an alcohol history.  You start them on CIWA scoring as a result of that.

     Patients aren't going to withdraw until 24 to 48 hours after their last drink, so if they come into the emergency department intoxicated and they sober up through their ER stay and they get admitted to the hospital, they're going to be fine at the beginning but we still assess them. We still assess their CIWA scores every four hours 24 hours a day, and when they start increasing their numbers on the CIWA score, that's when they're going through withdrawals, and that's what you as a registered nurse are required to know.

Q.   I understand that.  But my question is the people in the

1    ER are not detoxing.  You've already admitted that.  They come

2    in intoxicated, and you may evaluate them, but these nurses

3    are evaluating people that were detoxing, and so far what

4    you're telling me is you base that on census data which is not

5    relevant, you base it on policies and procedures which aren't

6    relevant, and you don't treat detox in the emergency room, we

7    just read that.

8    **A.**    You don't.  They get admitted to the hospital very quickly

9    from the emergency room, so if somebody is in detox in

10   24 hours, they shouldn't be anywhere near an emergency room at

11   that point.  They should be in an inpatient floor if they were

12   admitted.  That's why you have to assess the CIWA at the 24 --

13   it's the most important time, because when patients are

14   starting to go through withdrawal, you have to recognize that.

15   You have to medicate these patients or they're going to have a

16   bad outcome, and that's my job as an inpatient nurse.

17   Q.    But you only look at people that are intoxicated.  You

18   don't treat them when they're going through detox.  You might

19   put them up to a floor.  You've already testified that you

20   don't do that.

21         MS. DAMICO:  Your Honor --

22         THE WITNESS:  I think you're misunderstanding me,

23   because I work in the emergency room 25 percent of the time.

24   I work in an inpatient floor 75 percent of the time, so if I

25   see somebody coming into the emergency room, sure, 50 percent

1    of my patients will be intoxicated when they come in, but

2    they're going to sober up, and after they sober up and get

3    admitted to the hospital, now the inpatient nurse is going to

4    be required to do CIWA scoring because they have an alcohol

5    history.

6    Q.   And that's not you?

7    A.   That is me.

8    Q.   That's not what you testified to.  You testified your only

9    experience is seeing people in the ER, one or two every

10   three months which equates to three to six people a year.

11           MS. DAMICO:  Your Honor, this is argumentative.

12           THE COURT:  What's the objection.

13           MS. DAMICO:  Thank you.  Objection.  This is outside

14   of the scope of qualifications, and now he's just arguing with

15   him.

16           THE COURT:  It goes to qualifications in terms of --

17   okay.  Overruled.  Anything else?

18           MR. CHAPMAN:  No, Your Honor.

19           THE COURT:  Anything else on qualifications?

20           MS. DAMICO:  No, Your Honor.

21           THE COURT:  All right.  Ladies and gentlemen, we're

22   going to take a break.  Get a snack.  We're going to do some

23   work.  I'll bring you back in in a few minutes.  Get them out.

24           THE CLERK:  All rise for the jury.

25                  *(Jury left courtroom at 10:34 a.m.)*

1          THE COURT:  All right.  Have a seat.

2          THE WITNESS:  Your Honor, did you want me to step

3    down or stay here?

4          THE COURT:  You can step down if you'd like.

5    Hopefully it's not going to take that long.

6          All right.  First, I want to start with -- tell me

7    what the standard of care is and what you're citing for that,

8    because I keep hearing reasonably prudent person and I have

9    case law that says something a little bit slightly different,

10   so what is the standard of care?  Somebody?  You're qualifying

11   him.  Tell me what the standard of care is.

12         MS. DAMICO:  It's an ordinary nurse with -- it's a

13   reasonable nurse with ordinary skill and judgment and

14   education who --

15         THE COURT:  I don't want you to make it up.  I want

16   you to cite me something.

17         MS. DAMICO:  I'll pull the jury instruction so I can

18   get you exactly what it is because I want to be specific.

19         THE COURT:  That's what I would like.

20         MS. DAMICO:  Okay.  Thank you.

21         MR. CHAPMAN:  Your Honor, it is not the jury

22   instruction, and I do have a case.  I can find it for you

23   rather quickly.  If you are board certified, you're judged on

24   a national standard.  If you are not board certified, you're

25   judged on a local standard.  There's plenty of case law in the

1    state of Michigan that supports that and counsel knows that.

2        MS. DAMICO:  I wasn't finished.  I'm tired of him

3    just barking --

4        THE COURT:  Listen.  Okay.  Listen.  Object if you

5    need to object, okay?  Tell me -- stand up and tell me he's,

6    whatever, but please, let's just get to the point, okay?

7    Here's the standard of care from what -- some of the case law

8    that I found in Michigan.  The common law standard of care

9    applies to malpractice actions against nurses.  Therefore, the

10   applicable standard of care is the skill and care ordinarily

11   possessed and exercised by practitioners of the profession in

12   the same or similar localities.  That is Cox V Board of

13   Hospital Managers for City of Flint, 651 Northwest Second 356,

14   2002 Michigan Supreme Court case.

15       MS. DAMICO:  I agree with you.

16       THE COURT:  I'd love for you to give me the law,

17   though.  You agree with me.  Is that it?  Is there something

18   else, because all I've heard from the two of you is reasonably

19   prudent person, which that language could be construed a

20   little bit differently than this, so I want to know what the

21   standard of care is.

22       MR. CHAPMAN:  Your Honor, the standard of care is

23   what you just read.  Where the reasonably prudent person comes

24   is did the reasonably prudent person comply with the local

25   standard of care, so to determine whether they apply you have

1   to know the local standard of care, not the standard in

2   Virginia or somewhere else.

3           THE COURT:  Okay.  So we agree the standard of care

4   is the skill and care ordinarily possessed and exercised by

5   practitioners of the profession in the same or similar

6   localities, correct?

7           MS. DAMICO:  Yes.

8           MR. CHAPMAN:  That's correct, Your Honor.

9           THE COURT:  Okay.  All right.  So tell me as it

10  relates to -- first of all, I'm assuming there is no objection

11  to him being qualified in the field of nursing pursuant to

12  702, correct?

13          MR. CHAPMAN:  Correct.  I'm not disputing that, Your

14  Honor.

15          THE COURT:  Okay.  So that will go to the deliberate

16  indifference claim.  As to the medical malpractice claim, tell

17  me what it is -- what the objection is specifically and how it

18  does not meet the standard.

19          MR. CHAPMAN:  The objection, Your Honor, is he's

20  already testified he doesn't know the standard.  He hasn't

21  been to Michigan.  He looked at census data, which he

22  identified is not relevant to the standard of care.  He looked

23  at policies and procedures, which he testified is not relevant

24  to the standard of care.  That's how he determined the

25  standard of care.

1          Now, the other thing he says is he reviewed their

2   depositions to determine the standard of care which defies

3   logic because he's ruling that they didn't comply with the

4   standard of care, so you'd have to know the standard of care

5   and he doesn't know it.  He didn't do anything to learn the

6   standard of care.  He read the Nurse Practices Act which says

7   that a nurse can only assess, they can't prescribe medication,

8   they have to be reasonable.  It says nothing about what the

9   standard of care is.

10          THE COURT:  Ms. Damico.

11          MS. DAMICO:  Can I have one moment, Your Honor?  I

12   didn't know that we would be arguing this again and I'm

13   pulling up my motion in limine.

14          THE COURT:  Well, it goes to qualifications.  How do

15   you not know that we were -- you knew that he was objecting to

16   it, but go ahead.

17          MS. DAMICO:  I apologize.

18          THE COURT:  Pull up what you need.

19          MS. DAMICO:  I apologize.  I'm having a computer

20   issue.

21          THE COURT:  That's okay.

22          MS. DAMICO:  Your Honor, the standard is fairly

23   liberal when it comes to what they do to familiarize

24   themselves with the local standard, and there's several cases

25   that we cited in our motion in limine that says there's no

1      bright line rule for making the determination.  Holding that

2      an expert in the case of Turbin V Graesser, 214 Mich App

3      215 --

4              THE COURT:  Okay.  Turbin -- if I remember correctly,

5      Turbin involved a doctor, a general practitioner in Florida.

6              MS. DAMICO:  Yes.

7              THE COURT:  That is different than a nurse.

8              MS. DAMICO:  Right.  But he had to familiarize --

9      that was an expert witness who was adequately familiar with

10     the local standard because he reviewed pamphlets, brochures,

11     and yellow pages, but that was also -- he wasn't a specialist,

12     and it was also a local standard that he needed to

13     familiarize --

14             THE COURT:  That was a national standard.

15             MS. DAMICO:  It was not.  I'm almost positive it

16     wasn't.

17             THE COURT:  He was board certified, was he not?

18             MS. DAMICO:  I think it was a -- I'd have to read the

19     case but I'm positive he was like a chiropractor or something

20     along those lines so it was a local standard that applied to

21     him, and the same in Decker, it was a local standard, which is

22     -- basically said they could just look in the phonebook.  It

23     was a very -- it was a very --

24             THE COURT:  Look in the phonebook and, what?

25             MS. DAMICO:  And look up doctors and see what they

1    did and look up practice sizes.  It's a very low standard.

2         THE COURT:  Tell me in this case, even if that's the

3    standard -- I'm not quite sure that is because I think there

4    are substantial differences and I don't think that's the same

5    situation we have here, but even if that's the case, tell me

6    how his qualification -- what he's done in terms of this case

7    fits into the standard of care.

8         MS. DAMICO:  So what he did is he did look at census

9    data, compared the populations of Richmond and Grand Rapids,

10   which are very similar.  He compared the hospital sizes and

11   the number of hospitals that are very similar including the

12   Spectrum system and his VCA system, which is very similar.

13        He also took a look -- he looked at the jail sizes,

14   too.  He testified to that, and he said he looked at those and

15   they're similar.  Not that he has any experience in jails,

16   which I don't think that's relevant, and so that's what he did

17   to look for the local standard, but our second argument is

18   that because the CIWA scoring and the treatment of alcohol

19   withdrawal is so commonplace, that the law is that there

20   doesn't have to be a local standard of care because there is

21   no local standard because it's a national standard.

22        THE COURT:  Okay.  Stop.  Give me some basis -- some

23   legal basis for that.

24        MS. DAMICO:  I will.  That was my second argument.

25        THE COURT:  So you're telling me that overrides the

1    local standard of care?

2         MS. DAMICO:  Yeah.  Well, I'm not saying it

3    overrides.  I'm saying that in conjunction -- when that comes

4    specifically -- you know, he's not only testifying to the

5    alcohol withdrawal.  What I'm saying with that, too, the

6    treatment of alcohol withdrawal is so commonplace --

7         THE COURT:  Isn't that the whole issue?  Isn't that

8    why he's testifying in terms of their --

9         MS. DAMICO:  Well, there's also --

10        THE COURT:  What they did or didn't do as it relates

11   to the alcohol withdrawal?

12        MS. DAMICO:  That's true.  I'll pull it up.

13        In the case of Decker V Rochowiak, R-o-c-h-o-w-i-a-k,

14   287 Mich App 666, 2010, again, where the practice, procedure,

15   or treatment is commonplace the same standard of care may be

16   applied locally and nationally, and that's what we're relying

17   on in addition.

18        THE COURT:  That's not telling me what you just said.

19   That's not saying that for alcohol withdrawal --

20        MS. DAMICO:  It's not specific --

21        THE COURT:  Or for any -- what you just read to me

22   was where the practice, procedure, or treatment is

23   commonplace, so you're saying alcohol withdrawal is

24   commonplace.  I guess I need to know the basis of that and

25   what testimony has come out for that.  The same standard of

care may be applied locally or nationally, that's your

argument?

        MS. DAMICO:  No.  I'm saying the treatment and the

use of scoring tools such as the CIWA is a nationally

recognized treatment for alcohol withdrawals.  That's what I'm

saying is nationally recognized.  And defendants agree that

the use of the CIWA-Ar scoring tool in the assessment of

alcohol withdrawal is universal, and that's what I'm saying,

so where the practice, procedure, or treatment is commonplace,

then the standard of care, if it's nationally recognized, it's

the same locally and nationally.

        THE COURT:  For the CIWA?

        MS. DAMICO:  Yes.  Yes.  That's what I'm saying.

        THE COURT:  And so are you seeking to qualify him

just in the CIWA practice?

        MS. DAMICO:  No.  I'm qualifying -- I'm seeking to

qualify him in both and, Your Honor, I'm also -- I'm just

saying the standard -- to testify that he knows the Michigan

standard, he's compared the practice acts, he knows what the

standard of care is in nursing.  It's a very general standard.

There's nothing different about what the standard of care for

a licensed practical nurse or RN in Virginia is as it is in

Michigan.  It's what a reasonable prudent nurse would do under

like or similar circumstances.  He's testified to that.  It's

the same in Virginia.  It's the same as it is here.  He

1    compared the census data.  He looked up hospital sizes.  He's

2    testified before in Michigan so he's done it before.

3            THE COURT:  I haven't heard that he's testified

4    before.  He's testified in depositions.  That doesn't mean

5    he's been qualified so -- just because you testified in a

6    deposition doesn't mean he's been qualified.  He's telling me

7    this is the first time he's been in Michigan so that leads me

8    to believe he's never been qualified in the state of Michigan,

9    correct?

10           MS. DAMICO:  That's true.  He's testified in

11   depositions in Michigan.

12           THE COURT:  Yeah.  That doesn't qualify him.  Only

13   judges qualify experts.

14           MS. DAMICO:  Okay.

15           THE COURT:  Okay.  Anything else?

16           MR. CHAPMAN:  Well, yeah.  My one response is the

17   case that she just cited, the Court specifically said the

18   argument they're making doesn't apply to nurses, it applies to

19   physicians, and they said, rather, the common law standard of

20   care applies to nurses --

21           THE COURT:  Right.

22           MR. CHAPMAN:  -- the statute, and he's not qualified

23   under that statute.  He doesn't know the local standard of

24   care.

25           THE COURT:  And the common law standard is what I

1    read off --

2            MR. CHAPMAN:  Yes.

3            THE COURT:  -- earlier?

4            MR. CHAPMAN:  I agree.

5            THE COURT:  Okay.  I'm going to take a quick break.

6            THE CLERK:  All rise.

7        *(Recess taken at 10:47 a.m.; reconvened at 11:05 a.m.)*

8            THE CLERK:  All rise.

9            THE COURT:  All right.  Thank you.  You can be

10   seated.

11           All right.  We're back on the record.  All parties

12   and attorneys are present.

13           I'd say normally it's not as close of a call, and I'm

14   going to tell you it's a really close call as it relates to

15   qualifying this expert for the medical malpractice claim.

16           The common law standard of care, as I've cited

17   before, applies -- the quote, common law standard of care

18   applies to malpractice actions against nurses.  Therefore, the

19   applicable standard of care is the skill and care ordinarily

20   possessed and exercised by practitioners of the profession in

21   the same or similar localities.  Again, that's the Cox case at

22   651 Northwest Second 356, a 2002 Michigan Supreme Court case.

23           The one case that plaintiff cites, Turbin versus

24   Graesser, G-r-a-e-s-s-e-r, 542 Northwest Second, 607, a 1995

25   Michigan Court of Appeals case, in that case Doctor Macaluso

was a general practitioner in Florida -- Tallahassee, Florida,
and he reviewed some materials and concluded that Lansing was
a community similar to Tallahassee; specifically, they had
similar populations, similar procedures.  The big difference
is that Mr. -- I'm sorry, Doctor Macaluso was board certified
and he had treated thousands of patients with chemical
dependencies.  His credentials were far in excess of what we
have here, and he also, I believe, traveled extensively and
was familiar with standards across the country, not just one
area.

