UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as Personal Representative
of the Estate of WADE JONES, deceased,

       Plaintiff,

v.

CORIZON HEALTH, INC., TERI BYRNE,
RN, JANICE STEIMEL, LPN, MELISSA
FURNACE, RN, JOANNE SHERWOOD, NP,
JAMES AUGUST MOLLO, LPN, LYNNE
FIELSTRA, LPN, DANIEL CARD, LPN, AND
CHAD RICHARD GOETTERMAN, RN.

       Defendants.

Case No.: 1:20-cv-00036
Hon. Judge Hala Y. Jarbou
Mag. Judge Sally J. Berens

---

BACKFIRE LAW FIRM
Jennifer G. Damico (P51403)
Attorney for Plaintiff
29000 Inkster Road, Suite 150
Southfield, MI 48034
Direct (248) 234-9828
(248) 569-4646
(248) 569-6737 (fax)
Jennifer@buckfirelaw.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin Scarber (P64532)
Jeffrey L. Bomber (P85407)
Attorney for Defendants,
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com
jbomber@chapmanlawgroup.com

---

**PLAINTIFF'S SUPPLEMENTAL ARGUMENT AND AUTHORITY
REGARDING PROXIMATE CAUSE JURY INSTRUCTIONS AND
VERDICT FORM**

NOW COMES Plaintiff, Charles Jones, as Personal Representative of the

Estate of Wade Jones, through his attorneys, Buckfire Law Firm, and for his Supplemental Argument and Authority Regarding Proximate Cause Jury Instructions and Verdict Form, submits the following in support of his position that Defendants' proposed jury instructions and proximate cause question on verdict form should not be given.

I.    **CV 3.303A** – **Proximate Cause and Proximately Contributed– Section 1983 Action (PageID 4565-4568); and CV 3.03B- Proximately Cause and Contributed – Section 1983 Action (PageID 4569).**

**A. Proximate Cause of Actual Injury or Harm is Not Required.**

Whether proximate cause of actual injury or harm is a necessary element in a deliberate indifference cause of action has long been decided. *See, e.g. Helling v. McKinney,* 509 U.S. 25, 37 (1993) ("[t]oday the Court expands the Eighth Amendment in yet another direction, holding that it applies to a prisoner's mere *risk* of injury. Because I find this holding no more acceptable than the Court's holding in *Hudson,* I again dissent.") (Thomas, J. dissenting) (emphasis in original); *Blackmore v. Kalamazoo County,* 390 F.3d 890, 899 (6th Cir. 2004) ("[a]s the Supreme Court has held, the test for deliberate indifference is whether *there exists a "substantial risk of serious harm,"* *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), and "does not require actual harm to be suffered"; *Hill v. Marshall,* 962 F.2d 1209, 1214-1214 (6th Cir. 1992) (holding that a prisoner's mere increased risk of developing tuberculosis was compensable); *Darrah v. Krishner,* 865 F.3d 361, 370

(6th Cir. 2017) ("during the time his HPK was being ineffectively treated with Methotrexate, he faced a substantial risk of contracting a contagious disease, and Defendants disregarded this risk.  The district court discounted this argument  . . . We disagree with the district court's reliance on the fact that Darrah did not develop an infection.").

As noted in *Greene v. Crawford Cty.,* 22 F.4th 593, 615 (6th Cir. 2022),  the court explained the necessary elements of a deliberate indifference claim.  Once a plaintiff is diagnosed with a serious medical need, the plaintiff must prove that each defendant acted intentional or recklessly to disregard that serious medical need and "failed reasonably mitigate the risk of serious medical need posed to  the detainee." *Id.* at 607 (quoting *Brawner v. Scott Cnty Tennessee*, 14 F.4th 585, 597 (2021)).

