UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as Personal Representative
of the Estate of WADE JONES, deceased,

        Plaintiff,                  Case No.: 1:20-cv-00036

      v.                             Hon. Judge Hala Y. Jarbou

JANICE STEIMEL, L.P.N., JAMES
AUGUST MOLLO, L.P.N., LYNNE
FIELSTRA, L.P.N., MELISSA
FURNACE, R.N., CHAD RICHARD
GOETTERMAN, R.N., AND JOANNE
SHERWOOD, N.P.,

        Defendants.
_____/

| BUCKFIRE LAW FIRM | CHAPMAN LAW GROUP |
|---|---|
| Jennifer G. Damico (P51403) | Ronald W. Chapman Sr., M.P.A., |
| Attorney for Plaintiff | LL.M. (P37603) |
| 29000 Inkster Road, Suite 150 | Devlin Scarber (P64532) |
| Southfield, MI 48034 | Attorney for Defendants, |
| Direct (248) 234-9828 | 1441 West Long Lake Rd., Suite 310 |
| (248) 569-4646 | Troy, MI 48098 |
| (248) 569-6737 (fax) | (248) 644-6326 |
| Jennifer@buckfirelaw.com | rchapman@chapmanlawgroup.com |
|  | dscarber@chapmanlawgroup.com |

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR FOR A NEW TRIAL

NOW COMES Plaintiff, CHARLES JONES, as Personal Representative

of the Estate of WADE JONES, deceased through his counsel, BUCKFIRE LAW

FIRM, and pursuant to FED. R. CIV. P. 50 and 59, hereby requests this Honorable

Court deny Defendants' Motion for Judgment as a Matter of Law and/or For a

New Trial for the reasons set forth in his accompanying Brief in Response.

Respectfully submitted,

**BUCKFIRE LAW FIRM**

/s/ Jennifer G. Damico
JENNIFER G. DAMICO
(P51403)
Attorney for Plaintiff
29000 Inkster Road, Suite 150
Southfield, MI 48034
(248) 569-4646/fax (248) 281-
1886
Jennifer@buckfirelaw.com

January 25, 2023

# TABLE OF CONTENTS

INDEX OF AUTHORITIES……………….…………………………….....…ii, iii, iv

MOST APPROPRIATE OR CONTROLLING AUTHORITY…………………..…..v

ISSUES PRESENTED……………………………………………………….........vi

I.  INTRODUCTION….……………..………………………………………………… 1

II. STANDARD OF REVIEW……………………………………………..………....4

    A  Dismissal as a Sanction……………………………………………..………4

    B.  Renewed Judgment as a Matter of Law, FED. R. CIV. P. 50(b)……………………4

    C.  Motion for New Trial, FED. R. CIV. P. 59………………………………………6

III. ARGUMENT……………………………………………………….………6

    A.  Defendants' Motion for Judgment as a Matter of Law and/or
       New Trial Should be Denied Because a Legally Sufficient
       Evidentiary Basis Exists for a Reasonable Jury to Find that
       Defendants' Deliberate Indifference was a Proximate Cause
       of Plaintiff's Injuries, Damages, and Death………………………………6

    B.  Defendants' Motion For Dismissal, Judgment as a Matter of
       Law and/or New Trial Based Upon Plaintiff's Counsel's
       Misconduct During the of Examination of Brian Jones Should
       be denied……………………….…………………………………………30

    C.  Defendants' Motion for New Trial Should Be Denied Since
       Defendants Cannot Demonstrate that Juror #108 Failed to Honestly
       Answer a Material Question During *Voir Dire*……..………....…..………40

IV. CONCLUSION AND RELIEF REQUESTED…………………………45

# INDEX OF AUTHORITIES

**Cases**

*American and Foreign Ins. Co. v. Bolt*,
106 F.3d 155, 160 (6th Cir. 1997)……………………………………………………v, 5

*Bales v. Bell*,
788 F.3d 568, 579 (6th Cir. 2015)…………………………………………………...11

*Balsey v. LFP, Inc.*,
691 F.3d 747, 757 (6th Cir. 2012)………………………………………………v, 5

*Carpenter v. City of Flint*,
723 F.3d 700, 704 (6th Cir. 2013)………………………………………………4

*Carter v. City of Memphis*,
636 F.2d 159,161(6th Cir. 1980)………………………………………………...4

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 729 (6th Cir. 1980)………………………………………………….31, 32

*Consolidation Coal Co. v. Gooding*,
703 F.2d 230 (6th Cir. 1983)………………………………………………4

*Conte v. General Housewares Corp.*,
215 F.3d 628, 637 (6th Cir. 2000)…..……………………………………………v, 6

*Davis v. Jellico Cmty. Hosp, Inc.*,
912 F.2d 129, 133 (6th Cir. 1990)…………………………………………..3, 20

*Denhof v. City of Grand Rapids*,
494 F.3d 534, 543 (6th Cir. 2007)………………………………………………v, 6

*Dominquez v. Corr. Med. Servs.*,
555 F.3d 543, 550 (6th Cir. 2009)………………………………………………19, 28

*Duncan v. Duncan*,
377 F.2d 49, 52 (6th Cir. 1967)………………………………………………v, 6

*Greene v. Crawford Cty*,
22 F.4th 593, 609 (6th Cir. 2022)……………………………………………..19, 24

*Gonzales v. Firestone Tire and Rubber Co.,*
610 F.2d 241, 247 (5th Cir. 1980)…………………………………………………..4

*In re Air Crash Disaster*,
86 F.3d 498, 525 (6th Cir. 1996)…………………………………………………38, 39

*Inwalle v. Reliance Med. Prods. Inc.,*
515 F.3d 531, 543 ( 6th Cir. 2008)……………………………………………….5, 16

*Kay v. United of Omaha Life Ins. Co.,*
709 F. App'x 320, 328 (6th Cir. 2017)……………………………………………..2

*McDonough Power Equipment, Inc. v. Greenwood*,
464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d. 663 (1984)……………….....……43, 44

*Morales v. Am. Honda Motors Co.*,
151 F.3d 500, 509 (6th Cir. 1998)………………………………………………...20

*Morningstar v. Worthy*,
454 F.App'x. 391, 398 (6th Cir. 2011)……………………………………………..5

*Nolfi v. Oh. Ky. Oil Corp.*,
675 F.3d 538, 551 (6th Cir. 2012)………………………………………………….2

*Park W. Galleries, Inc. v. Global Fine Art Registry, LLC*,
732 F. Supp. 2d 727, 749 (E.D. Mich. 2010)……………………………………33, 34

*Park W. Galleries, Inc. v. Hochman*,
92 F.3d 536 (6th Cir. 2012)………………………………………………………..34

*Phillips v. Tangilag*,
14 F. 4th 524 (6th Cir. 2021)………………………………………………………7, 8

*Radvansky v. City of Olmstead Falls*,
496 F.3d 609, 618 (6th Cir. 2007)………………………………………………...16

*Richmond v. Huq,*
855 F.3d 928, 947-48 (6th Cir. 2018)……………………………………………….19

*Sutkiewicz v. Monroe County Sheriff,*
110 F.3d 352, 361 (6th Cir. 1997)……………………...…………………………..31, 32

*Treesh v. Bagley,*
612 F.3d 424, 437 (6th Cir. 2010)…………………………………………………44, 45

*United States v. Frost,*
125 F.3d 346, 379 (6th Cir. 1997)………………………………………………...45

*Williams v. Campbell,*
2016 U.S. Dist. LEXIS 161669 (E.D. Mich. Nov. 22, 2016) (unpublished)…..…*passim*

*Wu v. T.W. Wang, Inc.,*
420 F.3d 641, 643 (6th Cir. 2005)……………………………………………………4

*Zerka v. Green,*
49 F.3d 1181, 1186 (6th Cir. 1995)………………………………………………43

## Other Authorities

FED. R. CIV. P. 50(a)………...………………………………………………… 2, 30

FED. R. CIV. P. 50(b)………...…………………………………………....v, 2, 4, 5

FED. R. CIV. P.59………...………………………………………………....v, 2, 6

FED. R. CIV. P. 49(b)………...……………………………………...…….2, 16

M.C.L. §600.2912a……………………………………………………....…7

## MOST APPROPRIATE OR CONTROLLING AUTHORITY

Judgment as a matter of law under FED. R. Civ. P. 50(b) shall not be granted "unless, when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issue of fact upon which a reasonable person could differ." *American and Foreign Ins. Co.*, 106 F.3d at 157; *Balsey v. LFP, Inc.,* 691 F.3d 747, 757 (6th Cir. 2012).

"Generally, a court may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damage award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. General Housewares Corp*. 215 F.3d 628, 637 (6th Cir. 2000).  If the verdict is "one which reasonably could have been reached," the court may not grant a motion for new trial.  *Denhof v. City of Grand Rapids,* 494 F.3d 534, 543 (6th Cir. 2007) (citing *Duncan v. Duncan*, 377 F.2d 49, 52 6th Cir. 1967)).

