UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES JONES,

     Plaintiff,

                                   Case No. 1:20-cv-36

v.

                                   Hon. Hala Y. Jarbou

COUNTY OF KENT, et al.,

     Defendants.

_____/

## OPINION

Before the Court is Plaintiff's motion for attorney's fees (ECF No. 251), Plaintiff's supplemental motion for attorney's fees (ECF No. 279), Defendants' motion to strike the supplemental motion for attorney's fees (ECF No. 283), Plaintiff's amended motion for a bill of costs (ECF No. 277), and Defendants' motion for judgment as a matter of law and/or a new trial (ECF No. 258). The Court will deny Defendants' motion for judgment as a matter of law and/or new trial. The Court will deny Defendants' motion to strike. The Court will grant Plaintiff's amended motion for a bill of costs. The Court will grant Plaintiff's motions for attorney's fees, in part.

## I. BACKGROUND

### A. Claims & Parties

Wade Jones died while serving a sentence at the Kent County Correctional Facility ("KCCF"). His estate brought this action against Kent County, Kent County officials working at KCCF, Corizon Health, Inc., and several nurses who worked for Corizon at KCCF. At the time of trial, the only defendants remaining were Corizon and its nurses, Defendants Sherwood, Steimel, Card, Fielstra, Mollo, Furnace, and Goetterman. The remaining claims were a claim for

deliberate indifference under 42 U.S.C. § 1983 and a claim for professional negligence (i.e., medical malpractice) under Michigan law.  Corizon remained a defendant only to the extent that it would be vicariously liable for a medical malpractice claim against one of its employees.

### B. Jury Trial & Motion for Judgment as a Matter of Law

The Court discussed the facts of this case in detail in its opinion on Defendants' motion for summary judgment.  (*See* 4/29/2022 Op., ECF No. 147.)  The evidence at trial provided facts that are substantially similar to the facts discussed in that opinion.

Partway through the jury trial, Defendants asked the Court for judgment as a matter of law on Plaintiff's deliberate indifference claim against Defendant Sherwood and on the medical malpractice claim against Defendant Furnace for conduct after 5:00 am on April 27, 2018.  The Court granted their motion in part.  (1/22/2022 Order, ECF No. 226.)  The Court dismissed the medical malpractice claim against Defendant Furnace for conduct after 5:00 am on April 27, 2018.

### C. Jury Verdict

The jury found that Defendants Sherwood, Card, and Fielstra were not deliberately indifferent to Jones's medical needs.  (*See* Verdict, ECF No. 243, PageID.5674-5675.)  The jury found that Defendants Mollo, Furnace, and Goetterman had been deliberately indifferent, in violation of Jones's Eighth Amendment rights, and awarded Plaintiff a total of $6.4 million dollars in compensatory damages, but no punitive damages.  (*See id.*, PageID.5677.)

As to the medical malpractice claim, the jury found no liability for Defendants.  The jury concluded that Defendants Steimel, Mollo, Fielstra, and Card had not been professionally negligent in their care for Jones.  (*Id.*, PageID.5680.)  The jury concluded that Defendant Furnace was professionally negligent in her care before April 27, 2018, at 5:00 am, but her negligence was not a proximate cause of Plaintiff's damages.  (*Id.*, PageID.5680-5681.)

This Court entered judgment on December 5, 2022, and then an amended judgment on January 4, 2023, to clarify the original judgment.  (Am. J., ECF No. 264.)  After the verdict, the parties filed the motions mentioned above.

### D. Corizon Bankruptcy & Withdrawal of Counsel

A few weeks after the parties finished briefing their motions, the Court received notice that Corizon's successor, Tehum Care Services, Inc. ("TCS"),[1] had filed for bankruptcy protection.  (Suggestion of Bankruptcy, ECF No. 286.)  That filing automatically stayed the action against TCS.  Because TCS was the employer and insurance carrier for Defendants Sherwood, Steimel, Card, Fielstra, Mollo, Furnace, and Goetterman, they asked for an emergency stay.  The Court granted this request, staying the case against these defendants for 90 days so that Defendants could obtain new counsel.  (3/6/2023 Order, ECF No. 297.)  After the stay expired, the Court granted a motion by Defendants' counsel to withdraw from the case.  (7/12/2023 Order, ECF No. 305.)  The case now proceeds against Defendants Mollo, Furnace, and Goetterman, who are the only defendants liable for damages.  These defendants have not obtained new counsel and, so far as the Court is aware, they are not represented by counsel at this stage.

## II.   JUDGMENT AS A MATTER OF LAW / NEW TRIAL

Defendants bring a motion for judgment as a matter of law and/or new trial under Rules 50 and 59 of the Federal Rules of Civil Procedure.

### A. Dismissal as a Sanction

Defendants ask the Court to dismiss the deliberate indifference claims against them due to "contumacious conduct" by one of Plaintiff's attorneys during the trial.  That attorney appeared to cry in front of the jury while questioning Jones's brother on the witness stand.  She repeatedly

---

[1] Before the bankruptcy filing, Corizon merged into TCS.

sniffed and wiped her eyes throughout his testimony, which lasted for fifteen minutes.  (Trial Tr., PageID.7854-7866.)[2]  In a side bar conference after that testimony, the Court admonished the attorney for her emotional "theatrics," warning her not to do it again.  (*Id.*, PageID.7866.)  When discussing jury instructions with the Court a few days later, Defendants asked for a special instruction on the issue, but the Court declined to give one because the Court did not want to draw further attention to the attorney's conduct.  (*Id.*, PageID.8183.)  Also, the Court's standard instructions already told the jury to not let "bias, sympathy, or prejudice" for one side influence their decision.  (*Id.*, PageID.8368.)  Defendants now argue that the attorney's conduct unfairly prejudiced them, and that the Court should sanction Plaintiff by dismissing his claims against them.