As to the Decker case that was cited, that's 287 Mich
App 666, 2010-case, that individual, Wolff -- I don't know if
that was a female or male -- testified -- oh, her -- testified
to extensive experience working in -- this was pediatric
intensive care unit, had an extensive history as a professor
in that particular area, and then compared and testified the
Children's Hospital in Orange County to Grand Rapids.  Again,
I'm not -- I don't know that we have that kind of extensive
criteria here.

In the end, the bare minimum standard is the skill
and care ordinarily possessed by practitioners in the
profession in the same or similar localities, and so I guess,
quite reluctantly almost, I am going to qualify Mr. Furman in
the field of nursing as meeting the bare minimum
qualifications, and certainly the defense can argue -- can

1    cross examine him and certainly argue how much weight that

2    opinion should be given.  So the objection is overruled.

3           Let's bring in the jury.  Sir, if you'll take the

4    witness stand.

5           THE CLERK:  All rise for the jury.

6           *(Jury entered courtroom at 11:11 a.m.)*

7           THE COURT:  Thank you, everyone.  Please be seated.

8    All right.  Defendant's objection is overruled.  Mr. Furman is

9    qualified in the field of nursing.  All right.  Ms. Damico.

10          *DIRECT EXAMINATION (Continued)*

11   BY MS. DAMICO:

12   Q.   I forgot where we left off, so I don't know if I asked you

13   this question, what were you asked to do in this case?

14   A.   I was asked to review the records, deposition testimony,

15   and all of the records supplied and opine whether the nurses

16   did what they were supposed to do.

17   Q.   Okay.  And did you form any opinions in this case?

18   A.   I did, yes.

19   Q.   Okay.  I just want to get back to you a little bit.  You

20   talked about your -- what you do on a day-to-day basis and I

21   think you said 25 percent ER and 75 percent of your time is

22   spent, where, before you did your semi retirement?

23   A.   It's still the same percentages but 25 percent is the

24   emergency department and 75 percent is inpatient care.

25   Q.   Okay.

**A.**    So once you're admitted to the hospital.

**Q.**    When patients are seen in the emergency department and then they're transferred to a different department in the hospital, what is your hospital at VCU require as far as charting?

**A.**    So once you --

MR. CHAPMAN:  Your Honor, I'm going to object.  What his hospital requires is not relevant.  It's what's required here in the state of Michigan.

MS. DAMICO:  I am laying a foundation.

THE COURT:  How -- okay.  But how is it relevant? You're laying a foundation for, what?

MS. DAMICO:  Just charting in general as a new record started when you move from department to department, and I'm going to ask him what happened in this case, too, so I'm asking how it's done in his hospital.

THE COURT:  It doesn't matter how it's done there, right?

MS. DAMICO:  Okay.

THE COURT:  He's been qualified.  Ask him how it relates to this case.

MS. DAMICO:  All right.

BY MS. DAMICO:

**Q.**    Did you review the policies and procedures of Corizon in this matter?

1  A.  I did.

2  Q.  Did you form an opinion as to whether when a person is

3  moved to a different department within Corizon, if there's

4  anything that has to be done with the charting?

5  A.  Sure.  They create records.

6  Q.  Okay.  And is there -- did you review any specific

7  policies with respect to the infirmary?

8  A.  Yes.  They would start a patient chart.

9  Q.  Okay.  And do you recall what information was required to

10  be in the patient chart as part of your review?

11  A.  I don't.

12  Q.  As far as, like -- okay.

13      MR. CHAPMAN:  Objection, don't lead him.  She asked,

14  he gets to answer.  She can't now give him the answer.

15      THE COURT:  Ask the question.

16      MS. DAMICO:  I just said I would skip it.  I said I

17  withdrew it.

18      THE COURT:  Okay.  Let's move on.

19  BY MS. DAMICO:

20  Q.  Do you have any experience treating patients going through

21  alcohol withdrawal?

22  A.  I do.

23  Q.  And Mr. Chapman touched a little bit on that during the

24  qualification when we were talking earlier?

25  A.  Yes, ma'am.

**Q.**   Okay.  And you mentioned something about treating one

recently?

**A.**   Correct.

**Q.**   Okay.  And can you explain to the jury how to -- in your

opinion, how to conduct a proper CIWA score -- CIWA

assessment?

**A.**   Sure.  So once you go in and speak to the patient you can

typically tell if they're anxious, agitated because those --

they get different points on their degree of agitation, their

degree of anxiousness, their degree of -- they'll have

auditory hallucinations, which means they're hearing something

that's not there.  You'll typically see them having

conversations with the wall or the air.  They'll pick, looking

at potential visual hallucinations, so they're seeing stuff

that's not there as well.

Patients can also get piloerections or goose bumps.

They sweat.  Sometimes you see just very moist skin, so you

have to touch them.  Sometimes you'll see beads of sweat just

rolling down their face, and obviously there's a scale that is

assigned to those different things that you assess from the

patient.

Serial addition, you know, what's 2+5, they should be

able to give that information rather quickly.  Orientation, do

you know where you are?  Do you know why you're here?  Those

types of things kind of clue you in to if they're confused or

1    not, and I think that's all -- and plus we do a set of vital

2    signs.

3    Q.    Okay.  Is it -- is a CIWA scoring, in your opinion is it

4    objective or subjective?

5    A.    It's both.

6    Q.    Okay.  Can you explain to the jury what objective and

7    subjective means in the nursing world?

8    A.    Sure.  Subjective is something that is kind of your

9    opinion.  You know, somebody like me that doesn't have a lot

10   of hair and looks, yeah, they have a lot of hair.  That's my

11   opinion on how much hair you have.  So when somebody is

12   agitated, you know, you're kind of subjectively trying to

13   determine how agitated they are versus objective data which is

14   very concrete.  He is diaphoretic or he's sweating.  His blood

15   pressure is -- his heart rate is very high.  It's 124.  That's

16   a concrete number so that's an objective data.

17   Q.    So Mr. Chapman is going to ask you some questions about

18   the number, the scoring, and saying when you look at the score

19   sheets there's not a big difference between a two and a three

20   on the CIWA or a three and a four.  Do you think there's a big

21   difference between those numbers?

22   A.    There's not an excessive big difference with those

23   numbers, but in the end we do the score for a reason, and our

24   reasoning for doing the entire scoring on the page is to get

25   that end result or that end number because we act on what that

1    number is when we add up all of the columns.

2    Q.    Okay.  Do you know what a flow sheet is?

3    A.    I do know what a flow sheet is, yes.

4    Q.    Is a flow sheet something that you use in your practice?

5    A.    It is.  Now it's computerized, but before it was paper.

6    Q.    And what is the purpose of a flow sheet?

7    A.    So a flow sheet, it can be assessments.  It can be

8    something that we're documenting as relating to patient care.

9    Q.    Okay.  So with respect to this case, did you have an

10    opportunity to review any of the services or anything -- did

11    you see anything that would show you what services were

12    provided in the infirmary?

13    A.    Sure.

14    Q.    Okay.  And what is your opinion as to what this infirmary

15    could provide as opposed to what could be provided in a

16    hospital setting for someone going through alcohol

17    withdrawals?

18    A.    So it seems what this infirmary could provide was fluids,

19    a peripheral IV stick, access to a PICC line, a peripherally

20    inserted central catheter if they already have it inserted,

21    and that was about the extent of what they could provide other

22    than the oral medications.

23    Q.    In your experience in caring for patients who are going

24    through alcohol withdrawals, what is it that in your opinion

25    should be done with someone going through severe alcohol

1    withdrawals such as someone like Mr. Jones?

2    A.    He should be cared for in a hospital, and typically Mr.

3    Jones, by what I saw in the films and -- as well as the CIWA

4    scoring that was done by the staff there, he would be in an

5    intensive care unit.

6    Q.    Okay.  And you work in an intensive care unit, right?

7    A.    I do, yes.

8    Q.    And so you see patients in the intensive care unit that

9    are in severe alcohol withdrawals?

10   A.    Sure.  I do.  Because sometimes those patients refuse

11   medications, they'll refuse -- so sometimes those patients

12   actually will end up in restraints.  We will give them IV

13   medication to kind of suppress their withdrawal symptoms.

14   Q.    What kind of medication do you give them?

15   A.    We normally give oral or IV Ativan, which is a cousin to

16   diazepam or Valium.  We also give a barbiturate-type

17   medication, phenobarbital.

18   Q.    And what's that do?

19   A.    So phenobarbital will sedate a patient as well as it will

20   decrease their potentials of having an alcohol induced

21   seizure.

22   Q.    Okay.  And was that something that when reviewing -- when

23   you reviewed the infirmary scope of services or anything the

24   infirmary could do in this case -- is that something that you

25   were capable of in your review?

1  **A.**   It was not.

2  **Q.**   Okay.  Did you review any of the policies and procedures

3  with respect to Corizon's intoxication and withdrawal or their

4  medically supervised withdrawal policies?

5  **A.**   I did.

6  **Q.**   Okay.  Do you recall which ones you reviewed?

7  **A.**   I believe I reviewed both of them because it states that a

8  patient in Mr. Jones' condition needs to be transported

9  emergently to the hospital.

10  **Q.**   Do you recall if you reviewed a site specific one or the

11  corporate policy or both of them?

12  **A.**   I reviewed both of them, but the corporate policy states

13  that.

14  **Q.**   Okay.  And with respect to depositions, do you recall if

15  you reviewed any depositions other than the defendant

16  depositions?

17  **A.**   It was the deputies that were deposed, a 30(b)

18  representative was deposed, and my deposition.

19  **Q.**   Okay.  Do you have any opinions or conclusions with

20  respect to the CIWA-Ar assessments that were performed by the

21  defendant in this case?

22  **A.**   I'm sorry, could you --

23  **Q.**   Do you have any opinions or conclusions with respect to

24  the CIWA assessments that were performed in this case?

25          MR. CHAPMAN:  Your Honor, I would only object.  There

1    are seven defendants.  To group them altogether and say

2    somehow something, I think it should be broken up to the

3    defendants not just a global question.

4            MS. DAMICO:  I think he was going -- were you going

5    to break them down?

6            THE COURT:  Well, either way, let's do it

7    individually.

8            MS. DAMICO:  Okay.

9    BY MS. DAMICO:

10   Q.   With respect to the first CIWA-Ar, do you know what time

11   that occurred?

12   A.   So that occurred on the 26th at about four in the morning.

13   Q.   Okay.  Do you remember which nurse conducted that one?

14   A.   Nurse Steimel.

15   Q.   Do you have any criticisms of that one?

16   A.   It was elevated, and by their policy the patient should

17   have been transported to the infirmary at that point.

18   Q.   Okay.  After that one -- okay.  Did you take a look -- and

19   you reviewed the records?

20   A.   I did.

21   Q.   Did you review the video of that one?

22   A.   I did.

23   Q.   Okay.  Do you have any specific recollection of Ms.

24   Steimel conducting the CIWA at that --

25   A.   I believe it was a very short interaction.

Q.    Okay.

A.    I believe it was less than 60 seconds.

Q.    Do you recall if there were any orders issued after that evaluation?

A.    There were.  About an hour and a half after that evaluation there was an order for diazepam or Valium.

Q.    Okay.  And do you know where those orders came from?

A.    From the nurse practitioner.

Q.    Okay.  And do you know who called in those orders, received them from the nurse practitioner?

A.    Sure.  It was the charge nurse, Nurse Furnace.

Q.    Okay.  Let's go on to the second CIWA evaluation.  Do you recall when that one occurred?

A.    That was at about one o'clock in the afternoon on the 26th.

Q.    And do you recall who performed that one?

A.    That would be Nurse Mollo.

Q.    Okay.  Now, did you read Nurse Mollo's deposition testimony?

A.    I did.

Q.    And do you know what Nurse Mollo said about that CIWA evaluation?  Do you recall if he actually performed it or not, that's my question?

A.    He didn't perform it and wasn't sure where the number came from.

1   Q.    Okay.  Do you have any criticisms of that CIWA evaluation?

2   A.    Normally when we do the CIWA scoring we take ownership of

3   it so we will sign the form if it's done on paper or we sign

4   our computer form if it's done on the computer.

5   Q.    Now, were any other documents completed besides the CIWA

6   forms at the two CIWA-Ar assessments that we just talked

7   about?

8   A.    Completed forms, no.

9   Q.    You reviewed the flow sheets?

10   A.    I'm sorry, for what time?

11   Q.    I'll strike that.  Do you know if Nurse Mollo took any

12   vital signs?

13   A.    He did not.

14   Q.    Okay.  When you perform a -- when you perform a CIWA-Ar,

15   do you take vital signs?

16   A.    I do, yes.

17   Q.    What is your understanding if a -- did you read Corizon's

18   policies and procedures with respect to performing CIWA-Ars?

19   A.    I did.

20   Q.    And what does it require?

21   A.    The patient's vital signs be obtained.

22   Q.    What is the reason vital signs are obtained during a

23   CIWA-Ar, if you know?

24   A.    If a patient is going through alcohol withdrawals they

25   will have an elevated heart rate.  They will have an elevated

1    blood pressure, so you will have the elevated number, your

2    CIWA total score, and then you will also have, if you have it,

3    elevated heart rate that was assessed, then it just kind of

4    corroborates your final number that a patient is in

5    withdrawal.

6    Q.   When someone is going through withdrawal, in your

7    experience as a nurse did you find their vital signs change

8    during the course of withdrawals?

9    A.   Sure.  They normally are -- will turn normal at the

10   beginning.  As they withdraw their heart rate gets elevated.

11   The patients will get nauseated.  They'll throw up.  They will

12   stop eating, drinking.  They'll become dehydrated which also

13   adds to their tachycardia or elevated heart rate, and then

14   also the anxiety will increase their blood pressure.

15   Q.   Would you expect to see fluctuations within their vital

16   signs, they can go up and down throughout the course of

17   withdrawal?

18   A.   They may fluctuate a couple of points, but once they start

19   elevating they normally stay elevated until treated with

20   medications or IV fluids.

21   Q.   With respect to the order, the verbal orders that were

22   taken -- were given from Nurse Practitioner Sherwood to Nurse

23   Furnace, do you have any criticisms of the order itself?

24        MR. CHAPMAN:  Objection, Your Honor.  He's not a

25   nurse practitioner.  He can't object to that order.

1           THE COURT:  What's the response?

2           MS. DAMICO:  I'll withdraw the question.

3           THE COURT:  Okay.

4    BY MS. DAMICO:

5    Q.   In your practice of treating or assessing and dealing with

6    people going through alcohol withdrawal, have you received

7    similar orders from nurse practitioners or doctors?

8           MR. CHAPMAN:  Objection, Your Honor.  A nurse

9    practitioner order is not subject for an RN to comment on,

10   whether it's -- you received similar or you didn't receive

11   similar.  This is a back door trying to comment on an order

12   written by a nurse practitioner.

13          THE COURT:  How can he testify as --

14          MS. DAMICO:  I just asked if he received them.  I'm

15   assuming he's going to say the order is fine.  I don't think

16   he's going to criticize the order.

17          THE COURT:  Hold on.  Asking whether he received them

18   is different from asking him to comment on the order.  What

19   are you asking?

20          MS. DAMICO:  Did he -- has he ever received them.

21          THE COURT:  Okay.  Fine.  Answer that question.

22          THE WITNESS:  Yes, ma'am, I have.

23   BY MS. DAMICO:

24   Q.   All right.  You've received similar orders, true?

25   A.   I have, yes.

Q.   Okay.  And you're not here to offer any criticisms about Nurse Practitioner Sherwood, that's true?

A.   That's correct.

Q.   Okay.  Thank you.  Do you know what -- based upon your review of the records, do you know what information Nurse Furnace passed on to Nurse Sherwood when contacting her to obtain the verbal orders?

A.   I believe it was the --

MR. CHAPMAN:  Objection, Your Honor.  He can't testify what his belief was.  Either he knows or he doesn't know, and I don't know how he would know since Nurse Furnace spoke to Nurse Sherwood over a phone and he wasn't there.