## B. Plaintiff has Alleged a Delay *and* a Denial in Necessary Medical Treatment.

In support of their position that a proximate cause jury instruction is proper, Defendants state: "This is not a delayed medical attention/treatment case.  This case centers around medical decision making and whether the treatment was chosen was deliberately indifferent." ECF No. 194, PageID. 4567. A delay in treatment is exactly what Plaintiff is claiming – a delay in diagnosing his medical condition, a delay in providing his necessary medications, a delay in assessing and/or providing any treatment to him once he was transferred to the infirmary and a delay in transferring him to a hospital.  It is these delays, by the deliberate indifference of the

Defendants, that amounted to an unconstitutional *denial* of necessary medical care to Plaintiff's serious medical needs.

There is no distinction between cases where the plaintiff alleges a denial or delay based upon non-medical reasons (a purported "*Blackmore*" case). Defendants' argument that because Plaintiff received medical care, proximate cause must now be established, and established by expert testimony, is not supported by the facts or the law.

First, the causation element does not change whether there is an alleged delay or denial of treatment. *Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005) (estate need not prove that the denial of care for obvious medical need proximately caused death, "the delay alone . . . creates a substantial risk of serious harm."); *Cooper v. County of Washtenaw*, 222 Fed. Appx. 459, 471-72 (6th Cir. 2007) (requiring proof of direct causal effect or injury for failure to address obvious medical need "improperly injects a proximate cause discussion into our deliberate indifference analysis."); *Cabaniss v City of Riverside,* 231 Fed. Appx. 407, 415 (6th Cir. 2007); *Rhinehart v. Edelman,* 2016 U.S. Dist. LEXIS 173049 (E.D. Mich., Apr. 7, 2016).

Second, a medical provider's delay or denial in medical care or treatment, regardless of it involved "medical decision making" (which is not an affirmative defense, nor a jury instruction), simply goes to the medical provider's state of mind

and is a question of fact for the jury to decide.

Here, there can be no dispute that Plaintiff has shown a 'serious medical need' during the relevant time period. *See e.g. Kindl v. City of Berkley*, 798 F.3d 391, 401 (6th Cir. 2015); *Greene v. Crawford Cty.,* 22 F.4th 593, 615 (6th Cir. 2022) ("It is well established in this circuit that delirium tremens is an objectively serious medical need"). Plaintiff's and Defendants' medical experts will testify that Plaintiff suffered from delirium tremens. (*See* Defendants' Fed. R. Civ. P. 26(a)(2) expert reports) (Exhibit 1, Edward Journey, D.O., p. 2, 4) (Exhibit 2, Brian Williamson, M.D., p. 2).

Plaintiff need not chose between a "delay" or "denial" in treatment cause of action. However, here, he has alleged both. This Court has already found that a jury could find that Defendants "effectively stopped treating Jones" when they did not give him his medications. (ECF No. 147, PageID.3242. Further, the Court ruled that "a jury could find conclude that keeping Jones in his cell for periodic observation after he stopped receiving his medicine, or transferring him to the infirmary for further observation after he had apparently suffered a seizure, <u>was tantamount to providing no medical care at all</u>." (ECF No. 147, PageID.3245) (emphasis added); *Greene v. Crawford Cty*, 22 F.4th 593, 609 (6th Cir. 2022) ("At a certain point, bare minimum observation ceases to be constitutionally adequate.")

Based upon the foregoing, it is Plaintiff's position that CV 3.303A and 3.303B

Proximate Cause and Proximate Cause and Proximately Contributed – Section 1983

Claim are inappropriate and should not be given to the jury.

### C. Alternatively, <u>CV 3.03</u> – Specific Elements of Claim – Elements of Section 1983 Claim, Should be Amended to Include the Element of "Increased the Risk of Serious Harm", and <u>CV 3.303A</u> – Proximate Cause – Section 1983, Should Include Additional Language Regarding Multiple Parties.

If this Court is inclined to allow the proximate cause instruction, Plaintiff

states that CV 3.03 – Specific Elements of Claims – Elements of a Section 1983

Claim should be amended to:

"Fourth: That the individual defendant's deliberate indifference to his serious

medical need increased Mr. Jones' serious risk of harm.

Fifth: That the increased risk of harm was a proximate cause of his injuries

and death."