# ISSUES PRESENTED

I.      Should Defendants' Motion for Judgment as a Matter of
        Law and/or New Trial be Denied Because a Legally
        Sufficient Evidentiary Basis Exists for a Reasonable Jury
        to Find that Defendants' Deliberate Indifference was a
        Proximate Cause of Plaintiff's Injuries, Damages, and
        Death?

        Plaintiff answers:           Yes

        Defendants answer:           No

II.     Should Defendants' Motion for Dismissal, Judgment as a
        Matter of Law and/or New Trial Based Upon Plaintiff's
        Counsel's  Misconduct During the Examination of Brian
        Jones be Denied?

        Plaintiff answers:           Yes

        Defendants answer:           No

III.    Should Defendants' Motion for New Trial be Denied Since
        Defendants Cannot Demonstrate that Juror #108 Failed
        to Honestly Answer a Material Question During *Voir Dire?*

        Plaintiff answers:           Yes

        Defendants answer:           No

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES, as Personal Representative
of the Estate of WADE JONES, deceased,

       Plaintiff,                   Case No.: 1:20-cv-00036

  v.                             Hon. Judge Hala Y. Jarbou

JANICE STEIMEL, L.P.N., JAMES
AUGUST MOLLO, L.P.N., LYNNE
FIELSTRA, L.P.N., MELISSA
FURNACE, R.N., CHAD RICHARD
GOETTERMAN, R.N., AND JOANNE
SHERWOOD, N.P.,

       Defendants.

_____/

| | |
|---|---|
| BUCKFIRE LAW FIRM | CHAPMAN LAW GROUP |
| Jennifer G. Damico (P51403) | Ronald W. Chapman Sr., M.P.A., |
| Attorney for Plaintiff | LL.M. (P37603) |
| 29000 Inkster Road, Suite 150 | Devlin Scarber (P64532) |
| Southfield, MI 48034 | Attorney for Defendants, |
| Direct (248) 234-9828 | 1441 West Long Lake Rd., Suite 310 |
| (248) 569-4646 | Troy, MI 48098 |
| (248) 569-6737 (fax) | (248) 644-6326 |
| Jennifer@buckfirelaw.com | rchapman@chapmanlawgroup.com |
| | dscarber@chapmanlawgroup.com |

_____/

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW AND/OR FOR A NEW TRIAL**

## I.   <u>INTRODUCTION</u>

This case was tried to a jury over three weeks.  The jury heard, saw and touched extensive evidence, including over a thousand pages of documents, countless hours of jail video, and the lay and expert testimony of 27 witnesses.  The jury was charged by the Court and after two days of deliberations reached its verdict on December 2, 2022.  The jury found for Plaintiff and against Defendants, James August Mollo, L.P.N., Melissa Furnace, R.N., and Chad Richard Goetterman, R.N., for deliberate indifference to serious medical needs, awarding $6.4 million in compensatory damages.  The jury also found no cause of action for professional negligence against all Defendants.  An Amended Judgment was entered on January 4, 2023. (ECF No. 264).  The Court dismissed, with prejudice, the claims and parties, for which the jury found no cause of action. *Id.*

Defendants contend that errors, abuses of discretion, and misconduct by counsel and the jury foreperson, denied them the right to a fair trial, causing the jury to return a verdict based on sympathy, bias or prejudice.  They now seek an assortment of  relief from this Court, including:

1.   Dismissal of Plaintiff's lawsuit and the $6.4  million jury verdict, as a sanction, for Plaintiff's Counsel's misconduct during the examination of Brian Jones.

2.   Judgment as a Matter of Law for: (1) Plaintiff's Counsel's misconduct during the examination of Brian Jones, (2) failure to establish proximate cause for actions after 5:00 a.m.,

or alternatively, (3) vacating the jury's award $3.4 million for loss of society and companionship.

3.      A New Trial based upon: (1) Plaintiff's Counsel's misconduct during the examination of Brian Jones, (2) failure to establish proximate cause for actions after 5:00 a.m., and/or (3) the Jury Foreperson's failure to disclose a felony conviction during *voir dire.*

At the outset, Defendants' Motion for Judgment as a Matter of Law is a *renewed* motion as a matter of law, formally a "directed verdict." FED. R. CIV. P. 50(b). It is limited to the grounds raised in their preverdict motion. *Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017).  Respectfully, any consideration of Judgment as a Matter of Law, must be restricted to Defendants' pre-verdict Motion pursuant to Rule 50(a) where they sought a directed verdict on the grounds that no reasonable jury could find that Defendants' deliberate indifference was a proximate cause of Plaintiff's injuries and damages after 5:00 a.m., on April 27, 2018. (ECF No. 258, PageID.6178); (ECF No. 270, PageID.7344-7359); (ECF No. 274, PageID.8286-8296).

Likewise, Defendants' argument that the jury rendered an inconsistent verdict in finding deliberate indifference, but no professional negligence, is not only inaccurate, it is also waived.  Rule 49(b) requires a party challenging an inconsistent verdict to bring a motion before the jury is excused, or the challenge is waived.  FED. R. CIV. P. 49(b); *Nolfi v. Oh. Ky. Oil Corp.*, 675 F.3d 538, 551 (6th Cir. 2012).

As for Defendants' remaining arguments, Plaintiff responds there is no need for a new trial as the jury did not reach a seriously erroneous result. The verdict was not against the weight of the evidence, influenced by bias or prejudice, nor was it unfair for any other reason mandating a retrial.

Defendants had their day in court.  They were not prevented from arguing their theory of the case. The jury instructions on proximate cause largely mirrored those requested by Defendants.  Plaintiff maintains that the jury's verdict was clear, unambiguous, and consistent.  A reasonable interpretation of the jury's verdict is that Plaintiff proved the higher level of culpability – criminal recklessness – against 3 of the Defendants, as compared to negligence, which does not require knowledge of wrongdoing.  "The court is to accept the jury's verdict if it is one which reasonably could have been reached." *Davis v. Jellico Cmty. Hosp, Inc.,* 912 F.2d 129, 133 (6th Cir. 1990).

Lastly, whether this Honorable Court applies Rule 50's "sufficiency-of-the-evidence" or Rule 59's "weight-of-evidence" standard, Plaintiff argues that it should reach the same result.  Defendants cannot meet either burden. The jury's verdict must stand.  Plaintiff  requests this Honorable Court deny Defendants' Motion in its entirety.

## II.    STANDARD OF REVIEW

### A.    Dismissal as a Sanction.

Dismissal with prejudice is an extreme sanction. It is warranted only where "a clear record of delay or contumacious conduct by the plaintiff exists" and "a lesser sanction would not better serve the interests of justice." *Consolidation Coal Co. v. Gooding,* 703 F.2d 230 (6th Cir. 1983) (quoting *Gonzalez v. Firestone Tire and Rubber Co.*, 610 F.2d 241, 247 (5th Cir. 1980)).

Contumacious conduct is "behavior that is 'perverse in resisting authority' and 'stubbornly disobedient.'" *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013) (quoting *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir. 1980)). "The plaintiff's conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of his conduct on those proceedings." *Id.* at 705 (internal quotation marks and brackets omitted); *Wu v. T.W Wang, Inc.*, 420 F.3d 641, 643 (6th Cir.2005).

### B.    Renewed Judgment as a Matter of Law, Fed. R. Civ. P. 50(b).

A Motion for Judgment as a Matter of Law brought under Fed. R. Civ. P. 50(b) is a renewed Motion for Judgment as a Matter of Law. In ruling on the motion, the court may: (1) allow the judgment to stand, (2) order a new trial, or (3) direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

A Rule 50(b) motion renews consideration of issues initially raised in a Rule 50(a) "directed verdict" motion and may not advance additional grounds that were previously raised. *Morningstar v. Worthy*, 454 F.App'x. 391, 398 (6th Cir. 2011); *see also* Rule 50 Advisory Committee Note, 2006 ("Because the Rule 50(b) is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."). The purpose of this policy is "to narrowly restrict the grounds used to overturn a jury verdict by requiring that parties raise important issues before the case is submitted to the jury." *American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir.1997).

Under Rule 50(b), a motion for judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Inwalle v. Reliance Med. Prods. Inc.,* 515 F.3d 531, 543 ( 6th Cir. 2008).  Put another away, sufficient evidence for submission to the jury will be found "unless, when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issue of fact upon which a reasonable person could differ." *American and Foreign Ins. Co.*, 106 F.3d at 157; *Balsey v. LFP, Inc.,* 691 F.3d 747, 757 (6th Cir. 2012).