"The court has inherent power to punish abuse of its process by dismissal of an action in the interest of orderly administration of justice."  *Reid v. Prentice-Hall, Inc.*, 261 F.2d 700, 701 (6th Cir. 1958).  However, dismissal is "an extreme sanction that deprives a litigant of the opportunity to pursue his claim."  *Consol. Coal Co. v. Gooding*, 703 F.2d 230, 232 (6th Cir. 1983) (quoting *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 247 (5th Cir. 1980)).  It is warranted "only where a clear record of delay or contumacious conduct by the plaintiff exists . . . and a lesser sanction would not better serve the interests of justice."  *Id.* at 233 (internal quotation marks omitted).

"Contumacious conduct refers to behavior that is 'perverse in resisting authority' and 'stubbornly disobedient.'"  *Carpenter v. City of Flint*, 723 F.3d 700, 704-05 (6th Cir. 2013) (quoting *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008)).  It "'must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [that]

---

[2] The trial transcript is available at ECF Nos. 265-276.

conduct on those proceedings.'" *Id.* at 705 (quoting *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)).

The Court considers four factors when deciding whether to dismiss a party's lawsuit as a sanction:

> (1) whether the party's [conduct] [was] due to willfulness, bad faith, or fault;
>
> (2) whether the adversary was prejudiced by the dismissed party's conduct;
>
> (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and
>
> (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Fharmacy Records v. Nassar*, 379 F. App'x 522, 524 (6th Cir. 2010).

As to the first factor, the conduct at issue here was inappropriate, but it does not rise to the level of contumacious conduct warranting dismissal. It was not stubbornly disobedient or persistent. It occurred during a brief examination of one witness. After the Court admonished the attorney for her behavior, it did not continue. This factor weighs against dismissal.

The prejudice to Defendants' case is not significant. Although the jury likely saw and heard Plaintiff's attorney wiping her eyes and sniffing, it is more likely that they were focused on the testimony of the witness than the conduct of the attorney. Also, this conduct occurred for only 15 minutes over the course of a long trial with many witnesses that lasted for approximately 12 days. If the jury even remembered the attorney's conduct by the trial's end, it is unlikely that such conduct had a significant impact on the jury's consideration of the evidence. And as indicated, the Court instructed the jury not to rely on sympathy when deciding the case. Thus, this factor also weighs against dismissal.

As to the third factor, the Court did not warn Plaintiff that his attorney's conduct could lead to the dismissal of his case, which weighs against a dismissal sanction.

Finally, the Court considered a special jury instruction as a means to address the inappropriate behavior by Plaintiff's attorney but decided that one would only compound the potential harm by drawing the jury's attention to it.

In short, considering all the factors, a dismissal sanction is not warranted.

### B. Judgment as a Matter of Law Due to Attorney Misconduct

Alternatively, Defendants argue that the Court should grant them judgment as a matter of law because of counsel's behavior. The Court interprets this request as one for sanctions in the form of a judgment in their favor. Defendants cite *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir. 1980), which discusses when a court should set aside a verdict and *order a new trial* due to trial misconduct. *Id.* at 756. However, Defendants ask the Court for entry of judgment in their favor, rather than a new trial. Entering judgment is a sanction like dismissal. That sanction is not warranted for the reasons discussed in the previous section.

### C. Insufficient Evidence of Proximate Cause

Defendants contend that there was insufficient evidence to show that their deliberate indifference was the proximate cause of Jones's death, particularly when considered alongside the jury's verdict that Defendant Mollo was not professionally negligent before 5:00 am on April 27, 2018, and that Defendant Furnace was professionally negligent before 5:00 am on April 27, 2018, but her negligence was not the proximate cause of Plaintiff's damages.

#### 1. Standard

The Court grants a renewed motion for judgment under Rule 50(b) "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007)).

## 2. Background

For Plaintiff's medical malpractice claim, Plaintiff had to show that Jones's death "more probably than not was proximately caused by the negligence of the defendant or defendants." Mich. Comp. Laws § 600.2912a(2).  Plaintiff also had to show that, at the time of the negligent conduct, Jones's "opportunity to survive or . . . opportunity to achieve a better result . . . was greater than 50%."  *Id.*  At the summary judgment stage, Plaintiff conceded that Jones's opportunity to survive was not greater than 50% as of 6:00 am on April 27, 2018.  (*See* 4/29/2022 Op. 52, ECF No. 147.)  Accordingly, the Court dismissed all medical malpractice claims for events occurring after that time.  (*Id.* at 52, 55.)