MS. DAMICO:  I will rephrase the question.

THE COURT:  Go ahead.

BY MS. DAMICO:

Q.   Did you read any testimony or review any documents that told you or showed you what Nurse Furnace relayed to Nurse Practitioner Sherwood regarding the order?

A.   Yes.

Q.   Okay.  Can you tell us what that was?

A.   I believe Nurse Furnace said that the patient was hallucinating with a CIWA score of 19.

Q.   And did you read anywhere of whether or not that information was relayed to Nurse Practitioner Sherwood?

A.   Nurse Practitioner Sherwood said she would have treated

the patient differently if she would have known that.

Q.   Okay.  Now, in your practice, in your experience giving diazepam every eight hours, that's common for someone going through alcohol withdrawals?

A.   Some form of benzodiazepine, whether it be Ativan, whether it be diazepam, something on board helps minimize, and then the patient is reassessed, and if that reassessment shows, one, it's not making the signs and symptoms better, then you would reach back out to the practitioner and advise them of the same.

Q.   Do you have any opinion with respect to the timing of giving diazepam -- when the Valium was given in this case?

A.   I do.

Q.   Okay.  Can you explain that?

A.   Sure.  So if we have a patient that appears to be acutely withdrawing from alcohol and they score a 19, which is a moderate, and it's actually one point away from being severe, a call was made to the nurse practitioner, she ordered diazepam to be given to the patient, which is appropriate and which is what I would expect --

        MR. CHAPMAN:  Objection, Your Honor.  He can't testify whether diazepam is appropriate or not.  It's a nurse practitioner and he's not.

        THE COURT:  How can he testify to this?

        MS. DAMICO:  Excuse me?

1          THE COURT:  Do you want to respond?

2          MS. DAMICO:  No.

3          THE COURT:  Okay.  Then move on.  The objection is

4    sustained.

5    BY MS. DAMICO:

6    Q.   Okay.  So I asked you if you had an opinion as to whether

7    or not the timing was -- you have any criticism with the

8    timing when the medication was administered?

9    A.   Yes.

10   Q.   Okay.  What's that opinion?

11   A.   That Nurse Furnace was given the medication order at 5:30

12   in the morning and a now dose -- she didn't request a now dose

13   for somebody on the borderline of severe withdrawals and

14   severe withdrawal signs and symptoms.  Instead, we put it in

15   and allowed it to be given at the one o'clock hour where they

16   normally do their withdrawal checks, so normally it would

17   be -- normally we would convey that information to the nurse

18   practitioner and ask for a dose now, and I believe Doctor

19   Yacob, who is their medical director also said that's

20   completely --

21          MR. CHAPMAN:  Objection, Your Honor.

22          THE COURT:  Hold on.  Stop.

23          MR. CHAPMAN:  It's an out-of-court statement, it's

24   hearsay to testify what Doctor Yacob said or didn't say.

25          THE COURT:  Response.

1          MS. DAMICO:  It's something that he reviewed within

2     the -- a document that he reviewed in his practice, and I

3     agree he's not being called so we won't rely on Doctor Yacob's

4     testimony.

5          THE COURT:  Sustained.

6          THE WITNESS:  So you would --

7          MR. CHAPMAN:  Could you ask the question, then?  The

8     last question was about Doctor Yacob so maybe you need another

9     question before he answers.

10          MS. DAMICO:  I never asked a question about Doctor

11     Yacob.

12          THE COURT:  Okay.  What's the next question, please?

13          MS. DAMICO:  He's still answering the same question.

14     BY MS. DAMICO:

15     Q.   Did you have any criticisms about when the dose of

16     medication was given?

17     A.   Correct.  If an order is given at 5:30 in the morning and

18     the first dose isn't given until one o'clock in the afternoon

19     for somebody severely withdrawing, it should be clarified when

20     you want to give the first dose, because somebody who is

21     severely withdrawing needs benzodiazepines right now, not in

22     seven hours.

23     Q.   Do you believe it is -- what is your opinion with respect

24     to the communication between Furnace -- Nurse Furnace and

25     Nurse Practitioner Sherwood, that is, what is the nurse's duty

1    with respect to what she has to communicate to the nurse

2    practitioner?

3    A.    So when we call a nurse practitioner, a level of provider,

4    a physician, you have to convey all the information to that

5    provider for them to give you an adequate order.  If the order

6    doesn't make sense to you, you can question it, but in the end

7    you follow it, but if it doesn't make sense, then you would

8    question it or request a different order.

9    Q.    Doesn't the nurse have to follow the nurse practitioner's

10   orders?

11   A.    Sure.  And if they question the order, if it -- if we --

12   in this case if we order a drug at 5:30 in the morning and the

13   first dose isn't given until 1:00 in the afternoon for

14   somebody with severely -- on the borderline of severely

15   withdrawing, it's incumbent upon me to ask for a dose now

16   because maybe she didn't understand exactly what I was

17   explaining to her, so I would go in and reexplain that we have

18   a person with a score of 19, he's picking, hallucinating, and

19   it appears he needs a dose now.

20   Q.    Did you read anything in the records -- what did you read

21   in the record that was preventing Nurse Furnace from giving

22   him his dose now, or was there anything?

23   A.    There was nothing.

24   Q.    Okay.  With respect to the CIWA-Ar that was performed by

25   Nurse Fielstra, do you have any criticisms of that one?

**A.**    So when she came in and evaluated at seven o'clock in the

evening on the 26th, our CIWA score -- the first one that was

done was 19.  The second one that's documented is a 13 and now

we're at a 21, so now you can see our trajectory is going

upwards despite he's already had one dose of diazepam, the

Valium.  He's already had one dose and he's getting worse and

now he's in a severe alcohol withdrawal category, so in my

opinion that's a person that's getting bad in front of your

eyes and needs to be cared for in a hospital.

**Q.**    Did you review any documentation showing what Nurse

Fielstra did with respect to an examination of him besides the

CIWA?

**A.**    Correct, yes.

**Q.**    Did she take his vital signs?

**A.**    She did not.

**Q.**    Okay.  Did you see her attempt to take her vital signs?

**A.**    On the video, no.

**Q.**    Do you know if she gave him his medication?

**A.**    He refused.

**Q.**    Oh, that's your understanding?

**A.**    Well, he took them but didn't take them.

**Q.**    Okay.  Do you have an opinion as to whether he had the

mental capacity to understand whether to take his medications

or to refuse?

**A.**    Confused patients aren't allowed to refuse.  If somebody's

1    confused, what we call half capacity to make the decisions, if

2    you don't understand -- I can't guarantee you that you don't

3    understand the ramifications of what your actions are, which

4    are refusing medications, which we're giving you to treat your

5    present condition that's getting worse, so if you refuse, you

6    can't refuse.  You can't -- a confused person can't refuse.

7    Q.    Do you have an opinion at that point when he scored a 21

8    of what -- what should have happened to him at that point?

9    A.    The nursing staff should have called 911.

10   Q.    Okay.  And what do you base that on?

11   A.    The trajectory in which he's going.  His CIWA scores are

12   increasing despite a dose of benzodiazapine and is getting

13   worse.

14   Q.    Okay.  Did you see anything in the record as to whether

15   that 21 was reported to anyone?

16   A.    Not in the record, in deposition testimony.

17   Q.    Okay.  And whose deposition?

18   A.    Nurse Fielstra.

19   Q.    And what did she say?

20   A.    That she reported to the charge nurse and the night charge

21   nurse.

22   Q.    And do you know who either of those were?

23   A.    I'm not sure who the evening charge was but the night

24   charge nurse was Nurse Furnace.

25   Q.    Okay.  And was that the proper chain of command for Nurse

1   Fielstra, in your opinion?

2   A.   As an LPN, yes, you normally progress it up to your charge

3   nurse unless you think your charge nurse isn't doing something

4   appropriate and then you're required to bypass that person,

5   just as if I don't think -- I'm sorry.  Just if I go to a

6   physician and I don't think the physician is treating the

7   patient properly, then I bypass that physician.

8   Q.   Okay.  Did you see any documentation in the record that

9   Nurse Fielstra actually told Nurse Furnace about his scores?

10  A.   I didn't see that.

11  Q.   Okay.  Are you familiar with the nursing rule if it isn't

12  charted, it didn't happen?

13  A.   I am familiar with that, yes.

14  Q.   Is that commonplace in every place you've ever worked as a

15  nurse?

16  A.   It is, but I will say it's difficult to document

17  everything.

18  Q.   Okay.  With respect to the fourth CIWA that occurred, do

19  you have a recollection of that one?

20  A.   I do.

21  Q.   Okay.  Do you know who conducted that one?

22  A.   That would be Nurse Card.

23  Q.   And do you know when that occurred?

24  A.   That occurred at about the 4:00 a.m. mark.

25  Q.   Okay.

1    A.    I believe it was 3:55 a.m.

2    Q.    And what occurred at that CIWA?

3    A.    Nurse Card went into the jail cell with Mr. Jones, stood

4    there, talked to him for a minute or two, and then walked out.

5    Q.    Did he give him his medication, if you recall?

6    A.    He did not.

7    Q.    Do you know if Mr. Jones refused?

8    A.    That's what is stated.

9    Q.    Okay.  And do you believe he had the capacity to refuse?

10   A.    No, I don't.

11   Q.    And, again, what you said just a few minutes ago -- what

12   did you say about -- reiterate that again.  I can't remember

13   what you said.  The patient can't refuse if they don't have

14   the capacity?

15   A.    Exactly.  Confused patients aren't allowed to refuse

16   treatment, medications if they don't understand what could

17   potentially happen to them if they don't take that ordered

18   medication.

19   Q.    So what does the standard of care in nursing require of a

20   reasonable nurse in like -- like or similar circumstances when

21   a patient who's in severe withdrawal refuses their medication?

22   A.    They -- sadly it's going to be restraints, it's going to

23   be an IV and IV medication.

24   Q.    Is that the same in a jail situation?

25   A.    That was not available to them at that facility so it

1    would be transport to the emergency room.

2    Q.    Okay.  Do you know what his CIWA score was at that

3    evaluation?

4    A.    It was 20.

5    Q.    Okay.  And do you know what category that falls into?

6    A.    Severe withdrawal.

7    Q.    Okay.  Did you see any documentation or anything in the

8    record that that score was communicated to anyone?

9    A.    Not in the record, no.

10   Q.    Okay.  How about in any deposition testimony?

11   A.    Deposition testimony, yes.

12   Q.    Okay.  And what do you recall?

13   A.    That Nurse Card stated that he provided that information

14   to his charge nurse.

15   Q.    And that was, who?

16   A.    Nurse Furnace.

17   Q.    Are you familiar with the rules of delegation as far as it

18   applies to nursing?

19   A.    Absolutely.

20   Q.    Okay.  Will you explain that to the jury?

21   A.    Sure.  So if I had nursing duties, I can delegate that to

22   a person who is a non-licensed person, so if you come to work

23   with me and you get oriented on nursing assistant type duties,

24   whether it be a bed bath or emptying drains or putting a

25   dressing on somebody, I teach you how to do that and then I

1    can delegate you to do that once we need it, and that's what

2    delegation is, so it's you're getting a non-licensed person to

3    do something of a nursing nature.

4    Q.   Who is ultimately responsible if that non-licensed person

5    makes a mistake?

6    A.   The nurse, the registered nurse.

7    Q.   And is that by law in Virginia?

8    A.   And in Michigan.

9         MR. CHAPMAN:  Your Honor, objection.  I could care

10   less what the law is in Virginia.  I don't think the Court

11   does either.

12        MS. DAMICO:  I'm just --

13        THE COURT:  How is that relevant?

14        MS. DAMICO:  It's relevant because I was going to ask

15   him if it was the same in Michigan and if he knew it was the

16   same in Michigan.  That was my next question.

17        THE COURT:  Just ask about Michigan.  Let's move on.

18   BY MS. DAMICO:

19   Q.   Is it the same in Michigan?

20   A.   Yes, correct.  The Nurse Practice Act of Michigan also

21   states that.

22   Q.   Isn't it true you've had -- held a Michigan nursing

23   license before?

24   A.   I have.

25   Q.   I forgot to do that earlier.  When did you hold a Michigan

1  nursing license?

2  A.   In 2000.

3  Q.   How long did you have a Michigan nursing license?

4  A.   For one rotation, so three years.

5  Q.   Okay.  So you had to study for it and take a test?

6  A.   I applied for reciprocity, which means I gave them my

7  college transcripts to the state board of nursing in Michigan

8  and they issued me a license.

9  Q.   Okay.  I'm going to have you look at a video here.

10         MS. DAMICO:  Can you turn on --

11         THE CLERK:  Yes.

12         MS. DAMICO:  Thank you.  Wrong one.  Sorry.

13  BY MS. DAMICO:

14  Q.   Do you recall watching a video from 4-27-2018,

15  approximately 12 in the morning that's on the screen right

16  now?

17  A.   Correct.  I watched a lot of video.

18  Q.   This particular one -- I'll play a little bit for you.  Do

19  you recall that's when a medical assistant came up to his cell

20  to sign some forms?

21  A.   That's correct.

22  Q.   Is that a task that -- something a nursing assistant -- or

23  nurse -- excuse me, a registered nurse would assign or

24  delegate to a medical assistant?

25  A.   Yes.  A medical assistant would do whatever the nurse

1    asked the medical assistant to do, within reason, obviously.

2    Q.   Okay.  And anything that happens as a result of that

3    delegated task is ultimately the registered nurse's

4    responsibility, true?

5    A.   That's true.

6         MR. CHAPMAN:  Objection, Your Honor.  That calls for

7    a legal conclusion.

8         THE COURT:  What's the response?

9         MS. DAMICO:  He testified that he knows that that is

10   the law under the state of Michigan.

11        MR. CHAPMAN:  Objection, Your Honor.

12        THE COURT:  How does he -- okay.  He's not to be

13   giving legal conclusions.

14        MS. DAMICO:  Sure.

15        THE COURT:  Correct?  Sustained.

16        MS. DAMICO:  Okay.

17   BY MS. DAMICO:

18   Q.   In that video did you see the medical assistant provide

19   any medical services to Mr. Jones?

20   A.   No.  Only paper signing.

21   Q.   Okay.  He didn't appear to have a medical bag with him,

22   true?

23   A.   He did not, no.

24   Q.   He didn't have any medical supplies?

25   A.   Not that I saw, no.

1    Q.    Okay.  He didn't wrap his elbow?

2    A.    He did not.

3    Q.    He didn't perform any type of assessment?

4    A.    Not that I could tell, no.

5    Q.    Do you know who the registered nurse was on duty, the

6    charge nurse that evening?

7    A.    It was night shift, and, yes, I do.

8    Q.    Who was that?

9    A.    It was Nurse Furnace.

10   Q.    Okay.  Do you have any opinions regarding the standard of

11   care or anything related to Nurse Furnace with respect to that

12   incident?

13   A.    I believe it was reported that Mr. Jones had fallen off of

14   his bunk and then subsequently found to have a laceration of

15   his elbow, and the medical office was contacted by Deputy

16   Jourden, and the first person that comes down to see Mr. Jones

17   was somebody to get papers signed, not evaluate him after his

18   fall from a bunk -- or top bunk.

19   Q.    Did you have any criticisms of that conduct?

20   A.    Correct.  One, if someone falls off a top bunk, especially

21   in the CIWA range in which Mr. Jones was at that time, he

22   could be seriously injured.  He could have a head injury,

23   because the top bunk appears to be somewhere around the

24   five feet mark, so he should be evaluated by a -- at least a

25   registered nurse, if not a nurse practitioner.