(Exhibit 3 – Plaintiff's Proposed Amendment to CV 3.303).[1]

These elements comport with the case law in this circuit.  *See* arguments,

*supra*; *Rhinehart v. Scutt*, 894 F.3d 721, 736-737; 738; 751 (6th Cir. 2018); *Greene

v. Crawford County*, 22 F.4th 593, 605 (6th Cir. 2022).

Plaintiff proposes the following paragraph be added to CV 3.03A – Proximate

---

[1] Plaintiff argues that CV 3.03B – Proximate Cause or Proximately Contributed is redundant if the language that is recommended by Plaintiff is adopted by the Court.

Cause – Section 1983:

> A proximate cause need not always be the nearest cause either in time or in space.  In addition, there may be more than one proximate cause of an injury or damage.  Many factors or the conduct of two or more people may operate at the same time, either independently or together, to cause an injury.

(Exhibit 4– Plaintiff's proposed amendment to CV 3.303A – Proximate Cause – Section 1983) (Matthew Bender, Modern Federal Jury Instructions, Form 87–79 (citing *Grivhan v. Western Line Consolidates School Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979); *Mt. Healthy City School District Board of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 471 (1977)); *Greene v. Crawford County*, 22 F.4th 593 607(2022)).

### D. The Verdict Form Should Comport with the Court's Ruling on the Proximate Cause Jury Instructions.

For the reasons state above, Plaintiff argues that proximate cause should not be a question on the verdict form.  This is only disputed question on the verdict form. (ECF No. 195, PageID.4627-4629).

First, Plaintiff's states that Questions 1 through 6 sufficiently address this causal requirement by stating: "Did defendant [_____] act with deliberate indifference *to a risk of serious harm to plaintiff*? (ECF No. 195, PageID. 4625). Defendant is requiring the jury to determine causation *twice*.

In other words, if the jury finds that a defendant acted with deliberate indifference to a risk of serious harm to plaintiff, it has already determined that the

defendant "increased the risk of harm" which is the required causation element. *Greene v. Crawford Cty.,* 22 F.4th 593, 615 (6th Cir. 2022).

Second, the parties agreed to a joint award for actual or compensatory damages against all Defendants. *See* Question Number 13. (ECF No. 195, PageID. 4630).  It stands to reason that there should be ***one*** proximate cause question which is contained in Questions 1 through 6.

Nonetheless, if this Court is inclined to include a proximate cause question on the verdict form, Plaintiff request that it be one question, like the joint damages question, because the jury will have already determined causation – an increased risk of harm to each defendant.

Plaintiff proposes the following question regarding proximate cause on the deliberate indifference claim portion of verdict form:

Question 7:  Was the Defendants' deliberate indifference a proximate cause of the Plaintiff's damages?

## II.    Defendants' Special Instruction Regarding Expert Testimony Establishing Proximate Cause for Plaintiff's Deliberate Indifference Claim Misinterprets the Law and Should not be Given.

Defendants rely on *Phillips v. Tangilag,* 14 F. 4th 524 (6th Cir. 2021) for the proposition that expert testimony is necessary to prove proximate cause in a deliberate indifference claim and request a special jury instruction that interjects the medical malpractice standard into Plaintiff's federal claim. (ECF No. 194,

PageID.4593).  Respectfully, they misinterpret the law.

*Philips v. Tangilag* did not constitutionalize Michigan's medical-malpractice tort reform statute. *Philips* merely holds that expert testimony is required in order to satisfy the objective component when the prisoner has "received extensive care" for his serious medical need, as prior cases have similarly held. *Philips* at 536. *see also, Rhinehart v. Scutt*, 894 F.3d 721, 737-738 (6th Cir. 2018); *Anthony v. Swanson*, 701 Fed. Appx. 460, 464 (6th Cir. 2017). The objective prong of the deliberate-indifference test focuses not on the defendant's culpability, but rather on the potential harmfulness of the conditions objectively experienced by the prisoner. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that the risks posed by exposure to COVID-19 in a correctional facility satisfied the objective component, despite the fact that defendants responded reasonably to the risk). The Plaintiff in *Philips* did not proffer any expert testimony at all. *Philips*, 14 F.4th at 536. So any inference that *Philips* requires an Eighth-Amendment plaintiff proffer not just an expert opinion that the course of treatment he received was woefully-inadequate, but also a proximate cause expert *to exclude other reasonable hypotheses*, is mere dicta. *See Wright v. Spalding,* 939 F.3d 695, 701-702 (6th Cir. 2019)