**C.**    <u>Motion for New Trial, FED. R. CIV. P. 59.</u>

Federal Rule of Civil Procedure 59(a) governs a Motion for New Trial. A new trial is permissible "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). "Generally, a court may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damage award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. General Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000).  If the verdict is "one which reasonably could have been reached," the court may not grant a motion for new trial.  *Denhof v. City of Grand Rapids,* 494 F.3d 534, 543 (6th Cir. 2007) (citing *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)).

**III.**    <u>ARGUMENT</u>

    **A.**    <u>Defendants' Motion for Judgment as a Matter of Law and/or New Trial Should be Denied Because a Legally Sufficient Evidentiary Basis Exists for a Reasonable Jury to Find that Defendants' Deliberate Indifference was a Proximate Cause of Plaintiff's Injuries, Damages, and Death</u>.

        **1.**    <u>The Court's Exercise of Discretion Regarding Proximate Cause Jury Instructions, and Defendants' Motion(s) for Partial Directed Verdict</u>.

On November 21, 2022, after the testimony of Plaintiff's medical expert, cardiologist, Dan J. Fintel, M.D., Defendants orally moved for directed verdict, on two grounds: (1) to dismiss the deliberate indifference claim against Joanne

Sherwood, N.P., and (2) to dismiss Plaintiff's medical malpractice claims after 5:00 a.m. on April 27, 2018. (ECF No. 270, PageID.7344-7359).

Defendants argued that because Dr. Fintel testified on re-direct that Wade Jones (Jones) was certain to die after 5:00 a.m. on April 27, 2018, that Plaintiff had no medical expert witness to testify that: (1) N.P. Sherwood grossly deviated from the standard of care, and (2) her conduct, at 5:30 a.m., in sending Jones to the Jail infirmary instead of a hospital, was a proximate cause of his injuries or death. *Id.* at 7344-7359.

The Court noted that Dr. Fintel also testified that had Jones been transported to the hospital, he would have had greater than 50 percent of survival. *Id.* at 7348. The Court stated that the jury may weigh the credibility of witness if their testimony is inconsistent. *Id.*  The Court granted partial directed verdict dismissing Plaintiff's medical malpractice claims after 5:00 a.m. based upon MCL § 600.2912a, the medical malpractice statute requiring expert testimony that Jones' chances of survival were greater than 50% when the alleged malpractice occurred. *Id.* at 7356-7357.  The Court denied Defendants' motion for directed verdict on Plaintiff's deliberate indifference claims against N.P. Sherwood finding that *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021), did not stand for Defendants' proposition that MCL § 600.2912a's standard of care requirements applied to Plaintiff's federal claim. *Id.*

On November 28, 2022, during a jury instruction conference, and after parties submitted briefs regarding their respective positions on proximate cause for Plaintiff's deliberate indifference claim, the Court heard arguments, and ruled:

> So proximate cause is not necessary to establish deliberate indifference.  If a defendant was deliberately indifferent to Jones' serious need for care or to a substantial risk of serious harm then the defendant violated Jones' constitutional rights, but to the extent plaintiff seeks damages from a defendant for a particular injury, for instance Jones' death or increased risk of death, then plaintiff must connect that injury to the defendant's conduct through proximate cause.  Thus, the proximate cause instruction is proper.

(ECF No. 273, PageID.8153). [1]

Accordingly, the Court added the language from CV 3.03A- Proximate Cause – Section 1983 Claim, and CV 3.03B – Proximate Cause and Proximately Contributed – Section 1983 Claim, to the end of CV-3.04 – Consider Damages Only if Necessary.  These instructions were requested by the Defendants.

The Defendants also proposed a special jury instruction that "expert testimony is required to prove proximate cause" for both professional negligence and deliberate indifference.  Defendants relied on *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021)

---

[1] ECF No. 228, PageID.5077, Plaintiff's Corrected Supplemental Argument and Authority Regarding Proximate Cause, ECF No. 227, PageID.227, Defendants' Supplemental Argument Regarding Proximate Cause.

for the proposition that expert testimony is necessary to prove proximate cause in a deliberate indifference claim.  Plaintiff argued that Defendants again misinterpreted *Phillips* and were impermissibly interjecting a statutory malpractice requirement into Plaintiff's federal claim. The Court declined to give Defendants' proposed special jury instruction.  (ECF No. 273, PageID.8163-8164) (See also, November 21, 2022 Motion for Partial Directed Verdict Hearing) (ECF No. 270, PageID.7344-7359).

On November 29, 2002, the Court held another jury instruction conference prior to closing arguments.  Defendants requested that the Court instruct the jury that there were no deliberate indifference claims after 5:00 a.m. on April 27, 2018 for which Plaintiff responded was a motion for partial directed verdict. (ECF No. 274, PageID.8286-8296).

The Court ruled that questions of fact existed for the jury to decide as to whether the conduct of the Defendants after 5:00 a.m. proximately caused of Jones injuries and death.  The Court declined to give Defendants' requested instruction to the jury. *Id.*

As such, the Court exercised its discretion in ruling on the parties' proposed jury instructions. The jury was properly instructed as to the law. In ruling on Defendants' Motion(s) for Directed Verdict, on November 29, 2022, prior to closing arguments, the Court found that factual questions existed for the jury to decide

whether Defendants' conduct after 5:00 a.m. was a proximate cause of Plaintiff's injuries, damages and Jones' death.  *Id.* Plaintiff respectfully states that the Court should do the same here.

### 2.   The Testimony and Evidence Supporting Proximate Cause.

The jury was instructed to consider and weigh the evidence, to assess the credibility of the witnesses, including the expert witnesses, and that it did not have to accept the testimony of any witness as true, even if the testimony was uncontradicted, during its deliberations.[2]  Here, Defendants argue that because Plaintiff's expert witness, Dan J. Fintel, M.D., testified that Jones had no chance of survival after 5:00 a.m. on April 27, 2018, and the Court dismissed the professional negligence claims: (1) insufficient evidence exists for a reasonable jury to find that Defendants' conduct after 5:00 a.m. was a proximate cause of his injuries or death, or (2) the jury's verdict was seriously erroneous because it was against the great weight of the evidence presented at trial.

The verdict was supported by the evidence under either a "sufficiency" or "great weight" standard. Defendants' reliance on the testimony of one witness does not satisfy its burden for a Judgment as a Matter of Law and/or a request for a new

---

[2] CV- 2.05 – Consideration of Evidence, CV-2.07 – Credibility of Witnesses, CV-2.08C-Not Required to Accept Uncontroverted Testimony, and CV-4.05 – Testimony of Expert Witness.

trial. A trial court's instructions to the jury generally are presumed to have been followed. *Bales v. Bell*, 788 F.3d 568, 579 (6th Cir. 2015).

The medical records from Spectrum Butterworth Hospital in Grand Rapids showed that Jones' glucose level was low (44), and his sodium level was high (154), based upon his first admission blood draw at 8:40 a.m. (Tr. Ex. 49, p.542). The records showed that the physicians were concerned with his low glucose level (hypoglycemia) and administered IV dextrose (sugar) and other fluids upon admission. *Id.* at p. 7.

Plaintiff's expert cardiologist, Dan J. Fintel, M.D., testified that:

> Wade Jones died as result of the most severe form of alcohol withdrawal syndrome, delirium tremens, and that prompt recognition of his condition, which should have resulted in transfer to Spectrum Health and the institution of immediate lifesaving therapist [sic] would have saved his life and he would be with us here today if those actions had been taken.

(ECF No. 270, PageID.7285).  Dr. Fintel testified that he strongly believed that had Jones received basic medical care, including hydration, the initiation of benzodiazepines therapy, and maintenance of his electrolytes, and cardiac monitoring, he would have survived.  *Id.* Dr. Fintel testified that Jones' electrolyte imbalance played a significant role in his cardiac arrest. *Id.* at 7292.

Recall that the jury heard testimony, watched video, saw, and had access to, documents and records, regarding Defendants, Furnace, Mollo, and Goetterman's,

failure to properly perform assessments, to timely administer medication, to document or review Jones' fluid or food intake, to review his chart, to perform required tests, to contact the provider for new orders, to timely provide medical treatment, to properly observe Jones in the infirmary, to timely respond to his cardiac arrest and to properly perform life-saving measures. *See* Sections III. 4, 5 and 6, *infra.*

Dr. Fintel testified that had Jones remained in the jail, his likelihood of survival was less than 50% because he was deteriorating so rapidly. (ECF No. 270, PageID.7340-7341). Had he been transferred to a hospital; he would have been saved. *Id.* In his opinion, Jones had no chance of survival after 5:00 a.m. on April 27th, 2018 in the Jail. *Id.*

The jury heard from Stephen Cohle, M.D., the Kent County Medical Examiner, who performed Jones' autopsy. (ECF No. 266, PageID.6653). With respect to his findings, Dr. Cohle testified that Jones had a fatty liver and alcoholic hepatitis but did not have cirrhosis, which is end stage liver disease. (ECF No. 266, PageID.6667; 6680-6681). He testified that Jones did not have any other signs of end stage liver disease caused by alcoholism such as a distended abdomen, brain atrophy, dilated facial blood vessels, or swollen limbs. *Id.* at 6665-6667; 6672-6674; 6685-6688. Dr. Cohle testified that the abnormal findings regarding Jones' kidneys and pancreas were more likely than not caused by the lack of oxygen and blood flow

after he suffered a cardiac arrest.  Dr. Cohle testified that while Jones' fatty liver and alcoholic hepatitis contributed to his death, they were reversible conditions. *Id.* at 6681-6683.