At trial, the Court moved that time back to 5:00 am on April 27, 2018.  One of Defendants' experts, Dr. Williamson, opined that death or being in a vegetative state was certain to occur by that time.  (*See* Trial Tr., PageID.7900.)  Dr. Williamson believed that Jones would have suffered a cardiac arrest even if other measures had been taken, and Jones's heart attack meant that there was a "95 percent" chance he was going to die.  (*Id.*, PageID.7901.)  Plaintiff's causation expert, Dr. Fintel, testified that Jones died of a heart attack caused by severe alcohol withdrawal (delirium tremens), but that "prompt recognition of his condition . . . should have resulted in [his] transfer to [a hospital]," which would have saved his life.  (Trial Tr., PageID.7285.)  When asked by Defendants' attorney whether he agreed with the statement that Jones's condition was "irreversible" such that "death was certain" at 5:00 am, Fintel responded, "Yes.  We discussed that in my deposition in terms of when his condition at the jail was reversible."  (*Id.*, PageID.7338.) But on redirect, Fintel clarified that, as of 5:00 am, *if Jones remained at the jail*, "his likelihood of survival was less than 50 percent because he was deteriorating so rapidly."  (*Id.*, PageID.7340-7341.)  Plaintiff's attorney then asked Fintel whether he had an opinion on whether "that percentage would change if he had been transferred to the hospital[.]"  (*Id.*, PageID.7341.)  Fintel

stated, "Yes. . . . Had [Jones] been at the hospital the [medical] responses that I discussed would have prevented him from succumbing to cardiac arrest . . . and he would not have died." (*Id.*)

Based on Fintel's testimony, Defendants moved for a directed verdict as to all medical malpractice claims for conduct after 5:00 am, relying on Mich. Comp. Laws § 600.2912a. (Trial Tr., PageID.7343.) The Court granted the motion based on its recollection of the testimony. (*Id.*. PageID.7359.) Plaintiff conceded the issue when discussing jury instructions, agreeing to an instruction stating that there were no medical malpractice claims for conduct after 5:00 am on April 27, 2018. (*Id.*, PageID.8203.) For the medical malpractice claims, that left only conduct *before* 5:00 am on April 27, 2018. Because Goetterman was not involved in Jones's care until after 5:00 am, the medical malpractice claim against him could not proceed. But the other defendants were involved in Jones's care *before* that time, so those claims proceeded. As indicated above, the jury concluded that Furnace was professionally negligent before that time, but her negligence was not a proximate cause of Plaintiff's damages. The jury also concluded that Mollo and the other defendants were *not* professionally negligent before 5:00 am on April 27, 2018.

Defendants argue that the jury could not have concluded that Defendants' deliberate indifference was a proximate cause of Plaintiff's damages while also concluding that (1) Mollo was not negligent before 5:00 am on April 27, 2018, and (2) that Furnace's negligence before 5:00 am on April 27, 2018, was not a proximate cause of Plaintiff's damages. The Court will discuss each defendant in turn.

### 3. Analysis

#### (a) Nurse Furnace

Jones, who was a chronic alcoholic, was admitted to KCCF on the evening of April 24, 2018. Because he had a high level of alcohol tolerance and did not tell the truth about his alcohol use to the intake nurse, the medical staff at KCCF did not know he was at risk for alcohol

withdrawal.  When an officer noticed that Jones was hallucinating in the early morning hours of April 26, 2018, the officer told a nurse to assess him for alcohol withdrawal.  The nurse determined that he was suffering from alcohol withdrawal and informed Nurse Furnace, who was the charge nurse.  Furnace consulted with Nurse Practitioner Sherwood, who ordered that Jones have his vitals checked every shift and receive Valium every eight hours, a daily dose of thiamine, and a daily multivitamin.  Per Sherwood's instructions, Furnace put Jones on the alcohol withdrawal protocol at around 5:30 am on the morning of April 26, 2022, noting "high acuity" alcohol withdrawal by Jones with hallucinations.  (*Id.*, PageID.6905.)

Hallucinations are a sign of delirium tremens, a particularly serious form of alcohol withdrawal.  (*Id.*, PageID.6692.)  According to Dr. Fintel, a cardiologist, if delirium tremens is left untreated, it can lead to cardiac arrest.  (*Id.*, PageID.7336.)  In Fintel's opinion, if Jones had "received basic medical care, including hydration, the initiation of benzodiazepine therapy such as Valium, maintenance of his electrolytes, [and] cardiac monitoring[,] he never would have experienced a cardiac arrest[.]"  (*Id.*, PageID.7285.)  Similarly, Dr. Stephen Cohle, a medical examiner, testified that Jones's history of "shaking and hallucinations" were indicative of delirium tremens.  (*Id.*, PageID.6693.)  And if Jones "had been treated properly with Valium, diazepam, and monitored," it is likely that he would have survived.  (*Id.*, PageID.6695.)

As indicated, Sherwood's instructions required that Jones receive Valium every eight hours.  But Furnace did not order that Jones receive his dose of Valium immediately; instead, she allowed the nursing staff to give it to him during their regularly scheduled rounds, about seven hours later, at 1:00 pm on April 26, simply because "that's the schedule."  (*Id.*, PageID.6909.)

Later that day, around 6:30 pm, about five hours after Jones's first dose of medication, Nurse Fielstra scored Jones at 21 on an assessment for alcohol withdrawal symptoms, which put

him in the "severe" category of withdrawal on the form used by Corizon staff. (*Id.*, PageID.6835, 6849.) After learning about this report, Furnace did not change the treatment plan or take any other action. (*Id.*)

At 4:00 am on April 27, another nurse scored Jones at 20 on the assessment form, at the bottom of the "severe" range. (*See id.*, PageID.6845.) Jones also refused his medications. (*Id.*) After learning about this refusal, Furnace did not take any action to assess Jones or to ensure that he remained on the treatment plan prescribed by Sherwood.