1    MR. CHAPMAN:  Your Honor, I know it's a delayed

2  objection, but Mr. Jourden testified he was there, he didn't

3  say he called because he fell off a bunk.  He said that he

4  called because he might have a possible seizure.  I don't know

5  where we get this fell off a bunk.

6    MS. DAMICO:  This is --

7    THE COURT:  What's the response?

8    MS. DAMICO:  -- hours and hours before the possible

9  seizure.  This is --

10    THE COURT:  Okay.  Can you put it into context and

11  ask him where that comes from so that we can figure this out?

12    MS. DAMICO:  Me or his objection?

13    THE COURT:  The objection is -- okay.  Your response

14  is that this -- you and Mr. Chapman are talking about two

15  different time periods.

16    MS. DAMICO:  That's true.

17    THE COURT:  So put a better record on in terms of

18  establishing that so that we're not thinking about two

19  different things.

20    MS. DAMICO:  Okay.

21  BY MS. DAMICO:

22  Q.  So the video I just showed you, and I thought I told -- I

23  explained that it occurred at 4-27 (sic) at approximately

24  12:30; is that true?

25  A.   That is.

Q.   And the fall from the bunk occurred?

A.   At about 10:30, just prior to that.

Q.   Okay.

     MR. CHAPMAN:  Your Honor, I object.  She just restated it.  There's no evidence that he fell from a bunk. It hasn't been in.  We heard from all the deputies.  We heard from Ms. Cooper, Sergeant McGinnis, Mr. Jourden, none of them have said he fell off a bunk.

     THE COURT:  Ms. Damico.

     MS. DAMICO:  I'm going to find the video.

     THE COURT:  Can we -- okay.  Ask your witness where that came from and then you can play whatever video you want but (pause) --

BY MS. DAMICO:

Q.   Do you recall when he fell off the bunk?

A.   It was the early -- at 10:30 p.m. on the 26th, that or about there.

Q.   So I'm showing you video right now in his cell at approximately 10:22.  I apologize for taking so long to get to that point.  Is that what you were referring to?

A.   Correct.  You could see him through the top window there that he was on the top bunk and he went off the top bunk and landed on the concrete floor.

Q.   Okay.  And just for the record, that occurred on 4-26-18 at 22:52, so 10:52 according to the video?  Is that your

1    recollection?

2    **A.**    Yes, ma'am.

3    Q.    Okay.  And there was a time -- and was there a time in

4    your recollection when a deputy called to medical because they

5    thought Mr. Jones was having a seizure?

6    **A.**    Yes.  That he was doing poorly.

7    Q.    Do you recall when that occurred?

8    **A.**    That -- I'm sorry, when he was face down in the cell?

9    Q.    Yes.

10   **A.**    It was at 5:30 a.m. on the 27th.

11   Q.    And did you review the video of that?

12   **A.**    I did, yes.

13   Q.    And did you form any opinions as to whether you believed

14   he had a seizure?

15   **A.**    It didn't look like a seizure.  Seizures normally last for

16   some minutes and they have a post ictal stage after, which

17   means they're completely unconscious at that point.

18   Q.    Based upon your medical experience and training, did you

19   form any type of opinion of what was going on with Mr. Jones

20   when he had that fall in his cell when he was face down?

21   **A.**    He was withdrawing from alcohol severely.

22   Q.    Okay.  Could you form -- based upon reviewing the medical

23   records and everything you reviewed and saw, can you form any

24   opinion what your belief was what caused him to fall other

25   than just withdrawals?

1    A.    It would be withdrawals.  They lose their disorientation.

2    They think they can do more than what they can do, and they

3    fall and hurt themselves as a result of it.

4    Q.    Do you have an opinion of what should have happened to him

5    at that point when he had the fall at 5:30 in the morning on

6    the 27th?

7    A.    At 5:30 in the morning on the 27th he should have been

8    transported to the emergency department.

9    Q.    And what do you base that on?

10    A.    Severe CIWA scoring.  You can see how debilitated he was

11    ambulating once he was moved into the one-to-one holding cell

12    for closer observation.  You can see --

13          MR. CHAPMAN:  Your Honor, I object to the testimony.

14    It was Ms. Sherwood that made a decision.  He's not capable to

15    testify that Ms. Sherwood made a wrong decision not to

16    transfer him to the emergency room.

17          MS. DAMICO:  My response to that is we heard from

18    Nurse Furnace yesterday and she's the one that made the

19    decision along with Nurse Practitioner Sherwood, so it was a

20    combination to make -- she said she checked the box off before

21    she even called her.

22          THE COURT:  Okay.  But it goes up, right, nurse to

23    nurse practitioner so --

24          MS. DAMICO:  That's part of my whole argument in my

25    case is that the decision was already made.

1          THE COURT:  Okay.  You can ask him to comment on the

2     nurse practitioner's decision -- I'm sorry, the nurse's

3     decision --

4          MS. DAMICO:  Okay.

5          THE COURT:  -- or what she did or didn't do but not

6     on the nurse practitioner.

7     BY MS. DAMICO:

8     Q.   Do you have an opinion with respect to Nurse Furnace's

9     decision at 5:30 in the morning on the 27th?

10    A.   I do.

11    Q.   And what are your opinions?

12    A.   That she should have either called 911 herself, which she

13    was able to do, or advocate by way of the nurse practitioner

14    and asking for an order to transport to the emergency

15    department.

16    Q.   Okay.  Did you review the video of Mr. Jones while he's in

17    his -- while he's in the infirmary?

18    A.   I did, yes.

19    Q.   Now, once he got to the infirmary, did you review any

20    infirmary records, infirmary medical records?

21    A.   I didn't see infirmary medical records, only notes after

22    the cardiac arrest.

23    Q.   And, in your opinion, are infirmary records required?

24    A.   Yes.  It was a different level of care so you have to

25    justify why you're transporting somebody from one level of

1    care to another level of care to kind of show how serious the

2    patient is.

3    Q.    Did you see a shift report between Nurse Furnace -- Nurse

4    Furnace and Nurse Goetterman?

5    A.    I don't believe I did.

6    Q.    What's the purpose of a shift report?

7    A.    Shift report between two charge nurses is mainly to convey

8    problems that we're having with patients, if they -- you know,

9    obviously withdrawing, high fall risk, suicidal, homicidal

10   ideations so you can have your little antenna up on those

11   particular patients, so it's kind of an overview of the

12   patients which are under your care.

13   Q.    Once Mr. Jones got to the infirmary, what care did he

14   receive?

15   A.    None.

16   Q.    Well, is that up until he arrested or do you have an

17   opinion -- I mean, once he arrested he got CPR, true?

18   A.    Once he arrested he got chest compressions, yes, not

19   assisted ventilation.

20   Q.    I want to talk about the time he got admitted, which was

21   about what time?

22   A.    Into the infirmary was 6:06 a.m. on the 27th.

23   Q.    Okay.  And what time did he have his cardiac arrest?

24   A.    It was 7:40.

25   Q.    Okay.  So up until that time, so that hour and 40-minute

1    period, what care did he get from -- while he was moved to the

2    infirmary?

3    A.    None.

4    Q.    Okay.  And do you have an opinion as to what care was

5    available?  I may have asked you that already.

6    A.    Sure.  I mean, they can start IV.  They can start

7    peripheral IV.  They can give IV fluids for someone that's

8    been vomiting, dehydration.  They have a wide variety of

9    things they could do.

10   Q.    Okay.  And so what's the reason that if we're moving a

11   patient, why would they move him to a high level of care, the

12   infirmary, if they weren't going to give him any care?

13   A.    I don't know.  Normally that's why you move somebody to a

14   higher level of care, to do some type of care that wasn't

15   available from the place you just left.

16   Q.    I'm going to show you some video and I'm not going to

17   start at six o'clock and go all the way to 1:43, an hour and

18   40 minutes and make the jury watch all of that.  This is going

19   to start at seven in the morning, so 7:32, and it's a

20   side-by-side, so I can explain it to the jury, of the cell and

21   the medical office, which is a split screen.

22              MS. DAMICO:  If we can put it on?

23   BY MS. DAMICO:

24   Q.    And I've learned a new trick.  So I am going to draw --

25   the bottom screen, what I've circled, do you recognize that in

1    the screen, what I've circled?

2    **A.**    I do.  It's the bathroom.

3    **Q.**    Okay.  And then I'm going to circle over here.  This area

4    right here, what is this?

5    **A.**    That would be the observation unit -- I'm sorry,

6    observation window in front of the medical unit.

7    **Q.**    So if -- I'm going get too fancy here.  So

8    Mr. Goetterman -- excuse me, do you know who this person is

9    right here, the bottom screen?

10    **A.**    It was the day shift charge nurse on the 27th, Nurse

11    Goetterman.

12    **Q.**    Okay.  So if Mr. Goetterman, the arrow I'm pointing in,

13    he's looking into the cell which is over on this left camera

14    over into Mr. Jones' cell, true?

15    **A.**    No.  He's looking down at a piece --

16    **Q.**    I'm sorry, if he looks in the window, that's where he

17    would be looking at?

18    **A.**    Yes.  He has the opportunity and ability to do that.

19    **Q.**    Okay.  I just want to give the jury an idea of what we're

20    looking at.  I'm going to clear that.  Okay.  Looking at Mr.

21    Jones, what are your observations?

22    **A.**    That he has a very discoordinated gait.  He is -- appears

23    confused, anxious by his rapid, continual movements through

24    the cell.

25    **Q.**    Watch the clock up there, the bigger clock.  Can you see

1    that time or is it too small for you?

2    A.   It's too small.

3    Q.   7:36?  Okay.  What are you observing Mr. Jones doing right

4    now, if you can see him in his cell?

5    A.   I can see he's sitting on the toilet, I believe hunched

6    over.  I believe there was a sink right there where he's

7    facing.

8    Q.   Can you draw on your screen?  Do you have the ability over

9    there?

10   A.   I do.

11   Q.   Hit the pencil.

12   A.   Okay.

13   Q.   Can you circle where Mr. Jones is in the bathroom on the

14   medical office screen?

15   A.   (Witness complies).

16   Q.   All right.  Thank you.  At this point it appears that Mr.

17   Jones is still moving while he's sitting on the toilet; do you

18   agree?

19   A.   He is, yes.

20   Q.   Can you see what Mr. Jones is doing?

21   A.   It looks like he had lost his balance so he pulled some of

22   that shower curtain down, and now he's fidgeting with the

23   shower curtain itself while he sits on the toilet.

24   Q.   And what are your observations of Nurse Goetterman?

25   A.   He's sitting there looking away from Mr. Jones speaking to

1    the lady in the turquoise scrub top.

2    Q.    Can you tell what Mr. Jones is doing right now?

3    A.    He's still sitting on the toilet, still fidgeting with the

4    base of that shower curtain.

5    Q.    And what's the nurse doing, Nurse Goetterman?

6    A.    He's speaking to another one of the office staff.

7    Q.    Okay.

8    A.    Looking away from the patient with his hands over his

9    head.

10   Q.    Can you tell what he's doing now?

11   A.    It looks like he's looking at a ring with a magnifying

12   glass.

13   Q.    What's happening to Mr. Jones right now?

14   A.    It looks like he is either onset of a very brief seizure

15   but now he's not moving.

16   Q.    Okay.  And the time is 7:39:45, if you can see that?  The

17   jury might be able to see that.

18   A.    Yes, I can see that now.

19   Q.    Do you see that ring?  Do you see the ring?

20   A.    I can barely -- it's very small on my screen, but the

21   video I had at home was a lot larger.

22   Q.    Right.  I made them side-by-side so that's why they're

23   smaller.  Have you seen Mr. Jones move since he slumped over?

24   A.    No.  He's not moving at all.

25   Q.    Do you have an opinion as to why he's not moving?

1    A.    He's in cardiac arrest.

2    Q.    What's Mr. Goetterman appear to be doing right now?

3    A.    Talking to other people in the office and continuing to

4    use a magnifying glass to look at objects.

5    Q.    Can you see the end of that time on there?

6    A.    7:43 and 8 seconds.

7    Q.    All right.  Thank you.  Do you have any criticisms of

8    Mr. Goetterman just during what you just watched?

9    A.    I do.

10    Q.    Okay.  What are they?

11    A.    A patient is transported to a higher level of care to be

12    in close observation or one-to-one observation, and that's far

13    from what he received.  We can see that he doesn't look at Mr.

14    Jones.  Mr. Jones laid slumped over on the toilet not moving

15    and he was not observing the patient as he was supposed to be

16    doing.

17    Q.    What was happening to Mr. Jones' body while he was in

18    cardiac arrest?

19    A.    Nothing.  It was motionless.  All his organs, his blood

20    flow, his lungs, all motionless.

21          MR. CHAPMAN:  Objection, Your Honor.  How would he

22    know the blood flow to the lungs and everything?  He can only

23    see a picture of somebody.  He's speculating.

24          MS. DAMICO:  I will withdraw the question.

25    BY MS. DAMICO:

1    Q.    What happens to a person when they're in cardiac arrest?

2    A.    They do not breathe or circulate blood and oxygen.

3    Q.    And what does that cause?  What happens to a person when

4    they aren't circulating blood and oxygen?

5    A.    They --

6          MR. CHAPMAN:  Your Honor, I'm going to object.  He's

7    not a physician, not a medical provider.  He's a nurse.

8    Nurses are not allowed to diagnose or treat.  They can only

9    assess, so while he might have medical knowledge, it's not

10   appropriate here as a nurse.

11         MS. DAMICO:  He is trained in advanced critical life

12   support.  He is a critical care nurse, and maybe under the

13   Michigan Malpractice Act he can't testify as to causation, but

14   under the federal law he can, and he's just testifying as to

15   what he teaches.  He's an instructor in advanced critical life

16   support.

17         THE COURT:  Your question is what happens?

18         MS. DAMICO:  Yeah.

19         THE COURT:  What happens, what?

20         MS. DAMICO:  What happens to a person's body when

21   there's no circulation of blood or oxygen.  He learns it in

22   nursing school.

23         MR. CHAPMAN:  May we approach for a second, Your

24   Honor?

25         THE COURT:  Yeah.

```
 1                    (Side-bar held as follows:)

 2              MR. CHAPMAN:  What plaintiff is trying to do is get

 3      him to testify he had anoxic brain injury.  He cannot testify

 4      to that.  Whether he does CPR or not, under 702 he's not

 5      qualified by training, skill, or knowledge to determine

 6      whether somebody had anoxic brain injury or not.  It requires

 7      a medical opinion.  He's not allowed to give that kind of

 8      opinion.

 9              THE COURT:  Okay.

10              MS. DAMICO:  I wish you would stop telling me what

11      I'm trying to do.  I just asked him --

12              MR. CHAPMAN:  I'm making an argument to the judge.

13      Excuse me.  I can do that.

14              MS. DAMICO:  You're telling me what I am trying to do

15      and I haven't told you anything.  This is common knowledge

16      that he learned in basic anatomy and physiology, what happens

17      to a person's body when there's no oxygen and blood.  That's

18      it.

19              THE COURT:  And you're not going any further than

20      that?  Correct?  Yes or no, are you going any further than --

21              MS. DAMICO:  We're going to talk about what they

22      should have done with CPR because that's what he's trained in,

23      and that's what we're going into next.

24              THE COURT:  Just ask him about that.

25              MR. CHAPMAN:  She wants him to say it was anoxic
```

1    brain injury.  He can't make that determination.

2            THE COURT:  Are you going to ask him about it?

3            MS. DAMICO:  I will not ask him to make the

4    conclusion, if there was one, but what they should have done,

5    we're going to talk about CPR.

6            MR. CHAPMAN:  I have no problem with him testifying

7    what Nurse Goetterman should have done.  I have a problem with

8    him testifying what are the consequences of that.  He's not

9    qualified to do that.

10            MS. DAMICO:  Of course he is.  He teaches the course.

11    This is what you do CPR for, to prevent someone from having

12    anoxic brain injury.  Please stop.