As *Philips* itself recognizes, "a serious medical need alone can satisfy this objective element if doctors effectively provide no care for it." *Philips*, 14 F.4th at 534. A prisoner effectively receives no care in circumstances where, "the prison

fail[s] to provide treatment . . . or [] it provide[s] treatment 'so cursory as to amount

to no treatment at all.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th  Cir. 2018)

(quoting *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009)).


Yet even if the Court finds that Plaintiff is required to present expert

testimony to establish the objective component in this context, such testimony will

be forthcoming at trial. Plaintiff's causation expert, Dr. Dan Fintel, M.D. has

proffered testimony that Mr. Jones urgently needed to be transported to the hospital

as early as a few minutes after midnight on April 26, that his chances of survival fell

with each hour that he was not hospitalized, and that the failure to hospitalize him in

the morning hours of April 27 more likely than not resulted in his cardiac arrest and

death. (ECF No. 147, PageID.3223). This testimony is sufficient to support a finding

in Plaintiff's favor on the objective component, which merely "requires a plaintiff to

prove that the alleged deprivation of medical care was serious enough to violate the

Eighth Amendment." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

Defendants' proposed jury instruction adds an impermissible burden on

Plaintiff that does not comport with the law.  It should not be given.

Respectfully submitted,

BUCKFIRE LAW FIRM

By:  /s/  Jennifer G. Damico

JENNIFER G. DAMICO (P51403)
Attorney for Plaintiff
29000 Inkster Road, Suite 150
Southfield, MI 48034
Direct (248) 234-9828
Main (248) 569-4646
Fax (248) 281-1886
jennifer@buckfirelaw.com

November 20, 2022

## LIST OF EXHIBITS

**EXHIBIT 1**    **REPORT OF EDWARD JOUNEY, D.O.**

**EXHIBIT 2**    **REPORT OF BRIAN WILLIAMSON, M.D.**

**EXHIBIT 3**    **PLAINTIFF'S PROPOSED JURY INSTRUCTION**

        **CV 3.03 – SPECIFIC ELEMENTS OF CLAIM –**
        **ELEMENTS OF SECTION 1983 CLAIM**

**EXHIBIT 4**    **PLAINTIFF'S PROPOSED JURY INSTRUCTION**

        **CV 3.03A – PROXIMATE CAUSE – SECTION 1983**
        **CLAIM**

**EXHIBIT 1**

1/29/2021

# EXPERT WITNESS REPORT

*Estate of Wade Jones v. Kent County et. al.*

Edward A. Jouney, DO, PLLC



EXHIBIT 201

Jouney
8/20/21

Estate of Wade Jones v. Kent County et. al.

# Edward A. Jouney, DO, PLLC
# Expert Report

CASE: Estate of Wade Jones v. Kent County et. al.

REPORT DATE: January 29, 2021

**MATERIALS AND DATA CONSIDERED:**
1. Kent County Correctional Facility medical records (04/24/18 – 04/27/18)
2. Spectrum Health medical records (4/27/18 – 5/4/18)
3. Metro Health lab and imaging records (0519//17 – 06/16/17)
4. Plaintiff complaint
5. EMS records (04/27/18)
6. Autopsy Report
7. Death certificate

**HISTORICAL NARRATIVE:**
On April 13, 2018, Mr. Wade Jones (DOB: 1/5/1978) was detained by loss prevention personnel at a Meijer store in Walker, Michigan for stealing merchandise, including a fifth of alcohol. At the time of this incident, Mr. Jones was a 40-year-old male with a presumed history of a severe alcohol use disorder (alcohol addiction). On the afternoon of April 24, 2018, Mr. Jones was booked into the Kent County Correctional Facility (KCCF) for a 5-day sentence as a result of a third degree retail fraud conviction.