Dr. Cohle testified, in his opinion, that is was more likely than not that Jones was suffering from delirium tremens prior to being found unresponsive in the jail, concluding with the following:

> Q.    Do you have an opinion as to whether it's more
>        likely than not, if he had been treated properly
>        with valium, diazepam, and monitored, if he
>        would have died?
>
> A.    I think more likely than not he would have
>        survived.

*Id.* at 6693-6695.

The jury heard from Defendants' expert cardiologist, Brian Williamson, M.D., who testified that nothing could have prevented Jones' sudden death from liver disease or liver toxicity.  (ECF No. 273, PageID.7918-7919). Specifically, April 27, 2018, when medical staff responded to the radio call, after a deputy suspected that Jones had suffered a seizure, Dr. Williamson testified that even if Jones was transferred to a hospital at 5:30 a.m., his death from cardiac arrest caused by liver toxicity was inevitable.  *Id.*  However, the jury also heard the following **_reason_** supporting his opinion:

> Q.    So it's your opinion - - I just want to wrap this up - -
>        had Mr. Jones been taken to the hospital at 5:30 in the

13

morning on the 27th, received IV fluids, IV diazepam and otherwise treated in an emergency room or a hospital setting, it's your opinion he still would have had a cardiac arrest and died?

A.      I think you are misstating my opinion.  I said that had a decision been made to transfer him at 5:30, that the events would have turned out the same.  The reason that I make  that distinction is is that, you know, when you're in a jail or anywhere, for that matter, and you make a decision, oh, let's, you know, send somebody to the hospital, all those things take time. You know, whether you're in somebody's house or whether you're in jail, it takes time to travel there.  It takes time to get it triaged and assessed. It takes time to send out blood work.  Even - - as you point out, even if he had a cardiac arrest it took over an hour between the time he got to the hospital and he got the initial blood work back. That's in somebody who has no pulse and is taken with the light and siren on.

Now, Mr. Jones at 5:30 in the morning was walking around, able to stand on his own. He wouldn't be somebody that necessarily would be triaged immediately in the emergency room.  He's not somebody that necessarily even in a jail you could send out immediately. I mean, you know, I have worked in a jail when I was in medical school and jails have security.  You have to - - if you transfer a prisoner you have to make arrangements to transfer them, you know, via ambulance with some sort of, you know, sheriffs with them and so forth, so this all takes time, **and I just don't think there was time at 5:30 a.m. in the morning to really get him triaged in an emergency  room, get the blood work back, <u>and get the treatment initiated </u>before that cardiac arrest was going to occur at 7:38 a.m**.

*Id.* at 7953-7955 (emphasis added).

14

Here, a reasonable jury could have concluded that Dr Williamson's opinion, that Jones' would not have received *timely treatment* in a hospital as the reason why death after 5:30 a.m. was inevitable, was speculative and not based upon evidence.

Like Dr. Fintel, Dr. Williamson testified that treatment in an emergency department would include IV benzodiazepines, saline, electrolytes and whatever the blood work said the patient required. *Id.* at 7936.  Also like Dr. Fintel, Dr. Williamson testified that low blood sugar contributed to Jones' cardiac arrest.  *Id.* at 7946.  He further testified that Jones' low blood sugar and high sodium, probably developed before his cardiac arrest. *Id.* at 7947-7948. Dr. Williamson did not know if IV fluids could be provided to Jones in the infirmary.  *Id.* at 7936.

Thus, a jury could have reasonably concluded that had Jones been provided with medical treatment after 5:00 a.m., either in the Jail infirmary or in a hospital, by way of administering his missed dose of diazepam, or by starting him on IV fluids (both available in the infirmary), a reasonable probability existed that he would have survived.

Defendants' expert in addiction medicine, Edward Jouney, D.O., a psychiatrist, testified that Jones death was caused by sudden and unexplained liver toxicity due to alcohol abuse, and he was going to die from the moment he walked into the jail on April 24, 2018. (ECF No.273, PageID.8106; 8128-8129).

15

He disagreed with Dr. Cohle and Dr. Fintel who testified that Jones' would have survived had he been transferred to hospital and been given benzodiazepines and IV fluids. *Id.* at 8105.  Like Dr. Williamson, Dr. Jouney speculated that sending him to an emergency department for intravenous diazepam would not have saved him because "he would have to sit in the ER for hours before any work gets done." *Id.* at 8108.  Dr. Jouney could not state when Jones' chances of survival were less than 50%. *Id.* at 8110.

Again, based upon the evidence, a reasonable jury could find that had Jones been transferred to a hospital emergency department at 5:30 a.m., and received medical treatment, including IV fluids and diazepam, it is more likely than not, that his cardiac arrest and death could have been prevented.  Likewise, a reasonable jury could also find that had Jones been provided medical in the Jail infirmary, it is more likely than not that his injuries *and death* could have been prevented.

In viewing the evidence in the light most favorable to Plaintiff, a legally sufficient evidentiary basis exists for a reasonable jury to find that each Defendant's deliberate indifference was a proximate cause of Jones' injuries, damage and death. *Inwalle v. Reliance Med. Prods. Inc.,*, 515 F.3d 531, 543 ( 6th Cir. 2008).

### 3.    Defendants' Waived any Challenges of an Inconsistent Verdict.

The purpose of requiring a party to make a Rule 49(b) objection prior to the discharge of the jury is to eliminate any inconsistencies without the need to present

evidence to a new jury.  *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 618 (6th Cir. 2007).  The rule further prevents a dissatisfied party from "misusing the procedural rule and obtaining a new trial for an asserted inconsistent verdict." *Id.* Plaintiff argues that Defendants' claim that verdict is inconsistent because the jury found deliberate indifference against 3 Defendants, but no professional malpractice, is  completely meritless for the reasons stated below.   Nonetheless, Defendants waived this challenge by not raising the issue when the verdict was rendered on December 2, 2022.

### 4.   The Evidence Supporting a Verdict Against Defendant, Melissa Furnace, R.N.

Defendant, Melissa Furnace, R.N. (Furnace), was the charge nurse on duty responsible for the supervision of the licensed practical nurses and medical assistants, for 3 out of the 4 withdrawal checks performed during Jones' incarceration at the Jail.  (ECF No. 235, PageID.5282, 5306-5307).  The evidence at trial supported five (5) separate instances of conduct by Furnace for which the jury could have found her deliberately indifferent and/or professionally negligent.  They are summarized as follows:

- On April 26, 2018 at 5:30 a.m., after Jones scored a "19" on the first CIWA-ar assessment, and she documented him as "hallucinating," she delayed his first dose of Valium for 7 ½ hours, for non-medical reasons, i.e. she was following the schedule;

- On April 26, 2018, after his 3rd withdrawal check, and when Jones scored a "21" elevating him into the severe category, requiring a higher level of medical care, she did not: (1) contact NP Sherwood for new orders, (2) review his chart to ensure that the treatment plan was being followed by the L.P.N.'s, (3) conduct a face-to-face assessment, (4) request any changes to the treatment plan, and (5) transfer Jones to the hospital or the Jail infirmary;

- On April 27, 2018, at 12:30 a.m., after receiving a call from Deputy Jourdan that Jones cut his elbow and was still going through withdrawals, she did not: (1) review his chart to ensure that the treatment plan was being followed by the L.P.N's, (2) conduct a face-to-face assessment, (3) send an L.P.N. to conduct an assessment, or (4) otherwise provide any medical treatment to Jones. Instead, Furnace sent a medical assistant with consent and authorization forms for Jones to sign;

- After his 4th withdrawal check, on April 27 at 4:00 a.m., after Jones scored a "20" on the CIWA-ar, and allegedly refused to take his medication, she did not: (1) review his chart to ensure that the treatment plan was being followed, (2) contact NP Sherwood for new orders or advise that he refused withdrawal medications, (3) conduct a face-to-face assessment, (4) make any attempts to give him his Valium, and (5) transfer Jones to a higher level of care;

- On April 27, 2018, at 5:30 a.m., after receiving the radio call from the deputy who thought Jones was having a seizure, she conducted an incomplete assessment. She did not perform a required finger stick test that would have revealed his abnormally low blood sugar from dehydration that led to his cardiac arrest. She did not review his chart to see that treatment plan was not being adhered to by the L.P.N.'s. She made the decision, along with NP

18

Sherwood, to move him to the Jail infirmary for "observation" instead of immediately transferring him to hospital for emergency treatment. She did not provide all necessary information to N.P. Sherwood including the fact that Jones had refused withdrawal medication.  She did not request any changes to his treatment plan.  She did not start Jones on an IV of fluids and/or request that Jones be started on fluids.