At 5:30 am on April 27, an officer reported that Jones was face down in his cell; the officer thought Jones might be having a seizure. (*Id.*, PageID.6854-6855.) After receiving this call, Furnace went to see Jones. She testified that she did not think he had suffered a seizure. Nevertheless, she observed firsthand that he was hallucinating and confused. (*Id.*, PageID.6959.) She had him moved to the infirmary for further observation, but she did not take any other action to treat him. (*Id.*, PageID.6958.) She did not try to perform a simple test to check his blood sugar, which might have revealed that he had abnormally low blood sugar. (*Id.*, PageID.6856.) She did not attempt to medicate him, hydrate him with an IV, or have him transferred to a hospital. (*Id.*, PageID.6858.) She did, however, speak with Sherwood and an officer about the possibility of getting him released early so that he could go to an emergency room (he was scheduled to be released at midnight on April 28). (*Id.*, PageID.6872, 7842.) But she did not take steps to transfer him there. In other words, she simply prescribed further observation until Sherwood could check on him later that morning.

As the Court noted in a previous opinion, there is a point at which "bare minimum observation [of a detainee suffering delirium tremens] ceases to be constitutionally adequate." *Greene v. Crawford Cnty.*, 22 F.4th 593, 609 (6th Cir. 2022). That point was "for the jury to

determine." *Id.* Here, a jury could have reasonably determined that Nurse Furnace's decision to not order that Jones receive his medication immediately on the morning of April 26 was negligent, but that it was not a proximate cause of his death because he did receive medication later that day and he stayed alive for another 24 hours.

In addition, the jury could have concluded that, by 4:00 am on the morning of April 27, Jones had reached the point where observation alone was not constitutionally adequate. By that point, he was refusing medicine despite exhibiting signs of severe withdrawal. Thus, the jury could have concluded that Furnace was deliberately indifferent for not taking additional steps to treat him. And because prompt treatment was important, the jury could have concluded that her conduct was a proximate cause of his death.

### (b) Nurse Goetterman

Nurse Goetterman started his shift at 6:00 am on April 27, 2018, replacing Nurse Furnace as the charge nurse. Furnace testified that she would have "discussed everything" with Goetterman, including the fact that Jones had not taken a dose of his withdrawal medication because he refused them and that he had recently fallen in his cell. (Trial Tr., PageID.6882.) Also, Goetterman would have had access to Jones's chart, which indicated that he was going through severe alcohol withdrawal with hallucinations. Goetterman assisted with transferring Jones to the infirmary after Jones's fall and possible seizure. Like Furnace, Goetterman did not take any further action to treat Jones or check on him. And like Furnace, he could have started an IV on Jones or had him transferred to the hospital, but he did not do so. Instead, he simply observed Jones off and on for almost two hours while Jones fell and stumbled around in an observation cell by the infirmary.

Ariel Nulty, a medical records clerk, was working near the infirmary that day. At around 7:15 am, she saw Jones "slumped over" in the observation cell, sitting on the toilet. (*Id.*,

PageID.8050.)  She told Goetterman and Mollo about it.  (*Id.*, PageID.8051.)  They did not respond immediately.  Video of the incident indicates that they waited at least four or five minutes before checking on Jones.

After Goetterman and Mollo finally entered the cell to evaluate Jones, they determined that he did not have a pulse.  Mollo then gave Jones chest compressions but neither of them attempted to give rescue breaths or oxygen for about seven minutes, even though a bag valve mask was available to supply oxygen.  (*See id.*, PageID.7078, 8025.)  Although Goetterman claimed that the bag did not initially have a mask attached, the jury did not have to accept his testimony.  An expert identified the bag valve mask in a video of the incident.  (*Id.*, PageID.7078.)  And the video shows that Goetterman and Mollo eventually applied a mask to Jones's face.  Also, Goetterman testified that the bag valves usually came with masks.  (*Id.*, PageID.8021.)  And the video shows Goetterman attempting to connect the valve bag to an oxygen tank, which would make more sense if the valve bag already had a usable mask.  Thus, the jury could have concluded that a mask was available but that they did not use it.

A reasonable jury could also have concluded that Goetterman's decision to simply observe Jones in the infirmary without providing further care, his delayed response to Nulty's notice that Jones was slumped over in the cell, or his apparent decision to not administer oxygen after Jones suffered a heart attack were instances of deliberate indifference.

Defendants argue that Goetterman's conduct could not have been a proximate cause of Jones's death because all the experts purportedly agreed that, by 5:00 am on April 27, Jones's death was certain to occur.  To the contrary, Plaintiff's expert, Dr. Fintel, opined that Jones would have survived if he had been at the hospital.  Although his testimony was arguably inconsistent on this point, it was up to the jury to weigh his statements and decide which to accept.

12

### (c) Nurse Mollo

Much of the Court's discussion regarding Goetterman also applies to Mollo. Like Goetterman, Mollo heard Nulty's report that Jones was slumped over in the observation cell, yet he did not respond for several crucial minutes. In addition, Mollo gave CPR to Jones but, like Goetterman, he did not give Jones oxygen. The jury could have concluded that these actions were deliberately indifferent and that they were a proximate cause of Jones's injury or death.

In short, there was sufficient evidence to support the jury's verdict against Defendants.

### D. Inconsistent Verdict

Defendants argue that a finding of proximate cause for any conduct by Defendants after 5:00 am on April 27 resulted in an inconsistent verdict because the jury purportedly concluded that Defendants' conduct before that time was not the cause of his death.