13            THE COURT:  So you're going to ask him about CPR,

14    what should have been done or shouldn't have been done?  If it

15    hadn't been done, what might result?

16            MS. DAMICO:  (Non-verbal response).

17            THE COURT:  So how -- he's qualified in nursing.  How

18    is that not -- I guess, tell me how -- that's a stretch in

19    terms of causation and a more sophisticated professional

20    opinion.

21            MS. DAMICO:  I mean, all these nurses are trained in

22    the infirmary to give CPR.

23            THE COURT:  Right.

24            MS. DAMICO:  Yeah.  You have to tell them why they're

25    doing it, to prevent him from getting --

1          THE COURT:  I understand.  They're not talking about

2     CPR.  You're talking about CPR happens -- if CPR doesn't

3     happen, what could happen, but then you want to get into

4     specifics of brain and -- like, specific consequences.

5          MS. DAMICO:  No.  He didn't -- because he did it

6     improperly there was no oxygen or blood circulating to his

7     organs.  That's it.  I'm not going to say, then he was brain

8     dead.  We're not going to go that far, just that there was no

9     circulation or blood or oxygen, and that's what CPR does.

10          THE COURT:  Okay.  Mr. Chapman.

11          MR. CHAPMAN:  Well, I think he can testify there's no

12     circulation of blood.

13          THE COURT:  Right.

14          MR. CHAPMAN:  That's fine.

15          THE COURT:  Yeah.

16          MR. CHAPMAN:  But he can't testify to the

17     consequences of no circulation of blood.  It's going to

18     require a medical -- they have a cardiologist coming in.

19          THE COURT:  She just said that's all she's going to

20     get into.

21          MR. CHAPMAN:  That's not what he's going to say.

22          THE COURT:  Let's go.

23          One more thing.  Hang on.  How much more do you have

24     with him?

25          MS. DAMICO:  Not much.

1          THE COURT:  Okay.

2                    (Side-bar concluded)

3          THE COURT:  Go ahead.

4          MS. DAMICO:  I forgot my last question.  I can't

5    remember what it was.

6    BY MS. DAMICO:

7    Q.   Do you remember what it was?

8    A.   I do.

9    Q.   Okay.  Tell me what my last question was.

10   A.   So what happens when blood stops flowing and a

11   patient's --

12   Q.   Don't answer that.  I just wanted to know what it was.

13   A.   Oh, okay.

14   Q.   I just wanted to know what my last question was, so I know

15   what that is.  Okay.  So -- and I'm going to -- I'm going to

16   show you a little more video -- and this is just for the jury,

17   this is the -- once Mr. Jones is slumped over on the toilet,

18   this is the video of Nurse Goetterman going into his cell with

19   the deputy.  I'll go through this a little quicker.

20          I'm going to pause for a second and ask you a

21   question.  Do you know who the other gentleman is in the room

22   with Nurse Goetterman.

23   A.   I believe it's Nurse Mollo.

24   Q.   Okay.  And what are they doing?  What is Nurse Goetterman

25   doing?

1    A.    He's doing chest compressions.

2    Q.    Okay.  And that's CPR?

3    A.    Correct.  Yeah, when somebody's heart is not pumping you

4    compress the heart against your backbone to squeeze it to

5    force blood out of the left ventricle.

6    Q.    And you train other nurses and medical personnel in CPR?

7    A.    I teach nurses, physicians, paramedics, dentists, whoever

8    take the class.  It's an American Heart Association course.

9    Q.    So what is the standard of CPR now?  I've heard that it's

10   changed.

11   A.    It's not -- compression ratio is still the same.  We

12   update algorithm every five years -- or American Heart

13   Association updates algorithms every five years.  There is

14   compression only chest compressions in CPR that we teach to

15   the lay public who have no medical training.  Health care

16   providers get health care CPR.

17   Q.    Okay.  So what's the difference between what you just said

18   layperson and health care CPR?

19   A.    If you have a patient in cardiac arrest a 911 dispatcher

20   will probably talk you through in how to assess for a pulse.

21   We usually feel the carotid pulse.  If you don't feel a pulse,

22   then you start chest compressions, but it's only chest

23   compressions that you're going to do as the lay public until

24   911 shows up who will have a bag valve mask or a bag that we

25   use to rescue breathe for the patient.

1  Q.   Okay.  And that's a layperson.  Bystander CPR, would you

2  call that?

3  A.   Bystander CPR is what it's called, yes.

4  Q.   What did you say the other kind is?

5  A.   Health care CPR.

6  Q.   What's that?

7  A.   Health care CPR is when we teach -- and the patients we

8  find are in cardiac arrest, we show how to assess, how to

9  look, listen, feel for respiration, so we look at the

10  patients, their rise and fall of the chest.  We listen for any

11  grunting, agonal type breathing, and we feel for carotid pulse

12  simultaneously.  If we have none, we start chest compressions

13  at 30 compressions to a two breath ratio for five cycles, and

14  then we reassess the pulse at that point.  We normally apply

15  an AED if we had it readily available or some type of cardiac

16  monitor.

17  Q.   Okay.  In this case do you see an AED?

18  A.   That is the device that's yellow and black towards Mr.

19  Jones' head.

20  Q.   Okay.  Now, do you see anyone doing any rescue breaths

21  here?

22  A.   No rescue breaths were given yet, no.

23  Q.   Now, explain to the jury what you mean by rescue breaths?

24  A.   If a patient doesn't breathe for themselves, I have to

25  breathe for them, so we do 30 chest compressions and then we

1    squeeze the bag that you'll see in a minute, you squeeze that

2    bag twice to blow oxygen in, so he's doing chest compressions

3    to circulate blood, but you would like to circulate oxygenated

4    blood so we give them a breath which blows oxygen in.  Oxygen

5    crosses into the bloodstream, carbon dioxide comes out of the

6    bloodstream, and then they exhale it out, so we give two

7    breaths for every 30 compressions.

8    Q.   Does anyone do mouth-to-mouth anymore?

9    A.   Not in health care CPR.

10   Q.   Okay.  I know it's -- this is preCOVID, but no one does

11   that?

12   A.   They do not -- I will not say I've never seen it done

13   before, but typically it's not done.

14   Q.   Now, do you know if this infirmary was equipped with any

15   kind of supply to give oxygen?

16   A.   It's supposed to be.  It's listed on the contents of

17   what's available in this infirmary, and that is one that's

18   listed.

19   Q.   Let's watch a little more.  Do you know what that tubing

20   is for there?  It looks like the nurse has some tubing, a

21   female?

22   A.   It appears to be oxygen tubing.

23   Q.   Can you see what she's carrying in?

24   A.   Yes.  That's an oxygen tank.

25   Q.   Okay.  So in your training, experience, and skill and

1  judgment, to give oxygen do you need a tank?

2  A.    You do not.  We breathe 21 percent oxygen in the

3  atmosphere, so if you squeeze the bag that's not attached to

4  oxygen, they still get 21 percent oxygen.

5  Q.    Okay.  It looks like Mr. Goetterman has something in his

6  hands.  What is that?

7  A.    That's the Ambu bag or the bag valve mask that we squeeze

8  to get a breath in the patient.

9  Q.    Okay.  So that doesn't need to be hooked up to anything?

10  A.    It does not.  If you use it not hooked up to oxygen it's

11  21 percent.  If you hook it up to high flow oxygen, being 15

12  liters of oxygen per minute, you will give them near

13  100 percent oxygen.

14  Q.    In your opinion, Mr. Goetterman should have been pumping

15  that on his face at this point or a while -- when should he

16  have been using it?

17  A.    As soon as he received it, so it should have been every 30

18  compressions.  Every 30 chest compressions there should have

19  been two breaths.

20  Q.    At some point does Mr. Goetterman use the bag mask, if you

21  know?

22  A.    Mr. Jones finally gets one rescue breath -- a rescue

23  breath or rescue breathing at about seven minutes.

24  Q.    At that point right there?

25  A.    That's correct, that appears to be rescue breathing.

Q.   Okay.

A.   And so the chest compressor, you'll normally see them stop at the 30 mark and then two breaths.

Q.   Okay.  All right.  Do you have an opinion as to whether CPR was properly performed on Mr. Jones?

A.   I have an opinion.

Q.   Tell me your opinion.

A.   It was not performed as the American Heart Association requires chest compression -- or basic CPR to be performed on a patient in cardiac arrest.

Q.   Do you have an opinion as to -- with regard to the standard of care with respect to either Nurse Mollo or Nurse Goetterman with respect to video we just watched?

A.   Sure.  Nurse Goetterman should have -- as soon as he received the Ambu bag he should have started giving two breaths.  Whether you're attached to oxygen or not, at least you're giving them some oxygen, because some oxygen is better than no oxygen, and the longer he goes without oxygen, it's time is brain, is what we call it.

Q.   Do you have any opinions as to why Mr. Jones was not sent to a hospital?

         MR. CHAPMAN:  I would object.  At what time frame?

BY MS. DAMICO:

Q.   Any time frame.  After he was scored a 19, after his first assessment?

1    **A.**    I can't figure out why the nursing staff did not send him

2    to the hospital after he escalated on his CIWA scores.

3    **Q.**    Do you have any other opinions that I did not touch here

4    or anything else you'd like to express with respect to your

5    opinions in this case?

6    **A.**    I don't believe so.

7    **Q.**    I am sure Mr. Chapman is going to have a lot of questions

8    for you.

9              THE COURT:  All right.  Why don't we take our lunch

10    break, ladies and gentlemen.  Everybody back in an hour, 1:30,

11    please.

12              THE CLERK:  All rise for the jury.

13                   *(Jury left courtroom at 12:31 p.m.)*

14              THE COURT:  All right.  Thank you.  One hour,

15    everyone.  You can step down, sir.  Watch your step.

16        *(Recess taken at 12:31 p.m.; reconvened at 1:43 p.m.)*

17              THE CLERK:  All rise.

18              THE COURT:  All right.  Thank you.  Line them up.

19    You can be seated.  Thank you.  All attorneys are present.

20    Parties are present.  We're ready for the jury, correct?

21              MR. CHAPMAN:  Correct, Your Honor.

22              MS. DAMICO:  Yes, Your Honor.

23              THE COURT:  Okay.

24              THE CLERK:  All rise for the jury.

25                   *(Jury entered courtroom at 1:43 p.m.)*

1          THE COURT:  Thank you, everyone.  Please be seated.

2    All right.  Cross examination, Mr. Chapman.

3          MR. CHAPMAN:  Thank you, Your Honor.

4                    *CROSS EXAMINATION*

5    BY MR. CHAPMAN:

6    Q.   Good morning, sir -- or good afternoon now.

7    A.   Good afternoon, Mr. Chapman.

8    Q.   I'm going to kind of jump around and ask a variety of

9    questions, not necessarily going in any kind of linear order.

10         I would like to address one thing first, this fall

11   off the bunk.  I think the video you saw you said it was about

12   2200 hours, I think 2252 that he fell off the bunk?

13   A.   Correct.

14   Q.   Were you aware that the first time medical was advised was

15   at 0400 the following day that he was in CIWA?

16         MS. DAMICO:  Object, assumes facts not in evidence.

17         MR. CHAPMAN:  Mr. Jourden testified to that.

18         THE COURT:  Who did?

19         MR. CHAPMAN:  Deputy Jourden testified to that, that

20   he asked Ms. Steimel at 0400 on the 26th to start her CIWA.

21         MS. DAMICO:  The fall occurred on the -- evening of

22   the 26th at 2252.

23         THE COURT:  26th or 21st, what are we talking about?

24         MS. DAMICO:  26th.

25         THE COURT:  You're asking about the 21st?

1           MR. CHAPMAN:  No, not the 21st.  We were told on the

2    26th.

3    BY MR. CHAPMAN:

4    Q.    Let me ask you this, did Deputy Jourden call medical, tell

5    medical that he fell?

6    **A.**    That he had a laceration.

7    Q.    So he didn't tell them that he fell off his top bunk?

8    **A.**    Correct.  That he had a laceration to his elbow.

9    Q.    So the knowledge that you have, medical never learned that

10    he fell off the top bunk, correct, based on the information

11    you have, which is what Mr. Jourden told them or what he put

12    in an alert?

13    **A.**    Correct.

14    Q.    Just tell me what information you have.  Do you have any

15    information that medical was told that he fell off the bunk?

16    **A.**    No.  They were told that he had a laceration --

17    Q.    Okay.

18    **A.**    -- which would be --

19    Q.    That's fine.

20           THE COURT:  Hold on.  You both can't speak at the

21    same time, so let him finish, same with you, let him finish,

22    please.  Go ahead.

23           THE WITNESS:  Yes, ma'am.  He called medical stating

24    that he had a laceration, so it would be an unwitnessed

25    laceration to his arm, which somebody as a licensed

1    professional should investigate.

2    BY MR. CHAPMAN:

3    Q.   In order to determine your evaluation of the CIWA scores

4    you watched videos, right?

5    A.   I did watch videos, yes.

6    Q.   That's where you got your information as to whether or not

7    the CIWAs were scored correctly, right?

8    A.   I watched --

9    Q.   Do you understand my question?

10   A.   I understand.  I watched the videos.  I couldn't properly

11   score a CIWA from watching videos.

12   Q.   Okay.

13   A.   So, therefore, I'm bound to look at what the nursing staff

14   that was at the bedside, how they scored the CIWA.

15   Q.   So you're not disputing the scoring of the CIWA.  You're

16   disputing what happened with the scores of the CIWA?

17   A.   Correct.

18   Q.   Okay.

19   A.   And, I mean -- almost correct.  I mean, I can argue the

20   point that there was documentation saying that Mr. Jones was

21   vomiting and there were zeros on the CIWA for vomiting, but --

22   Q.   Well, what documentation?  I would like to challenge you

23   on that.  What documentation do you have that he was vomiting,

24   because I don't know of anything?  Deputy Jourden put in three

25   alerts.  He never told them he was vomiting and medical never

1   documented vomiting, so I would like to know what

2   documentation you have that says there was vomiting between

3   0400 on the 26th and 0400 on the 27th, because that's the time

4   frame we're talking about?

5   **A.**   I'm not sure where I extrapolated that data, because I had

6   vomiting times five at the beginning and then vomiting times

7   six.

8   Q.   I understand that.  But you're stating that in front of

9   the jury.  I would like to find the information --

10          THE COURT:  Stop.  If you want to object, you have to

11   stand up and object.

12          MS. DAMICO:  Objection.  He wasn't letting him

13   finish.

14          THE COURT:  Again, let each other finish, please.  Go

15   ahead.

16   BY MR. CHAPMAN:

17   Q.   The question to you is you made the statement in front of

18   the jury.  I want to see the documentation.  Not your opinion

19   of what you think might have happened, but the documentation

20   that there was vomiting.  We don't have it in the medical

21   records.  We don't have it from Deputy Jourden.  Those were

22   the only people that were there at 0400 on the 26th to 0400 on

23   the 27th.  Would you like to retract that statement?

24   **A.**   I will because I can't remember where I read that.

25   Q.   We're dealing with some numbers here and what should have

1    happened based on this number and that number.  In the field

2    of medicine, do you make all your determinations just on a

3    number?  Like, are you telling the jury because somebody

4    scored a 21 then this must happen irrespective of the

5    condition of the person?

6    **A.**    No.  It would be --

7    Q.    Okay.

8    **A.**    -- both of those.  So I assess a patient -- for a CIWA

9    patient, as we are speaking of, I assess a patient of a CIWA

10    score of 20 and then I look at the patient to see if they look

11    like somebody going through severe alcohol withdrawal, and in

12    this case we could see on the videos that's somebody who

13    appears to be going through severe alcohol withdrawal along

14    with a CIWA score of 20, so that seemed accurate.