Mr. Jones underwent a medical, psychiatric, and substance use assessment shortly after his arrival at KCCF, at which time, he did not convey a history of alcohol addiction or previous episodes of alcohol withdrawal.

Shortly after his booking at 5:27 PM, an unremarkable set of vital signs were obtained from Mr. Jones. His blood pressure was 130/82 with a heart rate of 98, and his respiratory rate was also normal at 16 with an adequate oxygen saturation at 96%.

At 4:00 AM on April 26, KCCF medical personnel conducted a Clinical Institute Withdrawal Assessment for Alcohol (CIWA), which is a measure of alcohol withdrawal severity. Mr. Jones's scored 19, which is indicative of mild-moderate alcohol withdrawal. Less than 2 hours later, a nurse practitioner appropriately recommended treatment for alcohol withdrawal with a tapering dose of diazepam (Valium) starting at 10 mg every 8 hours. Additionally, medically appropriate vitamin supplementation was also ordered, which included thiamine and a multi-vitamin.

Estate of Wade Jones v. Kent County et. al.

Over the next 24 hours, Mr. Jones was assessed a regular basis for alcohol withdrawal, including CIWA assessments vital sign checks three times daily. Additionally, diazepam and the prescribed vitamin supplements were continually provided.

On the morning of April 27, Mr. Jones's began to manifest exacerbating physical and psychiatric symptoms and he was moved to the infirmary for more intensive observation. He underwent a physical assessment by a nurse and was noted to be "shaking" and experiencing auditory hallucinations.

At 7:43AM on April 27, Mr. Jones was found unresponsive in his cell and was determined to be in cardiac arrest. KCCF medical personnel promptly imitated resuscitative efforts and EMS was notified. Spontaneous resumption of circulation (SROC) was attained and Mr. Jones was transported to a local hospital. Unfortunately, Mr. Jones suffered prolonged anoxia during his cardia arrest and was unable to regain any neurological function. He was pronounced dead on May 4, 2018.

**STATEMENT OF OPINIONS**:

Based on the review of the available medical records and other pertinent clinical data, the medical staff at the Kent County Correctional Facility (KCCF) acting within the standard of care when screening, monitoring, and managing Mr. Jones for an alcohol withdrawal syndrome.

The materials available also reveal that the KCCF medical team was not provided with any clinical information by Mr. Jones during his health intake, which would have reasonably predicted the emergence of an alcohol withdrawal syndrome of delirium tremens.

One of the risk factors for developing an alcohol withdrawal syndrome is chronic alcohol use, and inquiring on a patient's alcohol utilization pattern is essential in determining his/her risk for developing symptoms of alcohol withdrawal. Upon his arrival at KCCF on April 24, Mr. Jones underwent a comprehensive medical and psychiatric screening by a nurse, which appropriately included multiple questions regarding his pattern of alcohol use. These questions and their corresponding answers are listed below:

- *Are you currently drunk or high?  NO*
- *Do you currently use alcohol? Vodka occasionally.*
- *Do you have drug withdrawal concern?  NO*
- *Do you have alcohol withdrawal concern?  DENIES*
- *Have you ever had alcohol or drug withdrawal?  NO*

As noted in the questions and answers above, Mr. Jones did not provide any history to the KCCF medical staff which would've raised a concern for an impending alcohol withdrawal syndrome. He articulated the occasional use Vodka when asked if he currently uses alcohol, but such an answer is insufficient to generate a clinical concern, especially given his negative answers to the other alcohol-related questions.

Estate of Wade Jones v. Kent County et. al.