(ECF No. 267, PageID.6803-6972); (Tr. Ex. 1); *Richmond v. Huq,* 855 F.3d 928, 947-48 (6th Cir. 2018) ("neglecting a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation); *Dominquez v. Corr. Med. Servs.,* 555 F.3d 543, 550 (6th Cir. 2009) (medical provider who delayed 3 ½ hours after learning of serious medical condition because she "would not see him until her regularly-scheduled medication run" was deliberately indifferent."); *Greene v. Crawford Cty*, 22 F.4th 593, 609 (6th Cir. 2022) ("At a certain point, bare minimum observation ceases to be constitutionally adequate.").

In analyzing the conduct of Furnace, the evidence supports the jury's conclusion that Furnace was deliberately indifferent to Jones' serious medical needs. The evidence also supports the jury's verdict that Furnace's deliberate indifference to Jones' serious medical needs was a proximate cause of his injuries and death.

A reasonable interpretation of the jury's verdict is that it found against Furnace based on any, all, or a combination of the above instances of conduct.

Likewise, the jury could have reasonably reached the conclusion that any of the above instances of conduct by Furnace amounted to professional negligence, but

the conduct was not a proximate cause of Jones' injuries or death.  For example, the jury could have reasonably concluded that Furnace's 7 ½ hour delay in giving Jones his first dose of Valium violated the standard of care, but it was not a proximate cause of his injuries or death.

 "The court is to accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Davis v. Jellico Cmty. Hosp, Inc.,* 912 F.2d 129, 133 (6th Cir. 1990).  And where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.  *Morales v. Am. Honda Motors Co.,* 151 F.3d 500, 509 (6th Cir. 1998).

Deliberate indifference, proximate cause, and the jury's joint compensatory damages award of $6.4 million against Defendant, Melissa Furnace, R.N., are supported by the evidence, under either Rule 50 or 59.  Defendants' Motion for Judgment as a Matter of Law and/or for a New Trial should be denied.

### 5.    The Evidence Supporting a Verdict Against Defendant, Chad  Richard Goetterman, R.N.

The only claim against Defendant, Chad Richard Goetterman, R.N. (Goetterman), was for deliberate indifference. The jury determined that Goetterman acted with deliberate indifference to a risk of serious harm to Jones, and that his deliberate indifference was a proximate cause of the Plaintiff's damages.  (ECF No. 243, PageID.5675-5676).

Defendant Goetterman was the charge nurse on duty when Jones was transferred to the infirmary on April 27, 2018 at approximately 6:00 a.m. Defendant Furnace, the "off-going" charge nurse, testified that she provided a verbal shift report to Goetterman, and "discussed everything with him" including that Jones refused his medication at the last withdrawal check.   (ECF No. 235, PageID. 5354-55). Goetterman testified that he recalls having an in person shift report with Furnace and knew that Jones was going though alcohol withdrawal.  He knew alcohol withdrawal could be fatal. *Id.* at 5730.

Although Goetterman could not recall if he reviewed Jones' chart while he was in the infirmary, his chart was available if he had looked it.  *Id.* at 5734-5736. Had Goetterman looked for Jones' chart, the jury could have reasonably concluded that he would have seen the  Altered Mental Status NET (which documented that Furnace did not order the required finger stick tests for low blood sugar), and the Refusal Form (which documented that Jones did not take his medication, and per Corizon policy, a call to the provider was required.) *Id.*[3]

Goetterman testified that he did not recall starting an IV on Jones. It is an available therapy and within his scope of practice to start a patient on IV fluids in

---

[3] Trial Exhibit 9 – Medically Supervised Withdrawal and Treatment (MAT), J-F-04, and Trial Exhibit 33 – Refusal of Medication of Clinical Encounter, J-G-05 ("Notify provider for orders . . . if patient misses or refuses <u>one</u> dose of …critical medication . . . Medications for MAT programs.")

the infirmary.  *Id.* at 5739-5740.  When asked if he recalled a conversation with Deputy Houston, or anyone else, about starting an IV on Jones, he testified that he recalled the conversation with the deputy, but could not remember if it included an starting Jones on IV fluids.  *Id.*  IV fluids were not started.

For one hour and forty minutes, Goetterman did not provide *any* treatment to Jones, who was dehydrated, hypoglycemic, and hallucinating.[4]  When asked what medical treatment he provided to Jones during this time, Goetterman testified that he was "there observing him at times and things like that." *Id.* at 5739.  Goetterman testified:

> Q.   And what do you mean, and things like that?
>
> A.   Observing him.  Observing him through his cell seeing if he had any changes in his presentation from what was reported to me and from what he was displaying from the first time I seen him.
>
> Q.   And, again, what was the reason - - you had an understanding of why he was in there?
>
> A.   Yes.
>
> Q.   Just to be observed?
>
> A.   For ***increased observation*** and for reassessment when Joanne Sherwood was coming in.

---

[4] The jury heard testimony from Goetterman's deposition 2 years earlier where he testified that he recalled Jones "might be hallucinating or things like that." ECF No. 245, PageID. 5738.

*Id.* at 5738-5739 (emphasis added).

 Despite his testimony, the jury heard and saw otherwise.  The jury watched video of Goetterman with his back turned to Jones, talking to co-workers, including Defendant, James August Mollo ("Mollo"). (Tr. Ex. 56, H1M Medical Office View, 7:26-7:43) They watched Goetterman looking at an object with a magnifying glass for 7 minutes. *Id.* at 7:36:08-7:43:46.  At the same time, the jury watched the video Jones on the toilet in his cell as he went into cardiac arrest. (Tr. Ex. 56, HIM Inside Cell View 400, 7:34:35-7:43:36).

The jury heard from former Corizon medical clerk, Ariel Nulty, who testified that at approximately 7:36 a.m., she told Goetterman and Mollo that Jones looked "slumped" on the toilet. (ECF No. 273, PageID.8051-8053). Neither Goetterman nor Mollo went ino Jones' cell to check on him as a result Ms. Nulty's alert.  Goetterman testified that he did not recall this comment and if Ms. Nulty told him that Jones was slumped over, he would have asked [a deputy] to go into Jones' cell would have assessed him. (ECF No. 245, PageID. 5773-5774).

Thereafter, the jury watched video of Goetterman entering Jones' cell at 7:43 – approximately 7 minutes after Ms. Nulty alerted him.  The jury could have reasonably concluded that Ms. Nulty told Goetterman and Mollo that Jones was slumped over on the toilet and *they ignored him for 7 minutes*.

As this Court previously found "a jury could conclude that keeping Jones in his cell for periodic observation after he stopped receiving his medicine, or transferring him to the infirmary for further observation after he had apparently suffered a seizure, <u>was tantamount to providing no medical care at all</u>." (ECF No. 147, PageID.3245) (emphasis added); *Greene v. Crawford Cty*, 22 F.4th 593, 609 (6th Cir. 2022) ("At a certain point, bare minimum observation ceases to be constitutionally adequate.").

Based upon the evidence, including the testimony of Dr. Williamson, who testified that *timely treatment* for Jones would have included IV fluids, which were available in the infirmary, a reasonable jury could have concluded that Goetterman's deliberate indifference to Jones' serious medical needs was a proximate cause of injuries *and death*.

By the time Goetterman entered his cell, Jones had suffered a cardiac arrest and was pulseless. The jury heard testimony from Goetterman that CPR requires 2 breathes to every 30 chest compressions. (ECF No. 273, PageID.5759). He testified that using the bag valve mask (BM) manually (i.e. without being attached to an oxygen tank) was sufficient to supply 21% oxygen to a person in arrest. *Id.* at 5760; 5671. The jury watched the video showing the BVM on the floor in the cell next to Mollo untouched for approximately 5 minutes before Goetterman placed the mask over Jones' face. (Tr. Ex. 56, H1M, Inside Cell 400, 7:44:46 – 7:49:04). And while

Goetterman testified he did not use the BVM sooner because only part of it was brought into the cell, the jury watched the video of Goetterman fumbling around trying to connect the BVM to the oxygen tanks, never attempting to use it manually. *Id.* During this time, Jones' brain was deprived of critical oxygen sealing his fate.[5]

A jury could have reasonably concluded that Defendants Goetterman and Mollo's failure to timely supply oxygen to Jones during CPR, when the equipment was available, also amounted to deliberate indifference to his serious medical needs that was a proximate cause of his injuries and death.