Contrary to Defendants' brief, the jury never reached that conclusion. Instead, the jury concluded that Defendant Furnace's *negligence* before that time was not the cause of any damages. (Verdict, PageID.5681.) It also concluded that all the other defendants were not negligent. But negligent conduct is not the same as deliberate indifference. As explained above, Furnace could have been negligent in ways that did not proximately cause Jones's death and deliberately indifferent in ways that did.

On the other hand, Plaintiff effectively conceded that Jones's likelihood of survival at 5:00 am on April 27, 2018, was less than 50 percent when Plaintiff agreed to the dismissal of some of his medical malpractice claims on that basis. Defendants apparently argue that the verdict is inconsistent with that dismissal because their conduct after 5:00 am could not have proximately caused a death that was likely to occur anyway.

Defendants' argument is not persuasive because deliberate indifference claims under 42 U.S.C. § 1983 are not subject to Michigan law regarding proximate cause for medical malpractice

13

claims. Consequently, Plaintiff did not have to show that Jones's likelihood of survival was greater than 50 percent in order to establish that Defendants' deliberate indifference was "*a* proximate cause" of his death or other injury. *See Hill v. Marshall*, 962 F.2d 1209, 1214 (6th Cir. 1992) (emphasis added) (holding that the plaintiff "did not have to show a more than 50% risk of developing active tuberculosis, only that his risk had increased due to the deprivation [of medical treatment]"). Rather, as the Court instructed the jury, Plaintiff had to show that Defendants' conduct played a "substantial part" in bringing about the injury and that the injury was a "reasonably probable" consequence of that conduct. (Trial Tr., PageID.8388.) Even if Jones's likelihood of survival was less than 50 percent, Defendants' failure to treat him could have played a "substantial part" in his death by significantly decreasing the likelihood that he would survive. In addition, their failures could have played a substantial part in the suffering that he experienced *before* he died. Almost half of the damages awarded by the jury was for Jones's conscious pain and suffering. (Verdict, PageID.5677.)

### E. Wrongful Death Damages

Defendants make a similar causation argument when objecting to the type of damages awarded by the jury for Jones's death. Defendants argue that, because Defendants' actions were not a proximate cause of Jones's death, they are not liable for any damages attributable to the death itself. At most, they would only be liable for any pain and suffering experienced by Jones. For the reasons discussed above, however, that argument is not persuasive.

## III. NEW TRIAL

### A. Attorney Misconduct

Alternatively, Defendants ask for a new trial due to Plaintiff's counsel's improper conduct. "[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3)

the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996)).

Where the motion for a new trial is based on improper comments by counsel, the Court examines the following:

> the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*Id.* (quoting *Mich. First Credit Union v. CUMIS Ins. Soc'y, Inc.*, 641 F.3d 240, 249 (6th Cir. 2011)).  If the comments were improper, the Court can set aside the verdict "only 'if there is a reasonable probability that the verdict of the jury has been influenced by such conduct.'"  *Id.* at 762 (quoting *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998)).  Defendants ask the Court to apply this standard to counsel's improper conduct.

Here, Plaintiff's counsel did not make specific comments.  Instead, she displayed emotion in response to the testimony of Jones's brother, who discussed his relationship with Jones.  But that display of sympathy was brief and was limited to one witness.  Defendants did not object to it at the time, which "raises the degree of prejudice" they must show in order to obtain a new trial. *Id.* at 761-62 (quoting *Peter Kiewit Sons'*, 624 F.2d at 756) (cleaned up).  At any rate, the attorney's conduct likely had little impact on the jury's deliberations, particularly in light of the Court's instructions.  Also, the jury reached a complex but defensible verdict.  It did not find in Plaintiff's favor on all claims.  Considering the totality of the circumstances, the Court is not persuaded that there is a reasonable probability that the attorney's misconduct influenced the verdict.

15

**B. Juror Concealment of Information**

Defendants argue that they are entitled to a new trial because the jury foreman did not disclose a prior arrest and conviction from 2001. According to the results of a Lexis search, the juror was charged with "entry without breaking with intent" in 2001 and served a sentence of probation. (Lexis Report, ECF No. 258-1, PageID.6217.) Defendants assert that the official records of his conviction are not available because they have been destroyed. Defendants contend that they would have dismissed the juror for cause if they had known of his criminal history.

Under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), a party can obtain a new trial when they demonstrate that "a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. Defendants have not made that showing.

Defendants' attorney asked the jurors whether they had any *family members* who had been arrested or incarcerated:

> Have any of you had a family member, and let's not -- a close family member. We don't have to go to fifth cousins and sixth cousins that may have been incarcerated. Let's say first with Kent County jail? Any jails in the state of Michigan?

> How about been arrested and maybe put in jail for overnight or something like that?

(Trial Tr., PageID.6380.) A juror then disclosed that their nephew had been in prison "for a long time." (*Id.*)

Defendants' attorney did not ask whether the jurors *themselves* had been incarcerated or housed in a jail. For that reason, this case is not like *Jackson v. State of Alabama State Tenure Commission*, 405 F.3d 1276 (11th Cir. 2005), where the judge specifically asked the jurors whether any of them "ha[d] ever been convicted of a state offense in state court, or a federal offense in federal court," and a juror failed to disclose a felony conviction. *Id.* at 1288. Similarly, this case is not like *United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992), where a juror lied about their

felon status during *voir dire*. *Id.* at 634. In that case, the court "specifically asked the potential jury members to come forward and reveal any prior arrests or convictions privately at the bench." *United States v. Holloman*, No. 89-381 SSH, 1990 WL 678953, at *1 (D.D.C. Nov. 5, 1990). A juror did not disclose his prior felony conviction and arrest. *Id.* Unlike the jurors in *Jackson* and *Boney*, the jury foreman here was not asked about his own history of arrest or conviction.