15    Q.    So, again, you're watching a video and then making a

16    determination that a skilled nurse up there was making

17    face-to-face -- that's where you get your information, you're

18    watching a video and making a determination that not only is

19    there a number but you're confirming with what you're seeing

20    on the video; is that what you're saying?

21    **A.**    Yes.

22    Q.    Well, you said watching a video to make assessment is not

23    the same as being there, correct?

24    **A.**    And that's what I just told you about five minutes ago.

25    Q.    Well, then, how can you watch a video, have the CIWA

1    score, and say this video confirms the CIWA score?  You can't

2    check his pulse.  You can't see if he's perspiring.  You can't

3    see if he has any anxiety.  You can't see if anything is going

4    on.  You see him moving around in a cell, so how do you make

5    that determination?

6    A.   If you refer back to about two questions ago, you just

7    asked me, do you rely on the number itself or what you see,

8    and I think I said, I do rely on the number in which I see the

9    nursing staff which document it, and I also looked at a video,

10   so whether I'm looking at a video at a person stumbling around

11   pulling a shirt -- a shower curtain down and then dying

12   sitting on a toilet versus somebody walking -- if you would

13   have seen Mr. Jones when he first came in, he was walking

14   pretty well, so I look at both of those.  Just as the nursing

15   staff could also see Mr. Jones at that time, so I saw exactly

16   what those nurse saw.

17   Q.   You think from a video you can determine if he had any

18   type of sweating?

19   A.   I'm not arguing the CIWA score, and to your answer -- to

20   be responsive to your question, I -- it would be difficult to

21   see sweating from a video.

22   Q.   Do you agree it's hard to see variances in scoring from a

23   video, whether someone is a four or five or six or seven?

24   That's a yes or no, do you agree with that?

25   A.   Variances in the CIWA scoring?

1    Q.   You want me to repeat my question if you don't understand

2    it?

3    A.   You only said variances so I'm assuming -- and I shouldn't

4    assume.

5    Q.   No.  I said, is it hard to see variances between a one and

6    a two, two and a three, three and a five by watching a video

7    and the ten elements that are in a CIWA score?

8    A.   Some of that, yes.

9              MR. CHAPMAN:  Can I approach, Your Honor?

10             THE COURT:  Yes.  Hold on.  You want to -- you want

11   to let her know or show her --

12             MR. CHAPMAN:  Oh, I'll tell you.  You have your

13   transcript there.  It's going to be paying 101, line 18.

14             MS. DAMICO:  Thank you.

15             MR. CHAPMAN:  I only have one transcript.  May I

16   stand here for a second?

17   BY MR. CHAPMAN:

18   Q.   Could you just read from line 18 to line 20, just three

19   lines there?  You can see the question?

20             MS. DAMICO:  Are you asking a question or just

21   refreshing?

22             MR. CHAPMAN:  No.  I'm impeaching him.

23             THE COURT:  Okay.  So you asked him a question.

24             MR. CHAPMAN:  I did ask him a question.

25             THE COURT:  No, I know.  I'm just trying to recap

1    because everybody keeps bouncing up and down, okay?  So you're

2    asking him to read something that you're saying is impeaching

3    something he just previously said, correct?

4              MR. CHAPMAN:  This is prior deposition, Your Honor.

5              THE COURT:  I know.  To something he just testified

6    to?

7              MR. CHAPMAN:  Yes.

8              THE COURT:  Okay.  Thank you.

9    BY MR. CHAPMAN:

10   Q.   Could you read the question and the answer?  Do you see

11   it?

12   A.   18, okay.  Question:  It's hard to see those variances or

13   those nuances over video, correct?  And I said it is.

14   Q.   And you agree the video watched doesn't have any sound?

15   A.   I agree with that as well.

16   Q.   On the scoring sheet that you -- do you know the

17   difference -- let's take anxiety or hallucinations or whatever

18   between a four and a five, can you -- I mean, is it even

19   conceivable for you to know what those differences are?

20   Previously you told me you couldn't.  Do you know what those

21   differences are?  Can you make those determinations?

22   A.   So you have a patient which you're evaluating and you have

23   seen what he was in the past when you've previously scored

24   him, and if he's increasing, then you increase the number on

25   that score.

1          I think to be more responsive to your question, if

2     there's parts of the score that has a definition that goes

3     with it, you can.  If it's something that doesn't have a

4     definition to go with it, meaning hallucinations, auditory,

5     visual, then that's a little bit easier versus anxiety one

6     through six.

7          MR. CHAPMAN:  Could you turn my screen on, please?

8     Oh, I have to plug it in.  Sorry.

9     BY MR. CHAPMAN:

10    Q.   So let's say, for example, you're looking here at my

11    screen, paroxysmal sweating.  What's the difference between a

12    two and a three?

13    A.   It would be somebody who you can see is barely sweating,

14    perceivable -- or perceptible sweating that they're having.

15    Palms are moist so you have to actually touch them to feel

16    that.  As he gets a little bit more, other than barely

17    perceptible, that would be a three, and as we are's starting

18    to create small beads of sweat, that's going to be a three,

19    and then beads of sweat obviously on the forehead, that's

20    obviously going to be what's list as number four.

21         THE COURT:  Mr. Chapman -- this goes for everybody --

22    identify the exhibit for the record because --

23         MR. CHAPMAN:  Oh, this is Exhibit 1, Your Honor.

24         THE COURT:  Okay.  So if you don't, the transcript

25    won't reflect what you're asking the witnesses about.

BY MR. CHAPMAN:

Q.    Do you agree with this statement, if five people work in a situation like a jail, they're evaluating the same person at different times, their scores could be dramatically different but accurate?

A.    Sure.

Q.    Now, looking at this exhibit -- not an exhibit, this is a compilation of the record, do you see the scoring that's there?  Can you see it on your screen?

A.    I can see scoring, yes, sir.

Q.    You're not disputing any of that scoring, correct?

A.    I am not.

Q.    And then you see down at the bottom there's the numbers there, correct?  These are the total scores?  See that, 19, 13, 20, 21?

A.    I see those.

Q.    Okay.  Now, you said, I think, earlier that policies and procedures were not the standard of care, correct?

A.    Policies and procedures do not set the standard of care.

Q.    But you said policies and procedures of the corporation, the hospital, whatever, are something you should follow?

A.    Policies and procedures are nursing laws and we follow those unless we have a reason not to follow those.

Q.    You're saying policies and procedures are nursing law?

A.    We have to follow our policies and procedures.  When a

hospital creates policies and procedures, they utilize
evidence based practice and best practice to put those
policies into motion, so -- no matter what the policy is, so
we have to follow our policies.  If I don't follow my hospital
policy, then I can get in significant trouble, whatever
reprimand for not following policies and procedures of my
hospital.

Q.   What if Corizon's policies and procedures said that the
severe level was 25 to 67?  That would change everything,
wouldn't it, because that's what the corporation says?

A.   It would.

Q.   So if the corporation said anything over 23 is severe, we
wouldn't be here because he's a 22 and we'd be dealing with
moderate range and a moderate range doesn't have to go to the
hospital; is that what you're saying?

        MS. DAMICO:  I'm going to object to an improper
hypothetical.  It assumes facts not in evidence.

        THE COURT:  Hypotheticals don't have to have facts in
evidence.  That's why they're hypotheticals, right?

        MS. DAMICO:  That's true.  That's true.  Then it's
just an improper hypothetical.  I'll withdraw it.  He can
answer it.

        THE COURT:  Okay.  Go ahead.

        THE WITNESS:  I'm sorry, could you ask one more time?

BY MR. CHAPMAN:

1  Q.   Sure.  I forgot the question, too.  So what I'm saying is

2  if the corporate policy says that you don't go to the ER, you

3  don't go anywhere until you score a 24, then we wouldn't be

4  here because the highest score here was a 21, because the

5  corporate policy says that 21 you don't have to go to the ER;

6  is that what you're saying?

7  A.   You follow the policies and procedures.

8  Q.   Okay.  But if you follow the policies and procedures --

9  let's say -- let me drop that.  If the policies and procedures

10 said -- this hypothetical policies and procedures said at 30

11 you have to go outside and play in the snow, that's the

12 policies and procedures, at 29 you don't have to go play in

13 the snow, right?

14 A.   I'm following you.

15 Q.   But at 31 you would have to go out and play in the snow?

16 A.   Correct.

17 Q.   Okay.  Now, you looked at the policies and procedures,

18 right?

19 A.   I did.

20 Q.   Okay.  This is Exhibit 15.  I think this is the exhibit

21 that counsel was referring to which said that if you have --

22 if you score severe, which you're saying is 20 or higher,

23 right?

24 A.   As written on their paper, yes.

25 Q.   Yes.  Because the policy says severe is 20 and higher,

1    right?  The corporate policy says that?

2    **A.**    Correct.

3    **Q.**    Okay.  And so if it's severe or higher, you look at this,

4    and that's why you say he should have been sent to a licensed

5    acute care facility?

6    **A.**    Acute care facility, sure.

7    **Q.**    But it also says, should be immediately sent to medical

8    housing unit, which is an infirmary, so they followed the

9    policy correctly; that's what you just testified to, right?

10    MS. DAMICO:  Objection.  Can he please identify what

11    policy he's referring to or what exhibit?

12    MR. CHAPMAN:  15.

13    MS. DAMICO:  And that's not the corporate policy.

14    That's the site specific policy.

15    MR. CHAPMAN:  No, it's not.  This is the corporate

16    policy up here that you showed him.  The problem was you

17    didn't show him the whole policy.  This is the part you showed

18    him right here which said acute care facility.  I'm showing

19    him the whole policy.

20    MS. DAMICO:  Can we approach, please?

21    THE COURT:  All right.  We can't mouth things.  Just

22    approach.

23    *(Side-bar held as follows:)*

24    MS. DAMICO:  The policies he has up right now is

25    mentioned as Exhibit 15.  First of all, he doesn't even have

1    the policy up --

2              THE COURT:  Lower your voice.

3              MS. DAMICO:  He has Exhibit 48 from Yacob's

4    deposition which he's already yelled at me -- him for even

5    mentioning Yacob.  It's wrote --

6              THE COURT:  Stop, stop.

7              MR. CHAPMAN:  That's number 15.

8              THE COURT:  This is an admitted exhibit.  You asked

9    questions about it.  He can't ask questions about it?

10              MS. DAMICO:  No, no.  Listen.  I'll explain myself.

11    First of all, it's not the exhibit -- it is an exhibit,

12    Exhibit 15.  It's the site specific policy, not the corporate

13    policy.  That's Exhibit 9, so you have Exhibit 15 up there but

14    you have a sticker on it that says Exhibit 48 from Doctor

15    Yacob.  If you're going to put the exhibit up there that we

16    entered, you have to put the one with the exhibit sticker and

17    not Yacob.  It's not the one that's been entered into

18    evidence.

19              THE COURT:  Stop it.  These are multiple issues,

20    okay?  First of all, the exhibit that is shown at any point --

21    any exhibits that are shown up on the screen are exhibits that

22    have been admitted in trial.

23              MS. DAMICO:  Thank you.

24              THE COURT:  They should not be anything that's been

25    admitted -- not admitted, anything that was used in

1      depositions.  Only admitted exhibits; that's one, okay?

2            And, two, he can ask any question he wants about any

3      exhibit that's been admitted.

4            MS. DAMICO:  I agree.  But he referred to it as

5      something that I showed that it was the corporate policy.

6      It's not what he says it is.  You're showing the site specific

7      policy, and you said I put it up on the screen.  One, I

8      didn't.  That's fine.  I'll fix that, but, two, it's not the

9      policy -- it's not -- the copy you're showing is from Doctor

10     Yacob's deposition.  It's not the one that's been entered, the

11     actual one we entered into evidence.

12           MR. CHAPMAN:  The one I have is 15.  That's the site

13     specific corporation.

14           MS. DAMICO:  It says Exhibit 48 on the screen from a

15     deposition.

16           MR. CHAPMAN:  I'll put a box around it so you don't

17     see it.

18           THE COURT:  Pull up the right thing, take a look at

19     it, and then let's move on.

20                         *(Side-bar concluded)*

21           MR. CHAPMAN:  That is the right one.

22           THE COURT:  Pull it up and have her take a look.

23           MR. CHAPMAN:  Is that it?

24           THE COURT:  Take a look.  The's not going to be on

25     the screen until you take a look.

1    MR. CHAPMAN:  We can use it now, Your Honor.

2    THE COURT:  All right.  Go ahead.

3    BY MR. CHAPMAN:

4    Q.   You commented during direct examination that because there

5    was a score that was in the severe category they had to follow

6    the policy, and you said that's why they had to send him to an

7    acute care facility; do you remember that?

8    A.   I do.

9    Q.   But that's not the whole policy.  When you go down here it

10   says, site specific policies.  Now, do you know in the Kent

11   County jail what a site specific policy is?  Don't guess.  I

12   only what to know if you know.

13   A.   I mean, I have a good idea.

14   Q.   What's your good idea?

15   A.   That they have policies only specific to those -- that

16   facility.

17   Q.   And they're specific to that facility because there may be

18   something different at that facility than there might be at

19   another facility so they create their own special policy; does

20   that make sense?

21   A.   It does.

22   Q.   Do you know what makes Kent County jail different than the

23   vast majority of other jails?

24   A.   I do not.

25   Q.   Do you think maybe before you were -- came to testify

1    against these folks you might have come down to Kent County

2    jail or maybe even looked them up on the internet or read some

3    documents about them?  Would that have been helpful for you to

4    know?

5    **A.**    I have read about them in the past, yes.

6    **Q.**    Okay.  Do you know that the reason this policy is

7    different, and right here it says, patients experience severe,

8    life-threatening intoxication withdrawal are transferred to

9    the medical housing unit or licensed -- there's a big or

10   there.  Do you see that?

11   **A.**    I see it.

12   **Q.**    Now, according to your prior testimony, they followed the

13   policies of Corizon at Kent County because he scored a 21 and

14   they brought him down to the infirmary, didn't they?  Isn't

15   that true?

16   **A.**    That is absolutely not true.

17   **Q.**    They brought him to the infirmary.  You said they should

18   have taken him to acute care facility, right?

19   **A.**    They should have.

20   **Q.**    But the policy -- you just got done telling the jury that

21   the corporate policy is the law for nursing and they have to

22   follow it.  We just went through that whole discussion, so the

23   law for Kent County is if somebody is severe, you bring them

24   down to the infirmary.  That's what they did, right?  Yes or

25   no, is that what they did?

**A.**    No.

**Q.**    I thought he was in the infirmary.  We saw videos of him in the infirmary.

**A.**    I'm happy to explain.

**Q.**    I'm confused.  Was he or was he not ever in the infirmary?

**A.**    I'm sorry you're confused.  I can tell you he did get transferred to the infirmary eventually.  When he scored a 21, that was earlier on the 26th.  That was when Nurse --

**Q.**    I'll help you out.

**A.**    -- Fielstra --

**Q.**    Do you see that?

**A.**    That's when Nurse Fielstra assessed and he was a 21.  He was not taken to the infirmary at that point when he was a 21. That's why I just answered the way I answered, and what I think there was a question about the infirmary versus the hospital, with their site specific policy is their 30(b) rep, who had said that they were trying to --

        MR. CHAPMAN:  Objection.  You can't testify to what somebody else said out of court.

        THE COURT:  Hold on.

        MS. DAMICO:  May I respond?

        THE COURT:  Yes.

        MS. DAMICO:  A 30(b)(6) deposition is an admission binding on the corporation.  It can be used for any purposes in trial.

1      THE COURT:  Okay.  Stop.  Okay?  First of all, what's

2   your question?

3      MR. CHAPMAN:  My question had to do with whether or

4   not we had an infirmary and whether they followed the policy.

5   He went off that question and started explaining, so there

6   really was no question to him.