Mr. Jones also underwent a medical history and physical assessment upon his arrival to KCCF. These examinations were unremarkable and did not reveal any evidence of an active alcohol withdrawal syndrome. His systolic blood pressure was mildly elevated at 130, but this is relatively clinically benign and not indicative of alcohol withdrawal. All other physiological parameters including heart rate, respiratory rate, temperature, and pulse oximetry, were within normal limits. The evaluating nurse also noted that Mr. Jones was not exhibiting any tremors or sweats, nor was he anxious, lethargic, disheveled, angry or aggressive

On April 26, Mr. Jones began manifest an impaired ability to function while in jail, due to his use of alcohol, as evidenced by the emergence of perceptual disturbances. At 4:30 AM, the medical staff at KCCF noted that Mr. Jones was "hallucinating." This observation was appropriately identified as a potential sign of alcohol withdrawal and an alcohol withdrawal severity assessment was promptly conducted by using the CIWA. Mr. Jones scored 19 on the CIWA, which was is indicative of mild-moderate syndrome of alcohol withdrawal. The need for a treatment plan was recognized and verbal orders for pharmacological intervention were obtained by a nurse practitioner at 5:30 AM. These orders included the use of diazepam (Valium) 10 mg three times daily in addition to appropriate vitamin supplementation.

The use of benzodiazepines, such as diazepam, is an evidence-based and well accepted treatment modality in the treatment of acute alcohol withdrawal. Thus, the medical staff acted promptly and appropriately given the symptoms exhibited by Mr. Jones.

Subsequently to the development of an alcohol withdrawal syndrome, the medical staff appropriately conducted regular CIWA scores three times daily at 0400, 1300, and 1900 and continued to administer diazepam as prescribed.

On the morning of April 27 at 5:30 AM, Mr. Jones was noted to be manifesting mental status changes, including confusion and disorientation, which was continued evidence of his alcohol-induced functional impairment. He was also reported to be experiencing auditory and visual hallucinations and was "shaking." His vital signs were checked and other than an elevated blood pressure of 150/92, all other vital signs were normal, including a normal heart rate of 92. The etiology of these physiological and psychiatric changes could have been the manifestation of delirium tremens; however, this is only speculative and cannot be definitely determined.

Approximately two hour later, Mr. Jones was found unresponsive in his cell due to cardiac arrest and was taken to local hospital where he died one week later. He suffered anoxic encephalopathy due to the cardiac arrest and never regained neurological function.

The factors which contributed to Mr. Jones's demise were likely multifaceted manifestations of chronic alcohol use, which has the potential to adversely affect multiple organ systems in the body including the heart, liver, pancreas, brain, and bone marrow. In fact, the medical examiner noted in Mr. Jones's autopsy report that the final diagnosis was "medical complications from

JOUNEY, EDWARD

Estate of Wade Jones v. Kent County et. al.

chronic ethanol abuse" and noted the presence of alcoholic hepatitis and acute pancreatitis during his postmortem examination.

**SUMMARY:**

In summary, the medical staff at the Kent County Correctional Facility (KCCF) acted within the standard of care when monitoring and treating Mr. Wade Jones for an alcohol withdrawal syndrome. Within hours after his arrival at KCCF, Mr. Jones's use of alcohol and other substances was thoroughly interrogated, and at no time was the medical staff provided with any information which would've raised a concern for an impending alcohol withdrawal syndrome. Despite Mr. Jones's denial of chronic alcohol use, it was noted by the medical examiner that he had pathological evidence of chronic alcohol use, and thus, his denial was likely disingenuous.

Furthermore, at the time of his booking into KCCF, Mr. Jones's physical assessment was unremarkable, and did not reveal any signs or symptoms of an impending alcohol withdrawal.