For the reasons stated in Argument Section III.1., and 2., a sufficient evidentiary basis exists for a reasonable jury to find that Defendant, Chad Richard Goetterman's deliberate indifference was a proximate cause of Plaintiff's injuries, damages, *and death*. Defendants' Motion for Judgment as a Matter of Law and/or for a New Trial should be denied.

### 6.  The Evidence Supporting a Verdict Against James August Mollo, L.P.N.

Sufficient evidence exists supporting the jury's verdict that Defendant Mollo's deliberate indifference to Jones serious medical needs was a proximate cause of Plaintiff's injuries, damages and death by: (1) failing to follow a prescribed

---

[5] Dr. Fintel testified that "the lack of performing or resuscitating the patient by 10 minutes virtually guarantees that there will be no recovery of brain function." (ECF No.223, PageID.5050).

treatment plan on April 26, 2018 at 1:00 p.m., and/or (2) failing to provide medical attention to Jones in the infirmary.

Mollo provided Jones with Valium on April 26, 2018 at approximately 1:00 p.m. He testified at trial that he completed the CIWA-ar assessment on Jones which was part of the Order. (ECF No. 233, PageID.5214); (Tr. Ex. 1, p. 17). Mollo testified that Jones refused to have his vital signs taken during this withdrawal check which he documented on the CIWA form by writing "N/A". *Id.* at 5215-5216. He testified that he did not attempt them. *Id.* at 5222.  He testified that he knew taking and documenting Jones' vital signs were part of the withdrawal protocol. *Id.* at 5230. He identified his handwriting in "Column 1" on the CIWA form as his scores for the 10  "ask and observe" categories which totaled a score of  "13" putting Jones in the moderate range of withdrawals. *Id.* at 5223; (Tr. Ex. 1, p. 12).  Mollo testified that he asked Jones questions and he recalled Jones answering him. *Id.* at 5226.

The jury, however, heard contradictory deposition testimony from two years prior where Mollo could not: (1) recognize his handwriting anywhere on the same form, (2) recall if he actually performed the CIWA assessment, or (3) recall if Jones refused to have his vital signs taken. *Id.* at 5220-5221. When asked why he could not recognize his handwriting from two years prior and whether it had changed, Mollo answered: "actually, yes, my handwriting has changed" and "it is because now I use a computer so much I don't write that much." *Id*. at 5224-5225. His

explanation for his sudden recollection was from watching the additional video played during Plaintiff's opening statement. *Id.* at 5216-5217.

In addition to his contradictory deposition testimony, the jury watched video of Mollo in front of Jones' cell for approximately 40 seconds where he gave Jones his medication, and appeared to briefly talk to him and walk away. (Trial Exhibit 56).

On the Flow Sheet, a record of Jones' vital signs, level of consciousness and fluid intake, Mollo could only identify the initial "J" as his handwriting on the form. He agreed that he failed to complete this form.  *Id.* at 5233-5234; (Tr. Ex. 1., p. 11). Mollo admitted that the purpose of the Flow Sheet is to see if the patient is progressing further into withdrawals or getting better. *Id.* at 5267. He testified that he should have completed the Flow Sheet. *Id.* at 5234. *Importantly, the jury heard Mollo testify that at the time of his assessment, he "probably knew" that Jones was unable to sign a consent to treatment form because he was going through withdrawals.  Id.* at 5269; (Tr. Ex. 1, p. 2). Nonetheless, Mollo testified:

> Q.    Okay, do you agree that by not taking his vital signs you increased Mr. Jones' risk of harm?
>
> A:    I would say from him refusing to do the vital signs it would be a risk of harm.

*Id.* at 5237.

While Mollo argued it was Jones' refusal to have his vital signs taken that increased his risk of harm, a jury could infer that Jones did not in fact refuse because he lacked the mental comprehension to do so.  Since most defendants "do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence . . . a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). A reasonable jury could infer that: (1) Mollo did not conduct the CIWA-ar assessment on April 26, 2018 at 1:00 p.m., (2) the score of "13" was not accurate and/or not written by Mollo, (3) Jones' lacked the capacity to refuse an evaluation, and/or (4) Mollo's failure to properly assess Jones and document his encounter with Jones increased his serious risk of harm.

Thus, reasonable explanation for the jury's verdict is that it followed the jury instruction and inferred from the obviousness of the risk that Mollo consciously exposed Jones to an excessive risk of serious harm and that Mollo's deliberate indifference was a proximate cause of Plaintiff's damages.[6]

Then, at approximately 7:36 a.m., on April 27, 2018, Defendant Mollo, like Goetterman, was informed by Ms. Nulty that Jones was slumped over on the toilet in his cell for at least 7 minutes before he entered the cell.  Despite the video showing

---

[6] CV-3.03(2).

the BVM sitting next to him for 5 minutes, Mollo did not use it to administer oxygen manually to Jones.  For the same reasons that the jury could reasonably find Defendant Goetterman's conduct in performing CPR was deliberately indifferent, Plaintiff argues that it could also find against Mollo.

In assessing the evidence and the credibility of the Mollo, the jury reasonably reached the conclusion that he was deliberately indifferent to Jones' serious medical needs based upon one or both above instances of conduct, and that his deliberate indifference was a proximate cause of Jones' injuries, damages and death.

A reasonable interpretation of the jury's verdict is that Plaintiff proved the higher level of culpability – criminal recklessness – against 3 of the Defendants, including Mollo, as opposed to negligence, which does not require knowledge of wrongdoing.  Here, the jury's verdict makes sense, and the verdict must stand.

### 8. <u>The Verdict was a Joint Damages Award</u>.

Defendants' alternative argument, that the jury's verdict of $3.4 million for wrongful death damages should be vacated, or damages only should be retried, because of a lack of proximate cause after 5:00 a.m. on April 27, 2018, should be denied for the reasons previously stated.

Defendants' position, however, is further meritless because the jury's verdict was a *joint award of actual or compensatory damages*.

That is, even if there was a complete lack of evidence supporting any conduct after 5:00 a.m. as a proximate cause of Jones' death, Defendants would not be entitled to the relief sought.   Sufficient evidence exists supporting a finding of deliberate indifference against Defendant Furnace for 4 instances of conduct that occurred before 5:00 a.m. on April 27, 2018.  A reasonable explanation of the jury's verdict is that Defendant Furnace's deliberate indifference for any or all of the 4 instances of conduct occurring before 5:00 a.m. was a proximate cause of Plaintiff's injuries, damages and Jones' death.  The verdict against Furnace supports the entire damages award.  Accordingly, Defendants' argument that the $3.4 million award for wrongful death damages should be vacated or a new trial must be had, should be denied.

### B. Defendants' Motion For Dismissal, Judgment as a Matter of Law and/or New Trial Based Upon Plaintiff's Counsel's Misconduct During the of Examination of Brian Jones Should be Denied.

Next, Defendants argue that this Court should dismiss Plaintiff's lawsuit with prejudice, vacate the $6.4 million jury verdict and enter judgment in their favor, or alternatively, grant a new trial based on the "contumacious conduct" of Plaintiff's Counsel. As stated above, Defendants waived any argument for a Judgment as a Matter of Law for Plaintiff's Counsel's misconduct by failing to raise it during their pre-verdict motion under FED. R. CIV. P. 50(a).

Plaintiff's Counsel's behavior does not rise to the level of "contumacious conduct."  Defendants cannot demonstrate that the misconduct of Plaintiff's Counsel "consistently permeated the entire trial from beginning to end", justifying dismissal with prejudice or a new trial. *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 729 (6th Cir. 1980); *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997).

The contumacious conduct alleged by Defendants is summarized as: "counsel engaged in persistent misconduct in front of the jury, crying in full view for an hour, if not longer, causing decedent's brother to cry before the jury."  (ECF No. 258, PageID. 6181).  Defendants claim that Plaintiff's Counsel "intentionally tried, and succeeded, influencing the jury's verdict with her highly emotional display of crying." *Id.*

It is unnecessary to spar with Defendants over Plaintiff's perceived inaccuracies with the above statements and arguments.

Simply put, this case involved the tragic death of a 40-year-old man.  The last 63 hours of his life were captured on video.  The video showed him suffering a cardiac arrest on the toilet in the jail infirmary while one Defendant (Goetterman) sat with his back turned looking at a ring with a magnifying glass talking to another Defendant (Mollo) and others.  The jury literally watched Jones' heart stop beating.