Defendants argue that any sensible juror would have *interpreted* counsel's question to include whether the juror himself had been arrested or convicted. The Court disagrees. A reasonable juror would have answered the question asked. Thus, Defendants have not shown that the jury foreman failed to give an honest answer to questions during *voir dire*. Accordingly, Defendants are not entitled to a new trial or a hearing to investigate the jury foreman's failure to disclose his criminal history.

## IV. COSTS

Plaintiff seeks an award of costs. Under Federal Rule of Civil Procedure 54(d), the prevailing party may recover certain allowable, reasonable, and necessary costs. The types of costs allowed are listed in 28 U.S.C. § 1920:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Plaintiff initially sought a total of $29,464.84 in costs.  (Bill of Costs, ECF No. 248, PageID.5907.)  Defendants objected to some of the costs for deposition transcripts.  (Defs.' Mot. to Disallow Part of Pl.'s Claimed Costs, ECF No. 257.)  Plaintiff then submitted an amended bill of costs requesting a total of $24,000.00 in costs.  (Am. Bill of Costs, ECF No. 277, PageID.8439.)  The lower amount is due to a reduction in the claimed costs for transcripts.  Defendants did not respond to or otherwise object to the reduced amount in the amended bill of costs.  Upon review, the Court concludes that those costs are necessary and appropriate.  Accordingly, the Court will award the costs to Plaintiff in its amended bill of costs.

## V. ATTORNEY'S FEES

In an action under 42 U.S.C. § 1983, the Court may award the prevailing party a reasonable attorney's fee.  42 U.S.C. § 1988(b).  A reasonable attorney's fee is determined by "calculating the 'lodestar, which is the proven number of hours reasonably expended on a case by an attorney, multiplied by his court-ascertained reasonable hourly rate.'"  *H.D.V.- Greektown, LLC v. City of Detroit*, 774 F. App'x 968, 972 (6th Cir. 2019) (quoting *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)).  When determining whether the Court should adjust the lodestar, the Court considers the following factors:

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* (quoting *Reed v. Rhodes*, 179 F.3d 453, 471 n.3 (6th Cir. 1999)).

18

### A. Timeliness

Defendants argue that Plaintiff's motion for attorney's fees is untimely. Rule 54(d) permits a party to file such a motion no later than 14 days after entry of judgment. Fed. R. Civ. P. 54(d)(2)(B)(i). The Court entered its initial judgment on December 5, 2022. Plaintiff filed his motion on December 20, 2022, 15 days after entry of that judgment. But as the Court explained in a separate order (ECF No. 263), Defendants filed a motion to alter or amend judgment on December 16, 2020, which tolled the finality of the Court's judgment and extended the deadline for filing a motion for attorney's fees. *See Slep-Tone Ent. Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 316-17 (6th Cir. 2015) (noting that the 14-day clock in Rule 54 does not start until after a Rule 59 motion is decided). The Court did not decide Defendants' motion to alter or amend judgment until January 4, 2023, giving Plaintiff until January 18, 2023, to file his motion for attorney's fees. Thus, Plaintiff's motion for attorney's fees is timely. The same holds true for Plaintiff's supplemental motion for attorney's fees, which Plaintiff filed on January 16, 2023, two days before the deadline.

### B. Prevailing Party

Defendants argue that Plaintiff is not a "prevailing party" entitled to all of his claimed attorney's fees under § 1988. Defendants Mollo, Furnace, and Goetterman note that Plaintiff did not prevail on any of his medical malpractice claims against them. Also, Plaintiff did not prevail on any of his claims against the other nurses, against Corizon, or against the KCCF officials.

To be a prevailing party under § 1988, a party must receive "at least some relief on the merits of his claim." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603-04 (2001). "A plaintiff crosses the threshold to 'prevailing party' status by succeeding on a single claim, even if he loses on several others and even if that limited success does not grant him the 'primary relief' he sought." *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608,

620 (6th Cir. 2013) (quoting *McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010)).  Here,

Plaintiff succeeded on at least one claim.  Thus, Plaintiff is a prevailing party eligible for attorney's

fees.

Nevertheless, because Plaintiff did not prevail on some claims, he may not be entitled to

fees for litigating those other claims.  The Court must address "two questions":

> First, did the plaintiff fail to prevail on claims that were unrelated to the claims on
> which he succeeded?  Second, did the plaintiff achieve a level of success that makes
> the hours reasonably expended a satisfactory basis for making a fee award?

*Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

### 1. Relatedness of Claims

As to the first question,

> [w]ork on an unsuccessful claim cannot be considered to have been "expended in
> pursuit of the ultimate result achieved" where the plaintiff has presented distinctly
> different claims for relief based on different facts and legal theories.  But where the
> plaintiff's claims for relief involve common facts or related legal theories, such that
> much of counsel's time will have been devoted generally to the litigation as a
> whole, the court "should focus on the significance of the overall relief obtained by
> the plaintiff in relation to the hours reasonably expended on the litigation."

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 552 (6th Cir. 2008) (quoting *Hensley*, 461

U.S. at 435).