7      THE COURT:  Ask the next question.

8      MR. CHAPMAN:  Okay.

9   BY MR. CHAPMAN:

10  Q.   So is your real issue here, then, that he didn't go to the

11  infirmary at 1900 hours so -- but he did go at 0400, the next

12  day, so your real issue is he didn't go, what is that,

13  seven hours earlier because that was a 21 and you said he

14  should have gone then, so the real issue is he didn't go -- he

15  went seven hours to late, is that the issue?

16  A.   He was assessed at a 21 at 7:00 p.m.  He was transferred

17  to the infirmary almost 12 hours later, which would have been

18  6:06 the next morning.

19  Q.   I understand.

20  A.   He wasn't --

21  Q.   I'm sorry.  Go ahead.  I apologize.  Go ahead.

22  A.   He wasn't transferred down by their policies and

23  procedures at the 21.  He wasn't transferred down to the

24  infirmary for 12 hours following that.

25  Q.   I understand that, and I apologize for interrupting you.

1    So the real issue here is there was a 12-hour delay in getting

2    him from his cell to the infirmary; that's what you're here to

3    tell the jury?

4    A.    Sure.  And that he --

5    Q.    Okay.

6    A.    -- also didn't get the medications that were ordered by

7    the nurse practitioner for his increasing CIWA scoring --

8    Q.    Okay.

9    A.    -- and his trajectory of going upward in his CIWA score.

10    Q.    Okay.  So then let's concentrate on that period that you

11    say is at issue from 19 -- from 1900 hours, which is seven

12    o'clock, to 0400 on the 17th.  The change in his score was

13    just one, right?  He went from a 20 to a 21 -- or a 21 to a

14    20?

15    A.    That's correct.

16    Q.    Based on your testimony during direct examination, he's

17    not going up, he's actually going down, technically.  He went

18    from a 21 to a 20, right?

19    A.    I'll give you that.

20    Q.    And you would say -- you're smiling because you say, come

21    on, that's a change without a distinction, right?

22    A.    He's still high on the CIWA score, and, yes.

23    Q.    You're smiling because --

24    A.    That is a minute --

25              MR. CHAPMAN:  I'm going to drive the court reporter

1    crazy.

2              THE COURT:  Both -- I think everyone is.

3              MR. CHAPMAN:  I'll try to be better.

4    BY MR. CHAPMAN:

5    Q.   You're smiling because between 21 and 20, it really

6    doesn't -- it really doesn't change anything, does it?

7    A.   He was still significantly elevated.

8    Q.   Well, between a 19 and a 21, why, in your opinion, does

9    that dramatically change anything?  That's only two numbers.

10   A.   He went from a 13 to a 21.

11   Q.   No.  But he was a 19, between 19 and 21, that's only a two

12   number difference, right?

13   A.   That's correct.

14   Q.   But you're not smiling now.  You were smiling at the one

15   point difference, so why is a two point difference so much

16   different than a one point difference?

17   A.   It's not so much a one --

18   Q.   Okay.

19   A.   It's not so much that big of a difference.

20   Q.   Okay.  You made a statement in direct, and you might have

21   just made a mistake, but you said that, I believe that Ms.

22   Steimel did not take his vital signs.  She did, correct?

23   A.   That is correct, with the exception of the blood pressure.

24   She took the heart rate.  It was 124, I believe.

25   Q.   So I'll show you down here, we have Ms. Byrne.  She's the

1    one that took the vital signs when he came into the facility.

2    Do you see that?

3    A.   I see that.

4    Q.   And then you see Ms. Steimel took them when he came in --

5    or when she went up to assess him; do you see that?

6    A.   I see that.

7    Q.   Okay.  Now, Nurse Tennesen, we've already taken her dep.

8    It's going to be played tomorrow.  She said there's really no

9    difference between that set of vital signs.  Do you agree with

10   that?

11   A.   I do not agree with that.

12   Q.   And you don't agree because you say he's a little

13   tachycardic, his pulse rate is a little high?

14   A.   It's all -- yeah, it's significantly elevated, sure.  I

15   mean, above a hundred is high.

16   Q.   Okay.  Well, we'll listen to Ms. Tennesen and then we'll

17   judge between the two of you.

18            And you said, I believe, on direct that once somebody

19   starts in a detox like this, they're going to continue a

20   trajectory upward.  In other words, they're going to continue

21   to get worse, particularly if they're not given medication,

22   and this person had to go to the emergency room, so he's going

23   to continue going up?

24   A.   No.  From their starting point they're going up, that's

25   true.  I mean, you're not going to assess a patient and he's

1   98 and then he's 124 then he's 176 and then he's 200.  I'm not

2   saying that trajectory.  You're going to be elevated and stay

3   elevated.

4   Q.   Well, let's look on 4-27.  He had -- his temperature was

5   the same, his pulse rate was down to 92.  That's pretty good,

6   right?

7   A.   I agree that is pretty good.

8   Q.   His respirations were down.  There's also testimony from

9   Ms. Tennesen, there will be from others, that 150 over 92 is

10  nothing to be alarmed about when somebody is going through

11  detox.  Do you disagree with that?

12  A.   They elevate with detox.

13  Q.   That wasn't my question.  Do you agree that Ms. Tennesen

14  will testify, and other experts, that 150 over 92 for someone

15  going through detox is not an alarming blood pressure?

16  A.   I do agree with that, yes.

17  Q.   So if you look at the vital signs when he came in and the

18  vital signs when he went to the ER -- or when he went to the

19  infirmary, there's not much change; do you agree?

20  A.   That was -- sure.  That was 30 minutes before he went to

21  the infirmary.  Yeah, I'll agree with you, they're about the

22  same.

23  Q.   Okay.  And if you look up at the scoring, you'll agree

24  with the scoring, and if you match the scoring to here, from a

25  19 to a 21 to a 20, there's not much change, correct?

**A.**    I agree with you.

**Q.**    So his scoring isn't changing much and his vital signs
aren't changing much, and if I heard you correctly the only
reason, based on the corporate policies, which you say is law,
that he would have to go to the infirmary is because he went
up two points and scored a 21, so we're arguing over two
points; isn't that correct?

**A.**    I wouldn't say we're arguing over two points.  When he
scored a 19, I believe by their policy that's when he
should -- because he was a moderate and he would have been
moved to the infirmary at that point, and when he goes to 20,
that's when he's grossly elevated and goes to the emergency
department.

**Q.**    Okay.  Let's look at the policies, because I might have
read it wrong, but it says, patients experiencing severe,
life-threatening intoxication, and you would agree with me
that the scoring -- here, let's just put it up there.  The
scoring down at the bottom here says mild, zero to nine;
moderate 10 to 19; severe 20 to 67, right?  Is that what it
says?

**A.**    That is what it says.

**Q.**    So the policy says, patients experiencing severe, right,
should go to the medical housing unit or the licensed acute
care facility, right?  Isn't that what it says?  I think you
can answer that yes or no.

A.    It says, patients experiencing severe, life-threatening intoxication or overdose or a withdrawal are transferred immediately to the housing unit.

Q.    Yeah.

A.    So he was withdrawing at a 19 and then he was also severely withdrawing once he hits 20.

Q.    I'm confused in your reading of this.  It says -- and a jury can follow along with this and use their own experiences. It says, patients experiencing severe, life-threatening intoxication or withdrawal are transferred, so he was in withdrawal, right?

A.    He was in withdrawal.

Q.    So he would have to have severe withdrawal if we take the corporate policies as law, like you said, and then we would transfer him to the infirmary, right?

A.    I'm sorry, I missed -- unless I misread it, because I took it as patients experiencing severe, life-threatening intoxication, overdose, or withdrawal, not severe, life-threatening intoxication or severe only withdrawal are transferred immediately to the medical housing or licensed acute care facility.

Q.    This is our fourth day of trial.  Everybody has taken the stand and has argued or has said this means that people that are experiencing severe withdrawal should go to the medical housing unit or the licensed acute care facility.  Are you

1    saying now that your reading of the English language is

2    different and that's not what it says?

3              MS. DAMICO:  Objection, argumentative.

4              MR. CHAPMAN:  Well, it's cross examination.

5              THE COURT:  It is cross examination, Mr. Chapman, I

6    understand, but I think we've gone over this, so I'll allow

7    you one more time.

8              MR. CHAPMAN:  I'll move on.

9              THE COURT:  Each of you can read it.  Each of you

10   stated your viewpoints --

11             MR. CHAPMAN:  I'll change --

12             THE COURT:  -- and everyone can determine based on

13   whatever each witness said.

14   BY MR. CHAPMAN:

15   Q.   Switching gears, then, but going back to something we did

16   much, much earlier, you've never been to Kent County jail,

17   correct?

18   A.   That's correct.

19   Q.   You've never assessed a patient in jail, correct, in an

20   actual lockup jail?

21   A.   So our jail floor, it is locked up.  We have the real bars

22   and the bulletproof glass that we have actual inmates in, yes.

23   If that's what you're making reference to, I have assessed

24   patients in those areas.

25   Q.   And with your vast experience, how many have you actually

1    assessed inside that jail?

2    A.    I have assessed -- I mean, that's over 18 years.  I mean,

3    I've assessed hundreds of patients on that floor.

4    Q.    But you testified earlier your experience prior to 2018

5    was that you saw about six patients a year.  How does that

6    translate to a hundred?  You're not, like -- what would you

7    have to be?  You'd have to be practicing for -- gosh, my math

8    is not even there.  Like, to get hundreds for, like, 30 years,

9    40 years?  You're not that old, are you?

10   A.    Sadly, I am that old, and, number two, you asked me how

11   many patients have I assessed on those -- on that floor, and

12   I've been going to that floor for 18 years so I have assessed

13   a large number of patients on that floor.

14   Q.    Would you agree with me that virtually all of the patients

15   that you have assessed for detox were in the ER?

16   A.    No.

17   Q.    No?  Do you agree that between 2018 and 2021 that you've

18   only assessed one patient approximately every month or six

19   patients a year?

20   A.    That was actively withdrawing.

21   Q.    Well, isn't that what we're talking about, people actively

22   withdrawing?

23   A.    You asked me how many patients I've assessed.  I've

24   assessed a lot of patients.  I do physical assessments every

25   single day.  That's where you're throwing me off a little bit

1    on the question.

2    Q.    Well, I'm sorry.  Let me kind of go back.  I think we're

3    here talking about an individual who was detoxing, so that's

4    what I want to focus on, detoxing.  You only detox maybe -- or

5    do evaluations of people in detox maybe up to six a year,

6    actively going through detox?

7    A.    That are actively withdrawing, and we assess much more

8    that aren't and could potentially actively withdraw.

9    Q.    But, see the thing here is we're not talking about people

10   that could potentially being withdrawing.  We're talking about

11   people that are actively withdrawing.  Mr. Jones -- is there a

12   dispute, was he actively withdrawing from alcohol?

13   A.    He was.

14   Q.    Okay.  You agree that RNs and LPNs are required to

15   exercise their clinical judgment when doing either assessing,

16   if you're an RN, or information gathering, if you're an LPN?

17   A.    I agree with that.

18   Q.    Have you ever in your experience -- not just in a jail, it

19   doesn't matter where your experience is for this question --

20   ever been required to carry out a physician's order?

21   A.    Every single day that I work.

22   Q.    It's kind of a stupid question but I have to lay my

23   foundation, right?  That's what nurses do, right?

24   A.    Very frequently, yes.

25   Q.    And that's a significant function of nurses carrying out

1   orders, whether it's to do a history and physical or to change

2   a bandage or to give medication or even more complex things

3   depending upon where they're working, but it's based off a

4   physician treatment plan and order, correct?

5   A.   Or mid-level provider, correct.

6   Q.   Now, the system of medicine wouldn't work very well if

7   doctors could -- and nurse practitioners tell nurses to do

8   things and then the nurses could do what they wanted to do.

9   That's not how it works, right?  That's yes or no.

10  A.   Yes, that should not be how it works.

11  Q.   So you testified in your deposition that if a nurse feels

12  that the order is dangerous, and I think the example you used

13  is a medication that somebody gave at ten times the regular

14  dose or something like that, then the nurse has an obligation,

15  or you're saying a duty not to follow that order.

16  A.   They have a duty to question that order.

17  Q.   And if they question that order, they're still required to

18  carry out that order, right, unless it's going to kill

19  somebody?  I mean, like you said, if, hypothetically, there's

20  medication A that the max dose you should receive is 10 and

21  the doctor writes a hundred, you probably shouldn't carry that

22  out, right?

23  A.   You question the physician, and if they're still adamant,

24  that's when you invoke the chain of command and get a nursing

25  supervisor involved.

1    Q.    In this case we had a nurse practitioner who's been at the

2    jail for a long time and has assessed people in active detox

3    -- more than six people in a year -- listened to some

4    information and made a decision to give medication -- not give

5    it STAT, to give it at the next regular time, you're saying

6    that that is so life threatening that Nurse Furnace should not

7    have followed that order?

8    A.    She should have questioned the order.

9    Q.    But you were not on the phone call so you don't know if

10   she questioned the order or didn't question the order, do you?

11   You don't know that discussion?

12   A.    That would be true, I don't know the discussion.

13   Q.    You had said something during direct examination that just

14   really caught me off guard.  You said that they should

15   restrain and force the person to take medication.  Do you know

16   anything about Michigan or Kent County jail, do they actually

17   just on their own restrain people to give them medication if

18   they don't want to take it?

19   A.    They should not.

20   Q.    Okay.  You also made a comment that Ms. Fielstra didn't

21   give medication when she went up there to see him.

22         MR. CHAPMAN:  Could you put my screen on for one

23   second?  Yeah, put it on, please.

24   BY MR. CHAPMAN:

25   Q.    So she's the one that went up and did an assessment at

1    1900 on 4-26 and we watched the video at length yesterday when

2    she was testifying.  You could see her put something in a cup,

3    hand it to him.  She testified that he drank it.  She gave him

4    some more water.  We see him give the cup back.  How do you

5    come to the determination that he didn't take his medication.

6    Did you see him cheek it, maybe?

7            MS. DAMICO:  Objection, it assumes facts not in

8    evidence.

9            MR. CHAPMAN:  We watched the video.  What I said is

10    exactly what the video showed yesterday.

11           THE COURT:  Your question is, what?

12           MR. CHAPMAN:  My question is yesterday when we

13    watched the video -- we could watch it again if we need to --

14    Ms. Fielstra is up there with Deputy Jourden, she passes a cup

15    into Mr. Jones' cell, she's encouraging him to drink it.  We

16    went through this whole thing because she was putting her

17    hands up like this to trying to get him to drink it, and then

18    next thing we see is she gets a bottle of water, she puts more

19    water in the cup, he drinks that and hands the cup back to

20    him.

21           THE COURT:  What's the question?

22    BY MR. CHAPMAN:

23    Q.   The question is how do you now testify that she didn't

24    give him the medication?  Do you know something we don't know?

25           THE COURT:  What's the objection?

1      MS. DAMICO:  My objection is the facts are not in

2  evidence.  Through direct she testified she didn't know and

3  then when she was walked through it through cross she

4  testified she did.

5      THE COURT:  Okay.  Listen, the testimony is what it

6  is.  The jury can judge that for themselves.  He can ask the

7  question of whether he knows what either she was saying or

8  doing.

9      MS. DAMICO:  Can I place -- he's asking if he knows

10  what she watched yesterday.  I mean, the way he's formulating

11  it is what we all watched yesterday and what she said

12  yesterday and how is he supposed to know that?  That's my

13  objection.

14      MR. CHAPMAN:  That's precisely my question, Your

15  Honor.  He said he's watched all the video and he knows.  He

16  couldn't have testified the way he did if he didn't watch the

17  video.  That's what I'm asking.

18      THE COURT:  From watching the video, based on his

19  testimony you can ask what he --

20      MR. CHAPMAN:  Sure.

21      THE COURT:  What he can determine and what that's

22  based on.