Even with a reported history of regular alcohol use, the emergence of acute alcohol withdrawal can be difficult to predict. In a review of alcohol withdrawal by Goodson and colleagues, the authors concluded "that prediction of [a severe alcohol withdrawal] is highly variable, and few demographic, clinical, or biochemical parameters are consistently predictive of a [a severe alcohol withdrawal] episode." [1]

In the autopsy report, the death of Mr. Jones was attributed to medical complications from chronic alcohol use, and the presence of acute pancreatitis and alcoholic hepatitis were noted. Thus, prior to his entry int KCCF, Mr. Jones was afflicted with acute pancreatitis, alcoholic hepatitis, and likely other manifestations of chronic alcoholism. His demise was most likely the culmination of multi-organ dysfunction due to years of alcohol use. These underlying vulnerabilities rendered his body incapable to sustaining the strain of an alcohol withdrawal syndrome, even when being appropriately treated with a benzodiazepine (diazepam), and thus increased his susceptibility to cardiac arrest. Studies have shown that the presence of underlying acute medical illnesses are a significant risk factor in the development of delirium tremens, which has a mortality rate of up to 25%.

**EXHIBITS TO BE USED:**

I will rely on Mr. Wade's medical records, other evidence in this case, as well as other summaries, that defense counsel may create, to support my opinions. I have not created any exhibits of my own.

**QUALIFICATIONS:**

Please refer to curriculum vitae (attached)

**COMPENSATION TO BE PAID:**

$500 per hour for all services, including file review and deposition.

Estate of Wade Jones v. Kent County et. al.

**REFERENCES**:

1. Goodson CM, Clark BJ, Douglas IS. Predictors of severe alcohol withdrawal syndrome: a
   systematic review and meta-analysis. Alcohol Clin Exp Res. 2014 Oct;38(10):2664-77.
   doi: 10.1111/acer.12529. PMID: 25346507.

*Ed Jouney*

Edward A. Jouney, DO.

**EXHIBIT 2**

## Brian D. Williamson Consulting, LLC

17-MAR-2021

Devlin Scarber
Chapman and Associates
1441 West Long Lake Road
Suite 310
Troy, MI  48098

Dear Mr. Scarber:

At your request I have prepared a written report reflecting my opinions in the matter Wade Jones et. al, based on the following materials provided to me by your office:

Complaint, Exhibits and Affidavit of Merit
Autopsy
Spectrum Hospital Records 4/27/2018-5/4/2018
Kent County Jail Medical Records
Metro Health Records 5/19/2017 to 6/16/2017

At your request, I have reviewed provided medical records related to the medical evaluation and treatment of Wade Jones.  I intend to render opinions in the area of medical professional services provided to Mr. Wade Jones, and relating to his death.

Wade Jones was a 40-year-old male who was initially incarcerated at the Kent County jail on 4/24/2018. He had a history of daily alcohol ingestion prior to incarceration. In addition to a history of alcohol abuse he also had a history of smoking and records indicated he had had findings consistent with hepatitis and had negative serology for viral hepatitis. He had been incarcerated for retail fraud.

On the morning of 4/27/2018, Mr. Jones was observed to be  demonstrating hallucinations. He was suspected to have symptoms of alcohol withdrawal. Mr. Jones' scored a 20 on his Clinical Institute of Withdrawal Assessment (CIWA) at approximately 4:00 a.m on 4/27/18.  According the applicable CIWA scale, a score ranging from 20-67 is considered in the severe category. Mr. Jones' score of 20 was in the low severe category.  Based, upon an assessment by the healthcare staff, he was transferred to medical observation by prison staff. He was alone in his cell. He was seen by staff to move towards sitting on the toilet.  He was noted slumped against the wall. Jail staff entered his cell to check on him and found he was pulseless. He was moved to the floor where CPR was initiated. An AED was applied which did not recommend shock delivery. When EMS arrived, they also found he did not have a shockable rhythm. An airway was placed as well as an IV. He was transported to Spectrum emergency room. It was estimated that there was 20 minutes before the return of spontaneous circulation.  His blood toxicology screen was positive

## Brian D. Williamson Consulting, LLC

for promethazine, diazepam and caffeine. Urine drug screen was positive for benzodiazepines. CT scan of the head was negative for trauma. CT scan of the abdomen showed no trauma but did show fatty liver. An initial echocardiogram showed his ejection fraction was 55%, which is normal, with normal valve function. He was intubated in the emergency room and placed on mechanical ventilation and treated in the ICU. Unfortunately post admission he developed cerebral edema and ultimately was declared brain dead.  Based on prior wishes for organ donation, he underwent harvest of the heart post-mortem as a heart donor.