The trial was long and emotionally charged. After 3 ½ weeks, and 27

31

witnesses, including 2 other family members (and girlfriend, Jennifer Razzoog), who shed tears during their testimony, Defendants cannot make a concrete showing that the one examination led by Ms. Gorski, where she displayed emotions, wiped her eyes, sniffled, and cried, was the type of misconduct that permeated the entire trial from beginning to end. *Sutkiewicz*, 110 F.3d 352 at 361.

In determining whether "there is a reasonable probability that the verdict had been influenced" by improper conduct, warranting a new trial, the Court must examine the case based upon the totality of circumstances, including:

1)   the nature of the comments;

2)   their frequency;

3)   their possible relevancy to the real issues before the jury,

4)   the manner in which the parties and the court treated the comments;

5)   the strength of the case (e.g. whether it was a close case); and

6)   the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.,*, 624 F.2d 749 (6th Cir. 1980).

In examining the above factors, Defendants cannot meet their burden.

### 1.   <u>The Nature and Frequency of Plaintiff's Counsel's Conduct During Examination of Brian Jones</u>.

On November 23, 2022, Plaintiff's Counsel, Ms. Gorski, examined the decedent's brother, Brian Jones. Ms. Gorski became emotional during the <u>15-minute</u>

examination.  She wiped her eyes, sniffled, and cried. (ECF No. 272, PageID.7854 -7866).  Neither lead Plaintiff's Counsel nor the Defendants' two trial counsel noticed this conduct during the examination.  After the examination, the Court held a "side-bar" conference and warned Plaintiff's Counsel that her behavior would not be tolerated. (ECF No. 253, PageID.6114).  It did not happen again.  Ms. Gorski examined one witness out of the 27 presented at trial.

Defendants rely on caselaw that is too dissimilar to instant case for their position that dismissal or a new trial is warranted.  In *Park W. Galleries, Inc. v. Global Fine Art Registry, LLC,* the plaintiff alleged 17 instances of misconduct by defendant and his attorneys including violations of *in limine* rulings, evidentiary rulings, references to criminal investigations and other legal proceedings, attempts to introduce media stories, and other improper remarks. *Park W. Galleries, Inc. v. Global Fine Art Registry, LLC,* 732 F. Supp. 2d 727, 749 (E.D. Mich. 2010).  The district court found the defense counsel's comments and actions were deliberate, intentional and were calculated to improperly present inadmissible information before the jury for the purpose of unfairly prejudicing the jury against the plaintiff. 732 F. Supp. 2d at 749.  The court found:

> The comments and actions occurred frequently, repeatedly, consistently and throughout the course of the trial, such that the effect of their misconduct was that there was never an opportunity for the jury to escape, forget or overlook the misconduct.

*Id.*

Notably, the district court did not use its inherent powers of dismissal or vacate the jury's verdict in the plaintiff's favor, even under these extreme circumstances.  It granted the plaintiff a new trial. *Id.*  The court's ruling was affirmed on appeal.  *Park W. Galleries, Inc. v. Hochman*, 92 F.3d 536 (6th Cir. 2012).

Equating Plaintiff Counsel's repeated eye wiping and possible tears to the pervasive and repeated comments and actions by the defense counsel in *Park W. Galleries, Inc*., respectfully, is unreasonable, and should not be seriously considered by this Court.

The only case cited by Defendants that involves *non-verbal* conduct, i.e. crying, is the unpublished Eastern District of Michigan case, *Williams v. Campbell*, 2016 U.S. Dist. LEXIS 161669 (E.D. Mich. Nov. 22, 2016) (unpublished) (Exhibit 1).  *Williams* supports the argument that Plaintiff's Counsel's conduct does not warrant dismissal or a new trial.

 In *Williams,* the defendant, in a criminal case, alleged that he was in entitled to a new trial because the prosecutor cried in front of the jury when introducing testimony, through the victim's daughter, that the victim had tried to "get away from the petitioner." *Williams,* 2016 U.S. Dist. LEXIS 161669, at *59.  The defendant

argued that through this conduct, the prosecutor intentionally attempted to influence the jury, rendering the trial unfair. *Id.*

Prior to charging the jury, the trial court instructed the jury that they were not to let sympathy or prejudice influence their decision. *Id.* In exercising its discretion, the trial court concluded:

> Moreover, even if the prosecutor's appeals to the jury's emotions or sympathies was improper, this would be insufficient to render the trial fundamentally unfair, **since it was likely that the nature of the crime itself would have produced juror sympathy even before the prosecutor made any of these comments.**

*Id.* at *59 (emphasis added). The trial court denied the defendant's request for a new trial based upon the prosecutor's alleged misconduct. *Id.*

Like *Williams,* if the jurors had any sympathy towards the Plaintiff, a reasonable explanation is that it was likely due to the nature of the action and was produced prior to Plaintiff's Counsel's questioning Brian Jones. Also, like *Williams,* this Court provided an appropriate instruction to the jury regarding not allowing sympathy to influence their decisions, as discussed below.

### 2.     The Possible Relevancy of Plaintiff Counsel's Conduct to the Real Issues Before the Jury.

Plaintiff agrees that Brian Jones' testimony regarding his relationship with the decedent was real issue for jury deliberation. Again, Plaintiff states that Brian Jones was one of 4 heirs that testified. Janice Jones and Jennfer Tofferi, the decedent's

mother and sister, were the last two witnesses to testify.  Both witnesses were emotional.  Both witnesses cried.  Like *Williams,* if the jurors had any sympathy towards the Plaintiff, a reasonable explanation is that it was likely due to the nature of the action, and not due to the conduct of Plaintiff's Counsel.

Plaintiff argues that this factor alone is unpersuasive in light of the totality of circumstances.

### 3.   The Manner in Which the Parties and the Court Treated the Comments and The Court's Exercise of Discretion in Instructing the Jury.

The Court exercised its discretion in reviewing Plaintiff's Counsel's conduct on 3 occasions prior to the case being submitted to the jury. The first was during a "side- bar" with all counsel after the examination of Brian Jones on November 23, 2022.  (ECF No. 272, PageID. 6114).  Plaintiff's Counsel was warned by the Court that her conduct would not be tolerated.  She did not question any other witnesses during trial and received no further admonishments or warnings from the Court.

The second was on Monday, November 28, 2022, prior to seating the jury for the day. Defendants' Counsel stated that after researching law over the weekend, he was requesting a limiting instruction asking the jury "disregard the crying of counsel."  (ECF No. 273, PageID.7877).  Plaintiff's Lead Counsel argued that Ms. Gorski's conduct was not intentional, and that any instruction would, in her opinion, draw more attention to the conduct. *Id*. at 7877-7878. The Court instructed

Defendants' Counsel to draft a proposed limiting instruction along with authority in support of the instruction. *Id.*

The third time the Court considered Plaintiff's Counsel's conduct was on November 29, 2022, when Defendants' Counsel presented their proposed limiting instruction.  (ECF No. 274, PageID. 8181). They did not include any authority stating: "Your Honor, the reason why I didn't put authority is because all authority says it's discretionary to the Court 100 percent." *Id.*   After discussing the limiting instructing with counsel, the Court concluded that while Defendants' proposed instruction was proper, the standard instruction stating that jurors should not their base decisions sympathy was sufficient without drawing more attention to counsel's actions. *Id.* at 8183.

The Court, in exercising its discretion, gave the jury the following instruction:

> "Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way."

*See,* Jury Instruction, CV 2.02 - Jurors' Duties.  This instruction was similar to the instruction in *Williams, supra.*

### 4.   The Strength of the Case (e.g. Whether it was a Close Case).

Plaintiff argues that his case was extremely strong. The fact that the jury did not find any of the Defendants liable for professional negligence is further indication of the success of Plaintiff at trial. Agan, a reasonable interpretation of the jury's

verdict is that Plaintiff proved the higher level of culpability against the 3 Defendants.

Defendants' reasons for why the case was "extremely close" are completely speculative, and Plaintiff will only address the ones that have not been addressed in other sections of this brief.

First, because it took the jury over 2 days to reach a verdict and the question "whether they could resolve the case with a majority vote instead of a unanimous one," Defendants argue that the case was extremely close.

Defendants' argument is nothing more than an unsupported theory subject to varying interpretation. From the winning perspective, the verdict form was 11 pages and consisted of 40 questions.   The jury had to assess the conduct of 6 Defendants for deliberate indifference, and 5 Defendants for professional negligence. (ECF No. 243, PageID.5674-5684).   The actual question from the jury was: "Do we need everyone to agree on each verdict or is it based on a majority vote?" (ECF No. 243-1, PageID.5696).  This question, along with the 9 other questions, and the time it took for the jury to reach its verdict, can reasonably be interpreted to mean that the jury took its job seriously during deliberations.[7]   In *In re Air Crash Disaster,* in reviewing a motion for new trial based upon attorney misconduct, the Court of

_____

[7] The jury submitted 10 questions during deliberations.  (ECF No. 243, PageID.5691-5699).