Here, Plaintiff's deliberate indifference claims and medical malpractice claims against

Defendants were interrelated.  They relied on the same set of core facts.  The primary difference

between them was the mental state required for liability.  As Plaintiff indicates, the negligence

claims were alternative theories of relief.  Plaintiff succeeded in demonstrating the higher level of

culpability, i.e., deliberate indifference instead of negligence.  Considering that result, litigating

both types of claims was work reasonably expended in pursuit of the ultimate result achieved.

As to the claims against the other defendants (including Corizon, the other nurses, and the

Kent County officials), those claims were sufficiently related to the claims against Defendants

Mollo, Goetterman, and Furnace to justify an award of attorney's fees for hours expended on those other claims.  The conduct of the other nurses and officials at KCCF provided the backdrop for Plaintiff's claims against Defendants Mollo, Goetterman, and Furnace.  The evidence obtained from those other individuals indicated when Jones started his withdrawal from alcohol, when he experienced severe symptoms of withdrawal, when medical staff (especially Furnace) first became aware of those symptoms, and what treatment Jones received (and failed to receive) for those symptoms in the days leading up to his heart attack on the morning of April 27, 2018.  Indeed, the jury could have concluded that Defendants Mollo, Goetterman, and Furnace were deliberately indifferent, in part, because they were aware of the severity of Jones's condition through facts documented by the other defendants in his medical file or through discussions with those other defendants.  In addition, the prior conduct of the other officials involved in Jones's care was directly relevant to whether the conduct by Defendants Mollo, Goetterman, or Furnace proximately caused Jones's suffering or death. Thus, the claims against those other defendants were related to the claims against Defendants Mollo, Goetterman, and Furnace.

Defendants argue that Plaintiff should not receive fees for litigating his *Monell* claim against Corizon for its alleged failure to train its employees.  The Court resolved that claim at the summary judgment stage.  However, that claim was also based on facts and circumstances related to the claims against Defendants Mollo, Goetterman, and Furnace.  Indeed, as the Court discussed in its summary judgment opinion, the training that Defendants received for recognizing the symptoms of severe alcohol withdrawal and delirium tremens is part of the reason why a jury could conclude that they were deliberately indifferent for not responding to those symptoms.  (4/29/2022 Op. 51.)

In short, this case involves injuries for which any of the Defendants, including Corizon, might have been responsible, either in whole or part.  The object of the litigation was to identify which Defendants, if any, were at fault.  After discovery, summary judgment motions, and a trial, the jury identified Mollo, Goetterman, and Furnace as the ones most responsible.  Thus, work devoted to the case as a whole was reasonably expended to achieve the results obtained.

### 2. Level of Success

As to the second question, Plaintiff achieved a level of success that makes hours reasonably expended a basis for making a fee award.  The jury awarded Plaintiff a significant amount of damages as compensation for Jones's death and suffering.  This is not a case where the jury awarded the plaintiff only a nominal amount of damages for a constitutional injury.

### C. Lodestar Calculation

### 1. Hours Expended

According to her billing statement, Plaintiff's primary attorney, Jennifer Damico, spent 1,037.30 hours on the case from January 2020 (when she prepared the complaint) through December 2022 (when she prepared the motion for attorney's fees).  (Damico Billing Statement, ECF No. 251-2, PageID.6038-6052.)  Sarah Gorski, another attorney at Damico's law firm, devoted 101.90 hours to the case, assisting Damico with trial preparation, attending trial, and conducting one witness examination.  (Gorski Billing Statement, ECF No. 252-2, PageID.6053-6054.)

Defendants object to the hours spent on the claim against Corizon, but as discussed above, those hours are appropriate.

Defendants object to the hours associated with the deposition and preparation of Plaintiff's expert Michael McMunn, who never testified at trial and essentially abandoned Plaintiff's case.

The Court agrees and will reduce the Damico's hours by 29.1.  (*See* Pl.'s Suppl. Mot. 7, ECF No. 279.)

Plaintiff also objects to hours associated with the claims against Defendant Byrne and the medical malpractice claim against Sherwood, all of which Plaintiff agreed to dismiss "with prejudice and without costs to either party."  (11/9/2022 Stip. & Order, ECF No. 200.)

The Court agrees.  Accordingly, the Court will eliminate the following from Damico's hours: 1.8 hours on October 10, 2020 (prepare for deposition of Byrne); and 1.5 hours on October 12, 2020 (deposition of Byrne), for a total of 3.3 hours.  However, it is not possible to disentangle the work on the medical malpractice claim against Defendant Sherwood from other work, so the Court will not reduce other hours related to Defendant Sherwood.

Finally, Defendants ask the Court to reduce the compensable time spent by Damico on legal research and discovery because that work is often performed by lower-paid associates or legal assistants in larger firms.  But that is not always the case.  Upon review, the hours expended on those activities appear to be reasonable.

After the reductions discussed above, Damico's hours are 1004.90 and Gorski's hours are 101.90.

### 2. Rate

A reasonable hourly rate must be calculated according to the "prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The relevant community is "the legal community within [the Court's] territorial jurisdiction."  *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000).   The "prevailing market rate" is one that is comparable to rates in the relevant community for "similar services by lawyers of reasonably comparable skill, experience and reputation."  *Stenson*, 465 U.S. at 895 n.11.  The Court has the discretion to use historical rates or current market rates, "so long as it explains how the decision

23

comports with the ultimate goals of awarding reasonable fees." *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 617 (6th Cir. 2007).