23      MR. CHAPMAN:  Okay.

24  BY MR. CHAPMAN:

25  Q.  How do you determine that medication wasn't given at

1    1900 hours by Ms. Fielstra by watching a video where it shows

2    that she's giving medication?

3    **A.**    To me when -- it's difficult looking at the video, but

4    when I looked at the video it appeared that he had given it

5    back, didn't take it.  That's what it appeared to me.  That's

6    why I said what I said.

7    **Q.**    So what you're telling the jury is you watched the video

8    and you're making an assumption as to what you saw or didn't

9    see?

10   **A.**    Correct.  So normally when we give medication, yeah, we

11   crush them because they will cheek them, so normally you crush

12   them and then they drink the powder with the water, so it's --

13   **Q.**    Do you agree that's what happened here in this video?

14   **A.**    I didn't see crushing of a pill, no.

15   **Q.**    She handed him a cup.  She testified typically that's what

16   they do, but whether they crush it or they don't crush it, it

17   doesn't really matter, she gave him a cup, he drank it, gave

18   it back to her.

19   **A.**    I couldn't see him drink it so (pause) --

20   **Q.**    And you said you didn't see him give it back to her?

21   **A.**    It didn't appear to me, no.

22   **Q.**    There will be testimony later to clarify what I'm saying,

23   but do you know what happens in a jail when somebody is given

24   a cup, if they don't give it back?  Are you aware that the

25   deputy will go in and retrieve it because you can't have any

1    contraband, even a cup inside a jail?

2    **A.**   Correct.  Or something similar because we don't -- no

3    aluminum cans, no silverware.

4    Q.   Yeah.  On that video did you see Deputy Jourden open the

5    door and walk in to retrieve that cup?

6            MS. DAMICO:  Objection.  That assumes facts that

7    are --

8            THE COURT:  No, it doesn't.  He's asking him based on

9    his view of the video what he saw -- if he saw that, or maybe

10   the better question is what did you observe as to that

11   officer?

12   BY MR. CHAPMAN:

13   Q.   Do you want me to restate it for you like the judge

14   indicated?  Let me restate it.

15           Did you observe Deputy Jourden open the cell and walk

16   in to retrieve the cup?

17   **A.**   Correct.

18   Q.   You did?  Let me -- did you observe Deputy Jourden walk in

19   to the cell and retrieve the cup?

20   **A.**   I don't recall if he did or she did.

21   Q.   I don't recall is a good answer.

22   **A.**   I'm not sure.

23   Q.   Okay.  Let me give you a hypothetical.  If medication is

24   typically in the institution given at ten o'clock p.m. and a

25   provider writes an order at two o'clock p.m. and it does not

1   say STAT, it will be given at 10:00 p.m.; do you agree with

2   that?

3   A.   If that's what you're stating in the hypothetical, yes.

4   Q.   I think you testified on direct you're familiar with the

5   idea of shift report?

6   A.   Correct.

7   Q.   Oncoming nurse or maybe a charge nurse or somebody, when

8   they come on they brief the other person -- or when they go

9   off they brief the person that's coming on?

10  A.   That's correct.

11  Q.   You're aware that Ms. Furnace did, in fact, brief Nurse

12  Goetterman the morning of April 27, correct?

13  A.   27th?  Yes, sir.

14  Q.   Pardon?

15  A.   It appeared so, yes.  There's no audio but video, yes.

16  Q.   Okay.  We saw the video in the infirmary when

17  unfortunately Mr. Jones went down.  And I saw Mr. Mollo from

18  the time he walked in until the time he was done continuously

19  doing chest compressions.

20  A.   Nurse Goetterman started and --

21  Q.   That's not the question.  Mr. Mollo from the time he

22  walked in, he took over and started doing chest compressions

23  until the time emergency services got there?

24  A.   He was the only person compressing the chest, yes, but he

25  did take breaks.

Q.   Okay.  It's okay to take breaks if somebody relieves you

while you're doing chest compressions?

A.   It is, and that's what we actually teach.

Q.   Okay.

A.   So we do five cycles and then the compressor, the person

doing -- because you get tired and it's a very --

Q.   Okay.

A.   It's -- it really wears you out, so that's why we change

the compressor because that person gets tired and they won't

push as deep and as fast as they should.

Q.   And Mr. Mollo was in there doing chest compressions, that

was his contribution, if you will, to what was going on?

A.   That's correct.

        MR. CHAPMAN:  I have no further questions.  Thank

you, Your Honor.

        THE COURT:  All right.  Any redirect?

        MS. DAMICO:  Yes.

                    *REDIRECT EXAMINATION*

BY MS. DAMICO:

Q.   Okay.  You were questioned regarding the policy and

procedure on intoxication and withdrawal for quite a while; is

that true?

A.   I agree with that.

        MS. DAMICO:  Will you put that down?  I'm sorry, I

wasn't ready.

BY MS. DAMICO:

Q.    I am going to show you what's been marked as Exhibit Number 9.  You can put it up.  And this is the corporate policy of Corizon called medically supervised withdrawal and treatment, and I'll represent to you that this was admitted yesterday during Nurse Furnace's deposition (sic) and this is the corporate policy of Corizon regarding medically supervised withdrawal and treatment.  Do you recall reviewing this as part of your review of this case?

A.    I did, yes.

Q.    Okay.  And did you also review the clinical pathway for substance abuse withdrawal?

A.    Yes.

Q.    Okay.  And I'm going to take you down to the bottom of the page, and this talks about site specifics, and I believe that you were questioned for a while about the site specifics dealing with the Kent County jail, true?

A.    That's true.

Q.    Okay.  In the corporate policy down on the second page, the number five, the procedure statement, it talks about inmates experiencing severe or progressive intoxication or severe alcohol and drug withdrawal, it says they are transferred immediately to a licensed acute care facility; do you see that?

A.    I see that, yes.

1    Q.    Okay.  So in reading that statement -- I know there was a

2    lot of going back and forth between you and Mr. Chapman about

3    commas and how you read it.  Does that statement comport more

4    of how you were interpreting the site specific policy?

5    A.    Exactly.  How they have documented severe intoxication,

6    overdose, or severe alcohol drug withdrawal, that's what I was

7    trying to say.

8    Q.    Understand.  And then the area where it says facility

9    guidance, what does it say in that box?

10   A.    It says, severe withdrawal is a medical emergency.  As a

11   precaution, severe withdrawal syndromes must never be managed

12   outside of a hospital.  Death from acute intoxication or

13   severe withdrawal have occurred in correctional facilities.

14   Q.    And did you review anything that -- let me ask you this,

15   strike that.  Did you form an opinion or a conclusion as to

16   why the Kent County -- Corizon at Kent County changed their

17   policy or their site specifics were altered to say either

18   transfer to the infirmary or acute care facility?

19   A.    I did, yes.

20   Q.    And what's your opinion?

21   A.    It was because, as I was stating before, their 30(b), or

22   their corporate representative --

23           MR. CHAPMAN:  Objection, Your Honor.  He can't

24   specify what someone else said.  It's hearsay.

25           MS. DAMICO:  My response to that is that the

1    admission of a corporate representative pursuant to a 30(b)(6)

2    deposition is admissible and can be used for any purpose

3    during trial.  It's a corporate admission and it can be used

4    here.

5              THE COURT:  Mr. Chapman.

6              MR. CHAPMAN:  It's still hearsay, Your Honor.  It's

7    not an exception to the hearsay.  It's still an out-of-court

8    statement.  They could have brought the person here.  They

9    didn't bring the person here to testify so it is an

10   out-of-court statement.

11             MS. DAMICO:  First of all, Your Honor, it is a party

12   admission.

13             THE COURT:  Okay.  Cite me something.

14             MS. DAMICO:  I am.  I'm going to.  First of all --

15   I'll give you a rule of evidence and a Federal Rule of Civil

16   Procedure.

17             So 80 -- are you ready?

18             THE COURT:  Just cite me the rule.

19             MS. DAMICO:  Okay.  Rule 801(d)(2)(A).  That's the

20   rule of evidence --

21             THE COURT:  Hang on.  Okay.

22             MS. DAMICO:  And then Federal Rule of Civil Procedure

23   30(b) -- and I have to be more specific.

24             THE COURT:  30(b), what?

25             MS. DAMICO:  It's (b)(2) something.  I don't have

1    my --

2              THE COURT:  30(b)(2), is that what you just said?

3              MS. DAMICO:  Yes.  That's exactly what it is.  Thank

4    you, Your Honor.

5              THE COURT:  I'm not -- that's what I thought I heard.

6    I'm not saying --

7              MS. DAMICO:  No.  I think it's 30(b)(2).

8              THE COURT:  That's just production of documents.  Mr.

9    Chapman, first, as to the rule of evidence, 801(d)(2)(A), that

10   would seem to indicate it's not hearsay unless you're telling

11   me that the statement was not made.

12             MR. CHAPMAN:  I understand you're talking about a

13   party against interest, but Corizon is only here in their

14   vicarious liability because they're the employer, they're not

15   a party.

16             THE COURT:  Approach.

17                    *(Side-bar held as follows:)*

18             THE COURT:  801(d)(2)(A), statements are not hearsay

19   if offered against an opposing party.  It was made by the

20   party or individual or representative capacity, so what part

21   of that is not --

22             MR. CHAPMAN:  They're offering against these nurses.

23             THE COURT:  Yeah.

24             MR. CHAPMAN:  These nurses -- it can't be offered

25   against Corizon.  Corizon is not on trial.  You can't offer

1    this against these nurses.  They're not the party who made the

2    statement.  They're not the parties who authorized the

3    statement.  This person who did it isn't their agent.

4              THE COURT:  Okay.

5              MS. DAMICO:  That's the only way I would ever use a

6    30(b)(6) deposition.  That's the only --

7              THE COURT:  Okay.  But he's saying it doesn't come in

8    through this person.  I think that's what I'm hearing.

9              MS. DAMICO:  I can never get a corporation to

10   testify.  There's no such thing.

11             MR. CHAPMAN:  You do when a corporation is on trial,

12   the corporation is a defendant.

13             MS. DAMICO:  But --

14             MR. CHAPMAN:  You're using it not against the

15   corporation.  Then I would ask you what's the cause of action

16   against the corporation you're going to use it?  You're using

17   it to prove some kind of standard that the individuals have to

18   follow.  It's not -- they're not the party of interest that

19   made the statement.

20             THE COURT:  Let me ask you a question.  Is the

21   verdict form going to have Corizon as well as each individual

22   defendant?

23             MS. DAMICO:  Yep.

24             MR. CHAPMAN:  Well, that's in dispute, Your Honor.  I

25   believe Corizon is only here vicariously.  In your recent --

1    or your order for summary judgment all allegations against

2    them were dismissed.  They're not here for a med/mal claim.

3    They can't be vicariously liable for 1983.  They can only be

4    vicariously liable for a medical malpractice claim.  They're

5    vicariously liable --

6            THE COURT:  Even in the medical malpractices claim?

7            MR. CHAPMAN:  That would be the only way --

8            THE COURT:  And there is a medical malpractice claim.

9            MR. CHAPMAN:  Not against Corizon.  We do not have a

10   corporate practice --

11           THE COURT:  Just against the one --

12           MR. CHAPMAN:  Just against the individuals.  We don't

13   allow the corporate practice of medicine in the state of

14   Michigan.

15           MS. DAMICO:  If I was suing Henry Ford Hospital and

16   individual nurses and doctors, Henry Ford Hospital would still

17   be on the verdict form.

18           MR. CHAPMAN:  That's a different --

19           THE COURT:  Without being a medical malpractice

20   claim?

21           MS. DAMICO:  That's what this is.  I have a state law

22   medical malpractice claim.

23           THE COURT:  Against Corizon?

24           MS. DAMICO:  Yes, against Corizon.

25           MR. CHAPMAN:  No.  Michigan doesn't allow the

1    corporate practice of medicine.  You can't sue the corporation

2    for med/mal.  You can sue them vicariously liable for their

3    employees.  I'm not disputing that.  They would be obligated

4    to pay a judgment at some point in time --

5         THE COURT:  Okay.  We're going to move on.  Give me

6    whatever basis you have and I'll make a decision.  If it's in

7    your favor, we can indicate to them that at such and such a

8    deposition this was stated, but I need to know, because you

9    guys are all over the place here.  I need to know the basis,

10   legal basis of your argument, okay?  And if you think --

11   meaning if Corizon is a defendant, okay, for any claim, you

12   need to tell me which claim, what specifically, and how this

13   comes in.

14        MS. DAMICO:  Okay.  Well, I will, but they're just

15   vicariously liable.  I don't --

16        THE COURT:  Then why did we just have this discussion

17   for 10 minutes?  Okay.  So it's vicarious liability meaning

18   they're not going to be on the verdict form?  They're not

19   going to be a separate defendant?

20        MS. DAMICO:  I guess they're not.  I don't know why I

21   still can't bring in testimony what the corporate

22   representative said with respect to this particular --

23        MR. SCARBER:  Your Honor, it's really irrelevant.

24   Originally she had a Monell claim.  You ruled in your

25   motion -- in your order of summary judgment that the policies

1    and procedures were constitutional.  They were not

2    unconstitutional.  There was nothing unlawful about them.  All

3    he needs to be talking about is not why somebody would have

4    changed a policy or when the policy got changed and all that

5    kind of stuff.  He just needs to talk about what the policy

6    says.  I don't even know why it's relevant, why he would be

7    talking about if the policy got changed in 2012, if the board

8    of directors decided --

9              THE COURT:  All right.  Listen, what I just heard was

10   that everybody is in agreement this is vicarious liability.

11   There are no specific claims again Corizon, that Corizon won't

12   be on the verdict form, so if that's the case then let's move

13   on.

14             MS. DAMICO:  Okay.

15             THE COURT:  Because that only applies to their agent.

16                       *(Side-bar concluded)*

17   BY MS. DAMICO:

18   Q.   All right.  Mr. Furman, I'm finished with you.  If they're

19   finished, you can catch your flight home.  Thank you.

20             THE COURT:  Any --

21             MR. CHAPMAN:  I have no further questions.

22             THE COURT:  All right.  Thank you, sir.  You can step

23   down.

24             THE WITNESS:  Thank you, ma'am.

25             THE COURT:  Watch your step.

1    *(Witness excused at 2:53 p.m.)*

2    *(End of Excerpt)*

1

*I N D E X*

2

3    WITNESS:                                        PAGE

4    STEPHEN FURMAN, RN:

5              Direct Examination by Ms. Damico:     2

6              Voir Dire Examination by Mr. Chapman:  12

7              Direct (Cont) by Ms. Damico:          19

8              Voir Dire Examination by Mr. Chapman:  22

9              Direct (Cont) by Ms. Damico:          39

10             Cross Examination by Mr. Chapman:     88

11             Redirect Examination by Ms. Damico:   123

12

13

14   EXHIBITS:                                 ADMITTED

15   -None-

16

17

18

19

20

21

22

23

24

25

1                           *REPORTER'S CERTIFICATE*

2

3            I, Genevieve A. Hamlin, Official Court Reporter

4    for the United States District Court for the Western District

5    of Michigan, appointed pursuant to the provisions of Title

6    28, United States Code, Section 753, do hereby certify that

7    the foregoing is a full, true and correct transcript of the

8    excerpted portion of the proceedings had in the within

9    entitled and numbered cause on the date hereinbefore set

10   forth; and I do further certify that the foregoing transcript

11   has been prepared by me or under my direction.

12

13

14                           /s/ Genevieve A. Hamlin

15                           Genevieve A. Hamlin.
                             CSR-3218, RMR, CRR
16                           U.S. District Court Reporter
                             128 Federal Bldg.
17                           315 W Allegan St
                             Lansing MI 48933
18                           (517) 881-9582

19

20

21

22

23

24

25