Autopsy final diagnoses:

1. Medical complications of chronic alcohol abuse
    a. History of ethanol abuse
    b. Alcoholic hepatitis
    c. Acute pancreatitis
    d. History of shaking and hallucinations prior to being found unresponsive in jail cell
2. Status post postmortem harvest of heart
3. Hypoxic ischemic encephalopathy

Autopsy cause of death:  Medical complications of chronic ethanol abuse.

The records reflect the fact that the cardiac arrest was associated with a non-shockable rhythm. The initial rhythm was pulseless electrical activity with a heart rate of 20 beats per minute.  The AED applied did not recommend a shock be delivered.  Additionally, when the EMS arrived, the EMS also did not find a shockable rhythm present. Any allegation of a low battery on the AED had no bearing on the outcome of the resuscitation, as shock delivery from the AED was not needed.

The cardiac arrest was not due to underlying cardiac disease and was not due to a primary cardiac cause.

Mr. Jones' cardiac arrest was  caused by delirium tremens and medical complications of ethanol abuse. His ethanol abuse and intoxication led to his alcohol withdrawal, which caused his delirium tremens.  Therefore, his conduct was the cause of the event that resulted in his death.

Post cardiac arrest, no heart disease was present by transesophageal echo, transthoracic echo, and cardiac catherization.  Because there was no evidence of heart disease, the heart was harvested for transplant donation.

Based on the history of ethanol abuse and findings at autopsy Mr. Jones' prognosis prior to the cardiac arrest was limited due to alcoholic liver disease, and pancreatitis.  Given his history and medical findings, his life expectancy was severely diminished.

## Brian D. Williamson Consulting, LLC

More likely than not, had a decision been made to transfer Mr. Jones to the hospital on the morning of 4/27/2018, instead of the infirmary, he would have still had a cardiac arrest with the same outcome.

My opinions in this matter unless otherwise stated are based upon reasonable medical certainty. I reserve the right to change or amend my opinion as additional information becomes available. Enclosed is my curriculum vitae and a list of cases that I can recall testifying in during the last four years.

Sincerely,

Brian D Williamson, MD

**EXHIBIT 3**

## CV 3.03 - Specific Elements of Claims - Elements of a Section 1983 Claim

I will now discuss the specific elements of the first claim, deliberate indifference.

Plaintiff Charles Jones has brought deliberate indifference claims against five (5) nurses and one (1) nurse practitioner (Defendants Jim Mollo, L.P.N., Lynne Fielstra, L.P.N., Daniel Card, L.P.N., Melissa Furnace, R.N., Chad Goetterman, R.N., and Joanne Sherwood, N.P.) who were working as healthcare professionals at the Kent County Jail between April 24, 2018 to April 27, 2018.

In order to show that his Eighth rights were violated, Plaintiff must prove all of the following elements by a preponderance of the evidence:

First: That Mr. Jones had a serious medical need;

Second: That the individual defendant had actual knowledge of the serious medical need at the time of his or her involvement with Mr. Jones;

Third: That the individual defendant, with deliberate indifference to the serious medical need, failed to provide Mr. Jones with appropriate medical care within a reasonable time;

Fourth: That the individual defendant's deliberate indifference to his serious medical need increased Mr. Jones' serious risk of harm; and

Fifth: that the increased risk of harm was a proximate cause of Mr. Jones' injuries and death.

If Plaintiff, Charles Jones, proves these elements as to an individual defendant, you must find for the Plaintiff. If he fails to prove any one of these elements, you must find for the individual defendant.

**EXHIBIT 4**

## CV 3.03A - Proximate Cause – Section 1983 Claim

An injury or damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

A proximate cause need not always be the nearest cause either in time or in space. In addition, there may be more than one proximate cause of an injury or damage. Many factors or the conduct of two or more people may operate at the same time, either independently or together, to cause an injury.