Appeals wrote: "The jury took sixteen days to deliberate (with five intervening weekends), which hardly indicates an inflamed rush to judgment.  Whether or not Northwest's first objection was timely, Northwest has not sustained its heavy burden of showing that it deserves a new trial based on a few words in a long closing argument." *In re Air Crash Disaster*, 86 F.3d 498, 525 (6th Cir. 1996).

Second, their argument that the case was "extremely close" because the Court summarily dismissed some of Plaintiff's claims does not lend any support to verdict was influenced by Plaintiff's counsel's misconduct.

Plaintiff argued the opposite in greater detail in his Supplemental Motion and Brief in Support For Attorneys' Fees, Cost, Prejudgment Interest and Entry of Second Amended Judgment.  (ECF No. 279, Page ID.8445).

## 5)  <u>The Verdict Itself.</u>

Plaintiff directs the Court to his Argument Section III. B., *supra,* in support of the legally sufficient basis for the jury's verdict that the Defendants' deliberate indifference was a proximate cause of Plaintiff's injuries, damages and death.  Like *In re Air Crash,* there is no indication that the jury rushed to judgment, or that the verdict was the product of passion, bias or prejudice due to the 15-minute examination of Brian Jones by Ms. Gorski.

For all the reason stated, Defendants cannot show there is a reasonable probability that the verdict was influenced by Plaintiff's Counsel conduct, and their requested relief should be denied.

### C. Defendants' Motion for New Trial Should Be Denied Because Defendants Cannot Demonstrate that Juror #108 Failed to Honestly Answer a Material Question During *Voir Dire.*

Defendants contend that they were denied a fair trial because Juror #108 deliberately concealed a felony conviction during *voir dire*, and his bias against law enforcement and the judicial system.[8] This intentional concealment, they claim, impermissibly influenced the jury verdict. (ECF No. 258, PageID. 6197-6189). The Court should deny Defendants' Motion for New Trial as they cannot demonstrate actual bias by Juror #108.

### 1. Juror #108 Qualified Under the Juror Selection Plan.

This Court ensured that Juror #108 met the minimum statutory requirements to sit as a juror in the United States District Court by way of its Juror Selection Plan and "Juror Qualification Questionnaire." (Exhibit 2 - Juror Selection Plan, p. 5-7) (Exhibit 3 - Juror Information Letter). Questions regarding a potential juror's qualifications including criminal history are asked in the Juror Qualification

---

[8] In this Brief, the jury foreperson will only be referenced by his juror number, Juror #108 (seated as "Juror # 4").

Questionnaire, and the prospective juror is permitted to provide an explanation. (Ex. 2 and 3).  Juror #108 was qualified to serve as a juror in this court.

After the trial, Defendants conducted a search on LEXIS, a publicly available database.  Defendants argue that Juror #108 "was arrested for breaking an [sic] entering, charged with a felony, *more likely than not pled guilty*, and was placed on probation for 2 years."  (ECF No. 258, PageID. 6196) (emphasis added).  They further claim that Juror #108 was convicted of this felony but "his records have been destroyed based upon information learned from the Michigan Department of Corrections." *Id.* at 6197.   Based upon these inadmissible and speculative documents, they argue that he was disqualified from serving as a juror under federal and state law.[9] They have not submitted any evidence demonstrating that: 1) he was "convicted" of the alleged felony and/or 2) his rights were not restored by way of an expungement or otherwise.

Defendants cannot demonstrate that Juror #108 was disqualified to serve as a juror.

---

[9] The very same LEXIS report shows that Juror #108 purportedly voted in the past two elections: 2016 and 2020, demonstrating that his voting rights may have been restored.

### 2. **Defendants Cannot Show Actual Bias**.

Defendants further allege that Juror #108 intentionally concealed his criminal history by failing to answer affirmatively the following question by posed Defendants' Counsel during *voir dire:*

> **Have you had a family member**, and let's not - - a close family member. We don't have to go to fifth cousins and sixth cousins that may have been incarcerated. Let's say first with Kent County jail? Any jails in the state of Michigan? How about arrested and maybe put in jail overnight or something like that?

(ECF No. 246, PageID.5842) (emphasis added).

While Juror #108 was in the venire when the question was asked, he was obligated to answer the question regarding the criminal history of his close family members honestly when seated. *Id.* at 6405.

Once he was seated, the Court asked Juror #108 if he heard all the questions previously asked for which he answered "yes." *Id.* He answered that he did not have any acquaintances in law enforcement and stated that from all the questions asked there was nothing that stuck out in his mind that he thought "we should know about." *Id.* The Court asked Juror #108 if there was anything in his background, in his experiences, or in his relationships, that would cause him not to be fair and impartial to either side in this case, for which his answered "no." *Id.* at 6407.

Plaintiff's Counsel questioned Juror #108 during *voir dire* in an attempt to elicit any biases or experiences that would prevent him from serving as a fair and impartial juror. *Id.* at 6407-6408.

Defendants' Counsel did not ask Juror #108 any questions. *Id.* at 6408.

Their argument now, after the verdict went against them, is that Juror #108 is impartial and biased against law enforcement and the judicial system based upon his experience from a 2001 property crime. "Defendants believe it is evident that [Juror #108] intended to conceal his prior arrest and conviction to evade detection and serve as a member on the jury." (ECF No. 258, PageID. 6198)*.*  Defendants' position is untenable in law and in fact.

A trial court is only required to conduct a hearing to determine the effect of alleged misconduct if the Defendant proves that: (1) a juror failed to answer honestly a material question during jury selection, and (2) a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d. 663 (1984).

 "If a juror is found to have deliberately concealed material information, bias *may* be inferred. If, however, information is *not* concealed deliberately*,* the movant must show *actual bias*." *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995).  "In the absence of intentional concealment, only extreme circumstances justify a new trial." *Id.*

43

Defendants cannot meet their burden under *McDonough*.

Here, the first prong of *McDonough* is not met, and respectfully, the Court's analysis should end.

Mr. Chapman asked:

> ***Have you had a family member***, and let's not - - a close family member. We don't have to go to fifth cousins and sixth cousins that may have been incarcerated. Let's say first with Kent County jail? Any jails in the state of Michigan? How about arrested and maybe put in jail overnight or something like that?

(ECF No. 246, PageID.5842) (emphasis added).

Once seated, Juror #108 had an obligation to respond honestly as to whether he *had a family member* that may have been arrested or incarcerated . . . . **There is absolutely no evidence that Juror #108 lied, omitted, concealed, or withheld information to this question.**

Nonetheless, assuming that the above question pertained to Juror #108 *personally*, and not his family members, Defendants cannot show that an affirmative response by Juror #108 would have resulted in a *for cause* challenge. In other words, they cannot demonstrate any actual bias caused by this perceived omission by Juror #108.

"Actual bias is bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Treesh v. Bagley*, 612

F.3d 424, 437 (6th Cir. 2010) (internal quotation marks and citation omitted); *United States v. Frost*, 125 F.3d 346, 379 (6th Cir. 1997).

Defendants did not bother to ask Juror #108 any questions during *voir dire*.

Defendants cannot demonstrate any actual bias by Juror #108 against law enforcement and the judicial system based upon his experience from an alleged 2001 property crime for which he may or may have been convicted and/or exonerated. They admit that their allegations of bias are based on nothing more than speculation and their beliefs. (ECF No. 258, PageID.6198; 6199).

For the same reasons that Plaintiff Counsel's conduct during the examination of Brian Jones did not impermissibly influence the jury's verdict, any unproven, speculative actual bias by Juror #108 also did not influence the verdict.

An inflamed jury could have found against all the Defendants.  It did not.  A biased jury could have found the Defendants responsible for professional negligence *and* deliberate indifference. It did not.  A prejudiced jury could have awarded punitive damages.  It did not.

## IV.   <u>CONCLUSION AND RELIEF REQUESTED</u>

Based upon the foregoing, Plaintiff, Charles Jones, respectfully requests this Honorable Court deny Defendants' Motion For Judgment as a Matter of Law and/or Motion for New Trial, in its entirety.

Respectfully submitted,

BUCKFIRE LAW FIRM

By:    /s/  Jennifer G. Damico
        JENNIFER G. DAMICO (P51403)
        Attorney for Plaintiff
        29000 Inkster Road, Suite 150
        Southfield, MI 48034
        Direct (248) 234-9828
        Main (248) 569-4646
        Fax (248) 281-1886
        jennifer@buckfirelaw.com

January 25, 2023

## <u>LIST OF EXHIBITS</u>

**EXHIBIT 1**   *Williams v. Campbell*, 2016 U.S. Dist. LEXIS 161669 (E.D. Mich. Nov. 22, 2016) (unpublished)

**EXHIBIT 2**   Juror Selection Plan

**EXHIBIT 3**   Juror Qualification Questionnaire