### (a) Damico

Plaintiff argues that a rate of $750 per hour is appropriate for Damico, who has 28 years of experience in personal injury and civil rights litigation. According to the 2020 Economics of Law Practice Survey published by the State Bar of Michigan, this rate equals the 95th percentile for a personal injury attorney in Michigan; it is below the 95th percentile ($1,500 per hour) for a medical malpractice attorney, and far above the 95th percentile ($550 per hour) for a civil rights attorney. (2020 State Bar of Michigan Survey, ECF No. 251-4, PageID.6066-6067.)

The Court will use the 2023 survey[3] because it was not available when Plaintiff filed his motion and the 2020 survey was several years old at the time. The more current rates are reasonable because they account for the delay in payment.

The medical malpractice rates are not appropriate here. Although Plaintiff asserted medical malpractice claims in the alternative, the crux of his action was for a violation of his constitutional rights. That was the claim to which most of the pre-trial litigation was devoted, particularly dispositive motion practice. Also, as Defendants note, Plaintiff did not succeed on any medical malpractice claims. Those claims can be more complex than other types of claims, but that is often because of the expertise necessary to understand and demonstrate them. Here, Plaintiff's claims were not particularly complex from a medical standpoint, and Plaintiff's supporting evidence for the medical malpractice claims was noticeably underdeveloped. Plaintiff failed to offer any standard-of-care expert for a nurse practitioner. Plaintiff's standard-of-care expert for a nurse

---

[3] https://www.michbar.org/file/pmrc/pdfs/2_2023EOL_SurveyResults.pdf.

treating alcohol withdrawal had relatively limited experience and barely qualified as an expert for the Grand Rapids area.

The Court concludes that a rate of $450 per hour is appropriate for Damico, which is the 75th percentile for a civil rights attorney in Michigan and is slightly higher than the average rate for a personal injury attorney. The higher rate accounts for Damico's skill, experience, and reputation. At $450 per hour, her fee is $452,205.00.

### (b) Gorski

Plaintiff asks for a rate of $350 per hour for Gorski, who was licensed to practice law in May 2017 and is an associate attorney. After Gorski examined a witness at trial, Damico indicated that it was Gorski's first witness examination in her career. (Trial Tr., PageID.8184.) The Court concludes that $200 per hour is a reasonable fee for her work, which accounts for her limited skill, experience, and reputation, as well as her limited contribution to the case. Much of her time involved attending the trial, assisting Damico. At $200 per hour, her total fee is $20,380.00.

Combining the above amounts, the total attorney's fee is $472,585.00.

### 3. Supplemental Fees & Motion to Strike

After filing the initial motion for attorney's fees, Plaintiff filed a supplemental motion asking for additional fees for time spent to respond to Defendants' motion for judgment as a matter of law and to Defendants' objections to the initial bill of costs, which resulted in an amended bill of costs that received no objections by Defendants.

Plaintiff asserts that counsel (Damico) spent an additional 94.70 hours. This amount is reasonable. At $450 per hour, the additional attorney's fee is $42,615.00.

Defendants argue that the Court should strike the supplemental motion because it is untimely. As discussed above, however, the supplemental request is timely. It is also appropriate under the circumstances.

Defendants further argue that the Court should strike the supplemental motion because it contains arguments responding to Defendants' objections to the attorney fee request.  Defendants contend that the supplemental motion is an improper reply filed without leave of the Court.  Nevertheless, the Court will allow the reply because it aids the Court's resolution of Plaintiff's motion for attorney's fees.  Accordingly, the Court will deny Defendants' motion to strike.

### 4. Total Attorney's Fees

Based on the foregoing, Plaintiff is entitled to attorney's fees in the amount of $515,200.00

## VI.   PREJUDGMENT INTEREST

Plaintiff asks for an award of prejudgment interest, accruing from the date of Jones's death.  "Prejudgment interest is appropriate if needed to make a plaintiff whole."  *Lentz v. City of Cleveland*, 333 F. App'x 42, 51 (6th Cir. 2009) (citing *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170 (6th Cir. 1996)).  "But awarding prejudgment interest is at the discretion of the district court[.]"  *Id.*  "One instance when the denial of the award is appropriate is when . . . the district court concludes that the plaintiff has been compensated fully for the injury he has suffered."  *Young v. Langley*, No. 87-1446, 1988 WL 12805, at *1 (6th Cir. Feb. 19, 1988).

Here, the jury awarded substantial compensation to Plaintiff for the conscious pain and suffering of Jones, for the loss of the society and companionship to his heirs up to the date of the verdict, and for the loss of the society and companionship to his heirs "in the future."  (Verdict, ECF No. 243, PageID.5677.)  The verdict form also instructed the jury to state the "total amount of actual or compensatory damages that Plaintiff is entitled to[.]"  (*Id.*)  Thus, the verdict form and the amounts awarded reflect the jury's intent to fully compensate Plaintiff as of the date of the verdict.  Accordingly, Plaintiff is not entitled to prejudgment interest.

**VII. CONCLUSION**

For the reasons herein, the Court will deny Defendants' motion for judgment as a matter of law and for a new trial.  The Court will also deny Defendants' motion to strike.  The Court will grant Plaintiff's amended bill of costs.  The Court will grant Plaintiff's motion for attorney's fees and supplemental motion for attorney's fees as set forth herein.  The Court will award $24,000.00 in costs and $515,200.00 in attorney's fees.  The Court will not award prejudgment interest.

The Court will enter an order and amended judgment in accordance with this Opinion.

Dated: August 24, 2023                    /s/ Hala Y. Jarbou
                                          HALA Y. JARBOU
                                          CHIEF UNITED STATES DISTRICT JUDGE